ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 21-3032

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

**v.**

THEODORE B. DOUGLAS,
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

BRIEF OF APPELLANT

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

TONY AXAM, JR.
Asst. Federal Public Defender
625 Indiana Avenue, NW
Washington, DC 20004
(202)208-7500
tony_axam@fd.org

District Court
Cr. No. 20-121 (CJN)-2

# <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF AUTHORITIES..................................................................... iii

JURISDICTIONAL STATEMENT.............................................................1

CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES ............1

ISSUES PRESENTED FOR REVIEW .....................................................1

STATEMENT OF THE CASE ..................................................................2

      A.     Statement of Facts...................................................................2

            1.     The Hearing on the Motion to Suppress Evidence........3

            2.     Argument on the Motion to Suppress...........................9

            3.     District Court Ruling on the Motion to Suppress........11

            4.     Guilty Plea and Sentence .............................................12

SUMMARY OF ARGUMENT...................................................................13

ARGUMENT AND AUTHORITIES ........................................................15

I.     The officers' seizure of Mr. Douglas was unjustified
      and violated his Fourth Amendment rights..............................15

     A.     Standard of Review ...........................................................15

     B.     The characterization of the location of Mr. Douglas's
         arrest as a "high-crime" area, the "hand to hand exchange"
         of a backpack and a "light colored object," and
         Mr. Douglas's choice to wear the backpack under his
         coat did not establish reasonable suspicion justifying
         a stop and frisk ..................................................................15

C.      Given the totality of circumstances, the amount of
        force police used was unreasonable for a *Terry* stop,
        and thereby converting the stop into an arrest....................29

D.      The district court finding that Officer Poupart
        immediately recognized the presence of a gun
        upon frisking Mr. Douglas was clearly erroneous................39

CONCLUSION........................................................................................47

CERTIFICATE OF COMPLIANCE .......................................................47

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Williams,* 407 U.S. 143 (1972) .................................................32

*Beals v. Finkenbiner*, 12 App. D.C. 23 (1897)....................................40-41

*Brown v. Texas*, 443 U.S. 47 (1979) .........................................................15

*California v. Hodari D.*, 499 U.S. 621 (1991) ........................................16

*Farrar v. United States*, 275 F.2d 868 (D.C. Cir. 1959).....................40-41

*Florida v. Royer*, 460 U.S. 491 (1983)......................................................33

*Graham v. Connor*, 490 U.S. 386 (1989).....................................29, 35-36

*Illinois v. Wardlow*, 528 U.S. 119 (2000)..........................................17, 27

*Jackson v. United States*, 353 F.2d 862 (D.C. Cir. 1965)............ 40, 41, 42

*Kansas v. Glover*, 140 S. Ct. 1183 (2020)...........................................26-27

*Lundstrom v. Romero*, 616 F.3d 1108 (10th Cir. 2010) ..........................31

*Minnesota v. Dickerson,* 508 U.S. 366 (1993) ....................................43-44

*Navarette v. California*, 572 U.S. 393 (2014)....................................26-27

*Norris v. Alabama*, 294 U.S. 587 (1935)............................................40-41

*Ornelas v. United States*, 517 U.S. 690 (1996).......................................15

*Terry v. Ohio,* 392 U.S. 1 (1968) .........4, 9-14, 18, 22, 24, 26-27, 29-39, 46

*United States v. Acosta-Colon*, 157 F.3d 9 (1st Cir. 1998)................35-36

*United States v. Arvizu,* 534 U.S. 266 (2002) ....................................24-25

*United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011) ..............17-18

*United States v. Black*, 707 F.3d 531 (4th Cir. 2013) ............................. 18

*United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003) ....... 19, 25, 27-28

*United States v. Castle*, 825 F.3d 625 (D.C. Cir. 2016) ............... 17, 27-28

*United States v. Cortez*, 449 U.S. 411 (1981) .................................... 15-16

*United States v. Drakeford*, 992 F.3d 255 (4th Cir. 2021) ..................... 37

*United States v. Dykes*, 406 F.3d 717 (D.C. Cir. 2005) ..................... 29, 32

*United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001) ....... 24-25, 27-28

*United States v. Fiseku*, 915 F.3d 863 (2d Cir. 2018) ............................ 31

*United States v. Foster,* 634 F.3d 243 (4th Cir. 2011) ........................... 24

*United States v. Garrett*, 959 F.2d 1005 (D.C. Cir. 1992) ................. 22-23

*United States v. Gibson*, 19 F.3d 1449 (D.C. Cir. 1994) ........................ 28

*United States v. Holmes*, 385 F.3d 786 (D.C. Cir. 2004) ............. 31-32, 33

*United States v. Holmes*, 505 F.3d 1288 (D.C. Cir. 2007) ...................... 15

*United States v. Jackson*, 587 F. App'x 483 (10th Cir. 2014) ................ 21

*United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000) ..... 21-22, 27-28

*United States v. Laing*, 889 F.2d 281 (D.C. Cir. 1989) .......... 29, 30, 32-33

*United States v. Lovelace*, 357 F. Supp. 2d 39 (D.D.C. 2004) ................ 27

*United States v. Matthews*, 373 F. App'x 386 (4th Cir. 2010) ............... 21

*United States v. McLendon,* 378 F.3d 1109 (D.C. Cir. 2004) ................. 35

*United States v. Melendez-Garcia,,*
    28 F.3d 1046 (10th Cir. 1994) ...................................................... 36

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) ........................... 31

*United States v. Roberson*, 90 F.3d 75 (3d Cir. 1996)............................18

*United States v. Sharpe,* 470 U.S. 675 (1985)........................................29

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948).....40-41

*Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996) ......................30-31

## Constitutional Provision

Fourth Amendment .......................................................... 1, 15, 18, 24, 37

## Additional Authorities

L. Song Richardson, *Police Efficiency and the Fourth Amendment*, 87 Ind. L.J. 1143, 1148 (2012) ...............................................................37

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), defendant-appellant Theodore Douglas hereby states as follows:

### A. Parties and Amici:

This appeal arises from a criminal conviction of defendant-appellant Theodore Douglas by plaintiff-appellee, the United States of America. There are no intervenors or *amici.*

### B. Rulings Under Review:

This is an appeal from the judgment of the district court (the Honorable Carl J. Nichols) entered May 4, 2021, imposing sentence after conviction for one count of possession of a firearm by a person previously convicted of a crime punishable by greater than one year in prison in violation of 18 U.S.C. § 922(g).  In this appeal, Mr. Douglas seeks review of the district court's December 10, 2020 Order and Memorandum Opinion denying Mr. Douglas's motion to suppress evidence under the Fourth Amendment. App158. The district court court's opinion is reported at *United States v. Williams*, 507 F. Supp.3d 181 (D.D.C. 2020).

