**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 21-3032**

---

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellee,*

**v.**

**THEODORE B. DOUGLAS,**
*Defendant-Appellant.*

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

---

**APPENDIX FOR APPELLANT
VOLUME I**

---

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

TONY AXAM, JR.
Asst. Federal Public Defender
625 Indiana Avenue, NW
Washington, DC 20004
(202)208-7500
tony_axam@fd.org

District Court
Cr. No. 20-121 (CJN)-2

# Appendix

# Table of Contents

# (Volume I)

Docket ................................................................................................ 1

Indictment (07/21/20) ................................................................... 13

Defendant's Motion to Suppress Tangible Evidence (08/21/20) ............ 16

Government's Opposition to Defendant's Motion to
Suppress Tangible Evidence (09/04/20) ........................................ 20

Government's Surreply to Defendant's Reply to
Government's Opposition to Suppress (10/15/20) ......................... 87

Defendant's Motion to Suppress Tangible Evidence (10/20/20) ............ 93

Government's Exhibit List (10/20/20) .................................................... 105

Defendant's Exhibit List (10/20/20) ...................................................... 107

Government's Supplement to the Opposition to
Defendant's Motion to Suppress (11/03/20) ................................ 108

Government's Supplement to the Opposition to
Defendant's Motion to Suppress (11/03/20) ................................ 122

Defendant's Supplement to Motion to Suppress (11/03/20) ................. 134

Notice of Supplemental Authority in Support of
Defendant's Motion to Suppress (11/17/20) ................................ 144

Government's Exhibit 1A ........................................................................ 145

Government's Exhibit 1B ........................................................................ 146

Government's Exhibit 1C ............................................................... 147

Government's Exhibit 2 ................................................................. 148

Government's Exhibit 4A ............................................................. 149

Government's Exhibit 4B ............................................................. 150

Government's Exhibit 6A ............................................................. 151

Government's Exhibit 6B ............................................................. 152

Government's Exhibit 7 ................................................................. 153

Government's Exhibit 8 ................................................................. 154

Government's Exhibit 9 ................................................................. 155

Order (12/10/20) ........................................................................... 156

Memorandum Opinion (12/10/20) ............................................... 158

Plea Agreement (03/17/21) .......................................................... 187

Statement of the Offense (03/17/21) ........................................... 197

Judgment (05/04/21) .................................................................... 200

Notice of Appeal (05/24/21) ........................................................ 208

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:20–cr–00121–CJN–2

Case title: USA v. WILLIAMS et al

Magistrate judge case number: 1:20–mj–00068–DAR

Date Filed: 07/21/2020

Assigned to: Judge Carl J. Nichols

Appeals court case number:
21–3032

**Defendant (2)**

| | | |
|---|---|---|
| **THEODORE B. DOUGLAS** | represented by | **Eugene Ohm** |
| | | FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF COLUMBIA |
| | | 625 Indiana Avenue, NW |
| | | Suite 550 |
| | | Washington, DC 20004 |
| | | (202) 208–7500 |
| | | Fax: (202) 208–7515 |
| | | Email: eugene_ohm@fd.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Public Defender or Community Defender Appointment* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:922(g)(1); UNLAWFUL TRANSPORT OF FIREARMS, ETC.; Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year. (2) | Defendant sentenced to a term of Fifteen (15) Months of Incarceration followed by Thirty–Six (36) Months of Supervised Release (with conditions). Defendant further ordered to pay a special assessment of $100.00. No fine imposed. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| COMPLAINT in Violation of 18:922(g)(1) | |

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Steven B. Wasserman** |
| | | U.S. ATTORNEY'S OFFICE FOR THE |
| | | DISTRICT OF COLUMBIA |
| | | 555 Fourth Street, NW |
| | | Washington, DC 20530 |
| | | (202) 252–7719 |
| | | Fax: (202) 616–2296 |
| | | Email: steve.wasserman@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Assistant U.S. Attorney* |

| Date Filed | # | Docket Text |
|---|---|---|
| 04/23/2020 | 1 | COMPLAINT as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2). (Attachments: # 1 Statement of Facts) (bb) (Main Document 1 replaced on 4/23/2020) (ztnr). [1:20–mj–00068–DAR] (Entered: 04/23/2020) |
| 04/23/2020 | | ORAL MOTION for Temporary Detention by USA as to THEODORE B. DOUGLAS (2). (ztl) [1:20–mj–00068–DAR] (Entered: 04/24/2020) |
| 04/23/2020 | | ORAL MOTION for Immediate Detention Hearing by USA as to THEODORE B. DOUGLAS (2). (ztl) [1:20–mj–00068–DAR] (Entered: 04/24/2020) |
| 04/23/2020 | | Arrest of THEODORE B. DOUGLAS (2). (ztl) [1:20–mj–00068–DAR] (Entered: 04/24/2020) |
| 04/23/2020 | 25 | Arrest Warrant Returned Executed on 4/23/2020 as to THEODORE B. DOUGLAS (2). (ztl)[1:20–mj–00068–DAR] (ztl). (Entered: 04/24/2020) |
| 04/23/2020 | | Minute Entry for proceedings held before Magistrate Judge Deborah A. Robinson: Initial Appearance as to THEODORE B. DOUGLAS (2) held on 4/23/2020. Case called for Detention Hearing but not held. Federal Public Defender Eugene Ohm appointed as counsel. Oral Motion by the Government for Temporary Detention (3 and 10 day hold) as to THEODORE B. DOUGLAS (2); heard and granted. Oral Motion by the Government for Immediate Detention Hearing as to THEODORE B. DOUGLAS (2); heard and granted. Government orally moved for a continuance of the preliminary hearing until on or after June 11, 2020. Status Hearing set for 4/24/2020 at 2:30 PM by Telephonic/VTC before Magistrate Judge Deborah A. Robinson. Bond Status of Defendant: Defendant Held Without Bond; Court Reporter: Cathryn Jones; Defense Attorney: Eugene Ohm; US Attorney: Steve Wasserman; Pretrial Officer: Andre Sidbury.(ztl) Modified on 4/30/2020 (ztl). [1:20–mj–00068–DAR] (Entered: 04/24/2020) |
| 04/24/2020 | 2 | MOTION for Detention Hearing and Opposition to the Government's Oral Motion to Continue the Preliminary Hearing by THEODORE B. DOUGLAS (2). (Attachments: # 1 Exhibit, # 2 case)(Ohm, Eugene) Modified text on 4/27/2020 (zed, ). Modified event on 4/27/2020 (znmw). [1:20–mj–00068–DAR] (Entered: 04/24/2020) |
| 04/24/2020 | 6 | NOTICE *of Filing* by THEODORE B. DOUGLAS (Ohm, Eugene) [1:20–mj–00068–DAR] (Entered: 04/24/2020) |
| 04/24/2020 | | ORAL MOTION for Release from Custody by THEODORE B. DOUGLAS (2). (ztl)[1:20–mj–00068–DAR] (Entered: 04/26/2020) |
| 04/24/2020 | | ORAL MOTION to Commit Defendant to Custody of Attorney General by USA as to THEODORE B. DOUGLAS(2) . (ztl)[1:20–mj–00068–DAR] (Entered: 04/26/2020) |
| 04/24/2020 | | Minute Entry for proceedings held before Magistrate Judge Deborah A. Robinson: Status/Detention Hearing as to THEODORE B. DOUGLAS (2) held on 4/24/2020. Oral Motion by THEODORE B. DOUGLAS (2); for Release from Custody heard and denied. Oral Motion by the Government to Commit Defendant to Custody of Attorney General as to THEODORE B. DOUGLAS (2); heard and granted. Bond Status of Defendant: Defendant Committed/Commitment Issued; Court Reporter: Tim Miller; Defense Attorney: Eugene Ohm; US Attorney: Steven Wasserman; Pretrial Officer: |

| | | |
|---|---|---|
| | | Christine Schuck. Motion Hearing set for 4/30/2020 at 1:00 PM by Telephonic/VTC before Magistrate Judge Deborah A. Robinson. Bond Status of Defendant: Defendant Committed/Commitment Issued; Court Reporter: Tim Miller; Defense Attorney: Eugene Ohm; US Attorney: Stevem Wasserman; Pretrial Officer: Christine Schuck.(ztl)[1:20–mj–00068–DAR] (Entered: 04/26/2020) |
| 04/24/2020 | | FINDINGS OF FACT AND STATEMENT OF REASONS IN SUPPORT OF ORDER OF DETENTION. This courts findings and conclusions are set forth on the written record of the detention hearing conducted on April 24, 2020. Signed by Judge Deborah A. Robinson on April 24, 2020. (ztl) [1:20–mj–00068–DAR] (Entered: 04/26/2020) |
| 04/24/2020 | | MINUTE ORDER: As this court conducted Defendant THEODORE DOUGLAS (2) detention hearing today, it is hereby ORDERED that his Motion for Detention Hearing (ECF No. 2, Part 1) is DENIED AS MOOT. Signed by Magistrate Judge Deborah A. Robinson on 4/24/2020. (ztl) [1:20–mj–00068–DAR] (Entered: 04/26/2020) |
| 04/24/2020 | 7 | Memorandum in Opposition by THEODORE B. DOUGLAS re ORAL MOTION to Continue Preliminary Hearing. (See Docket Entry 2 to view document). (znmw) Modified text on 4/27/2020 (znmw). [1:20–mj–00068–DAR] (Entered: 04/27/2020) |
| 04/28/2020 | 8 | MOTION to Continue *Preliminary Hearing* by USA as to THEODORE B. DOUGLAS. (Attachments: # 1 Text of Proposed Order)(Wasserman, Steven) [1:20–mj–00068–DAR] (Entered: 04/28/2020) |
| 04/29/2020 | 9 | SUPPLEMENT by THEODORE B. DOUGLAS re 2 MOTION for Hearing (Attachments: # 1 Exhibit)(Ohm, Eugene) [1:20–mj–00068–DAR] (Entered: 04/29/2020) |
| 04/30/2020 | | Minute Entry for proceedings held before Magistrate Judge Deborah A. Robinson: Motion Hearing as to THEODORE B. DOUGLAS held on 4/30/2020. Oral Motion by the Government to Continue Preliminary Hearing as to THEODORE B. DOUGLAS (2); heard and granted. Preliminary Hearing set for 6/11/2020 at 1:45 PM in Courtroom 7 before Magistrate Judge Robin M. Meriweather. Bond Status of Defendant: Defendant Held Without Bond; Court Reporter: Lisa Griffith; Defense Attorney: Eugene Ohm; US Attorney: Steven Wasserman; Pretrial Officer: Christine Schuck; Witness: John Cramer (IT). (ztl) [1:20–mj–00068–DAR] (Entered: 04/30/2020) |
| 05/04/2020 | 10 | Consent MOTION for Protective Order *Governing Body Worn Camera Material* by USA as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS. (Attachments: # 1 Text of Proposed Order)(Wasserman, Steven) [1:20–mj–00068–DAR] (Entered: 05/04/2020) |
| 05/07/2020 | 11 | CONSENT PROTECTIVE ORDER GOVERNING DISCOVERY OF BODY WORN CAMERA MATERIALS. Signed by Magistrate Judge G. Michael Harvey on 5/7/2020. (zpt) [1:20–mj–00068–DAR] (Entered: 05/07/2020) |
| 05/12/2020 | 12 | MOTION for Reconsideration re 8 MOTION to Continue *Preliminary Hearing* filed by USA by THEODORE B. DOUGLAS. (Attachments: # 1 Text of Proposed Order)(Ohm, Eugene) [1:20–mj–00068–DAR] (Entered: 05/12/2020) |
| 05/18/2020 | 13 | RESPONSE by USA as to THEODORE B. DOUGLAS re 12 MOTION for Reconsideration re 8 MOTION to Continue *Preliminary Hearing* filed by USA (Attachments: # 1 Exhibit A)(Wasserman, Steven) [1:20–mj–00068–DAR] (Entered: 05/18/2020) |
| 05/19/2020 | | Set/Reset Hearings as to THEODORE B. DOUGLAS: Motion for Reconsideration Hearing set for 5/20/2020 at 11:00 AM by Telephonic/VTC before Magistrate Judge Deborah A. Robinson. (ztl) [1:20–mj–00068–DAR] (Entered: 05/19/2020) |
| 05/20/2020 | | Minute Entry for proceedings held before Magistrate Judge Deborah A. Robinson: Motion Hearing as to THEODORE B. DOUGLAS held on 5/20/2020. For reasons set forth on the record, Motion for Reconsideration 12 re 8 MOTION to Continue Preliminary Hearing filed by USA by THEODORE B. DOUGLAS as to THEODORE B. DOUGLAS (2); heard and granted. Preliminary Hearing set for 5/27/2020 at 2:00 PM by Telephonic/VTC before Magistrate Judge G. Michael Harvey. Bond Status of Defendant: Defendant Remains Held Without Bond; Court Reporter: Lisa Bankins; |

| | | |
|---|---|---|
| | | Defense Attorney: Eugene Ohm; US Attorney: Steven Wasserman; Pretrial Officer: Christine Schuck; Witnesses: John Cramer (IT). (ztl) [1–20–mj–00068–DAR] (Entered: 05/22/2020) |
| 05/27/2020 | | Minute Entry for proceedings held before Magistrate Judge G. Michael Harvey: Preliminary Hearing as to THEODORE B. DOUGLAS held on 5/27/2020. Court finds Probable Cause in this case. Bond Status of Defendant: Defendant Committed/Commitment Issued; Court Reporter: Lisa Edwards; Defense Attorney: Eugene Ohm; US Attorney: Steve Wasserman; Pretrial Officer: Christine Schuck; Witnesses: Maxwell Poupart (Metropolitan Police Department) (zpt) [1:20–mj–00068–DAR] (Entered: 05/28/2020) |
| 06/15/2020 | 19 | TRANSCRIPT OF VIDEO–TELECONFERENCE PRELIMINARY HEARING in case as to THEODORE B. DOUGLAS before Magistrate Judge G. Michael Harvey held on May 27, 2020; Page Numbers: 1–54. Date of Issuance: June 15, 2020. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse or at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/6/2020. Redacted Transcript Deadline set for 7/16/2020. Release of Transcript Restriction set for 9/13/2020.(Edwards, Lisa) [1:20–mj–00068–DAR] (Entered: 06/15/2020) |
| 07/10/2020 | 22 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by THEODORE B. DOUGLAS (Ohm, Eugene) [1:20–mj–00068–DAR] (Entered: 07/10/2020) |
| 07/13/2020 | | MINUTE ORDER as to Defendant #2 THEODORE B. DOUGLAS. DIRECTING the government to respond by 2:00 PM on July 15, 2020, to the defendant's 22 Appeal of Magistrate Judge Decision to District Court. It is SO ORDERED. Signed by Chief Judge Beryl A. Howell on 7/13/2020. (ztg) [1:20–mj–00068–DAR] (Entered: 07/13/2020) |
| 07/13/2020 | | NOTICE OF HEARING as to THEODORE B. DOUGLAS. The parties shall take notice that the Appeal Hearing on the Defendant's 22 Appeal of Magistrate Judge Decision is scheduled for 7/17/2020, at 1:00 PM via video conference before Chief Judge Beryl A. Howell. Video conference connection details will be provided by the deputy clerk. (ztg) [1:20–mj–00068–DAR] (Entered: 07/13/2020) |
| 07/15/2020 | 23 | RESPONSE by USA as to THEODORE B. DOUGLAS re 22 Appeal of Magistrate Judge Decision to District Court (Attachments: # 1 Exhibit A)(Wasserman, Steven) [1:20–mj–00068–DAR] (Entered: 07/15/2020) |
| 07/17/2020 | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell: Appeal of Magistrate Judge's Decision/Detention Hearing via video conference as to Defendant #2 THEODORE B. DOUGLAS held on 7/17/2020. The Defendant agreed to appear via video conference at this hearing. Argument heard, Magistrate Judge's detention ruling AFFIRMED. Request for a hearing before the magistrate by Counsel for the Defendant, granted. Hearing tentatively scheduled for 7/31/2020, at 1:00 PM before Magistrate Judge Deborah A. Robinson. Bond Status of Defendant: Defendant committed. Present: Defense Attorney: Eugene Ohm; US Attorney: Steven B. Wasserman; Pretrial Officer: Christine Schuck. Court Reporter: Elizabeth Saint–Loth. (ztg) [1:20–mj–00068–DAR] (Entered: 07/17/2020) |
| 07/21/2020 | 24 | INDICTMENT as to TAVONTE WILLIAMS (1) count 1, THEODORE B. DOUGLAS (2) count(s) 2. (FORFEITURE ALLEGATION). (bb) Modified text on 7/21/2020 (bb). (Entered: 07/21/2020) |

4

| 07/28/2020 | | MINUTE ORDER as to THEODORE B. DOUGLAS (2): Arraignment/Initial Status Conference set for 7/31/2020 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. So Ordered by Judge Carl J. Nichols on 7/28/2020. (zcal) (Entered: 07/28/2020) |
|---|---|---|
| 07/31/2020 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Initial Status Conference as to TAVONTE WILLIAMS (1) and Initial Status Conference/Arraignment as to THEODORE B. DOUGLAS (2) held on 7/31/2020. Not Guilty Plea as to Count 2 by THEODORE B. DOUGLAS (2). Further Minute Order to be issued by the Court. Speedy Trial is excluded as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2) from 7/31/2020 to 9/24/2020, in the Interest of Justice, XT. Motion Hearing set for 9/24/2020 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant Williams remains on Personal Recognizance/ Defendant Douglas remains Committed; Court Reporter: Lisa Moreira; Defense Attorney: John Marston (1) and Eugene Ohm (2); US Attorney: Steven Wasserman; Pretrial Officer: John Copes. (zcal) Modified on 7/31/2020 to include speedy trial information. (zcal) (Entered: 07/31/2020) |
| 07/31/2020 | | MINUTE ORDER as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2). In light of the July 31, 2020 Status Conference, it is hereby ORDERED that the following pretrial motions briefing schedule applies: (1) on or before August 21, 2020, the Parties shall file all pretrial motions; (2) on or before September 4, 2020, the Parties shall file oppositions to the pretrial motions; and (3) on or before September 18, 2020, the Parties shall file replies in support of their pretrial motions. It is further ORDERED that a pretrial motions hearing is scheduled for September 24, 2020, at 10 AM. The Court shall decide whether the pretrial motions hearing will be held in person or via remote means as that date approaches. It is further ORDERED that the Parties shall make expert disclosures on or before September 4, 2020. The above dates are subject to change given the uncertain nature of the current COVID–19 pandemic. It is so ORDERED. Signed by Judge Carl J. Nichols on July 31, 2020. (lccjn1) (Entered: 07/31/2020) |
| 08/20/2020 | 28 | MOTION for 404(b) Evidence *Government's Motion to Admit 404(b) Evidence and to Impeach Defendants With Prior Convictions Pursuant to Fed. R. Evid. 609* by USA as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS. (Attachments: # 1 Exhibit A)(Wasserman, Steven) (Entered: 08/20/2020) |
| 08/21/2020 | 31 | MOTION to Suppress *Tangible Evidence* by THEODORE B. DOUGLAS. (Ohm, Eugene) (Entered: 08/21/2020) |
| 08/31/2020 | 32 | Unopposed MOTION for Leave to File by THEODORE B. DOUGLAS. (Attachments: # 1 Text of Proposed Order)(Ohm, Eugene) (Entered: 08/31/2020) |
| 08/31/2020 | 33 | MOTION to Suppress *Identifications* by THEODORE B. DOUGLAS. (Ohm, Eugene) (Entered: 08/31/2020) |
| 09/02/2020 | | MINUTE ORDER as to THEODORE B. DOUGLAS (2). Upon review of Defendant's 32 Unopposed Motion for Leave to File, it is hereby ORDERED that the Motion is GRANTED. Defendant's 33 Motion to Suppress Identifications is DEEMED timely filed. Signed by Judge Carl J. Nichols on September 2, 2020. (lccjn1) (Entered: 09/02/2020) |
| 09/04/2020 | 34 | Memorandum in Opposition by USA as to THEODORE B. DOUGLAS re 31 MOTION to Suppress *Tangible Evidence* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wasserman, Steven) (Entered: 09/04/2020) |
| 09/04/2020 | 35 | Memorandum in Opposition by USA as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS re 30 MOTION to Suppress *Identification*, 33 MOTION to Suppress *Identifications* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wasserman, Steven) (Entered: 09/04/2020) |
| 09/04/2020 | 37 | NOTICE *of Filing of Experts* by USA as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS (Attachments: # 1 Notice to Counsel/Party Expert Notice)(Wasserman, Steven) (Entered: 09/04/2020) |
| 09/04/2020 | 39 | Memorandum in Opposition by THEODORE B. DOUGLAS re 28 MOTION for 404(b) Evidence *Government's Motion to Admit 404(b) Evidence and to Impeach Defendants With Prior Convictions Pursuant to Fed. R. Evid. 609* (Ohm, Eugene) |

| | | |
|---|---|---|
| | | (Entered: 09/04/2020) |
| 09/16/2020 | | Set/Reset Hearings as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2):Telephone Status Conference set for 9/18/2020 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 09/16/2020) |
| 09/18/2020 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2) held on 9/18/2020. Parties are to give an update about travel and availability by 9/21/2020 at 5:00 PM for hearing scheduled for 9/24/2020. Bond Status of Defendant: Defendant Williams (1) remains on Personal Recognizance/ Defendant Douglas (2) remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: John Marston (1) and Eugene Ohm (2); US Attorney: Steven Wasserman. (zcal) (Entered: 09/18/2020) |
| 09/18/2020 | 41 | REPLY TO OPPOSITION to Motion by USA as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS re 28 MOTION for 404(b) Evidence *Government's Motion to Admit 404(b) Evidence and to Impeach Defendants With Prior Convictions Pursuant to Fed. R. Evid. 609* (Wasserman, Steven) (Entered: 09/18/2020) |
| 09/18/2020 | 42 | ENTERED IN ERROR.....REPLY TO OPPOSITION to Motion by THEODORE B. DOUGLAS re 31 MOTION to Suppress *Tangible Evidence* (Ohm, Eugene) Modified on 9/21/2020 (zhsj). (Entered: 09/18/2020) |
| 09/18/2020 | | NOTICE OF CORRECTED DOCKET ENTRY: as to THEODORE B. DOUGLAS re 42 Reply to opposition to Motion was entered in error and counsel was instructed to refile said pleading. Document filed as a motion and not as a reply. (zhsj) (Entered: 09/21/2020) |
| 09/23/2020 | | Set/Reset Hearings as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): Evidentiary Hearing RESET for 10/20/2020 at 10:30 AM in Ceremonial Courtroom before Judge Carl J. Nichols. (zcal) (Entered: 09/23/2020) |
| 10/02/2020 | 43 | NOTICE *of Filing* by THEODORE B. DOUGLAS (Ohm, Eugene) (Entered: 10/02/2020) |
| 10/15/2020 | 44 | SURREPLY by USA as to THEODORE B. DOUGLAS re 45 Defendant's Reply to Government's Opposition to 31 Defendant's Motion to Suppress Tangible Evidence (Wasserman, Steven) Modified Text on 10/22/2020 (zhsj). (Entered: 10/15/2020) |
| 10/20/2020 | 45 | REPLY TO OPPOSITION to Motion by THEODORE B. DOUGLAS re 31 MOTION to Suppress *Tangible Evidence (refiling)* (Ohm, Eugene) (Entered: 10/20/2020) |
| 10/20/2020 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Evidentiary Hearing as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2) held on 10/20/2020. Supplemental Briefs due by 11/3/2020. Bond Status of Defendant: Defendant Williams (1) remains on Personal Recognizance; Defendant Douglas (2) Committed/ Commitment Issued; Court Reporter: Lorraine Herman; Defense Attorney: John Marston (01) and Eugene Ohm (02); US Attorney: Steven Wasserman. Witnesses: Officer Isaac Jackson, Officer Maxwell Poupart, and Officer Brianna Taylor (zcal) (Entered: 10/20/2020) |
| 10/20/2020 | 47 | EXHIBIT LIST by USA as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2). (zcal) (Entered: 10/20/2020) |
| 10/20/2020 | 49 | EXHIBIT LIST by THEODORE B. DOUGLAS (2). (zcal) (Entered: 10/20/2020) |
| 10/26/2020 | 50 | TRANSCRIPT OF PROCEEDINGS in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols held on October 20, 2020; Page Numbers: 209. Date of Issuance: October 26, 2020. Court Reporter/Transcriber Lorraine Herman, Telephone number 202–354–3196, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public te rminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/16/2020. Redacted Transcript Deadline set for 11/26/2020. Release of Transcript Restriction set for 1/24/2021.(Herman, Lorraine) (Entered: 10/26/2020) |
| 11/03/2020 | 51 | SUPPLEMENT by USA as to THEODORE B. DOUGLAS re 34 Memorandum in Opposition, 44 Surreply to Defendant's Reply to Government's Opposition to 31 Defendant's Motion to Suppress Tangible Evidence. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Wasserman, Steven) Modified Text on 11/5/2020 (zhsj). (Entered: 11/03/2020) |
| 11/03/2020 | 52 | SUPPLEMENT by USA as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS re 35 Memorandum in Opposition, (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Wasserman, Steven) (Entered: 11/03/2020) |
| 11/03/2020 | 53 | SUPPLEMENT by THEODORE B. DOUGLAS re 31 MOTION to Suppress *Tangible Evidence* (Ohm, Eugene) (Entered: 11/03/2020) |
| 11/17/2020 | 55 | SUPPLEMENT by THEODORE B. DOUGLAS re 31 MOTION to Suppress *Tangible Evidence* (Ohm, Eugene) (Entered: 11/17/2020) |
| 12/10/2020 | 56 | ORDER. Signed by Judge Carl J. Nichols on December 10, 2020. (lccj1) (Entered: 12/10/2020) |
| 12/10/2020 | 57 | MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on December 10, 2020. (lccjn1) (Entered: 12/10/2020) |
| 12/15/2020 | | MINUTE ORDER. It is ORDERED that a telephonic status conference in this matter is set for January 4, 2021, at 10 a.m. Furthermore, finding that the ends of justice are best served and outweigh the interest of the public and Defendants in a speedy trial, it is ORDERED that the time between December 15, 2020, and January 4, 2021, shall be excluded in computing time within which the trial must commence in this case under the Speedy Trial Act. Signed by Judge Carl J. Nichols on December 15, 2020. (lccjn1) (Entered: 12/15/2020) |
| 12/15/2020 | | Set/Reset Hearings as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): Status Conference set for 1/4/2021 at 10:00 AM in Telephonic/VTC before Judge Carl J. Nichols. Speedy Trial as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2), is Excluded from 12/15/2020 to 1/4/2021, in the Interest of Justice, XT. (zcal) (Entered: 12/15/2020) |
| 01/04/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status Conference as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2) held on 1/4/2021. Jury Selection/Jury Trial set for 4/12/2021 at 09:00 AM in Ceremonial Courtroom before Judge Carl J. Nichols. Further Orders to be issued by the Court. Bond Status of Defendant: Defendant Williams remains on Personal Recognizance/ Defendant Douglas remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: John Marston (01) and Eugene Ohm (02); US Attorney: Steve Wasserman; Pretrial Officer: John Copes. (zcal) (Entered: 01/04/2021) |
| 01/04/2021 | | MINUTE ORDER. Finding that the ends of justice are best served and outweigh the interest of the public and Defendants in a speedy trial, it is hereby ORDERED that the time between January 4, 2021, and April 12, 2021, shall be excluded in computing time within which the trial must commence in this case under the Speedy Trial Act. Furthermore, consistent with the Due Process Protections Act, and Local Criminal Rule 5.1, the government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and that is known to the government. If the government fails to do so, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the |

| | | |
|---|---|---|
| | | circumstances. *See* LCrR 5.1. Signed by Judge Carl J. Nichols on January 4, 2021. (lccjn1) (Entered: 01/04/2021) |
| 02/26/2021 | | Set/Reset Hearings as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): Scheduling Conference set for 3/1/2021 at 10:30 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 02/26/2021) |
| 03/01/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Status /Scheduling Conference as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2) held on 3/1/2021. Further hearing and trial date to be scheduled. Bond Status of Defendant: Defendant Williams (1) remains on Personal Recognizance; Defendant Douglas (2) remains Committed; Court Reporter: Lorraine Herman Defense Attorney: John Marston (1) and Eugene Ohm (2); US Attorney: Steven Wasserman. (zcal) (Entered: 03/01/2021) |
| 03/01/2021 | | MINUTE ORDER as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): Plea Agreement Hearing set for 3/9/2021 at 03:00 PM in Telephonic/VTC before Judge Carl J. Nichols as to THEODORE B. DOUBLAS (2). Status Conference set for 3/9/2021 at 03:00 PM in Telephonic/VTC before Judge Carl J. Nichols as to TAVONTE WILLIAMS (1). So Ordered by Judge Carl J. Nichols on 3/1/2021. (zcal) (Entered: 03/01/2021) |
| 03/09/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Plea Agreement Hearing as to THEODORE B. DOUGLAS (2) and Video Status Conference as to TAVONTE WILLIAMS (1) began on 3/9/2021. Plea Agreement Hearing continued to 3/12/2021 at 01:00 PM as to THEODORE B. DOUGLAS (2) and Status Conference continued to 3/12/2021 at 01:00 PM as to TAVONTE WILLIAMS (1) in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant Williams remains on Persoal Recognizance and Defendant Douglas remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: John Marston (1) and Eugene Ohm (2); US Attorney: Steven Wasserman; Pretrial Officer: John Copes. (zcal) (Entered: 03/09/2021) |
| 03/12/2021 | | MINUTE ORDER as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): It is hereby ORDERED that the hearing scheduled for March 12, 2021, is CONTINUED until March 16, 2021, at 1:00 p.m. Signed by Judge Carl J. Nichols on March 12, 2021. (lccjn2) Modified to add defendant names on 3/12/2021 (zkh). (Entered: 03/12/2021) |
| 03/12/2021 | | NOTICE OF HEARING (**Time Change**) as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): VTC Plea Agreement Hearing and Status Conference set for 3/16/2021 at **1:45 PM** before Judge Carl J. Nichols. (zkh) (Entered: 03/12/2021) |
| 03/15/2021 | | Set/Reset Hearings as to TAVONTE WILLIAMS (1) and THEODORE B. DOUGLAS (2): Plea Agreement Hearing RESET for 3/17/2021 at 01:00 PM in Telephonic/VTC before Judge Carl J. Nichols as to THEODORE B. DOUGLAS (2). Status Conference set for 3/17/2021 at 01:00 PM in Telephonic/VTC before Judge Carl J. Nichols as to TAVONTE WILLIAMS (1). (zcal) (Entered: 03/15/2021) |
| 03/17/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Plea Agreement Hearing as to THEODORE B. DOUGLAS (2) held on 3/17/2021. Guilty Plea entered by THEODORE B. DOUGLAS (2) as to Count 2. REFERRAL TO PROBATION OFFICE for Presentence Investigation as to THEODORE B. DOUGLAS (2). Sentencing Memorandum due by 4/23/2021. Sentencing set for 4/30/2021 at 02:00 PM in Telephonic/VTC before Judge Carl J. Nichols. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Eugene Ohm; US Attorney: Steven Wasserman; Pretrial Officer: John Copes. (zcal) (Entered: 03/17/2021) |
| 03/17/2021 | 62 | PLEA AGREEMENT as to THEODORE B. DOUGLAS (2). (zcal) (Entered: 03/17/2021) |
| 03/17/2021 | 63 | STATEMENT OF OFFENSE by USA as to THEODORE B. DOUGLAS (2). (zcal) (Entered: 03/17/2021) |

| 03/17/2021 | 64 | WAIVER of Trial by Jury as to THEODORE B. DOUGLAS (2). Approved by Judge Carl J. Nichols on 3/17/2021. (zcal) (Entered: 03/17/2021) |
| 04/23/2021 | 68 | MOTION for Leave to File *Motion to Late File Government's Sentencing Memorandum* by USA as to THEODORE B. DOUGLAS. (Attachments: # 1 Text of Proposed Order)(Wasserman, Steven) (Entered: 04/23/2021) |
| 04/23/2021 | 69 | SENTENCING MEMORANDUM by THEODORE B. DOUGLAS (Attachments: # 1 Exhibit)(Ohm, Eugene) (Entered: 04/23/2021) |
| 04/26/2021 | 70 | SENTENCING MEMORANDUM by USA as to THEODORE B. DOUGLAS (Wasserman, Steven) (Entered: 04/26/2021) |
| 04/27/2021 | | Set/Reset Hearings as to THEODORE B. DOUGLAS (2): Sentencing RESET for 5/5/2021 at 11:00 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 04/27/2021) |
| 04/28/2021 | | Set/Reset Hearings as to THEODORE B. DOUGLAS (2): Sentencing RESET for 5/4/2021 at 09:00 AM in Telephonic/VTC before Judge Carl J. Nichols. (zcal) (Entered: 04/28/2021) |
| 04/28/2021 | | MINUTE ORDER. After review of the government's 68 Motion for Leave to File the Government's Sentencing Memorandum, it is hereby ORDERED that the Motion is granted. It is further ORDERED that the government shall file its Sentencing Memorandum by April 29, 2021. Signed by Judge Carl J. Nichols on April 28, 2021. (lccjn1) (Entered: 04/28/2021) |
| 04/28/2021 | | Set/Reset Deadlines as to THEODORE B. DOUGLAS (2): Government Sentencing Memorandum due by 4/29/2021. (zcal) (Entered: 04/29/2021) |
| 04/30/2021 | 71 | PRE–TRIAL SCHEDULING ORDER. Signed by Judge Carl J. Nichols on April 30, 2021. (lccjn1) (Entered: 04/30/2021) |
| 05/03/2021 | 72 | SUPPLEMENT by THEODORE B. DOUGLAS re 69 Sentencing Memorandum (Ohm, Eugene) (Entered: 05/03/2021) |
| 05/04/2021 | 73 | AMENDED PLEA AGREEMENT as to THEODORE B. DOUGLAS (2). (zcal) (Entered: 05/04/2021) |
| 05/04/2021 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Video Sentencing held on 5/4/2021 as to THEODORE B. DOUGLAS (2): Count 2. Defendant sentenced to a term of Fifteen (15) Months of Incarceration followed by Thirty–Six (36) Months of Supervised Release (with conditions). Defendant further ordered to pay a special assessment of $100.00. No fine imposed. Bond Status of Defendant: Defendant remains Committed; Court Reporter: Lorraine Herman; Defense Attorney: Eugene Ohm; US Attorney: Steven Wasserman; Probation Officer: Aidee Gavito. (zcal) (Entered: 05/04/2021) |
| 05/04/2021 | 76 | JUDGMENT as to THEODORE B. DOUGLAS. Statement of Reasons Not Included.. Signed by Judge Carl J. Nichols on 5/4/2021. (zstd) (Entered: 05/05/2021) |
| 05/04/2021 | 77 | STATEMENT OF REASONS as to THEODORE B. DOUGLAS re 76 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Carl J. Nichols on 05/4/2021. (zstd) (Entered: 05/05/2021) |
| 05/14/2021 | 81 | ENTERED IN ERROR.....NOTICE OF APPEAL – Final Judgment by THEODORE B. DOUGLAS re 56 Order on Motion to Sever Defendant, Order on Motion to Suppress, Order on Motion for 404(b) Evidence,,. Fee Status: No Fee Paid. Parties have been notified. (Ohm, Eugene) Modified on 5/25/2021 (zstd). (Entered: 05/14/2021) |
| 05/14/2021 | | NOTICE OF CORRECTED DOCKET ENTRY: as to THEODORE B. DOUGLAS re 81 Notice of Appeal – Final Judgment, was entered in error and counsel refiled said pleading as docket entry 82 . (zstd) (Entered: 05/25/2021) |
| 05/24/2021 | 82 | NOTICE OF APPEAL – Final Judgment by THEODORE B. DOUGLAS re 56 Order on Motion to Sever Defendant, Order on Motion to Suppress, Order on Motion for 404(b) Evidence,,. Fee Status: No Fee Paid. Parties have been notified. (Ohm, Eugene) |