**C. <u>Related Cases</u>:**

There currently are no related cases. On May 7, 2021, the district court granted the government's motion to dismiss without prejudice the case of co-defendant Tavonte Williams.

Mr. Douglas's case has not previously been before this Court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. A timely notice of appeal having been filed, this Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

The Fourth Amendment to the Constitution of the United States of America provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV

## ISSUES PRESENTED FOR REVIEW

**I.**     Whether appellant's presence in an area deemed "high-crime," his receipt of a backpack from another person in exchange for an unidentified object, and the choice to wear the backpack under his coat rather than over it created reasonable suspicion for officers to stop and frisk appellant.

**II.**    Whether officers' physical removal of appellant from one location to another, their placement of handcuffs on him, and the two-officer frisk was an unreasonable amount of force for a *Terry* stop given the facts in this case, and therefore amounted to an arrest.

**III.**    Whether the district court's finding was clearly erroneous that it became "immediately apparent" to Officer Poupart while he was frisking appellant, that appellant had a gun on his person.

## STATEMENT OF THE CASE

### A.  Statement of Facts.

On April 23, 2020, the government filed a one-count complaint against Theodore Douglas and his co-defendant, Tavonte Williams, charging each with possession of a firearm by a person previously convicted of a crime punishable by greater than a year imprisonment in violation of 18 U.S.C. § 922(g). App12.[1] On July 21, 2020, the government filed an indictment for the same charge against each defendant. Mr. Douglas and Mr. Williams filed motions to suppress evidence for which the district court held an evidentiary hearing on October 20, 2020.

---

[1] "App__" refers to the Appellant's Appendix filed with this Brief.

## 1. The Hearing on the Motion to Suppress Evidence.

MPD Officer Isaac Jackson testified that at 3:00 p.m. on April 22, 2020, he was working in an undercover capacity as a member of the Narcotics Special Investigation Division. App227. He said that he had ten years' experience in the narcotics enforcement unit and twenty years' as a police officer. App216. He was inside a parked car on a public street in the 2300 block of 15th Street Northeast that he referred to as an observation post. App227. He was in radio communication with an arrest team of 10-15 nearby uniformed officers. App297.

While in his observation post, he was looking for "hand to hand transactions" involving drugs, which he said were usually preceded by individuals talking, one of person passing money to the other, and then that other person going to a stash and returning with a "secretive hand movement." App219, 222. Officer Jackson said that individuals engaged in these transactions are often looking around, presumably to see if anyone is watching, and holding their bodies to obstruct others' views of their actions. App223. At the conclusion of such an exchange, the two individuals usually separately depart the area. App312, 322. He stated that he also keeps an eye out for guns, which might be suggested by

3

movements to conceal something at a person's waist or pockets using their hand or arm. He stated that he had not heard of cases where bulk narcotics or firearms were transferred out in the open, but was familiar with such transfers in a car or building. App225.

Officer Jackson identified the Fifth District, where Mr. Douglas was arrested, as a "high-crime area" (as compared to other districts except Sixth and Seventh Districts) App227. He stated that he previously had seen drug activity near the walkway where Mr. Douglas was arrested. App237.

Officer Jackson testified that on the afternoon of April 22, 2020, he saw Mr. Douglas standing in the walkway between apartment buildings talking to two other individuals. App238, 279. Other people were also nearby, going about their business. App237, 326-27. A third person, who was later identified as Tavonte Williams, walked up to Mr. Douglas and handed him a backpack. App269. Neither Douglas nor Williams opened the backpack, took anything out of it, or put anything into it. App275. Rather, Mr. Douglas took off his coat, put the backpack on his back, and put his coat back on. 238.

Officer Jackson initially testified that after Mr. Douglas took the backpack, he "could have handed [Mr. Williams] some sort of U.S. currency, some money" with a handshake,(App238), but subsequently clarified that, at a distance of 15 yards, he "could not say that it was U.S. currency." App275-76, 278. He ultimately stated that what he had termed a "hand to hand exchange" involved "a light colored object" – not paper, and not currency. App298, 314. He also later admitted that he made an "assumption" that he had seen a drug sale because Williams handed the backpack to Mr. Douglas who immediately put it on and there was a handshake between the two where it looked like a "light colored object" had been passed. App313-14. After putting on the backpack, Mr. Douglas "stood there for some time." App247.  Douglas and Williams then briefly meandered out of Officer Jackson's line of sight, but returned within seconds. App251. Jackson broadcast a description of Douglas and Williams for the arrest team to move in and detain them. App248. Once each was stopped, Officer Jackson positively identified them. App260-61.

MPD Officer Maxwell Poupart testified that he was a member of the arrest team supporting Officer Jackson on April 22, 2020. App345. He

and Officer Brianna Taylor stopped Mr. Douglas within 60-90 seconds of Officer Jackson's lookout broadcast. App346, 349.

Poupart was in full uniform with his firearm holstered and visible at his side as he approached Douglas. App346-47; 375. Mr. Douglas did not flee or try to evade Poupart. App 364. Poupart could see Mr. Douglas's hands at his sides. App367. He directed Douglas to "come over" and Mr. Douglas complied. App364. Poupart pulled out his handcuffs and grabbed Mr. Douglas by the arm, while Officer Taylor touched his other arm, with both of them leading him away from Mr. Williams and another person who was standing with them. App348; Gov't Ex. 4 at 19:02:32.[2] Officer Poupart told Douglas he was being stopped as part of an investigation. Gov't Ex. 4 at 19:02:38. Poupart testified that although no one was making threatening gestures or movements, he was concerned for his safety solely because other individuals were nearby. App372. While walking with Officers Poupart and Taylor, Mr. Douglas placed his hands behind his back and Poupart handcuffed him. App349, 370). There was

---

[2] Government Exhibit 4 is the body-worn-camera of Officer Poupart depicting this arrest. Specific moments on the body-worn-camera video were referenced during the motion hearing by the running timestamp in the upper right corner of the video.

no resistance, only complete submission to Poupart's authority. App364-65. After Mr. Douglas was handcuffed, Officer Taylor reached from front to back and frisked Mr. Douglas's back area and also unzipped his coat and frisked his front. Gov't Ex 4 19:02:51; Defense Ex. 3 19:03:06; 19:03:13-34. Government Exhibit 4 depicts a voice saying, "He have a book bag underneath his coat," after which Officer Poupart can be seen placing his hand on Mr. Douglas's back on the outside of his puffy coat, moving his thumb and forefingers around while squeezing. Gov't Ex. 4 at 19:02:056-19:03:17.

Officer Poupart testified that when he first touched the backpack at 19:02:56, he felt something that he suspected was not a gun that later turned out to be a sunglasses case. App377. The backpack appears to made of leather or a leather-like material with padding on the inside and more than one compartment. *See* Gov't Ex. 4 at 19:03:53; 19:07:52. Poupart identified 19:03:10 as the point that he felt he was touching a gun. App375-76, 379. Until that point, he was "squeezing to figure out" what he was touching. App380.