9

| | | (Entered: 05/24/2021) |
|---|---|---|
| 05/25/2021 | 83 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The fee was not paid as the defendant is represented by FPD as to THEODORE B. DOUGLAS re 82 Notice of Appeal – Final Judgment. (zstd) (Entered: 05/25/2021) |
| 05/25/2021 | | USCA Case Number as to THEODORE B. DOUGLAS 21–3032 for 82 Notice of Appeal – Final Judgment filed by THEODORE B. DOUGLAS. (zstd) (Entered: 06/01/2021) |
| 06/28/2021 | 84 | TRANSCRIPT OF INITIAL SCHEDULING CONFERENCE in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols held on July 31, 2020; Page Numbers: 1–15. Date of Issuance:June 28, 2021. Court Reporter/Transcriber Lisa A. Moreira, RDR, CRR, Telephone number (202) 354–3187, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the co urthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/19/2021. Redacted Transcript Deadline set for 7/29/2021. Release of Transcript Restriction set for 9/26/2021.(Moreira, Lisa) (Entered: 06/28/2021) |
| 07/08/2021 | 85 | TRANSCRIPT OF PROCEEDINGS, in case as to THEODORE B. DOUGLAS, before Chief Judge Beryl A. Howell, held on 7–17–2020. Page Numbers: 1 – 19. Date of Issuance: 7–08–2021. Court Reporter: Elizabeth SaintLoth, Telephone number: 202–354–3242. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the c ourt reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/29/2021. Redacted Transcript Deadline set for 8/8/2021. Release of Transcript Restriction set for 10/6/2021.(Saint–Loth, Elizabeth) (Entered: 07/08/2021) |
| 07/15/2021 | 86 | TRANSCRIPT OF PROCEEDINGS in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols held on January 4, 2021; Page Numbers: 1–14. Date of Issuance: July 15, 2021. Court Reporter/Transcriber: Lorraine Herman. Telephone number: 202–354–3196, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public termin al or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. |

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/15/2021. Release of Transcript Restriction set for 10/13/2021.(Herman, Lorraine) (Entered: 07/15/2021)

| 07/15/2021 | 87 | TRANSCRIPT OF PROCEEDINGS in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols, held on March 1, 2021; Page Numbers: 1−18. Date of Issuance: July 15, 2021. Court Reporter/Transcriber: Lorraine Herman. Telephone number: 202−354−3196. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public termi nal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/15/2021. Release of Transcript Restriction set for 10/13/2021.(Herman, Lorraine) (Entered: 07/15/2021) |

| 07/15/2021 | 88 | TRANSCRIPT OF PROCEEDINGS in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols held on March 9, 2021. Page Numbers: 1−21. Date of Issuance: July 15, 2021. Court Reporter/Transcriber: Lorraine Herman. Telephone number: 202−354−3196. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public ter minal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/15/2021. Release of Transcript Restriction set for 10/13/2021.(Herman, Lorraine) (Entered: 07/15/2021) |

| 07/15/2021 | 89 | TRANSCRIPT OF PROCEEDINGS in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols, held on March 17, 2021. Page Numbers: 1−36. Date of Issuance: July 15, 2021. Court Reporter/Transcriber: Lorraine Herman. Telephone number: 202−354−3196. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public termin al or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/15/2021. Release of Transcript Restriction set for 10/13/2021.(Herman, Lorraine) (Entered: 07/15/2021) |
| 07/15/2021 | <u>90</u> | TRANSCRIPT OF PROCEEDINGS in case as to THEODORE B. DOUGLAS before Judge Carl J. Nichols, held on May 4, 2021. Page Numbers: 1−43. Date of Issuance: July 15, 2021. Court Reporter/Transcriber: Lorraine Herman. Telephone number: 202−354−3196, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/15/2021. Release of Transcript Restriction set for 10/13/2021.(Herman, Lorraine) (Entered: 07/15/2021) |
| 07/15/2021 | <u>91</u> | TRANSCRIPT OF PROCEEDINGS in case as to TAVONTE WILLIAMS, THEODORE B. DOUGLAS before Judge Carl J. Nichols, held on September 18, 2020. Page Numbers: 1−25. Date of Issuance: July 15, 2021. Court Reporter/Transcriber: Lorraine Troutman. Telephone number: 202−354−3196. Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/5/2021. Redacted Transcript Deadline set for 8/15/2021. Release of Transcript Restriction set for 10/13/2021.(Herman, Lorraine) (Entered: 07/15/2021) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term

### Grand Jury Sworn in on May 7, 2019

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **MAGISTRATE NO: 20-MJ-0068** |
| | : | |
| **TAVONTE WILLIAMS, and** | : | **VIOLATION:** |
| **THEODORE B. DOUGLAS,** | : | **18 U.S.C. § 922(g)(1)** |
| | : | **(Unlawful Possession of a Firearm and** |
| **Defendants.** | : | **Ammunition by a Person Convicted of a** |
| | : | **Crime Punishable by Imprisonment for a** |
| | : | **Term Exceeding One Year)** |
| | : | |
| | : | **FORFEITURE: 18 U.S.C. § 924(d),** |
| | : | **21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c)** |

### I N D I C T M E N T

The Grand Jury charges that:

### COUNT ONE

On or about April 22, 2020, within the District of Columbia, **TAVONTE WILLIAMS,** knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in the Superior Court of the District of Columbia, Criminal Case Nos. 2015-CF2-006932 and 2017-CF2-000287, did unlawfully and knowingly receive and possess a firearm, that is, Sig Sauer P320, .40 caliber firearm, and did unlawfully and knowingly receive and possess ammunition, that is, .40 caliber ammunition, which had been possessed, shipped and transported in and affecting interstate and foreign commerce.

**(Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year**, in violation of Title 18, United States Code, Section 922(g)(1))

## COUNT TWO

On or about April 22, 2020, within the District of Columbia, **THEODORE B. DOUGLAS**, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in the Circuit Court for Prince George's County, Maryland, Criminal Case No. CT090351X, and in the Superior Court of the District of Columbia, Criminal Case No. 2013-CF2-006028, did unlawfully and knowingly receive and possess a firearm, that is, Sig Sauer P320, .40 caliber firearm, and did unlawfully and knowingly receive and possess ammunition, that is, .40 caliber ammunition, which had been possessed, shipped and transported in and affecting interstate and foreign commerce.

**(Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year**, in violation of Title 18, United States Code, Section 922(g)(1))

## FORFEITURE ALLEGATION

1.        Upon conviction of the offense alleged in Counts One and Two of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearms and ammunition involved in or used in the knowing commission of the offense, including but not limited to a Sig Sauer P320, .40 caliber firearm and .40 caliber ammunition.

2.        If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    (a)        cannot be located upon the exercise of due diligence;

    (b)        has been transferred or sold to, or deposited with, a third party;

    (c)        has been placed beyond the jurisdiction of the Court;

    (d)        has been substantially diminished in value; or

2

(e)    has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 924(d), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c))

A TRUE BILL:

FOREPERSON.

*Michael R. Sherwin* /se

Attorney of the United States in
and for the District of Columbia.

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | | **Criminal No. 1:20-cr-121 (CJN)** |
| | **:** | |
| **THEODORE DOUGLAS** | **:** | |

_____

**DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE**
**AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

      Mr. Theodore Douglas, the defendant, through undersigned counsel, pursuant to the

Fourth Amendment to the United States Constitution, respectfully moves this Honorable Court to

suppress the use as evidence at trial, all tangible objects seized and statements made as the result

of the unlawful search and seizure by officers of the Metropolitan Police Department ("MPD")

of Mr. Douglas on the 2300 block of 15th Street, NE on April 22, 2020.  Mr. Douglas requests an

evidentiary hearing on this motion.  In support of this motion, counsel submits the following.

**Factual Background**

      Mr. Douglas is charged in a one-count indictment with unlawful possession of a firearm

by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in

violation of 18 U.S.C. § 922(g)(1).  The charge arose out of an incident that occurred on April

22, 2020.

      On that date, MPD officers were conducting an undercover observation post.  The

undercover claimed to see an individual later identified as Tavonte Williams give a black

backpack to Mr. Douglas.  According to the undercover, Mr. Douglas then put the backpack on

over his shoulders and wore his jacket over the backpack. The undercover also claimed that Mr.

Douglas then gave U.S. Currency to Mr. Williams.  The undercover provided a lookout

description and officers stopped Mr. Douglas.  The officers ordered Mr. Douglas to walk several

steps and placed him in handcuffs.  The officer then requested permission to search the backpack

from Mr. Douglas but Mr. Douglas did not consent.  The officer requested permission to search

the backpack over the radio, ostensibly to a supervisor.  The officer then searched the exterior of

the backpack.  Shortly thereafter, the officer opened the backpack and discovered a firearm.

The officers did not have a warrant authorizing them to seize Mr. Douglas or search his

backpack.  No exceptions to the Fourth Amendment apply so the entry, arrest and subsequent

search of Mr. Douglas, therefore, were unlawful.

## Argument

At the time that Mr. Douglas was stopped, the police did not have a warrant for his arrest

or reasonable articulable suspicion.  Probable cause is an essential prerequisite to an arrest.

*Dunaway v. New York*, 442 U.S. 200, 213 (1979).  Mr. Douglas was arrested at the point that the

police officer stopped him and immediately handcuffed him.  At that point, the police had no

information that suggested that Mr. Douglas had committed a crime.  The warrantless arrest of

Mr. Douglas, therefore, was unlawful.  The evidence seized and the statements made as a result

of the illegal stop must be suppressed as the fruit of the unlawful arrest of Mr. Douglas.  *Wong*

*Sun v. United States*, 371 U.S. 471, 488 (1963) (if the evidence has been obtained through the

exploitation of a Fourth Amendment violation the evidence must be suppressed).

The evidence also must be suppressed as a fruit of the unlawful warrantless search of Mr. Douglas.  The Supreme Court has held that, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted).  Where the government seeks to introduce evidence seized without a warrant, it has the burden of showing that the evidence falls within one of the "few specifically established and well delineated exceptions" to the warrant requirement of the Fourth Amendment.  *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *Katz v. United States*, 389 U.S. 347, 357 (1967).  Here, the police officers did not have a search warrant to search Mr. Douglas.

In addition, the government contends that the police had reasonable articulable suspicion to stop Mr. Douglas. First, this case involved an arrest and a search, not a stop and frisk.  But in any case, the officers did not have reasonable articulable suspicion.  "It is the government's burden to provide evidence sufficient to support reasonable suspicion justifying any stop." *United States v. Castle*, 825 F.3d. 625, 634 (D.C. Cir 2016) (citations omitted).  "Under *Terry*, and its progeny, a police officer may perform a protective frisk if he has reason to believe, based on 'specific and articulable facts … taken together with rational inferences from those facts,' that 'he is dealing with an armed and dangerous individual.'"  *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (quoting *Terry v. Ohio*, 392 U.S. 21, 27 (1968). The officers did not have reasonable articulable suspicion that Mr. Douglas was armed until police searched the backpack and recovered the firearm.

Because Mr. Douglas was not lawfully under arrest at the time of the search, there is no applicable exception to the warrant requirement.

Absent a showing of an exception to the warrant requirement, the evidence seized from

Mr. Douglas must be suppressed.

## Conclusion

For the reasons set forth above, and for such other reasons as this Court may determine at

a hearing on this motion, Mr. Douglas respectfully requests that this motion be granted and that

the Court suppress the use as evidence of all items seized and all statements made on April 22,

2020.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 20-cr-121 (CJN)** |
| | : | |
| **THEODORE DOUGLAS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS TANGIBLE EVIDENCE**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits this opposition to defendant's motion to suppress

tangible evidence (ECF #31).  In support of this opposition motion, the government relies on the

points and authorities set forth below, and any additional points and authorities, which may be

cited at a hearing on this motion.

**FACTUAL BACKGROUND**

On Wednesday, April 22, 2020, at approximately 2:59 p.m., members of the Metropolitan

Police Department (MPD), Narcotics and Special Investigations Division (NSID), were

conducting an observation post in the 2300 block of 15th Street, Northeast, Washington, D.C. An

undercover officer (UC 2268) observed an individual, later identified as Theodore Douglas

(Defendant Douglas), standing in the walkway between 2315 and 2317 15th Street, Northeast. An

individual, later identified as Tavonte Williams (Defendant Williams), approached Defendant

Douglas. Defendant Williams handed Defendant Douglas a black bag with shoulder straps.

Defendant Douglas appeared to UC 2268 to be in a hurry to take off the blue jacket he was wearing,

put the black bag just handed to him by Defendant Williams onto his back, and then put his blue

jacket on over the black bag. After this, UC 2268 observed Defendant Douglas give Defendant

Williams an unknown amount of U.S. currency, completing the exchange with a handshake. UC 2268's training and experience, as well as what appeared to be Defendant Douglas's hurried attempt to remove his jacket and conceal the backpack under the jacket, led UC 2268 to believe that Defendant Douglas had just purchased something illegal from Defendant Williams.

UC 2268 alerted other officers in the area and officers moved in to stop both Defendant Williams and Defendant Douglas. Defendant Douglas was stopped by Officer Poupart and Defendant Williams was stopped by Officer Gabster. Both individuals stopped were later positively identified by UC 2268 as the individuals observed exchanging the backpack and U.S. currency. Defendant Douglas was wearing a backpack under his jacket, as observed by UC 2268. The body worn camera (BWC) footage confirms that Officer Poupart and his partner, who were both wearing police uniforms, approached Defendant Douglas, who was standing next to Defendant Williams and at least one other individual. *See BWC of Ofc. Poupart* (Exhibit A) at 19:02:25.[1] Officer Poupart approached Defendant Williams, greeted him in a conversational tone, placed his hand on Douglas's arm, and walked him several feet away from Defendant Williams and the other individual. *Id.* at 19:02:27 – 19:02:50.   Officer Poupart can be heard advising Defendant Douglas that he wanted to speak to him in connection with an investigation. *Id.*  Officer Poupart then placed Defendant Douglas in handcuffs for both officer safety and his safety. *Id.*  UC 2268 can be heard over the radio reiterating that Douglas had been passed a "book bag" that he placed underneath his coat. *Id.* at 19:02:55.

Officer Poupart then conducted an external frisk of the backpack worn by Defendant Douglas and immediately felt what he recognized to be a firearm. *Id.* at 19:03:00; *See Transcript*

---

[1] A copy of Exhibit A will be emailed to chambers and has previously been disclosed to the defense in discovery.

*of Preliminary Hearing, U.S. v. Theodore Douglas, 20-MJ-068, May 27, 2020* (Exhibit B) at p. 16; lines 12-21.  As Officer Poupart was conducting the external frisk, Douglas claimed that the item was his glasses case.  Exhibit A at 19:03:16.  Officer Poupart stated over the radio that the book bag was underneath Douglas's sweatshirt, and then he and his partner proceeded to remove Douglas's coat and sweatshirt in order to be able to observe the book bag.  *Id.* at 19:03:28 – 19:03:52.  Officer Poupart then asked Douglas if he minded if he checked the book bag, and Defendant Douglas replied, "You [unintelligible] check it, but I told you it was my glasses case." *Id.* at 19:03:54 – 19:03:59.  Officer Poupart responded, "I don't know if that's glasses man."  *Id.* at 19:04:00.  Officer Poupart then voiced over the radio that he had the person in possession of the book bag, and asked whether he was "good for a search."  *Id.* at 19:04:57.  UC 2268 replied, "affirm," and advised that Douglas had given money to the person who handed him the book bag. *Id.* at 19:05:01.  Poupart opened the backpack, observed a firearm inside, and voiced over the radio, "1-800," which was the signal that a firearm had been recovered.  *Id.* at 19:05:06 – 19:05:13.

Defendant Williams and Defendant Douglas were placed under arrest. Defendant Douglas was also determined to have a bench warrant.  The firearm that was recovered from the backpack was determined to be a Sig Sauer, model P320, .40 caliber semiautomatic handgun with an obliterated serial number.  When the firearm was recovered, it was loaded with one (1) round in the chamber and twelve (12) rounds in a thirteen (13) round capacity magazine.  During a search incident to arrest of Defendant Williams, officers recovered two iPhones.  Officers did not recover any money from Williams' person at the time of his arrest.

On July 21, 2010, a grand jury returned an indictment that charged the defendants with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

The defendant now moves to suppress the evidence recovered from his person as the fruit of an illegal arrest, asserting in conclusory fashion that the defendant was arrested "at the point the police officer stopped and immediately handcuffed him." Def. Mot. (ECF. #31) at 2. The defendant further argues that the evidence and any statements should be suppressed as the fruit of a warrantless search for which no exception to the warrant requirement applies. *Id.* at 3. Again, the defendant cites to no facts in support of his assertion that the evidence was the fruit of an illegal search. The defendant further asserts that police did not have reasonable suspicion to justify a stop of the defendant, nor any "reasonable articulable suspicion that Mr. Douglas was armed" at the time a protective frisk was conducted. *Id.* Although the government disclosed to defense counsel both the police reports and the BWC footage related to this case shortly after the defendant's arrest, the defendant's motion contains no reference to any of these materials or other facts in support of his motion. Accordingly, the government submits that the in light of the BWC footage submitted as Exhibit A to this opposition, and the defendant's failure to assert any facts in support of his motion to suppress that would warrant an evidentiary hearing, this Court should decide this motion on the pleadings. *United States v. Gaston,* 357 F.3d 77, 80 (D.C. Cir. 2004) (quoting *Franks v. Delaware,* 438 U.S. 154, 171 (1978) (defendant is entitled to evidentiary hearing where attack on search warrant affidavit is "more than conclusory" and 'accompanied by an offer of proof.'"); *United States v. Thorton,* 454 F.2d 957, 967 n. 65 (D.C. Cir. 1971) (noting that an "evidentiary exploration is not required as a matter of course, but only upon factual allegations which, if

established, would warrant relief.") (citation omitted); *United States v. Williams-Davis,* No. 91-0559, 1992 WL 38449 *1 (D.D.C. Feb. 5, 1992) (denying an evidentiary hearing where defendants' motions to suppress search warrants "consists of pages and pages of legal argument devoid of any application to the facts.").

## **ARGUMENT**

i.      *The Initial Stop and Frisk of Defendant Was Based Upon Reasonable Articulable Suspicion and the Use of Handcuffs Did Not Convert Stop Into an Arrest.*

A seizure occurs only when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). A citizen's liberty is only restrained if "a reasonable person would have believed that he was not free to leave[.]" *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). The question is not what the subjective belief of the defendant was at the time but whether "a reasonable man, innocent of any crime" would have believed himself free to leave. *United States v. Goddard*, 491 F. 3d 457, 460 (D.C. Cir. 2007) (per curiam).  In determining whether reasonable suspicion exists, officers are to consider whether all the facts "taken together [warrant] further investigation" and may consider behavior that would normally be innocent conduct. *Terry*, 392 U.S. at 22. Officers are permitted to take into account a wide range of factors in making the reasonable suspicion determination. *Id.* (officers can take account of strange or atypical behavior).[2]   Furthermore, the subjective motivations of the police in making a stop or a frisk are irrelevant; the test is whether the facts known to the police established a reasonable articulable suspicion in an objective matter. *Whren*

---

[2]      *See also Wardlow v. Illinois*, 528 U.S. 119, 125 (2000) (officers may take account of the fact that an individual is in a high crime area because they need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Laing,* 889 F.2d 281, 286 (D.C. Cir. 1989) (time of day, the "high crime" nature of an area, and furtive hand movements are all relevant to the reasonable suspicion inquiry).

*v. United States*, 517 U.S. 806 (1996); *see also Devenpeck v. Alford*, 543 U.S. 146 (2004); *United States v. Hensley* 469 U.S. 221, 231 (In addition "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.") (Quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (1976)).

"Although the D.C. Circuit has suggested that 'simply receiving an object from another person' is a common occurrence for which there may many explanations," where a hand-to-hand transaction is coupled with other behaviors, such as "furtive conduct," such circumstances may give rise to reasonable suspicion that illegal activity is afoot. *United States v. Lovelace,* 357 F. Supp. 2d 39, 43-44 (D.D.C 2004) (quoting *United States v. Johnson,* 212 F.3d 1313, 1316 (D.C. Cir. 2000). In *Lovelace,* Judge Richard J. Leon concluded that police had reasonable suspicion to stop Lovelace and remove him from his vehicle after observing him engage in a hand-to-hand transaction while sitting in his vehicle with another man in an area known for narcotics activity. *Id.* at 41. Officers approached the vehicle, smelled the odor of marijuana emanating from the vehicle, and observed Lovelace making furtive movements towards his waistband. *Id.*; *See United States v. Devaugh,* 422 F. Supp. 3d 104, 110-111 (D.D.C 2019) (officers' observation of Devaugh engage in hand-to-hand transaction in high crime area, walking to a vehicle after being advised of police presence in the area, and appearing to adjust his waistband established reasonable suspicion to conduct investigatory stop).

In the instant case, based upon the authority cited *supra,* it is clear that police had reasonable articulable suspicion that a crime had been committed by Defendants Douglas and Williams, and therefore, were justified in conducting a *Terry* stop. The undercover officer was in

a high crime area[3] and observed Douglas engage in a hand-to-hand transaction by receiving a backpack from Williams in exchange for money. The UC further observed Douglas appear to quickly remove his jacket, place it over his shoulders, and place his coat over the backpack in an apparent attempt to conceal it. The government anticipates that at any hearing on this matter, police witnesses will testify that in their training and experience, such observations are consistent with an illegal transaction for contraband, most likely for firearms or drugs. As the Supreme Court noted in *Adams v. Williams*, 407 U.S. 143, 145 (1972), "[t]he Fourth Amendment does not require a [police officer] who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Instead, the police may briefly detain or stop an individual and, if circumstances warrant, frisk him or her, even in the absence of probable cause. *See Terry*, 392 U.S. at 30 (stating that police can subject someone to a pat down for guns during a *Terry* stop if the police suspect weapons in order to protect the officers and other people nearby).

In the instant case, there is no dispute that Defendant Douglas was seized by police for Fourth Amendment purposes once they took a hold of his arm and placed him in handcuffs. "It is well settled that 'the right to make… [an] investigatory stop necessarily carries with it the right to

---

[3] The government anticipates that at any evidentiary hearing on the motion, police witnesses would testify that the location where the offense occurred, which is in the Fifth Police District (5D) is known as a high crime area, including for narcotics and firearms offenses. Furthermore, crime data from the District of Columbia government establishes that between August 28, 2019 and August 27, 2020, there were 27 homicides in 5D, as compared to 22 homicides during the same period from the previous year. *See http://crimemap.dc.gov/Report.aspx* (August 28, 2020). During the same period over the last year, there were 131 robberies with a gun, up from 123 during the previous year, and 129 assaults with a dangerous weapon, up from 85 during the previous year. *Id.* While these numbers are somewhat lower than for the same offenses committed in the Sixth and Seventh Police Districts, they are substantially higher than the rate at which these same offenses are committed in 1D, 2D, 3D, and 4D. *Id.* The District of Columbia does not appear to maintain statistics by district for narcotics related offenses.

use some degree of physical coercion or threat thereof.'" *United States v. Smith,* 373 F. Supp. 3d 223, 238 (D.D.C. 2019) (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989). "In deciding what degree of force is permissible, courts must look to the 'facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *United States v. Dykes,* 406 F.3d 717, 720 (D.C. Cir. 2005). Furthermore, the use of handcuffs during a *Terry* stop does not automatically convert the stop into an arrest. *Id..*; *See United States v. Laing,* 889 F.2d 281, 285 (D.C. Cir. 1989) (holding that "amount of force used to carry out the stop and search must be reasonable, but may include use of handcuffs…"); *United States v. Tilman,* 19 F.3d 1221, 1227-28 (7th Cir. 1994) (upholding use of handcuffs during an investigative detention where the suspect matched the description of an armed bank robber). "'Courts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations.'" *Moore v. Volpe,* 177 F. Supp. 3d 409, 415 (D.D.C. 2016) (citation omitted) (holding that police officers who drew their weapons and pointed them at Plaintiff, and then handcuffed him until his identification was confirmed did not convert investigative stop into arrest where Plaintiff matched the description of armed robbery suspect).

The stop of Defendant Douglas by police and his placement in handcuffs prior to the external frisk did not convert an otherwise lawful *Terry* stop into an arrest. At the time Officer Poupart and his partner approached Douglas, they were aware that he had been given a backpack. At the time, Douglas was standing in close proximity to two other men (one of which was Defendant Williams). Unlike a more typical hand-to-hand transaction involving small objects where there would ordinarily not be a basis to believe had involved the transfer of a weapon, here

the backpack easily could have contained a firearm(s) or other dangerous weapon(s).[4]  The lookout for Defendant Douglas also made clear that he was in possession of the backpack, and therefore, had immediate access to its contents.  Furthermore, Officer Poupart and his partner were not able to observe Defendant Douglas between the time of the initial lookout and the time they encountered him in the parking lot, so at the time they approached him it certainly would have been possible for Douglas to gain access to any weapon that may have been inside the backpack.

Based upon this backdrop and the aforementioned authority, the officers were more than justified in securing Douglas in handcuffs at the time of the encounter.  The recent decisions in *Devaugh* and *Smith,* cited *supra,* are distinguishable from the instant case and do not compel the conclusion that Douglas was under arrest when he was placed in handcuffs.  In *Devaugh*, an undercover officer observed the defendant engage in a hand-to-hand transaction, which involved the exchange of money for a small object.  *Devaugh,* 422 F. Supp. 3d at 108.  The UC then overheard someone tell Devaugh that the police were in the area and Devaugh then walked to a vehicle while appearing to adjust his waistband.  *Id.*  The arrest team arrived in unmarked cruisers, activated their emergency lights, and three officers approached Devaugh who was inside the vehicle.  *Id.* at 108-109.  Additional officers also arrived on scene to assist.  *Id.* at 109.  The officers issued a series of commands for Devaugh to show his hands, and one officer drew his weapon and displayed it against the glass of the vehicle.  *Id.*  The officers ordered Devaugh out of the vehicle and once he exited, an officer took Devaugh's arm and placed him in handcuffs.  *Id.*  A subsequent search of the vehicle resulted in the recovery of a firearm.  *Id.*

---

[4]  There was also a basis to believe that the backpack may have contained drugs in addition to weapons.  It is axiomatic that "guns and drugs go together."  *United States v. Johnson,* 592 F.3d 164, 169 (D.C. Cir. 2010).

Judge Rudolph Contreras held that while the officers were justified in conducting an investigatory stop of Devaugh, under the circumstances of that case, the use of handcuffs transformed the detention into an arrest.  *Id.* at 114.  Judge Contreras noted the following factors that in their totality, converted the stop into an arrest: (1) one officer's display of his firearm; (2) the use of handcuffs to restrain Devaugh; and (3) the large number of responding officers (six) and police vehicles (two) that surrounded Devaugh and prevented him from leaving.  *Id.* at 114-115.  Judge Contreras further noted that one of the officers testified that "he and the arrest team did not believe Mr. Devaugh was armed."  *Id.* at 115.  In the case of Defendant Douglas, and as confirmed by the BWC, Officer Poupart and his partner maintained a calm and conversational demeanor, they were the only officers in the immediate vicinity of Douglas at the time he was cuffed and patted down, and no officer drew a weapon or threatened Douglas in anyway.  An "'officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'"  *United States v. Gorham,* 317 F. Supp. 3d 459, 467 (D.D.C. 2018) (quoting *Terry,* 392 U.S. at 27).

In the *Smith* case, Judge Moss held that the handcuffing of the defendant who was standing between an open driver's side door of a parked car and the car itself, and where officers smelled PCP, but were unable to determine if the odor was coming from the defendant or that he was under the influence of PCP, converted a permissible *Terry* stop into an arrest.  *Smith,* 373 F. Supp. 3d at 239.  While noting that it would be reasonable for a police officer to handcuff a person whom he reasonably believed to be under the influence of PCP, Judge Moss held that there was an insufficient basis for the police to believe such was the case in *Smith.  Id.*  As discussed *supra,* the officers who stopped Douglas were reasonable in believing that he may have been armed and

29

presently dangerous.  While the officers could not be certain that Douglas was armed, the hand-to-hand transaction involving a backpack that easily could have contained a weapon, along with the defendant's presence in a high crime area and his attempts to conceal the backpack, certainly justified the officer's use of handcuffs to pursue the investigation safely.  *See Gorham,* 317 F. Supp. 3d at 467.

     ii.    *Probable Cause to Arrest the Defendant Arose After Discovery of the Firearm During the Pat Down.*

The arrest of the defendant was supported by probable cause.  It is axiomatic that the police may arrest someone without first obtaining an arrest warrant where the police have probable cause to believe that person is committing or has committed a criminal offense.  *Florida v. White*, 526 U.S. 559 (1999).  Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his or her training and experience that would lead the officer to believe that a criminal offense had been or is being committed.  *See United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981); *Brinegar v. United States*, 338 U.S. 160 (1949).