According to Officer Poupart, once he believed there was a gun in the bag, he and Taylor removed Douglas's coat. App383. With his hand on

7

the zipper of the bag, Poupart asked Douglas for permission to search the bag, which Douglas declined to give while repeating that the bag had glasses in it. App384; Gov't Ex. 4 at 19:03:56. Without opening the zipper of the bag, Officer Poupart stated, "I don't know if that's glasses man." Gov't Ex. 4 at 19:04:00. Poupart and Taylor then stood holding Mr. Douglas on each side for nearly a minute while Taylor frisked him a third time. Gov't Ex. at 19:04:01; Defense Ex. 3 at 19:04:09-16. Officer Poupart then radioed to another officer and asked if Douglas was "good for a search?" Gov't Ex. 4 at 19:05:01. He received a response, immediately unzipped the backpack and, for the first time, Poupart alerted other officers with the code word for the presence of a gun – "1-800 . .. blue jacket is 1-800." Gov't Ex. 4 at 19:05:13.

Officer Poupart explained that the reason he asked Mr. Douglas for consent to search his bag was to "giv[e] him the opportunity to be honest" as a "courtesy," even though he felt he already had a basis to search. App375. He further explained that the reason he did not search the bag immediately after Mr. Douglas denied him consent was because he did not know if Williams had been stopped, and he wanted to be sure "the scene was secure." App387. In fact, he claimed that when he

8

subsequently radioed to ask if Mr. Douglas was "good for a search," his question would have been understood by other officers as an expression asking whether the scene was secure. App391. Finally, Officer Poupart admitted that prior to opening the backpack and seeing the gun, he had not notified his partner that he had felt a gun, either directly or through a signal. App392.

Officer Taylor confirmed that there were at least seven other offices present at the moment she and Officer Poupart detained Mr. Douglas. App403. She also testified that when Poupart asked if Mr. Douglas was good to be searched, she interpreted the question at face value, not as asking whether the scene was secure. App405-06.

## 2. Argument on the Motion to Suppress

In his written briefing, Mr. Douglas argued that Officer Jackson's observations did not amount to reasonable suspicion to stop him and objected to the suggestion that that citizens in parts of the city where crime rates are higher have diminished expectations of privacy when compared to citizens in other parts of the city. App98-99, n. 1. Mr. Douglas further submitted that even if there was grounds for a *Terry*

stop, there was no basis for police to believe that he was armed and dangerous so as to justify his subsequent frisk. App18; App142.

Mr. Douglas also argued that the officers' immediate handcuffing and frisking of him amounted to an arrest, for which there was no probable cause. App140-41. Additionally, the officer's manipulation of the backpack during the "frisk" exceeded permissible bounds and amounted to a full blown search for which there was no probable cause. App101-02; App142-43. Finally, Mr. Douglas submitted that the record evidence did not support crediting a claim that Officer Poupart "immediately recognized" a firearm during his frisk of Mr. Douglas. App142-43 n.3 & 4.

In opposition, the government argued that Mr. Douglas's initial stop and frisk were supported by reasonable articulable suspicion based and that the handcuffing did not convert the stop into an arrest. App115. Notably, the government did not explicitly argue in post-hearing briefing that it was "immediately apparent" to Officer Poupart during his frisk that there was a gun in the backpack. Rather, the government submitted that the frisk of Mr. Douglas was "minimally invasive" and "sufficiently long enough to allow Ofc. Poupart to distinguish between two separate

10

items inside the book bag and to identify one of the items as a firearm" under the plain feel doctrine, which then provided probable cause. App117.

### 3.  District Court Ruling on the Motion to Suppress.

On December 10, 2020, the district court issued a Memorandum Opinion denying the defendants' motions. App158. The court ruled that police had reasonable suspicion to stop Mr. Douglas, first, because of his presence in a high-crime area; second, because the officer's experience with "hand to hand transactions" led him to believe that "bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack"; and third, because Mr. Douglas's attempt to conceal the backpack under his coat amounted to "furtive conduct." App175-76.

The court ruled that handcuffing Mr. Douglas did not convert the stop into an arrest because it was reasonable for officers to fear for their safety during a *Terry* stop given that: "(1) [there were] two unidentified men in close proximity to Douglas; (2) the second suspect involved in the backpack transaction remained unaccounted for; (3) the transaction [Officer Poupart] was responding to involved a bag, capable of concealing a weapon; and (4) the reported transaction sounded like a narcotics

11

transaction and in Officer Poupart's experience drug traffickers are often armed." App178 (citing Tr. at 140-42, 165, 185-86, 187).

Finally, the court ruled that police did not exceed the bounds of a *Terry* frisk because in the course of the frisk, Officer Poupart "lightly touched the back of Douglas's jacket just a few times," and "testified that the shape and weight of the object made it immediately apparent that he was touching a firearm." App181. In this regard, the court implicitly credited Officer Poupart's testimony on this point without explicitly reconciling other inconsistent evidence and testimony.

### 4. Guilty Plea and Sentence.

On March 17, 2021, Mr. Douglas entered a conditional guilty plea to the single count of the indictment pursuant a written plea agreement allowing him to appeal the district court's denial of his motion to suppress tangible evidence.

On May 4, 2021, the court sentenced Mr. Douglas to 15 months' imprisonment followed by three years' supervised release and imposed a $100 special assessment. On May 7, 2021, the district court granted the government's motion to dismiss without prejudice the indictment against Tavonte Williams.

12

On May 24, 2021, Mr. Douglas filed a timely notice of appeal.

## SUMMARY OF ARGUMENT

Police lacked reasonable suspicion to stop Mr. Douglas based solely on his presence in a "high-crime" area, his receipt of a small backpack for an unidentified item, and his placement of his backpack on his back under his coat. The act of receiving a bag from someone in exchange for of an unidentified object, even in a "high-crime" area, is not objective conduct that establishes reasonable suspicion of a crime. In the absence of an explanation for why such conduct could be interpreted as criminal, this evidence did not establish or add to a basis for reasonable suspicion in this case. Neither did the act of wearing a backpack under a coat out of view, especially when such "concealment" of a bag is not done in response to police presence. Given that there was not otherwise an objective basis for concluding that Mr. Douglas committed a crime, his stop was unlawful.

Even if there were a way to interpret the facts in this case to establish reasonable suspicion, the totality of circumstances and the weak basis for stopping Mr. Douglas would not justify the amount of force used in doing so. The physical seizure and relocation, handcuffing, and multiple frisks

of Mr. Douglas exceeded a reasonable degree force in order to remain a *Terry* stop instead of an arrest, especially in light of Mr. Douglas's lack of evasion, complete submission and cooperation, and the absence of any particularized reason to believe that he was armed and dangerous. Given the totality of circumstances in this case, the escalating use of force against Mr. Douglas converted his stop into an arrest without probable cause.