In the instant case, after Defendant Douglas was stopped, the attached BWC footage shows Officer Poupart conduct a brief pat down of the rear of his jacket, when he immediately felt what he recognized as a firearm.  *See Exhibit A* at 19:03:00; *Exhibit B* at p. 16, lines 12-21.  "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.'"  *United States v. Spriggs,* No. 09-0361, 2010 WL 917709, *2 (D. Md. March 10, 2010) (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 373–75 (1993)).  After recognizing the presence of the gun during the pat down, probable cause existed to place the defendant under arrest and execute a search of the backpack to recover the gun.  It is of no moment that Officer Poupart, after feeling the presence of the firearm, requested permission

over the radio to conduct the search of the backpack.  Probable cause to arrest the defendant and conduct a search of the backpack found on his person arose upon Officer Poupart's recognition of the presence of the firearm inside of the backpack during the external frisk.  Accordingly, the officers' search of the interior of the backpack was supported by probable cause, and therefore, was a lawful search.

## **CONCLUSION**

  **WHEREFORE** for the reasons stated above the United States respectfully submits that the defendant's motion to suppress tangible evidence should be denied.

          Respectfully submitted,

          MICHAEL R. SHERWIN
          United States Attorney
          N.Y.S. Bar No. 4444188

    By:      /S/
          STEVEN B. WASSERMAN
          D.C. Bar No. 453251
          Assistant United States Attorney
          555 Fourth Street, N.W., Fourth Floor
          Washington, D.C. 20530
          Telephone: (202) 252-7719
          E-mail: steve.wasserman@usdoj.gov

## **CERTIFICATE OF SERVICE**

  I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 4th day of September 2020.

          /S/
          Steven B. Wasserman
          Assistant United States Attorney

# EXHIBIT A (Emailed to Chambers)

## *(BWC of Officer Poupart)*

1      UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLUMBIA
2
  * * * * * * * * * * * * * * * * )
3  UNITED STATES OF AMERICA,   )  Criminal Action
             )  No. 20-MJ-00068
4       Plaintiff,  )
             )
5   vs.         )
             )
6  THEODORE B. DOUGLAS,    )  Washington, DC
             )  May 27, 2020
7       Defendant.  )  2:13 p.m.
             )
8  * * * * * * * * * * * * * * * * )

9

10   TRANSCRIPT OF VIDEO-TELECONFERENCE PRELIMINARY HEARING
     BEFORE THE HONORABLE G. MICHAEL HARVEY,
11      UNITED STATES MAGISTRATE JUDGE

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:  STEVEN B. WASSERMAN, ESQ.
  (Appearing      UNITED STATES ATTORNEY'S OFFICE
15   Via VTC)      FOR THE DISTRICT OF COLUMBIA
          555 Fourth Street, NW
16          Eleventh Floor
          Washington, DC 20530
17

18  FOR THE DEFENDANT:   EUGENE OHM, ESQ.
  (Appearing      OFFICE OF THE FEDERAL PUBLIC
19   Via VTC)      DEFENDER
          625 Indiana Avenue, NW
20          Suite 550
          Washington, DC 20004
21

22  FOR PRETRIAL SERVICES: CHRISTINE SCHUCK
  (Appearing
23   Via VTC)

24

25

```
 1       REPORTED BY:           LISA EDWARDS, RDR, CRR
           (Via VTC)             Official Court Reporter
 2                               United States District Court for the
                                   District of Columbia
 3                               333 Constitution Avenue, NW
                                 Room 6706
 4                               Washington, DC 20001
                                 (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|                                      | Direct | Cross | Red. |
|--------------------------------------|--------|-------|------|
| WITNESSES FOR THE GOVERNMENT:        |        |       |      |
| Maxwell Poupart                      | 8      | 20    | 44   |

| EXHIBITS RECEIVED IN EVIDENCE   | PAGE |
|---------------------------------|------|
| Government's Exhibit No. 1       | 14   |
| Government's Exhibit No. 2       | 15   |
| Government's Exhibit No. 3       | 16   |
| Government's Exhibit No. 4       | 17   |
| Government's Exhibit No. 5       | 18   |

```
 1              THE COURT:  Let's go ahead and call the case.

 2              THE COURTROOM DEPUTY:  This is Case 20-MJ-68, the

 3     United States of America versus Theodore Douglas.

 4              I'm sorry.  I seem to be having issues.  Did

 5     anybody hear what I was saying?

 6              I can see your lips moving, Judge.  I can't hear

 7     you.

 8              THE COURT:  I need to unmute myself.

 9              Go ahead, Mr. Tran.  Call the case again.

10              THE COURTROOM DEPUTY:  This is 20-MJ-68, the

11     United States of America versus Theodore Douglas.

12              This is scheduled to be a video preliminary

13     hearing.

14              Would the parties please introduce themselves to

15     the Court, beginning with the Government.

16              MR. WASSERMAN:  Good afternoon, your Honor.

17     Steven Wasserman for the United States.

18              THE COURT:  Good afternoon.

19              MR. OHM:  Eugene Ohm on behalf of Mr. Douglas.

20     Good afternoon, your Honor.

21              THE COURT:  Good afternoon.

22              So this matter's been scheduled for a preliminary

23     hearing.

24              Mr. Ohm, we'll start with you.  Of course, we're

25     proceeding by video because of the pandemic.  Does your
```

1      client consent to these proceedings being conducted by video

2      here today?

3                MR. OHM:  He does, your Honor.

4                THE COURT:  Okay.  I have received exhibits.  I

5      don't know if they're from the Government and the Defendant,

6      but I do have the exhibits.  I've had -- I've struggled

7      today seeing the video.  I can try to see the video today on

8      my machine, if we need to.  But I would like to first try to

9      use the screen [indiscernible], and I hope both sides know

10     how to do that.  But I do have the -- the exhibits have been

11     provided to me ahead of time, which I can try and get if

12     that function doesn't work.

13                So this matter's been scheduled for preliminary

14     hearing.

15                Is the Government ready to proceed?

16                MR. WASSERMAN:  Yes, your Honor.

17                THE COURT:  Mr. Ohm, are you ready as well?

18                MR. OHM:  Yes, your Honor.

19                THE COURT:  I think the next hearing that's before

20     me is at 3:00, but there is some flexibility there in that

21     it is before me.  But if we can keep this as short as

22     possible, that would be helpful.

23                Let me just ask the Defendant, can you hear me,

24     sir?  I can't hear you yet if your mute is on.

25                I still can't hear you.  I'm not hearing you now.

1    Maybe you can get the corrections officer to help you.

2    Please watch whatever they do, because it is important that

3    you know how to use the mute function.

4              It looks like we've lost the Defendant.  Maybe

5    they're trying to rejoin.

6              Officer, you're buzzing in and out, too, on my

7    screen, anyway.

8              OFFICER POUPART:  My apologies, your Honor.  I'm

9    not sure what I can do here.  I'm using a computer at work.

10             THE COURT:  Are you hooked up to wireless through

11   work?

12             OFFICER POUPART:  Honestly, I'm not sure if this

13   computer is wireless or hard Ethernet cable.  I honestly

14   don't know.

15             THE COURT:  Well, your audio is coming through

16   fine.

17             OFFICER POUPART:  It's just the visual that's

18   fuzzy?

19             THE COURT:  Well, I mean, it pixilates every few

20   seconds.

21             THE CORRECTIONS OFFICER:  Hello?

22             THE COURT:  Yes.

23             THE DEFENDANT:  Yes.  I can hear you.

24             THE COURT:  Thank you.

25             So it's important as this proceeding goes forward

1    that you mute the microphone there.  In the prison, there's

2    often a lot of background noise.

3            Everyone on the call, if you're not speaking, you

4    should mute.

5            So you should know how to do it, Mr. Douglas.  It

6    sounds like you didn't there.  It was just a technical

7    problem before.  Do you know how to mute?

8            THE DEFENDANT:  Yes, your Honor.

9            THE COURT:  As this hearing goes forward, if

10   there's something you want to say to Mr. Ohm, then let me

11   know.  All right?  Say, "Can I talk to my attorney?"  Wave

12   your hand.  And then Mr. Ohm has a way to reach you, to call

13   you directly.  The rest of us mute.  We won't hear.  Or

14   [indiscernible] yours so we won't hear that discussion.  At

15   any point, if you want to have a word with Mr. Ohm, we can

16   allow you to do that.  Okay?

17           THE DEFENDANT:  Okay.

18           THE COURT:  All right.  We'll go ahead.  Everyone

19   mute their phones and I'm going to turn it over to

20   Mr. Wasserman.

21           You may begin.

22           MR. WASSERMAN:  Thank you, your Honor.

23           The Government calls Officer Maxwell Poupart to

24   testify.

25           Good afternoon, Mr. --

 1            THE COURT:  Mr. Tran, let me go ahead and get him

 2    sworn in.  Mr. Tran, swear in the officer, please.

 3            THE COURTROOM DEPUTY:  Yes, your Honor.

 4        MAXWELL POUPART, GOVERNMENT WITNESS, SWORN.

 5            THE COURT:  Mr. Wasserman, before you begin, I

 6    just want to make sure.

 7            Is the reporter able to hear everything that's

 8    happening?

 9            THE COURT REPORTER:  Yes, Judge.  Thank you.

10            THE COURT:  Mr. Wasserman, go right ahead.

11                        DIRECT EXAMINATION

12    BY MR. WASSERMAN:

13    Q.  Can you please introduce yourself and spell your last

14    name for the court reporter.

15    A.  Good afternoon.  I am Officer Maxwell Poupart -- that is

16    P-O-U-P-A-R-T -- of the Metropolitan Police Department.

17    Q.  And what's your position with MPD?

18    A.  I'm an officer in the narcotics and special

19    investigations division.

20    Q.  How long have you been a police officer with MPD?

21    A.  I have been with MPD for approximately four years.

22    Q.  And just briefly, if you can describe your duties with

23    the NSID.

24    A.  [Indiscernible] many different investigations ranging

25    from narcotics to firearms to human trafficking.  Mainly,

1     narcotics investigations operations.

2     Q.  All right.  Officer Poupart, I want to direct your

3     attention to April 22nd of this year.  Were you involved in

4     [indiscernible] that resulted in the seizure of a firearm in

5     the area of the 2300 block of 15th Street, Northeast,

6     Washington, DC?

7     A.  Yes.

8     Q.  And can you still hear me?

9     A.  Yes.  And yes, I was.

10    Q.  Approximately what time of day was that?

11    A.  It was approximately 3:00 p.m.

12    Q.  And during your investigation, were you involved in the

13    [indiscernible] relating to the seizure of this?

14    A.  Yes, I was.

15    Q.  Who was that?

16    A.  That would be Mr. Theodore Douglas.

17    Q.  And was a criminal complaint and statement of facts

18    generated in support of the arrest for Mr. Douglas?

19    A.  Yes, it was.

20    Q.  And are you aware of whether anyone other than

21    Mr. Douglas was arrested as a result of this investigation?

22    A.  Yes.

23    Q.  And who was that?

24    A.  That would be Mr. Tavonte Williams.

25    Q.  Are you the author of a sworn statement of facts that

1    went with the criminal complaint in this matter?

2    A.  I did.

3    Q.  And have you had an opportunity to review your sworn

4    statement of facts in support of the arrest of Mr. Douglas?

5    A.  Yes, I have.

6    Q.  And do you have personal knowledge of some of the

7    information included in your statement of facts?

8    A.  Yes.

9    Q.  Was some of the information included in your statement

10   of facts provided to you by other officers or work that you

11   reviewed?

12   A.  Yes.

13   Q.  Are there any changes that you'd like to make to your

14   sworn statement of facts at this time?

15   A.  No.

16   Q.  If permitted by the Court, would you adopt the sworn

17   statement of facts in the criminal complaint as part of your

18   testimony in this matter?

19   A.  Yes.

20        MR. WASSERMAN:  Your Honor, I would

21   [indiscernible] that Officer Poupart be permitted to adopt

22   the complaint and sworn statement of facts as part of his

23   testimony.

24        THE COURT:  Any objection, Mr. Ohm?

25        MR. OHM:  No, your Honor.

 1          THE COURT:  Okay.  His complaint will be adopted

 2     as part of this -- his testimony in this proceeding.

 3          MR. WASSERMAN:  Thank you, your Honor.

 4     BY MR. WASSERMAN:

 5     Q.  Officer Poupart, [indiscernible] participation in this

 6     investigation, have you become familiar with the appearance

 7     of Theodore Douglas?

 8     A.  Yes.

 9     Q.  And do you see Mr. Douglas anywhere on your screen?

10     A.  Yes, I do.

11     Q.  Can you please identify him by describing an article of

12     clothing that he's wearing.

13     A.  He's wearing an orange shirt.

14          MR. WASSERMAN:  Your Honor, I would ask that the

15     record reflect the identification of the Defendant.

16          THE COURT:  Mr. Ohm, any objection?

17          MR. OHM:  No objection, your Honor.

18          THE COURT:  The record will reflect an

19     identification of this Defendant.

20     BY MR. WASSERMAN:

21     Q.  Officer Poupart, what, if any, description was broadcast

22     by the undercover officer of the two suspects that were

23     observed to have been engaged in the exchange that the

24     undercover observed in this matter?

25     A.  A lookout was broadcast for a black male [indiscernible]

```
1    puffy coat and blue hood.

2    Q.  What -- did you [indiscernible] that?

3    A.  Yes, I did.

4    Q.  And were you able to locate an individual that was

5    matching -- that matched that description?

6    A.  Yes, I was.

7    Q.  Where did you locate that individual, approximately?

8    A.  Approximately the [indiscernible] off the 2300 block of

9    15th Street.

10   Q.  And were you able to identify that individual that

11   matched the description of the blue puffy coat?

12   A.  Yes.

13   Q.  And who was that?

14   A.  That was Mr. Theodore Douglas.

15   Q.  Are you aware of whether the additional suspect that you

16   mentioned in this case was located?

17   A.  Yes, he was.

18   Q.  Which officer located the other suspect?

19   A.  Officer Gabster.

20   Q.  Is that G-A-B-S-T-E-R --

21   A.  Correct.

22   Q.  -- for the court reporter?

23          Do you know the first name of Officer Gabster?

24   A.  I'm sorry.  I can't remember.

25   Q.  Thank you.
```

Poupart - DIRECT - By Mr. Wasserman

44

1        And was that individual the second suspect that

2    turned out to be Tavonte Williams?

3    A.  Yes.

4    Q.  I'm going to try to show you what's been marked for

5    identification as Government's Exhibit No. 1.

6            THE COURT:  Have the exhibits been shared with

7    Mr. Ohm prior to today, Mr. Wasserman?

8            MR. WASSERMAN:  Yes, your Honor.

9            THE COURT:  Mr. Ohm, are you going to have any

10   objections to these exhibits, to the admission of these

11   exhibits?

12           MR. OHM:  No, your Honor.

13           THE COURT:  Okay.  Obviously, you're sharing.  I'm

14   going to see it right now.  So that's why I wanted to ask

15   Mr. Ohm.

16           MR. WASSERMAN:  Yes.

17   BY MR. WASSERMAN:

18   Q.  Here we go.

19           Officer Poupart, I've shown you what's been marked

20   for identification as Government's Exhibit No. 1.  Are you

21   able to see that on your screen?

22   A.  Yes.

23   Q.  And do you recognize that photograph?

24   A.  Yes.

25   Q.  And who is that a photograph of?

1    A.   Defendant Douglas.

2    Q.   And is that photograph a fair and accurate depiction of

3    how Mr. Douglas appeared on April 22nd of this year when he

4    was arrested?

5    A.   Yes.

6              MR. WASSERMAN:  Your Honor, I would move

7    Government's Exhibit No. 1 into evidence.

8              THE COURT:  No objection, Mr. Ohm?

9              MR. OHM:  No, your Honor.

10             THE COURT:  It will be admitted, Exhibit 1.

11             (Whereupon, Government's Exhibit No. 1 was entered

12   into evidence.)

13   BY MR. WASSERMAN:

14   Q.   Officer Poupart, I'm going to show you Government's

15   Exhibit No. 2.  I apologize.  Are you able to see that,

16   Officer Poupart?

17   A.   Yes.

18   Q.   And do you recognize that photograph?

19   A.   Yes.

20   Q.   And who is that a photograph of?

21   A.   A photograph of Defendant Williams.

22   Q.   And is that a fair and accurate depiction of how

23   Mr. Williams appeared on April 22nd of this year?

24   A.   Yes.

25   Q.   And just for the record, what does -- what type of coat

 1    does Mr. Williams appear to be wearing there?

 2    A.  He has -- the jacket underneath is kind of a greenish

 3    jacket with an orange-lined hood as well as the jacket worn

 4    over that was, like, the color black, gray, something like

 5    that.

 6            MR. WASSERMAN:  Your Honor, I would move

 7    Government's Exhibit No. 2 in evidence.

 8            THE COURT:  Any objection?

 9            MR. OHM:  No, your Honor.

10            THE COURT:  It will be admitted.

11            (Whereupon, Government's Exhibit No. 2 was entered

12    into evidence.)

13    BY MR. WASSERMAN:

14    Q.  Thank you.

15            Officer Poupart, I'm going to show you what I've

16    marked for identification as Government's Exhibit No. 3.

17    Are you able to see that photograph?

18    A.  Yes.

19    Q.  And what is that a photograph of?

20    A.  That is a photograph of my hand on Defendant Douglas's

21    back.

22    Q.  And is that photograph a fair and accurate depiction

23    of -- well, let me ask you this:  Is that a still shot from

24    your body-worn camera?

25    A.  Yes.

1    Q.  And is that a fair and accurate depiction of a portion

2    of your body-worn camera on April 22nd of 2020?

3    A.  Yes.

4              MR. WASSERMAN:  Your Honor, I would move

5    Government's Exhibit No. 3 into evidence.

6              THE COURT:  Any objection?

7              MR. OHM:  No, your Honor.

8              THE COURT:  It will be admitted.

9              (Whereupon, Government's Exhibit No. 3 was entered

10   into evidence.)

11   BY MR. WASSERMAN:

12   Q.  Officer Poupart, are you able to describe what you're

13   doing with your hand there in Exhibit 3?

14   A.  Yes.  Conducting an external frisk.

15   Q.  And is there anything you were able to detect during

16   that external frisk?

17   A.  I was able to detect what I recognized to be the handle

18   of a firearm.

19   Q.  And is that what you appear to be grabbing in Exhibit

20   No. 3?

21   A.  Essentially, yes.

22   Q.  I want to show you Exhibit -- Government's Exhibit No.

23   4.  Are you able to see Government's Exhibit No. 4?

24   A.  Yes.

25   Q.  And what is Government's Exhibit No. 4?

1    A.  That is a photo of the firearm that was recovered.

2    Q.  And where is that -- where is that firearm located in

3    that photograph?

4    A.  Inside the backpack by the Defendant.

5    Q.  And is that a fair and accurate depiction of the firearm

6    as it was found inside the backpack worn by the Defendant on

7    April 22nd of 2020?

8    A.  Yes.

9            MR. WASSERMAN:  Your Honor, I would move

10   Government's Exhibit No. 4 in evidence.

11           THE COURT:  Any objection?

12           MR. OHM:  No, your Honor.

13           THE COURT:  It will be admitted.

14           (Whereupon, Government's Exhibit No. 4 was entered

15   into evidence.)

16   BY MR. WASSERMAN:

17   Q.  And finally, I'm going to show you what I've marked for

18   identification as Government's Exhibit No. 5.

19           Are you able to see that, Officer Poupart?

20   A.  Yes.

21   Q.  And what is that a photograph of?

22   A.  That is a photograph of the firearm recovered from the

23   Defendant's backpack.

24   Q.  Is it a fair and accurate depiction of the firearm

25   recovered from Defendant Douglas's backpack on April 22nd of

1    2020?

2    A.  Yes.

3            MR. WASSERMAN:  Your Honor, I would move

4    Government's Exhibit No. 5 into evidence.

5            THE COURT:  Any objection?

6            MR. OHM:  No objection, your Honor.

7            THE COURT:  It will be admitted.

8            (Whereupon, Government's Exhibit No. 5 was entered

9    into evidence.)

10   BY MR. WASSERMAN:

11   Q.  Officer Poupart, you indicated that Co-Defendant Tavonte

12   Williams was stopped and also arrested.

13           Can you tell us where Mr. Williams was arrested in

14   relation to where Theodore Douglas was arrested?

15   A.  Defendant Williams was stopped and arrested in the 2300

16   block of 15th Street.  Defendant Douglas was stopped at the

17   end of the walkway that goes between the parking lot and the

18   2300 block of 15th Street.

19   Q.  And do you know whether Mr. Williams was stopped before

20   or after you stopped Mr. Douglas?

21   A.  He was stopped after I had stopped Mr. Douglas.

22   Q.  And how were you able to determine that?

23   A.  The body-worn camera.

24   Q.  And whose body-worn camera did you review in connection

25   or to figure out when Mr. Douglas was arrested -- excuse

```
 1    me -- when Mr. Williams was arrested relative to

 2    Mr. Douglas?

 3    A.  Officer Gabster.

 4    Q.  And based on your review of Officer Gabster's body-worn

 5    camera, at the time that Mr. Williams was stopped, was there

 6    anyone in his immediate vicinity, anyone else?

 7    A.  Yes.

 8    Q.  And do you know how many other people?

 9    A.  I believe it was two other people standing with him.

10    Q.  Was Mr. Williams to your knowledge searched after he was

11    stopped by police?

12    A.  Yes.

13    Q.  And to your knowledge, was any money recovered from his

14    person?

15    A.  No.

16    Q.  Do you know or have any knowledge whether Mr. Williams

17    handed any money to anyone shortly before he was stopped by

18    police?

19    A.  I'm not aware of that occurring.  It's possible.

20    Q.  You don't know.  Is that correct?

21    A.  I don't know.

22           MR. WASSERMAN:  The Court's indulgence.

23           THE COURT:  Okay.

24           MR. WASSERMAN:  Your Honor, that's all I have.

25           THE COURT:  Mr. Ohm, I want to read the complaint.
```

1    It's on my phone here.  So I'm going to do that for a moment

2    before you begin.

3              MR. OHM:  Sure.

4              THE COURT:  Okay, Mr. Ohm.  Go right ahead.

5              MR. OHM:  Thank you, your Honor.

6                        CROSS-EXAMINATION

7    BY MR. OHM:

8    Q.  Good afternoon, Officer -- is it "Poupart"?

9    A.  "Poupart."

10   Q.  Did you [indiscernible] any handwritten notes during the

11   course of this case?

12   A.  No.

13   Q.  I want to talk about sort of what was going on in the

14   neighborhood when this incident occurred.

15             You had said in your complaint, I think, there was

16   some NSID operations being conducted?

17   A.  Yes.

18   Q.  And Mr. Douglas wasn't like a target of this operation.

19   Right?

20   A.  Well, I mean, can you define "target"?

21   Q.  Mr. Douglas specifically [indiscernible] was not a

22   target of the operation that was set up to monitor this

23   neighborhood on this day?

24   A.  Not specifically.

25   Q.  And Mr. Williams wasn't either.  Right?

1   A.  Not to my knowledge.

2   Q.  And there were -- is it fair to say there were a lot of

3   police officers out there that day?

4   A.  Where do you mean?  In the city?

5   Q.  No.  I mean in the neighborhood during the time of the

6   incident.

7   A.  Well, I mean, it's kind of hard to say if there were a

8   lot of police officers in our unit.  We're not a patrol

9   unit, so there's not a lot of marked cruisers and things

10  going by from our unit.  We're not patrol.

11  Q.  Okay.  I'm going to show you a still of your body-worn

12  camera.  Okay?

13  A.  Sure.

14  Q.  And this is Defense 1 at T19, 14:37.  At least after the

15  arrest, there were a lot of police officers that were

16  around.  Correct?

17  A.  Yes.  You could say that.

18  Q.  And they're all -- some are in uniform.  Correct?

19  A.  Correct.

20  Q.  And there are also uniformed police officers and

21  plainclothes police officers who were in the area before the

22  arrest.  Right?

23  A.  I mean, the majority moved in to effect the arrest.

24  Q.  And were you one of the individuals who moved in?

25  A.  Yes.

1    Q.  And you were in your car at the time?

2    A.  Yes.

3    Q.  And was it a marked car?

4    A.  No.  It was an unmarked vehicle.

5    Q.  Were there also marked police cars there?

6    A.  I believe some marked cars arrived.

7    Q.  Okay.  Now, the undercover officer told you that he saw

8    Mr. Douglas standing in a walkway.  Right?

9    A.  Yes.  I believe so.

10   Q.  And then he said that he saw Mr. Williams approaching

11   Mr. Douglas?

12   A.  Yeah.

13   Q.  Is that something that you saw also?

14   A.  No.

15   Q.  So before you got out of the car, did you notice

16   Mr. Douglas?

17   A.  Yes.

18   Q.  When you first noticed Mr. Douglas, what was Mr. Douglas

19   doing?

20   A.  He was standing near the corner of the parking lot in

21   the walkway.

22   Q.  Was he standing [indiscernible]?

23   A.  No.

24   Q.  Was he standing with Mr. Williams?

25   A.  No.

1    Q.  Was he standing with the two individuals that he was

2    standing with when you initially approached?

3    A.  Yes.

4    Q.  And when you got out of your car, did you notice

5    Mr. Williams?

6    A.  No.

7    Q.  And other than [indiscernible] standing there, did you

8    see Mr. Douglas do anything else?

9    A.  Not particularly.

10   Q.  So you didn't see him making any gestures?

11   A.  No.

12   Q.  He was just standing there talking to the other

13   individuals?

14   A.  Essentially, yeah.

15   Q.  Without telling us exactly where the undercover was,

16   could you tell us whether the undercover was stationary or

17   moving?

18   A.  I believe he was stationary at the time.  I can't speak

19   to his exact actions.

20   Q.  And could you see whether -- did you know whether the

21   undercover was looking through any obstructions like trees

22   or windows or anything like that?

23   A.  That I don't know.

24   Q.  So you never talked to the undercover about his line of

25   sight and whether he had a clear view?

Poupart - CROSS - By Mr. Ohm

1   A.  Well, he said that he was able to see everything that he

2   had called out clearly.

3   Q.  Okay.  But he was obviously describing something.  You

4   don't have any information about his opportunity to observe?

5   A.  What do you mean?

6   Q.  Well, was the undercover where he was because he was

7   looking at that walkway in particular or was the undercover

8   just sort of generally looking in that area?

9   A.  I would think he was looking in that area.  I couldn't

10  specifically say what he chose or didn't choose to focus on.

11  Q.  Okay.  Approximately how far from what he says he

12  observed was the undercover?

13          MR. WASSERMAN:  Objection.

14          MR. OHM:  It goes to opportunity to observe, your

15  Honor.

16          THE COURT:  Is that going to -- you tell me,

17  Mr. Wasserman.

18          MR. WASSERMAN:  Your Honor, it potentially reveals

19  the location of the undercover.

20          MR. OHM:  Your Honor, it only matters if the

21  undercover was in a [indiscernible].  Number one, it's

22  still --

23          THE COURT:  I can imagine a scenario in which the

24  distance out there would tell a great deal about it, because

25  they're [indiscernible] the distance he's at.  I don't know

 1    enough about the neighborhood to respond to figure out

 2    whether or not the response would disclose where the

 3    undercover was.

 4          Officer, do you know?  Would revealing the

 5    approximate distance of the undercover's location reveal the

 6    undercover, where he was located?  You understand the

 7    neighborhood better than I do.

 8          THE WITNESS:  It's possible that it could.

 9          THE COURT:  Well, then, I'm going to sustain the

10    objection.

11    BY MR. OHM:

12    Q.  Let me ask this, Officer:  Is the undercover operation

13    like a continuous operation from that particular location?

14          MR. WASSERMAN:  I'm going to object to that.

15          THE COURT:  Hold on, Officer.

16          Go ahead, Mr. Wasserman.

17          MR. WASSERMAN:  I don't think it's relevant

18    whether it was a continuing operation or a one-off.

19          MR. OHM:  Well, if it's a one-off, your Honor,

20    then who cares whether it's revealed or not?  If he's in a

21    car at the corner, then the opportunity to observe is a

22    question that is relevant to probable cause and there's no

23    real prejudicial effect that the Government needs to worry

24    about if it's not going to be used again.

25          THE COURT:  Mr. Wasserman, any objection?

1          Go on, Mr. Poupart.

2               MR. OHM:  I'm sorry.  I didn't hear.  I missed the

3     operative verb.

4               THE COURT:  I'm sorry.  I'm going to sustain the

5     objection.

6               MR. OHM:  Okay.

7     BY MR. OHM:

8     Q.  Officer, was the undercover elevated or on ground level?

9     A.  As far as I know, he was ground level.

10    Q.  And if I can ask a broader question, was the undercover

11    over 100 feet away from the location of what he was

12    observing?

13    A.  I'm not sure of the exact distance that he was.

14    Q.  Now, do you know what area the undercover was saying

15    that it observed the transaction or the interaction between

16    Mr. Williams and Mr. Douglas?

17    A.  Yes.

18    Q.  Is it any sort of a private area?

19    A.  Well, it's a walkway between buildings in this complex.

20    Q.  So I guess I'm trying to figure out like if it's a

21    walkway like just an open sort of sidewalk through the

22    property or is it like --

23    A.  Yes.

24    Q.  -- a walkway that's hidden from view?

25    A.  No.  It's an open sidewalk in the property.

1   Q.  So it's not secluded at all?

2   A.  No.

3   Q.  And did the undercover observe the people that are

4   identified as Mr. Douglas and Mr. Williams -- did he observe

5   them sort of walking away to have a more secluded

6   interaction?

7   A.  I believe when the undercover witnessed the transaction,

8   they had been [indiscernible], two of them.

9   Q.  So I guess what I'm asking is, did they meet and then

10  walk off or did they just meet and then have an interaction,

11  according to the undercover?

12  A.  Well, at some point, after the exchange, they did walk

13  off.

14  Q.  Sure.

15       So in terms of the exchange itself, did the

16  exchange happen where the two of them met or did they meet

17  and then walk off somewhere more secluded and then have an

18  interaction at that stage?

19  A.  That much I don't recall.

20  Q.  Got it.

21       And the undercover didn't report Mr. Douglas

22  looking around [indiscernible] there or anything like that.

23  Right?

24  A.  Not that I recall.

25  Q.  And you were listening to the undercover over some radio

1    [indiscernible]?

2    A.  Yes.

3    Q.  And did the undercover report observing Mr. Williams

4    acting nervously at all?

5    A.  I don't recall.

6    Q.  According to the undercover, how long was the

7    interaction between Mr. Douglas and Mr. Williams?

8    A.  I would say no more than a couple minutes.

9    Q.  So the undercover didn't describe how much time the

10   interaction was?

11   A.  Well, just going by what I recall from the undercover

12   observing and voicing, the interaction wasn't more than a

13   couple minutes.

14   Q.  And then the undercover -- I'm sorry.  And then the

15   undercover called the lookout and then moved in on

16   Mr. Douglas?

17   A.  Correct.

18   Q.  And when you first observed Mr. Douglas, did he match

19   the lookout?

20   A.  Yes.

21   Q.  Now, you were the original officer that originally

22   stopped Mr. Douglas.  Right?

23   A.  Yes.

24   Q.  And you stayed with him throughout the time he was on

25   the scene?

Poupart - CROSS - By Mr. Ohm

1   A.  Yes.

2   Q.  And he was talking to you and [indiscernible]?

3   A.  Yes.

4   Q.  He never said that he was aware there was a firearm in

5   the bag.  Right?

6   A.  I don't recall him making any [indiscernible].

7   Q.  And if he did, that would be something that you would

8   put into your statement of facts.  Right?

9   A.  Typically, yes.  Yeah.

10  Q.  And he never said that he was aware that there was

11  something.  Right?

12  A.  No.  I don't remember him mentioning any contraband.

13  Q.  And the bag was like a [indiscernible].  Correct?

14  A.  Yeah.  I think that was the brand.

15  Q.  Like an expensive-looking leather backpack?

16  A.  Right.  Like a little designer bag.

17  Q.  Now, while you were approaching Mr. Douglas, he didn't

18  try to evade you in any way, did he?

19  A.  No.

20  Q.  He didn't make any motions towards the bag or towards

21  anything?

22  A.  No.

23  Q.  He was entirely cooperative?

24  A.  Yeah.  He got a little verbal.  But beyond that, he

25  wasn't resistant.

1    Q.  And I know that you said that you personally did not

2    observe Mr. Douglas until you were -- I think right before

3    you [indiscernible].  Right?  That's correct, right?

4    A.  Yes.  I saw him as we were pulling into the parking lot.

5    Q.  Okay.  Regarding the undercover, what was Mr. Douglas

6    doing before he interacted with Mr. Williams?

7    A.  I don't recall what -- I don't recall what he was doing

8    beforehand regarding Mr. Williams.

9    Q.  And according to the undercover, what was Mr. Williams

10   doing before the interaction?

11   A.  I don't know.

12   Q.  Did you talk with any other officers who noticed

13   Mr. Douglas before this interaction?

14   A.  No.

15   Q.  Did you talk with any of the officers who noticed

16   Mr. Williams before the interaction?

17   A.  No.

18   Q.  Now, prior to you making contact with Mr. Douglas, other

19   than what you heard from the undercover, did you have any

20   other information about Mr. Douglas?

21   A.  Other than what I heard from the undercover, no.

22   Q.  Now, according to the undercover, did he lose sight of

23   Mr. Douglas?

24   A.  Not that I recall.

25   Q.  From where he -- from where the undercover was

1   positioned, was he in a position where he would have lost

2   sight of Mr. Douglas?

3   A.  I don't believe so.  No.

4   Q.  And from where the undercover was positioned, was he in

5   a position where he would have lost sight of Mr. Williams?

6   A.  Not that I'm aware of.

7   Q.  So without telling us where the undercover was, you know

8   where the undercover was.  Right?

9   A.  Essentially.  The basic area.

10  Q.  And in that basic area, he had a continuous line of

11  sight on both Mr. Douglas and Mr. Williams?

12  A.  As far as I know.

13  Q.  And during your approach of Mr. Douglas, the undercover

14  was sort of narrating what Mr. Douglas was doing.  Right?

15  A.  Yes.

16  Q.  He was describing Mr. Douglas and Mr. Williams.  Right?

17  A.  Yes.

18  Q.  Now, you testified that no money was recovered from

19  Mr. Williams.  Right?

20  A.  Correct.

21  Q.  And the undercover never said that while he kept his

22  eyes on Mr. Williams, Mr. Williams was ever -- had ever

23  transferred money anywhere else.  Right?

24  A.  No.  I don't believe so.

25  Q.  And he was -- okay.

Poupart - CROSS - By Mr. Ohm