Lastly, the record establishes that the district court clearly erred in finding that during the frisk of Mr. Douglas, it was "immediately apparent" to Officer Poupart that he was touching a gun. Officer Poupart's testimony that he discovered the gun before his search of Mr. Douglas's backpack was highly questionable and his behavior – that is, taking absolutely no action with regard to the gun – was at variance with normal expectations of how an officer finding a gun on a drug suspect would react. Under the doctrine of inherent incredibility, this Court should rule it was clear error to find that Officer Poupart felt a gun on Mr. Douglas during the frisk that took place before the officer's unzipping and full search of the backpack.

14

## ARGUMENT AND AUTHORITIES

**I.  The officers' seizure of Mr. Douglas was unjustified and violated his Fourth Amendment rights.**

**A. Standard of Review.**

When reviewing a district court's denial of a motion to suppress, this Court "consider[s] a district court's legal rulings on a suppression motion de novo and review[s] its factual findings for clear error giving 'due weight to inferences drawn from those facts' and its determination of witness credibility." *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). "[A]s a general matter, determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas*, 517 U.S. at 699.

**B. The characterization of the location of Mr. Douglas's arrest as a "high-crime" area, the "hand to hand exchange" of a backpack and a "light colored object," and Mr. Douglas's choice to wear the backpack under his coat did not establish reasonable suspicion justifying his stop and frisk.**

Reasonable suspicion "must be based on specific, objective facts," *Brown v. Texas*, 443 U.S. 47, 51 (1979), and requires that "the detaining officers . . . have a particularized and objective basis for suspecting the

15

particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Officers Poupart and Taylor seized Mr. Douglas the moment they came upon him, with the officers taking positions on each side of him, and Officer Poupart immediately grabbing him by the arm and handcuffing him while simultaneously leading him away. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement.").

Officers seized Mr. Douglas based solely on Officer Jackson's information. App175. According to the district court, Officer Jackson's information that Mr. Douglas: (1) was present in a high-crime neighborhood; (2) had engaged in a "hand to hand exchange"; and (3) had removed his coat to place a backpack on his back thereby concealing it under his coat (a "furtive movement"), collectively established reasonable suspicion that Mr. Douglas was engaged in criminal activity. App175-76. Contrary to the district court's conclusion, the objective facts underlying the totality of these circumstances did not establish reasonable suspicion to stop and frisk Mr. Douglas.

16

First, Officer Jackson's designation of the area where Mr. Douglas was arrested as "high-crime" is of limited significance in an assessment of  reasonable suspicion in this case. "[T]he high crime nature of the neighborhood . . . is not unimportant. But it is only a 'contextual consideration[ ]' and, as such, cannot provide the kind of information particular to Appellant that is necessary to demonstrate reasonable suspicion." *United States v. Castle*, 825 F.3d 625, 636 (D.C. Cir. 2016) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). This is true because "presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry." *Wardlow,* 528 U.S. at 139 (Stevens, J., concurring in part and dissenting in part).

The designation of the neighborhood here was indeed generic and Mr. Douglas's objectively innocent conduct was not susceptible to re-characterization as criminal based solely on the neighborhood. *See, e.g., United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011) (fact that housing project where defendant was stopped was known for drug trafficking was a not a basis for finding reasonable suspicion where, upon

17

officer's approach, pedestrian ceased interaction with second individual and hurriedly walked away at 2:30 a.m.).

Officer Jackson testified that the Fifth District was a high-crime area when compared to the First, Second, Third, and Fourth Districts, but not compared to the Sixth and Seventh Districts. App226-27. This description suggested a general reason to be suspicious of behavior of persons in the Fifth District not considered suspicious in other police districts. *Cf. United States v. Roberson*, 90 F.3d 75, 80 (3d Cir. 1996) ("We simply cannot accept the Government's position that any resident of (or visitor to) that neighborhood who, without otherwise engendering suspicion, is unlucky enough to be the subject of a non-predictive anonymous tip, is subject to a *Terry* stop simply because the neighborhood is known for narcotics sales."); *see also United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013) (drawing connection between reliance on presence in "high crime area" and "implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people").

And although Jackson stated that over his twenty-year career, he was familiar with narcotic and violent crimes in the neighborhood where he

observed Mr. Douglas, and previously had seen drug transactions in the walkway where Douglas was standing, App231; 237, Jackson did not indicate any time frame for these observations. He did not state when during his time as a narcotics officer, or more specifically, when in the recent past, he had observed drug transactions in the location involved here. *See, e.g., United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (in assessing area characterized as "high-crime," Court found it relevant that "earlier in the same year, there had been 'several homicides'" and on night in question, a citizen had called police to report gunshots).

Officer Jackson also gave no indication that criminal activity in the location here had caused displacement of law-abiding activity, or if it had, what portion of street activity around those apartment buildings was criminal and what portion was ordinary neighborhood life. Even without these shortcomings in Jackson's testimony, an area's high-crime rate remains of limited significance where, as here, it sheds no light on otherwise innocent behavior observed by police.

In particular, the district court's second factor in support of reasonable suspicion was Officer Jackson's observation of a "hand to

hand exchange." App175. Although the court acknowledged that a "hand to hand exchange" could be innocent, it treated the exchange here as a reason to believe that Mr. Douglas was engaged in criminal activity despite the absence of any objective indicia thereof.

Foremost, Officer Jackson testified that he saw Mr. Douglas receive a bag and, although he initially thought he saw Mr. Douglas hand U.S. currency to the person later identified as Mr. Williams, he ultimately clarified that he could not see what Mr. Douglas handed to Mr. Williams after receiving the bag, only that it was an unidentified light colored object. App275 (Officer Jackson testifying, "I could not say the it was U.S. currency. . ."); App313 (Officer Jackson admitting that he "[didn't] know if there was money" and it was "an assumption" that there was a sale.); App314 (Officer Jackson confirming that he was "not saying [he] could tell it was paper."). Indeed, the district court did not make or explicitly rely upon a finding that money was observed or passed. Thus, the evidence was that Mr. Douglas received a bag and handed something to the person who gave him the bag.