```
 1              Did Mr. Williams attempt to leave or flee when
 2      police approached him?
 3      A.  No.  I don't believe so.
 4      Q.  And how far away was Mr. Williams from Mr. Douglas?
 5      Like how far away were the two different points where they
 6      were stopped?
 7      A.  Approximately -- I can approximate, if you'd like.
 8      Q.  That would be great.
 9      A.  Maybe -- I don't know -- 40 feet, maybe.
10      Q.  So they were pretty close?
11      A.  Yes.
12      Q.  Now, when you were approaching Mr. Douglas and
13      interacting with him, you were communicating with other
14      individuals that were part of your team.  Right?
15      A.  Yeah.  A little.
16      Q.  So there was the undercover that was on the radio.
17      Right?
18      A.  Right.
19      Q.  And there was also some sort of a supervising officer
20      that you were interacting with.  Right?
21      A.  Yes.  There was the [indiscernible].
22      Q.  And at a certain point in time, you asked that officer
23      if you were good for a search.  Right?
24      A.  Yes.
25              MR. WASSERMAN:  Objection.  Objection.  Beyond the
```

1    scope.

2                THE COURT:  Yes, Mr. Wasserman?

3                MR. WASSERMAN:  It's beyond the scope.

4                THE COURT:  The question was:  Was he good for a

5    search?  Is that the question, Mr. Ohm?

6                MR. OHM:  Yes, your Honor.  That there was a point

7    in time where he asked a superior officer if he was good for

8    a search.

9                THE COURT:  Well, how is that within the scope of

10   what the Government presented for probable cause in this

11   case?

12               MR. OHM:  If the Court would like, I can re-call

13   him in my case, I guess, if that's the objection.

14               THE COURT:  Well, I don't know why you would do

15   that.  But in any event, I'm going to sustain the objection.

16               MR. OHM:  So it's -- if I can ask it in a

17   nonleading fashion, would that be permissible?

18               THE COURT:  I mean, okay, then.  What's the

19   relevance of this to probable cause?

20               MR. OHM:  I think I would agree that it's not

21   relevant to probable cause.  But it is -- given that this is

22   the preliminary hearing, that would normally be done through

23   the proffer that the Court relied upon in its determination

24   about whether Mr. Douglas should be detained, that this

25   information is [indiscernible] in the weight of the evidence

 1    against Mr. Douglas.

 2          THE COURT:  Mr. Wasserman, do you understand?  The

 3    concept is that in the normal course, pre-pandemic, we would

 4    have a joint preliminary and detention hearing, assuming

 5    that there was no indictment, but I think you've just got to

 6    assume that.

 7          And Mr. Ohm's argument is that he would have been

 8    allowed to ask questions that would go to the weight of the

 9    evidence as well, which this --

10          MR. WASSERMAN:  I'm still -- yeah.  I'm not seeing

11    where this goes to the weight of the evidence.  I mean, I

12    know what Mr. Ohm is going to argue, which is that there is

13    no evidence that the Defendant was aware of what was in the

14    bag.  I'm not sure I see how asking the officer about when

15    he received authorization to conduct the search is pertinent

16    to that.

17          The argument is, there was a gun in the bag.

18    Obviously, the Defendant was not in a position to see that

19    gun while it was in the bag.  That's the argument.

20          THE COURT:  Mr. Ohm, I'm not [indiscernible] a

21    suppression issue here.  I'm not seeing any strict argument

22    that you can make with respect to when precisely the officer

23    received the okay from his supervisor to conduct a search.

24          MR. OHM:  So, your Honor, I guess I'd prefer to

25    have a side-bar.

1              In terms of the --

2              THE COURT:  Well, we can ask the officer to mute

3     his phone.  Or I guess -- how does that work?  I don't know

4     if we can do that.  We can mute him, but can he mute us?

5     Maybe I can mute him.

6              THE LAW CLERK:  This is Amanda.

7              All he has to do is turn off the volume on his

8     computer, Judge.

9              THE COURT:  Oh, okay.  That's pretty smart.

10             Officer, we'll let you know when we want you to

11    send the volume back up.  Okay?

12             THE WITNESS:  Okay.

13             THE COURT:  Can you hear us now?

14             THE WITNESS:  (No response.)

15             THE COURT:  Go ahead, Mr. Ohm.

16             MR. OHM:  Thank you, your Honor.

17             So to this point, we have an undercover who's

18    essentially saying that he sees an item exchanged for money,

19    money which was never recovered, even though the individual

20    who had it was in the line of sight the entire time.

21             The only other thing that would supposedly save

22    the search was supposedly this -- what was described as a

23    grabbing, which, you know, might be a pat-down, which I

24    think is what he's trying to say.  But he doesn't

25    actually -- although he's narrating what he's doing here

1    with his superior officer and then ultimately asks if he's

2    good for a search, he doesn't mention that he feels anything

3    in the backpack.  So that's not something that he

4    immediately recognizes to be a gun, which is what he says in

5    the complaint.

6           So I'm bringing out the fact that he is saying

7    that he's good for a search, that he's asking for a search,

8    because he's directly reporting to his supervisor, but that

9    at no point in time does he actually tell his supervisor

10   that he believes this is a firearm.

11          THE COURT:  Mr. Wasserman?

12          MR. WASSERMAN:  That's an issue -- that's a

13   suppression issue.  I mean, the bottom line is the gun was

14   recovered.  I still just don't see how that pertains to

15   probable cause or the weight of the evidence.

16          And I would argue just as an aside that Mr. Ohm's

17   I don't think characterizing the evidence about line of

18   sight necessarily all that accurately.  The officer doesn't

19   really know what the UC was looking at at specific times.

20   But beyond that, I'm just not seeing how -- whether or not

21   the officer communicated or was radioed to a supervisor or

22   if the supervisor -- I don't even know if the supervisor was

23   standing right there; but how, you know, the timing of this

24   goes to anything but suppression.

25          THE COURT:  Well, I agree.  I'm not even going to

```
 1    get [indiscernible] towards suppression.

 2              In any event, I'm going to sustain the objection.

 3              So do you have a different line of questions,

 4    Mr. Ohm?

 5              MR. OHM:  I have [indiscernible] questions --

 6              THE COURT:  Okay.

 7              MR. OHM:  -- but not very many more.

 8              THE COURT:  I'm going to tell him to turn the

 9    volume back up then.  All right.

10              How did I say I was going to do that?

11              MR. OHM:  Wave.

12              THE COURT:  I'll wave.

13    BY MR. OHM:

14    Q.  Okay, Officer.  I'm going to show you what I've marked

15    as Defense 1, which is I believe your body-worn camera of

16    the entire interaction.  Okay?

17    A.  Okay.

18              THE COURT:  Well, Mr. Ohm, is it Defense 1?

19    Haven't you already shown a few others?

20              MR. OHM:  I've shown him 1.  I paused.  I'm not

21    going to call it a still, because I didn't capture it.  But

22    I showed him a part of Defense 1.

23              THE COURT:  I see.  Got it.  Go right ahead.

24              MR. OHM:  For the record, your Honor, I'm starting

25    at the point when --
```

```
 1   BY MR. OHM:

 2   Q.  Officer, does it look like you in your car?

 3   A.  Yes.

 4   Q.  And is it fair to say that audio usually begins in two

 5   minutes?

 6   A.  Correct.

 7          MR. OHM:  So for the Court's -- for the Court's

 8   benefit, I'm forwarding up to a little bit before two

 9   minutes, which is at 19:02.

10   BY MR. OHM:

11   Q.  Officer, we're at 19:03 on the top right-hand timestamp.

12   Is that you grabbing the back of his backpack -- is that

13   what you were describing earlier under examination?

14   A.  Yes.

15   Q.  What are you feeling there?  Is it fair to say that it's

16   sort of like a rectangle that you're moving around?

17   A.  Part of it.

18   Q.  Well, is there any other part of it that -- well, let me

19   show you the video.  You can tell me if there's any other

20   part of it.

21          Did you see yourself grabbing any other part of --

22   anything other than the rectangle there?

23   A.  Where --

24          MR. WASSERMAN:  I'm going to object to the

25   characterization of that question.
```

1      THE COURT:  Overruled.  He can describe however he

2   wants to describe what he did.

3      THE WITNESS:  Okay.  Where you see my fingers are

4   also pressing into the bag and feel the object inside.

5   BY MR. OHM:

6   Q.  At any point in time, do you -- and during this time,

7   you are communicating with your supervisor over the radio.

8   Right?

9   A.  Yes.  There's one point where people are talking and I

10  can't get over and I'm essentially just waiting.  It's not

11  that -- I really don't talk that much over the radio.

12  [Indiscernible] on the unit.

13  Q.  But the unit is all sort of focused on the arrest you're

14  about to make.  Right?

15  A.  Correct.

16  Q.  And you're the person that has the most information

17  about it.  Right?

18  A.  Aside from the undercover.

19  Q.  At that point, you started tugging on the zipper.

20  Right?

21  A.  Uh-huh.

22  Q.  And you asked if you mind if -- if he minds if you check

23  it.  Right?

24  A.  Correct.

25  Q.  And he essentially said, No; they're glasses.  Right?

1    A.  Right.

2    Q.  Okay.  And just for the record, we're at 19:04:29.

3         MR. WASSERMAN:  Your Honor, if I can interject for

4    just a second.

5         THE COURT:  Stop the video.

6         MR. OHM:  I'm sorry.  I didn't understand that he

7    was talking.

8         MR. WASSERMAN:  Your Honor, I just would note,

9    there is audio on this video that is being played.  And I'm

10   going to object to Mr. Ohm playing it without the audio and

11   then asking the officer to describe what he was saying to

12   the Defendant or was saying at all when what he said is on

13   the video that's being played with no sound.  I just think

14   it's mischaracterizing it for the record.

15        THE COURT:  We cannot hear the sound.  The

16   transcript was issued yesterday.  I don't know if you want

17   to attempt.  It was somewhat better yesterday.  It still

18   wasn't great.

19        MR. OHM:  I'm sorry.  I may have --

20        MR. WASSERMAN:  I mean, I just -- I was

21   [indiscernible] to that.  I didn't hear any sound.

22        THE COURT:  Well, it is a technical issue.

23        What did you do yesterday, Mr. Ohm?  Did you --

24        MR. OHM:  I basically had the phone -- the audio

25   feed through the phone, which I think I can do right now.

Poupart - CROSS - By Mr. Ohm

 1              THE COURT:  Well, let's try that.  It wasn't

 2     great, Mr. Wasserman, but we can try it.

 3              MR. WASSERMAN:  Okay.

 4              MR. OHM:  If Mr. Tran is still there, are we still

 5     at the 877-336-1839 number?

 6              THE COURT:  Mr. Tran?

 7              MR. OHM:  I can hear the Court through the phone,

 8     so I think this must be working.  So for the record, I'll

 9     just go back.

10              Mr. Wasserman, did you have a particular point

11     that you wanted me to go back to?

12              MR. WASSERMAN:  Wherever you were was fine.

13     BY MR. OHM:

14     Q.  Officer, did you hear yourself say, "Mind if I check

15     that?"

16              THE COURT:  You still can't hear it, Mr. Ohm.  I'm

17     happy to view the video myself if there's some point you

18     want to make with what was actually being said.  I don't

19     think it is fair to have this officer, you know, without

20     having heard the video, being asked what the video is

21     saying.  He can't remember at every point in time what he

22     said during the video.

23              MR. OHM:  Certainly, your Honor.

24     BY MR. OHM:

25     Q.  Well, do you have a recollection, an independent

```
 1    recollection, of this case, Officer?

 2    A.  Yes.

 3    Q.  And have you had an opportunity to look at your

 4    body-worn camera video?

 5    A.  Yes.

 6    Q.  Was that somewhat recently?

 7    A.  Yes.

 8    Q.  So it seemed like when you were [indiscernible] yourself

 9    on the video, you remember asking a question and sort of

10    stopping.  Right?

11    A.  Yes.

12    Q.  Okay.  And when you looked at the video, were you able

13    to hear the video when you recently were looking at the

14    video?

15    A.  Yes.

16              MR. OHM:  The Court's indulgence, your Honor.

17              THE COURT:  I have a question.

18              The gun was in the bag.  Correct?

19              THE WITNESS:  Yes, your Honor.

20              THE COURT:  Was there anything else in the bag?

21              THE WITNESS:  Yes.  I believe there was like a

22    glasses case.

23              THE COURT:  Anything else?

24              THE WITNESS:  Not that I recall.

25              THE COURT:  I don't remember which photo was
```

```
 1    presented by the Government.  One of the screen shots

 2    presented by Mr. Wasserman showed the gun inside the bag.

 3    At least that's what I understood it to be a photo of.  Do

 4    you recall that?

 5              THE WITNESS:  Yes, your Honor.

 6              THE COURT:  Do you know if anything was taken out

 7    of that bag before that video was shot?

 8              THE WITNESS:  I don't recall.  I don't believe

 9    anything was taken out of the bag before it was

10    photographed.

11              THE COURT:  Thank you.

12              Mr. Ohm, sorry.

13              MR. OHM:  Thank you, your Honor.

14    BY MR. OHM:

15    Q.  Was there anything about the bag itself that allowed you

16    to tell who owned the bag?

17    A.  There weren't any identifiers on it.

18    Q.  And there wasn't any pieces of paper or anything like

19    that in the bag?

20    A.  No.

21              MR. OHM:  Your Honor, I don't have anything

22    further.

23              THE COURT:  Anything further, Mr. Wasserman?

24              MR. WASSERMAN:  Just briefly, your Honor.

25
```

```
 1                        REDIRECT EXAMINATION

 2    BY MR. WASSERMAN:

 3    Q.  Officer Poupart, looking back at Government's Exhibit 3,

 4    can you see that?  Can you see that, Officer Poupart?

 5    A.  Yes.  Now I can.

 6    Q.  So where is -- is the bag underneath his coat?

 7    A.  Yes.

 8    Q.  And so in other words, he was not wearing a

 9    backpack-type bag?

10    A.  Yes.

11    Q.  So he's actually got the backpack underneath his coat as

12    opposed to slung over it.  Is that accurate?

13    A.  Yes.

14    Q.  And you indicated on cross-examination that the

15    Defendant claimed his glasses were in the bag?

16    A.  His glasses case.

17    Q.  His glasses case was in the bag.  Okay.

18            So just so we're clear, you [indiscernible] that

19    there was anything in the bag?

20    A.  Yes.

21    Q.  And his response was what?

22    A.  The glasses case.

23    Q.  Okay.

24            MR. WASSERMAN:  I don't have anything else, your

25    Honor.
```

```
 1              THE COURT:  Thank you very much, Officer.  You're

 2    free to go.  So you can turn off your camera.

 3              THE WITNESS:  I'm sorry.  I didn't hear that.

 4              THE COURT:  I just wanted to say you're free to

 5    go.  Thank you for your time.  You can terminate the

 6    session.  You can turn off your camera.

 7              THE WITNESS:  Okay.  Thank you, your Honor.  Thank

 8    you for your time.

 9              THE COURT:  Sure.

10              (Witness excused.)

11              THE COURT:  I'll hear the parties on probable

12    cause.

13              Mr. Wasserman.

14              MR. WASSERMAN:  Yes, your Honor.

15              So this is a fairly, I think, straightforward case

16    where an undercover officer in an observation

17    [indiscernible] observes a hand-to-hand transaction.  In

18    this case, it happens to be a backpack in exchange for

19    money.

20              The undercover officer, based on the sworn

21    statement, observes this fairly quick transaction and sees

22    Defendant Douglas in particular hurriedly take off his coat

23    and then put the black backpack on and put his coat over the

24    bag, you know, a backpack that slings over your shoulders.