There was nothing remotely criminal about Mr. Douglas's conduct, even when described in the "hand to hand" parlance common in drug

cases. *Compare United States v. Matthews*, 373 F. App'x 386, 392 (4th Cir. 2010) (describing as a "hand-to-hand drug sale" the act of a "female hand[ing] paper currency to the [defendant], who reached into the bag, removed an item, and passed it to her"); *United States v. Jackson*, 587 F. App'x 483, 484 (10th Cir. 2014) ("The agents then observed [the buyer] exchange money with [the defendant] for an item passed by [the defendant] through the driver's side window, after which [the buyer] walked away. Based on their training and experience, the agents believed they had witnessed a hand-to-hand drug transaction."). There was no drug exchange here. Rather, the facts of Mr. Douglas's case approximate aspects of *United States v. Johnson*, 212 F.3d 1313, 1314 (D.C. Cir. 2000), where an officer patrolling in a "high narcotics area" saw the defendant and another person in a parked car in a parking lot at a location where the officer had been involved in numerous narcotics arrests. *Id.* The officer saw a woman lean into the car and hand the defendant an unidentified object. *Id.* As the officer approached in his unmarked car, he saw the woman walking away while the defendant was making a "shoving down" motion, leading the officer to believe that he might be armed. *Id.* at 1315. The officer drew his gun and shouted, "Let me see

your hands." *Id.* Though not a seizure because the defendant did not submit, this Court noted that "[i]f the seizure had taken place at that point, we doubt very much whether it would have been valid." *Id.* That is, the fact of passing something hand to hand inside of a car in a high drug area would likely not provide reasonable suspicion; and, as further discussed *infra*, the additional factor of the defendant's shoving motion did not amount to a "furtive movement" since it was not "undertaken in response to police presence." *Id.*

Mr. Douglas's case and the persuasive authority of *Johnson*, contrast with *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992), where the Court found a stop was valid under *Terry* after officers received a citizen's detailed tip describing car from which a person was selling drugs at a specific location known to police as a "high narcotic area"; they saw the defendant near the car and observed him engage in a hand to hand exchange of a "small object" for money with another individual; and an officer explained the criminal significance of the exchange in context of his experience.

Unlike in *Garrett*, there was no citizen's complaint describing illegal conduct at Mr. Douglas's location or describing Mr. Douglas or someone

22

associated with or near him as being involved in a crime. Also, crucially, Officer Jackson did not observe the exchange of small objects or money. And although the district court relied on the claim that "in [Officer Jackson's] experience bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack" as a basis for reasonable suspicion App175. (citing Tr. 17-18), Officer Jackson did not provide a foundation for this conclusion and never suggest the reverse – that transfers of bags such as backpacks frequently involve contraband. Nor did he explain why the passing of something "concealed" in a bag – the situation every time a closed bag is passed – was a reason to believe that a crime had occurred. Furthermore, he did not explain what objective factor drawn from his experience indicated any likelihood whatsoever that the passing of a bag from one person to another in an open public area in broad daylight involved "bulk transfers of narcotics or firearms," even in a high-crime area. In fact, Officer Jackson said that he had not heard of "bulk transfers of narcotics or firearms" occurring out in the open but had seen instances where "those transactions took place

in the vehicle, the building, like, sometimes in a free area outside in a particular area."[3] App225.

Under the Fourth Amendment the government must "be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *United States v. Foster,* 634 F.3d 243, 248 (4th Cir. 2011). *See, e.g., Terry v. Ohio,* 392 U.S. 1, 28 (1968) (relying on officer's explanation as to why, in his experience, the conduct he observed was not innocent but was consistent with potential thievery from stores); *United States v. Arvizu,* 534 U.S. 266, 269–71 (2002) (relying on border patrol officer's explanation of why pattern of behavior by minivan and its occupants indicated likely smuggling of drugs or illegal aliens); *Edmonds,* 240 F.3d at 60–61 (relying on officer's explanation as to why,

---

[3] Officer Jackson did not state what he meant by "a free area outside in a particular area," but given the context, was likely referring to an "open air drug market," not alleged to exist here. *See, e.g., United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) (referencing testimony about high-crime area that was an "open air drug market" where primarily cocaine and marijuana were sold in the open).

24

in his experience, defendant's actions were consistent with someone trying to hide something from police under a car seat); *see also Brown*, 334 F.3d at 1177 (finding officers lacked reasonable suspicion where officers did not explain why being "sized up" by driver, or why "furtive gesture" of car's occupant moving from back to front seat, created reason to believe defendant was engaged in criminal activity in separate car). Without any distinction by Officer Jackson between the innocent transfer of a bag and a criminal one, there was no basis for a finding that the transfer of the backpack here established reasonable suspicion of a crime.

Moreover, based on patterns of criminal behavior that Officer Jackson did describe from his experience, the "hand to hand exchange" here lacked any of the criteria that would suggest that a crime was taking place, thereby undermining a reasonable suspicion finding. For example, Officer Jackson said that individuals involved in hand to hand drug transactions are typically "looking around" and holding their bodies so others cannot see what they are doing as they are "trying to be secretive and reaching on their person." App223. Yet, he did not claim that he observed Mr. Douglas or any individual near Mr. Douglas engaged in such behavior.

Officer Jackson described drug transactions as usually involving a person "going to a stash location, where they could get their narcotics or drugs from and subsequently go back to that [other] person and give that item to them." App223. He witnessed no such sequence of behavior here. Crucially, as noted above, he also said he "look[s] for the exchange of currency, money," but did not identify money in the exchange here. *Id.*

Officer Jackson additionally testified that he would normally expect the parties to a drug transaction to inspect the product, but stated that neither Mr. Douglas nor Mr. Williams took such action here. App313.

Finally, Jackson explained that usually after a hand to hand exchange of contraband, the parties to the transaction separate and disperse. App312. In this case, he did not observe Mr. Douglas or Mr. Williams separate and disperse, but instead testified that Mr. Douglas "stood there for some time" and then walked out of his field vision *with* Mr. Williams only for them both to return to his view a moment later. App347, 351.

The Supreme Court has emphasized that because "[t]he standard [for a seizure] takes into account the totality of the circumstances – the whole picture[,] . . . the presence of additional facts might dispel reasonable

26

suspicion." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (citing *Navarette v. California*, 572 U.S. 393, 397 (2014); *Terry*, 392 U.S. at 28)). Here, the additional facts drawn from Officer Jackson's experience certainly tended to dispel reasonable suspicion that Mr. Douglas was committing a crime.

There was not otherwise a basis for Mr. Douglas's seizure because the third factor identified by the district court as contributing to reasonable suspicion – Mr. Douglas's removal of his coat in order to place the backpack on his back under his coat – added nothing to the calculus. According to the district court, Mr. Douglas tried "'to conceal whatever was in the book bag'" and "'tried to hide the book bag on his person by covering it up with his jacket.'" App176 (citing testimony of Officer Jackson at Tr. 30; 102-03). The court characterized this conduct as "[f]urtive movements . . . consistently recognized as grounds for reasonable suspicion, justifying a stop and frisk." App176 (citing *United States v. Lovelace*, 357 F. Supp. 2d 39, 43 (D.D.C. 2004) (citing *Wardlow*, 528 U.S. at 124)).