25    And he sees a transaction where Douglas hands him money.
```

1        This is the type of transaction that results in

2    stops routinely in DC.

3        So there's clearly a reasonable suspicion to

4    believe that a transaction for contraband has occurred.

5    There's a lookout.  The Defendant, Mr. Douglas, is

6    [indiscernible] consistent with that lookout.  He's wearing

7    a baggy or puffy blue coat and he's standing in the area

8    where the undercover indicates he was later positively

9    identified.  And the officer pats him down, feels what he

10   recognizes is a gun and then of course finds it.

11       So the only issue is really knowledge by

12   Mr. Douglas of what's in the bag.  Officer Poupart

13   interestingly testifies that the Defendant claims to know

14   what's in the bag or at least part of the bag.  He says a

15   glass case.

16       So if this is a situation where Mr. Williams is

17   selling the Defendant a bag that has nothing in it, there

18   would be no reason for Mr. Douglas to have any

19   [indiscernible], not to mention obviously a gun.

20   Particularly this type of gun is fairly heavy, and it would

21   be a fair inference that somebody taking possession of this

22   bag would know that there was something heavy inside.  And

23   obviously, he's paying for the bag that apparently already

24   has Mr. Douglas's glass case in it.  That doesn't make

25   sense.

1          The fact that Mr. Douglas appears to be trying to

2     conceal the bag by wearing it or the backpack from how you

3     would typically [indiscernible] that type of bag is also, I

4     think, consistent with not only inference of knowledge of

5     what's inside the bag.

6          And then I think the Court also can consider, as

7     you're able to consider at a trial, the Defendant's two

8     prior possessory firearms convictions, raising the inference

9     that he knew what was in the bag.  Obviously, in a

10    constructive possession case such as this, a jury with the

11    permission of the Court would be permitted to consider those

12    possessory offenses for -- to infer the Defendant's

13    knowledge of what was in that bag; and this instance is no

14    different.  The Court can and should consider those two

15    prior firearms convictions to infer that the Defendant knew

16    what was in the bag and knowingly and voluntarily possessed

17    that firearm.

18          So for all of those reasons, the Government

19    submits that there's probable cause that's been established.

20          THE COURT:  Thank you.

21          Mr. Ohm?

22          MR. OHM:  Thank you, your Honor.

23          Your Honor, what makes the Government's case here

24    is the allegation that there is money exchanged for -- that

25    this is actually a transaction, that there was money

1   exchanged for [indiscernible].  And the evidence that the

2   Government presented for that is in our view just highly --

3   completely unsupported and weak.

4        The Government didn't put on evidence about the

5   opportunity of the undercover to observe.  I mean, these

6   people could be a mile away; they could be looking through a

7   telescope; they could be 15 feet away.  But we have no idea

8   because the Government has not brought that information.

9   [Indiscernible] it's the Government's burden.

10       What the evidence is of it being a transaction is

11  this idea that money was exchanged.  And as the officer

12  testified, no money was recovered from Mr. Williams.  This

13  is a very short interaction.  He was arrested very quickly

14  afterwards.

15       Mr. Wasserman tried to suggest under examination

16  that maybe he could have passed that money off to two other

17  individuals.  We'd submit if that were the case, then the

18  undercover would have told the officers.  And the Court

19  could see that there were [indiscernible] there, searched

20  the two individuals with them to see if there's evidence

21  consistent with "what I think I saw."

22       The hand-to-hand transaction of money is not

23  something like one [indiscernible] sees.  I think that is

24  something that the Government has to buttress with evidence

25  of an opportunity to observe.  And they in this case just

1    chose not to.

2           The Government also wants to [indiscernible] the

3    firearm was heavy.  We have no evidence of that.  There was

4    no testimony about that.  It was just something that the

5    Government wants the Court to decide.

6           There's no other indicia -- your Honor, I don't

7    think that there's -- I think this is a very unusual case,

8    because if the Government is correct that Mr. Williams --

9    Mr. Douglas is sitting there with a firearm that he knows

10   that he purchased, and he doesn't act at all.  He doesn't

11   react when the police come towards him.  He doesn't react

12   when the police pull him aside.  And he just sits there and

13   stands there and lets them search without seemingly having

14   any idea of what's going on.

15          And then at the same time, the Government has no

16   evidence as to where this bag came from, whether it could be

17   somebody saying, "Hold onto this bag" or -- but it's

18   certainly not a normal thing to have a leather Coach

19   backpack, which seems like it has value, I think -- the

20   officer described it as a designer backpack -- as a vehicle

21   of transporting contraband when the backpack was probably --

22   would be more valuable than the contraband that it could

23   carry.

24          There's too many holes in the Government's theory

25   for the Court to be able to find probable cause.  So I'd ask

1    the Court not to do so.

2              THE COURT:  Mr. Wasserman?

3              MR. WASSERMAN:  Your Honor, with reference to the

4    money issue, there's no indication that the undercover had

5    eyes on Mr. Williams continuously from the time that he

6    completed the transaction to the time that he

7    [indiscernible].

8              Officer Poupart did testify that the Defendant --

9    excuse me -- Mr. Williams was standing in close proximity to

10   the individuals near a vehicle on 15th Street, a distance

11   away from where the transaction had occurred, a fair

12   distance away.  You know, there was plenty of opportunity

13   for Mr. Williams to have disposed of that money in between

14   the time of the transaction and the stop.  That's something

15   that happens in cases involving drug transactions all the

16   time with stash locations or transferring money from one

17   person to another.

18             The officers would not have had a basis to search

19   anybody else on the scene to check if they had

20   [indiscernible].  I'm not sure if that would have revealed

21   anything anyway, even if they did have some money, because

22   this was not prerecorded funds or anything like that.

23             So I think this is a very straightforward matter.

24   Probable cause, as the Court's aware, is a low standard.

25   And there's more than sufficient evidence to draw the

1     inference -- a reasonable inference that the Defendant knew

2     what was in that backpack and intended to possess that

3     firearm.

4              THE COURT:  Thank you.

5              I am going to find probable cause in this case.  I

6     do think that there's some interesting features to the case

7     with respect to this incident and that the Government does

8     have to show knowledge.  And this is a case where it would

9     ask the finder of fact to draw an inference based on what

10    the officers were able to observe.

11             And moreover, this is a case where there's the

12    missing money and the Defendant didn't resist or run when he

13    was approached by the officers.

14             That said, given what the Government was able to

15    show at this hearing, I do find probable cause in fact to

16    the possession of the gun for the reasons [indiscernible]

17    here.

18             I would just highlight that the -- the complaint

19    states with respect to the actions of this Defendant, when

20    he was what appears to be -- certainly we can infer -- was

21    seeking to hide or conceal [indiscernible] with his coat as

22    well as his knowledge of at least one of the items that

23    appears to have been inside the bag.  I think it would be

24    inconsistent with the idea that he either purchased the bag

25    or had no knowledge of what was inside of the bag.

1        So I do find that the Government's demonstrated

2    probable cause in this case.

3        Mr. Douglas, you should know that this is just an

4    intermediate step.  I'm not finding you guilty.  That's

5    going to be the jury who will make the decision with respect

6    to whether you're guilty or not.  [Indiscernible] be told

7    about my finding here today with respect to probable cause.

8    That is all I'm finding, is probable cause.  It's a low

9    standard, as the Government said.  The Government will have

10   a much higher burden of proof at trial, and you will have

11   the presumption of innocence like you do today at the

12   beginning and throughout that trial.  The Government has to

13   prove the case at trial.

14       But I do find probable cause now and I will

15   further bound the case over to -- for further action by the

16   [indiscernible].

17       Any further things we need to do today,

18   Government, in this case?

19       MR. WASSERMAN:  No, your Honor.

20       THE COURT:  Mr. Ohm?

21       MR. OHM:  I think we have a date [indiscernible].

22       THE COURT:  Good enough, then.  Thank you,

23   everyone.  I think it was a good hearing, and we were able

24   to overcome the various technical difficulties.  So I

25   appreciate everyone's work to make this happen and patience

1    during this proceeding here today.

2              The parties are excused.

3              MR. OHM:   Thank you, your Honor.

4              MR. WASSERMAN:   Thank you, your Honor.

5              (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3                  I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                 Dated this 15th day of June, 2020.

11

12                 /s/ Lisa Edwards, RDR, CRR
                   Official Court Reporter
13                 United States District Court for the
                     District of Columbia
14                 333 Constitution Avenue, NW, Room 6706
                   Washington, DC 20001
15                 (202) 354-3269

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 20-cr-121 (CJN)** |
| | : | |
| **THEODORE DOUGLAS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SURREPLY TO DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION MOTION TO SUPPRESS TANGIBLE EVIDENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's motion to suppress tangible evidence (ECF #S 31, 42). In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

## PROCEDURAL BACKGROUND

On August 21, 2018, counsel for Defendant Douglas filed a boilerplate motion to suppress tangible evidence. In his motion, the Defendant made conclusory assertions regarding the illegality of the stop and eventual search of the defendant, which resulted in the seizure of a loaded firearm. On September 4, 2020, the government filed its opposition (ECF # 34) to Defendant Douglas's motion to suppress. Due to the lack of any application of the facts in the defendant's motion to the legal analysis included therein, the government was required to try to anticipate what specific conduct defense counsel would be arguing as violative of the Fourth Amendment.[1] On September 18, 2020, the Defendant filed his reply to the government's opposition, re-asserting

---

[1] Defense counsel had been provided the body worn camera footage and the police reports several months prior to the motions deadline. Accordingly, there is no basis for the defense to assert that they lacked sufficient information to file a proper motion.

some of the same legal arguments made in his initial motion, mischaracterizing facts readily observable in the BWC footage, and misconstruing the legal principles that apply to these facts.

Most notably, the defendant incorrectly asserts that: (1) the defendant was under arrest at the time he was handcuffed; (2) there was no reasonable articulable suspicion to conduct a *Terry* stop of the defendant; and (3) that the officer's frisk of the defendant exceeded the lawful scope of a *Terry* frisk for weapons.

**ARGUMENT**

A.    *The Use of Handcuffs Did Not Convert Stop Into an Arrest.*

In his motion, the defendant conveniently ignored the multiple facts, which supported the two responding officers' placing the defendant in handcuffs.  As discussed in the government's opposition motion, these consisted of the observation by the UC of a hand-to-hand transaction of the backpack for money, the defendant's apparent attempts at quickly concealing the backpack from view, the defendant's presence in an area known for high crime, including firearms and narcotics offenses, and the fact that the backpack could easily have contained a firearm or other dangerous weapon.  *See* ECF # 34 at 5-7.  The defendant also ignores the additional factors courts have recognized as bearing on whether use of handcuffs converts an otherwise valid *Terry* stop into an arrest, including the demeanor of the officers, the number of officers involved in the stop, and whether any weapons were drawn by the officers.  The defendant attempts to obfuscate these factors by noting that a short time *after* the two responding officers had placed the defendant in handcuffs, other officers arrived on scene.  The defendant's argument ignores the fact that the other officers were involved in searching for the second suspect observed by the UC, and that the officers who initially approached Defendant Douglas could not have known the exact timing of when these other officers would be arriving in the area.  As it only takes a person a split-second to draw a

weapon like a gun or knife and kill or injure someone, the officers' action in handcuffing the defendant was reasonable.

The defendant next complains that there was an insufficient basis to stop him, as well as insufficient facts for the police to suspect that he was armed.  ECF #42 at 6.  Defense counsel asserts that the governments reliance, in part, on the defendant's presence in a high crime area such as the Fifth District to support the stop and frisk amounts to the government "advocating for a position that any individual stopped in the 5th (or 6th and 7th Districts) is inherently more suspicious than an individual stopped in [sic] First, Second, Third and Fourth District." *Id.* at 7.  Defense counsel then proceeds to employ the oft-used dog whistle that the government's focus of prosecutorial resources in areas where violent crime and narcotics trafficking are the most frequent and deleterious is racist.  ECF #42 at 7, n.1.  These arguments ignore well-established precedent that facts such as those presented in the instant case, **in combination**-- observation of a hand-to-hand transaction, nervous behavior, acts of concealment, and presence in a high crime area are sufficient to justify a *Terry* stop and frisk.  *See United States v. Lovelace,* 357 F. Supp. 2d 39, 43-44 (D.D.C. 2004); *See Minnesota v. Dickerson,* 508 U.S. 366, 368-369 (1993) (upholding *Terry* stop and frisk where defendant was observed exiting known "crack-house" and engaged in evasive behavior upon noticing police presence).

    B.    *The Frisk of the Defendant Did Not Exceed the Scope Lawful Terry Frisk.*

Officer Poupart's frisk of the exterior of Defendant Douglas's jacket was within the scope of a lawful frisk under *Terry*.  As can be plainly observed on the BWC footage, Officer Poupart is feeling through the defendant's jacket *and* the backpack, where it is clear he is able to feel the presence of a large metal object.  *See* ECF #34, Exhibit A at 19:03:00.  Officer Poupart testified at the preliminary hearing that he immediately recognized this item as a firearm.  ECF #34, Exhibit

B at p. 16; lines 12-21.  Contrary to the defendant's claim, there was no improper manipulation of Defendant's jacket or the backpack of the type invalidated by the U.S. Supreme Court in *Minnesota v. Dickerson.*  Defendant's reliance on *Dickerson* is inapposite because in that case, the frisk by the officer revealed that what he was feeling could not have been a weapon, and thus, the Court ruled that any further manipulation of the accused's pocket to determine that the concealed item was crack-cocaine exceeded a permissible *Terry* frisk for weapons.  *Dickerson,* 508 U.S. at 379. Furthermore, the Defendant's claim that the frisk employed by Officer Poupart was improper "manipulation" misconstrues the permissible extent of a frisk and creates an untenable standard upon which to evaluate such frisks.  The manner in which a frisk is conducted is necessarily going to be impacted by the nature of the item an officer is touching.  Conducting a frisk on a pocket to a light jacket is likely to require less manipulation in order to determine if a weapon is present than if an officer is touching a backpack located underneath a jacket.  The defendant appears to be advocating for restrictions, without citation to any authority, on the manner in which an officer touches the area to be searched without regard to the nature of the item being frisked.  Under the defendant's view, it would appear that anything more than simply placing the palm of one's hand on an item constitutes an impermissible "manipulation."  In fact, the BWC footage establishes that Officer Poupart used his thumb and other fingers to feel through the jacket and backpack. ECF #34, Exhibit A at 19:03:00.  There is nothing unreasonable about the manner in which Officer Poupart conducted this frisk in light of the nature of the area he was frisking.  "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.'"  *United States v. Spriggs,* No. 09-0361, 2010 WL 917709, *2 (D. Md. March 10, 2010) (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 373–75 (1993)).  Since Officer Poupart had probable cause to arrest the defendant and seize the forearm upon recognizing

90

it as such, it is of no moment that he then removed the defendant's jacket and continued to feel for the location of the gun inside of the backpack.[2]

Finally, the defendant's assertion that Officer Poupart's request for consent to search after he conducted the frisk and the fact that he later asked permission over the radio to conduct the search of the backpack does not undermine the probable cause that arose to arrest the defendant and search the backpack after he recognized the items as a firearm during the earlier frisk. Officer Poupart's testimony regarding his recognition of the gun during the lawful frisk is corroborated by the BWC footage, which clearly shows an item consistent with a firearm.

## <u>CONCLUSION</u>

**WHEREFORE** for the reasons stated above the United States respectfully submits that the defendant's motion to suppress tangible evidence should be denied.

Respectfully submitted,

MICHAEL R. SHERWIN
United States Attorney
N.Y.S. Bar No. 4444188


By:     _____/S/_____
STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorney
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
Telephone: (202) 252-7719
E-mail: steve.wasserman@usdoj.gov

---

[2] Even had Officer Poupart not been able to determine through the frisk over the defendant's jacket that the item was a gun or had first chosen to remove the jacket to gain access to the backpack, *Terry* would have supported Officer Poupart gaining direct access to the backpack, so that he could conduct the frisk. The defendant was wearing the backpack and it matters not that it was underneath his jacket, since removing the jacket only revealed the backpack in order to make it accessible for a permissible frisk.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 15th day of October 2020.


_____/S/_____

Steven B. Wasserman
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : **Criminal No. 1:20-cr-121 (CJN)** |
| | : |
| **THEODORE DOUGLAS** | : |

_____

**DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE**
**AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Mr. Theodore Douglas, the defendant, through undersigned counsel, pursuant to the

Fourth Amendment to the United States Constitution, respectfully moves this Honorable Court to

suppress the use as evidence at trial, all tangible objects seized and statements made as the result

of the unlawful search and seizure by officers of the Metropolitan Police Department ("MPD")

of Mr. Douglas on the 2300 block of 15th Street, NE on April 22, 2020.  Mr. Douglas requests an

evidentiary hearing on this motion.  In support of this motion, counsel submits the following.

**Factual Background**

Mr. Douglas is charged in a one-count indictment with unlawful possession of a firearm

by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in

violation of 18 U.S.C. § 922(g)(1).  The charge arose out of an incident that occurred on April

22, 2020.

**Argument**

I.      Officer Poupart arrested Mr. Douglas at the point of handcuffing him without
        probable cause.

The government claims that Officer Poupart acted reasonably by pulling Mr. Douglas

aside and handcuffing him because "they were aware that he had been given a backpack" and because "Douglas was standing in close proximity to two other men." ECF 34 at 8. This claim renders the Fourth Amendment meaningless, as demonstrated by the weight of the authority on the subject.

When Officer Poupart approached Mr. Douglas, he was standing on a sidewalk conversing with two individuals. The officer stated, "How's it going gentlemen" and said "Do me a favor and come talk to me for a minute." Mr. Douglas responded, "Me?" and Officer Poupart said "Just want to talk to you for a moment." Officer Poupart walked him several feet away and said "You're just being stopped as part of an investigation." Mr. Douglas was entirely cooperative and even placed his right hand behind his back as Officer Poupart cuffed his left hand. ECF 34 Exhibit 1 at 2:11-2:36. Within seconds, at least six officers surrounded Mr. Douglas. He remained cooperative. Officers then took off his jacket and searched the exterior of the backpack – all without probable cause.

Because Mr. Douglas was cooperative and did not attempt to flee, it was unreasonable for officers to place him in handcuffs absent probable cause. "In deciding what degree of force is permissible, courts must look to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *United States v. Dykes*, 406 F.3rd 717, 720 (D.C. Cir. 2005). In applying *Dykes* to these facts, the officer was not reasonable in handcuffing Mr. Douglas – indeed, given Mr. Douglas' cooperation and the multitude of officers mere feet away, he had no reason to do so.

At the time of the arrest, Officer Poupart did not know what crime Mr. Douglas was suspected of committing – other than the fact it was a possessory offense. Indeed, the officers

were conducting a narcotics operation to observe drug offenses.  Officer Poupart had no

information from the undercover that Mr. Douglas was suspected of having any weapon in his

possession.  Nothing that Mr. Douglas did indicated that he posed a threat to officer safety.  He

was cooperative with the officers, walked with them several steps away from the other

individuals and was compliant with instructions.  He did not raise his voice but followed all of

the officers' commands.  He did not resist any of the officer's actions.  He made no gestures

towards his backpack and no attempt to take off his backpack. As stated, the backpack was in

fact inaccessible because it was underneath Mr. Douglas' jacket at the time he was handcuffed.

Once officers led Mr. Douglas away and placed him in handcuffs, it was an arrest

requiring probable cause.  For a stop to qualify as a *Terry* stop, it must employ "the least

intrusive means reasonably available to verify or dispel the officer's suspicion."  *Florida v.

Royer,* 460 U.S. 491, 500 (1983).  While "handcuffing a suspect is not ordinarily proper during

an investigative stop, there are a variety of special circumstances that will make such a step

permissible."  *United States v. Smith,* 373 F.Supp 3d 223, 238 (D.D.C. Jan. 30, 2019) (citations

and quotations omitted).  "Officers can use handcuffs without converting a stop into an arrest

only when specific circumstances make it reasonable to do so, such as 'when they reasonably

fear for their safety or the safety of others.'"  *United States v. Devaugh*, 422 F.Supp.3d 104, 114

(D.D.C. Nov. 2019).

In *Smith*, Judge Moss recently held that a full blown arrest occurred when the police

handcuffed an individual who was not "uncooperative" and did not "pose[] a flight risk." *Smith*,

373 F.Supp 3d at 238..  Finding no evidence that supported a reasonable conclusion that the

defendant "posed an immediate threat to the safety of the officer or others" the Court determined

that handcuffing the defendant was unreasonable.  *Id.*  The government's attempt to distinguish

this case from *Smith* falls back on the very same facts to justify articulable suspicion.  ECF 34 at 11.  The government asks the Court to expand the basis of reasonable suspicion to include the *possibility* that the backpack "could have easily contained a weapon."  ECF 34 at 11 ("While the officers could not be certain that Douglas was armed, the hand-to-hand transaction involving a backpack that easily could have contained a weapon…").  But the government's argument for reasonable articulable suspicion consumes its argument for reasonableness.  In essence, the government argues that if reasonable articulable suspicion exists, it follows that officers may handcuff individuals.  That is not the test. Here, the government cannot articulate any reason that "immediate threat" that would justify handcuffing Mr. Douglas without converting the interaction to a full blown stop.

The government's attempts to distinguish *Devaugh* similarly fail.  Although the two officers who initially approached Mr. Douglas had not drawn weapons, they were both visibly armed.  The government is incorrect in stating that Officer Poupart and his partner "were the only officers in the immediate vicinity of Douglas at the time he was cuffed and patted down." Within six seconds of when the handcuffs are secured (at 2:32 of Government Exhibit 1), one can see at least three officers approaching, only a short distance away.



Finally, at the time of the arrest, there appear to be at least 5 and up to 9 police officers surrounding Mr. Douglas, further demonstrating that Mr. Douglas posed no threat, much less an immediate one.  "[S]ometimes the magnitude of such police activity will compel the conclusion an arrest had occurred."  *Id.* at 115.

The government does not and cannot argue that Officer Poupart had probable cause to search and seize Mr. Douglas at the point he was handcuffed.  The fruits of the illegal seizure must thus be suppressed.

II.     Officer Poupart did not have reasonable articulable suspicion to even stop Mr. Douglas.

Even if the Court determines that the initial interaction with Mr. Douglas was a mere *Terry* stop, Officer Poupart did not have reasonable articulable suspicion at that point.

"No right is held more sacred, or is more carefully guarded, by common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."  *Terry v. Ohio*¸

329 U.S. 1, 9 (1968).  However, "[u]pon suspicion that the person may be armed, the police

should have the power to 'frisk' him for weapons."  *Id.* at 10.  "And in determining whether the

officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and

unparticularized suspicion or 'hunch' but to the specific reasonable inferences which he is

entitled to draw from the facts in light of his experience."  *Id. at 27.*

The government asks the Court to accept "unparticularized suspicion or 'hunches'" in

order to justify what it incorrectly describes as a *Terry* stop.  In doing so, it acknowledges that

lack of particularity to the officers' hunch. ECF 34 at 7 ("such observations are consistent with

an illegal transaction for contraband, most likely for firearms and drugs"); ECF 34 at 9 ("the

backpack easily could have contained a firearm or other dangerous weapon").  In short, the

government argues that Officer Poupart could articulate reasonable suspicion for a stop for three

reasons:  1) that the incident occurred in the Fifth District; 2) that there was a hand to hand

transaction for money; and 3) that the Mr. Douglas placed his jacket over his backpack.  All of

these factors are dubious, either as a matter of evidence or as a logical basis for a reasonable

belief that the actions are suspicious.

According to the government, one of the reasons that Officer Poupart had reasonable

articulable suspicion to stop Mr. Douglas because Mr. Douglas was in the Fifth District.  ECF 34

at 7 fn 3.  This argument is remarkable in its overbreadth as it suggests that any individual would

invite an unwanted interaction with police, simply by his geographical location.  The Fifth

District, encompasses a substantial part of the District, as demonstrated by the colored areas

here.



   If accepted, the government is advocating for a position that any individual stopped in the

5th District (or 6th and 7th Districts) is inherently more suspicious than an individual stopped in

First, Second, Third and Fourth District.[1]

   The Fifth, Sixth and Seventh Districts are bordered in black here.

---

   [1] To amplify the harm of this approach, the U.S. Attorney's Office has chosen only to prosecute individuals in the 5th, 6th and 7th District in federal court. These districts also happen to be the districts that have a substantial African-American population. "D.C. crackdown on gun crime targeted Black wards, was not enforced citywide as announced." https://www.washingtonpost.com/local/legal-issues/dc-crackdown-on-gun-crime-targeted-black-wards-was-not-enforced-citywide-as-announced/2020/09/03/f6de0ce2-e933-11ea-970a-64c73a1c2392_story.html (last accessed Sept. 18, 2020). By logical extension, the government is advancing a position that it is reasonable for law enforcement to consider an African American resident of the District more dangerous and should also be subject to harsher penalties.



Next, the government argues that Mr. Douglas' actions were suspicious because he exchanged cash for the backpack in a transaction with Mr. Tavonte Williams.  But officers arrested Mr. Williams almost immediately and he did not have any cash in his possession.

Finally, the government's 4th Amendment analysis then points to anticipated officer testimony that Mr. Douglas removed his jacket, placed the backpack over his shoulders and placed his coat over the backpack – contending that it anticipates that these actions are consistent with an illegal transaction for "most likely … firearms or drugs." ECF 34 at 7.   The government fails to articulate how the officer's training and experience would help an officer reasonably determine that the bag contained a firearm or drugs, as opposed to any item that inherently had value.

In sum, although the handcuffing of Mr. Douglas, the removal of his jacket and the search of the exterior of his backpack amounted to a search requiring probable cause, the officers did not even have the reasonable articulable suspicion justifying a *Terry* stop.

III.     The actions of the officers constituted a search requiring probable cause

The government characterizes the removal of Mr. Douglas' jacket and the exterior search of his backpack as a "frisk." Because those actions constituted a search requiring probable cause, the evidence must be suppressed.

First, the officer's conduct in this case, a repeated manipulation of the backpack both from outside and then inside the jacket, constitutes a search.  The government's reliance on the "plain feel doctrine" is misplaced because neither a firearm, nor any sort of contraband was apparent to the officers when they felt the exterior of the bag.  Government's Exhibit 1 of ECF 34 illustrates that the character of the object was not immediately apparent to officer. Officer Poupart begins to manipulate the object at 2:43 of Exhibit 1.  At 3:00 he repeats, "this is a glasses case?"  At 3:11, he radios, "bookbag is underneath his sweatshirt."  At 3:22, he then removes Mr. Douglas' jacket. At 3:36, Officer Poupart requests consent to search.  When he is refused, another officer begins to feel the bookbag to determine its contents.  At 4:41, Officer Poupart requests permission to search.  At 4:56, he searches and locates the firearm.

As a factual matter Government's Exhibit 1, from 3:40, demonstrates that officers were not frisking the exterior of the bag but rather were manipulating its shape and contour.



In order to fall within the scope of the "plain feel" doctrine, an extension of the "plain view" doctrine, a patdown cannot involve "impermissible manipulation or palpation to determine the exact contents of the pocket." *United States v. Williams*, 38 Fed.Appx. 26 at 27 (D.C. Cir. 2002). "If a police officer pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as contraband immediately apparent the seizure of such an item whose identity is already known occasions no further invasion of privacy." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

*Dickerson*'s facts illustrate the limit of the plain feel doctrine:

> Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or

by any other exception to the warrant requirement.
*Dickerson*¸508 U.S. at 379.

This search spanned over a minute, an eternity within the context of the plain feel doctrine. It involved two officers manipulating the contents of the bag and was an unquestionable attempt to determine its contents because the content was not "immediately apparent" to the officer. Notably, officers are relaying information over the radio, determining when it would be proper to search. Neither officer ever states that they feel what they suspect to be a firearm.

Next, the offices impermissibly removed Mr. Douglas' jacket in the course of their search. ECF 34, Exhibit 1 at 3:23. At the time, Mr. Douglas had a reasonable expectation over the inside of his jacket – indeed, the government appears to argue that he used the jacket in order to protect his privacy. "[W]hat [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*¸389 U.S. 347, 351 (1967). Because the search was made without a warrant, and no warrant exceptions apply, the removal of the jacket was impermissible and any fruits from that search should be suppressed.

## **Conclusion**

For the reasons set forth above, and for such other reasons as this Court may determine at a hearing on this motion, Mr. Douglas respectfully requests that this motion be granted and that the Court suppress the use as evidence of all items seized and all statements made on April 22, 2020.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

| | | |
|---|---|---|
| **Government** | ☑ | United States |
| **Plaintiff** | ☐ | VS. |
| **Defendant** | ☐ | Tavonte Williams, et al. |
| **Joint** | ☐ | |
| **Court** | ☐ | |

Civil/Criminal No. <u>20-cr-121 (CJN)</u>

## GOVERNMENT'S EXHIBIT LIST
## MOTIONS HEARING

| Government Exhibit No. | Exhibit Description | Marked for ID | Rec'd into Evidence | Witness |
|---|---|---|---|---|
| **1A** | Aerial Map of 2300 block of 15th Street, NE, Washington, DC | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson |
| **1B** | Closer View - Aerial Map of 2300 block of 15th Street, NE, Washington, DC | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson |
| **1C** | Higher View - Aerial Map of 2300 block of 15th Street, NE, Washington, DC | | | |
| **2** | Still shot of walk path from the Body Worn Camera Footage of Officer King on *(19:03:08Z)* | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson |
| **3** | Radio Transmission <u>*Time Reference*</u> *06:00 – 06:29* *06:29 - 07:08* *07:28 - 07:39* | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson Ofc. Maxwell Poupart Ofc. Briana Taylor |
| **4** | Officer Maxwell Poupart's Body Worn Camera Footage <u>*Time Reference:*</u> 19:02:25 – 19:02:50 19:02:50 - 19:03:10 19:03:00 – 19:03:16 19:03:16—19:04:00 19:04:57—19:05:05 19:05:06- 19:05:13 | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson Ofc. Maxwell Poupart Ofc. Briana |
| **4A** | Still shot of defendants from the Body Worn Camera Footage of Ofc. Poupart *(19:02:31Z)* | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson Ofc. Maxwell Poupart Ofc. Briana Taylor |

| | | | | |
|---|---|---|---|---|
| **4B** | Still shot of external frisk from the Body Worn Camera Footage of Ofc. Poupart *(19:03:10Z)* | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupart |
| **5** | Officer Andrew Stout's Body Worn Camera Footage *Time Reference: 19:02:29Z – 19:03:41Z* | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson |
| **6A** | Physical Evidence Firearm | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupart |
| **6B** | Physical Evidence Ammunition | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupart |
| **7** | Photo of firearm in backpack | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupart |
| **8** | Photo of firearm and ammunition | | | |
| **9** | Physical Evidence Backpack | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupart |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

USCA Case #21-3032      Document #1944494      Filed: 04/26/2022      Page 110 of 211

| | United States of America | | | Civil/Criminal No. | CR 20-121 (CJN) |
| | VS. | | | | |
| | Theodore B. Douglas (02) | | | | |

Government ☐
Plaintiff ☐
Defendant ☑
Joint ☐
**Court** ☐

| EXHIBIT NUMBER | DESCRIPTION OF EXHIBITS | MARKED FOR I.D. | RECEIVED IN EVIDENCE | WITNESS | EXHIBITS SENT INTO JURY (date & time) |
|---|---|---|---|---|---|
| D1 | Govt. Exhibit 2 (Still shot of walk path from ofc King Body Cam 19:03:08) | 10/20/20 | 10/20/20 | Ofc. Isaac Jackson | |
| D2 | Govt. Exhibit 5 (ofc. Stout Body Camera) | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupar | |
| D3 | Govt. Exhibit 4 (ofc. Poupar Body Camera) | 10/20/20 | 10/20/20 | Ofc. Maxwell Poupar Ofc. Brianna Taylor | |
| D4 | Video of Body Worn Camera (Brianna Taylor) | 10/20/20 | 10/20/20 | Ofc. Brianna Taylor | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 20-cr-121 (CJN)** |
| | : | |
| **THEODORE DOUGLAS,** | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S SUPPLEMENT TO THE OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental brief in opposition to defendant's motion to suppress tangible evidence (ECF #31). In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

### PROCEDURAL BACKGROUND

On October 20, 2020, an evidentiary hearing in this matter was held on Defendant Theodore Douglas's motion to suppress tangible evidence. The government called two witnesses, Metropolitan Police Department (MPD) Officers Isaac Jackson and Maxwell Poupart, and Defendant Douglas called MPD Officer Brianna Taylor. After completion of the hearing, this Court ordered the parties to each file a supplemental brief to their respective pleadings on the motion to suppress in order to summarize the testimony adduced at the hearing and to synthesize this testimony with the legal arguments set forth in the previous filings.

## THE WITNESS TESTIMONY AT THE HEARING

   A.   *Testimony of Officer Isaac Jackson*

Officer Isaac Jackson testified that he has been a police officer with MPD for 20 years and has been assigned to the Narcotics Enforcement Unit, Narcotics and Special Investigations Division (NSID) for approximately 10 years.  *10-20-20 Motion Hearing Transcript* ("Tr.") at 8. Ofc. Jackson further testified that prior to being assigned to NSID, he worked as a police officer in the Sixth Police District, where he worked on primarily narcotics investigations and prostitution cases.  *Id.* at 9.  Ofc. Jackson stated that in his current assignment with NSID he works on narcotics investigations.  *Id.*  Ofc. Jackson testified that during the course of his career he has received training in narcotics investigations from the Drug Enforcement Administration, as well as annual training to remain current with narcotics and firearms investigations.  *Id.*  Ofc. Jackson also testified that he has received "on-the-job" training.  *Id.*

Ofc. Jackson advised that during this career he has worked as an observation post ("OP") officer "more than 500" times.  *Id.* at 12.  Ofc. Jackson stated that in his training and experience, he was familiar with the behaviors exhibited by individuals engaged in hand-to-hand narcotics transactions.  *Id.* at 14.  He described some of those behaviors included individuals trying to be "discreet" or "secretive," when they reach "upon their person."  Ofc. Jackson looks for the exchange of money, "someone going to a stash location" and then giving an item to another person, and "hand movement, secretive…"  *Id.* at 14-15.  Ofc. Jackson explained that beyond a hand-to-hand exchange, he looks for behavior such as the suspect "looking around" and for acts of concealment.  *Id.* at 15.  With respect to firearms possession, Ofc. Jackson testified that he looks for "hand/arm movement, person trying to conceal something up against their waistband and…pockets."  *Id.* at 16.  He further testified that in his training and experience it was "very

common" for drug traffickers to possess firearms.  *Id.*  Ofc. Jackson stated that in cases he has

worked as an OP officer where there were bulk transfers of narcotics or transfer of a firearm, these

transactions frequently occurred in a vehicle or the transfer of contraband was concealed inside of

a "bag."  Ofc. Jackson testified that he would not expect such transfers to occur out in the open.

*Id.* at 17-18.

Ofc. Jackson testified that prior to April of 2020, he had worked in the Fifth Police District

("5D") "quite frequently."  He stated that in his experience in 5D between 2015 and the present,

the most frequent criminal offenses committed were "violent crimes, shootings…narcotics

transactions…" *Id.* at 18.  He further testified that these offenses were committed more frequently

in 5D than in 1D, 2D, 3D, and 4D, and not as frequently as in 6D and 7D, but

"somewhat…similar." *Id.*, 117-118.  Ofc. Jackson testified that on April 22, 2020, shortly before

3:00 pm., he was working as an OP officer in the 2300 block of 15th Street, N.E., Washington,

D.C.  He stated that he was sitting in an unmarked vehicle.  *Id.* at 20.  Ofc. Jackson testified that

he was familiar with the area of the 2300 block of 15th Street, N.E., and worked investigations in

that area close to "200" times in the last five years.  *Id.*  Ofc. Jackson stated that in his training and

experience, the 2300 block of 15th Street, N.E., is known as a high crime area, specifically narcotics

sales and violent crimes.  *Id.* at 23.  Ofc. Jackson further stated that he has had prior investigations

involving drug sales in the walkway located between the 2300 block of 15th Street, N.E., and the