Although courts have consistently found that furtive movements can contribute to reasonable suspicion, this Court has repeatedly held that

27

"in the context of a reasonable, articulable suspicion analysis, 'furtive gestures are significant only if they were undertaken in response to police presence.'" *United States v. Castle*, 825 F.3d 625, 629 (D.C. Cir. 2016) (quoting *Brown*, 334 F.3d at 1168 (quoting *Edmonds*, 240 F.3d at 61-62 (quoting *Johnson*, 212 F.3d at 1316-17)) (cleaned up)).

In this case, assuming arguendo that Mr. Douglas's actions in removing his coat to place his backpack on his back were an effort to "conceal" the backpack, there is no evidence that Mr. Douglas took these actions *in response to police presence*. His actions therefore are not properly characterized as "furtive." They do not contribute to reasonable suspicion as citizens are entitled to keep their property from public view. *See United States v. Gibson*, 19 F.3d 1449, 1452 (D.C. Cir. 1994) ("The Fourth Amendment stands in the way of the police arresting people simply because they appear suspicious and may be hiding something."). Left with Mr. Douglas's presence in an area described as "high-crime" and the innocent act of receiving a backpack in exchange for an unidentified item, there was not reasonable suspicion to stop him. The district court's contrary ruling therefore must be reversed.

## C.    Given the totality of circumstances, the amount of force police used was unreasonable for a *Terry* stop, and thereby converted the stop into an arrest.

"Although an investigative stop is not an arrest, it may become one if the duration of the stop or the amount of force used is 'unreasonable' under the circumstances." *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) (citing *United States v. Sharpe,* 470 U.S. 675, 682–88 (1985)).

In deciding whether the force used is reasonable, courts must look to "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id. United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)). The circumstances in the immediate case did not support the degree of force used against Mr. Douglas in view of these factors.

When officers ordered Mr. Douglas to come over to them, physically grabbed him, led him away, handcuffed him, and frisked him repeatedly, the severity any criminal activity was uncertain. All the officers knew was that if Mr. Douglas was involved in a crime, it was likely a possessory

29

offense given that Mr. Douglas had received a bag. They also knew that Mr. Douglas's access to whatever he had received was limited as the observing officer had reported that the bag was closed and on Mr. Douglas's back under his zipped up coat.

Moreover, there was nothing that posed an immediate threat to the safety of officers. Mr. Douglas did not present as a threat when officers approached as his hands were visible at his sides, he made no motions suggesting he possessed a weapon, and he did not attempt to evade police or behave as though he would flee. To the contrary, he calmly stood in place, followed the command to "come over here," placed his hands behind his back where they were cuffed, answered the officer's questions, and complied with their authority while undergoing an initial frisk by Taylor, an second frisk by Poupart, and an additional frisk by Taylor.

The circumstances in this case did not present a pressing need for the officers to immediately handcuff and subsequently frisk Mr. Douglas repeatedly as they did. And even though this Court has recognized that the amount of force used during a *Terry* stop "may include the use of handcuffs," *Laing*, 889 F.2d at 285, such use obviously escalates the intrusiveness of a stop. *See Washington v. Lambert*, 98 F.3d 1181 (9th

Cir. 1996) (finding that handcuffs are an "especially intrusive means of effecting a stop" and are permissible only "in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur."); *United States v. Fiseku*, 915 F.3d 863, 871 (2d Cir. 2018) ("We generally view handcuff use as a "hallmark of a formal arrest.") (citing *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004)); *Lundstrom v. Romero*, 616 F.3d 1108, 1123 (10th Cir. 2010) (ruling that handcuffing was excessive as woman "did not act in a threatening manner, nor did she refuse to cooperate with police").

The repeated frisks of Mr. Douglas while officers stood astride him holding each of his arms increased the cumulative force police were using during Mr. Douglas's stop. An officer may conduct a "protective frisk" during a *Terry* stop where he "has reason to believe, based on 'specific and articulable facts taken together with rational inferences from those facts,' that '[the officer] is dealing with an armed and dangerous

31

individual.'" *See United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (quoting *Terry*, 392 U.S. at 21). But aside from the crime underlying the dubious basis for the stop itself, there were no objective facts here to suggest that Mr. Douglas was armed and dangerous. Mr. Douglas had been nothing but cooperative, and at the time of his second frisk by Poupart, his arms were handcuffed behind his back and there was an armed officer holding either side of him with at least seven other officers present. At this point, the amount of force used against Mr. Douglas was unreasonable under the circumstances. *Terry* authorizes "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," and permits a "limited search ... not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *See Adams v. Williams,* 407 U.S. 143, 146 (1972). The degree of force police used here reflected that officers were not simply maintaining the status quo, but were searching for evidence of a crime and that Mr. Douglas was thus under arrest.

The district court did not explicitly rely upon the factors identified in *Dykes* or separately analyze whether "the amount of force used [was]

32

unreasonable under the circumstances," *Laing*, 889 F.2d 281, but instead asked only whether it was "reasonable for Officer Poupart to fear for his safety and the safety of others." App178. Certainly, there is a correlation between the two standards and an officer's reasonable fear for safety is always relevant, but under the district court's formulation, the *amount* of force police use becomes irrelevant so long as an officer has *any* reasonable fear for his safety. This approach is at odds with *Laing* which asks whether the force was unreasonable given the circumstances. *Laing,* 889 F.2d at 285, and with *Holmes*, which assesses officer safety under an objective standard of whether there is reason to believe the defendant is "armed and dangerous," *Holmes,* 385 F.3d at 786. Moreover, it conflicts with the overarching principle that a *Terry* stop should involve "the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).

The district court nevertheless based its ruling on the conclusion that it was "reasonable for Officer Poupart to fear for his safety and the safety of others" when he stopped Mr. Douglas given: "(1) [the] two unidentified men in close proximity to Douglas; (2) the second suspect involved in the backpack transaction remained unaccounted for; (3) the transaction

[Officer Poupart] was responding to involved a bag, capable of concealing a weapon; and (4) the reported transaction sounded like a narcotics transaction and in Officer Poupart's experience drug traffickers are often armed." App178. These four factors did not provide a basis for concluding that the amount of force used was reasonable necessary for a *Terry* stop in the circumstances of this case.

Addressing the last of these reasons – that "the reported transaction sounded like a narcotics transaction and in Officer Poupart's experience drug traffickers are often armed" requires an evaluation of the purported basis for reasonable suspicion in this case as well as the individualized basis for believing that Mr. Douglas was armed and dangerous. As argued *supra* at subsection B, the facts known to police at the time of the stop – that Mr. Douglas was in a high-crime area, had received a backpack in exchange for an unidentified object, and had placed the backpack on his back under his coat – did not establish reasonable suspicion of a drug transaction or a basis for believing that Mr. Douglas was armed and dangerous. Even if they somehow could be cast to establish a weak basis for reasonable suspicion of criminal activity, the facts simply did not justify the amount of force used against Mr. Douglas.