parking lot for the row houses across the street from the recreation center.  *Id.* at 29.

Ofc. Jackson advised that his OP vehicle was a sedan, that the windows were not tinted,

and that he was seated in the driver's seat.  He also stated that he was not using binoculars or other

visual aids, that he did not have a prescription for eyeglasses or contact lenses, and that he was not

experiencing any problems with his vision on April 22, 2020.  *Id.* at 24.  Ofc. Jackson drew a green

circle on Government's Exhibit 2 to identify the location of his OP vehicle in the 2300 block of

15th Street, N.E., which was visible on Ofc. King's body worn camera (BWC) shortly after Jackson

observed the book bag exchange between the two defendants.  *Id.* at 24-25; Attachment A (Govt.

Ex 2).  Ofc. Jackson advised that the vantage point from where Govt. Ex. 2 was taken was located

in the walkway where he observed the hand-to-hand exchange between the defendants.  He also

stated that the location of his vehicle as depicted in Govt. Ex. 2 was where the OP vehicle was

located at the time he made his observations of the book bag exchange.  *Id.* at 26.  Ofc. Jackson

was also shown Government's Exhibit 1A, which is an overhead view of the 2300 block of 15th

Street, N.E., including the walkway where the book bag exchange between the defendants

occurred.  Ofc. Jackson made a green circle on Govt. Ex. 1A to mark the approximate location of

his vehicle at the time he made his observations.  *Id.* at 26-27; Attachment B (Govt. Ex. 1A).

Ofc. Jackson testified that while in his vehicle, he focused on two separate locations—the

area near the recreation center, which was closer to the passenger side (right) of his vehicle, and

the walkway between 15th Street and the parking lot for the row homes in the 2300 block of 15th

Street, which was across 15th Street from where he was parked and to his left side.  *Id.* at 28.  Ofc.

Jackson stated that shortly before 3:00 p.m., he observed an individual standing in the walkway

with one or two other people, when he saw another male appear and hand one of the individuals

in the walkway a "book bag."  Ofc. Jackson stated he observed the individual who received the

book bag take off his jacket, place the book bag on his person by putting the straps over his

shoulders, and put his jacket back on over the top of the book bag.  *Id.* at 30, 103.  Ofc. Jackson

stated that "[i]t appeared this individual was trying to conceal whatever was in that book bag,

trying to hide the book bag on his person by covering it up with his jacket."  *Id.*  Ofc. Jackson

further characterized the action of the male taking his jacket off, placing the bag over his shoulders,

and putting the jacket over the bag as occurring "quickly." *Id.* at 102-103. Ofc. Jackson testified that the individual who received the book bag handed the individual some money. Ofc. Jackson advised that he believed the item handed by the individual who received the book bag to the individual who gave it to him was money, due to the color of the item and how the person "cuffed" his hand. Ofc. Jackson testified that he could not be certain that the item was U.S. currency. *Id.* at 30-31.

Ofc. Jackson testified that the individual who received the book bag was wearing a "bluish jacket, blue coat," and dark colored pants. He also advised that when the individual in the blue coat was taking off his coat and placing the book bag on his person he could see him from the back. *Id.* at 31-32, 96. Ofc. Jackson testified that the other person who handed the book bag off had "bushy-ish sort of hair, and he had a grayish pattered coat…and an orange hood. *Id.* at 32.[1] Ofc. Jackson testified that he was able to see the left side of the individual who handed off the book bag at the time of the hand-off. He further stated that at the time of the exchange of the suspected money, he was able to see the right side of the individual wearing the blue coat and the left side of the individual wearing the gray coat with the orange hood. *Id.* at 32, 96, 116. Ofc. Jackson was shown Government's Exhibit 1B and drew a green circle around the approximate location of where he observed the exchange of the book bag and currency. *Id.* at 36-37; Attachment C (Govt. Ex. 1B). Officer Jackson confirmed that there were no obstructions to his view of the exchange, and nothing that distracted his attention away from his observation of the

---

[1] Officer Jackson provided a detailed description of each defendant in the radio run played at the hearing and admitted as Government's Exhibit 3. Ofc. Jackson's testimony was consistent with the lookout description he provided over the radio after he observed he exchange. It is also clear from the BWC video of Ofc. Poupart (Govt. Ex. 4 and 4A) that both defendants matched the lookout description. This radio transmission was included as Exhibit A to the government's opposition to the defendants' motion to suppress identification (ECF #35).

exchange.  *Id.* at 37, 63, 124-125.  Ofc. Jackson testified that the only individuals he observed

engaging in the exchange of the book bag and money were the two defendants.  *Id.* at 38, 122.

Ofc. Jackson testified that based upon what he observed, including the attempts to conceal

the book bag, the exchange of what appeared to be money, and Ofc. Jackson's knowledge of the

location as a high crime area, including for narcotics, he suspected that he had just observed the

transfer of a large quantity of narcotics or a gun.  *Id.* at 38-39, 129.  Ofc. Jackson further testified

that when he broadcast his initial lookout description, there were no obstructions of the two males

he observed engage in the exchange.  *Id.* at 40.

### B.    *Testimony Officer Maxwell Poupart*

Ofc. Maxwell Poupart testified that he has been a police officer with MPD for nearly five

years, and was assigned to the Narcotics Enforcement Unit of NSID from approximately late

January of 2020 until June of 2020.  *Id.* at 132-133.  Ofc. Poupart stated that in his experience at

NSID as well as the other assignments he has had with MPD, he has worked on narcotics

investigations and participated in the seizure of multiple firearms.  *Id.* at 133-134.  Ofc. Poupart

testified that in his training and experience, he was familiar with the size, shape, weight, and other

physical characteristics of most handguns and that he would be capable of recognizing the presence

of a firearm through sense of touch even if he could not see the firearm.  *Id.* at 134-135.  He also

stated that in his training and experience it was common for individuals engaged in narcotics

trafficking to possess firearms.  *Id.* at 141.

Ofc. Poupart further testified that on April 22, 2020, he was part of the arrest team for an

operation targeting narcotics sales.  *Id.* at 135, 158.  He stated that during his tour of duty he

received a radio transmission from Ofc. Jackson to respond to the 2300 block of 15th Street, N.E.,

to stop two individuals who had engaged in the transfer of a book bag for money.[2]  *Id.* at 136-137, 159.  Ofc. Poupart explained that he and his partner were the first officers on the scene when they encountered Defendant Douglas, who was standing next to Defendant Williams and another unidentified male (UM) as they approached.  *Id.* at 139-140.  Ofc. Poupart stated that for officer safety he approached Defendant Douglas, lead him away from the two males he was standing next to, and placed him handcuffs.  Ofc. Poupart cited the safety reasons for doing so were based on the following: (1) the fact that he and his partner were the first on the scene to encounter Douglas; (2) there were three males in the immediate vicinity (including the Defendant Douglas); (3) he was aware from the lookout that the OP officer had observed a suspected illegal transaction and his knowledge that narcotics traffickers are commonly armed; (4) there was a second subject (in addition to Douglas) that was involved in that transaction; and (5) he and his partner were in a housing complex where it was possible that more people could come on the scene.  *Id.* at 140-142, 165, 185-186, 187.

Ofc. Poupart testified that during his external frisk of the rear of Defendant Douglas's jacket, he recognized a hard object, which he recognized as a firearm.  Specifically, he advised that he recognized during the frisk the handle or butt of the gun, which was pointed upwards, and the slide of the gun that was positioned horizontally facing towards Douglas's right arm.[3]  *Id.* at 143-144, 148-150.  Ofc. Poupart explained through use of his BWC footage (Govt. Ex. 4 and 4B) how he recognized the firearm during the external frisk.  *Id.*, 169-171.  Ofc. Poupart further

---

[2] During direct examination, Ofc. Poupart listened to a portion of the radio run (Govt. Ex. 3) and identified the lookout description from Ofc. Jackson as the one he responded to, which included the description of the exchange that had occurred between the defendants.  *Id.* at 137-138.

[3] Ofc. Poupart acknowledged that he was also able to detect the presence of another object inside the book bag during the frisk, but that he could not determine identity of the object.  The additional object turned out to be the defendant's glasses case.  *Id.* at 145.

testified that after recognizing the presence of the firearm during the frisk, he proceeded to request

consent to search the book bag, because it was his practice to give individuals the opportunity to

be honest about their conduct.  He stated that his request to consent to search was not based on any

uncertainty about the identity of the item that he felt as being a firearm.  *Id.* at 151, 177.  Ofc.

Poupart testified that after he recognized the gun during the frisk, he asked over the radio whether

Douglas was "good for a search," because he wanted to ensure that the scene was secure and that

the other suspect had been secured prior to conducting the search for the firearm.  *Id.* at 152, 180-

182.

## ARGUMENT

A.   *The Testimony of Officer Jackson and Officer Poupart Established Reasonable Articulable Suspicion that Criminal Activity was Afoot and that Defendant Douglas was Armed.*

Officer Jackson's unimpeached testimony summarized above established that he was

operating an OP in an area known for high crime, including for narcotics trafficking and gun

violence, that he observed a hand-to-hand transaction between the two defendants of a book bag

for suspected money, and that Defendant Douglas exhibited behavior that appeared to be an effort

to conceal the book bag when he quickly placed his jacket over the bag.  Ofc. Jackson testified that

in his training and experience, he suspected that the illegal contraband, most likely narcotics and/or

a firearm were inside.  Both Officers Jackson and Poupart testified that in their training and

experience, drug traffickers commonly possess firearms.[4] *See Wardlow v. Illinois*, 528 U.S. 119,

125 (2000) (officers may take account of the fact that an individual is in a high crime area because

they need not "ignore the relevant characteristics of a location in determining whether the

---

[4] It is axiomatic that "guns and drugs go together."  *United States v. Johnson,* 592 F.3d 164, 169
(D.C. Cir. 2010).

circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Laing,* 889 F.2d 281, 286 (D.C. Cir. 1989) (time of day, the "high crime" nature of an area, and furtive hand movements are all relevant to the reasonable suspicion inquiry); *see also United States v. Lovelace,* 357 F. Supp. 2d 39, 43-44 (D.D.C 2004) (quoting *United States v. Johnson,* 212 F.3d 1313, 1316 (D.C. Cir. 2000) ("Although the D.C. Circuit has suggested that 'simply receiving an object from another person' is a common occurrence for which there may many explanations," where a hand-to-hand transaction is coupled with other behaviors, such as "furtive conduct," such circumstances may give rise to reasonable suspicion that illegal activity is afoot.); *United States v. Devaugh,* 422 F. Supp. 3d 104, 110-111 (D.D.C 2019).

> **B.** **Ofc. Poupart's Testimony Established that it was Reasonable to Place Defendant Douglas in Handcuffs for Officer Safety and that the External Frisk was Lawful under Terry.**

As summarized above, Ofc. Jackson testified that the area where Defendant Douglas was stopped was a high crime area, and both Officers Jackson and Poupart testified that narcotics traffickers commonly possess firearms. Based upon the radio transmission, officers Poupart and Taylor knew that they were responding to stop individuals suspected of having engaged in a drug transaction involving a book bag and they were the first officers on the scene at the time they encountered Defendant Douglas. Under the circumstances, it was entirely reasonable to believe Douglas was armed. Officers Poupart and Taylor were also aware that there was one other suspect who had not yet been stopped, and that Defendant Douglas was standing in close proximity to two other males, one of whom was later identified as co-defendant Williams. When Officers Poupart and Taylor approached Douglas, neither were aware of whether the two males standing with Douglas were the second suspect in the transaction observed by Ofc. Jackson.

116

The use of handcuffs during a *Terry* stop does not automatically convert the stop into an arrest. *United States v. Smith,* 373 F. Supp. 3d 223, 238 (D.D.C. 2019); *United States v. Laing,* 889 F.2d 281, 285 (D.C. Cir. 1989) (holding that "amount of force used to carry out the stop and search must be reasonable, but may include use of handcuffs…"); *United States v. Tilman,* 19 F.3d 1221, 1227-28 (7th Cir. 1994) (upholding use of handcuffs during an investigative detention where the suspect matched the description of an armed bank robber). "'Courts have consistently upheld the reasonable use or show of force during investigative stops in order to protect police officers in potentially dangerous situations.'" *Moore v. Volpe,* 177 F. Supp. 3d 409, 415 (D.D.C. 2016) (citation omitted) (holding that police officers who drew their weapons and pointed them at Plaintiff, and then handcuffed him until his identification was confirmed did not convert investigative stop into arrest where Plaintiff matched the description of armed robbery suspect).

In addition, Ofc. Poupart's external frisk of Defendant Douglas's jacket was also reasonable and within the scope of a lawful *Terry* frisk. The external frisk was minimally invasive and lasted only a matter of seconds—sufficiently long enough to allow Ofc. Poupart to distinguish between two separate items inside the book bag and identify one of the items as a firearm based upon his recognition of the handle and slide. There is no credible evidence from which to conclude that Ofc. Poupart did not feel the presence of the firearm. Finally, upon recognizing the presence of the firearm based upon the "plain feel" doctrine, there was probable cause to place Defendant Douglas under arrest and search the book bag incident to his arrest.

117

## **CONCLUSION**

**WHEREFORE** for the reasons stated above the United States respectfully submits that

the defendant's motion to suppress tangible evidence should be denied.

Respectfully submitted,

MICHAEL R. SHERWIN
United States Attorney
N.Y.S. Bar No. 4444188

By:    _____/S/_____
STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorney
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
Telephone: (202) 252-7719
E-mail: steve.wasserman@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for
Defendant, on this 3rd day of November 2020.

_____/S/_____
Steven B. Wasserman
Assistant United States Attorney

Government's Exhibit 2

2020-04-22 T19:03:08Z
AXON BODY 2 X81057932



Government's
Exhibit
1A



Government's
Exhibit
1B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 20-cr-121 (CJN)** |
| | : | |
| **THEODORE DOUGLAS and** | : | |
| **TAVONTE DOUGLAS,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SUPPLEMENT TO THE OPPOSITION TO DEFENDANTS' MOTIONs TO SUPPRESS TANGIBLE IDENTIFICATION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental brief in opposition to the defendants' motion to suppress identification (ECF #s 30, 33). In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

### PROCEDURAL BACKGROUND

On October 20, 2020, an evidentiary hearing in this matter was held on the motions to suppress identification testimony by Defendants Theodore Douglas and Tavonte Williams. The government called two witnesses, Metropolitan Police Department (MPD) Officers Isaac Jackson and Maxwell Poupart, and Defendant Douglas called MPD Officer Brianna Taylor. After completion of the hearing, this Court ordered the parties to each file a supplemental brief to their respective pleadings on the motion to suppress identification in order to summarize the testimony adduced at the hearing and to synthesize this testimony with the legal arguments set forth in the previous filings.

## THE WITNESS TESTIMONY AT THE HEARING

*Testimony of Officer Isaac Jackson*

Officer Isaac Jackson testified that he has been a police officer with MPD for 20 years and had been assigned to the Narcotics Enforcement Unit, Narcotics and Special Investigations Division (NSID) for approximately 10 years. *10-20-20 Motion Hearing Transcript* ("Tr.") at 8. Ofc. Jackson further testified that prior to being assigned to NSID, he worked as a police officer in the Sixth Police District, where he worked on primarily narcotics investigation and prostitution cases. *Id.* at 9. Ofc. Jackson stated that in his current assignment with NSID he works on narcotics investigations. *Id.* Ofc. Jackson testified that during the course of his career he has received training in narcotics investigations from the Drug Enforcement Administration, as well as annual training to remain current with narcotics and firearms investigations. *Id.* Ofc. Jackson also testified that he has received "on-the-job" training. *Id.* Ofc. Jackson advised that during this career he has worked as an observation post ("OP") officer "more than 500" times. *Id.* at 12. He testified that it was important for him to provide an accurate lookout description to the arrest team to ensure that the correct individual is stopped. Ofc. Jackson further advised that due to the need for the arrest team to act quickly to prevent the suspect from fleeing the area, he would frequently need to supplement his initial lookout description with additional details to assist the arrest team in stopping a suspect. *Id.* at 14.

Ofc. Jackson advised that his OP vehicle was a sedan, that the windows were not tinted, and that he was seated in the driver's seat. He also stated that he was not using binoculars or other visual aids, that he did not have a prescription for eyeglasses or contact lenses, and that he was not experiencing any problems with his vision on April 22, 2020. *Id.* at 24. Ofc. Jackson drew a green circle on Government's Exhibit 2 to identify the location of his OP vehicle in the 2300 block of

15th Street, N.E., which was visible on Ofc. King's body worn camera (BWC) shortly after Jackson observed the book bag exchange between the two defendants. *Id.* at 24-25; Attachment A (Govt. Ex 2). Ofc. Jackson advised that the vantage point from where Govt. Ex. 2 was taken was located in the walkway where he observed the hand-to-hand exchange between the defendants. He also stated that the location of his vehicle as depicted in Govt. Ex. 2 was where the OP vehicle was located at the time he made his observations of the book bag exchange. *Id.* at 26. Ofc. Jackson was also shown Government's Exhibit 1A, which is an overhead view of the 2300 block of 15th Street, N.E., and the walkway where the book bag exchange between the defendants occurred. Ofc. Jackson made a green circle on Govt. Ex. 1A to mark the approximate location of his vehicle at the time he made his observations. *Id.* at 26-27; Attachment B (Govt. Ex. 1A). Ofc. Jackson also marked with a green circle on Govt. Ex 1B the approximate location of where he observed the exchange occur. *Id.* at 36-37; Attachment C (Exhibit 1B). Ofc. Jackson estimated that he was approximately 15 yards away from where the book bag exchange occurred. *Id.* at 70.

Ofc. Jackson stated that shortly before 3:00 p.m., he observed an individual standing in the walkway with one or two other people, when he saw another male appear and hand one of the individuals in the walkway a "book bag." Ofc. Jackson stated he observed the individual who received the book bag take off his jacket, place book bag on his person by putting the straps over his shoulders, and put his jacket back on over the top of the book bag. *Id.* at 30, 103. Ofc. Jackson testified that the individual who received the book bag handed the individual some money. Ofc. Jackson advised that he believed the item handed by the individual who received the book bag to the individual who gave it to him was money, due to the color of the item and how the person "cuffed" his hand. Ofc. Jackson testified that he could not be certain that the item was U.S. currency. *Id.* at 30-31.

Ofc. Jackson stated that at the time of the exchange of the book bag, he was able to see Defendant Douglas' back and was able to observe the left side of Defendant Williams.[1]  He testified that when he observed the exchange of the suspected currency, he was able to see Douglas's right side and Williams' left side.  *Id.* at 31-32, 95-96, 116.  Ofc. Jackson estimated that the exchange between both defendants lasted approximately 20 to 30 seconds.  *Id.* at 37.  Officer Jackson confirmed that there was nothing obstructing his view of the exchange, and nothing that distracted his attention away from his observation of the exchange.  *Id.* at 37, 62-63, 124-125.  Ofc. Jackson testified that the only individuals he observed engaging in the exchange of the book bag and money were the two defendants.  *Id.* at 38.  Ofc. Jackson further testified that when he broadcast his initial lookout description, there were no obstructions of the two males he observed engage in the exchange.  *Id.* at 40.  He also advised that prior to the arrest team moving into the area; both defendants were walking in and out of his sight line while his OP vehicle was still parked in the location where he observed the exchange.  *Id.* at 43.  Ofc. Jackson testified that eventually both defendants walked towards the parking lot in the direction of Montana Avenue, that he moved his vehicle from where it was located, and that both defendants were out of his sight when the arrest team stopped them.  *Id.* at 43-44, 51, 101, 210.

Ofc. Jackson testified that in his initial lookout for Defendant Williams he had not mentioned the orange hood worn by Williams, because his initial concern was the lookout for

---

[1] Officer Jackson provided a detailed description of each defendant in the radio run played at the hearing and admitted as Government's Exhibit 3.  Ofc. Jackson's testimony was consistent with the lookout description he provided over the radio after he observed the exchange.  Tr. at 31-32. It is also clear from the BWC video of Ofc. Poupart (Govt. Ex. 4 and 4A (Attachment D)) that both defendants matched the lookout description.  Further, Ofc. Jackson identified both defendants from Govt. Ex. 4A as the individuals he observed engage in the exchange of the book bag for money.  *Id.* at 46-48.  This radio transmission was included as Exhibit A to the government's opposition to the defendants' motion to suppress identification (ECF #35).

Defendant Douglas and getting him stopped by the arrest team as quickly as possible. Ofc. Jackson further stated that he was concerned about getting Douglas stopped because he was in possession of the book bag. *Id.* at 44, 126. Ofc. Jackson stated, as confirmed by the radio run (Govt. Ex. 3), that he supplemented his lookout description of Williams in two additional radio transmissions after the initial lookout. *Id.* at 126-127. Jackson also confirmed that nobody told him Williams was wearing an orange hood, and that it was the result of his own observations. *Id.* at 44. Ofc. Jackson stated that after he learned that the arrest team had two people in custody, he drove to the parking lot where both defendants were detained in order to see if he could make a positive identification. *Id.* at 52-53. Ofc. Jackson stated that he was in his vehicle, which was parked at the mouth of the parking lot off Montana Avenue, and that he was approximately 15 to 20 yards from where both defendants were standing when he made his positive identification. *Id.* at 53, 73. He further stated that there was nothing obstructing his view of the defendants at the time he was making his identification, and that he had no doubts about the accuracy of his identifications of either defendant as the individuals involved in the book bag exchange. *Id.* at 53-54, 129-130. Ofc. Jackson testified that while he did get a "good look" at the faces of the defendants, he made his identifications based primarily on their clothing match and the hair. *Id.* at 78, 96-97. Ofc. Jackson testified that nobody did or said anything to suggest to him who he should identify.[2] *Id.* at 55. He also advised that while there were other individuals who had been in the immediate vicinity of the walkway during the exchange, none of those individuals matched the descriptions of either Defendants Douglas or Williams. *Id.* at 127-128, 130. Ofc. Jackson was also able to identify both defendants in court during the motions hearing. *Id.* at 55-56.

---

[2] Ofc. Jackson's positive identification was recorded on the radio run (Govt. Ex. 3 at 00:10:28).

Ofc. Jackson testified that in the 500 observation post cases he has worked on, there were only a small number of occasions when the arrest team had stopped the wrong person. *Id.* at 85. Ofc. Jackson further stated that he had no problem failing to make a positive identification if he believed that the individual stopped was not actually the person he observed engage in the suspected criminal activity. *Id.* at 130.

## ARGUMENT

The testimony by Ofc. Jackson establishes that the identification procedure used was both reliable and not unduly suggestive. Applying the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199 (1972) to evaluate the reliability of an identification, Ofc. Jackson's testimony established that he had sufficient opportunity to view the defendants at the time of the exchange. Specifically, Jackson testified that there were no obstructions to his view of the defendants during the exchange, and he had the opportunity to observe both defendants during the exchange of the book bag as well as for a period after the exchange was completed. Further, Jackson testified that there were no obstructions of his view during the identification procedure itself. He also testified that his attention was focused on both defendants during the exchange. Further, Ofc. Jackson's descriptions of each defendant were highly accurate as confirmed by the radio run (Govt. Ex. 3) and the BWC of Ofc. Poupart (Govt. Ex. 4 and 4A). Ofc. Jackson further testified that he had no doubt regarding the accuracy of his identification, and it was clear from the radio run and the BWC footage that the identification occurred less than five minutes after Ofc. Jackson observed the exchange of the book bag. In addition, Ofc. Jackson is a trained law enforcement officer who is "expert" in observing criminals, which courts have noted is a factor that bolsters the reliability of the identification. *United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991), *cert. denied*, 506 U.S. 836 (1992); *Singleton v. United States*, 702 F.2d 1159, 1165-66 (D.C. Cir. 1983).

There was also no testimony or other evidence adduced at the hearing that established that the identification procedure "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] . . . was denied due process of law." *Russell v. United States*, 408 F.2d 1280, 1284 (D.C. Cir. 1968); *cert. denied*, 395 U.S. 928 (1969) (internal quotations and citations omitted). Ofc. Jackson's testimony, as well as the radio run and BWC footage, established that Ofc. Jackson's identifications were based upon his own, independent observations, and not the result of any suggestive behavior by the officers involved in the stop of the defendants.

Finally, as set forth in the government's initial opposition (ECF #35 at 10-12) to the defendants' motion to suppress identifications and the evidence adduced at the hearing, the initial stops of each defendant were supported by reasonable suspicion, and therefore, the identifications were not the result of an illegal stop or arrest.

## <u>CONCLUSION</u>

**WHEREFORE** for the reasons stated above the United States respectfully submits that the defendants' motions to suppress identifications should be denied.

Respectfully submitted,

MICHAEL R. SHERWIN
United States Attorney
N.Y.S. Bar No. 4444188

By:   _____/S/_____
STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorney
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
Telephone: (202) 252-7719
E-mail: steve.wasserman@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 3rd day of November 2020.


_____/S/_____
Steven B. Wasserman
Assistant United States Attorney

Government's
Exhibit
2

2020-04-22 T19:03:08Z
AXON BODY 2 X81057932





Government's
Exhibit
1B



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | :      **Criminal No. 1:20-cr-121 (CJN)** |
| | : |
| **THEODORE DOUGLAS** | : |

_____

**SUPPLEMENT TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

On the afternoon of April 22, 2020, the Narcotics and Special Investigation Division deployed an undercover operation to the 2300 block of 15th Street, NE Washington D.C.  Tr. at 20.  The operation had approximately four undercover officers and ten to fifteen uniformed officers on the arrest team.  Tr. at 89. Officer Isaiah Jackson was one of a few officers observing activities from what he described as an "observation post."  Officer Jackson was not using binoculars and was seated in the driver's seat of a sedan.  Tr. at 23-24. Officer Jackson testified that at some point near 3 pm, he saw a person with one or two individuals standing in the walkway.  Tr. at 29.  He saw another individual (later identified as Tavonte Williams) hand one of them a backpack. Tr. at 29-30.  The recipient of the backpack, whom he later identified as Theodore Douglas, took off his jacket, put the backpack on, and then put the jacket on his back over the backpack.  Tr. at 30.  It appeared to Officer Jackson that the man who put on the backpack "could have given him some sort of U.S. currency, some money."  Tr. at 30.  The two men then exchanged "some sort of handshake."  Tr. at 30.  Officer Jackson believed that the exchange involved U.S. currency because the object was "light in color" but "that's pretty much all [he] can remember."  Tr. at 31.  The interaction lasted "close to 20 to 30 seconds – no more than a minute."  Tr. at 37.  At the time of the interactions "maybe one" other man was still standing in that area at the time of the exchange but the officer didn't observe any interactions between that third person and either of the men later identified as Mr. Douglas and Mr. Williams.  Tr. at 37-38.  After the exchange, Mr. Douglas "stood there for some

time.  Then shortly after, walked out of [Officer Jackson's] sight."  Tr. at 39.  Mr. Williams "walked out of [Officer Jackson's] sight as well."  Tr. at 39.  The men remained in sight for "maybe 30 to 45 seconds" but "no more than a minute."  Tr. at 39.  By the time Mr. Douglas had walked out of Officer Jackson's line of sight, Officer Poupart had begun his approach.  Exh. A attached.[1]

Officer Jackson suspected that he had observed a transaction involving "either a large quantity of narcotics or possibly a firearm."  Tr. at 39.  His suspicions were based upon the concealment of the backpack underneath the jacket and the possibility that money was exchanged.  Tr. at 39.  Officer Jackson acknowledged that he did not know if there was contraband in the backpack.  Tr. at 90.  He observed that the transaction involved a light-colored object but testified that he really couldn't say what the object was, one way or another.  Tr. at 90-91.

Officer Jackson said that he broadcasted a lookout over the radio and waited until he saw enough officers initiate contact with Mr. Douglas in so that he could be confident that Mr. Douglas would be stopped.  Tr. at 111.

Upon seeing Officer Stout's body worn camera footage, Officer Jackson agreed that at least seven officers and at least one police car were present during the initial stop of Mr. Douglas.  Tr. at 112-113.  Two of those officers were Officer Poupart and Officer Taylor.  Officer Poupart estimated about eight officers were involved.  Tr. at 163.[2]

Officers Poupart and Taylor approached Mr. Douglas, grabbed his arm, guided him aside and immediately placed him in handcuffs.  Officer Poupart testified that once he put his hand on Mr. Douglas, that Mr. Douglas was not free to leave.  Tr. at 162.  The officer agreed that Mr. Douglas never tried to flee, was compliant with his directions and didn't resist at all.  Tr. at 156.  He said that he did not know

---

[1] Using the time where Officer Poupart finds the firearm and declares 1-800 (9:33 on the radio recording and 19:05:13 on Officer Poupart's body worn camera footage), counsel transposed the audio of the radio recording to Officer Poupart's camera to aid the Court in seeing what information was being shared during the initial moments of the stop.

[2] Body-worn camera footage shows that at least 18 uniformed officers were involved in the arrest of Messrs. Douglas and Williams.

Mr. Douglas to be armed and dangerous.  Tr. at 158.  He also agreed that as he approached, he could see

both of Mr. Douglas' hands and he did not see any movements towards any other part of his body.  Tr. at

159.  Officer Poupart also acknowledged that the potential contraband that he was investigating was

inside a zipped backpack and underneath a zipped jacket and would be "pretty hard" to access.  Tr. at

159-160.   Still, Officer Poupart testified that he was, and always is, concerned with officer safety.  Tr. at

140.  Here, he and Officer Taylor were the only officers on the scene when they arrived and three

individuals were there.  Tr. at 140.  He later stated that other than the presence of the additional two men,

there was nothing that he could articulate about the men or the encounter that made him concerned about

his safety.  He testified that he had no reason to actually suspect they were armed, other than the fact that

he was not certain that they weren't. Tr. at 166-167.  Because of that concern, he moved Mr. Douglas

away from the men rather than ordering the men to move away.  Tr. at 166.

This is what Officer Poupart observed as he approached the three men.  Arrows show Mr. Douglas'

hands.



Mr. Williams is paying no attention to the officer.  Neither man shows any interest and hands are

visible.



Despite Officer Poupart's claim that he handcuffed Mr. Douglas because he was fearful of the two other individuals, the officers immediately turned their backs on the two men as they lead Mr. Douglas away.



Officer Poupart knew that there were at least eight officers on the arrest team and that he expected, correctly, that they would be momentarily joining him and Officer Taylor in stopping of Mr. Douglas.  Tr. at 161.  Officer Poupart said that because this was a narcotics investigation, he was concerned that Mr.

Douglas or another individual was armed.  Tr. at 142.  He placed Mr. Douglas in handcuffs because he didn't "know at that moment what their capability is of harming us or someone else."  Tr. at 142. However, Officer Poupart acknowledged that during drug operations, he handcuffed individuals "pretty much" "all of the time."  Tr. at 157.

After handcuffing Mr. Douglas, Officer Poupart testified that he noticed a bulge under Mr. Douglas' jacket to feel and determine what was in the backpack.  Tr. at 142.  During the course of that action, Officer Poupart thought he recognized a firearm from the "shape, weight of the object, the length and the grip" of the firearm.  Tr. at 143.  He distinguished the object that he can feel from another object in the backpack – which he could not identify.  Tr. at 145.

When viewing the "first time [he] touched Mr. Douglas' back," "[i]t looks like I am feeling part of the sunglass case and my thumb either is or is about to be pressed up against the grip of the firearm."  Tr. at 168.  Unable to immediately identify the contents of the bag, the officer is "trying to articulate what's there" or "trying to figure out what it is."  Tr. at 168.  "On that second," "I can't say exactly what my finger was on."  Tr. at 168.

During his testimony, Officer Poupart broke down what he felt from second-to-second while feeling the outside of the backpack.  While reviewing his bodyworn camera footage, he testified that he first believed he was feeling a gun at 19:03:05.  Tr. at 170.  Specifically, he said, "I am suspecting that it's a gun and I am furthering that I am continuing to frisk his bag."  Tr. at 171.

This picture captures 19:03:01 of his footage.



This picture captures 19:03:03.



This picture captures 19:03:05.



After several seconds of manipulating the contents of the backpack, Officer Poupart requested, but did not

receive, consent from Mr. Douglas.  Tr. at 150.  Officer Poupart testified that he asked for consent

because he likes "to give people the opportunity to be honest."  Tr. at 151.  He then asked over the radio if

he was "good for a search."  According to Officer Poupart, the question about being "good for a search"

was a covert way to ask the other officers if the other suspect had been stopped.  Tr. at 152.  However

Officer Poupart agreed that he never asked any of the other officers if the other individual had been

stopped.  Tr. at 183.  Officer Briana Taylor testified that when Officer Poupart asked if he was "good for

a search" the purpose was "To do a search."  Tr. at 197.  She also testified that Mr. Douglas was compliant throughout the encounter and that none of the other individuals in the area did anything threatening towards the officers.  Tr. at 198.

**Argument**

"The Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."  *Minnesota v. Dickerson*, 508 U.S. 366, 379 (1993) (Scalia, J. concurring).  These words especially apply where a police officer, apparently unaware of the constitutional limitations of his practices, acknowledges that he regularly handcuffs individuals as a matter of course.  From his description, Officer Poupart presumably routinely handcuffs individuals without probable cause, or any particularized suspicion of weapons or flight or any enhanced concern about officer safety.  Thus, notwithstanding that Officer Poupart ultimately discovered a firearm in this case, his actions in handcuffing Mr. Douglas without any risk of flight or particularized danger violates Mr. Douglas' constitutional rights.  And suppressing this evidence is necessary so that Officer Poupart ceases his practice of handcuffing individuals that he investigates – both for Mr. Douglas' benefit but also to protect the rights of all of those that Officer Poupart handcuffs without reason.

I.     Officer Poupart handcuffs people he is investigating "pretty much "all of the time" and by doing so regularly converts investigatory stops into arrests requiring probable cause.

Officer Poupart agreed that his normal practice, at least in drug operations, is to handcuff everyone that he is investigates.  *See Devaugh v. United States*, 422 F.Supp.3d 104, 115 (D.D.C. 2019) ("Officers can use handcuffs without converting a stop into an arrest only when specific circumstances make it reasonable to do so….").  Even granting Officer Poupart the hunch that Mr. Douglas was involved in a drug transaction, the assumption that all individuals involved in possible drug transactions have weapons is a "factually unanchored justification for placing [in individual] in handcuffs [that] is generalizable to virtually *every* investigatory stop initiated upon an articulable suspicion of drug trafficking."  *United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st. Cir. 1998).

Officer Poupart approached Mr. Douglas with two other individuals.  There was no reason to suspect that Mr. Douglas could be an immediate threat.  *Devaugh,* 422 F.Supp.3d at 116 (declining to give the general "'gun-drug' nexus much weight" where there is no evidence that the police had reason to believe these particular suspects had weapons).   There was no concern he was on a violent drug like PCP. *United States v. Smith*, 373 F.Supp.3d 223, 241 (D.D.C. 2019).  He made no motions to his waistband and had no suspicious bulges on his body.  He did not shift his body away from the police.  His arms were casually swinging as he stood conversing.  He did not flee or give any indication that he was attempting to flee.  And at the time Officer Poupart was approaching, he did not know what crime Mr. Douglas may have committed – other than to know that it was a possessory offense.  Finally, whatever hypothetical risk that existed, that risk was inert because access to that risk would require unzipping a jacket, taking off a backpack, opening that backpack and removing the threatening object.  Under the test set forth in *Graham v. Connor*, Officer Poupart's actions were unreasonable and required probable cause 490 U.S. 386, 396 (1989).  Because probable cause didn't exist, the contents of the backpack should be suppressed.

In *United States v. Dykes*, the D.C. Circuit repeated the reasonableness test employed by *Graham:*

> In deciding what degree of force is permissible, courts must look to 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
> 406 F.3d 717, 720 (D.C. Cir. 2005) (quoting *Graham*, 490 U.S. at 396) (employing test to determine whether handcuffing went beyond the permissible scope of a *Terry* stop).

Applying this test, this Court has little choice but to suppress.  Officer Poupart did not know the severity of the crime Mr. Douglas was suspected of at the time he handcuffed him, other than that it was likely a possessory offense for drugs or firearms and that the contraband was stowed inside his jacket on his back.  Mr. Douglas gave no indication that he was armed and was entirely compliant during the entire stop.  And Officer Poupart saw and knew that at least eight but as many as eighteen police officers were converging on Mr. Douglas seconds after the initial stop.  Tr. at 163.

 The government attempts to convince the Court to expand the *Graham* test to include other bystander individuals that may pose a threat.  The government points to no authority for this shift but