34

Given the circumstances in this case, by immediately grabbing, relocating, handcuffing and frisking Mr. Douglas, and then frisking him again while he remained physically held and handcuffed, officers exceeded a permissible *Terry* stop.

In explaining why he immediately handcuffed Mr. Douglas, Officer Poupart testified that he "almost always handcuffs" individuals when he is involved in a drug investigation, and Officer Jackson's suspicion of a drug transaction here meant a gun might be present. App349, 365. That Officer Poupart routinely handcuffs citizens he has stopped betrays the absence of a particularized assessment of the force reasonably necessary for the circumstances of a given case. That betrayal is evidence that the amount of force used against Mr. Douglas was unreasonable given the facts here.

And although this Court's caselaw "has frequently recognized that guns and drugs go together in  drug  trafficking," *United States v. McLendon,* 378 F.3d 1109, 1113 (D.C. Cir. 2004), the Supreme Court has instructed courts to look at "the facts and circumstances of each particular case" when deciding what degree of force is permissible during a *Terry* stop. *Graham*, 490 U.S. at 396. *Cf. United States v. Acosta-Colon,*

35

157 F.3d 9, 19 (1st Cir. 1998) (rejecting a "factually unanchored justification for placing [the suspect] in handcuffs" that would be "generalizable to virtually *every* investigatory stop involving a drug suspect").; *see also United States v. Melendez-Garcia*, 28 F.3d 1046, 1052–53 (10th Cir. 1994) ("Drugs and guns and violence often go together, and thus this might be a factor tending to support an officer's claim of reasonableness. However, there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop."). Given the facts and circumstances in the immediate case, the amount of force that had been employed against Mr. Douglas when Officer Poupart frisked him for a second time reflected that he was under arrest.

The other reasons the district court provided for the physical relocation, handcuffing, and frisks of Mr. Douglas – that there were "(1) two unidentified men in close proximity to Douglas;" and that "(2) the second suspect involved in the backpack transaction remained unaccounted for" – also did not add justify the degree of force police used

given the circumstances of this case. As an initial matter, it is inconsistent that Officer Poupart was concerned for his safety because two individuals *were* present near Mr. Douglas and also concerned for his safety because he believed that Mr. Williams *was not* present.[4] Poupart's concern was not based on objective facts establishing a need to increase the force used against Mr. Douglas, but on pure speculation that because he did not know anything about the other people in the area, regardless of whether they were present at or absent from the scene, they presented a threat.[5] *See* App167 (Poupart agreeing that only reason he had any concern about other individuals was because he "did not know they weren't [armed]."). In any case, Officer Poupart's reactive approach ignored the reasonable view that there were more than enough officers

---

[4] Gov't Exhibit 4 shows Mr. Williams and one other individual are present near Mr. Douglas as officers arrive. Gov't Ex. 4 at 19:02:27. Mr. Williams appears to stand in place momentarily and then slowly walk away. Gov't Ex. 4 at 19:03:08. To the extent that Mr. Williams was unaccounted for, this may have been because Officer Poupart was "essentially focused on Mr. Douglas." App348.

[5] Such an assumption may reflect underlying unconscious biases that lead to arbitrary treatment under the Fourth Amendment. *See United States v. Drakeford*, 992 F.3d 255, 267 (4th Cir. 2021) (Wynne, J., concurring) (recognizing that "'[o]ne behavioral effect of implicit bias is that it influences how individuals interpret the ambiguous behaviors of others.'" (citing L. Song Richardson, *Police Efficiency and the Fourth Amendment*, 87 Ind. L.J. 1143, 1148 (2012)).

37

to handle the two or three others nearby – a fact further suggesting that the amount of force used against Mr. Douglas was unreasonable for a *Terry* stop.

Lastly, the district court's finding that "(3) the transaction [Officer Poupart] was responding to involved a bag, capable of concealing a weapon," also was not an objective fact that made it reasonable to forcibly relocate Mr. Douglas, handcuff him, hold him in place, and frisk him repeatedly given the circumstances here. The presence of a bag was an innocuous fact about which Officer Poupart assumed the most dangerous possibility. A bag can conceal a weapon, but police are not justified in escalating the use of force simply because a bag is present. In this case, there were not otherwise a particularized facts from which to reasonably suspect that Mr. Douglas's bag contained a weapon. And even if there were, as Officer Poupart agreed, by the time that Mr. Douglas was relocated, handcuffed, and being held by two officers, it would have been "pretty hard to get what [was] in that backpack." App368. Taking these circumstances into account, along with the first frisk by Taylor as well as Mr. Douglas's unabridged cooperation and calm compliance, it is clear that the second frisk by Officer Poupart was a further escalation in the

38

amount of force that was unreasonable classify the encounter at this point as a brief *Terry* stop.

Given the totality of circumstances in this case, from the moment Mr. Douglas was placed in handcuffs and led away, he was effectively under arrest. Even if the line for arrest was not clear when Mr. Douglas was initially handcuffed, it was crossed by the time that Officer Poupart initiated the second frisk while a compliant Mr. Douglas remained handcuffed and physically restrained by two officers in the midst of an overwhelming show of force by the other officers present. Because there was no probable cause to support his arrest, evidence seized in the course thereof should have been suppressed.

### D. The district court finding that Officer Poupart immediately recognized the presence of a gun upon frisking Mr. Douglas was clearly erroneous.

The district court ruled that "Officer Poupart testified that the shape and weight of the object made it immediately apparent that he was touching a firearm." App181 (citing Tr. 169-71). This finding was clearly erroneous. Although Poupart testified that it was at some point during his frisk of Mr. Douglas that he became aware of the presence of a gun, the video from his body-worn-camera and other evidence in the case

makes clear that he became aware of the gun during the search of the bag, not during the frisk of the bag. *See generally* Gov't Ex. 4.

Officer Poupart's body-worn-camera provides video evidence of the moment it was apparent to him that there was a gun in Mr. Douglas's backpack. It is the moment that Officer Poupart announces to his fellow officers that there is gun present using the code word "1-800." Gov't Ex. 4 at 19:05:13. This was after Officer Poupart frisked Mr. Douglas and after Officer Poupart unzipped the backpack to search inside of it.

Upon reviewing the video evidence and the entire record in this case, this Court cannot help but be left with a "definite and firm conviction that a mistake has been committed" in accepting Officer Poupart's testimony that he became aware of the presence of the gun in this case while frisking Mr. Douglas. *Jackson v. United States*, 353 F.2d 862, 865 (D.C. Cir. 1965) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Under the doctrine of inherent incredibility, this Court may find a witness who was otherwise credited by the factfinder incredible where the witness's allegations "seem highly questionable in the light of common experience and knowledge," or the witness "behaved in a

manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." *Id.* (citing *Beals v. Finkenbiner*, 12 App. D.C. 23, 29 (1897); *Farrar v. United States*, 275 F.2d 868, 869 (D.C. Cir. 1959); *Norris v. Alabama*, 294 U.S. 587 (1935)). Both standards are met here.