under these facts, such a proposal would offer no help.  A *Terry* stop "must employ the least intrusive means reasonably available to verify or dispel the officer's suspicion."  *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).  Here, Officer Poupart's suspicions could have been addressed by less intrusive means by walking Mr. Douglas farther away or ordering the other individuals to back away.  Moreover, the officer had no reason to believe that these particular individuals were actually dangerous.  As he testified, his claim that he was concerned about the other individuals was based on conjecture, not fact: "The possibility that they could be armed, what their intentions are or are not.  The possibility of flight and things like that."  Tr. at 166.  Officer Poupart was then asked "And you had no reason to suspect that they were – actually suspect they were armed other than the fact that you did not know that they weren't."  Tr. at 178.  He agreed that he did not.  Tr. at 178.

In other words, Officer Poupart's actions on April 21, 2020 were not even based upon hunches.  They were based upon a principle that does not exist in Fourth Amendment jurisprudence – that with reasonable articulable suspicion, an officer can commit any intrusion necessary to conclusively determine that s/he is safe.  Officer Poupart acknowledged in his testimony that he handcuffed Mr. Douglas because: 1) he couldn't be certain that he would flee (despite expressing no desire to do so); 2) he couldn't be certain that he could reach a weapon (despite no movements or words indicating that he would try); and 3) he couldn't be certain the other men wouldn't flee or be dangerous (despite no evidence suggesting that they would do either).[3]

In addition, Officer Poupart's "external frisk" was in fact an impermissible search that went well beyond a permissible frisk. Officer Poupart's description of the search demonstrated that it was not "immediately apparent" that he was feeling a gun.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (quoting *Horton v. California*, 496 U.S. 128, 136-137 (1990).  While viewing his body worn camera

---

[3] While it is not necessary to find Officer Poupart incredible to grant the defense Motion, it should be noted that despite Officer Poupart's claimed concern about the other men, he never asked them if they were armed, did not request that they show their hands or waistbands and turned his back on those men when he was leading and then handcuffing Mr. Douglas.

footage, he was asked if he could feel the gun when he is manipulating the backpack at 19:03:01.  He

responded, "At this point, no."  Tr. at 170.  He did not believe he felt he was feeling a gun until 19:03:05.

Tr. at 170.  At 19:03:10, he is "suspecting that it's a gun and [he is] furthering that as [he is] continuing to

frisk his bag," Tr. at 171.  Officer Poupart is then squeezing to figure out if something else is in there.

Tr. at 172.

   Taken as a whole and even crediting his entire testimony, it is at least clear that the existence of the

firearm was not "immediately apparent."[4]  The plain feel doctrine does not apply as Officer Poupart's

successful manipulation of the backpack is not analogous to exception created by the plain view doctrine.

<div align="center">**Conclusion**</div>

   Theodore Douglas respectfully requests that for all of the reasons argued in this Supplement, in

his Reply to the Government's Opposition, in his initial Motion, and for any other reasons that appear to

the Court, that this Honorable Court grant his Motion to Suppress.


        Respectfully submitted,


        A. J. KRAMER
        FEDERAL PUBLIC DEFENDER

          /s/
        _____
        EUGENE OHM
        Assistant Federal Public Defender
        625 Indiana Avenue, N.W., Suite 550
        Washington, D.C.  20004
        (202) 208-7500


---

[4] Officer Poupart's testimony that he recognized he was touching a firearm should not be credited.
According to the government's theory, he identified a firearm after the initial frisk.  None of his actions
support that recognition.  Officer Poupart did not communicate the existence of a firearm to the numerous
officers with whom he was communicating, including the partner standing next to him.  He did not use
the predetermined codeword for firearm.  He then asked for consent for a search of the backpack.  And
when Mr. Douglas refused, he asked over the radio if he was "good for a search."

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | | **Criminal No. 1:20-cr-121 (CJN)** |
| | **:** | |
| **THEODORE DOUGLAS** | **:** | |

_____

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANT'S
MOTION TO SUPPRESS TANGIBLE EVIDENCE**

Mr. Theodore Douglas, the defendant, through undersigned counsel, respectfully requests

that this Court consider *United States v. Askew*, 529 F.3d 1119 (D.C. Cir. 2008) (en banc) with

apologies for the oversight.  *Askew* holds that the unzipping of a jacket to facilitate a showup

identification procedure was a search requiring probable cause.  *Id.* at 423-24.  In addition,

*Askew* reiterates the narrow scope of the plain-feel doctrine in *Minnesota v. Dickerson*. *Id.* at

428.



Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


/s/

_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500



Government's
Exhibit
1A








148





# UNITED STATES ATTORNEY'S OFFICE
# DISTRICT OF COLUMBIA

## *United States v. Tavonte Williams, et al.,*
## 20-cr-121 (CJN)



## PHYSICAL EVIDENCE

## EXHIBIT 6A

## *Firearm*

# UNITED STATES ATTORNEY'S OFFICE
# DISTRICT OF COLUMBIA

### *United States v. Tavonte Williams, et al.,* 20-cr-121 (CJN)



## PHYSICAL EVIDENCE

## EXHIBIT 6B

## *Ammo*



Government's
Exhibit
7



# UNITED STATES ATTORNEY'S OFFICE
# DISTRICT OF COLUMBIA

### *United States v. Tavonte Williams, et al.,* 20-cr-121 (CJN)



## PHYSICAL EVIDENCE

## EXHIBIT 9

## *Backpack*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

     v.

TAVONTE WILLIAMS, et al.,

     *Defendants.*

Criminal Action No. 1:20-cr-00121 (CJN)

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the government's Motion to Admit Other Crimes Evidence and to

Impeach the Defendants with their Prior Convictions, ECF No. 28, is **GRANTED IN PART** and

**DENIED IN PART**.  It is further

**ORDERED** that the Court finds admissible under Rule 404(b):

1. Douglas's 2013 conviction for unlawful possession of a firearm;

2. Douglas's picture from November 19, 2019, showing him in possession of a gun;

3. Douglas's video from a May 8, 2019 text thread showing him firing a weapon;

4. Douglas's text message exchanges from February 6, 2020, and February 15, 2020; and

5. Williams's and Douglas's text message exchange from February 26, 2020.  It is

further

**ORDERED** that the Court will exclude under Rule 404(b):

1. Douglas's 2010 conviction for carrying a handgun; and

2. Douglas's 2006 picture in which he is holding a firearm.  It is further

**ORDERED** that the Court finds admissible under Rule 609:

1. Douglas's 2013 conviction for unlawful possession of a firearm;

2. Williams's 2017 conviction for distribution of PCP; and

3. Williams's 2017 conviction for possession of PCP.  It is further

**ORDERED** that the Court will exclude under Rule 609:

1. Douglas's 2010 conviction for carrying a handgun.  It is further

**ORDERED** that Defendant Williams's Motion to Sever Defendants' Trials, ECF 29, and

Motion to Suppress Identification, ECF 30, are **DENIED**.  It is further

**ORDERED** that Defendant Douglas's Motion to Suppress Tangible Evidence, ECF 31,

and Motion to Suppress Identification Testimony, ECF 33, are **DENIED**.

It is so **ORDERED**.

DATE:  December 10, 2020

CARL J. NICHOLS
United States District Judge

157

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| |
| v. |
| |
| TAVONTE WILLIAMS, et al., |
| *Defendants*. |

Criminal Action No. 1:20-cr-00121 (CJN)

## <u>MEMORANDUM OPINION</u>

Defendants Tavonte Williams and Theodore Douglas are each charged with one count of unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Currently before the Court are a series of pretrial motions from both Defendants and the government. The government moves to admit other crimes evidence under Federal Rule of Evidence 404(b) and to impeach Defendants' testimony with their prior convictions under Federal Rule of Evidence 609. *See generally* Government's Motion to Admit Other Crimes Evidence and To Impeach the Defendants' with their Prior Convictions ("Gov.'s Mot. to Admit Evid."), ECF 28. Williams moves the court to sever his trial from Douglas's and to suppress an undercover officer's identification of him. *See generally* Williams's Motion to Sever Defendants' Trials ("Williams's Mot. to Sever"), ECF 29; *see also generally* Williams's Motion to Suppress Identification ("William's Mot. to Supp. Id."), ECF 30. Douglas moves to suppress tangible evidence and statements obtained from his arrest and to suppress an undercover officer's identification of him. *See generally* Douglas's Motion to Suppress Tangible Evidence ("Douglas's Mot. to Supp. Evid."), ECF 31; *see also generally* Douglas's Motion to Suppress

Identification Testimony ("Douglas's Mot. to Supp. Id."), ECF 33.  The Court grants the

government's motion in part and denies it in part, and denies Defendants' motions.

## I.      Background

On the afternoon of April 22, 2020, the Narcotics and Special Investigations Division

("NSID") of the Metropolitan Police Department ("MPD") conducted an undercover operation in

the 2300 block of 15th Street, Northeast, Washington, D.C.  *See* Motions Hearing Transcript

("Tr.") at 20.  During this operation, an undercover officer, while sitting in an unmarked vehicle,

observed an individual (later identified as Defendant Douglas) standing in a walkway between

two buildings.  Tr. at 30.  Officer Jackson testified that he was about fifteen yards from the

individual with a clear line of sight.  Tr. at 30.  Shortly thereafter, another individual (later

identified as Defendant Williams) approached Douglas.  Tr. at 30.  According to Officer Jackson,

Williams handed Douglas a black backpack in exchange for what appeared to be money,

although Officer Jackson stated that he could not be sure that it was not some other light-colored

object.  Tr. at 29–30.  Officer Jackson observed that Douglas quickly concealed the backpack,

placing it on his back and putting his jacket on over it.  Tr. at 30.  Officer Jackson suspected that

he had observed a transaction involving "either a large quantity of narcotics or possibly a

firearm."  Tr. at 39.  He put a "lookout" over the police radio, describing what he had witnessed

and asking for uniformed NSID officers in the area to respond.  Govt. Ex. 3.

Responding to Officer Jackson's lookout, two uniformed officers approached Douglas in

the same general location where Officer Jackson observed the backpack exchange.  Tr. at 139–

40.  Officer Poupart greeted Douglas and the two other men with whom he was talking, advised

Douglas that he was being stopped as part of an investigation, and guided Douglas away from

the other two individuals by touching his arm.  *See BWC of Ofc. Poupart*, ECF 34-1, at 2:11–

2:36.  Officer Poupart then placed Douglas in handcuffs and frisked him to determine if he had

any weapons on his person.  *Id.*  Officer Poupart felt what he says he immediately knew to be a firearm in the backpack underneath Douglas's jacket.  Tr. at 169–71.  Officer Poupart then removed Douglas's jacket and searched the backpack, recovering a Sig Sauer, model P320, .40 caliber semiautomatic handgun with an obliterated serial number, loaded with a single round in the chamber and twelve rounds in a thirteen-round capacity magazine.  Shortly after Douglas was stopped, officers stopped Williams and, after receiving word that Douglas's bag contained a firearm, arrested him.  *See BWC of Ofc. Gabster*, ECF 35-3.

After being alerted that the suspects had been arrested, Officer Jackson drove to the parking lot where Williams and Douglas were detained.  *Id.* at 52–53.  From approximately twenty yards away, while remaining in his vehicle, Officer Jackson confirmed that Douglas and Williams were the individuals who had been engaged in the backpack exchange.  Gov.'s Ex. 3 at 10:28.

In July 2020, a grand jury returned an indictment that charged both Defendants with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g).  The Parties filed various motions to admit or suppress evidence, and the Court held an evidentiary hearing on these Motions.

## II.    Government's Motion to Admit Other Crimes Evidence and Impeach Defendants with Prior Convictions

### A.    Rule 404(b) Evidence

In its Motion to Admit Other Crimes Evidence and Impeach Defendants with Prior Convictions, ECF 28, the government first asks the Court to admit certain Rule 404(b) evidence against both Douglas and Williams.  *See generally* Gov.'s Mot. to Admit Evid., ECF 28.  Specifically, with regard to Douglas, the government seeks to introduce two prior gun possession

convictions; images and videos taken from Douglas's cellphone of him holding and shooting firearms; and two text message conversations, again taken from Douglas's cellphone, in which Douglas inquires about the price of certain firearms. *See id.* The government argues that this evidence is probative of the fact that Douglas knowingly and intentionally possessed the firearm recovered from the backpack he was wearing on the day of his arrest, and that his possession of the firearm was not the result of inadvertence, mistake, or accident. *See id.* at 22. The government also seeks to introduce a screenshot sent from Williams to Douglas, and recovered from Douglas's phone, of a masked man holding a gun while on a video call with Williams. *See id.* at 19. The government argues the screenshot demonstrates that Williams and Douglas had previously discussed and shared images of firearms, which tends to make it more likely that they engaged together in a firearm exchange. *See id.* at 28–29.

"Convictions are supposed to rest on evidence relevant to the crime charged, not on evidence of other, unrelated bad acts suggesting nothing more than a tendency or propensity to engage in criminality." *United States v. McGill*, 815 F.3d 846, 878 (D.C. Cir. 2016). Thus, under Rule 404(b), evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character. However, that evidence is admissible for any non-propensity purpose, including to establish motive, intent, plan, knowledge, or absence of mistake. *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000) (citing Fed. R. Evid. 404(b)). The rule against introducing character evidence is not based on the idea that a defendant's character is irrelevant. Rather, it is based "on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985).

Despite Rule 404(b)'s "restrictive[]" framing, the D.C. Circuit has noted that it is actually "quite permissive." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*).  It only prohibits the admission of other crimes evidence in "one circumstance"—when the evidence is being introduced to demonstrate that the defendant's acts conformed with his character.  *Id.*; *see also United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.").

A two-prong test determines whether evidence of prior crimes is admissible under Rule 404(b).  First, the evidence must be "probative of a material issue other than character." *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir 1990).  Second, the evidence is subject to the Rule 403 balancing test, in which the evidence's probative value must not be "substantially outweigh[ed]" by its prejudicial effect.  *Id.*  The government is allowed to admit 404(b) evidence in the government's case-in-chief in anticipation that a defendant will deny intent or knowledge.  *See United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) (noting that Rule 404(b) other crime evidence "is admissible during the government's case-in-chief if it is apparent that the defendant will dispute the issue").

### 1.      Evidence Pertaining to Douglas

Before turning to the specific evidence that the government seeks to introduce against Douglas, the Court addresses Douglas's threshold argument that all of the government's 404(b) evidence against him should be excluded.  *See* Douglas's Opp'n to Gov.'s Mot. to Admit Evid., ECF 39, at 4.  Douglas insists that the evidence is "irrelevant" because he is willing to stipulate to the fact that he was previously convicted of a crime punishable by imprisonment for a term exceeding one year.  *See id*.  Douglas relies on *Old Chief v. United States*, 519 U.S. 172 (1997), in which the Supreme Court held that a district court abused its discretion when it rejected a

defendant's offer to stipulate to the element of a prior felony conviction and instead admitted the full record of the prior judgment, despite the fact that the full record raised the "risk of a verdict tainted by improper considerations." *Id.* at 174.

Douglas's reliance on *Old Chief* is inapposite and his argument lacks merit.  In *Old Chief*, the government sought to introduce the facts of a prior conviction "solely to prove the element of prior conviction." *Id.* at 174.  Here, in contrast the government seeks to introduce 404(b) evidence not to demonstrate the existence of a prior conviction, but to demonstrate that Douglas knowingly possessed the firearm, another necessary element in a felon-in-possession case involving constructive possession of a firearm, *see United States v. Cassell*, 292 F.3d 788, 792–94 (2002)—and an element to which Douglas has *not* offered to stipulate.  The D.C. Circuit has held that prior convictions and evidence of other wrongs are admissible as probative of this knowledge element, even if they would not be admissible simply to prove the element of a prior conviction.  *See United States v. McCarson*, 527 F.3d 170, 173 (2008).  The 404(b) evidence that the government seeks to introduce is probative of the fact that Douglas knowingly and intentionally possessed the gun.

Turning to the specific evidence that the government seeks to introduce against Douglas, the government first asks the Court to admit evidence related to two prior convictions.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 5.  In one, Douglas pleaded guilty and admitted to possessing a loaded .22 caliber revolver in April 2013; the gun was recovered from his jacket as he fled police near the same location he was arrested in the instant case.  *See United States v. Douglas*, No. 2013-CF2-006028, Dkt. May 23, 2013 (D.C. Super. Ct. 2013).  In the other, Douglas pleaded guilty on April 7, 2010, and admitted to possessing a .357 caliber firearm recovered from his person on February 17, 2009.  *See Maryland v. Douglas*, No. CT090351X,

Dkt. April 7, 2010 (Md. Prince George's Cir. Ct. 2009).  The government states that it will

present evidence of these two prior convictions through the judgment and conviction orders in

each case and the transcripts of Douglas's plea hearings.  *See id.* at 6.

The D.C. Circuit has consistently allowed the admission of other crimes evidence relating

to possession of drugs and firearms under Rule 404(b) to demonstrate knowing possession and

absence of mistake.  *See, e.g.*, *McCarson*, 527 F.3d at 174 (holding two prior possession with

intent to distribute convictions and two firearm convictions "were not only relevant; they were

also highly probative of . . . his constructive possession of the gun and the drugs"); *United States*

*v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (holding that evidence of a prior conviction for

distribution of cocaine from a defendant's car "made it substantially more likely that [the

defendant] knew that there was (and intended that there be) crack in the console [of his car]");

*see also United States v. Moore*, 75 F. Supp. 3d 444, 451–52 (D.D.C. 2014) (finding prior

unlawful possession of a firearm evidence admissible under Rule 404(b) to show intent or lack of

mistake).  A prior gun possession conviction is certainly relevant to demonstrate that Douglas

was familiar with guns, and that his possession of a gun at the time of his arrest was not an

inadvertent mistake.

But Douglas's 2010 conviction lacks the requisite probative value because the ten-year-

old conviction is stale under *United States v. Sheffield*, 832 F.3d 296 (D.C. Cir. 2016).

Admitting this conviction would therefore unfairly prejudice Douglas.  With respect to his 2013

conviction, however, Douglas has failed to show "compelling or unique" evidence of prejudice

that would warrant exclusion.  *See United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995).

And any potential residual risk of prejudice to Douglas can be minimized through the issuance of

a limiting instruction to the jury.  *See United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir.

2007) (emphasizing the significance of the district court's instructions to the jury on the permissible and impermissible uses of evidence).  Douglas's most recent gun possession conviction is therefore admissible, while the conviction stemming from his 2009 arrest is inadmissible.

The government also seeks to introduce images, videos, and text messages recovered from Douglas's phone and Apple iCloud account.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 4–5.  The first is a picture, dated November 19, 2019, of Douglas holding a firearm.  *See id.* at 7.  The second is a video that Douglas sent in a text message on May 8, 2019, with the caption "My New toy like dat," and which depicts Douglas shooting a firearm.  *Id.* at 8.  The third is an image that Douglas received in a text message on August 4, 2019, which depicts Douglas with a firearm in one hand and holding up his middle finger to the camera with the other.  *Id.*  Douglas responded to that message by writing, "Man this like 06," *id.* at 10, which both parties construe to mean that the picture was taken in 2006.  *Id.* at 28.

The government argues that these images demonstrate Douglas's familiarity with guns, thereby making it more likely that Douglas knowingly possessed the firearm found in the backpack.  Gov.'s Mot. to Admit Evid., ECF 28, at 24.  To be sure, the video of Douglas shooting a gun and the picture of him holding a gun from 2019 are probative of knowledge and absence of mistake.  *See McCarson*, 527 F.3d at 174.  Both tend to make it more likely that Douglas knew of the firearm in his backpack.  And because Douglas has not demonstrated that the probative value of the image is "substantially outweigh[ed]" by the prejudicial effect, these images are admissible.  *Miller*, 895 F.2d at 1435.

In contrast, the image from 2006 lacks the same probative value.  Much like his 2010 conviction, this image is stale under *Sheffield*.  A picture from 14 years ago does little to

demonstrate that Douglas is *currently* familiar with firearms and thus does little to show knowledge or the absence of mistake, especially when the more recent videos and images demonstrate the same thing.  *See Sheffield*, 832 F.3d at 308.

Finally, the February 2020 text message conversations are admissible.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 12–18.  In each conversation, a contact sent Douglas a photograph or photographs of firearms for sale.  *Id.* at 15–16.  Douglas responded by either inquiring about the cost or offering a price for the weapon.  *Id.* at 13, 15.  The Court agrees with the government that these messages are probative of knowledge or absence of mistake because they establish that within two months of his arrest, Douglas was seeking to purchase a firearm—the very act that Officer Jackson believes he witnessed.  *See id.* at 25.  And because Douglas has not shown that he will suffer unfair prejudice from their admission, the Court finds that the text message exchanges are admissible under Rule 404(b).

### 2.      Evidence Pertaining to Douglas and Williams

The final piece of 404(b) evidence that the government seeks to introduce pertains to both Williams and Douglas.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 28.  On February 26, 2020, at Douglas's request, Williams sent a screenshot of himself on a video call (such as Facetime).  *See id.*  Williams's face appears in a small box on the left-hand corner of the image, and he appears to be speaking to a masked individual holding a handgun with several accessories.  *See id.*  The government argues that this exchange demonstrates a relationship between Williams and Douglas that includes communicating about firearms and therefore makes it more likely that they would be involved in an intentional exchange of a firearm.  *See id.* at 6.

For their part, Defendants argue that the texted screenshot is insufficiently similar to the charged offense.  *See* Williams's Opp'n to Gov's Mot. to Admit Evid., ECF 38, at 6.  A primary requirement when seeking to establish knowledge or intent with prior bad acts is that the

evidence must meet a threshold level of similarity to be admissible.  *See United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003); *see also Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 494 (7th Cir. 1998) ("The other act must be similar enough and close enough in time to be relevant to the matter at issue.").  "Otherwise, the evidence would lack probative value of intent, and instead would be more in nature of propensity." *Mazloum v. D.C. Metro. Police Dep't*, 517 F. Supp. 2d 74, 81 (D.D.C. 2007) (finding that defendant's violent verbal threats against his wife two days prior to the alleged assault and battery on another person were not admissible because they were offered as propensity evidence, and verbal threats are "fundamentally different" than actual physical force).  Defendants argue that the image is too dissimilar from the alleged criminal activity because it is not the same gun (or type of gun) and neither Williams nor Douglas is even depicted holding the gun.  *See* Williams's Opp'n to Gov's Mot. to Admit Evid., ECF 38, at 6.

The Court concludes that this texted screenshot survives the similarity requirement of Rule 404(b).  The message is close enough in time to the alleged crime to be relevant; after all, it was sent just two months before the alleged exchange.  *See* Gov.'s Mot. to Admit Evid., ECF 28, at 28.  And, most significantly, the texted screenshot demonstrates that the same people, Williams and Douglas, have had prior conversations about firearms—the subject of the alleged exchange.  The probative value of the image is also not "substantially outweigh[ed]" by the prejudicial effect.  *Miller*, 895 F.2d at 1435.  Although Defendants argue that a photo depicting a masked figure with a menacing gun is "highly inflammatory," the image is important to the government's case.  Williams's Opp'n to Gov's Mot. to Admit Evid., ECF 38, at 6.  It establishes that Defendants had previously discussed firearms and makes it more likely that both Defendants intentionally possessed the firearm that was allegedly exchanged.  The best way of

ensuring that any risk of prejudicial effect is minimized is not by exclusion, but by issuing a limiting instruction to the jury. *See Douglas*, 482 F.3d at 601.

### B.      Rule 609 Evidence

Rule 609 of the Federal Rules of Evidence permits the admission of a defendant's prior convictions for purposes of impeachment, as long as the "crime . . . was punishable by death or by imprisonment for more than one year" and "the probative value of the evidence outweighs its prejudicial effect." Fed. R. Evid. 609(a)(1)). The Rule sets a higher bar for felonies where "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later." Fed. R. Evid. 609(b). In those instances, admission is appropriate only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1).

With respect to Williams, the government seeks to impeach his testimony with two prior convictions, both from 2017—one for distribution of a controlled substance and another for unlawful possession of liquid PCP. *See* Gov.'s Mot. Admit Evid., ECF 28, at 31. Williams does not oppose the government's use of these prior convictions. Both convictions fall within the ten-year period of William's arrest, and the probative value of the convictions outweighs any prejudicial effect from their admission. The government may therefore use these two convictions for the purpose of impeaching Williams's testimony.

With respect to Douglas, the government seeks to impeach his testimony with the same convictions that it seeks to introduce under Rule 404(b). *See* Gov.'s Mot. to Admit Evid., ECF 28, at 31. The Court has already decided that the jury may hear about the 2013 conviction under Rule 404(b), but not the 2010 conviction, and thus need not reconsider that analysis in connection with Rule 609. *See United States v. Moore*, 75 F. Supp. 3d 444, 456 (D.D.C. 2014) (collecting cases in which courts declined to find prejudice based on the Government's

additional use of a prior conviction for Rule 609 purposes when the court had already permitted

the prior conviction for use in the Government's case-in-chief under Rule 404(b)).  The

government may therefore use Douglas's 2013 conviction, but not his 2010 conviction, to

impeach his testimony under Rule 609.

### III.    William's Motion to Sever

Williams moves the Court to sever his trial from Douglas's.  *See generally* Williams's

Mot. to Sever, ECF 29.  Williams first argues that the trials should be severed because Douglas

has agreed to provide exculpatory testimony for Williams if the trials are conducted separately

and Williams's trial happens second.  *See* Williams's Mot. to Sever, ECF 29, at 1.  Williams also

contends that because the evidence against Douglas is so "damning and vivid," a jury would be

unable to appropriately compartmentalize the evidence introduced against Douglas, and its

introduction would unfairly prejudice Williams.  *See id.*

Federal Rule of Criminal Procedure 8(b) permits joinder of both offenses and defendants.

*United States v. Perry*, 731 F.2d 985, 989 (D.C. Cir. 1984).  The Rule directs that "[t]wo or more

defendants may be charged in the same indictment . . . if they are alleged to have participated in

the same act or transaction or in the same series of acts or transactions constituting an offense or

offenses."  Fed. R. Crim. P. 8(b).  The D.C. Circuit construes Rule 8(b) broadly in favor of

joinder.  *United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991).  And it has cautioned that it

is "difficult to prevail on a claim that there has been misjoinder under Rule 8(b)."  *Id.*

But even if joinder of defendants and offenses is proper under Rule 8(b), Federal Rule of

Criminal Procedure 14(a) allows a court to sever defendants or counts, if the joinder "appears to

prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  The decision to sever is

within the discretion of the trial court, though the balance is "struck in favor of joint trials."

*United States v. Bruner*, 657 F.2d 1278, 1289–90 (D.C. 1981) (quoting *United States v. Hines*,

455 F.2d 1317, 1334 (D.C. Cir. 1972)).  This presumption is especially strong where "the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, *inter alia*, with participating in the same illegal acts." *United States v. Sutton*, 801 F.2d 1346, 1363 (D.C. Cir. 1986).

As a result, Rule 14 severance should be granted only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 540 (1993).  Serious risks identified by the Supreme Court include circumstances where essential exculpatory evidence available to a defendant tried alone is unavailable in a joint trial, where defendants with drastically different degrees of culpability are tried together in a complex case, and where highly prejudicial evidence that is probative of a defendant's guilt is only technically admissible against a codefendant.  *Id.*

As to Williams's first argument, in deciding whether to sever on the basis of an expected co-defendant's testimony, courts in this circuit first determine whether the moving co-defendant has established a *prima facie* case for severance, which requires showing:  "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed." *United States v. Kayode*, 254 F.3d 204, 210 (D.C. Cir. 2001) (quoting *United States v. Ford*, 820 F.2d 729, 731 (D.C. Cir. 1989)).  "A failure to demonstrate any one of these elements is dispositive." *United States v. Washington*, 12 F.3d 1128, 1133 (D.C. Cir. 1994).  And once a movant has made this showing, courts must then "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and

(4) give weight to the timeliness of the motion." *Kayode*, 254 F.3d at 210–11 (quoting *Ford*, 870 F.2d at 731). When conducting this balancing analysis, courts also consider "the extent to which proffered exculpatory testimony could be impeached." *Ford*, 870 F.2d at 732–33.

Williams has failed to demonstrate the fourth prong of the *prima facie* inquiry. To meet his burden Williams must demonstrate by "a reasonable probability" that the proffered exculpatory evidence from Douglas will be forthcoming. *Id.* Williams claims that he has met this burden because Douglas assured Williams's counsel that Douglas "will unequivocally testify if Mr. Williams is tried separately, and after Mr. Douglas' case is completed." Williams's Mot. to Sever, ECF 29, at 8.

But courts, including the D.C. Circuit, have consistently held that a movant fails to meet this burden if the offer is conditioned on a specific order in which the defendants will be tried. *See, e.g.*, *Ford*, 870 F.2d at 731; *United States v. Blanco*, 844 F.2d 344, 353 (6th Cir. 1988). In *Ford*, the movant's co-defendant stated through counsel that he would testify in favor of the movant, but, as here, the offer was conditioned on the co-defendant being tried first. The D.C. Circuit found severance inappropriate, reasoning that Rule 14 should not be read "as a mechanism for alleged co-conspirators to control the order in which they are tried." *Ford*, 870 F.2d at 731 (quoting *Blanco*, 844 F.2d at 353).

Douglas's offer to testify is similarly conditioned on Douglas's trial occurring first. Williams admits that "while Mr. Douglas will not testify at a joint trial (or it seems any other trial prior to resolution of his case), Mr. Douglas has agreed to testify at a separate trial for Mr. Williams." Williams's Mot. to Sever, ECF 29, at 4. The conditional nature of this promise fails to establish a reasonable probability that Douglas will actually testify. *Ford*, 870 F.2d at 732.

Even if Douglas had made an unconditional promise to testify, Williams cannot meet his burden to establish the third prong of the *prima facie* inquiry—that the testimony would be exculpatory.  This third requirement "demands more than conclusory statements by counsel; rather the showing must be sufficiently definite in nature to allow the court reasonably to conclude that the testimony would in fact be 'substantially exculpatory.'"  *Ford*, 870 F.2d at 732 (quoting *United States v. DeLuna*, 763 F.2d 897, 920 (8th Cir. 1985)).  Williams asserts that Douglas will testify that, despite knowing Williams and talking with him on occasion, the two had not talked or texted on the day of their arrest, nor had Douglas planned to see Williams on that day.  *See* Williams's Motion to Sever, ECF 29, at 7.  Instead, they came across one another by happenstance, and Williams walked up to Douglas and asked to borrow his phone.  *See id.* Douglas would therefore apparently testify that he simply allowed Williams to borrow his phone after unexpectedly bumping into him and that their interaction had nothing to do with the backpack or its contents.  *See id.*

On its face, this proposed testimony seems sufficiently exculpatory.  After all, Douglas will attest that Williams had nothing to do with the backpack.  But Williams ignores the extent to which Douglas could be impeached, which the D.C. Circuit has found to be an important consideration when evaluating this factor.  *See Ford*, 870 F.2d at 732.  The government has proffered Douglas's prior conviction, which will likely harm his credibility as a witness.  Most importantly, the government is prepared to show that Douglas's testimony would be directly contradicted by the call logs on Douglas's cellphone, which reveal that a short time before their arrest Douglas and Williams exchanged two FaceTime calls.  *See* Gov.'s Opp'n to Mot. to Sever, ECF 36, at 10.  The Court therefore concludes that Williams's testimony will not be sufficiently exculpatory to warrant severance.

Williams also argues that a joint trial in which "damning and vivid evidence against Mr. Douglas" is presented will improperly prejudice a jury against Williams.  *See* Williams's Mot. to Sever, ECF 29, at 1.  Williams notes that Douglas was caught, on police body camera, wearing a backpack containing a gun and ammunition, and that Douglas made statements indicating that he had some idea about the contents of the backpack.  *See id.*  Williams, in contrast, was not in possession of the backpack, nor was he found with the cash that Officer Jackson believed he saw Douglas give to Williams.  Additionally, Williams argues that the government's Rule 404(b) evidence against Douglas is far stronger and more "vivid" than the Rule 404(b) evidence against Williams.  *See id.* at 10.

But even with these disparities in evidence, Williams has failed to meet his "heavy burden" under Rule 14.  *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013).  The D.C. Circuit has consistently cautioned that severance is only appropriate when the moving party shows that the evidence against his co-defendant is "far more damaging than the evidence against [the movant]."  *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1980).  "Absent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to be given individual consideration to the defendant."  *Bruner*, 657 F.2d at 1290.  The critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991).  Here, the risk of jury confusion is minimal.  And Williams has not presented any compelling reason why a jury instruction would be insufficient to ensure that the jury compartmentalizes the evidence against Douglas from the evidence against Williams.

### IV.    Douglas's Motion to Suppress Tangible Evidence

Douglas seeks to suppress all tangible objects seized and statements made as a result of his arrest on April 22, 2020.  *See generally* Douglas's Mot. to Supp. Evid., ECF No. 31.  Douglas

argues that those objects and statements were the fruits of a warrantless search for which no

exception to the Fourth Amendment's warrant requirement applies.  *See id.* at 2.

###### A.        Whether Reasonable Suspicion Existed to Conduct an Investigatory Stop

The Parties first disagree whether Officer Poupart had reasonable, articulable suspicion

that a crime had been committed when he stopped Douglas.  *See* Douglas's Mot. to Supp. Evid.,

ECF 31, at 3.  Under *Terry v. Ohio*, 392 U.S. 1 (1968), an "officer may, consistent with the

Fourth Amendment conduct a brief, investigatory stop when the officer has reasonable,

articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000).  In determining whether reasonable suspicion exists, courts ask whether a reasonable

officer would ascertain that all facts "taken together [warrant] further investigation."  *Terry*, 392

U.S. at 22.  A reasonable officer can consider a wide range of factors when making that

determination.  *See id.*; *see also United States v. Laing*, 889 F.2d 281, 286 (D.C. Cir. 1989)

(holding that the time, the "high crime" nature of the area, and the defendant's furtive

movements were relevant to the reasonable suspicion inquiry).  The reasonable suspicion test is

an objective test, and the subjective motivations of a particular officer are irrelevant to the

analysis.  *Whren v. United States*, 517 U.S. 806, 814 (1996).  Ultimately, "it is the government's

burden to provide evidence sufficient to support reasonable suspicion justifying a stop."  *United

States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016).

Especially relevant here, an officer making an investigatory stop need not have "direct

personal knowledge of *all* the facts necessary to give rise to reasonable suspicion."  *United States

v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007).  Instead, an officer "may act on 'a directive or

request from another officer or agency.'"  *United States v. Gorham*, 317 F. Supp. 3d 459, 470

(D.D.C. 2018) (quoting Wayne R. LaFave, 2 Search and Seizure: A Treatise on the

Fourth Amendment, § 3.5(c) (Oct. 2017 update)).  Therefore, even though Officer Poupart did

174

not observe the backpack exchange himself, if Officer Jackson "reasonably suggest[ed] that

fellow officers investigate" the individuals engaged in the backpack exchange, Officer Poupart is

said to have reasonable suspicion to conduct a stop through the collective knowledge rule.

*United States v. Devaugh*, 422 F. Supp. 3d 104, 133 (D.D.C. 2019).  The reasonable suspicion

inquiry in this case therefore turns on whether the exchange that Officer Jackson observed and

the surrounding circumstances gave rise to reasonable suspicion, justifying Officer Jackson's

order to other officers to stop the participants in the backpack exchange.

The government has identified three facts that it argues, when considered in their totality,

establish the "minimum level of objective justification" necessary to justify a *Terry* stop.  *United

States v. Sokolow*, 490 U.S. 1, 7 (1989).  First, the government submits that the area where

Officer Jackson witnessed the exchange was a high crime area.  *See Wardlow*, 528 U.S. at 124

(noting that "the fact that the stop occurred in a 'high crime area' among the relevant contextual

consideration in a *Terry* analysis.").  Officer Jackson testified that he had "quite frequently"

worked in the Fifth Police District, where "violent crimes, shootings, [and] narcotics

transactions" were the most frequent criminal offenses and occurred more frequently than some

neighboring police districts.  Tr. 18; 117–18.  And, specifically with regard to the 2300 block of

15th Street, Officer Jackson stated that he had worked investigations in the area more than 200

times in the last five years and that that block is a high crime area, known for narcotics sales and

violent crime.  Tr. at 23.  Officer Jackson did not merely testify that the area "suffers from

general, undifferentiated 'crime,' but that it is home to the precise type of infraction[]" that

Officer Jackson suspected Douglas was committing.  *Edmonds*, 240 F.3d at 60.

Second, the government points to the hand-to-hand transaction that Officer Jackson

witnessed.  *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid., ECF 34, at 7.  Officer Jackson

testified that based on his experience as a police officer, he was familiar with how individuals

engaged in hand-to-hand narcotics transactions, and that in his experience bulk transfers of

narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack.  Tr.

at 17–18.  Of course, "simply receiving an object from another person . . . is a common

occurrence for which there could be many innocent explanations."  *United States v. Johnson*, 212

F.3d 1313, 1316 (D.C. Cir. 2000).  "But even so, the observation [of a hand-to-hand exchange]

would certainly contribute to a reasonable officer's suspicion."  *Devaugh*, 422 F. Supp. 3d at

111.

Finally, the government relies upon Officer Jackson's observation of Douglas's attempt

to conceal the backpack under his jacket.  *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid.,

ECF 34, at 7.  Officer Jackson testified that the person who received the backpack (later