Officer Poupart's claim that he recognized a gun while frisking Mr. Douglas's backpack is so "highly questionable in light of common experience and knowledge" that it would not be possible, even for a trained police officer, to discern by touch that a gun was inside of Mr. Douglas's backpack. *Jackson,* 353 F.2d at 865. The officer attempted to frisk through Mr. Douglas's puffy coat and through a leather-like backpack that appears too thick and stiff to allow for its contents to be discerned by touch. And ultimately the gun was not in an outer pouch of the backpack, but was deep inside an area of the bag that appears to be padded. *See* Gov't Ex. 4 at 19:07:51. Moreover, it is highly questionable that the item Officer Poupart was intentionally trying to squeeze over several seconds was thought to be a gun where common knowledge would suggest that no officer would act so recklessly as to continually try to manipulate and  squeeze an object he believed was a gun. Gov't Ex. 4 at

19:02:56-19:03:17. Officer Poupart's claim that his thumb could feel the slide and grip of a gun through a puffy coat and a non-pliable leather-like bag is too farfetched to be credited.

Officer Poupart also "behaved in a manner strongly at variance with the way in which [one] would normally expect a similarly situated person" – that is, a police officer who had discovered a gun on a suspect – "to behave." *Jackson,* 353 F.2d at 865. Foremost, if it was true that Officer Poupart discovered a gun while frisking Mr. Douglas, it is also true that he took no action in word or deed indicating such a discovery as one would expect. He did not signal the presence of a gun to his fellow officers – as he did when he discovered the gun after unzipping the bag and called out the code "1-800." Nor did he exhibit any private reaction to his alleged sensing of a gun. He did not flinch, pull back, or pause. Nor did he take any step to further secure the gun or the bag in which he claimed to have found it. To the contrary, at the moment he testified that he recognized "the shape, weight of the object, the length and the grip, or some people call it the handle, of the firearm sticking up," he did not act in the slightest way as though he had discovered a gun. App351. Instead, he acted as though he was still searching for something, with all of his

42

actions geared toward having a lawful reason to see inside of Mr. Douglas's bag.

After Officer Poupart frisked Mr. Douglas, he asked if what he felt was the glasses case that Mr. Douglas had said was in the bag. App382; Gov't Ex. 4 at 19:03:16. Officer Poupart then radioed to other officers that the book bag was under Mr. Douglas's coat, and after receiving an inaudible response, he pulled back Mr. Douglas's coat to reveal the bag – a decision he said was his. App175; Gov't Ex. 4 at 19:03:37. Even once the coat was pulled down, Poupart did not behave with the urgency of disarming someone with a gun, but continued to investigate Mr. Douglas for evidence of a crime. He asked Mr. Douglas for permission to "check out" the contents of the bag and when Mr. Douglas denied him permission, he did not open the bag and seize the gun he claims to have felt. Gov't Ex. 4 at 19:03:54. In this way, again, Officer Poupart's behavior was at variance with how any officer would act if he had already felt a gun on a drug suspect. If he had in fact discerned the presence of a gun via the frisk, he would have immediately seized it. *See, e.g., Minnesota v. Dickerson,* 508 U.S. 366, 375–76 (1993) (allowing for seizure of contraband whose nature as such is "immediately apparent" to

43

experienced police officer during protective frisk). There was no need for Officer Poupart to ask permission to search for something he already knew was there. Officer Poupart's explanation that he did not proceed to disarm Mr. Douglas, but instead asked him for consent to search his bag to "giv[e] him the opportunity to be honest" as a "courtesy," was patently incredible. App375.

After being denied permission to search the bag, Poupart then radioed to another officer to ask if Mr. Douglas was "good for a search?" Gov't Ex. 4 at 19:05:01. This too was a question no officer would ask if had already felt a gun in the backpack as Officer Poupart claimed. Officer Poupart explained the inconsistency on this point by claiming he did not search the bag immediately because he did not know if Williams had been stopped, and he wanted to be sure "the scene was secure." App387. This explanation too is belied by common sense. First, it is unclear why the scene would need to be more secure in order to seize the gun Poupart claimed to have felt, especially since waiting to be sure the scene was secure left the gun sitting unseized on Mr. Douglas's back. But in any event, when Officer Poupart asked if Mr. Douglas was "good for a search," there were at least seven officers in his field of vision standing by with

no hint of urgency in their movements. Given the overwhelming number of officers present, there was absolutely no reason to believe that the scene was not secure. Also, undermining any reasonable reliance on Officer Poupart's explanation is that his partner, Officer Taylor, testified that she interpreted Poupart's question as a genuine request to search Mr. Douglas's bag. App405-06.

This Court should conclude that it was clearly erroneous to credit Officer Poupart's testimony that he discovered the gun during the frisk and reverse the district court's suppression ruling, which turned entirely on that claim.

At a minimum, this Court must reverse as clear error the district court's finding that "the camera footage shows that Officer Poupart lightly touched the back of Douglas's jacket just a few times, with the total sequence of events lasting only a few seconds, before Officer Poupart recognized the presence of a gun." App181.

When asked directly, "So you immediately feel it as a gun on your thumb?" Officer Poupart testified, "At this point, no." App378. Also, the camera footage does not depict Poupart "lightly touch[ing]" the back of Mr. Douglas's jacket "just a few times." App181. It shows Poupart

deliberately trying to squeeze the back of Mr. Douglas's jacket in the same small area at least six individual times. *See* Gov't Ex. 4 at 19:03:01-19:03:17. When asked specifically, Officer Poupart provided a precise timeline for when he claimed to recognize the presence of a gun and admitted that he was "squeezing to figure out" what he was touching inside the backpack. App380. Thus, contrary to the district court's finding, the timeline from when Poupart first started squeezing until he claimed to recognize a gun was a full 14 seconds, and not a mere "few seconds." *See* App377-380. The district court's findings on this point are therefore clearly erroneous and to the extent they bear on whether police exceeded the bounds of a *Terry* frisk must be reversed.

## CONCLUSION

For the foregoing reasons, Mr. Douglas respectfully requests that this Court reverse the district court's order denying his motion to suppress evidence, vacate his conviction, and remand the his case.

Respectfully submitted,

A.J. Kramer
Federal Public Defender

_____/s/_____
Tony Axam, Jr.
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500
tony_axam@fd.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Opening Brief was prepared in Century Schoolhouse 14-point font pursuant to Fed. R. App. P. 27(d)(2) and contains 9,841 words.

_____/s/_____
Tony Axam
Assistant Federal Public Defender

47