identified as Douglas) acted "quickly" to "conceal whatever was in that book bag" and "tried to

hide the book bag on his person by covering it up with his jacket."  Tr. at 30; 102–03.  In Officer

Jackson's experience, individuals engaged in hand-to-hand narcotics transactions often attempt

to be "discreet" or "secretive" and engage in acts of concealment.  Tr. 14–15.  "Furtive

movements . . . have been consistently recognized as grounds for reasonable suspicion, justifying

a stop and frisk."  *See United States v. Lovelace*, 357 F. Supp. 2d 39, 43 (D.D.C. 2004) (citing

*Wardlow*, 528 U.S. at 124).

Based on these factors, Officer Jackson suspected that he had observed either the transfer

of a large quantity of narcotics or a weapon.  Tr. at 38–39, 129.  The Court concludes that,

looking at the facts and circumstances in their totality, Officer Jackson's suspicion that criminal

activity was afoot was reasonable.  *See Wardlow*, 528 U.S. at 123 (holding that reasonable

suspicion only requires a "minimal level of objective justification for the stop").

### B.     Whether the Investigatory Stop was Transformed into an Arrest

Second, Douglas argues that, even if Officer Poupart had reasonable suspicion to conduct an investigatory stop, his immediate use of handcuffs converted the stop into an arrest before the police developed probable cause.  *See* Douglas's Reply Mot. to Supp. Evid., ECF 42,  at 1.  The government concedes that Officer Poupart did not have probable cause to arrest Douglas when he placed him in handcuffs, and thus the question is whether Officer Poupart's immediate use of handcuffs converted the stop into an arrest.  *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

"The point at which an investigative stop becomes an arrest is not marked with a bright line."  *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).  But two general principles govern a *Terry* stop and ensure that it does not ripen into an arrest.  The stop must "last no longer than is necessary to effectuate the purpose of a stop" and the officer "must employ the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).  If a stop is "unduly prolonged or intrusive," it "transforms from an investigative stop into an arrest requiring probable cause." *Hall*, 867 F.3d at 153.

Although handcuffs are "generally recognized as a hallmark of a formal arrest," *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (collecting cases), their use does not automatically convert a *Terry* stop into an arrest.  *United States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019); *see also Laing*, 889 F.2d at 285 (holding that "amount of force used to carry out the stop and search must be reasonable, but may include use of handcuffs").  However, officers can only use handcuffs to effectuate a *Terry* stop "when specific circumstances make it reasonable to do so."  *Devaugh*, 422 F. Supp. 3d at 114.  One such set of circumstances is when an officer "reasonably fear[s] for [his] safety and the safety of others."  *Smith*, 373 F. Supp. 3d at

177

238; *see also United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (holding that, where it was "reasonable for officers to fear that [the suspect] had a weapon in his waistband," the use of handcuffs did not convert a *Terry* stop into an arrest).  After all, "a policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."  *Id*.

Here, the government contends, and Officer Poupart testified, that he placed Douglas in handcuffs because he feared for his safety and the safety of others.  *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid., ECF 34, at 8–10.  Officer Poupart identified in his testimony a number of reasons for his safety concerns, including that:  (1) two unidentified men were in close proximity to Douglas; (2) the second suspect involved in the backpack transaction remained unaccounted for; (3) the transaction he was responding to involved a bag, capable of concealing a weapon; and (4) the reported transaction sounded like a narcotics transaction and in Officer Poupart's experience drug traffickers are often armed.  Tr. at 140–42, 165, 185–86, 187.  These factors made it reasonable for Officer Poupart to fear for his safety and the safety of others.  An "officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *United States v. Gorham*, 317 F. Supp. 3d at 467 (quoting *Terry*, 392 U.S. at 27).

Douglas argues that two recent decisions from courts in this circuit—*United States v. Devaugh*, 422 F. Supp. 3d 104 (D.D.C. 2019), and *United States v. Smith*, 373 F. Supp. 3d 223 (D.D.C. 2019)—both of which found that the use of handcuffs was a factor transforming a *Terry* stop into an arrest, compel the conclusion that Douglas was arrested here.  *See* Douglas's Reply Mot. to Supp. Evid., ECF 42, at 4.  But these cases are distinguishable.

In *Devaugh*, an undercover officer observed a suspect engage in a hand-to-hand transaction, involving the exchange of money for a small object. *Devaugh*, 422 F. Supp. 3d at 108. After the suspect was alerted to police presence in the area, he quickly walked to a vehicle while appearing to adjust his waistband. *Id.* An arrest team arrived in unmarked police cruisers with activated emergency lights. *Id.* at 108–09. Officers approached the vehicle that the suspect was now sitting in and one officer drew his weapon, touching it to the window of the suspect's vehicle. *Id.* at 109. After the suspect, in compliance with police orders, exited the vehicle, he was immediately handcuffed. *Id.* A subsequent search of the vehicle resulted in the recovery of a firearm. *Id.*

In a decision suppressing evidence of the recovered gun, Judge Contreras held that a number of factors increased the intrusiveness of the stop beyond what was reasonable. In addition to the use of handcuffs, Judge Contreras noted that the overwhelming number of officers (six) responding to stop the suspect and the fact that one officer brandished his weapon transformed the *Terry* stop into an arrest. *Id.* at 114–15. Furthermore, one of the arresting officers testified that "he and the arrest team did not believe Mr. Devaugh was armed." *Id.* at 115.

Here, in contrast, the responding officers did not draw their weapons, did not yell orders at Douglas, and did not surround Douglas in large numbers. Officer Poupart and his partner were the only officers interacting with Douglas, and they maintained a calm and conversational demeanor throughout the interaction. *See* Gov. Ex. 4 and 4B. Officer Poupart also testified about a number of factors that led him to conclude that Douglas was armed. Tr. at 140–42, 165, 185–86, 187.

In *Smith*, Judge Moss found that handcuffing a suspect standing by the open driver's side door of a parked car, where the officers could smell PCP but were unable to determine whether the suspect was under the influence, converted a *Terry* stop into an arrest.  *Smith*, 373 F. Supp. 3d at 239.  Judge Moss noted that it would have been reasonable for officers to handcuff a person whom they reasonably believed to be under the influence of PCP to ensure officer safety, but there was an insufficient basis for such a belief in that case.  *See id.*  Here, in contrast, Officer Poupart testified why he believed that Douglas was armed, together with the other reasons he was concerned for his safety and the safety of others.  Tr. at 140–42, 165, 185–86, 187.

### C.      Whether Officer Poupart Exceeded the Scope of a *Terry* Frisk

Finally, Douglas argues that even if Officer Poupart had reasonable suspicion to conduct a *Terry* stop, and even if his use of handcuffs did not transform the stop into an arrest, evidence of the firearm should be suppressed because the manner in which Officer Poupart felt the exterior of Douglas's jacket exceeded the scope of a lawful frisk under *Terry*.  *See* Douglas's Reply in Support of Mot. to Supp. Evid., ECF 42, at 1.

When an officer conducting a *Terry* stop reasonably believes the subject is armed and a threat to his safety or the safety of others, the officer is permitted to conduct a limited protective search "to determine whether the person [being stopped] is in fact carrying a weapon."  *Terry*, 392 U.S. at 24.  The purpose of a *Terry* frisk "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  *Adams*, 407 U.S. at 146. "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.'"  *United States v. Spriggs*, 2010 WL 917709, *2 (D. Md. March 10, 2010) (quoting *Minnesota v. Dickerson*, 508 U.S 366, 3723–75 (1993)). In order to fall within the scope of the "plain feel" doctrine, a pat down cannot involve an impermissible manipulation or palpitation of the contours of an object to determine its exact

contents.  *See Dickerson*, 508 U.S. at 375.  But when a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."  *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).

As discussed above, Officer Poupart reasonably believed that the subject was armed and posed a threat to his safety and the safety of others.  Conducting a protective frisk for weapons was therefore reasonable under *Terry*.  The only remaining question is whether Officer Poupart's frisk went beyond what was necessary to determine whether Douglas was armed.  The footage from Officer Poupart's body worn camera and Officer Poupart's testimony demonstrates beyond serious question that the search was minimally invasive and did not exceed what is permissible in a protective frisk.  *See* Gov. Ex. 4 and 4B; Tr. at 169–71.  The camera footage shows that Officer Poupart lightly touched the back of Douglas's jacket just a few times, with the total sequence of events lasting only a few seconds, before Officer Poupart recognized the presence of a firearm.  Tr. at 169–171.  And Officer Poupart testified that the shape and weight of the object made it immediately apparent that he was touching a firearm.  Tr. at 169–71.  This brief and minimally invasive protective frisk did not exceed the bounds established in *Terry* and *Dickerson*.

**V.    Defendants' Motion to Suppress Identification**

Williams and Douglas move the Court to suppress Officer Jackson's identification of them after they were stopped and any subsequent in-court identification.  *See generally* Williams's Mot. to Supp. Id., ECF 30; *see also* Douglas's Mot. to Supp. Id., ECF 33.

Beginning with their due process argument, both Defendants argue that Officer Jackson's show-up identification—the identification procedure where a single suspect is presented for the witness to identify as the perpetrator—was unduly suggestive and unreliable.  *See* Williams's Mot. to Supp. Id., ECF 30, at 5; *see also* Douglas's Mot. to Supp. Id., ECF 33, at 2.  In

determining whether to suppress a witness's identification under the Due Process Clause, the

Court performs a two-step analysis. *See United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir.

2007). First, the Court must determine "whether the identification procedure 'was impermissibly

suggestive.'" *Id.* (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)).

If the Court finds that the procedure was impermissibly suggestive, the Court must next decide

whether the identification was nonetheless "sufficiently reliable to preclude 'a very substantial

likelihood of irreparable misidentification.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98,

116 (1977)). This determination involves a balancing test in which courts weigh the degree of

suggestiveness against the strength or weakness of factors indicating reliability. *Manson*, 432

U.S. at 114. The reliability factors include the "opportunity of the witness to view the criminal at

the time of the crime, the accuracy of the witness' prior description of the criminal, the level of

certainty demonstrated by the witness at the confrontation, and the length of time between the

crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 192 (1972). Additionally, courts

have noted that if a trained law enforcement officer, who is "expert" in observing criminals, is

the individuals making the identification, that bolsters the reliability of the identification. *United

States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991); *Singleton v. United States*, 702 F.2d 1159,

1165–66 (D.C. Cir. 1983).

The government admits, as it must, that courts have held that show-up identifications,

such as those used here, are inherently suggestive. *See* Gov.'s Opp'n Mot. to Supp. Id., ECF 35,

at 8. *See, e.g.*, *Singleton*, 702 F.2d at 1165–67; *Russell v. United States*, 408 F.2d 1280, 1284

(D.C. Cir. 1968). But despite their inherent suggestiveness, "immediate on-the-scene showup

identifications . . . have long been upheld" as reliable by the D.C. Circuit. *Singleton*, 702 F.2d a

1165–66.

Here the indicia of reliability all point in favor of admitting Officer Jackson's identification.  First, Officer Jackson had an opportunity to view the suspects at the time of their actions.  Officer Jackson testified that he was in a parked car fifteen yards away from the alleged exchange with a clear line of sight, and that he witnessed the entire exchange of the backpack and had ample time to observe both suspects.  Tr. at 26–30.  Second, Officer Jackson's descriptions of the suspects, captured on the Radio Run, accurately described the suspects that were eventually stopped.  Gov. Exhibit 3.  Third, Officer Jackson did not express any doubts about his identification.  Finally, the identification occurred from a distance of about twenty yards, less than five minutes after Officer Jackson observed the backpack exchange.  Tr. at 53, 73.

Furthermore, Officer Jackson is a trained law enforcement officer, who is expert in observing criminals.  Officer Jackson has over twenty years of experience working as a police officer and ten of those years were spent working for the NSID—the division responsible for the undercover operation here.  Tr. at 8.  Officer Jackson further testified that during the course of his career he has worked as an observation post officer "more than 500" times.  Tr. at 12.  Officer Jackson's experience strengthens the reliability of the identification.  *See Dring*, 930 F.2d at 693; *see also Singleton*, 702 F.2d at 1165–66.

Defendant's principal attack against the identifications is that Officer Jackson's description of the events was inaccurate or incomplete.  Defendants argue that Officer Jackson's initial description of the person who handed over the backpack (later identified as Williams) was generic and only became more specific after another officer, sensing the insufficiency of the description, filled in the blanks.  *See* Williams's Mot. to Supp. Id., ECF 30, at 5.  Defendants allege that this second officer "suggested [to Officer Jackson the] additional identifying factor of

[the] 'orange hood'" on Williams's jacket and that "it appears [that Officer Jackson] affirmed and added 'orange hood' to his own now-evolving description." *See id.* at 3.

Defendants are correct that Officer Jackson's descriptions evolved and became more detailed with each lookout. The initial broadcast lookout stated that the person who turned over the backpack was a "black male with a gray coat," *see* Radio Run, April 22, 2020 ("Radio"), ECF 35-1, at 6:00–6:29; the next description was "a black male with a gray coat with puffy hair" that was "real messy," *id.* at 6:53–7:08; and the third was that the black male with the gray coat had an "orange hood." *Id.* at 7:24–7:39.

But Defendants are wrong to argue that Officer Jackson's descriptions were influenced by any other officer. Instead, body worn camera footage conclusively shows that Officer Jackson provided his descriptions of Williams's orange hood before Williams was handcuffed and the second officer mentioned the orange hood. *See BWC of Ofc. Gabster*, ECF 35-3, at 19:04:26–19:04:35. Officer Jackson also testified that nobody told him Williams was wearing an orange hood, and that his lookout descriptions were the product of his own observations. Tr. at 44.

Defendants make much of the fact that Officer Jackson stated in his initial lookout that the backpack was exchanged for money, but no money was found on Williams when he was arrested. *See* Radio, ECF 35-1, at 6:00–6:29; *see also* William's Mot. to Supp. Id., ECF 30, at 3. Defendants insist that makes Officer Jackson's observation inaccurate and thus unreliable. *Id.* But as the government points out, Williams was out of sight of Officer Jackson immediately after the exchange and had ample time to dispose of any cash. *See* Gov.'s Opp'n to Williams's Mot. to Sever, ECF 36, at 3. In any event, even if Officer Jackson misidentified the object being

exchanged for the backpack, this inaccuracy is insufficient to render Officer Jackson's identification testimony unreliable.

Finally, if a show-up identification occurs while the subject is in custody following an illegal stop, the identification must be suppressed as the fruit of the illegal stop. *See United States v. Crews*, 445 U.S. 463, 472–73 (1980). A stop is illegal if the officers did not have a "reasonable, articulable suspicion that 'criminal activity may be afoot.'" *Edmonds*, 240 F.3d at 59 (quoting *Terry*, 392 U.S. at 30). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those fact, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016). The government bears the "burden to provide evidence sufficient to support reasonable suspicion." *Id.* at 634.

Here, Williams argues, much like Douglas in his Motion to Suppress Tangible Evidence, that the government has not demonstrated that the police had reasonable suspicion. He argues that Officer Jackson's observation of a hand-to-hand transaction did not create "reasonable, articulable suspicion that 'criminal activity may be afoot.'" *Edmonds*, 240 F.3d at 59 (quoting *Terry*, 392 U.S. at 30). As discussed above, however, an examination of the totality of the circumstances demonstrates that the government has indeed met its burden. Officer Jackson witnessed a hand-to-hand exchange in a high crime neighborhood, known for drug and firearm activity. During the exchange, Douglas acted strangely, quickly placing the backpack under his jacket, as if to hide it. Tr. at 29–30. These factors provided Officer Jackson with reasonable suspicion that a crime was occurring. Furthermore, Officer Jackson gave an accurate description of Williams, including supplementing his original description without prompting from other

185

officers.  The police therefore had reasonable suspicion to conduct an investigatory stop of

Williams.

## VI.    Conclusion

For the reasons discussed above, the Court grants in part and denies in part the

government's motion, and the Court denies the Defendants' motions.  An Order will be issued

contemporaneously with this Memorandum Opinion.

DATE:  December 10, 2020

_____

CARL J. NICHOLS
United States District Judge

U.S. Department of Justice

Michael R. Sherwin
Acting United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

March 10, 2021

Eugene Ohm, Esq.
*Attorney for Theodore Douglas*

Re:   United States v. Theodore Douglas
       Criminal Case No. 20-121 (CJN)

Dear Mr. Ohm:

This letter sets forth the full and complete plea offer to your client, Theodore Douglas (hereinafter referred to as "your client" or "defendant"), from the Office of the United States Attorney for the District of Columbia (hereinafter also referred to as "the Government" or "this Office"). This plea offer expires on **March 12, 2021**. If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as "this Agreement"). The terms of the offer are as follows:

[1].   **Charges and Statutory Penalties**

Your client agrees to plead guilty to Count One in the Indictment, charging your client with Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

Your client understands that a violation of 18 U.S.C. § 922(g)(1) carries a maximum sentence of 10 years of imprisonment; a fine of $250,000; a term of supervised release of not more than 3 years pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

In addition, your client agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court for the District of Columbia. Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Commission, *Guidelines Manual* (2018) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation. Further, your client understands that, if your client has two or more convictions for a crime of violence or felony

drug offense, your client may be subject to the substantially higher penalties provided for in the career-offender statutes and provisions of the Sentencing Guidelines.

[2]. **Factual Stipulations**

Your client agrees that the attached "Statement of Offense" fairly and accurately describes your client's actions and involvement in the offense to which your client is pleading guilty. Please have your client sign and return the Statement of Offense as a written proffer of evidence, along with this Agreement.

[3]. **Additional Charges**

In consideration of your client's guilty plea to the above offense, your client will not be further prosecuted criminally by this Office for the conduct set forth in the attached Statement of Offense. The government agrees that it will not recharge your client with the offenses charged in Superior Court of the District of Columbia, Case Number 2015-CF2-008493 that were dismissed on February 22, 2021.

[4]. **Sentencing Guidelines Analysis**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties agree to the following:

    A.    **Estimated Offense Level Under the Guidelines**

The parties agree that the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(6)(A) | Base Offense Level | 14 |
| U.S.S.G. § 3E1.1 | Applicable Adjustments | -2 |
| | Total | 12 |

Acceptance of Responsibility

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence.

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth above, should your client move to withdraw your client's guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

In accordance with the above, the Estimated Offense Level will be at least 12.

### B.      Estimated Criminal History Category

Based upon the information now available to this Office, your client has at least the following criminal convictions:

- Unlawful Possession of a Firearm, Washington, DC, 2013
- Carry a Handgun, Maryland, 2010

Accordingly, your client is estimated to have three (3) criminal history points and your client's Criminal History Category is estimated to be II (the "Estimated Criminal History Category"). Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached, and your client's criminal history points may increase or decrease.

### C.      Estimated Guidelines Range

Based upon the Estimated Offense Level and the Estimated Criminal History Category set forth above, your client's estimated Sentencing Guidelines range is 12 months to 18 months (the "Estimated Guidelines Range"). In addition, the parties agree that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 12, the estimated applicable fine range is $5,500 to $55,000. Your client reserves the right to ask the Court not to impose any applicable fine.

The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted. Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A. However, the parties

are free to argue for a Criminal History Category different from that estimated above in subsection B.

Your client understands and acknowledges that the Estimated Guidelines Range calculated above is not binding on the Probation Office or the Court. Should the Court or Probation Office determine that a guidelines range different from the Estimated Guidelines Range is applicable, that will not be a basis for withdrawal or recission of this Agreement by either party.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement. Should your client commit any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

[5].   **Agreement as to Sentencing Allocution**

The parties further agree that a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below. Nevertheless, your client reserves the right to seek a sentence below the Estimated Guidelines Range based upon factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a). The government agrees to allocute for a sentence at the low end of the applicable Guidelines range.

[#].   **Reservation of Allocution**

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charges to which your client is pleading guilty, to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. The parties also reserve the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein. In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein.

In addition, if in this Agreement the parties have agreed to recommend or refrain from recommending to the Court a particular resolution of any sentencing issue, the parties reserve the

right to full allocution in any post-sentence litigation. The parties retain the full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding(s) before the Bureau of Prisons. In addition, your client acknowledges that the Government is not obligated and does not intend to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

[6].      **Court Not Bound by this Agreement or the Sentencing Guidelines**

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), and upon consideration of the Sentencing Guidelines. Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Court. Your client acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing. Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Court.

Your client acknowledges that your client's entry of a guilty plea to the charged offense authorizes the Court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range. The Government cannot, and does not, make any promise or representation as to what sentence your client will receive. Moreover, it is understood that your client will have no right to withdraw your client's plea of guilty should the Court impose a sentence that is outside the Guidelines range or if the Court does not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Court. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

[7].      **Conditions of Release**

Your client agrees not to object to the Government's recommendation to the Court at the time of the plea of guilty in this case that your client be detained without bond pending your client's sentencing in this case, pursuant to 18 U.S.C. § 3143.

[8].      **Waivers**

a.        **Statute of Limitations**

Your client agrees that, should the conviction following your client's plea of guilty pursuant to this Agreement be vacated for any reason, any prosecution, based on the conduct set forth in the attached Statement of Offense, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement (including any counts that the Government has agreed not to prosecute or to dismiss at sentencing pursuant to this Agreement)may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of Offense that is not time-barred on the date that this Agreement is signed.

b.      **Trial Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule.  Your client agrees to forego the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea.  Your client also agrees to waive, among other rights, the right to plead not guilty, and the right to a jury trial.  If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify.  If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client.  Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt.   If your client were found guilty after a trial, your client would have the right to appeal your client's conviction.  Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of self-incriminating statements in a criminal prosecution.  By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn.  Your client knowingly and voluntarily waives the rights that arise under these rules in the event your client withdraws your client's guilty plea or withdraws from this Agreement after signing it.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the plea of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court.  Your client understands that the date for sentencing will be set by the Court.

c.      Appeal Rights

Your client agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which your client is pleading guilty is unconstitutional, (2) the admitted conduct does not fall within the scope of the statute(s).  However, your client is preserving his right to appeal the court's December 10, 2020 denial of his motion to suppress tangible evidence (ECF Doc. 57). Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances.  Your client also agrees to waive the right to appeal the sentence in this case, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Court to set conditions of release, and the manner in which the sentence was determined, except to the extent the Court

Page **6** of **10**

sentences your client above the statutory maximum or guidelines range determined by the Court. In agreeing to this waiver, your client is aware that your client's sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement. Notwithstanding the above agreement to waive the right to appeal the conviction and sentence, your client retains the right to appeal on the basis of ineffective assistance of counsel, and the Court's denial of his motion to suppress tangible evidence, but not to raise on appeal other issues regarding the conviction or sentence.

### d.      **Collateral Attack**

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel. Your client reserves the right to file a motion brought under 18 U.S.C. § 3582(c)(2), but agrees to waive the right to appeal the denial of such a motion.

### [9].   **Use of Self-Incriminating Information**

The Government agrees pursuant to U.S.S.G. § 1B1.8(a), that self-incriminating information provided by your client pursuant to this Agreement or during the course of debriefings conducted in anticipation of this Agreement, and about which the Government had no prior knowledge or insufficient proof in the absence of your client's admissions, will not be used by the Government at the time of sentencing for the purpose of determining the applicable guideline range. However, all self-incriminating information provided by your client may be used for the purposes and in accordance with the terms identified in U.S.S.G. § 1B1.8(b).

### [10].  **Forfeiture**

The United States and your client hereby agree that the following items seized from your client on April 22, 2020, and currently in the custody and/or control of the Metropolitan Police Department, were properly seized and were involved in or used in violation of Federal law by your client:

A. a Sig Sauer P320 semi-automatic pistol, serial number 58AU72741; and magazine.

B. 13 rounds of .40 caliber ammunition.

Your client agrees that these items are subject to seizure and forfeiture by the United States, and that no defense exists to the seizure and forfeiture of this property by the United States. As such, your client hereby relinquishes all claim, title, and interest he has in the above-referenced property to the United States and/or the District of Columbia and agrees not to oppose any civil, administrative, or judicial forfeiture of the property. Your client agrees that he will not file a claim

to this property and withdraws any claim for the property that he may have filed.  Your client knowingly and voluntarily waives any right to timely notice provided for in 18 U.S.C. § 983.  In the event that the law enforcement agency having custody of the property decides not to pursue forfeiture of the property, your client hereby consents to its destruction by, and/or abandonment to, the law enforcement agency.  Your client certifies that he is the sole owner of the property listed above, and that no one else has an ownership interest in this property.  Your client hereby waives any right he has to transfer the above-referenced property to a third-party.

Your client agrees to waive all constitutional and statutory challenges in any manner (including, but not limited to, direct appeal) to any forfeiture/destruction carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

[11].   **Breach of Agreement**

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing, your client will have breached this Agreement.  In the event of such a breach:  (a) the Government will be free from its obligations under this Agreement; (b) your client will not have the right to withdraw the guilty plea; (c) your client will be fully subject to criminal prosecution for any other crimes, including perjury and obstruction of justice; and (d) the Government will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client and any of the information or materials provided by your client, including such statements, information and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously characterized as "off-the-record" debriefings, and including your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by a preponderance of the evidence, except where such breach is based on a violation of federal, state, or local criminal law, which the Government need prove only by probable cause in order to establish a breach of this Agreement.

Nothing in this Agreement shall be construed to permit your client to commit perjury, to make false statements or declarations, to obstruct justice, or to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement.  Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses.  Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement.  In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

Page **8** of **10**

[12]. **Complete Agreement**

No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and an Assistant United States Attorney for the District of Columbia.

Your client further understands that this Agreement is binding only upon the Criminal and Superior Court Divisions of the United States Attorney's Office for the District of Columbia. This Agreement does not bind the Civil Division of this Office or any other United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by signing this Agreement and the Statement of Offense and returning both to me no later than **March 12, 2021**.

Sincerely yours,

*/S/Dineen Baker/for*
Michael R. Sherwin
Acting United States Attorney

By:    */S/Steven Wasserman*
Steven B. Wasserman
Assistant United States Attorney

Page **9** of **10**

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorney, Eugene Ohm, Esq. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense(s) identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorney in connection with this Agreement and matters related to it.

Date: 3-11-21

THEODORE DOUGLAS
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Theodore Douglas, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: 3/11/2021

EUGENE OHM, Esq.
Attorney for Defendant

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.** | **20-cr-121-02 (CJN)** |
| | : | | |
| **v.** | : | | |
| | : | | |
| **THEODORE DOUGLAS,** | : | | |
| | : | | |
| **Defendant.** | : | | |

### STATEMENT OF THE OFFENSE

Had this case proceeded to trial, the government's evidence would have established beyond a reasonable doubt that on April 22, 2020, at approximately 2:59 p.m., members of the Metropolitan Police Department (MPD), Narcotics and Special Investigations Division (NSID), were conducting an observation post in the 2300 block of 15th Street, Northeast, Washington, D.C. An undercover officer (UC) observed an individual, later identified as Theodore Douglas (Defendant Douglas), standing in the walkway between 2315 and 2317 15th Street, Northeast. Defendant Douglas acknowledges that the UC would testify that an individual, later identified as Tavonte Williams (Defendant Williams), approached Defendant Douglas and handed Defendant Douglas a black bag with shoulder straps. Defendant Douglas put this black bag onto his back, and then put his blue jacket on over the black bag. The UC then observed Douglas hand Williams an unidentified object.

The UC alerted other officers in the area and officers moved in to stop both Defendants Douglas and Williams. Both Defendants Douglas and Williams were stopped by separate officers and both defendants were later positively identified by the UC as the individuals observed exchanging the backpack and unidentified object. Defendant Douglas was found to be wearing a

1

backpack under his jacket, as observed by the UC. The officer who stopped Defendant Douglas then conducted an external frisk of the backpack worn by Defendant Douglas, and a later search of the backpack revealed the presence of a firearm inside the backpack.

Defendant Douglas was then placed under arrest. The firearm that was recovered from the backpack was determined to be a Sig Sauer, model P320, .40 caliber semiautomatic handgun. When the firearm was recovered, it was loaded with one (1) round in the chamber and twelve (12) rounds in a thirteen (13) round capacity magazine. The stop and search of Defendant Douglas was recorded on police body worn camera.

The defendant acknowledges that at the time he possessed the loaded .40 caliber semi-automatic pistol, he had previously been convicted of an offense for which the penalty was greater than one year of imprisonment, to wit, Carrying a Handgun, in the Circuit Court for Prince George's County, Maryland, Criminal Case Number CT090351X, and Unlawful Possession of a Firearm, in D.C. Superior Court, Criminal Case No. 2013-CF1-006028. The defendant also agrees and acknowledges that at the time he possessed the .40 caliber semi-automatic pistol, he was aware that he had a previous conviction for an offense for which the penalty was greater than one year of imprisonment, that the government's evidence at trial would establish that the Sig Sauer .40 caliber model P320 semi-automatic pistol and .40 caliber ammunition had been shipped or transported from one state to another, and that the firearm was capable of expelling a projectile by means of an explosive.

/S/*Steven Wasserman*
STEVEN B. WASSERMAN
Assistant United States Attorney

2

## Defendant's Acceptance

I have read this Statement of Offense and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of Offense and all matters relating to it. I fully understand this Statement of Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to fully understand this Statement of Offense. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

3-11-21
Date

THEODORE DOUGLAS
Defendant

## Defense Counsel's Acknowledgment

I am Theodore Douglas' attorney. I have reviewed every part of this Statement of Offense with him. It accurately and completely sets forth the Statement of Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

3/11/21
Date

EUGENE OHM, Esq.
Attorney for the Defendant

3

199

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 1

# UNITED STATES DISTRICT COURT

_____ District of _____

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v. | ) )<br>) )<br>) )<br>) )<br>) ) |

**JUDGMENT IN A CRIMINAL CASE**

Case Number: _____

USM Number: _____

_____
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)  _____

☐ pleaded nolo contendere to count(s)  _____
   which was accepted by the court.

☐ was found guilty on count(s)  _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| | | | |

     The defendant is sentenced as provided in pages 2 through _____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)  _____

☐ Count(s)  _____  ☐ is  ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

_____
Date of Imposition of Judgment

_____
Signature of Judge

_____
Name and Title of Judge

_____
Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

Judgment—Page _____ of _____

DEFENDANT:
CASE NUMBER:

## ADDITIONAL COUNTS OF CONVICTION

**Title & Section**          **Nature of Offense**                              **Offense Ended**          **Count**

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:
CASE NUMBER:

Judgment — Page _____ of _____

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at  _____ ☐ a.m. ☐ p.m.   on  _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on  _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

|  | Judgment—Page _____ of _____ |
|---|---|

DEFENDANT:
CASE NUMBER:

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
     ☐ The above drug testing condition is suspended, based on the court's determination that you
          pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

203

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page _____ of _____

DEFENDANT:
CASE NUMBER:

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____    Date  _____

DEFENDANT: Theodore B. Douglas
CASE NUMBER: CR 20-121-02 (CJN)

## SPECIAL CONDITIONS OF SUPERVISION

Educational/Vocational Training - You shall participate in an educational/vocational skills training program as approved and directed by the Probation Office.

Substance Abuse Treatment -You must participate in an inpatient and/or outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Substance Abuse Testing - You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

Mental Health Treatment - You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Print this page now Reset this page
Include this page when printing?
Yes No

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page _____ of _____

DEFENDANT:
CASE NUMBER:

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ | $ | $ | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page _____ of _____

DEFENDANT:
CASE NUMBER:

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☐ Lump sum payment of $ _____ due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,            :

               **vs.**            :            **Criminal No.: 20-CR-121 (CJN)**

THEODORE DOUGLAS,            :

         **Defendant.**            :

# NOTICE OF APPEAL

**Name and address of appellant:**            Theodore Douglas

**Name and address of appellant's attorney:**            Eugene Ohm
                                              Assistant Federal Public Defender
                                              Office of the Federal Public Defender
                                              625 Indiana Ave., N.W., Suite 550
                                              Washington, DC 20004

**Offens**e: 18:922(g)(1); UNLAWFUL TRANSPORT OF FIREARMS, ETC.

**Concise statement of judgment or order, giving date, and any sentence:** Defendant sentenced to a term of Fifteen (15) Months of Incarceration followed by Thirty-Six (36) Months of Supervised Release (with conditions). Defendant further ordered to pay a special assessment of $100.00. No fine imposed.

**Name of institution where now confined, if not on bail:** Central Detention Facility
                                                         Washington, D.C.

      **I, the above-named appellant, hereby appeal to the United States Court of Appeals for the District of Columbia from the above-stated judgment.**

May 14, 2021 _____            Theodore Douglas _____
DATE            APPELLANT

CJA, NO FEE _____FPD_____            Eugene Ohm _____
PAID USDC FEE ___NO_____            ATTORNEY FOR APPELLANT
PAID USCA FEE ___NO_____

Does counsel wish to appear on appeal? Yes

Has counsel ordered transcripts? No

Is this appeal pursuant to the 1984 Sentencing Reform Act? Yes

208