ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 21-3032

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

**v.**

THEODORE B. DOUGLAS,
*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

---

APPENDIX FOR APPELLANT
VOLUME II

---

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

TONY AXAM, JR.
Asst. Federal Public Defender
625 Indiana Avenue, NW
Washington, DC 20004
(202)208-7500
tony_axam@fd.org

District Court
Cr. No. 20-121 (CJN)-2

# Appendix

## Table of Contents

## (Volume II)

Transcript of Motion Hearing (10/20/20) ...............................................209

Transcript of Status Conference/Guilty Plea (03/09/21) .....................419

Transcript of Status Conference/Guilty Plea (03/17/21) .....................441

Transcript of Sentencing (05/04/21) ......................................................477

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

    UNITED STATES OF AMERICA,              CR Action
 3            Plaintiff,                    No. 1:20-121

 4       vs.                                Washington, DC
                                            October 20, 2020
 5  TAVONTE WILLIAMS,
    THEODORE B. DOUGLAS                      10:55 A.M.
 6            Defendants.
    _____/
 7
                       TRANSCRIPT OF MOTION HEARING
 8            BEFORE THE HONORABLE CARL J. NICHOLS
                    UNITED STATES DISTRICT JUDGE
 9
    APPEARANCES:
10
    For the Plaintiff:      STEVEN B. WASSERMAN
11                          U.S. ATTY'S OFC. FOR THE D OF C
                            555 Fourth Street, NW
12                          Washington, DC 20530
                            (202) 252-7719
13                          steve.wasserman@usdoj.gov

14

15  For Defendant Williams: JOHN PETER MARSTON
                            FOLEY HOAG, LLP
16                          1717 K Street, NW
                            Washington, DC 20006
17                          (202) 261-7321
                            jmarston@foleyhoag.com
18

19  For Defendant Douglas:  EUGENE OHM
                            FED. PD FOR THE DISTRICT OF COLUMBIA
20                          625 Indian Avenue, NW
                            Suite 550
21                          Washington, DC 20004
                            (202) 208-7500
22                          eugene_ohm@fd.org

23  Reported By:      LORRAINE T. HERMAN, RPR, CRC
                      Official Court Reporter
24                    U.S. District & Bankruptcy Courts
                      333 Constitution Avenue, NW
25                    Room 6710
                      Washington, DC 20001
```

1                      **I N D E X**

2    **WITNESS**                                    **PAGE**

3    OFR. ISAAC JACKSON

4         Direct Examination by Mr. Wasserman           7
          Cross Examination by Mr. Marston             57
5         Cross Examination by Mr. Ohm                 86
          Redirect Examination by Mr. Wasserman       123
6
     OFR. MAXWELL POUPART
7         Direct Examination by Mr. Wasserman         131
          Cross Examination by Mr. Ohm                156
8         Redirect Examination by Mr. Wasserman       185

9

10   OFR. BRIANNA TAYLOR

11        Direct Examination by Mr. Ohm               191
          Cross Examination by Mr. Wasserman          199
12

13   **EXHIBITS**                                   **PAGE**

14   Government's Exhibit No. 1-A was admitted         22
     Government's Exhibit No. 1-B was admitted         23
15   Government's Exhibit No. 2 was admitted           25
     Government's Exhibit No. 3 was admitted           41
16   Government's Exhibit No. 4 was admitted           46
     Government's Exhibit No. 4-A was admitted         47
17   Government's Exhibit No. 4-B was admitted        146
     Government's Exhibit No. 5 was admitted           49
18   Government's Exhibit No. 6-A was admitted        148
     Government's Exhibit No. 6-B was admitted        148
19   Government's Exhibit No. 7 was admitted          154
     Government's Exhibit No. 8 was not marked or ID'd ***
20   Government's Exhibit No. 9 was admitted          155

21   Defendant Williams' Exhibit No. 1 was admitted    70
     Defendant Williams' Exhibit No. 2 was admitted    73
22
     Defendant Douglas' Exhibit No. 1 was admitted    204
23   Defendant Douglas' Exhibit No. 2 was admitted    204
     Defendant Douglas' Exhibit No. 3 was admitted    204
24   Defendant Douglas' Exhibit No. 4 was admitted    194

25

1                    **P R O C E E D I N G S**

2              CLERK:  This is criminal case year 2020-121,

3    United States of America versus Tavonte Williams, Defendant

4    number 1, and Theodore B. Douglas, Defendant number 2.

5    Counsel, please come forward and introduce yourselves

6    beginning with the Government.

7              MR. WASSERMAN:  Good morning, Your Honor.  Steven

8    Wasserman on behalf of the United States.

9              THE COURT:  Mr. Wasserman, good morning.

10             MR. WASSERMAN:  Good morning.

11             MR. OHM:  On behalf -- I wanted to thank Your

12   Honor and court staff and marshals for accommodating us this

13   morning on behalf of Mr. Douglas.

14             THE COURT:  Thank you.

15             MR. MARSTON:  John Marston for Mr. Williams who is

16   present.

17             THE COURT:  Mr. Marston, thank you.

18             Obviously, these are strange times.  We are in the

19   ceremonial courtroom to spread out as much as possible,

20   consistent with the Court's standing orders around COVID.

21   We are going to do our very best to remain masked and to,

22   generally, follow the standing order.

23             I think just in terms of that question, I would

24   like, to the maximum extent possible, for everyone speaking

25   to remain masked, except the witness or witnesses who I will

1    permit to wear either no mask or a face guard, if we have

2    them in the courtroom, and I think we do.

3               So I'd like, again, this is all strange times, but

4    I think we'll be fine with masks, except for the witnesses.

5               Other than that, I would like to try to conduct

6    this hearing just like if we were in my courtroom without

7    masks, eight months ago.

8               I realize that we have pending four different

9    motions, some defense motions, some Government motions.

10   Some of them obviously implicate evidentiary questions and

11   testimony, some don't.

12              I probably have a view about how I would like to

13   proceed, but I didn't know if the parties had discussed an

14   order of operations or a proposal for how we would begin.  I

15   am happy to hear from you, Mr. Wasserman, if you either

16   discussed that question with defense counsel or have a

17   proposal.

18              MR. WASSERMAN:  I haven't discussed it with

19   defense counsel.  I guess I assumed that we would proceed

20   with the evidentiary motions because, obviously, if the

21   evidence were somehow suppressed, it would moot out at least

22   for now, the other two motions, Government's motion and I

23   believe the motion to sever; so that would be my

24   recommendation.  I don't know, you know, what defense

25   counsel's position is.  I also want to apprise the Court and

1    the marshals, I have the evidence here in the courtroom,

2    which also consists of the firearm and the ammunition, which

3    are in separate packaging and the firearm has been cleared

4    by the marshals downstairs.  I just wanted to mention that.

5            THE COURT:  Thank you.  I will say the following,

6    I tend to think we should just do the evidentiary issues

7    first.  I am very likely to take even evidentiary motions

8    under advisement and write something on them and on the

9    other motions.  So I don't think the question of the

10   evidentiary motion mooting out the other motions is

11   relevant, but I think it makes sense to do them first in any

12   event.  I didn't want to necessarily decide that until I

13   heard from defense counsel.

14           MR. WASSERMAN:  I am still fine with that.

15           THE COURT:  Mr. Ohm?

16           MR. OHM:  That makes sense to me, Your Honor.

17           THE COURT:  Mr. Marston?

18           MR. MARSTON:  I agree.

19           THE COURT:  Okay.  Why don't we start there.

20           Do you want to begin with argument or witnesses,

21   Mr. Wasserman?

22           MR. WASSERMAN:  Your Honor, I would just begin

23   with witnesses.

24           THE COURT:  Okay.  Let's do that.

25           MR. WASSERMAN:  The Government would call Officer

                              213

1    Isaac Jackson.

2              Your Honor, ordinarily we would have the touch

3    screen.  To the extent that I anticipate having Officer

4    Jackson mark some exhibits, I am going to have to approach

5    him and have him probably just do it the old-fashioned way.

6              THE COURT:  That's fine.  We will figure it out.

7              MR. WASSERMAN:  Okay.  Thank you.

8              THE COURT:  Not a problem.

9              CLERK:  Please raise your right hand.  Do you

10   solemnly swear to tell the truth, the whole truth and

11   nothing but the truth, so help you God?

12             THE WITNESS:  I do.

13             MR. WASSERMAN:  Your Honor, I don't know if you

14   want to address him with respect to the mask and face cover

15   and shield?

16             THE COURT:  Officer Jackson, you are free to go

17   forward with the mask.  Since you are the witness, you are

18   the one person who could, if you would prefer, put on a face

19   shield and remove the mask.  I am happy for you to proceed

20   either way.  I suppose one question is whether the defense

21   counsel has a strong preference for his wearing the face

22   shield for credibility issues?

23             MR. OHM:  No preference, Your Honor.  Whatever

24   suits the witness is fine.

25             MR. MARSTON:  Same for me, Your Honor.

1          THE COURT:  Officer Jackson, if you would like to

2    put on a face shield and take off the mask, that's not a

3    requirement.

4          THE WITNESS:  I am fine with this.

5          MR. OHM:  Before the Government begins, Your

6    Honor, I forgot to tell Mr. Douglas if he wants to

7    communicate with me, that he should raise his hand.  We have

8    the phone and can have a conversation.

9          THE COURT:  Yes.  We have -- everyone should know

10   we have what I think has to be a relatively elaborate setup

11   for clients and counsel to communicate as well as for me to

12   be able to communicate with counsel in what would be

13   something like a bench conference but a virtual one.

14          I think if anyone feels the need to communicate

15   with someone who he or she is not sitting next to, that's

16   basically everyone, go ahead, especially if it's a

17   defendant.  Please raise your hand.  We will pause.  We will

18   make sure you can communicate, and then we will just resume.

19          MR. WASSERMAN:  Thank you, Your Honor.

20                      **DIRECT EXAMINATION**

21   **BY MR. WASSERMAN:**

22     **Q.**   Good morning.

23     **A.**   Good morning.

24     **Q.**   Can you introduce yourself to the Court and spell

25   your first and last name for the court reporter.

1          A.   Officer Isaac Jackson.  First name Isaac,

2     I-s-a-a-c.  Last name Jackson, J-a-c-k-s-o-n.

3          Q.   Where are you currently employed?

4          A.   Metropolitan Police Department in Washington, D.C.

5          Q.   How long have you been employed with MPD?

6          A.   Approximately 20 years.

7          Q.   And what is your position with MPD?

8          A.   I am an officer.

9          Q.   And what is your current assignment with MPD?

10         A.   I am currently assigned to the narcotics

11    enforcement unit, which is out of NSID, Narcotics Special

12    Investigation.

13         Q.   How long have you been with NSID or the narcotics

14    enforcement unit?

15         A.   On and off 10 years.

16         Q.   And prior to being assigned to NSID, what other

17    assignments have you had?

18         A.   I was assigned to sixth district vice unit and

19    then that turned into sixth district team and that's pretty

20    much it.

21              THE COURT:  I am seeing that the court reporter

22    she is having trouble hearing.

23              Officer Jackson, I think one of the reasons she is

24    having a hard time is because of your mask.  Would you mind

25    putting on a face shield?

216

1      THE WITNESS:  Not at all.

2      (Witness was assisted by the Deputy Clerk.)

3      THE COURT:  You can go ahead.

4      MR. WASSERMAN:  Okay.  Your mask is off?  Okay.

5      THE COURT:  Thank you, Ms. Lesley.  Thank you,

6  Officer Jackson.

7      THE WITNESS:  You're welcome.

8  BY MR. WASSERMAN:

9      Q.   I was asking you, prior to your assignment with

10  NSID, what other assignments have you had with MPD?

11      A.   Sixth district vice and served some time in sixth

12  district patrol.

13      Q.   And your positions when you were in six D, what

14  types of cases or investigations did you work?

15      A.   Primarily narcotics investigations, other

16  investigations and some prostitutions as well.

17      Q.   What types of investigations do you work on

18  currently with NSID?

19      A.   Narcotics investigations.

20      Q.   And as part of your assignment for your experience

21  as an MPD officer, have you received any training in

22  connection with narcotics investigations and firearms

23  investigations?

24      A.   Yes, sir.  I served some time on-the-job training

25  as well as some training in DEA, which is based out of

1    Quantico at the time.  We did some training there.  Also,

2    some training at the police academy as well.

3         Q.   And, as part of your current assignment at NSID,

4    is there yearly training that's provided?

5         A.   Yes.  We have a training course, which is called

6    EDT, and we train at least twice a year, and we familiarize

7    ourselves with narcotics investigations as well as firearms.

8         Q.   All right.  Can you describe for the Court what an

9    observation post is?

10        A.   Sure.  An observation post can be -- I could be

11   out walking, in a vehicle or also in a building.  There are

12   observations made by undercover officers, undercover

13   officers would be looking to observe for any type of illegal

14   activity and, like I said before, probably be in the

15   building, on foot or sometimes in the vehicle.

16        Q.   Okay.

17             MR. WASSERMAN:  I'm sorry.  Is he coming over the

18   speaker?  I am not hearing him too well.  Is the mic working

19   that well?

20             THE COURT:  I agree.  I can hear him but I don't

21   think he is being transmitted on the speaker.

22             (The witness was provided a microphone.)

23   **BY MR. WASSERMAN:**

24        Q.   Okay.  All right.  You indicated that observation

25   post can be either on foot or in a vehicle; is that what you

1    said?

2         **A.**   Yes, sir.

3         **Q.**   And have you actually personally worked

4    observation post, as an observation post officer?

5         **A.**   Yes, sir.

6         **Q.**   And what, generally, are you looking for in terms

7    of criminal activity as an OP officer?

8         **A.**   We go to areas and we will look for hand-to-hand

9    interactions.  People engaging in -- usually start with

10   individuals engaging in conversation and after that

11   conversation person would probably go to a stash, which is

12   somewhat near them, which could be on their person.  Also, I

13   would look for hand movements between those two people.

14   After that I would give a look out.

15        **Q.**   So for the OP it is typically narcotics then that

16   you are looking for?

17        **A.**   Yes, sir.

18        **Q.**   All right.  And how about firearms?

19        **A.**   Firearms as well.  I would look for any type of

20   movements or indication or characteristics of anybody that

21   could possibly be armed with a firearm; arm or hand

22   gestures, movements upon their waistband or on their person,

23   and things like that.

24        **Q.**   And how many times do you think you worked an OP

25   case as an OP officer?

 1       **A.**   I can say more than 500.

 2       **Q.**   Okay.  That is over the course of your 20-year

 3   career?

 4       **A.**   Yes, sir.

 5       **Q.**   All right.  When you are working in OP, do you

 6   sometimes use any tools to enhance your vision?

 7       **A.**   Yes, sir.

 8       **Q.**   All right.  And what types of tools might you use?

 9       **A.**   If available, I can use a set of binoculars.

10       **Q.**   Do you always use these?

11       **A.**   No.

12       **Q.**   Are there situations where -- well, let me --

13   describe what situations you might not use binoculars to

14   enhance your vision?

15       **A.**   Like I said before, usually on observation post if

16   I am out on foot or if I am in the vehicle and I am in the

17   presence of other individuals or nearby, I would try to

18   blend in by being in an undercover capacity.  I cannot pull

19   out a set of binoculars without bringing attention to

20   myself.

21       **Q.**   What is the arrest team?

22       **A.**   The arrest team is nearby police officers; they

23   will be wearing police insignia in unmarked vehicles and

24   they are constantly transmitting on radio lookouts and

25   monitoring those lookouts and monitoring my transmissions so

 1    that they can move into the area if I give a lookout.  But

 2    they do wear police insignia.

 3        **Q.**   When you use the term "lookout", is that a

 4    reference to someone you've identified as being someone

 5    suspected to participate in a criminal transaction or

 6    criminal activity?

 7        **A.**   Yes, sir.

 8        **Q.**   Okay.  And lookout, what is that?

 9        **A.**   A lookout can be a description.  A description of

10    an individual who I saw engage in what appeared to be

11    illegal activity.  It could be clothing description, race,

12    age approximately sometimes, what the person is wearing or

13    anything that sticks out and things like that.

14        **Q.**   All right.  When someone is stopped by officers of

15    the arrest team as a result of your observations, is there

16    typically an identification procedure that you use to

17    determine whether the officers have stopped the correct

18    person?

19        **A.**   Yes.

20        **Q.**   Can you just describe how that ID procedure is

21    typically conducted in your experience?

22        **A.**   Sure.  The officers will have an individual stop

23    that is matching the lookout that I have given previously.

24    If I can, at the time, I would come across the radio and say

25    positive ID; that's the person I need to be stopped, and

1    there appears to be illegal activity.

2         Q.   All right.  And when you are operating an OP, how

3    important is it for you to provide an accurate description

4    to the arrest team of what and whom you are observing?

5         A.   It is very important so that the right person is

6    stopped, and I don't want anybody who is not involved in my

7    observations to be stopped.

8         Q.   Okay.  When you voice an initial lookout for the

9    arrest team, are you typically concerned about trying to be

10   sure that the arrest team is trying to stop the person or

11   persons before they leave the area?

12        A.   Yes.

13        Q.   Are there times when you will provide additional

14   descriptive detail after you first broadcast a lookout for

15   somebody?

16        A.   Yes.

17        Q.   All right.  Based upon your training and

18   experience, are you familiar with some of the signs or

19   behaviors exhibited by a person engaged or people engaged in

20   sort of a typical hand-to-hand transaction for drugs?

21        A.   Yes.

22        Q.   Can you kind of just describe some of those

23   characteristics or behaviors?

24        A.   Um, in most times, um, people are trying to be --

25   well, people I am observing are in a discreet type of

1    nature.  They are trying to be secretive and they are

2    reaching upon their person.  Sometimes I will look for the

3    exchange of currency, money.  Also, I will look to see if a

4    person is reaching on their person or possibly going to a

5    stash location, where they could get their narcotics or

6    drugs from and subsequently go back to that person and give

7    that item to them.  It is just hand movement, secretive and

8    things like that.

9        **Q.**   When you use the term "secretive" in terms of the

10   behaviors of the individuals that you may observe engaging

11   in hand-to-hand, what, if any, behaviors do you typically

12   see them exhibit beyond the sort of reaching on their person

13   and the actual exchange?

14       **A.**   Looking around.  I do recognize that people engage

15   in a hand-to-hand transaction will not hold out the drugs so

16   that everybody can see it.  Just trying to be discreet,

17   looking around, holding upon their person in a manner that

18   is not, um -- so that somebody cannot see right away.

19       **Q.**   All right.  And with respect to firearms, you

20   eluded to this a little bit earlier, but in terms of

21   observing somebody who may be in possession of a firearm on

22   their person, what are the types of behaviors that you

23   typically look for?

24           MR. OHM:  Objection, Your Honor, foundation.  He

25   has only testified to his training and experience in

1    narcotics.

2           THE COURT:  Can you repeat the question?

3           MR. WASSERMAN:  With respect to your observations

4    of individuals that you suspect are in possession of

5    firearms, what are the types of behaviors and

6    characteristics that you typically look for?

7           THE COURT:  I'll allow the question.

8           THE WITNESS:  Hand/arm movement, person trying to

9    conceal something up against their waistband and sometimes

10   even in their pockets.  For instance, I carry a firearm on

11   and off duty and I carry it upon my waistband.  Sometimes I

12   would hold it up against my waistband while using my arm,

13   just to try to conceal it and things like that.  Someone

14   trying to conceal their waistband area with their arms and

15   hand movement and things like that.

16      Q.   In your training and experience, how common is it

17   for individuals engaged in drug trafficking to possess

18   firearms?

19      A.   It is very common.

20      Q.   In your experience as PO officer, when there is an

21   arrest or seizure, what types of contraband are commonly

22   involved?

23      A.   U.S. currency, other narcotics, empty Ziplocs,

24   plastics and firearms as well.

25      Q.   Are you familiar with the size, shape, weight and

1    other characteristics of your typical handgun?

2         **A.**   Yes.

3         **Q.**   Is that through your training and experience as a

4    police officer?

5         **A.**   Yes, sir.

6         **Q.**   In your experience, have you had cases as an OP or

7    heard of cases where transactions or transfers of bulk

8    quantities of narcotics or of a firearm occur in the type of

9    hand-to-hand transaction that you earlier described?

10        **A.**   Yes, I've had instances like that.

11        **Q.**   In those instances, are they -- where we are

12   talking about bulk transfers of narcotics or firearms, have

13   you heard of cases where this is done out in the open where

14   people are actually handing them to each other or --

15        **A.**   No.  Are you finished with the question?

16        **Q.**   No.  How, in your experience, are those types of

17   transactions or exchanges conducted?

18        **A.**   Usually in a vehicle if large quantities or

19   firearms usually in a bag or I have been a part of instances

20   where those transactions took place in the vehicle, the

21   building, like, sometimes in a free area outside in a

22   particular area; that's pretty much it.

23        **Q.**   All right.  Would you expect then somebody to out

24   in the open, in the street, hand somebody a kilo of coke or

25   a handgun out in the open?

1       **A.**   No.

2       **Q.**   All right.  Prior to April of 2020 this year, how

3  frequently have you worked as a police officer in the fifth

4  police district?

5       **A.**   Quite frequently.

6       **Q.**   In your 20 years of experience as a police officer

7  with MPD, what types of crimes occur most frequently in the

8  fifth district?

9            MR. OHM:  Object to the question.  Experience from

10  2000 to 2015 is broad.

11           THE COURT:  Why don't we narrow it a little bit

12  chronologically.

13  **BY MR. WASSERMAN:**

14      **Q.**   Going back to, say, 2015 to the present, what

15  types of crimes, in your experience, in the fifth district,

16  most frequently occur?

17      **A.**   We've had violent crimes, shootings take place

18  narcotics transactions and things like that.

19      **Q.**   All right.

20      **A.**   Are you asking the nature of the crime?

21      **Q.**   Yes, the nature of the crime?

22      **A.**   Violent crimes, people who have been victims of

23  gunshots, things like that, robberies, and things like that.

24      **Q.**   And you indicated -- is there drug trafficking as

25  well?

1      **A.**   Yes.  And drug transactions as well, yes.

2      **Q.**   In your experience between, say, 2015 and 2020,

3   how does the frequency of the drug and violent crimes in 5D

4   compare to similar offenses in terms of frequency in the

5   first, second, third and fourth police stations?

6      **A.**   In my experience and my time in the area, it is

7   more frequent than those districts.  First district, second

8   district, third district and fourth district, the fifth

9   district would be more frequent than those districts.

10     **Q.**   How about with respect to sixth and seventh?

11     **A.**   It wouldn't be, in my experience, as frequent but

12  it's somewhat almost similar.

13     **Q.**   All right.  I want to direct your attention to

14  shortly before 3:00 p.m. on April 22nd of 2020 this year.

15  Were you on duty that day?

16     **A.**   Yes.

17     **Q.**   What was your assignment that day?

18     **A.**   I was operating an undercover capacity, utilizing

19  an unmarked vehicle on an observation post.

20     **Q.**   What street or block was your OP, your observation

21  post, located?

22     **A.**   2300 block of 15th Street Northeast.

23     **Q.**   You indicated you were in an unmarked vehicle?

24     **A.**   Yes, sir.

25     **Q.**   And was anyone with you in the vehicle?

20

 1      A.   No.

 2      Q.   Can you generally describe what's located in that

 3   block, the 2300 block of 15th Street Northeast?

 4      A.   The 23rd block of 15th Street, if you are going

 5   southbound on 15th Street, there is a set of row houses on

 6   your left.  Then on the right-hand side, there is a

 7   recreational center, a playground and that's pretty much it.

 8      Q.   Are you familiar with this area?

 9      A.   Yes.

10      Q.   How are you familiar with that area?

11      A.   Just based on past instances conducting

12   investigations, operations and just basic patrolling in that

13   area.

14      Q.   How often have you worked as a police officer in

15   this particular area?

16      A.   Quite often.  Since my time at NSID, it was quite

17   frequent.  I would say more than -- I would say about five

18   years on and off.

19      Q.   Five years?

20      A.   Yeah, five years.

21      Q.   And in terms of frequency, can you estimate the

22   number of times you sort of patrolled or have been involved

23   in investigations in that area?

24      A.   I can say close to 200.

25           (Government's Exhibit 1-A was marked for

228

 1    identification.)

 2          MR. WASSERMAN:  I want to show you what I have

 3    marked for identification as Government's Exhibit 1-A.

 4    Officer Jackson, do you recognize what is on the screen

 5    marked as Government's Exhibit 1-A?

 6          THE WITNESS:  Yes.

 7          Real quick.  I would much rather take the mask

 8    (sic) off.  It's fogging up and affecting my ability to see

 9    and since I have the microphone I can use -- would that be

10    better?

11          THE COURT:  Why don't we try that.  Why don't you

12    put the mask back on and take the shield off, use the

13    microphone.  We will confirm with the court reporter that

14    that's --

15          THE WITNESS:  That's much better as far as my

16    vision is concerned.

17    BY MR. WASSERMAN:

18      Q.   Do you recognize the area depicted in 1-A?

19      A.   Yes, sir.

20      Q.   What is that area?

21      A.   This is the 2300 block of 15th Street Northeast.

22      Q.   And is this the area where you were conducting

23    your OP on April 22nd of this year?

24      A.   Yes, sir.

25      Q.   Is that a fair and accurate depiction of the

1    general appearance of that area on that date?

2        **A.**   Yes, sir.

3            MR. WASSERMAN:  Your Honor, I would move for

4    Government's Exhibit 1-A into evidence.

5            MR. MARSTON:  No objection.

6            MR. OHM:  No objection.

7            THE COURT:  So admitted.

8            (Government's Exhibit 1-A was admitted.)

9            (Government's Exhibit 1-B was marked for

10   identification.)

11   **BY MR. WASSERMAN:**

12       **Q.**   Showing you Government's Exhibit 1-B for

13   identification.  Do you recognize that photograph?

14       **A.**   Yes, sir.

15       **Q.**   And what is that -- what is depicted in that area?

16       **A.**   This is the same 2300 block of 15th Street

17   Northeast, but it is the back side of the row houses that I

18   previously mentioned, along with the walkway that leads to a

19   back parking lot.

20       **Q.**   And is the area depicted in 1-B a fair and

21   accurate depiction of that area as it appeared on April 22nd

22   of this year?

23       **A.**   Yes, sir.

24            MR. WASSERMAN:  Your Honor, I move Government's

25   Exhibit 1-B into evidence.

```
 1              MR. MARSTON:  No objection.

 2              MR. OHM:  No objection, Your Honor.

 3              THE COURT:  We will admit 1-B as well.

 4              (Government's Exhibit 1-B was admitted.)

 5  BY MR. WASSERMAN:

 6      Q.   Officer Jackson, in your training and experience

 7  do you know if this particular block is known as a high

 8  crime area?

 9      A.   In my training and experience, yes, it is known as

10  a high crime area.

11      Q.   What types of criminal activities are most common

12  in this block, this area that is depicted in 1-A and 1-B?

13      A.   Narcotic sales.

14      Q.   Anything else?

15      A.   Narcotic sales and there has been some violent

16  crimes that took place in this particular area.

17      Q.   Okay.  With respect to the vehicle that you were

18  stationed in, what type of vehicle was it?  Was it a sedan

19  or SUV?

20      A.   It was a sedan type of vehicle.

21      Q.   And were the windows tinted?

22      A.   No.

23      Q.   Where inside of the vehicle were you seated while

24  you were making your observations?

25      A.   In the driver's seat.
```

1    Q.   Were you using binoculars or any other tools to

2    enhance your vision?

3    A.   No, sir.

4    Q.   On April 22nd of 2020, did you have a prescription

5    for eyeglasses or contacts?

6    A.   No.

7    Q.   Do you recall having any problems with your vision

8    that day?

9    A.   No.

10        (Government's Exhibit No. 2 was marked for

11   identification.)

12   **BY MR. WASSERMAN:**

13   Q.   Okay.  I want to show you Government's Exhibit No.

14   2, if we can bring that up on the screen.  Do you recognize

15   that photograph?

16   A.   Yes, sir.

17   Q.   And looking at that photograph, Exhibit No. 2, are

18   you able to actually see the vehicle that you were in on

19   April 22nd?

20   A.   Yes, sir.

21   Q.   All right.  What I am going to do is, I am going

22   to -- I actually have to bring you a hard copy of this

23   photograph, and I am going to ask you to circle where your

24   vehicle is.

25   A.   Sure.

```
 1                     MR. WASSERMAN:  Your Honor, may I approach?

 2                     THE COURT:  Please.

 3                     THE WITNESS:  Circle it now?

 4       BY MR. WASSERMAN:

 5             Q.   Yeah.  All right.

 6                  Officer Jackson, do you see the green circle where

 7       my finger is?

 8             A.   Yes, sir.

 9             Q.   And that vehicle that you circled, was that your

10       OP vehicle on April 22nd?

11             A.   Yes, sir.

12             Q.   And that photograph, is that a fair and accurate

13       depiction of the scene in the area, the 2300 block of 15th

14       Street, as it appeared to you on that date?

15             A.   Yes, sir.

16                     MR. WASSERMAN:  Your Honor, I would move

17       Government's Exhibit No. 2 into evidence.

18                     MR. MARSTON:  No objection.

19                     MR. OHM:  No objection, Your Honor.

20                     THE COURT:  Admitted with the circle?

21                     MR. WASSERMAN:  Yes, thank you.  I appreciate

22       that.

23                  (Government's Exhibit No. 2 was admitted.)

24       BY MR. WASSERMAN:

25             Q.   And that particular exhibit, number 2, is that
```

233

1    actually from one of the officer's body worn cameras?

2        **A.**   Yes, sir.

3        **Q.**   And the area that the officer whose body worn

4    camera we are seeing here, what is that particular area?

5        **A.**   This is the walkway where I was making

6    observations and saw a hand-to-hand exchange.

7        **Q.**   Where are you parked?

8        **A.**   On 15th Street, the 2300 block, facing southbound.

9        **Q.**   Okay.  And just so we are clear, with respect to

10   this particular photograph from the body worn camera, was

11   that a photograph or a still shot that was recorded after

12   you made your observations in this case?

13       **A.**   Yes, sir.

14       **Q.**   And where you circled your vehicle with the green

15   circle there, is that the location where your vehicle was

16   when you made the observations that led to the arrests in

17   this case?

18       **A.**   Yes, sir.

19       **Q.**   I want to show you Exhibit No. 1.  If I can put

20   that -- oops.  Hang on a second.  On Exhibit 1-A, do you see

21   the walkway that you just were referring to?

22       **A.**   Yes, sir.

23       **Q.**   And can you see on 1-A the approximate location of

24   where your vehicle was stationed on April 22nd?

25       **A.**   Yes, sir.

234

1    **Q.**   All right.  I am going to ask you to go ahead and

2    circle -- and just so we are clear, was this photograph one

3    that was taken on the day you did the OP?

4    **A.**   Was this?

5    **Q.**   Yes.

6    **A.**   No.

7    **Q.**   All right.  So in terms of the vehicles that are

8    parked on that street, you don't know whether they were

9    there on the day of the 22nd?

10   **A.**   No.  No.

11   **Q.**   Okay.  I will ask you to circle the approximate

12   location of where your vehicle was stationed on 1-A, if you

13   can.

14   **A.**   It would be around in this area.  (Indicated)

15   **Q.**   So you've -- looking at 1-A you marked with a

16   green circle on Exhibit 1-A.  Is there a speed bump sort of

17   near the green circle?

18   **A.**   Yes, sir, and sort of, like, the upper left corner

19   there is a speed bump.

20   **Q.**   All right.  And your vehicle was parked in front

21   of that speed bump?

22   **A.**   Yes.  Yes.

23   **Q.**   Was there a particular area that you were focused

24   on that afternoon?

25   **A.**   That afternoon I was looking at two different

1    locations.  I was originally looking at a group on the right

2    side, which would be -- do you want me to further explain it

3    on this picture?

4         Q.   If you say right side, is the rec center where my

5    finger is?

6         A.   Yes, sir.

7         Q.   You were looking over there at times?

8         A.   Yes, sir.

9         Q.   And what was the other area you were focused on?

10        A.   And towards the left side, which would be the

11   walkway.

12        Q.   All right.  And is this what you are referring to,

13   where my finger is?

14        A.   Yes, sir.

15        Q.   And for the record, it's the sort of long paved

16   pathway between the two buildings on one end; is that right?

17        A.   Yes, sir.

18        Q.   Looking at -- well, let me ask you this:  Did

19   there come a point when you noticed some activity that

20   raised your suspicions?

21        A.   Yes.

22        Q.   Where was that generally, that activity located?

23        A.   In the walkway.

24        Q.   All right.  I am going to show you -- go back to

25   Exhibit No. 2, Government's Exhibit No. 2, the photograph or

1    the location of the officer's body worn camera, how does

2    that compare with the location of where you observed this

3    activity?

4         A.    This is where my observation post was which was in

5    the vehicle and I am looking up across, across the street

6    into that walkway; is that what you were asking?

7         Q.    Yeah.  In terms of where the officer is positioned

8    with the body worn camera, how does that compare with where

9    the activity you observed actually happened?

10        A.    That is my line of sight, from where I can see.

11        Q.    And in terms of that particular location, that

12   walkway, have you had prior experiences in other cases of

13   criminal activity occurring in that walkway?

14        A.    Yes.

15        Q.    What types of criminal activity?

16        A.    Drugs, drug transactions.

17        Q.    Okay.  Was there a point between -- excuse me.  Is

18   there a point shortly before 3:00 p.m. that you observed

19   something that caught your attention in that walkway?

20        A.    Yes, sir.

21        Q.    Can you just describe what you saw?

22        A.    Sure.  I saw an individual along with maybe, I

23   would say, one to two other individuals standing in the

24   walkway.  I didn't think anything of it until another

25   individual appeared in my line of sight and handed a book

1    bag over to one of the individuals in that walkway.

2         Q.   And after the hand off of the book bag occurred,

3    what, if anything, did you observe the individual who

4    received the book bag do?

5         A.   After that, he took off his jacket, placed the

6    book bag on his person, actually put the straps on his

7    shoulders, and then put the jacket over top of the book bag.

8         Q.   Was there anything about that conduct that struck

9    you as being unusual?

10        A.   Yes.

11        Q.   What?

12        A.   It appeared that this individual was trying to

13   conceal whatever was in that book bag, trying to hide the

14   book bag on his person by covering it up with his jacket.

15        Q.   And with respect to -- I may have missed this --

16   did the individual -- was there any exchange between the

17   individual who received the backpack to the individual who

18   handed it over?

19        A.   Yes.  It appeared that the individual who received

20   the backpack gave that individual, the one who gave him the

21   book bag, it appeared he could have given him some sort of

22   U.S. currency, some money.  After that action, it was

23   followed up by some sort of handshake.

24        Q.   All right.  What led you to believe, based on your

25   observations, the handoff from the individual who received

 1    the backpack to the individual that gave it to him, that it

 2    was U.S. currency?

 3        A.    It was just color and nature.  It just happened so

 4    fast.  When I looked at his hand, I could see that after

 5    receiving the money, it was just light in color and then he

 6    cuffed his hand and that was it.  That's pretty much all I

 7    can remember.

 8        Q.    Could you be certain that it was U.S. currency?

 9        A.    I can't be certain.

10        Q.    When this exchange was occurring -- and just so we

11    are clear and sort of have a little bit of a reference

12    point, do you recall generally what the person who received

13    the backpack was wearing?

14        A.    Yes, sir.

15        Q.    What was that individual wearing?

16        A.    It was like a bluish jacket, blue coat.  I believe

17    dark-colored pants.  I don't remember the color of the

18    shirt.  When he took the coat off, I don't remember the

19    color of the shirt.

20        Q.    What angle did you have of the male in the blue

21    coat when this exchange was occurring?

22        A.    I could see his back.

23        Q.    I'm sorry?

24        A.    I could see his back.  Do you mean which part of

25    his body can I see?

1    **Q.**   Yeah.

2    **A.**   When I see him taking off his jacket -- I couldn't

3    see one side.  I could just see him taking off the coat and

4    putting the book bag on his person and covering it up with

5    the coat.

6    **Q.**   And the other individual, can you describe what

7    the other individual looked like who handed off the

8    backpack?

9    **A.**   Sure.  I remember it was like a bushy-ish sort of

10   hair, and he had a grayish or patterned jacket or coat, and

11   that is the best I can remember, and an orange hood.

12   **Q.**   All right.  What angle did you have of that

13   individual?

14   **A.**   Just --

15   **Q.**   From your view.

16   **A.**   From my view, I can see the left side of this

17   individual.

18   **Q.**   His left side?

19   **A.**   Yes, sir.

20   **Q.**   And in terms of the exchange that occurred when

21   you saw what you believed might have been U.S. currency, can

22   you describe what angle you had of both men?

23   **A.**   I just had the right side of the individual

24   wearing the blue coat, and I had the left side of the

25   individual wearing the grayish jacket with the orangish

1    hood.  I could originally see the right hand.  I could see

2    orange hood's right hand.

3        Q.    The guy giving the backpack?

4        A.    Yes.

5        Q.    His right hand?

6        A.    Yes.

7        Q.    What hand did you observe the individual in the

8    blue coat who received the backpack handoff?

9        A.    The back side of his right arm.  The back side of

10   his right hand.

11       Q.    The back side of his right hand?

12       A.    Yes.  Are you talking about the one with the blue

13   coat?

14       Q.    The one with the blue coat.

15       A.    Yeah.  When he made a gesture I could see his

16   right arm extended.

17       Q.    Okay.  So just so I am clear, which -- looking at

18   Exhibit 2 where my finger -- well, which side of the fence

19   is the individual with the blue coat that received the

20   backpack standing?

21       A.    Do you want me to point?

22       Q.    Well, you are not going -- was it between --

23       A.    Between your two fingers right there.

24       Q.    This finger or that finger?

25       A.    The, um --

1      Q.   Was it the side of the fence closer to you or --

2           THE COURT:  Can we start with inside of the fence

3      on the walkway?  Were they inside of the fence on the

4      walkway?

5           THE WITNESS:  Yes, the individual with the blue

6      coat was on the walkway.  When I originally saw the

7      individual with the grayish coat and orange hood, I believe

8      he was on the other side of the fence.

9      BY MR. WASSERMAN:

10     Q.   Let me go ahead and bring up Exhibit 1-B.  Looking

11     at Exhibit 1-B, do you see from where -- well, where was it

12     that you saw -- first saw the individual with the orange

13     hood and the backpack coming?

14     A.   Coming from the lower portion of this photograph,

15     up into the walkway leading up, if you go further up.  I

16     couldn't see -- where your finger is, I couldn't see him

17     coming from that -- I couldn't see him at that point.  You

18     have to keep going up.

19     Q.   I'm sorry?  When did you first notice him?

20     A.   I would say mid-point into the center of this

21     photograph where the walkway is.

22          THE COURT:  Can we be a little clearer for the

23     record what the witness is describing?  I think the witness

24     is describing the individual was walking from the bottom of

25     the photograph toward the top of the photograph in that

1       direction.  Correct?

2               THE WITNESS:  Yes, Your Honor.  Yes.

3               MR. WASSERMAN:  Thank you, Your Honor.

4               THE COURT:  I think the problem is with finger

5       pointing, it will not appear on the record.  Let's talk

6       directionally about the photo.

7               MR. WASSERMAN:  I appreciate that, Your Honor.

8       **BY MR. WASSERMAN:**

9          **Q.**   And the individual that had the backpack, when you

10      saw that individual, was he in the walkway or -- when you

11      first saw him inside of the walkway between the fence or was

12      he outside of the fence?

13         **A.**   Which individual are you referring to?

14         **Q.**   The individual who handed off the backpack.

15         **A.**   I remember that individual being on the other side

16      of the fence.  Not in the walkway.

17         **Q.**   Okay.  And did the handoff occur while the

18      individual with the orange hood was outside of the fence or

19      in the walkway?  Did he hop the fence?

20         **A.**   I believe he did hop the fence at some point.

21         **Q.**   Okay.  So where did the actual exchange occur?

22         **A.**   In the walkway.  The individual with the blue

23      coat, he was in the walkway.

24         **Q.**   All right.  So again, looking at Exhibit No. 2,

25      you see your vehicle circled in green.  Was the individual

1    in the blue jacket who received the backpack standing on the

2    fence line closer to you or further away from where you were

3    positioned?

4        **A.**   Closer to me.  I would say closer to me.

5        **Q.**   Okay.  And to back up, when you saw the exchange

6    between the two individuals, of what you believe was

7    currency, which side of the individual in the blue jacket

8    were you able to see?

9        **A.**   Just the back right side.

10       **Q.**   Okay.  And which hand, if you can recall, do you

11   think the individual in the blue jacket extended to hand the

12   object or potential currency?

13       **A.**   If I can remember, I believe it was his right

14   hand.

15       **Q.**   His right hand?

16       **A.**   Yes, sir.

17       **Q.**   I am going to, actually, ask you to mark on

18   Exhibit 1-B if you can, the approximate location of where

19   you saw the exchange?

20       **A.**   (Complied.)

21       **Q.**   Looking at Exhibit 1-B, and you circled -- do you

22   see the green circle there?

23       **A.**   Yes, sir.

24       **Q.**   And is that the approximate location where you

25   observed the exchange occur?

1      **A.**   Yes, sir.

2      **Q.**   And just for the record, the green circle is

3   towards the top of the walkway at the top of the photograph

4   closer to 15th Street; is that accurate?

5      **A.**   Yes, sir.

6      **Q.**   Was there anything obstructing your line of sight

7   when you observed the exchange?

8      **A.**   No, not at that moment.

9      **Q.**   Was there anything distracting your attention away

10   from the exchange that you were observing at that time?

11      **A.**   No.

12      **Q.**   About how long do you think the interaction was

13   between the two individuals, person in the blue coat and

14   person in the orange hood, when they did this exchange?

15      **A.**   I would say close to 20 to 30 seconds.  No more

16   than a minute.

17      **Q.**   And at the time of this exchange, you indicated

18   earlier that you initially noticed the individual in the

19   blue jacket with one or two other males?

20      **A.**   Yes.

21      **Q.**   Were those other two males still standing in that

22   area at the time of the exchange, if you can recall?

23      **A.**   If I can recall, I can maybe recall maybe one.

24      **Q.**   Did any of these -- this other individual that you

25   mentioned appear to participate in any way in this exchange

245

1    that you observed?

2        **A.**   No.

3        **Q.**   Did you observe any exchange or interaction

4    between either the individual in the blue coat or the

5    individual in the orange hood with this third person?

6        **A.**   Can you repeat that?

7        **Q.**   Did you see any exchange or physical interaction

8    between the individual in the blue coat or the individual in

9    the orange hood with this third person?

10       **A.**   Oh, no.  No.

11       **Q.**   Prior to observing the exchange of the backpack in

12    the walkway, do you recall approximately how long the male

13    in the blue coat had been standing in the walkway before the

14    exchange occurred?

15       **A.**   I would say maybe one to two minutes, but that was

16    back and forth just in and out of my sight, just walking up

17    and down the walkway.

18       **Q.**   About how long had you been in that location in

19    your OP vehicle before you observed the exchange?

20       **A.**   The best of my recollection, about 10 to 15

21    minutes.

22       **Q.**   When you observed the exchange that you just

23    described, what if anything did you suspect had occurred?

24       **A.**   I suspected that some sort of -- some transaction

25    had taken place, illegal transaction.  I suspected it could

1    have been either a large quantity of narcotics or possibly a

2    firearm.

3        Q.   And what, based upon your observations, what

4    caused you to believe that?

5        A.   Well, the way that the individual, after receiving

6    the bag, tried to conceal the book bag, he took off his

7    jacket, put the book bag on and covered the book bag with

8    his jacket so that it could not be seen, and also the hand

9    gestures, what appeared to be the exchange of U.S. currency.

10   I recognized this to be some sort of transaction.

11       Q.   After you observed the exchange of the backpack

12   for the money, what, if anything, did you observe the

13   individual in the blue coat do?

14       A.   After taking off -- he took off his jacket.

15       Q.   After he put his jacket back over the backpack.

16       A.   Oh, okay.  He stood there for some time.  Then

17   shortly after, walked out of my sight.

18       Q.   And what about the individual, who handed him the

19   backpack, in the orange hood?  What did that individual do?

20       A.   He had walked out of my sight as well.

21       Q.   And do you remember about how long they remained

22   in your sight after the initial exchange?

23       A.   I would say no more than a minute.  I would say

24   maybe 30 to 45 seconds.

25       Q.   Okay.  And looking at Exhibit 1-B, which direction

1    did they walk when they, you know, eventually were out of

2    your sight?

3        **A.**   They walked further down the middle portion of the

4    exhibit displayed.  They walked further in the walkway out

5    of my sight towards the parking lot.  They would be walking

6    further down to the bottom portion of this exhibit.

7        **Q.**   Okay.  Is there a parking lot in Exhibit 1-B near

8    the row houses; is that what you are referring to?

9        **A.**   Yes, sir.

10       **Q.**   What did you do?

11       **A.**   I broadcast the lookout and advised the arrest

12   team I needed to move in and stop the individuals involved.

13       **Q.**   At the time that you broadcast the lookout, did

14   you remain in the same location that you made those

15   observations?

16       **A.**   Yes, I did.

17       **Q.**   At the time that you first broadcast the lookout

18   over the radio, was there anything obstructing your view of

19   the two males that you described do the exchange?

20       **A.**   No.

21       **Q.**   Prior to this hearing, have you had an opportunity

22   to listen to the radio communications you had that day after

23   seeing the exchange?

24       **A.**   Yes.

25       **Q.**   All right.  I am going to play you a portion of

1    Government's Exhibit No. 3 starting at, I guess, the six

2    minute mark.

3              (Played audio.)

4              Officer Jackson, do you recognize the voice on

5    that recording?

6         **A.**   Yes.

7         **Q.**   Whose voice is that?

8         **A.**   That's mine.

9         **Q.**   And is that your recording of your lookout or the

10   beginning of your lookout from April 22nd of this year?

11        **A.**   Yes, sir.

12        **Q.**   And was that -- is that a fair and accurate

13   recording of your transmissions, radio transmissions, that

14   day?

15        **A.**   Yes, sir.

16             MR. WASSERMAN:  Your Honor, I move for

17   Government's Exhibit No. 3 into evidence.

18             MR. MARSTON:  No objection.

19             MR. OHM:  No objection.

20             THE COURT:  It is admitted.

21             (Government's Exhibit No. 3 is admitted.)

22             MR. WASSERMAN:  Thank you.

23             If you can continue playing until about 6:30.

24             (Played audio.)

25

1    **BY MR. WASSERMAN:**

2         **Q.**   Officer Jackson, at the time that you gave this

3    lookout that you just listened to, were both suspects still

4    in your view?

5         **A.**   Yes.

6              MR. WASSERMAN:  I want to direct your attention

7    now to -- or ask to play Government's Exhibit No. 3 from

8    about the 6:29 mark to 7:08 of the recording.

9              THE COURT:  If you could possibly turn the sound

10   down a little bit, which may result in having a little less

11   static.  Let's see if that makes it a little easier to hear.

12              (Played audio.)

13   **BY MR. WASSERMAN:**

14        **Q.**   Officer Jackson, at this point of the radio run,

15   do you know where each suspect was located?

16        **A.**   Can you repeat that?

17        **Q.**   At the time you broadcast this additional lookout,

18   do you know where your subject was located?

19        **A.**   At that time I couldn't see him.  I believe they

20   walked further in the walkway out of my sight towards the

21   parking lot.

22        **Q.**   All right.

23              THE COURT:  Can you put the volume back up,

24   please?  Thank you.

25              MR. WASSERMAN:  I will ask to play now from 7:28

1    to about 7:39 of Exhibit 3.

2              (Played audio.)

3    **BY MR. WASSERMAN:**

4        **Q.**   All right.  Do you recall if you were able to see

5    both suspects at this time based on that lookout?

6        **A.**   At that time I couldn't see them.

7        **Q.**   All right.  Backing up then to the previous clip

8    we played you, which was from 6:29 to 7:08, do you recall --

9    you initially said you thought they may have walked off?

10       **A.**   Yes.

11       **Q.**   Do you still have that recollection?  In other

12   words, did they walk off and then come back into your view?

13       **A.**   It was pretty much back and forth.  I could see

14   them because arresting hadn't moved in yet.  I saw them

15   reappear again but then they walked back out of my sight

16   again.

17       **Q.**   All right.  When they walked back out of your

18   sight for the second time, which direction did they go?

19       **A.**   Back towards the parking lot.

20       **Q.**   All right.  Away from 15th Street?

21       **A.**   Yes, sir.

22       **Q.**   Now, in the transmission we just listened to, 7:28

23   to 7:39, you mentioned that the male with the grayish coat

24   had an orange hood --

25       **A.**   Yeah.

251

1    **Q.**   -- that you had not mentioned in your first two

2    lookouts.  Was your reference to the orange hood based upon

3    your own observations?

4    **A.**   Yes.

5    **Q.**   Did anybody tell you that this individual was

6    wearing an orange hood?

7    **A.**   No.

8    **Q.**   Do you recall why you didn't mention the orange

9    hood in your initial lookout description?

10   **A.**   I was trying to hurry up -- I was more focused on

11   the individual wearing the blue coat because I knew he was

12   in the possession of that book bag.  I was trying to

13   expedite the situation by telling arresting, Look, I need

14   you to get here right now.  I think at the time I probably

15   didn't give that portion of the lookout because I just

16   needed the arresting to pretty much get into the area.  And

17   it may have -- I didn't mention the hood at all but I just

18   -- I was more concerned with the individual wearing the blue

19   coat.

20   **Q.**   Did there come a point or you indicated there came

21   a point when both males, both individuals that you just

22   described, moved out of your line of sight?

23   **A.**   Yes.

24   **Q.**   All right.

25        (Government's Exhibit No. 4 was marked for

 1    identification.)

 2         MR. WASSERMAN:  I am going to show you what we've

 3    marked for identification as Government's Exhibit No. 4.

 4    And I'm going to ask to probably fast forward there to about

 5    19:02:29 --

 6         The Court's indulgence.

 7         MR. WASSERMAN:  I'm sorry.  19:02 to :31.

 8    **BY MR. WASSERMAN:**

 9         **Q.**   Do you recognize -- did you have an opportunity to

10    view Officer Poupart's body worn camera from April 22nd of

11    this year?

12         **A.**   Yes, sir.

13         **Q.**   Was that prior to today?

14         **A.**   Yes, sir.

15         **Q.**   Was Officer Poupart on the scene as part of the

16    arrest team?

17         **A.**   Yes, sir.

18         **Q.**   And was the footage that you reviewed from Officer

19    Poupart's body worn camera a fair and accurate recording as

20    part of the events of that day?

21         **A.**   Yes, sir.

22         MR. WASSERMAN:  Your Honor, I move Government's

23    Exhibit No. 4 into evidence at this time.

24         MR. MARSTON:  No objection.

25         MR. OHM:  No objection.

```
 1                    THE COURT:  So moved.

 2                    (Government's Exhibit No. 4 was admitted.)

 3                    MR. WASSERMAN:  Thank you, Your Honor.

 4   BY MR. WASSERMAN:

 5        Q.   I am going to show you Government's Exhibit No.

 6   4-A.  Is that on your screen?

 7        A.   Yes, sir.

 8        Q.   Do you recognize that still shot?

 9        A.   Yes.

10        Q.   And is that a still shot from Officer Poupart's

11   body worn camera?

12        A.   Yes.

13        Q.   Who is depicted in this still shot that you are

14   looking at?

15        A.   The individual with the blue coat that would be

16   Defendant Douglas, and the individual with the grayish/dark

17   brown coat would be Defendant Williams.

18        Q.   And is this a fair and accurate depiction of part

19   of Officer Poupart's body worn camera?

20        A.   Yes.

21                    MR. WASSERMAN:  Your Honor, I move Government's

22   Exhibit 4-A into evidence.

23                    MR. MARSTON:  No objection.

24                    MR. OHM:  No objection.

25                    THE COURT:  4-A is admitted.
```

```
 1              (Government's Exhibit No. 4-A was admitted.)
 2   BY MR. WASSERMAN:
 3      Q.   And do you see -- or can you see the time stamp in
 4   the upper right-hand corner?
 5      A.   Yes.
 6      Q.   What does it say?
 7      A.   It says 2:312, the date is 4-22-2020 and then --
 8      Q.   I'm sorry.  You said you see the time stamp?
 9      A.   Yes.  2:31 -- I'm sorry.  19:02:312.
10      Q.   Yes.  Okay.
11              Just so we are clear, do you know whether the body
12   worn camera time stamp is different -- is it in eastern
13   standard time?
14      A.   Yes, it is.
15      Q.   Are you sure about that?
16      A.   I am not 100% sure.
17      Q.   You are not sure?
18      A.   [SHAKES HEAD]
19      Q.   All right.
20              MR. OHM:  On behalf of Mr. Douglas and for clarity
21   we will stipulate that it is eastern standard time.
22              THE COURT:  Thank you.
23   BY MR. WASSERMAN:
24      Q.   Was this a little after 3:00 p.m. when this
25   happened?
```

1       **A.**    Yes.

2       **Q.**    Thank you.  Looking at Exhibit 4-A, which person

3    in the photo was the person that received the backpack and

4    handed off the, you know, suspected currency?

5       **A.**    The individual wearing the bluish coat with blue

6    hood, and that would be Defendant Douglas.

7       **Q.**    And what about -- who actually stopped this

8    individual?

9       **A.**    To my recollection Officer Poupart.

10      **Q.**    And which person in the photo was the individual

11   you observed hand off the backpack and receive the suspected

12   currency?

13      **A.**    The one wearing the orangish hood and reddish

14   brown colored jacket, Defendant Williams.

15      **Q.**    You said dark colored.  Is there anything else

16   that would distinguish it?

17      **A.**    Light-colored jeans and the bushy hair.

18      **Q.**    All right.  And is that individual to the left or

19   to the right of Mr. Douglas?

20      **A.**    He is to the right of Mr. Douglas.

21      **Q.**    Have you had an opportunity to review a portion of

22   Officer Andrew Stout's body worn camera?

23      **A.**    Yes.

24

25            (Government's Exhibit No. 5 was marked for

1    identification.)

2    **BY MR. WASSERMAN:**

3         **Q.**   I will show you what I have marked for

4    identification Government's Exhibit No. 5.  I move that to

5    19:02:29.  And is Exhibit 5 a fair and accurate depiction of

6    a portion of the events that occurred on April 22nd of this

7    year?

8         **A.**   Yes.

9              MR. WASSERMAN:  Your Honor, I move Government's

10   Exhibit No. 5 into evidence.

11             MR. MARSTON:  No objection.

12             MR. OHM:  No objection.

13             THE COURT:  Exhibit 5 is admitted.

14             (Government's Exhibit No. 5 was admitted.)

15             MR. WASSERMAN:  And if we can play from 19:02:29

16   to 19:03:41.

17             (Played audio.)

18   **BY MR. WASSERMAN:**

19        **Q.**   All right.  Officer Jackson, are you able to see

20   in Exhibit 5 the individual in the orange hood that you

21   described in the radio transmission?

22        **A.**   Yes.

23        **Q.**   Was that person in the video wearing the orange

24   hood standing next to the male in the blue coat?

25        **A.**   Is he there?

1    **Q.**   Is he in the same position as when you initially

2    observed him?

3        **A.**   No.

4        **Q.**   All right.  What area is that relevant to where

5    you made the observations of the exchange?

6        **A.**   So if you -- actually, if you see where the

7    individual in this photograph -- I'm sorry -- where the

8    still is, the individual with the black coat and fur on it,

9    it would be a little bit further in front of that

10   individual.

11       **Q.**   All right.

12           MR. WASSERMAN:  And this is 19:03:01 of Exhibit 5.

13   If we can continue to play this until 19:03:39 seconds.

14           (Played audio.)

15   **BY MR. WASSERMAN:**

16       **Q.**   All right.  Officer Jackson, do you see anyone in

17   this part of the video that you recognize?

18       **A.**   Yes.

19       **Q.**   And who is that?

20       **A.**   That individual is Defendant Williams.

21       **Q.**   And which direction does Mr. Williams appear to be

22   walking at this point?

23       **A.**   Towards 15th Street.

24       **Q.**   And at this point, do you recall where you were

25   located?

1        **A.**    I believe I was still in my observation, I was

2    still in the block.  Let me see.  I believe I was still

3    there on 15th Street.

4        **Q.**    All right.  Are you sure about that or just from

5    this video or -- let me ask you this:  Did there come a

6    point when you left that location?

7        **A.**    Yes.

8        **Q.**    All right.  And do you remember -- where did you

9    go?

10       **A.**    I went around -- so I went southbound on 15th

11   Street towards W and then I came back around on Montana

12   Avenue so I can do the observation process.

13       **Q.**    And at the time that -- if you can recall, at the

14   time that Mr. Williams, the individual in the orange hood,

15   was stopped by police, were you -- do you recall whether you

16   were still in your OP location or had you moved?

17       **A.**    I moved.  I was gone at that point.

18       **Q.**    All right.  So did you actually observe

19   Mr. Williams getting stopped by the officers?

20       **A.**    No, I did not.

21       **Q.**    Okay.  I want to play you now Government's Exhibit

22   No. 3 starting at the 9:40 mark.

23              (Played audio.)

24   **BY MR. WASSERMAN:**

25       **Q.**    Based upon this transmission that you just

1    listened to, that was your voice; is that correct?

2        **A.**   Yes, sir.

3        **Q.**   What, if anything, did you conclude regarding

4    whether the officers had stopped the individual with the

5    orange hood that you described?

6        **A.**   They just wanted clarification.  Clarification on

7    what happened, what probable cause existed for this

8    individual to be arrested.

9        **Q.**   Was it your understanding that they had stopped

10   that individual?

11       **A.**   Yes, sir.

12       **Q.**   All right.  What does 1-800 mean?

13       **A.**   That is our code word for firearm.

14       **Q.**   So what were you explaining to the officer when

15   you said, "orange hood was good to go for 1-800".

16       **A.**   I was saying the orange hood was the one

17   originally passing the book bag off.  At that point they did

18   confirm that there was a firearm in the book bag.  So what I

19   was saying was, this individual is good to go for passing

20   off that firearm that I observed.

21       **Q.**   All right.  Was there a point in which you were

22   able to view both males who had been stopped by police to

23   see if you can make a positive identification of the two

24   individuals you observed engage in the transaction of the

25   backpack?

 1          **A.**   Yes.

 2          **Q.**   Where were you located when you were viewing the

 3    individual you observed receive the backpack?

 4          **A.**   At that time I was in the parking lot off of

 5    Montana.

 6          **Q.**   I'm sorry.  You were parked in the parking lot?

 7          **A.**   Yeah.  The parking lot where the arresting team

 8    was moving into.

 9          **Q.**   Okay.  And do you remember about the distance you

10    were from where this individual was located, the blue coat?

11          **A.**   From the time I gave the positive identification?

12          **Q.**   When you were doing the identification.

13          **A.**   I would say 15 to 20 yards. I was pretty much at

14    the mouth of that parking lot on Montana.  I am still trying

15    to maintain an undercover capacity.

16          **Q.**   Were you located in your vehicle?

17          **A.**   Yes, sir.

18          **Q.**   Were there any obstructions of your view of the

19    individual in the blue coat when you made the

20    identification?

21          **A.**   No.

22          **Q.**   Do you have any doubts about your identification?

23          **A.**   No.

24          **Q.**   The accuracy of the identification?

25          **A.**   No.

54

```
 1            Q.   Where were you when you were viewing the
 2      individual you observed hand the backpack off?
 3            A.   On 15th Street.
 4            Q.   I'm sorry.  Where were you when you were doing the
 5      ID procedure?
 6            A.   ID procedure?
 7            Q.   Yeah, of the individual who handed the backpack
 8      off.
 9            A.   Oh, still in the parking lot area.
10            Q.   Same location?
11            A.   Same location.
12            Q.   And any obstructions of your view of that
13      individual?
14            A.   No.
15            Q.   Do you have any doubts about the accuracy of your
16      identification of the individual handing the backpack off?
17            A.   No.
18                 MR. WASSERMAN:  I am going to ask that
19      Government's Exhibit No. 2 at 10:28 -- I'm sorry.
20      Government's Exhibit No. 3.
21                 (Played audio.)
22      BY MR. WASSERMAN:
23            Q.   All right.  Was that your statement indicating a
24      positive identification of both males?
25            A.   Yes, sir.
```

262

1      **Q.**   And at the time that you were viewing both of

2      these individuals, did anyone on the scene do or say

3      anything to you to suggest who you should identify?

4      **A.**   No.

5      **Q.**   Do you see the individual who handed the backpack

6      off in exchange for the suspected currency anywhere in the

7      courtroom?

8      **A.**   Yeah.

9      **Q.**   Can you identify that person by their location in

10     the courtroom and an article of clothing they are wearing?

11     **A.**   I can just by the hair alone, the individual

12     wearing the pink sweat shirt, gray jacket and the hair.

13              MR. WASSERMAN:  Your Honor, I would ask that the

14     record reflect the in-court identification of Defendant

15     Williams.

16              THE COURT:  I would like the Defendant to remove

17     his mask.

18     **BY MR. WASSERMAN:**

19     **Q.**   Having observed this individual that you mentioned

20     had the pink sweat shirt on, remove his mask, is that -- are

21     you able to recognize that individual?

22     **A.**   Yes, sir.

23     **Q.**   Who do you recognize that individual as?

24     **A.**   As Defendant Williams.

25     **Q.**   Is that the person you observed hand the backpack

1    off?

2        **A.**    Yes, sir.

3            MR. WASSERMAN:  Your Honor, I ask that the record

4    reflect the in-court identification of Defendant Williams.

5            THE COURT:  The record does reflect that.

6    **BY MR. WASSERMAN:**

7        **Q.**    Do you see the individual who you observed receive

8    the backpack and hand the suspected currency to Defendant

9    Williams in the courtroom?

10       **A.**    Yes, sir.

11       **Q.**    Can you identify that individual by an article of

12   clothing they are wearing and the location in the courtroom?

13       **A.**    To my left wearing an orange jumpsuit, to my left

14   of the witness stand.

15           THE COURT:  I would, again, ask that the Defendant

16   Douglas please remove his mask so there is no question that

17   you can see his face.

18           THE DEFENDATN:  Yes, Your Honor.

19           MR. WASSERMAN:  Having had Mr. Douglas remove his

20   face mask, do you continue to indicate that that was the

21   individual that you observed receive the backpack?

22           THE WITNESS:  Yes, sir.

23           MR. WASSERMAN:  Your Honor, again, I would move

24   that the record reflect the in-court identification of

25   Defendant Douglas.

```
 1              THE COURT:  Thank you.  The record does reflect
 2    that.  Thank you.
 3              MR. WASSERMAN:  Your Honor, that is all I have.
 4              THE COURT:  Thank you.  Counsel?
 5              MR. MARSTON:  Thank you, Your Honor.
 6                        CROSS EXAMINATION
 7    BY MR. MARSTON:
 8         Q.   Good afternoon, sir.  Officer Jackson, I am John
 9    Marston.  I represent Mr. Williams.  How are you doing
10    today?
11         A.   Pretty good.
12         Q.   I appreciate you being here with everything that
13    is happening.
14              Officer Jackson, let me make sure I understand.
15    You say you got to this location on 15th Street, 2300 block
16    about 10 or 15 minutes before you observed this exchange of
17    a backpack; is that right?
18         A.   Yes, sir.
19         Q.   All right.  And had you been anywhere else that
20    day earlier, for work while on duty?
21         A.   Probably a couple blocks away making observations.
22         Q.   What time did you start work that day?
23         A.   Our tour of duty started at 1300 hours.
24         Q.   Thirteen hundred is?
25         A.   1:00 p.m.
```

1      **Q.**   1:00?

2      **A.**   Yes, sir.

3      **Q.**   Okay.  This is a couple hours later?

4      **A.**   Yes, sir.

5      **Q.**   What time was it when this exchange happened?

6      **A.**   I can't remember.

7      **Q.**   It was right about 3:00; is that right?

8      **A.**   Yes, sir.

9      **Q.**   I mean, we were watching the body worn camera

10     footage and you called it a 2, but it is a Z after the time,

11     which stands for zulu, which is universal time.  Does that

12     make sense?

13     **A.**   Yes, sir.

14     **Q.**   When it says 19:02, for example, universal time,

15     that time of year you have to subtract 4 hours; 19 becomes

16     15 that is 3:00.  Sound right?

17     **A.**   Yes, sir.

18     **Q.**   Okay.  So here we are a little after 3:00 that

19     day.  Is that when you saw this happen?

20     **A.**   Yes, sir.

21     **Q.**   All right.  And you mentioned the person you later

22     identify as Mr. Williams walking up into the -- I guess a

23     grassy area on the other side of the fence from Mr. Douglas;

24     is that right?

25     **A.**   Yes.

1      **Q.**   Where did he come from?

2      **A.**   I don't know.

3      **Q.**   Which direction?  From the parking lot direction?

4      **A.**   I believe it was from the area of the walkway

5    where there is a parking lot, in back of the row houses

6    there is another walkway.  So I am estimating he probably

7    came from that walkway.

8      **Q.**   You couldn't see back there from where you were.

9    Right?

10     **A.**   Correct.  Correct.

11     **Q.**   So he came from the direction of the parking lot.

12   Who knows from where back there; is that right?

13     **A.**   Yes.

14     **Q.**   You don't know.

15     **A.**   No, I don't know.

16     **Q.**   Oh, okay.  And in other words, that was the first

17   time you had seen him; is that right?

18     **A.**   Yes.

19     **Q.**   He wasn't out in front of those buildings on 15th

20   Street at any point while you were there in the 10 or 15

21   minutes; is that right?

22     **A.**   To my recollection, no.

23     **Q.**   All right.  When Mr. Williams walked up in that

24   grassy area, what did he have?

25     **A.**   A little bag.

```
 1          Q.   Where was he?  Was he holding it?  Was he wearing

 2     it?

 3          A.   He was holding it.  He wasn't wearing it.  He just

 4     had it in his hand.

 5          Q.   How was he holding it?

 6          A.   Holding it out by his arm.

 7          Q.   Down by his side?

 8          A.   No, when I first saw him, his arm was extended

 9     with the bag towards Defendant Douglas.

10          Q.   So he was handing it off when you first saw it?

11          A.   Yes.

12          Q.   So you did not see him with the book bag when he

13     walked up?

14          A.   Yes, I did.  But then he eventually handed it off.

15          Q.   Well, you just told us you didn't see where it

16     was, whether it was by his side or on his back or whatever;

17     you said the first time you saw it was when he was handing

18     it off.  It was extended, you said.

19          A.   Yes.

20          Q.   So then you did not see, before then?

21          A.   Are you asking where he came from with it?  What

22     are you asking?

23          Q.   When he walked up.  You told us you saw him

24     walking up from the direction of the parking lot area.

25          A.   Correct.
```

```
 1        Q.   And if he handed a book bag off later, he must

 2   have had it with him.  Right?

 3        A.   Yes.

 4        Q.   But you didn't see the book bag at that time?

 5        A.   I saw it in his hand.

 6        Q.   You told us you didn't see it until he extended

 7   it.  I am talking about before --

 8             MR. WASSERMAN:  Asked and answered.

 9             THE COURT:  Overruled.

10             THE WITNESS:  I am asking which point you are

11   talking about.  Are you asking when he came from -- when he

12   first appeared or when I observed him make the hand to hand

13   exchange?

14   BY MR. MARSTON:

15        Q.   I appreciate you clarifying.  That is exactly what

16   I should have been doing.

17             You saw it extended in his hand to make an

18   exchange before that time as he is walking up, you don't see

19   a book bag then because you first saw it when he extended

20   it.

21        A.   That's correct.  That's correct.

22        Q.   Got you.  Okay.  And he extended it with which

23   hand?

24        A.   To my recollection the right hand.

25        Q.   What side of the fence was he on then?  The grassy
```

1    side or the walkway side?

2         **A.**    The grassy side.

3         **Q.**    So he -- Mr. Williams -- extends the book bag over

4    the fence to Mr. Douglas?

5         **A.**    Yes.

6         **Q.**    Okay.  When did he hop the fence?

7         **A.**    I don't know.  At that point I was watching the

8    lookout still trying to maintain my undercover capacity.

9         **Q.**    Do you know if he did hop the fence?

10        **A.**    I am assuming he did because he did eventually end

11   up into the walkway.

12        **Q.**    But we can't assume here.  I'm sorry.

13        **A.**    That's correct.

14        **Q.**    Okay.  So you don't know?

15        **A.**    I don't know.

16        **Q.**    Okay.  Later on you see him walking away --

17   Mr. Williams walking away from this exchange?

18        **A.**    Later on.  Correct.  Yes.

19        **Q.**    All right.  Was he walking down the walkway then?

20        **A.**    Yes.

21        **Q.**    Okay.  During this time you had your eyes, you

22   mention, on a group on the right-hand side, your right-hand

23   side, the rec center side.  Was your attention ever diverted

24   over to them around the time of this backpack exchange?

25        **A.**    No.

1    Q.   So you sat there watching Mr. Williams and

2    Mr. Douglas and someone else throughout that time, and

3    including up to the point of them walking away.  You are

4    watching them the whole time; is that what are you saying?

5        A.   Which one?

6        Q.   Start with Mr. Williams walking up, extending a

7    bag over the fence.

8        A.   Right.

9        Q.   And then you don't see Mr. Williams jump the fence

10   but you know later on he walked off; is that right?

11       A.   Correct.

12       Q.   From the time he walked up, to the time he walked

13   off, you are saying you were watching that whole time

14   Mr. Williams and Mr. Douglas?

15       A.   Yes.

16       Q.   And you had a clear line of sight?

17       A.   Yes.

18       Q.   No obstructions?

19       A.   Right.

20       Q.   20/20 vision?

21       A.   Yes.

22       Q.   But you have no idea how he got from the grassy

23   area to the walkway?

24       A.   I am not saying I don't have an idea, I just don't

25   remember.

1    **Q.**   That's a poor question on my part.  You didn't see

2    how he got there.

3              MR. WASSERMAN:  Your Honor, asked and answered.

4              THE COURT:  I will allow again.

5    **BY MR. MARSTON:**

6    **Q.**   Because I ask a question poorly, which I apologize

7    for.  You didn't see him -- so we were talking about the

8    time frame from him walking up, exchange, he walks off, he

9    starts -- Mr. Williams starts in the grassy area, later on

10   he is in the walkway and there is a fence between those two

11   areas.  Right?

12   **A.**   Yes.

13   **Q.**   You didn't see how he got over the fence or if he

14   did?

15   **A.**   I will say this:  I don't remember because that

16   part wasn't important to me.  I just don't remember that

17   part.

18   **Q.**   Got you.  So while you are there, there are some

19   things that aren't important to you.

20   **A.**   That's probably a poor choice of words; however, I

21   was more focused on the individual in possession of the book

22   bag.  I try to make my observations as accurate as possible,

23   but I can't give a complete play-by-play of what everyone is

24   doing at this particular time because I am trying to do a

25   bunch of other things, which is maintain my undercover

 1    capacity as well.

 2         Q.   I know.  It's not an easy job, obviously.  For

 3    sure.  I apologize for these questions.  It's part of my

 4    job.

 5         A.   I am trying to be accurate.

 6         Q.   I hear you.

 7              Now, since your focus, I think you had said when

 8    Mr. Wasserman was asking you questions, your focus was on

 9    the blue coat person.  Right?

10         A.   Correct.

11         Q.   Mr. Douglas?

12         A.   Yes, sir.

13         Q.   And that contributed to you not exactly seeing

14    everything that Mr. Williams was doing it sounds like; is

15    that right?  Is that fair?

16         A.   Which part?

17         Q.   Your focus --

18         A.   Before or after?

19         Q.   Well, after there is an exchange now you've seen a

20    backpack you feel your focus should be there?

21         A.   Absolutely.  Yes, sir.

22         Q.   Let me ask you this:  Your focus is on this

23    backpack.  How did Mr. Douglas put it on?

24         A.   He took his jacket off, his blue coat.  I keep

25    saying jacket.  He took his blue coat off, put the book bag

                               273

1    on his person with the shoulder straps and then subsequently

2    put the jacket over it, over the book bag, while that book

3    bag was still on his person.

4        Q.   What did he do with his jacket while he was

5    putting on the backpack?

6        A.   I don't remember.  He took it off.  I can't say he

7    threw it to the ground.  I can't say he had somebody hold it

8    for him.  All I know is he took the jacket off and put the

9    book bag on and put it on -- and put the jacket over top of

10   it.

11       Q.   And your focus is here, but you don't know -- I

12   mean, you would agree with me, though, that putting on a

13   backpack requires both arms to be free.  You can't do it

14   with a jacket partially off.  It would be hard to hold on to

15   a jacket while putting it on.  Right?

16       A.   Right.

17       Q.   Even though your focus is there, you didn't see

18   what he did with the jacket?

19       A.   I could tell you at the time, but right now as I

20   tell you three months later, I just can't say.

21       Q.   Okay.  In terms of the backpack, how quickly did

22   Mr. Douglas put the backpack on?  Was it immediate?

23       A.   Yes, immediately.  After receiving the book bag,

24   he took his jacket off.  He didn't have his jacket on -- he

25   had his jacket on at the time.  He took the jacket off.  So

1   what I was trying to say is he didn't already have his

2   jacket off upon receiving the book bag.  He had the jacket

3   on after receiving the book bag, took the jacket off, then

4   put the book bag on and covered up the book bag with the

5   jacket.

6       **Q.**   Okay.  And nobody opened the backpack during this

7   time?

8       **A.**   No.

9       **Q.**   And nobody took anything out of it?

10      **A.**   No.

11      **Q.**   Nobody put anything into it?

12      **A.**   No.

13      **Q.**   That makes sense.  There wouldn't have been time

14  to do that.  Right?

15      **A.**   Correct.

16      **Q.**   Now, so the -- all right.  So I am trying to

17  understand the cash, the currency in this situation.  And

18  you had a view of what you believed to be an exchange of

19  currency from Douglas to Williams; is that right?

20      **A.**   Yes.

21      **Q.**   And where were they standing at that time?

22      **A.**   Still in the same positions.  After receiving the

23  book bag, placed the book bag on, put his jacket over, and

24  did the hand gesture, as if Williams was receiving the

25  currency.  I could not say that it was U.S. currency, but I

1    did see it was some sort of hand exchange like I mentioned.

2         **Q.**    Was the fence between them still?

3         **A.**    Yes.

4         **Q.**    Okay.  Where does Mr. Douglas get this currency

5    from?

6         **A.**    I cannot tell you that.

7         **Q.**    What did Mr. Williams do with the currency upon

8    receiving it?

9         **A.**    I do not remember.

10        **Q.**    Was it folded, the currency?

11        **A.**    All I saw was just a small object that I believed

12   to be U.S. currency.

13        **Q.**    I mean, you did a writeup in this case.  Right?

14        **A.**    Correct.

15        **Q.**    A written report?

16        **A.**    Yes.

17        **Q.**    And today you are expressing uncertainty about

18   whether it was currency.  The report expresses no

19   uncertainty.  Would you say that's correct?

20        **A.**    My report reflects the sequence of events that I

21   observed.  I am just basing my observation from that day.

22        **Q.**    I mean, we can get it as an exhibit.  I don't know

23   if we need to.  Does this sound right?  You said after the

24   exchange S1 gave S2 an unknown amount of U.S. currency.

25             MR. WASSERMAN:  Your Honor, what is he reading

276

 1   from?

 2               (Defendant Williams' Exhibit No. 1 was marked for

 3   identification.)

 4               MR. MARSTON:  Government's (sic) Exhibit 1 -- I'm

 5   sorry.  May I approach the witness?

 6               THE COURT:  You may.

 7   **BY MR. MARSTON:**

 8        **Q.**   Defendant's Exhibit 1.  Do you recognize that?

 9        **A.**   Yes.

10        **Q.**   What is it?

11        **A.**   This is my observation notes.

12        **Q.**   Is that how you prepared it?

13        **A.**   Yes.

14        **Q.**   It hasn't been changed by anybody?

15        **A.**   No.

16               MR. MARSTON:  Your Honor, ask to admit Defendant's

17   Exhibit No. 1.

18               THE COURT:  Mr. Wasserman.

19               MR. WASSERMAN:  I'm sorry.  No objection.

20               THE COURT:  Defendant's Exhibit No. 1 is admitted.

21               MR. MARSTON:  Thank you, Your Honor.

22               MR. OHM:  No objection but can it be Defendant

23   Williams' Exhibit No. 1?

24               THE COURT:  Defendant Williams' Exhibit No. 1 is

25   admitted.

1              (Defendant Williams' Exhibit No. 1 was admitted.)

2              MR. MARSTON:   Thank you.

3    **BY MR. MARSTON:**

4        **Q.**   Officer Jackson, do you see the discussion of U.S.

5    currency in Defendant Williams' Exhibit 1?

6        **A.**   Yes, sir.

7        **Q.**   I mean, it says that is what happened.   Right?

8        **A.**   Yes.

9        **Q.**   But you don't know that is what happened.

10       **A.**   That's correct.

11       **Q.**   In terms of the U.S. currency, if it even was,

12   could you have -- do you have a memory of whether it was one

13   bill or multiple?

14       **A.**   I cannot tell you that.

15       **Q.**   How far away were you in the car from where this

16   exchange occurred in the walkway leading to 15th Street?

17       **A.**   Um, you want me to try to estimate feet or yards?

18       **Q.**   You used yards earlier, maybe stick with the

19   yards.

20       **A.**   Right.   I would say maybe about 15 yards.

21       **Q.**   Fifteen yards?   You never measured it?

22       **A.**   No.

23       **Q.**   And it was, essentially, too far to see for sure

24   that it was currency?

25       **A.**   Yes.

1      **Q.**  Tell us about the other person you said who was

2      there -- well, let's break this up, because I think you

3      said, at first when you looked over and saw Mr. Douglas,

4      before Mr. Williams was there.  Okay?

5      **A.**  Yes.

6      **Q.**  There were other people out there with

7      Mr. Douglas?

8      **A.**  Yes.

9      **Q.**  Okay.  And what did they -- I mean, these are

10     other black males?

11     **A.**  Yes.

12     **Q.**  Okay.  Also with jeans on?

13     **A.**  I cannot tell you a description of what they had

14     on at that time.  Not right now.  At the time I could have.

15     As of right now, I cannot remember.

16     **Q.**  In one of the Government exhibits, it was from

17     Officer Poupart's camera, you saw Mr. Douglas with the blue

18     puffy coat, saw Mr. Williams standing there.  You told us

19     that.  There was another individual in that image as well.

20     **A.**  Yes.

21     **Q.**  And the person is a black male?

22     **A.**  Black male wearing a black coat with fur on the

23     hood.

24     **Q.**  Dark jacket?  Jeans?

25     **A.**  Yes.

1      Q.   Okay.  Okay.  Which direction -- I mean, how close

2    were these other individuals -- so before the exchange, how

3    close were -- before Mr. Williams is there, how close were

4    these other individuals to Mr. Jackson?

5              I completely blew that.  You are Mr. Jackson.

6      A.   Yes, sir.

7      Q.   So before Mr. Williams arrives, before the

8    exchange, when it is just Mr. Douglas out there, and there

9    are other individuals there, you said as well, how close

10   were those other individuals to Mr. Douglas?

11     A.   The best I could describe is just near him.  I

12   can't give you an approximate feet.  I just can't tell you

13   that, but I can tell you they were near Mr. Douglas at the

14   time.  I am trying to be as accurate as possible.

15     Q.   I appreciate that.  Did it look like they were

16   talking to each other?

17     A.   Yes.

18     Q.   I am going to go to what is called a show up, like

19   when you went to view the suspects --

20     A.   Yes.

21     Q.   -- and make an identification.

22     A.   Yes.

23     Q.   This is Defendant Williams' Exhibit No. 2.

24              (Defendant Williams' Exhibit No. 2 was marked for

25   identification.)

280

1        MR. MARSTON:  I think I will just put it up here.

2            (Put on overhead projector.)

3    **BY MR. MARSTON:**

4        **Q.**   So this is the same vicinity we have been talking

5    about, the 2300 block, 15th Street.  Does that look right?

6        **A.**   Yes.

7        **Q.**   Okay.  Now, you had mentioned that when you did

8    the identification you were still in your vehicle?

9        **A.**   Yes.

10       **Q.**   You were at the mouth of the parking lot you said.

11   Do you remember that?

12       **A.**   Yes.

13       **Q.**   I am going to point over here to -- so the bottom

14   left of Defendant Williams' 2 is 15th Street -- actually, is

15   this a fair and accurate depiction of this vicinity?

16       **A.**   Yes.

17           MR. MARSTON:  Can I have Defendant Williams'

18   Exhibit 2 admitted into evidence?

19           MR. WASSERMAN:  No objection.

20           THE COURT:  So admitted.

21           (Defendant Willisams' Exhibit No. 2 was admitted.)

22   **BY MR. MARSTON:**

23       **Q.**   We see the walkway jutting from the bottom

24   left-hand corner to the center of the picture.  Right?

25       **A.**   Yes.

 1        Q.   Here we see the triangle-shaped parking lot.

 2   Right?

 3        A.   Yes.

 4        Q.   With a triangle-shaped median?

 5        A.   Yes.

 6        Q.   And the entrance to the parking lot is all of the

 7   way up here in the upper right corner.  Right?  What is this

 8   street?  Montana?

 9        A.   Montana Avenue, yes.

10        Q.   And there is only one way into the parking lot; is

11   that right?

12        A.   Yes.

13        Q.   And I am pointing to it at the upper-right corner.

14   Right?

15        A.   Yes.

16        Q.   I will just write E on there for entrance; is that

17   all right?

18        A.   Yes.

19        Q.   You say you were at the mouth of the parking lot

20   for identification.  Is that where you were roughly, where

21   the E is?

22        A.   Yes, sir.

23        Q.   And the suspects were being held right in the

24   center of this picture, on these sidewalks right here; is

25   that right?

1        **A.**   Yes.

2        **Q.**   Okay.  So was Douglas over here?  I am pointing to

3    a spot just rear and to the right of a white car parked in

4    the middle of the picture.

5        **A.**   Yes.  However, this picture does not depict the

6    cars at the time.

7        **Q.**   That's a good point.  This is not a picture from

8    that day.  Correct?

9        **A.**   From that day.  Right.

10       **Q.**   Very good.  But so Douglas was here where I am

11   pointing -- it's hard to see.  Do you want me to come up

12   there?

13       **A.**   No, you are fine.

14            MR. WASSERMAN:  You can zoom in a little bit on

15   that too.

16            MR. MARSTON:  Oh, there we go.  Thank you.

17   **BY MR. MARSTON:**

18       **Q.**   Roughly here?

19       **A.**   Yes.

20       **Q.**   Is it okay if I put a D there for Douglas?

21       **A.**   Let me make sure.

22       **Q.**   Yeah.

23       **A.**   That's good.  That's good.

24       **Q.**   Okay.  Okay.  Where is Mr. Williams?

25       **A.**   At the time I saw him, roughly around right in

283

1    this area.  Move your pen to the left around in that area.

2         **Q.**   Around here?

3         **A.**   Go back to the left.  I am estimating but around

4    that area.

5         **Q.**   Do you mind if I put a W there?

6         **A.**   This is an overview of the row house, so it's kind

7    of shady in that area.

8         **Q.**   Got you.  I guess we can kind of see it.

9              So here is where you make the positive

10   identification.  I mean, if you look on this picture,

11   bottom-left corner is roughly, you know, where you were

12   parked, where I am pointing now.  Right?

13        **A.**   Are you asking me was I parked there doing

14   observation?

15        **Q.**   I'm sorry.  During the observation post, you are

16   out here on the street.  Right here.  Right?

17        **A.**   Yes.

18        **Q.**   I am just going to put a circle there, roughly.

19   This does not write on there.

20              MR. WASSERMAN:  Want a different marker?

21              MR. MARSTON:  Yeah.  Thank you.

22              THE WITNESS:  Sir, I would put it more like where

23   -- not that far back but more towards the rear of the van.

24   **BY MR. MARSTON:**

25        **Q.**   I agree.  The speed bump makes the triangles.  So

284

1    it's right about here?

2         **A.**   Yes.

3         **Q.**   Okay.  And the exchange, you said, was in the

4    walkway.  Am I pointing to that vicinity now?

5         **A.**   Come down to the left.  That's fine.

6         **Q.**   I will put an X there.  X for the exchange?

7         **A.**   Yeah.

8         **Q.**   So look here is the E.  I will circle the E.  You

9    remember that.  Right?  That was for where you did the --

10   where you were for the identification.

11        **A.**   Yes.

12        **Q.**   And so you are even further away from the people?

13        **A.**   Yes.

14        **Q.**   Okay.  And I mean, look, we saw on the video,

15   there's cars.  These aren't the cars from that day.  There

16   are a number of cars parked on the bottom right side of the

17   triangle-shaped parking lot.  Right?

18        **A.**   Right.

19        **Q.**   When you are there that day?

20        **A.**   Yes.

21        **Q.**   Then there are police who arrive and park in the

22   middle of this bottom right part of the triangle where I am

23   pointing now.  Right?

24        **A.**   Correct.

25        **Q.**   Somehow you look from the mouth of this parking

285

1    lot all of the way down past all of those things and people

2    and you are able to make an identification?

3         **A.**   Yeah.

4         **Q.**   The identification that you made was based on

5    clothing primarily?

6         **A.**   Clothing and hair and what I observed.

7         **Q.**   Okay.  You wouldn't have been able to see faces

8    from that distance.  Right?

9         **A.**   Not from that distance.  Correct.

10        **Q.**   Okay.  Now you told us -- this is a very important

11   part of the case.

12        **A.**   Say it again.

13        **Q.**   This is a very important part of your job.  Right?

14        **A.**   Yes.

15        **Q.**   Observing is critical to conducting an observation

16   post.

17        **A.**   Yes.

18        **Q.**   Okay.  And the first time you voice a lookout with

19   regard to, you know, let's call it blue and orange.  Blue

20   for Mr. Douglas.  Orange for Mr. Williams.  The first

21   lookout with regard to Mr. Williams was for -- we just heard

22   it was a black male with a gray coat?

23        **A.**   Correct and bushy hair.

24        **Q.**   Well, the first time you said black male with gray

25   coat.

1      A.   Correct.  Followed up by bushy, bushy-ish hair.

2      Q.   Then sometime later on the recordings, I think it

3  is merely 50 seconds later, black male -- this was just with

4  regard to Mr. Williams, not the blue coat.  You are always

5  consistent on the blue coat.  Correct?

6      A.   Right.

7      Q.   So then regarding Mr. Williams, black male --

8  second time, about 50 seconds -- not quite 50 seconds later

9  black male with gray coat, with puffy hair?

10     A.   Correct.

11     Q.   His hair is real messy?

12     A.   Correct.

13     Q.   We haven't heard anything about an orange hood at

14 this point?

15     A.   The second time.

16     Q.   Yeah, first time or second time you never said

17 anything about an orange hood.

18     A.   Which --

19     Q.   We can go through it again.  The first time you

20 spoke.  We heard it on the radio with regard to

21 Mr. Williams, black male with a gray coat.

22     A.   Correct me if I'm wrong, I believe the second

23 sequence was, move in -- it was the sequence where I did say

24 the blue coat was with the gray jacket with the orange hood.

25     Q.   Mr. Douglas is not my client and you mentioned

287

 1    blue coat, kind of from the beginning, for Mr. Douglas?

 2         **A.**    Correct.

 3         **Q.**    Your focus was on him?

 4         **A.**    Correct.

 5         **Q.**    And so I am really just focusing on Mr. Williams.

 6         **A.**    Okay.

 7         **Q.**    So for the first time when you mention the second

 8    person, you could say the giver of the bag --

 9         **A.**    Correct.

10         **Q.**    All right.  Black male with gray coat; is that

11    your lookout?

12         **A.**    Correct.

13         **Q.**    All right.  Don't mention an orange hood?

14         **A.**    Correct.

15         **Q.**    Second time, black male with gray coat with puffy

16    hair.  His hair is real messy.

17         **A.**    Correct.

18         **Q.**    And it's like, you know, 50 seconds later.  It has

19    to be after this whole exchange occurred.  Right?  You said

20    it took 30, 45 seconds, whatever it was, for the whole thing

21    to occur?

22         **A.**    For the exchange or the stop?

23         **Q.**    For the exchange.

24         **A.**    For the exchange.  Correct.

25         **Q.**    So the exchange is over at that point?

 1      **A.**   Correct.

 2      **Q.**   You are still not mentioning an orange hood.

 3      **A.**   Correct.

 4      **Q.**   At that point Mr. Williams has walked away.

 5 Right?  You said he walked away --

 6      **A.**   Yes.

 7      **Q.**   -- and later came back.  Kind of walking around?

 8      **A.**   Correct.

 9      **Q.**   All right.  And so then over almost a minute and a

10 half later, now you say Mr. Williams walks back up the

11 walkway.  Now you can see him again.  Right?

12      **A.**   Did I say that?  I saw him --

13      **Q.**   I thought you told us when Mr. Wasserman was

14 asking questions, there is the exchange.

15      **A.**   Correct.

16      **Q.**   Mr. Williams walks up.

17      **A.**   Correct.

18      **Q.**   And Mr. Williams walks back into your line of

19 sight.

20      **A.**   Correct.  I gave the lookout.  Am I giving the

21 lookout?

22      **Q.**   Yeah.  So there is the exchange, which you call

23 out.  Then a minute and a half later, on the recording at

24 least, you know, you mention for Mr. Williams, black male

25 with grayish coat with orange hood; that's the first time

                                289

 1    you say orange hood?

 2         **A.**    Correct.

 3         **Q.**    Now, is Mr. Williams in your line of sight at that

 4    point?

 5         **A.**    Yes.

 6         **Q.**    So while he's there you don't mention anything

 7    about an orange hood the first time?

 8         **A.**    The first time.  Correct.

 9              THE COURT:  Mr. Marston, how much longer do you

10    have?  I just want to be cognizant of how long the court

11    reporter's been going.

12              MR. MARSTON:  If we took a break, I might be able

13    to narrow it down to another 10 to 15 minutes.

14              THE COURT:  Why don't we do that.  We have been

15    going almost two hours already.  Why don't we take a short

16    recess until 1:10 p.m.

17              MR. MARSTON:  Very good.

18              THE COURT:  Be back in 20 minutes.

19              MR. MARTSON:  Thank you.

20              (Recess.)

21              CLERK:  We are now back on the record.

22    **BY MR. MARSTON:**

23         **Q.**    Officer Jackson, a limited number of additional

24    questions.  Okay.  Hopefully it won't be too much longer.

25              In your various lookouts that related to,

 1    ultimately, Mr. Williams in this case, you did not mention

 2    age; is that right?

 3         **A.**   Did you say age?

 4         **Q.**   Right.

 5         **A.**   Correct.  No, I did not.

 6         **Q.**   You did not mention height; is that right?

 7         **A.**   No, I did not.

 8         **Q.**   You did not mention weight?

 9         **A.**   No, I did not.

10         **Q.**   You did not mention build?

11         **A.**   Correct.  No, I did not.

12         **Q.**   All right.  And those are pretty standard things,

13    I mean, wouldn't you agree, to include in a lookout, if

14    able?

15         **A.**   If able, yes.

16         **Q.**   Okay.  They are on all of the police forms.  Age,

17    height, weight.  Among clothing and other things.  Right?

18         **A.**   Correct.

19         **Q.**   All right.

20              You said you've done over 500 operations in 20

21    years; is that right?

22         **A.**   Yes.

23         **Q.**   How many arrests has that resulted in?  Do you

24    know?

25         **A.**   From my observations or just being part of

1   operations?

2        **Q.**   Well, so out of the 500 operations, how many of

3   those are you in observation post?

4        **A.**   I would say 500.

5        **Q.**   Okay.  And out of those 500 where you are in

6   observation post, how many of those resulted in an arrest?

7        **A.**   You want me to try to give -- I would say close to

8   500.

9        **Q.**   Okay.  It's just about every time it sounds like;

10  is that right?

11       **A.**   Just about.  There are times when I call out

12  observations and there's -- my observations were not proven

13  to be illegal.

14       **Q.**   Like in this case if they open up the bag and

15  there's nothing in it, it wouldn't have amounted to

16  anything.

17       **A.**   Correct.  There have been instances -- giving just

18  an example -- instances where I seen a hand-to-hand exchange

19  and it turned out to be a signaling or something like that.

20       **Q.**   Got you.  Okay.

21            And essentially, all of those, you know,

22  approximately 500 arrests where you were in observation

23  post, involve a show-up identification similar to here.

24  Correct?

25       **A.**   Right.

1    **Q.**   Have you ever been involved in a show up where you

2    were in the observation post and said, Nope, that's not him?

3    **A.**   Yes.

4    **Q.**   Okay.  How often does that happen?

5    **A.**   You mean a number or just --

6    **Q.**   Yeah.  Whatever you can do?

7    **A.**   That's a long time.  I would say more than 10.

8    **Q.**   More than 10?

9    **A.**   Yes.

10   **Q.**   But not a lot more than 10?

11   **A.**   It could be a lot more but that's -- at minimum.

12   **Q.**   The minimum of 10?

13   **A.**   It's hard to really say.

14   **Q.**   Okay.  So out of 500 it could be 490 times you got

15   the guy.

16   **A.**   It could be.

17   **Q.**   Okay.

18   **A.**   I don't like to mess around with numbers because I

19   am trying to be as accurate as possible.

20   **Q.**   Okay.  I mean, the operation is designed to arrest

21   people who are engaged in illegal conduct.  Right?

22   **A.**   Yes.

23   **Q.**   And it would be -- the operation would not succeed

24   if somebody engaged in some conduct you thought was illegal

25   and the person didn't get arrested?

```
 1            A.    Repeat that.

 2            Q.    It would be a failure of the operation if you

 3      observed what you thought was illegal conduct and those

 4      people were not arrested.

 5            A.    I wouldn't say failure.

 6            Q.    Is it a success?

 7            A.    If the person -- I can't understand what you are

 8      asking me.

 9            Q.    You know what, I am through.  I don't have any

10      further questions.  Thank you.

11                  THE COURT:  Mr. Ohm.

12                  MR. OHM:  Good afternoon, Your Honor.

13                        CROSS EXAMINATION

14      BY MR. OHM:

15            Q.    You said that you were out there on observation

16      post operation.  Correct?

17            A.    Correct.

18            Q.    You weren't there targeting Mr. Douglas.  Right?

19            A.    Correct.

20            Q.    The operation wasn't targeting Mr. Douglas?

21            A.    Correct.

22            Q.    It wasn't targeting Mr. Williams.  Right?

23            A.    Correct.

24            Q.    In fact, it wasn't targeting anyone individually?

25            A.    Right.
```

 1      **Q.**   You were just out there looking to see if there

 2   were any hand-to-hand transactions that the police would

 3   further want to investigate?

 4      **A.**   Yes.

 5      **Q.**   There were no complaints by neighbors calling 911

 6   saying man with the gun, man selling drugs or nothing like

 7   that?

 8      **A.**   Correct.

 9      **Q.**   This is more of a proactive thing that the

10   narcotics unit does.

11      **A.**   Correct.  Yes.

12      **Q.**   You testified that you are part of the narcotics

13   unit.  Right?

14      **A.**   Yes.

15      **Q.**   Which is a subdivision of the narcotics and

16   special investigation division?

17      **A.**   Yes, sir.

18      **Q.**   Okay.  So you are generally -- your mission is to

19   get drugs off the street; is that fair?

20      **A.**   Yes.

21      **Q.**   And that's what you were doing when you were -- on

22   April 22nd, you were doing an anti-narcotics operation.

23   Right?

24      **A.**   Yes, essentially.  I can't base it on narcotics

25   alone because we are always -- the number one priority is

295

 1    illegal firearms, which we do, people get injured and death

 2    and stuff.

 3        Q.   Right.  So if you saw a robbery in front of your

 4    eyes, you don't say, I am a narcotics officer.

 5        A.   I am not trying to limit our observations to just

 6    drugs.

 7        Q.   There is a drug recovery unit.  Right?

 8        A.   That's right.

 9        Q.   That's a separate part of the department?

10        A.   Yes.

11        Q.   Their focus is on drugs?

12        A.   Yes.

13        Q.   You are part of the drug unit.  Right?

14        A.   Yes.

15        Q.   And your focus is on drugs?

16        A.   Yes.

17        Q.   And on this day, this operation was a pretty

18    extensive operation.  Right?

19        A.   Yes.

20        Q.   It would be fair to say that there were a lot of

21    officers involved in the operation?

22        A.   Yes.

23        Q.   Okay.  How many officers were involved?

24        A.   Do you mean undercover officers or undercover

25    officers and arresting members?

1      Q.    Let's start with undercover officers.

2      A.    Undercover officers, I can best remember maybe

3    four to five.  It could have been four.  Those are the only

4    ones I can think of offhand.

5      Q.    And how many uniformed officers?

6      A.    I can think of maybe 10 to 15 uniform.  I am just

7    giving an estimate.  I am not 100% sure.

8      Q.    Okay.  And so just to be clear, when a person --

9    when an undercover says, Move in, the entire arrest team

10    goes and moves in.  Right?

11      A.    In this particular situation or are you just

12    asking about --

13      Q.    Well, let's start generally.  You don't have --

14      A.    I'm sorry.  I am not trying to be confusing.  I

15    just want to be as accurate as possible.

16      Q.    Great.

17      A.    I don't have officers assigned to me.  It is

18    generally undercover officers in the neighborhood.  Based

19    off of their observations they will say, I need arrest team

20    members to move in.

21      Q.    Okay.  And that's what happened here.  Basically,

22    the whole arrest team moved in once you gave the call to

23    move in?

24      A.    Yes.

25      Q.    Now, when you gave the call to move in, you didn't

1    know what was inside of the bag.

2         **A.**   That's correct.

3         **Q.**   You didn't know if it was contraband.

4         **A.**   No, I did not know.

5         **Q.**   You didn't know if it wasn't contraband.

6         **A.**   That's correct.

7         **Q.**   And your suspicion was based upon a hand-to-hand

8    transaction for what you thought might be money.  Right?

9         **A.**   Correct.

10        **Q.**   And you testified today that you are really not

11   sure.  You just know it was a white piece of paper.

12        **A.**   I didn't say white piece of paper.  I just said

13   white colored object.

14        **Q.**   So what you saw was a white-colored object.  You

15   didn't know what it was.

16        **A.**   Correct.  I cannot testify and tell you, yes, for

17   sure, that was U.S. currency.

18        **Q.**   You remember it was a white-colored object.

19   Right.

20        **A.**   Say again?  Are you saying white or light?  I am

21   saying light not white.  I'm sorry about that.

22        **Q.**   Do you remember seeing a light-colored object?

23        **A.**   Yes.

24        **Q.**   And sitting here today remembering the

25   light-colored object you could say definitively that you are

1   not sure what that light-colored object was?

2       **A.**   Correct.  I cannot tell you that I am 100% sure it

3   was U.S. currency.

4       **Q.**   Well, I don't want to say -- the two choices are

5   100% or 0%.  It sounds like you are saying that you really

6   don't know what it was.

7       **A.**   That's correct.  I just can't say.

8       **Q.**   Okay.  So you are not 80% sure?

9       **A.**   I can't say.

10      **Q.**   You just can't say one way or the other.

11      **A.**   I can't say; that's correct.

12      **Q.**   Now, when you're sitting there in your police car

13  making these observations, all of these other arrest team

14  individuals, they are waiting for you to make -- tell them

15  whether they should make a move or not.  Right?

16      **A.**   Yes.

17      **Q.**   And you are -- one of the most important things is

18  to make sure you are getting a good look at what is going

19  on.  Right?

20      **A.**   Yes.

21      **Q.**   So you are not on the side of the street on 1500

22  that -- of what you are observing, you are across the

23  street; is that fair?

24      **A.**   Right.

25      **Q.**   You are parallel parked?

1      **A.**   Yes.

2      **Q.**   Is it fair to say that across the street there are

3   other cars that are parallel parked?

4      **A.**   Yes.

5      **Q.**   And it looked like from Government's Exhibit 2

6   that at least part of your vision would be blocked by some

7   of the cars; is that fair?

8      **A.**   Which exhibit?

9           MR. OHM:  Your Honor, I am showing the witness

10   Government's Exhibit 2, which was previously admitted.

11   There is a zoom button somewhere.

12           CLERK:  On the screen, the little button.

13           MR. WASSERMAN:  Is that our exhibit or something

14   that --

15           MR. OHM:  It's my copy of the defendant's exhibit.

16           THE COURT:  Why don't we use, so the record is

17   clean, the exhibit that was, in fact, admitted.

18           MR. OHM:  In terms of touching, Your Honor.

19           THE COURT:  Oh, that's fair.  Do you have any

20   reason to believe that the photograph is in any way

21   different than the Government's?

22           MR. WASSERMAN:  No, Your Honor.  It is in the

23   plastic sleeve because it is distorted.

24           THE COURT:  Remove it from the --

25           MR. WASSERMAN:  It appears to be the same shot.

1          THE COURT:  Mr. Marston?

2          MR. MARSTON:  I just would note, I think

3    Government's Exhibit 2 as it was admitted has a marking on

4    it with a green marker, which to the extent that makes a

5    difference, but I think it was just a circled car.

6          THE COURT:  It was a circled car on the right-hand

7    side.  I think because of concerns about different people

8    touching exhibits, we will just go ahead with this version,

9    Mr. Ohm.  Thank you, Mr. Marston.

10          MR. WASSERMAN:  Should we mark it as Defendant

11    Douglas' Exhibit 1?

12          THE COURT:  Sure.

13          MR. OHM:  I will mark this as Defendant's Exhibit

14    D, Douglas, 1 which is also Government's Exhibit 2.

15    **BY MR. OHM:**

16      **Q.**   Do you see that, Officer?

17      **A.**   Yes, sir.

18      **Q.**   As Mr. Marston was saying, there is a black sedan

19    on the other side of the street that you marked with a green

20    marker earlier.  Right?

21      **A.**   Correct.

22      **Q.**   And that is where my pen is now; is that right?

23      **A.**   Yes, sir.

24      **Q.**   I will mark a circle around it.  And that's where

25    you are.  Right?

1      **A.**   Yes.

2      **Q.**   You are positioned in the driver's side of that

3   vehicle?

4      **A.**   Yes, sir.

5      **Q.**   The front, driver's side?

6      **A.**   Yes, front, driver's side, yes.

7      **Q.**   Now, you, in terms of where the walkway is, the

8   walkway is a little bit to the left of the center of the

9   exhibit.  Right?

10     **A.**   Yes.

11     **Q.**   Between your line of sight and where the walkway

12   is, there is at least one SUV, a white SUV.  Do you see

13   that?

14     **A.**   Yes, sir.

15     **Q.**   Is it fair to say that that, under certain

16   circumstances, that that might block your vision?

17     **A.**   That's correct, yes, sir.

18     **Q.**   And you also see the big tree in the middle.

19   Right?

20     **A.**   Correct.

21     **Q.**   And that's to the right of the exhibit right -- if

22   you are looking at it, in front of the SUV.  Right?

23     **A.**   Yes, sir.

24     **Q.**   It's sort of in your line of vision too.

25     **A.**   Correct.

1      **Q.**   And the activity you are looking at is on this

2   wall.  Right?

3      **A.**   Correct.

4      **Q.**   I think you previously said that it was around

5   where the building begins or ends; is that fair?

6      **A.**   Yes.

7      **Q.**   Okay.  So I am going to mark that here also.

8      **A.**   Are you saying the exchange?  Which part?

9      **Q.**   Yeah.  The people coming together.

10      **A.**   I wouldn't say right there.

11      **Q.**   I'm sorry.  Where would you say?

12      **A.**   Let's go about -- down, come down, no, about right

13   where that shadow is.

14      **Q.**   Right here?

15      **A.**   Yeah.  About here.

16      **Q.**   I will draw an X where my original marking is and

17   I will say the exchange is at the circle where the shadow

18   is.  Is that a fair depiction of where it was?

19      **A.**   Let me make sure.  I am not trying to be

20   difficult, I am trying to be as accurate as possible.

21          I would say that's fair.

22      **Q.**   Okay.  You are looking at this part from your car,

23   the black car where the first circle is.  Right?

24      **A.**   Yes.

25      **Q.**   And I think you were testifying earlier that

1    you're essentially -- for Mr. Douglas, you are seeing his

2    back?

3        **A.**   Yes.

4        **Q.**   And sort of his right side; is that right?

5        **A.**   Correct.

6        **Q.**   Okay.  So is it fair to say that you could not see

7    his face at that point?

8        **A.**   That's correct.

9        **Q.**   I think you also testified when you identified,

10    when you did the drive-by identification, that you weren't

11    identifying a face.  You were identifying clothes.

12        **A.**   Yes.

13        **Q.**   Because you never really got a good look at the

14    faces.  Correct?

15        **A.**   I got a good look at the face, but I didn't base

16    my identification process on the face alone.  I based it on

17    the article of clothing.

18        **Q.**   Well, it's a little bit different than what you

19    said a little bit ago.

20        **A.**   Okay.

21        **Q.**   You said you identified them based on the clothes.

22    Right?

23        **A.**   Correct.

24        **Q.**   Not the face.  Right?

25        **A.**   No, you were asking -- I could have been confused,

 1    but I am not saying that I didn't see his face.  I did see

 2    his face.  I just didn't base my identification process on

 3    that alone.

 4         **Q.**   Sure.

 5         **A.**   I based my identification process on the clothing.

 6    I did see his face.  I just didn't base the identification

 7    process on that.

 8         **Q.**   Let me just be clear.  You testified that you

 9    noticed a man in blue because he was standing there in the

10    walkway.  Right?

11         **A.**   Correct.

12         **Q.**   He wasn't really doing anything, and he was

13    standing with his back towards you.  Right?

14         **A.**   At which point?  During the exchange or just

15    during my observations?

16         **Q.**   During your observations.

17         **A.**   No, he wasn't standing with his back towards me

18    the whole entire time.  To the best of my recollection,

19    probably just walking back and forth, but that is the best I

20    can describe it.

21         **Q.**   So when you say "best of your recollection" and

22    "probably" it makes it seem like you are putting pieces

23    together.  It's important to know what you actually remember

24    seeing versus what you are sort of inferring.

25              MR. WASSERMAN:  Your Honor, I would object.

1      Leading, Your Honor.

2              THE COURT:  Sustained.

3      **BY MR. OHM:**

4          **Q.**  Do you remember seeing him walking back and forth?

5          **A.**  Yes.

6          **Q.**  Could you describe that for us, because I don't

7      remember you saying that.

8          **A.**   I am talking about prior to the exchange, and

9      that's just walking back and forth; that's the best I can

10     describe it.

11         **Q.**  Okay.  Is it fair to say, though, that you weren't

12     focused on the man in blue at that point?

13         **A.**   That is correct.  That's why it may come off like

14     I am being uncertain, but I wasn't completely focused on the

15     man in blue at the time.  But to the best of my

16     recollection, I do remember some walking back and forth, but

17     that is about it.

18         **Q.**  So you now remember you saw a face during that

19     time when you were sitting in the black car and seeing a man

20     walk back and forth?

21         **A.**  A face?

22         **Q.**  A face.

23         **A.**  Yeah.  Yes.  Yes.

24         **Q.**  Okay.  But on direct examination you were saying

25     that when you did the actual identification part, you were

306

 1     over by the mouth of the parking lot and your identification

 2     was just based on clothing?

 3          **A.**   Correct.  Right.

 4          **Q.**   Okay.

 5               When you made the identification, the person you

 6     identified was surrounded by police officers; is that fair?

 7          **A.**   Can you move your notes on the projector?

 8          **Q.**   You will get a preview of my questions.

 9          **A.**   I don't want a cheat code.

10          **Q.**   I forgot my question.  So you had -- officers were

11     surrounding the person in blue at the time of the

12     identification.  Right?

13          **A.**   Yes.

14          **Q.**   Was the person handcuffed?

15          **A.**   Yes.

16          **Q.**   Was he still wearing the blue jacket?

17          **A.**   Yes.

18          **Q.**   Were there also police cars there?

19          **A.**   Yes.

20          **Q.**   How many officers would you say were there?

21          **A.**   Off hand, like I said, maybe four to five.

22          **Q.**   Okay.  And while they were arresting him, you were

23     listening.  Right?  You were on the radio with the arrest

24     team.  Right?

25          **A.**   Yes.

```
 1          Q.   You could hear them arresting him, essentially.
 2    Right?
 3          A.   Yes.
 4          Q.   Okay.
 5          A.   I'm sorry.  I am not trying to be difficult.  I
 6    could hear that they had stopped him.  At that point he
 7    wasn't arrested.  Is that what you were asking.  Or was he
 8    under arrest?
 9          Q.   Did you hear them moving in on the person you
10    described?
11          A.   Yes.  Correct.  He wasn't under arrest at that
12    point.
13          Q.   That's a legal conclusion; is that fair?
14          A.   Yes.
15               THE COURT:  You did use that term yourself.
16               MR. OHM:  That's true.  That's also fair.
17               THE WITNESS:  And I'm trying to be clear, Mr. Ohm.
18    BY MR. OHM:
19          Q.   At the time he was in handcuffs, let's put it that
20    way.
21          A.   Okay.
22          Q.   From the time you put out the lookout and the time
23    the arresting team went to put him in handcuffs, you were in
24    communication with them.  Right?
25          A.   Correct.
```

308

1      Q.   You were also in communication from the time that

2   they had him in handcuffs to the time they brought him to

3   the parking lot.  Right?

4      A.   Correct.

5      Q.   All right.

6           So you knew you were looking at the person that

7   the officers had stopped after you gave your direction?

8      A.   Can you repeat that question?

9      Q.   You knew the person that was being presented to

10  you, the person in blue, was the person that the officers

11  had stopped after you gave the direction to move in?

12     A.   No.  And the only reason why I am trying to

13  clarify is essentially he went out of my sight and I did not

14  see him being stopped.  I kept continually asking, Do you

15  have him stopped?

16     Q.   Okay.

17     A.   I don't know if that clarifies anything.  I did

18  continually ask, Do you have the blue coat stopped?  Because

19  I didn't see him being stopped.  It wasn't until I came

20  around, that's when I saw him stopped.

21     Q.   Okay.  When you asked that question, they said,

22  Yes.  Right?

23     A.   To my recollection, yes.

24     Q.   So you didn't see --

25     A.   I did not see the stop.

1    Q.   You did get confirmation from them that they were

2    stopping the person you directed them to stop?

3    A.   Correct.  Yes.

4    Q.   Okay.  Now in terms of the things that you

5    observed from your driver's seat, were you able to describe

6    the bag?

7    A.   All I remember was a dark-colored bag; that was

8    it.

9    Q.   From where you were sitting, you couldn't see the

10   colors of the bag other than the fact it was dark?

11   A.   Yeah.  At the time I could see what color it was

12   but right now as I am telling you I cannot remember what

13   color it was.

14   Q.   Okay.  And then I think that you had -- how would

15   you describe, if you could, the action and motions of the

16   individual putting the bag on?

17   A.   Sure.  After receiving that book bag, he quickly

18   took off his jacket; I can't remember what he did with the

19   jacket.  He put the book bag on his shoulders as he wore a

20   book bag regularly and put his jacket over top of that.

21   Q.   Okay.  So when you say "quickly", are you saying

22   that as soon as he got the bag he took off his jacket or are

23   you describing some action where the actual taking off of

24   his jacket?

25   A.   Repeat that question.

1    **Q.**   Okay.  You used the adverb quickly for taking off

2    the jacket.

3    **A.**   Right.  I am only referring that to his action the

4    way it appeared while he was taking -- it looked like -- he

5    wasn't taking it off slowly.  It was hurrying it up and

6    taking it off and putting the book bag on.  When I say

7    quickly, I am describing that action.

8    **Q.**   So you're saying that the whole thing was sort of

9    -- he did it as quick as possible?

10   **A.**   Not Incredible Hulk, tearing clothes off, but the

11   motion I am trying to best describe -- and I'm sorry if I am

12   being confusing but I can tell you, I remember him taking

13   his jacket off in a quick motion and putting the book bag on

14   in a quick motion; that's the best I can describe it.

15   **Q.**   The quick part is taking the jacket off?

16   **A.**   Yes.

17   **Q.**   Not the putting it back on?

18   **A.**   I would say that would be a quick part too.

19   **Q.**   And putting the jacket back on?

20   **A.**   Hurrying up taking the jacket off and hurrying up

21   putting the jacket on.

22   **Q.**   So you have a very clear memory of this?

23   **A.**   Yes.

24   **Q.**   So where was the jacket?

25   **A.**   I don't know.  That's what I am trying to tell

1    you.  I don't know where the jacket was.  I just remember

2    him taking the jacket off, putting the book bag on, and

3    putting the jacket back on.  I don't know if it was in his

4    hands or between his legs.  I don't remember.

5        Q.    Now, you testified about your general practice as

6    undercover.  You are looking for things that seem like they

7    are secretive or whatever.

8        A.    Correct.

9        Q.    That might include if I went and talked to

10   Mr. Marston and said something to him, that might be

11   something you would consider secretive?

12       A.    Correct.

13       Q.    One of the things that you look for is the

14   transaction of hand-to-hand and the parties just dispersed

15   or separate.  Right?

16       A.    At which point?

17       Q.    For example, in the hand-to-hand drug transaction,

18   and you've been doing it for 20 years so you've seen a long

19   history of hand-to-hands.

20       A.    Yes.

21       Q.    Somebody could come, do a hand-to-hand, receive

22   something.  The buyer leaves.  The seller stays.  That's

23   pretty typical?

24       A.    Right.

25       Q.    The buyer and seller are not just going to hang

1   out.

2        **A.**   Right.

3        **Q.**   And in your -- in this situation it sounds like

4   what you are saying is, the transaction that you observed,

5   you are assuming that it was a sale.  Right?

6        **A.**   It appeared.

7        **Q.**   It's an assumption.  Right?

8        **A.**   Right.

9        **Q.**   You don't know if there was money.

10       **A.**   That's correct.

11       **Q.**   And you didn't hear anything between them.  Right?

12       **A.**   That's correct.

13       **Q.**   Oftentimes a buyer will look and inspect a

14   product.  Right?

15       **A.**   Correct.

16       **Q.**   You didn't see any inspecting of a product.

17   Right?

18       **A.**   No, I did not.

19       **Q.**   You didn't see anything like that.  Right?

20       **A.**   No.

21       **Q.**   You didn't see the person in blue do anything to

22   indicate that they were getting something or that they were

23   purchasing something and they wanted to know what it was.

24   Right?

25       **A.**   Are you indicating as far as him looking into the

```
 1    bag after the receipt?

 2         Q.   No looking into the bag.  Right?

 3         A.   Say again.

 4         Q.   There was no looking into the bag?

 5         A.   Correct.

 6         Q.   There was no feeling of the bag?

 7         A.   Correct.

 8         Q.   And there was no other interactions between these

 9    two people other than the handing over of the bag and some

10    sort of handshake.

11         A.   Correct.

12         Q.   And that handshake you think had included some

13    sort of light-colored material in the exchange.

14         A.   Correct.

15         Q.   You said "object" today.  I just want to be clear.

16    You are not saying you could tell it was paper.

17         A.   That's correct.

18         Q.   You mentioned the words "probable cause" on

19    direct.  Right?

20         A.   Correct.

21         Q.   And probable cause is probable cause to arrest

22    somebody.  Right?

23              MR. WASSERMAN:  Objection.

24              THE COURT:  What is the question?

25              MR. OHM:  When you say it is probable cause to
```

 1    arrest somebody.

 2              THE COURT:  What is the reason for this question?

 3              MR. OHM:  I want to go to the importance of money

 4    in the assessment that the officers would have.

 5              THE COURT:  I'll allow the question, Mr. Ohm.

 6    **BY MR. OHM:**

 7         Q.   Probable cause to arrest is what you are referring

 8    to.  Right?

 9         A.   Yes.

10         Q.   When you have an exchange of money, that is

11    exactly what you are looking for.  Right?

12         A.   Say again.

13         Q.   When you are observing an exchange of an object

14    for money, that is what you are looking for.  Right?

15         A.   Correct.

16         Q.   And especially if they are acting in other ways

17    like going to a stash location, that would indicate to you

18    that it was contraband.  Right?

19         A.   Correct.

20         Q.   If I gave Mr. Marston a bag and I shook his hand,

21    that wouldn't be illegal?

22         A.   Wouldn't be what?

23         Q.   That wouldn't be illegal.  Right?

24              MR. WASSERMAN:  Objection.  Relevance.

25              THE COURT:  Sustained.

**BY MR. OHM:**

    **Q.**   Okay.  So you had testified both on direct on Mr. Marston's questions that you believed that the individual in gray jumped the fence.  Right?

    **A.**   He could have.  I didn't see that part.

    **Q.**   Okay.  So you don't know one way or another?

    **A.**   I cannot testify to you that he hopped the fence.

    **Q.**   Okay.  Because you weren't focusing on him at that point in time or because he wasn't in your line of sight?

    **A.**   Which defendant?

    **Q.**   The grey.

    **A.**   That's correct.  I wasn't focusing on that part. I was trying to get my lookout out and get the arrest team members to get them stopped.

    **Q.**   Was he in your line of sight?

    **A.**   Which part?

    **Q.**   The part -- so you saw him on the other side of the fence at one point?

    **A.**   Right.  In my sight.

    **Q.**   Later on you say you saw him on the other side of the fence?

    **A.**   Yes.  At some point he was in my line of sight in the walkway.

    **Q.**   Did you lose sight of him though between those two times or is it just that you can't remember whether you saw

1    him jump the fence?

2        **A.**   I just cannot remember.

3        **Q.**   So you didn't lose sight?

4        **A.**   I can't say that I lost sight.  I am not trying to

5    be difficult.  I just can't remember that part.

6        **Q.**   Sure.  But you are watching this transaction,

7    Right, and as a drug undercover, you are looking at both the

8    buyer and the seller all of the time.  Right?

9        **A.**   Correct.

10       **Q.**   You are not just focusing on one individual.

11   Right?

12       **A.**   Correct.

13       **Q.**   And so you see the buyer and you are saying you

14   are focused on him and the guy in the gray is the seller in

15   your perspective, then are you continuing to watch both the

16   blue and the gray, the buyer and the seller?

17       **A.**   Trying to, yes.

18       **Q.**   When you say that you don't know if he jumped the

19   fence or not, are you saying that you lost sight of the guy

20   in gray or are you saying you just don't remember?

21       **A.**   I am telling you, I just don't remember.

22       **Q.**   Okay.  You don't know if you lost sight of him or

23   not?

24           MR. WASSERMAN:  Objection.  Asked and answered.

25           THE COURT:  Yes.  Sustained.

1   BY MR. OHM:

2       Q.   Then you watch -- at one point do you decide to

3   leave to drive around to Montana?

4       A.   I think when I saw sufficient arresting members in

5   the block, I just drove off because I wanted to make sure

6   that they had Mr. Douglas stopped.  At some point they did

7   indicate that they had him stopped, and I wanted to come

8   around just to make sure of that.

9       Q.   Okay.  And did you see Mr. Douglas get stopped?

10      A.   Getting stopped or was he already stopped?

11      Q.   Did you see him stopped?

12      A.   I saw him stopped.

13      Q.   But you didn't see him getting stopped?

14      A.   I did not see him getting stopped.

15      Q.   And you said you didn't see Mr. Williams getting

16  stopped?

17      A.   That's correct.

18      Q.   But you saw the officers move in upon your

19  command?

20      A.   Correct.

21      Q.   And after that point, when you saw enough officers

22  move in, that's when you decided to go?

23      A.   I am not trying to be difficult.  It's just the

24  officers moving in was not my factor to leave.

25      Q.   I thought you just said you wanted to make sure

1    that Mr. Douglas was stopped and so you waited for all of --

2    enough officers to move in and that's when you left.

3       **A.**   Correct.  I just left.

4       **Q.**   Okay.  So it seemed like the main factor in your

5    decision to leave was after you were making sure that there

6    were enough officers where you were confident that Mr.

7    Douglas was stopped.

8       **A.**   Ask that again.

9       **Q.**   It sounds like you were waiting to leave until

10   after you were sure there were enough officers moving in so

11   you could be confident that Mr. Douglas would be stopped?

12      **A.**   Correct.

13      **Q.**   Okay.

14          So you didn't leave though until a bunch of

15   officers came in is what I am trying to say?

16      **A.**   Correct.

17      **Q.**   Okay.  I wanted to -- if we could go to --

18          MR. OHM:  I will mark this as Defense Douglas' 2,

19   Government's Exhibit 5, the Andrew Stout camera that you

20   previously identified.

21          CLERK:  Mr. Ohm, is this on your laptop?

22   **BY MR. OHM:**

23      **Q.**   Okay.  So this is the footage you watched earlier

24   on direct examination, from Officer Stout.  Right?

25      **A.**   Correct.

 1        Q.   Here you see the individuals in the walkway.

 2   Right?

 3        A.   Correct.

 4        Q.   I am at 2:16 now.  Going back to 2:18.  Here you

 5   see different members of the arrest team moving in.

 6        A.   Correct.

 7        Q.   So at 2:19 on the right hand of the exhibit you

 8   see one officer.  Right?

 9        A.   Yes.

10        Q.   And then you see a -- is that a police car, the

11   silver car --

12        A.   Yes.

13        Q.   -- at 2:19 in the middle of the exhibit and there

14   is a second officer there.  Correct?

15        A.   Right.

16        Q.   Here at 2:21 is a third officer.  Right?

17             THE COURT:  Let's be clear that when you are

18   talking about 2:19 and 2:21, you are talking about the time

19   in the file, not the time posted in the upper right-hand

20   corner.

21             MR. OHM:  Yes, Your Honor.  I apologize.  Is it

22   better for the record if I switch to the upper right-hand

23   corner?

24             THE COURT:  That's probably the clearest way to

25   proceed.

1              MR. OHM:  Okay.

2      **BY MR. OHM:**

3          Q.   I am at 19:02:42 is the time in the upper

4      right-hand corner.

5              (Played video.)

6              Okay.  So at 19:02:49 you see the two officers and

7      the one unmarked police car.  Right?

8          A.   Yes, sir.

9          Q.   Are there any other police cars here?

10         A.   So far I just see one.

11         Q.   Okay.  At 19:02:51 is when another officer

12     arrives.  Correct?

13         A.   That's correct.

14         Q.   And Officer Stout is in uniform also.  Is that

15     fair?

16         A.   Yes.

17         Q.   Is that one of the officers that we see in

18     19:03:03?  Is that one we already saw or a different one?

19         A.   I believe it is one we already saw.

20         Q.    Is this Mr. Williams on the left-hand side of the

21     exhibit at 19:03:03?

22         A.   Yes.

23         Q.   He is in full view of the officers.  Correct?

24         A.   Of the officers, yes.

25              (Played video.)

1     Q.   If you look in the background, did you see the
2     squad car drive by in 19:03:03?
3     A.   Yes.
4     Q.   You see your car behind it.  Right?
5     A.   Right.  Right next to it.
6     Q.   It's fair to say that Mr. Williams was in the
7     presence of officers at the time that you left.
8     A.   I couldn't see that far.  I couldn't see those
9     officers walking past Mr. Williams.
10    Q.   Okay.  Well, it's fair to say that the officers
11    walked by Mr. Williams while you were still there.
12    A.   Yes.
13    Q.   Okay.  And after the exchange, how much longer did
14    you see the two individuals?
15    A.   Um, maybe -- after the exchange.  Right?
16    Q.   Yeah.
17    A.   No more than a minute, maybe 20 to 30 seconds.
18    Q.   And in those 20 to 30 seconds, they didn't
19    separate.  Right?
20    A.   At the time I saw them.  Correct.
21    Q.   They stayed together.
22    A.   Yes, at the time I saw them.
23    Q.   Which is different than you often see with a
24    buyer/seller situation.  Right?
25    A.   Correct.

1     Q.   I just wanted to clarify one point.  Did the

2     exchange, the hand-to-hand transfer of the light-colored

3     object, did that happen before or after the backpack was

4     given?

5         A.   After.

6         Q.   Okay.  And did it happen before or after the

7     backpack was put on?

8         A.   It was before the backpack was put on.

9         Q.   Okay.  So you are saying that the backpack is

10    handed over, the jacket is taken off and then the money is

11    exchanged and then backpack is put on?

12        A.   No.

13        Q.   Why don't you break it down.

14        A.   The backpack is given, the exchange, and then the

15    taking off of the jacket and putting it back on.

16        Q.   So the backpack is given, the money is given and

17    then the exchange?

18        A.   Yes.

19        Q.   Okay.  And was it almost like right after is when

20    the backpack was given and the money -- or not the money,

21    when the light-colored object was given?

22        A.   Correct.

23        Q.   Is it simultaneous or is it --

24        A.   Which part was simultaneous?

25        Q.   The backpack and then the hand-to-hand where the

1      light-colored object was given?

2          **A.**    It was quick like that so simultaneously, yeah.

3      The backpack was given, hand-to-hand and then the jacket --

4          **Q.**    The next instant the hand-to-hand?

5          **A.**    Yes.

6          **Q.**    And this is the part where the man in blue is --

7      his back is facing you.  Right?

8          **A.**    That's correct.

9          **Q.**    And I think you had said that the man in gray was

10     sort of -- well, I will just ask you.  Where was the man in

11     gray?

12         **A.**    The man in gray, I could see the left portion of

13     his body.  I could see more dominant -- I could see.  Keep

14     going.  Right there -- that portion of the body.

15         **Q.**    So a little bit of the front but not the whole

16     right side?

17         **A.**    Yeah.

18         **Q.**    You had testified that the fifth district has the

19     most drug use; is that what you said?

20         **A.**    No, sir.

21         **Q.**    What did you say?

22         **A.**    I was asked if I had observed and I am just trying

23     to think if drug sales took place more than usual in first

24     district, second district, third district and fourth

25     district.  And I said I observed more drug sales taking

1    place in the fifth district versus those other four

2    districts.

3         Q.   I see.  How often -- in the last five years or so,

4    how often did you work in the first district?

5         A.   The first district?

6         Q.   Yeah.

7         A.   Do you want a rough number?

8         Q.   Sure.

9         A.   I would say maybe close to 100.

10        Q.   And what about the second district?

11        A.   The second district I can think of offhand no more

12   than five.

13        Q.   So less than five times?

14        A.   Let me double check.  Let me think.  I am basing

15   this off of some investigations and drug complaints that we

16   had.  No more than 10.

17        Q.   What about the third district?

18        A.   The third district we have been there quite

19   frequently as well.  I would say maybe about 100 times.

20        Q.   What about the fourth district?

21        A.   The fourth district probably the same, close to

22   100.

23        Q.   What about the fifth district?

24        A.   The fifth?

25        Q.   Yeah.

1          A.    Um, more than those districts I just described.

2     It's hard to give you an accurate number.

3          Q.    A couple hundred?

4          A.    Yeah, a couple hundred.

5               MR. WASSERMAN:  I'm sorry.  I didn't catch the

6     question.

7               MR. OHM:  A couple hundred?

8               MR. WASSERMAN:  What was the question before that?

9               MR. OHM:  How many times from the fifth district?

10               MR. WASSERMAN:  Okay.

11     **BY MR. OHM:**

12          Q.    To be clear because I wasn't sure you are saying

13     your understanding of where drugs are sold the most is based

14     upon your observations and experience as an undercover

15     officer.  Right?

16          A.    And drug complaints.

17          Q.    Drug complaints.

18          A.    Yes.

19          Q.    Okay.  Okay.

20               You had testified that at the time of the exchange

21     that there may have been other individuals who were around

22     the person in the blue and the person in orange?

23          A.    Correct.

24          Q.    How many?

25          A.    I can remember maybe two walking.

 1       **Q.**   So there were two other people right there?

 2       **A.**   Possibly.  I can't actually say that it was two

 3    but possibly.

 4       **Q.**   When you say you can't say it was two, do you mean

 5    it could be more or it could be less or it could be zero?

 6       **A.**   It's definitely not zero.  It could be more or

 7    less.  I just can't give you an exact number.

 8       **Q.**   Okay.  And what was the gender of those other

 9    people?

10       **A.**   Males.

11       **Q.**   They were males?

12       **A.**   At the time, yes.  I didn't mean to cut you off.

13    Are you asking at the time of the exchange or between the

14    time I was there for 10 or 15 minutes.

15       **Q.**   At the time of the exchange.

16       **A.**   At the time of the exchange, I would say maybe one

17    or two and those are males.

18       **Q.**   And could you tell us what -- the first person

19    that you remember, what did that person look like?

20       **A.**   I don't remember.

21       **Q.**   What was the race of that person?

22       **A.**   Black male.

23       **Q.**   Any idea what their clothing was?

24       **A.**   I do not.

25       **Q.**   Tall?  Short?

1      **A.**   I can't tell.

2      **Q.**   Heavy or skinny?

3      **A.**   I cannot testify to that.

4      **Q.**   Okay.  With the same -- so there's a second male

5   that you may or may not have seen?

6      **A.**   Yes.  And I'm only basing it off of what I saw

7   earlier from the individual with the black coat and fur on

8   it.  I can't even tell you -- that refreshed my recollection

9   at the time of seeing the video.  So I can't tell you --

10  what I am trying to say is I can't --

11     **Q.**   Okay.  In terms of your refreshed recollection

12  about the person with the black coat and fur, what did you

13  see that person doing?

14     **A.**   I cannot tell you that.  I can only reflect my

15  recollection that I saw that individual.  I cannot remember

16  specific details.

17     **Q.**   Okay.  But there was something that was triggered

18  in your memory that made you think that person was part of

19  the group?

20     **A.**   He could have been out there, yes.

21     **Q.**   Okay.  How many people were out there?  Were there

22  a lot?

23     **A.**   In the walkway or just in --

24     **Q.**   The whole complex.

25     **A.**   There were --

1            MR. WASSERMAN:  Objection.  Relevance.  The whole

2    complex?

3            MR. OHM:  That part he can see.

4            THE COURT:  Rephrase the question.

5    **BY MR. OHM:**

6       **Q.**   How many people did you see out there?

7       **A.**   I can only testify to the group of individuals

8    that were to the right of me, which was right by the

9    recreational center, and the ones I just previously brought

10   up, maybe two to three individuals, one or two individuals.

11   So this group on the right side of me by the recreational

12   center, I would say maybe six to eight.

13      **Q.**   Okay.  And did you see all of those individuals

14   interacting with each other?

15      **A.**   They were just standing around each other and just

16   interacting amongst each other.

17      **Q.**   And are you saying with certainty that nobody else

18   interacted with the person in gray?

19      **A.**   Which?

20      **Q.**   Did you see anyone else interact with the person

21   in gray, come to arms length with the person in gray?

22      **A.**   During the exchange or just in general?

23      **Q.**   In general.

24      **A.**   I can't say for certain.

25      **Q.**   Okay.  How about during the exchange?

 1        A.   Ask the question again.

 2        Q.   During the exchange, did you see anybody else

 3   within arm's length of the person in gray?

 4        A.   No.  I'm sorry.

 5        Q.   During the exchange did you any person within

 6   arm's length of the person in blue?

 7        A.   No.  The only person I saw was the individual in

 8   gray and the individual in blue within arm's length of each

 9   other.

10        Q.   Where was the third person?

11        A.   I cannot tell you that.

12        Q.   You just know a person was there?

13        A.   I just know a person was there.

14        Q.   Okay.  Oh, why didn't you have binoculars?

15        A.   For one, I was in the undercover vehicle, which

16   does not have tinted windows.  I was within some feet from a

17   group of individuals where we were watching not only those

18   but individuals -- so I cannot -- I am trying to blend in as

19   an undercover officer.  So I cannot keep putting up

20   binoculars.  It would be very obvious that I am undercover.

21        Q.   Do you typically not use binoculars?

22        A.   I typically don't.

23        Q.   Okay.  And then -- oh, there were some questions

24   about training.  I just want to clarify some things.  You

25   said you had training in the academy, on-the-job training,

1    and I think you said you had something twice a year?

2         A.   Yes, PDT, which I cannot think what the acronym

3    is.  Training done at the academy.  It is a refresher

4    course.  We go over certain subjects, refresh our training

5    on certain things like firearms.

6         Q.   Is it something that all of the officers do?

7         A.   Yes.

8         Q.   Okay.  So in terms of specialized training as an

9    undercover narcotics officer, what kind of training do you

10   have?

11        A.   On a yearly basis, nothing as far as on a yearly

12   basis for drug op.  The only other thing is probably just

13   search warrant training.

14        Q.   So when is the last time you had undercover

15   narcotics training?

16        A.   Um, I would say maybe 10 years ago.

17        Q.   Okay.

18             MR. OHM:  Your Honor, that is all I have.

19             THE COURT:  Mr. Wasserman, would you wish to do

20   redirect?

21             MR. WASSERMAN:  We do, Your Honor.

22                    **REDIRECT EXAMINATION**

23   **BY MR. WASSERMAN:**

24        Q.   Good afternoon, Officer Jackson.

25        A.   Good afternoon.

1    **Q.**   You were asked about the hand-to-hand exchange

2    that you observed.  And specifically related to the object

3    that Mr. Douglas handed Mr. Williams, what did you believe

4    that to be at the time?

5        **A.**   U.S. currency.

6        **Q.**   And in your training and experience, is that the

7    only thing of value that might ever be transferred between

8    two people that might be for contraband?  Is there ever

9    transfer of drugs for firearms, in your experience?

10       **A.**   Not in my experience.  I am not saying that it

11   can't happen but in my experience, U.S. currency will be

12   more often used.

13       **Q.**   I'm sorry.  What?

14       **A.**   In my experience, U.S. currency will be more often

15   used.

16       **Q.**   And based upon your observations, is that what you

17   believe you were seeing?

18       **A.**   Yes.

19       **Q.**   Okay.  With respect to your observations of the

20   actual exchange of the backpack, you were shown a map --

21   excuse me, a photograph that showed where your vehicle was

22   in relation to other vehicles.  Do you recall seeing that?

23       **A.**   Yes.

24       **Q.**   All right.  Was there anything -- any of those

25   things, cars, trees, bushes, that obstructed your view of

1    the exchange between Mr. Williams and Mr. Douglas?

2        **A.**    No.

3        **Q.**    You were -- I want to ask you a little bit about

4    the radio run and just to make sure that we are clear on the

5    course of your description.  So if I can, and just to be

6    clear, Mr. Marston said a certain amount of time passed when

7    you first gave the lookout and when you mentioned the orange

8    hood.  Do you recall that?

9        **A.**    Yes.

10        **Q.**    All right.  So if I can go ahead and play

11    Government's Exhibit No. 3, at the 6 minute mark, it is

12    6:29.

13            THE COURT:  Before you play that, does this audio

14    file have a time stamp associated with the time of day?

15            MR. WASSERMAN:  No, it doesn't.  Since it's a -- I

16    don't know if we can call it a tack channel, it doesn't have

17    a dispatch, sometimes it will give a timing stamp or marker

18    on the transmissions.

19            THE COURT:  Okay.

20            MR. WASSERMAN:  If you can play from the

21    six-minute marker.

22            (Played video.)

23    **BY MR. WASSERMAN:**

24        **Q.**    Officer Jackson, was that your initial lookout?

25        **A.**    Yes.

1    Q.   So primarily focused on the individual in the blue

2    coat?

3    A.   Yes.

4    Q.   And why were you particularly focused on the

5    individual in the blue coat at that point?

6    A.   Because I knew he was in possession of the book

7    bag.

8    Q.   All right.  And what did you -- is that -- is the

9    book bag what you suspected may have contained contraband?

10    A.   Yes.

11    Q.   I am going to go ahead and ask you to play from

12    6:29 to 7:08 of Exhibit 3.

13         (Played audio.)

14         Officer Jackson, was that the second part of your

15    lookout?

16    A.   Yes.

17    Q.   The next transmission you made that had a lookout?

18    A.   Yes.

19    Q.   All right.  And in that lookout, did you

20    supplement your description of what was later identified as

21    Mr. Williams with puffy hair or puffy or messy hair?

22    A.   Yes.

23    Q.   And since we started about the six-minute mark and

24    that transmission ended about 7:08, is it about a minute or

25    so from the first -- from the time you first gave -- started

334

1      to give the first lookout?

2            **A.**   Yes.

3            **Q.**   Now, I am going to ask to play from 7:28 of the

4      recording to 7:39, Exhibit 3.

5                  (Played audio.)

6                  So is this the third transmission you had that

7      included the lookout for the two individuals?

8            **A.**   Yes.

9            **Q.**   And in this particular transmission, is this the

10     first point in which you mentioned the orange hood as it

11     related to Mr. Williams?

12           **A.**   Correct.

13           **Q.**   All right.  That was approximately about a minute

14     and a half after you started the initial lookout.

15           **A.**   Correct.

16           **Q.**   Is that right?

17           **A.**   Yes.

18           **Q.**   All right.  So for timing, based upon you are

19     listening to the recording, was it about a minute and a

20     half, a minute and a half that it took you to add the

21     additional descriptive information as it related to Mr.

22     Williams?

23           **A.**   Correct.

24           **Q.**   You talked a little bit about or have been asked

25     about some of the other people that you saw in the immediate

                                    335

1    vicinity of the walkway.  Did any of the individuals that

2    you saw in the area match the description or have a similar

3    description as to Mr. Douglas or Mr. Williams?

4        **A.**    No.

5        **Q.**    With respect to -- I want to ask you a little bit

6    about some of the questions that Mr. Ohm asked you.  You

7    indicated that there might have been four or five undercover

8    officers working that day in this operation.  Do you recall

9    that?

10        **A.**    Yes.

11        **Q.**    All right.  And is everybody working in the same

12    area or were those other undercovers located in other parts

13    of 5D, if you know?

14        **A.**    I am basing this off of some transmission that

15    took place, but we were all in the same area, but not

16    directly with each other.  I would say a couple undercover

17    officers were some blocks away and pretty much scattered

18    amongst this neighborhood.

19        **Q.**    And you indicated there may have been about 10 to

20    15 uniformed officers that were assigned to the arrest team?

21        **A.**    Correct.

22        **Q.**    All right.  And were those people, those uniformed

23    officers sort of assigned to respond to anything that might

24    have been called out as far as the lookout from any one of

25    the undercover officers, the four or five that were working

1   that day?

2        **A.**   Yes, sir.

3        **Q.**   So they weren't -- the 10 to 15 officers were not

4   specifically assigned to you.

5        **A.**   Correct.

6        **Q.**   With respect to your observations of the exchange,

7   you talked about your experience and your understanding of

8   the frequency of criminal activity not only in 5D but in

9   that particular location of the walkway and the rec center.

10  Do you recall that?

11       **A.**   Yes.

12       **Q.**   Does that experience, and your understanding of

13  that area, factor into your assessment of whether what you

14  are observing, what you observed with respect to Mr. Douglas

15  and Mr. Williams was suspicious?

16       **A.**   Can you repeat that?

17       **Q.**   I'm sorry.  It was not a well-worded question.

18  Your understanding of that area as an area with more

19  frequent criminal activity, I think you said drugs,

20  robberies, did that factor into your assessment that what

21  you were observing between these two people was suspicious?

22       **A.**   Yes.

23       **Q.**   You were also asked about your show-up ID, as

24  Mr. Marston termed it, and when you did the identification

25  procedure in relation to where both defendants were located.

 1    Just to clarify, were you able to clearly see both

 2    individuals without anything obstructing your view?

 3         **A.**   Yes, I did.

 4         **Q.**   Had something been obstructing your view, would

 5    you have moved into a position in order to be able to see

 6    them clearly?

 7         **A.**   Yes.  Not only that, I would indicate to arrest

 8    team, radio to bring them further towards this way or that

 9    direction, like I have done in the past.

10         **Q.**   All right.  And I think you've indicated there are

11    times where the arrest team has stopped somebody that turned

12    out to not be the person that you observed?

13         **A.**   Correct.

14         **Q.**   So do you have no problem telling the arrest team

15    they have the wrong guy?

16         **A.**   No problem at all.

17         **Q.**   And, again, just so we are clear, was there

18    anybody else that you observed in that area that sort of

19    matched the description or had similar description in terms

20    of clothing and appearance as Mr. Williams and Mr. Douglas?

21         **A.**   No.

22         **Q.**   I just have one other question.  You indicated

23    that after you saw this exchange between Mr. Douglas and Mr.

24    Williams, they sort of both walked off at some point towards

25    the parking lot.  Do you recall saying that?

1    **A.**   Yes, sir.

2    **Q.**   Did you have any idea at that time whether they

3    were going to be remaining together or separate?

4    **A.**   I did not have any idea.  All I know is they just

5    walked out of my sight towards that parking lot.

6              MR. WASSERMAN:  That's all I have.

7              THE COURT:  Thank you.

8              Officer Jackson, I don't have any questions for

9    you.  Thank you for your time today.

10             THE WITNESS:  Leave the microphone here?

11             THE COURT:  I think so, yes.  You are excused.

12             Are you ready to call your next witness?

13             MR. WASSERMAN:  Yes.  The Government calls Officer

14   Poupart.

15             THE COURT:  Officer, hold on for one second.

16             MR. WASSERMAN:  I was going to give him a wipe.

17             THE COURT:  If you want to wipe that down.

18             CLERK:  Please raise your right hand.  Do you

19   solemnly swear that the testimony you shall give the Court

20   today will be the truth, the whole truth, and nothing but

21   the truth?

22             THE WITNESS:  I do.

23             CLERK:  Please be seated.

24             THE COURT:  Officer Poupart, you are obviously

25   wearing a mask.  You have the option to put on a face shield

1    if you want to take off the mask and have the face shield.

2    What the prior witness found was that that face shield

3    fogged up to some extent.  So while you can speak more

4    easily with it, you may not be able to see as well.  It's

5    your choice.  We put that microphone over there to make it

6    easier to hear a witness with a mask on.  If you want to

7    start that way and see how it goes, that's fine with us or

8    if you prefer to do a face shield, we have some available.

9              THE WITNESS:  I will start like this.  Thank you.

10             THE COURT:  Okay.  We will try that.

11                       **<u>DIRECT EXAMINATION</u>**

12   **BY MR. WASSERMAN:**

13        **Q.**   Good afternoon.  Can you introduce yourself to the

14   Court and spell your first and last name for the court

15   reporter, please?

16        **A.**   My name is Officer Maxwell Poupart, M-a-x-w-e-l-l,

17   P-o-u-p-a-r-t.

18        **Q.**   Where are you currently employed?

19        **A.**   The Metropolitan Police Department.

20        **Q.**   What is your position with the MPD?

21        **A.**   Officer.

22        **Q.**   How long have you worked with MPD as a police

23   officer?

24        **A.**   Close to five years.

25        **Q.**   What is your current assignment?

1      **A.**   I am an officer of the third district.

2      **Q.**   Any specific role in 3D?

3      **A.**   I am on the crimes suppression team.

4      **Q.**   What do you do with the crime suppression team?

5      **A.**   It's a special missions unit.  We focus on violent

6    crime in the district, firearms, occasionally prostitution.

7      **Q.**   Where were you assigned on April 22nd of 2020?

8      **A.**   NSID, the narcotics enforcement unit.

9      **Q.**   When were you first assigned to NSID?

10     **A.**   I don't know the exact date.  It was the end of

11   January or the beginning of February of this year.

12     **Q.**   And how long were you in NSID -- well, before you

13   went to 3D?

14     **A.**   Approximately five months.  I went back to 3D in

15   June of this year.

16     **Q.**   Okay.  Was that a temporary detail you were doing

17   in NSID?

18     **A.**   Yes.

19     **Q.**   Okay.  And prior to your assignment with NSID, I

20   guess in late January, where were you assigned?

21     **A.**   Prior to NSID I was assigned third district in the

22   same position I am in now.

23     **Q.**   Okay.  What were your duties?  What was your

24   assignment when you were with NSID?

25     **A.**   i was assigned to the narcotics enforcement unit.

1    We would handle drug complaints that came in from citizens,

2    residents, as well as narcotics-related operations, buy/bust

3    operations.

4         Q.   And, specifically, your role in those

5    investigations?

6         A.   I was a member of the arrest team.

7         Q.   All right.  As part of your training and

8    experience as a police officer, have you received any

9    firearms training?

10        A.   Yes.

11        Q.   And have you been involved in investigations where

12   firearms were seized?

13        A.   Yes.

14        Q.   And prior to April 22nd of 2020, have you been

15   involved in investigations where either you seized a firearm

16   or officers you were with seized firearms?

17        A.   Yes.

18        Q.   How many times do you think you participated in

19   investigations where firearms were seized?

20        A.   I don't know the exact number.  Approximately 20,

21   maybe more.

22        Q.   Based upon your training and experience, are you

23   familiar with the size, shape, weight and other

24   characteristics of most handguns?

25        A.   Yes.

1          Q.   Based upon your training and experience, are you

2     able to recognize what a handgun feels like without

3     necessarily being able to see it?

4          A.   Yes.

5          Q.   I want to direct your attention to the afternoon

6     of April 22nd of 2020, were you on duty that afternoon?

7          A.   Yes.

8          Q.   And do you recall what your assignment was that

9     day?

10         A.   Arrest unit.

11         Q.   Was that with NSID?

12         A.   Yes.

13         Q.   And do you know what -- why you all were out there

14    that day?  Was there a particular operation or --

15         A.   We were conducting operations in that district.

16         Q.   I'm sorry?

17         A.   We were conducting operations in the fifth

18    district.

19         Q.   All right.  And was there anything in particular

20    that the operations focused on?  Narcotics?  Firearms?

21         A.   We were -- I believe we were focused on narcotics

22    complaints in the area.

23         Q.   Okay.  How were you dressed that day?

24         A.   Full police uniform.

25         Q.   And were you on foot or in a vehicle?

1          **A.**   I was in a vehicle.

2          **Q.**   Was that vehicle marked or unmarked?

3          **A.**   Unmarked.

4          **Q.**   Were you with any other officers that day?

5          **A.**   Yes.

6          **Q.**   Who was that?

7          **A.**   Officer Taylor.

8          **Q.**   All right.  Any other officer other than Officer

9    Taylor?

10         **A.**   No.

11         **Q.**   Were you involved in an investigation on that date

12   that resulted in the seizure of a firearm in the area of the

13   2300 block of 15th Street in northeast Washington, DC?

14         **A.**   Yes.

15         **Q.**   Prior to April 22nd of 2020, were you familiar

16   with the area of the 2300 block of 15th Street?

17         **A.**   I haven't particularly worked over there since I

18   was assigned to the 3rd district.

19         **Q.**   Okay.  Did you have experience -- have you worked

20   there before or are you not famniliar with that area?

21         **A.**   Well, my unit has executed search warrants in

22   other parts of the city other than the third district.  We

23   have been in other districts.  But not to my recollection

24   being in that block.

25         **Q.**   All right.  Did there come a point on April 22nd

344

1   of 2020 when you received a radio transmission to respond to

2   that block?

3        **A.**   Yes.

4        **Q.**   And do you recall generally what the radio

5   transmission requested?

6        **A.**   It was another officer from observation post

7   requesting for units to move in and make a stop.

8        **Q.**   Of anybody in particular?

9        **A.**   Yeah, two described individuals.

10        **Q.**   All right.  And prior to your testimony today,

11   have you had an opportunity to review the radio transmission

12   from that particular incident?

13        **A.**   Yes.

14        **Q.**   All right.  I want to play you Government's

15   Exhibit No. 3 from 6 minute mark to about 6:29.

16             (Played audio.)

17             Do you recognize the voice on that radio

18   transmission?

19        **A.**   Yes.

20        **Q.**   Who is that?

21        **A.**   That is Officer Jackson.

22        **Q.**   And do you know what Officer Jackson was doing

23   that day in terms of his assignment?

24        **A.**   Yes, he was an undercover officer.

25        **Q.**   Was that the radio transmission that you responded

1    to that day?

2         **A.**   Yes.

3         **Q.**   To your knowledge, were you and Officer Taylor the

4    first officers on the scene?

5         **A.**   Yes.

6         **Q.**   And have you had, prior to today, an opportunity

7    to review your body worn camera footage from that day?

8         **A.**   Yes.

9         **Q.**   All right.  I am going to play you Government's

10   No. 4 from 19:02:25 time stamp to about 19:02:50.

11        (Played audio.)

12        All right.  Officer Poupart, did you recognize

13   that portion of the video?

14        **A.**   Yes.

15        **Q.**   All right.  Can you tell us why you approached the

16   individual in the blue jacket?

17        **A.**   That was the description given by the undercover

18   officer.

19        **Q.**   And do you see the individual in the blue jacket

20   that you interacted with anywhere in the courtroom today?

21        **A.**   Yes.

22        **Q.**   All right.  Can you please identify that

23   individual by describing where he is sitting and an article

24   of clothing he is wearing?

25        **A.**   Sitting to my left in orange.

1          THE COURT:  And, again, because we are wearing

2     masks, I would ask the defendant to take off his mask if you

3     can confirm --

4          MR. WASSERMAN:  Is that the person you interacted

5     with there in the blue coat that is on Government's Exhibit

6     4?

7          THE WITNESS:  Yeah.

8          MR. WASSERMAN:  Your Honor, I ask the record

9     reflect of the in-court identification of Mr. Douglas.

10         THE COURT:  The record so reflects.

11    **BY MR. WASSERMAN:**

12    **Q.**   Okay.  During your interaction with Mr. Douglas,

13    did either you or your partner draw your weapons at any

14    point during that interaction?

15    **A.**   No.

16    **Q.**   Were you or your partner yelling at or threatening

17    Mr. Douglas at any point during that interaction?

18    **A.**   No.

19    **Q.**   I am going to show you what has been admitted into

20    evidence as Government's Exhibit 4-A.  Do you recognize that

21    still shot, Exhibit 4-A?

22    **A.**   Yes.

23    **Q.**   Is that from your body worn camera?

24    **A.**   Yeah.

25    **Q.**   Other than Mr. Douglas, can you see anyone

```
 1        standing near Mr. Douglas?

 2            A.    Yes.

 3            Q.    Do you recognize either one of those individuals?

 4            A.    Yes.

 5            Q.    Which one do you recognize?

 6            A.    The individual on the right.

 7            Q.    All right.  Who is that?

 8            A.    Mr. Williams.

 9            Q.    As you approached Mr. Douglas, did you know

10        whether or not at the time these two other individuals, the

11        one you referred to as Mr. Williams and the other individual

12        in the black coat to Mr. Williams' left, did you know

13        whether or not these other two individuals had any

14        involvement in the transaction observed by the OP?  The

15        observation post.

16            A.    I essentially focused on Mr. Douglas.

17            Q.    Why did you lead Mr. Douglas away from these two

18        other individuals?

19            A.    In my experience it is safer for everyone on the

20        scene to pull the stop away from a group of people.

21            Q.    All right.  And why would safety be of concern to

22        you under these circumstances?

23            A.    Well, officer safety is always paramount but at

24        the time my partner and I arrived, we were the only officers

25        on scene.  There are two of us and three other individuals
```

1    standing there and it is a housing complex with the

2    possibility of more people coming outside.

3        **Q.**   Why did you place Mr. Douglas in handcuffs after

4    you brought him aside?

5        **A.**   Officer safety.

6        **Q.**   When you say "officer safety" were you aware of

7    what, based on the lookout, the observation post officer had

8    observed?

9        **A.**   Yes.

10       **Q.**   Can you estimate approximately how much time

11   elapsed between the time you first heard the lookout and

12   when you encountered Mr. Douglas?

13       **A.**   Maybe a minute and a half, around that.

14       **Q.**   All right.  I am going to play you Government's

15   Exhibit No. 4 from 19:02:50 to 19:03:10.  I want to ask you

16   one additional question first.  Based upon -- have you been

17   involved in narcotics investigations previously?

18       **A.**   Yes.

19       **Q.**   And how common in your training and experience is

20   it for individuals engaged in narcotics trafficking to

21   possess firearms?

22       **A.**   It's common.

23       **Q.**   Common.  And at the time that you placed Mr.

24   Douglas in handcuffs, you indicated that you were concerned

25   about officer safety.  What specifically were you concerned

1    about other than -- I think you mentioned a couple other

2    individuals there.

3         A.    In narcotics investigations, it is common for one

4    or many subjects in the area to be armed.  So if someone has

5    been identified as part of an alleged illegal transaction,

6    we stop the individual for officer's safety.  We put them in

7    handcuffs because we don't know at that moment what their

8    capability is of harming us or someone else.

9         Q.    All right.  Is it fair to say that you didn't know

10   whether Mr. Douglas was armed or not at the time that you

11   approached him?

12        A.    Correct.

13        Q.    All right.  Go ahead and play Exhibit 4.

14             (Played audio.)

15             Can you describe for us in looking at Exhibit 4,

16   that clip, what you were doing?

17        A.    I had noticed a bulge under the defendant's

18   jacket, which was a backpack that was seen put on under his

19   jacket, so I frisked him.

20        Q.    And is that why you were sort of feeling the rear

21   area of Mr. Douglas' jacket?

22        A.    Correct.

23        Q.    Were you able to detect whether there was anything

24   in the area of the jacket that you were, you know, feeling

25   or --

1        A.    Yeah.

2        Q.    What, if anything, were you able to detect as a

3   result of the external frisk?

4        A.    I thought I recognized what was a firearm.

5        Q.    Can you describe what specifically you felt that

6   made you recognize what you believed was a firearm?

7        A.    Both the shape, weight of the object, the length

8   and the grip, or some people call it the handle, of the

9   firearm sticking up.

10        Q.    Okay.  So just to break that down a little bit,

11   was the item that you were feeling in Exhibit 4, was it a

12   hard object or a soft object?

13        A.    Yes, it was a hard object.

14        Q.    And you mentioned that you recongnized what you

15   thought was the butt or handle of the firearm; is that

16   right?

17        A.    Correct.

18        Q.    What direction, if you can -- from Exhibit 4, how

19   did it feel to you that that item was positioned in the bag?

20        A.    It was positioned so that the grip was sticking

21   upwards towards the sky to the left-hand side of the bag.

22        Q.    All right.  So I am going to step over to the TV

23   screen.  Tell me if I am correct.  Did you feel the butt of

24   the gun, the handle of the gun, going up in this direction?

25        A.    Correct.

351

1      Q.   And I am pointing up towards the top of the screen

2  of the TV.  And then what other portion of what you believed

3  was a firearm did you say you recognized other than the

4  butt?

5      A.   The slide.

6      Q.   Which direction was that going?

7      A.   Horizontal.

8      Q.   Which way would the slide and barrel be facing?

9      A.   The barrel would be facing towards the right where

10 that officer is pictured.

11     Q.   All right.  So it would be towards Mr. Douglas'

12 right arm?

13     A.   Yes.

14     Q.   Horizontally?

15     A.   Right.

16     Q.   Okay.  In your recognition of that item, was that

17 based upon -- it is a gun -- is that based upon your

18 familiarity with handguns and your training and experience?

19     A.   Yes.

20     Q.   All right.  I am going to ask to play, with the

21 sound hopefully up a little bit, from 19:03 of Government's

22 Exhibit 4 to 19:03:16.

23          (Played audio.)

24          All right.  Did you hear in the last part of that

25 clip you saying, "Is that your glasses case?"

 1          A.   I believe I asked what was that and the defendant

 2     said "glasses case" and I repeated that.

 3          Q.   So you asked him what that was and he said,

 4     "glasses case" and you repeated, "Is that your glasses

 5     case?"

 6          A.   Right.

 7          Q.   And while you were conducting that frisk, did you

 8     -- (cell phone ringing.)

 9              MR. WASSERMAN:   I'm sorry, Your Honor.   I thought

10     I turned that off.

11     **BY MR. WASSERMAN:**

12          Q.   Officer Poupart, were you able to feel anything

13     else other than the gun during the pat down?

14          A.   Yes.

15          Q.   And did you know what that was, before he told you

16     it was a glasses case?

17          A.   No, I didn't know what it was.

18          Q.   All right.   Were you able to distinguish during

19     your pat down between whether there were two separate items

20     or, you know, whether it was just one big item?

21          A.   It felt like there was an additional item in with

22     the firearm.

23          Q.   I am going to show you Government's Exhibit 4-B.

24     Do you recognize that photograph?

25          A.   Yes.

1      Q.    Was that just a still shot from your body worn

2  camera?

3      A.    Yes.

4      Q.    And is that a fair and accurate depiction of at

5  least part of the external frisk you conducted on that date,

6  April 22nd?

7      A.    Yeah.

8          MR. WASSERMAN:  Your Honor, I move Government's

9  Exhibit No. 4 into evidence.

10          MR. MARSTON:  No objection.

11          MR. OHM:  No objection.

12          THE COURT:  Government's Exhibit 4-B is admitted.

13          (Government's Exhibit No. 4-B was admitted.)

14          (Government's Exhibit Nos. 6-A and 6-B were marked

15  for identification.)

16  **BY MR. WASSERMAN:**

17      Q.    Can you describe what you are feeling in that

18  particular still shot?

19      A.    In that shot I am feeling the firearm.

20      Q.    All right.  I want to show you Government's

21  Exhibits 6-A and 6-B.

22          MR. WASSERMAN:  Your Honor, can I approach?

23          THE COURT:  Please.

24  **BY MR. WASSERMAN:**

25      Q.    If you can just take 6-A out of the bag.

354

```
 1          A.   (Complied.)

 2          Q.   What does 6-A consist of?

 3          A.   The firearm.

 4          Q.   Is that also a magazine there?

 5          A.   Yes, firearm and magazine.

 6          Q.   Do you recognize Government's Exhibit 6-A?

 7          A.   Yes.

 8          Q.   What is it?

 9          A.   It's the firearm removed from the backpack.

10          Q.   And the firearm that was removed on April 22nd,

11   was that firearm, 6-A, loaded?  Was the magazine loaded with

12   ammunition?

13          A.   Yes.

14          Q.   And was it loaded into the gun, into the butt of

15   the gun?

16          A.   Yes.

17          Q.   So other than that the magazine is now removed and

18   the ammo is separate, is it substantially the same

19   condition?

20          A.   Yes.

21               MR. WASSERMAN:  Your Honor, I move Government's

22   Exhibit 6-A into evidence.

23               MR. MARSTON:  No objection.

24               MR. OHM:  No objection.

25               THE COURT:  So admitted.
```

 1                 (Government's Exhibit No. 6-A was admitted.)

 2   **BY MR. WASSERMAN:**

 3        **Q.**   Looking at Government's Exhibit 6-B in the bag, do

 4   you recognize the items in that bag?

 5        **A.**   Yes.

 6        **Q.**   What is that?

 7        **A.**   The ammunition that would have been in the

 8   firearm.

 9        **Q.**   Again, other than it being outside of the magazine

10   and the firearm, is it substantially the same condition?

11        **A.**   Yes.

12             MR. WASSERMAN:  Your Honor, I move Government's

13   Exhibit 6-B into evidence.

14             MR. MARSTON:  No objection.

15             MR. OHM:  No objection.

16             THE COURT:  Government's Exhibit 6-B is admitted.

17             (Government's Exhibit No. 6-B was admitted.)

18   **BY MR. WASSERMAN:**

19        **Q.**   Recognizing that the magazine is not inside of the

20   butt of the firearm, can you actually hold up Government's

21   Exhibit 6-A and just kind of show us what parts of the

22   firearm you felt that you recognized during the external

23   frisk and how it was positioned in the bag?

24             THE COURT:  Please stand up.

25             THE WITNESS:  It was against his back, here, this

1    position, left arm, right arm, positioned in the bag with

2    the slide forward at the time but it was positioned like

3    this in the bag.  Feeling it in a manner similar to this, I

4    was feeling the grip as well as the lower portion.

5    **BY MR. WASSERMAN:**

6        **Q.**   I'm sorry, lower portion what?

7        **A.**   Lower portion of the slide and the grip.

8        **Q.**   You are holding the firearm in your hand with the

9    butt of the gun facing up and your thumb sort of towards the

10   butt of the gun and your forefinger there on the slide and

11   the barrel of the gun sort of facing towards your left side

12   of your body.  Is that accurate, Officer, just the way you

13   are holding it now?

14       **A.**   Sure.

15       **Q.**   Okay.

16            THE COURT:  It is pointing towards the right side

17   of his body.  I think most importantly, he has described how

18   the gun was positioned, we believe, against the defendant's

19   back in relation to the defendant's body.  Correct, Officer?

20            THE WITNESS:  That's correct, Your Honor.

21            MR. WASSERMAN:  Thank you.

22   **BY MR. WASSERMAN:**

23       **Q.**   With respect to the other item that you felt, do

24   you have a sense for where it was positioned?  Was it in

25   front of the gun or closer to the defendant's back?

1       **A.**   In front of the gun.

2       **Q.**   All right.  And was it -- do you know whether it

3   -- was that object, you know, was it horizontal or was it up

4   vertical, if you know, to the other object that you felt?

5       **A.**   It felt like it was laying horizontal.

6       **Q.**   Okay.  Thank you.  Have a seat.

7            I want to play for you now, Government's Exhibit 4

8   from 19:03:16 to about 19:04.

9            (Played audio.)

10           Officer Poupart, just so we are clear, in terms of

11  when you first recognize that item as a firearm, when did

12  you first recognize it?  Was it during that initial frisk?

13      **A.**   Yes.

14      **Q.**   All right.  So in the clip that we just played,

15  did you ask the defendant if he minded if you searched the

16  bag?

17      **A.**   Yes.

18      **Q.**   And what was his response?

19      **A.**   He did not consent, in other words.

20      **Q.**   Okay.  And what did you say, you know, if

21  anything?  Did you hear what he said after he said, You

22  can't search it or you can't look in it?  He said something

23  to the effect that it was just glasses or glasses case.

24  Were you able to hear what your response was?

25      **A.**   I said, I don't know that that is a glasses case.

358

1    **Q.**   Why did you ask the defendant for consent to

2    search at this point if you had already recognized the item

3    as a firearm?

4    **A.**   I like to give people the opportunity to be

5    honest.

6    **Q.**   I'm sorry?

7    **A.**   I like to give people the opportunity to be

8    honest.

9    **Q.**   Okay.  So did your asking him for consent to

10   search have anything to do with whether you -- you know,

11   your degree of certainty about what you thought?

12   **A.**   No.

13   **Q.**   Why did you say, I don't know if that is your

14   glasses case?

15   **A.**   Typically, we don't like to use the word gun on

16   the scene unless it is an emergency situation.  We don't use

17   that and it's just not something I would say to someone.

18   **Q.**   I mean, why would you be concerned about saying,

19   Hey, that's not your glasses case, it's a gun?

20   **A.**   It's going to make that person much more likely to

21   flee, fight, endanger the scene.

22   **Q.**   All right.  Going to Government's Exhibit 4, I

23   want to play, if we can, from 19:04:57 to 19:05.

24             (Played audio.)

25             All right.  In that clip, from Exhibit 4, were you

1    able to hear what you said?

2         **A.**   Yes.  I said the guy with the blue jacket, is he

3    good for a search?

4         **Q.**   Why were you asking about whether he was good for

5    a search at that point?

6         **A.**   It's my way of checking with everyone else that

7    the scene is safe and secure.  I did not have eyes on the

8    other subject that was involved.  I didn't know if he was

9    stopped, secured or detained.  I don't want to conduct a

10   search for a firearm in a bag if the other suspect that was

11   involved is not stopped or secured.  Definitely could have

12   someone running.

13        **Q.**   Did your request for permission to -- permission

14   to search, for lack of a better way of phrasing, have

15   anything to do with your level of certainty of what you had

16   initially felt in that external frisk?

17        **A.**   No.

18        **Q.**   I want to play from 19:05:06 to 19:05:13.

19             (Played audio.)

20             In that clip, what was the result of the search?

21   You opened up the backpack at that point; is that correct?

22        **A.**   Yes.

23        **Q.**   What did you observe, if anything?

24        **A.**   I observed a firearm in the backpack.

25        **Q.**   Did you hear yourself say "1-800"?

1    **A.**   Yes.

2    **Q.**   What does that mean?

3    **A.**   It is our code word for presence of a firearm.

4          (Government's Exhibit No. 7 was marked for

5    identification.)

6    **BY MR. WASSERMAN:**

7    **Q.**   I want to show you Government's Exhibit No. 7 for

8    identification.  Do you recognize that photograph?

9    **A.**   Yes.

10   **Q.**   And what is that photograph?

11   **A.**   It's a photograph of the firearm inside of the

12   backpack.

13   **Q.**   Is that the same firearm that is Exhibit 6-A on

14   your table there?

15   **A.**   Yes.

16   **Q.**   Is it a fair and accurate depiction of how the

17   firearm appeared inside of the backpack on April 22nd at the

18   time that it was recovered?

19   **A.**   Yes.

20          MR. WASSERMAN:  Your Honor, I would move for

21   Government's Exhibit No. 7 into evidence.

22          MR. MARSTON:  No objection.

23          MR. OHM:  No objection.

24          THE COURT:  Government's Exhibit No. 7 is

25   admitted.

 1           (Government's Exhibit No. 7 was admitted.)

 2    **BY MR. WASSERMAN:**

 3        **Q.**   Do you recall whether ultimately there was a

 4    glasses case recovered or found inside of that backpack?

 5        **A.**   Yes, I believe there was.

 6        **Q.**   All right.  And were you the one that actually did

 7    the removal, once it was -- well, was the backpack taken off

 8    Mr. Douglas after you initially looked in and found it?

 9        **A.**   Yes.

10        **Q.**   Did somebody else actually conduct the search and

11    removal of the firearm?

12        **A.**   Yes.

13        **Q.**   All right.  That wasn't you?

14        **A.**   Correct.

15        **Q.**   All right.  And did you see specifically where

16    that glasses case was located at the time it was removed?

17        **A.**   I think it was against the firearm, but I can't

18    specifically recall at the moment.

19        **Q.**   You are not sure at the moment?

20        **A.**   No.

21        **Q.**   All right.  After you observed the gun inside Mr.

22    Douglas' backpack, you said "1-800".  What was done with Mr.

23    Douglas at that point?

24        **A.**   At that point he was placed under arrest.

25        **Q.**   And his backpack was also seized?

1      **A.**   Yes.

2      **Q.**   All right.

3            (Government's Exhibit No. 9 was marked for

4      identification.)

5   **BY MR. WASSERMAN:**

6      **Q.**   I am going to show you what has been marked for

7      identification as Government's Exhibit No. 9.  Do you

8      recognize that exhibit?

9      **A.**   Yes.

10     **Q.**   What is it?

11     **A.**   The backpack that was taken off of Mr. Douglas.

12     **Q.**   Does it appear to be in substantially the same

13     condition as when you found it on Mr. Douglas on April 22nd?

14     **A.**   Yes.

15           MR. WASSERMAN:  Your Honor, I move Government's

16     Exhibit No. 9 into evidence.

17           MR. MARSTON:  No objection.

18           MR. OHM:  No objection.

19           THE COURT:  So admitted.

20           (Government's Exhibit No. 9 was admitted.)

21           MR. WASSERMAN:  Your Honor, that is all I have.

22           THE COURT:  Thank you.  Mr. Ohm, I assume?

23                    <u>**CROSS EXAMINATION**</u>

24   **BY MR. OHM:**

25     **Q.**   Good afternoon, Officer.

363

1       **A.**    Good afternoon.

2       **Q.**    When you approached Mr. Douglas, he didn't try to

3   flee, did he?

4       **A.**    No.

5       **Q.**    And you said, Come over here for a minute.  Right?

6       **A.**    Correct.

7       **Q.**    And he complied with your direction?

8       **A.**    He did.

9       **Q.**    You told him he was being stopped as part of an

10   investigation?

11       **A.**    Right.

12       **Q.**    And he walked with you.  Right?

13       **A.**    Yes.

14       **Q.**    Then you took out your handcuffs.  Right?

15       **A.**    Yes.

16       **Q.**    He basically put his hands behind his back.  You

17   didn't have to tell him to do that?

18       **A.**    I think we guided his hands behind his back.  I

19   don't specifically recall.

20       **Q.**    You didn't say, Put your hands behind your back?

21       **A.**    He wasn't forced into handcuffs.

22       **Q.**    I'm sorry.  He complied with you and did not

23   resist at all in terms of being handcuffed.  Right?

24       **A.**    Sure.

25       **Q.**    And at that point there was no indication that he

1    wasn't being compliant.  Right?

2        **A.**    No, not at that time.

3        **Q.**    And really at any time.

4        **A.**    No, he was complying.

5        **Q.**    Now, you testified -- I just want to make sure I

6    have this right.  Mr. Wasserman asked you why you placed him

7    in handcuffs.  Right?

8        **A.**    Yes.

9        **Q.**    You said it was common for officers' safety to put

10   people in handcuffs?

11       **A.**    Yes.

12       **Q.**    When would you put somebody in handcuffs?

13       **A.**    Well, I mean, that depends.  It is situational.

14       **Q.**    Okay.  So it sounded like you were saying that

15   generally speaking, when you are doing the drug operations,

16   when you are told to move in, then you place people in

17   handcuffs.  Is that fair?

18       **A.**    Yes.

19       **Q.**    You do that almost all of the time?

20       **A.**    Pretty much.

21       **Q.**    It doesn't matter if somebody is trying to flee.

22   Right?

23       **A.**    [Inaudible] -- A person in handcuffs you typically

24   don't move in when the individuals are handcuffed.

25       **Q.**    I'm having a tough time hearing you.

1      **A.**   I'm sorry.  Typically it is the arrest team and

2   sometimes they are handcuffed.

3      **Q.**   Now, at this time when you are approaching Mr.

4   Douglas, you don't know Mr. Douglas.  Right?

5      **A.**   Correct.

6      **Q.**   You haven't heard of Mr. Douglas as being someone

7   who is armed and dangerous?

8      **A.**   No, I don't personally know him.

9      **Q.**   Okay.  And you know that there was a suspicion of

10   contraband in the bag, but you don't know what that

11   contraband is.  Right?

12      **A.**   Correct.

13      **Q.**   And no one -- I think you had said something about

14   complaints about drug activity.  There were no complaints

15   about gun sales or gun operations in that neighborhood.

16   Right?

17      **A.**   Not that I know of.

18      **Q.**   And you were definitely conducting observations

19   both for potential marijuana sales, cocaine sales and that?

20      **A.**   Narcotics in general.

21      **Q.**   And no one had called in and said there is a man

22   with a gun out there that day.  Right?

23      **A.**   No, not that I know of.

24      **Q.**   Now, as you approach Mr. Douglas, you could see

25   both of his hands.  Right?

1    **A.**   Yes.

2    **Q.**   They were actually sort of swinging like he was

3    kind of hanging out, like this.  Right?  (Indicated)

4          MR. OHM:  If the record could reflect I am

5    swinging my hands back and forth.

6          THE WITNESS:  I guess.

7    **BY MR. OHM:**

8    **Q.**   There was no movement of his hands towards any

9    other part of the body?

10   **A.**   Not that I recall.

11   **Q.**   The information that you had was that the

12   potential contraband was underneath the jacket in a book

13   bag.  Right?

14   **A.**   Correct.

15   **Q.**   When Officer Jackson reported a book bag, he

16   didn't say it was open.  Right?

17   **A.**   Right.

18   **Q.**   He didn't say, Be careful.  What is in that book

19   bag, it is easy to access what is in it.  Nothing like that?

20   **A.**   No.

21   **Q.**   All right.  And when you first made contact with

22   him, for Mr. Douglas to get into that bag, he would have had

23   to have taken off his jacket, taken off the backpack,

24   unzipped the book bag and get whatever is inside; is that

25   fair?

1    **A.**   That would be the easiest way.

2    **Q.**   Well, was there any other way?

3    **A.**   I don't know if he is flexible enough to reach

4    around.  It's unlikely.

5    **Q.**   You can at least agree it is not like accessing

6    the waistband.  It is pretty hard to get what is in that

7    backpack.  Correct?

8    **A.**   Correct.

9    **Q.**   You were part of the arrest team for this

10   operation?

11   **A.**   Correct.

12   **Q.**   How many individuals were part of the arrest team?

13   **A.**   I don't recall how many that day.  Maybe -- do you

14   want me to proximate?

15   **Q.**   Sure.

16   **A.**   Maybe eight.

17   **Q.**   Okay.  And when Officer Jackson puts in the call

18   for arrests, the whole arrest team comes out.  Right?

19   **A.**   Yeah.

20   **Q.**   It's not like there's an Officer Jackson team

21   where only two people come out?

22   **A.**   Once in a while the team gets separated or some of

23   them are still on something else.  But in this case, I

24   believe the whole arrest team --

25   **Q.**   So approximately eight people came out and that

1    was the understanding that you had when you were moving in

2    for arrest.

3        A.   Eventually.  Like I previously stated, my partner

4    and I were the first on scene.

5        Q.   Right.  And you knew that other people were also

6    listening to the same radio communications that Officer

7    Jackson was making.  Right?

8        A.   Correct.

9        Q.   You knew that they were supposed to join you in

10   coming out?

11       A.   Yes.

12       Q.   You didn't think that they were going to sit back

13   in their cars while you and Officer Taylor were dealing with

14   it?

15       A.   I hope not.

16       Q.   You also knew they were close by.  Right?

17       A.   I don't know their locations when they are waiting

18   for a call, but I assumed they were relatively close.

19       Q.   When you say "relatively close," you mean within a

20   block or two, not like 15.  Right?

21       A.   Yeah, within a few blocks.

22       Q.   Now showing your body worn camera, I want to make

23   sure we have a decent sense --

24           MR. OHM:  I will mark this, Your Honor, as --

25           THE COURT:  So you are marking what is

369

 1   Government's Exhibit 4, body worn camera footage, as

 2   Defendant Douglas' Exhibit 3?

 3            MR. OHM:  Yes, Your Honor.

 4            THE COURT:  Okay.

 5            (Defendant Douglas' Exhibit No. 3 was marked for

 6   identification.)

 7   **BY MR. OHM:**

 8       **Q.**   I am right now at 19:02:52, the timeframe in the

 9   upper right-hand corner.  This is when you and Officer

10   Taylor make initial contact with Mr. Douglas.  Right?

11       **A.**   Yes.

12       **Q.**   Okay.  And for clarity, I am going to scroll back

13   a little bit so we know -- we will go to :33, that is when

14   you put your hands on Mr. Douglas.  Right?

15       **A.**   Yes.

16       **Q.**   All right.  And then 19:02:43 is when you hear the

17   handcuffs going on.  Right?

18       **A.**   Yes.

19       **Q.**   It's fair to say that he is not free to leave.

20   Right?

21       **A.**   No, he is detained.

22       **Q.**   And it's also fair to say when you first put your

23   hands on him, he is also not free to leave.  Right?

24       **A.**   Correct.

25       **Q.**   Okay.  So now it is 19:02:55 and other officers

1    are converging on the scene.  Right?

2        **A.**   Yes.

3        **Q.**   You know that these officers are responding to

4    Officer Jackson's call to move in.  Right?

5        **A.**   Yes.

6        **Q.**   Although they first appear on your video at

7    19:02:55, they are obviously walking up before.  They don't

8    just magically appear there.  Right?

9        **A.**   I would think so, yeah.

10       **Q.**   These are the folks you knew would come and

11   support you shortly after you were making contact with Mr.

12   Douglas?

13           MR. WASSERMAN:  Objection.  It calls for

14   speculation.

15           THE COURT:  Rephrase it.

16   **BY MR. OHM:**

17       **Q.**   These are the folks that are part of the arrest

18   team whose job it is to support you also.  Right?

19       **A.**   Correct.

20       **Q.**   And I know that you said that you thought that

21   maybe there were about eight people out there.  I want to

22   see if the body worn camera shows that there might be a few

23   more.  I will go to 19:03:35.  At this point you can sort of

24   see a couple officers in the background.

25       **A.**   Yeah.

1    Q.   And in the background here you can also see there
2  are other officers who are posted in the parking lot area.
3  Right?
4    A.   Yes.
5    Q.   There are also marked cars on the scene.  Right?
6    A.   There was a marked car there.
7    Q.   Now, at no time during your interaction with Mr.
8  Douglas did he threaten to harm any officer or anybody else?
9    A.   Not that I recall.
10   Q.   In fact, Mr. Douglas never indicated that he had a
11 weapon.  Right?
12   A.   No.
13   Q.   And the other individuals that were standing
14 there, there was no time where any of those individuals made
15 any comments towards you.  Correct?
16   A.   Not to me.
17   Q.   Well, during the time where you are walking up to
18 Mr. Douglas, did any of those individuals ever say anything
19 to you, that is even remotely threatening?
20   A.   No.
21   Q.   Did any of them talk to you at all?
22   A.   That I don't recall.  I don't know.
23   Q.   And the same with Officer Taylor.  Did any of
24 those individuals say anything to Officer Taylor that was
25 threatening?

1        **A.**   Not that I know of.

2        **Q.**   Did you notice or see any of them making any

3    gestures towards waistbands or towards anything else?

4        **A.**   Not that I recall, no.

5        **Q.**   So your assessment of them being threatening to

6    you was sort of the general assessment that they are in a

7    neighborhood conducting a street encounter and stopping an

8    individual.

9        **A.**   Can you repeat that?

10       **Q.**   Those other two individuals that were there, when

11   you assessed them as a possible threat to you, that is only

12   because you are in a neighborhood, in a general street

13   encounter; that's the basis of your assessment?

14       **A.**   At the time my partner and I were the only ones on

15   the scene.  There were two other gentlemen besides Defendant

16   Douglas.  I don't know who they are, if they are armed and

17   what their intentions are; that's my basis.

18       **Q.**   But in terms of specifics about those two

19   individuals or this situation, was there anything else that

20   you knew about what was going on that made you concerned

21   about the two individuals?

22       **A.**   Other than what I just listed?

23       **Q.**   Right.  Just the general fact that they were

24   there.

25            THE COURT:  Let's pause for one second.  We may be

373

 1      losing a charge.

 2              CLERK:  (Replaced microphone batteries.)

 3      **BY MR. OHM:**

 4      **Q.**   I assume you will ask me to repeat my question.

 5      **A.**   Sorry.  Yeah.

 6      **Q.**   Other than the presence of these two individuals

 7      and the fact that it was a street encounter, was there

 8      anything about them specifically that made you concerned

 9      about your safety?

10      **A.**   Not specifically other than the things that I

11      previously listed.

12      **Q.**   That you didn't know if they were armed?

13      **A.**   Right.  The possibility that they could be armed,

14      what their intentions are or are not.  The possibility of

15      flight and things like that.  Other than that, no.

16      **Q.**   Okay.  Well, them fleeing is not a concern to you?

17      **A.**   I was referencing Mr. Douglas.

18      **Q.**   Mr. Douglas himself did not show any indication of

19      fleeing.  Right?

20      **A.**   Most people don't until they do.

21      **Q.**   Did you ask any of them if they were armed?

22      **A.**   No.

23      **Q.**   Did you ask them to step back 20 yards?

24      **A.**   No, that's why I moved Mr. Douglas away from them

25      so I wouldn't have to.

1      Q.   Okay.  And just to be 100% clear, you didn't see

2   them actually do anything, reach for anything on their

3   person?

4      A.   No.

5      Q.   And you had no reason to suspect that they were --

6   actually suspect they were armed other than the fact that

7   you did not know that they weren't.

8      A.   Right.

9      Q.   When you and Officer Taylor approached, you were

10   fully uniformed you said?

11      A.   Correct.

12      Q.   Your firearm was on your hip?

13      A.   Correct.

14      Q.   Was visable?

15      A.   Yes.

16      Q.   Officer Taylor's firearm was also visible?

17      A.   Yes.

18      Q.   I know you were talking about the glasses case

19   versus the firearm.  I just wanted to ask you when you were

20   feeling which.  I am going to go back to Defendant's 3,

21   which is Government's 4?

22           THE COURT:  I believe it is Defendant Douglas' 3.

23           (Played video.)

24   BY MR. OHM:

25      Q.   So we are at 19:03:01.  Is it fair to say that is

1    the first time you touched Mr. Douglas' back?

2         **A.**   Yes.

3         **Q.**   What are you feeling right there?

4         **A.**   At that point I noticed a protrusion in his

5    jacket, the backpack.  At that point it looks like I am

6    feeling -- it's the beginning of a frisk.  It looks like I

7    am feeling part of the sunglass case and my thumb either is

8    or is about to be pressed up against the grip of the

9    firearm.

10        **Q.**   Okay.  So what are you trying to do when you are

11   feeling like this?

12        **A.**   I am trying to articulate what's there.

13        **Q.**   You are trying to figure out what it is?

14        **A.**   Yeah.  Right.

15        **Q.**   Now you are feeling at 19:03:03 another part of

16   the jacket sort of more towards, I guess, middle to right of

17   middle?

18        **A.**   Yes.

19        **Q.**   And what are you feeling there?

20        **A.**   The the end of the object.

21        **Q.**   Okay.  Which object?

22        **A.**   It looks like probably the glasses case, maybe.

23        **Q.**   Okay.  Do you not know at the time?

24        **A.**   I don't specifically remember.  I can't say

25   exactly what my finger was on that second.  I know what

1   objects were there.

2        **Q.**   You had said when we were at 19:03:01, you said

3   you could feel a gun.  When you are holding the left part of

4   the jacket and you now concluded -- are you concluding in

5   hindsight it was a sunglass case or did you know it was a

6   sunglass case when you first felt it?

7        **A.**   I couldn't definitively say it was a sunglass case

8   until I saw it.

9        **Q.**   But you didn't suspect it was a gun?

10        **A.**   Not the sunglass case.

11        **Q.**   So you felt an object.  You said this is some

12   random object that is not a gun in your mind?

13        **A.**   Right.

14        **Q.**   Okay.  And then I think you said right here at

15   19:03:01 your finger could feel the slide of the gun; is

16   that right?

17        **A.**   Right.

18        **Q.**   At that point in time did you identify it as a

19   gun?

20        **A.**   In reaching around, essentially around the

21   sunglass case, my thumb is up now on the grip of the

22   firearm.

23        **Q.**   Okay.  Could you tell it was a firearm?

24        **A.**   From my first guess?

25        **Q.**   At this point in time?

1          A.   Yeah, I would say.

2          Q.   So you are feeling the sunglasses but your thumb

3     is feeling, what you were saying now was the gun and you

4     knew it was the gun at this moment, at 19:03:01.

5          A.   Can you go back a split second where it stops and

6     starts?

7          Q.   Starting at 19:02:56.  Okay.  So you immediately

8     feel it is a gun on your thumb?

9          A.   At this point, no.

10         Q.   Right before that in -- I went back like you asked

11    me to.  Can you tell me to stop when you first feel the gun

12    and know that it's a gun?

13         A.   Sure.

14         Q.   All right.

15              (Continued playing the video.)

16         A.   There.

17         Q.   So 19:03:05 is when you first believe you are

18    feeling a gun?

19         A.   Correct.

20         Q.   Okay.  So when you are talking about the thumb

21    before, is that something that in hindsight you now think

22    was a gun, but you didn't know at the time?

23         A.   When I am feeling that handle with my thumb, I

24    recognized it to be the handle of the firearm.

25         Q.   Okay.  So at 19:03:01 you know you are feeling the

1    gun.

2              (Playing video again.)

3              So right there you know your thumb is touching a

4    gun.

5        **A.**   I told you it was after that.  Keep going.

6        **Q.**   Up until this point you don't know that you are

7    dealing with a gun?

8        **A.**   I am suspecting that it's a gun and I am

9    furthering that as I am continuing to frisk his bag.

10       **Q.**   So at 19:03:10 you are suspecting it is a gun; is

11   that fair?

12       **A.**   Sure.  At this point it looks like I am feeling it

13   pretty well.  Yeah, I will say it was a firearm.

14       **Q.**   Before that, 19:03:10, you feel like you are

15   feeling the sunglasses.

16       **A.**   Yeah.  I mean at one point I would say I was

17   feeling the sunglass case.  It is difficult to go back in

18   time in split-second stills to go back and say what your

19   mind was thinking or feeling.  I am doing the best for you,

20   here.  At this point I think it is safe to say, yes, I

21   believe I was feeling a firearm.

22       **Q.**   Okay.  Is it fair to say at this point this is the

23   first time where you feel like you are feeling a firearm or

24   suspecting you feel like you are feeling a firearm?

25       **A.**   Yes.

 1      Q.   When you mention your thumb feeling something

 2   earlier, you are talking about this 19:03:10 time frame?

 3      A.   Yes.

 4           (Playing video.)

 5      Q.   Now, when Mr. Douglas says, It's a glasses case,

 6   at that point in time you also agree there is at least a

 7   glasses case in there?

 8      A.   Yeah, or a similar-shaped object.

 9      Q.   What you are trying to figure out is if there is

10   something else in there.

11      A.   Right.  If there is something else in there.

12      Q.   It is good you are squeezing to figure out.

13      A.   Right.

14      Q.   You feel like you successfully did that or at

15   least starting at 19:03:10.

16      A.   Yeah.

17           THE COURT:  Mr. Ohm, I think we need to take

18   another break for the court reporter.  Before we do that,

19   though, how much longer do you think you have?

20           MR. OHM:  Probably about 15 to 20 minutes.

21           THE COURT:  Let's take a brief recess.  Before we

22   do, though, are there going to be any other witnesses?

23           MR. WASSERMAN:  Not from the Government.

24           MR. OHM:  I have Officer Taylor.  At this point I

25   don't think so but I probably --

1          THE COURT:  You can reserve but you think it's

2   unlikely.  Here is why I ask:  If we do -- if we resume 15

3   minutes from now and were to go to 4:15 approximately, with

4   the continuation of cross -- I am assuming you don't have

5   anything, Mr. Marston?

6          MR. MARSTON:  No questions.

7          THE COURT:  Redirect from the Government we will

8   be at 4:15 or so.  I think that what I may do is just call

9   the hearing for the day.  We will have had all of the

10  evidence introduced and then I may ask you all separately,

11  perhaps tomorrow or at a time when we can agree on, to argue

12  the motions based on what the record would reflect.

13          That's what I am thinking.  I am not so sure about

14  that yet, but let's at a minimum, for the court reporter's

15  sake and for those working here, let's come back at 3:48.

16  We can finish with this witness, let the officer go, and

17  talk about next steps.

18          MR. OHM:  Your Honor, would the court admonish the

19  witness not to discuss his testimony?

20          THE COURT:  Yes.  Please do not discuss your

21  testimony with anyone.

22          THE WITNESS:  Very good, Your Honor.

23          CLERK:  All rise.  Court is in recess.

24          (Break.)

25          CLERK:  Court is now in session.  Please be seated

 1   and come to order.

 2                We are now back on the record.

 3                MR. OHM:  May I proceed?

 4                THE COURT:  Please.

 5                MR. OHM:  Thank you.

 6   **BY MR. OHM:**

 7       **Q.**   Good afternoon.  We stopped around 19:03:11 which

 8   is when you first feel you are identifying it as a gun.

 9   Okay?

10                (Playing video.)

11                Okay.  See how at 19:03:15 you switch over to a

12   different part?

13       **A.**   Yes.

14       **Q.**   Is that the gun or the sunglasses case?

15       **A.**   I believe it is both.

16       **Q.**   You believe you are feeling both at that point?

17       **A.**   Yes.

18       **Q.**   You hear yourself say, Is this the glasses case?

19       **A.**   Yes.  He mentioned a glasses case and I said, Is

20   this a glasses case?

21       **Q.**   Is that at 19:03:17?  Is that what are you feeling

22   when you say, Is this the glasses case?

23       **A.**   Yeah.

24       **Q.**   Was that -- do you hear the statement, The book

25   bag is underneath the sweat shirt, at 19:03:38?

                              382

1    **A.**    Yes.

2    **Q.**    Who was it that said that?

3    **A.**    I did.

4    **Q.**    Was that in response to anything or was it just

5    something you just said?

6    **A.**    I don't recall.

7    **Q.**    Okay.  Does it sound familiar that somebody said,

8    Negative on the book bag?

9    **A.**    I don't remember.

10   **Q.**    Okay.  Now, whose decision was it to take off his

11   jacket?

12   **A.**    Mine.

13   **Q.**    And what was the purpose of that?

14   **A.**    To get to the book bag.

15   **Q.**    Okay.

16   **A.**    Because I felt what I recognized to be a firearm

17   inside of it.

18   **Q.**    Pardon me?

19   **A.**    Because I felt what I recognized to be a firearm

20   in the book bag.

21   **Q.**    Okay.  So is your purpose -- is it fair to say the

22   purpose of taking off the jacket -- you are no longer in the

23   external frisk section, you are beginning the search; is

24   that fair?

25   **A.**    The search hasn't started yet.  I am feeling the

1    jacket for the book bag.

2         **Q.**   What is the purpose of exposing the book bag?

3         **A.**   Essentially, I haven't seen the book bag yet.

4         **Q.**   Okay.  So at this point you have your eyes on the

5    book bag.  Right?  We are now at 19:03:38.  Do you see

6    yourself -- it looks like you are pulling down the zipper a

7    little bit more?

8         **A.**   I'm sorry?

9         **Q.**   What are you doing with your left hand at

10   19:03:38?

11        **A.**   My left hand is touching the strap of the book

12   bag.

13        **Q.**   Okay.  And what are you trying to do with it?

14        **A.**   I was just articulating.

15        **Q.**   I'm sorry?

16        **A.**   Articulating.  I don't recall exactly what I was

17   doing with it.

18        **Q.**   All right.  Okay.  And now you see yourself

19   putting your hand on the backpack.  Right?

20        **A.**   Correct.

21        **Q.**   And this is when you say something to the effect,

22   Do you mind if I search?

23        **A.**   Correct.

24        **Q.**   And he says, No?

25        **A.**   Correct.

1    Q.   Now, you testified on direct examination -- what

2    was the reason why you said, Do you mind if I search?

3    A.   I was giving him the opportunity to be honest with

4    me.

5    Q.   That's the only reason?

6    MR. WASSERMAN:  I can't really hear Mr. Ohm.  He's

7    not near the microphone.

8    MR. OHM:  My computer is over here.  I'm sorry.

9    CLERK:  (Provided Mr. Ohm with a lapel mic.)

10    MR. OHM:  Can you hear me?  Can you hear me?

11    **BY MR. OHM:**

12    Q.   Okay.  So I think you said -- you just said that

13    the reason you asked him, Do you mind if I search, had

14    nothing to do with trying to get consent to search.  Is that

15    fair?

16    A.   Well, I mean, I am asking -- as I said, it's a

17    courtesy, in my eyes.

18    Q.   Are you trained on that?

19    A.   What do you mean?

20    Q.   Are you trained on giving a courtesy or giving a

21    person the opportunity to tell the truth?

22    A.   Not specifically.  I like to give people the

23    opportunity to tell the truth.

24    Q.   Okay.  And what happens if they tell the truth

25    versus if they don't?

1          MR. WASSERMAN:  Objection.

2          MR. OHM:  He can tell the answer of the witness.

3          THE COURT:  I will allow it.

4          THE WITNESS:  I will still do my job either way,

5     just giving them the opportunity to tell the truth.

6     **BY MR. OHM:**

7     **Q.**   Okay.  So other than giving someone an opportunity

8     to be honest, you had no other reason to ask to search his

9     bag?

10    **A.**   No.

11    **Q.**   Okay.  And you are familiar with consent within

12    the Fourth Amendment and the police officer's job.  Right?

13    **A.**   Right.

14    **Q.**   But that didn't enter into your mind?

15    **A.**   No.  At this point, I already articulated enough

16    to search the bag.

17    **Q.**   Okay.  Now, Mr. Douglas said immediately, No.

18    Right?

19    **A.**   Correct.

20    **Q.**   So at that point you are free to search.  Right?

21    **A.**   Correct.

22          (Playing video.)

23          I think it was at 19:03:58 where you hear him

24    saying -- you can hear yourself saying, I don't know if that

25    is possible.

386

1       **A.**   Correct.

2       **Q.**   It was said in response to Mr. Douglas saying you

3    can't search.  Right?

4       **A.**   Yeah, I think so.

5       **Q.**   Okay.  So now it's 19:04, you still haven't

6    searched yet.

7       **A.**   Right.

8            (Playing video.)

9       **Q.**   Now it is 19:40:09 and you still haven't searched.

10   Right?

11      **A.**   Yes.

12      **Q.**   It is 12 seconds since he declined the opportunity

13   to tell the truth.  Right?

14      **A.**   I wasn't watching the clock.  If you say 12

15   seconds.

16      **Q.**   So far it is 12 seconds.

17      **A.**   Okay.

18      **Q.**   Now it is 19:04:19.  Why haven't you searched him?

19      **A.**   I don't know if the other individual is stopped,

20   if the scene is secure.

21      **Q.**   Did you ask?

22      **A.**   When you hear my radio key up and go Mmmm it means

23   someone else was talking so I couldn't.

24      **Q.**   Okay.  So right now it sounds like everything is

25   clear.  Right?

1     **A.**   No.  I think they are still talking on the radio.

2     **Q.**   I just want to make sure I understand what you are

3     saying.  Since 19:03:58 or so that's where Mr. Douglas says

4     you can't search, the entire time you are just waiting to

5     confirm whether the other suspect has been apprehended?

6     **A.**   Yes.  Waiting to confirm the scene is secure so I

7     can search him.

8     **Q.**   That's the only thing you are waiting for?

9     **A.**   Yes.

10    **Q.**   Okay.  And at this point you are surrounded by

11    around 10 officers.  Is that fair?

12    **A.**   I didn't count but there are several officers.

13    **Q.**   So when you say the scene isn't secure, what is

14    going on in your mind?  What are you thinking?

15    **A.**   I don't know if the other subject has been

16    stopped, detained, secured.  Because you could have a

17    scenario where I pull a firearm out of his backpack and he

18    sees it and takes off running.  Then we have officers going

19    after that subject.

20    **Q.**   Fair.  But you don't have to pull the firearm out

21    of the bag.  Right?

22    **A.**   No.

23    **Q.**   In fact, you never pull the firearm out of the

24    backpack.  Right?

25    **A.**   Right.

1        **Q.**   You just look in to see if there is a firearm in

2    your search?

3        **A.**   [NODDED HEAD]

4        **Q.**   So that wouldn't -- that scenario you just laid

5    out wouldn't happen.  Right?

6        **A.**   Well, the firearm is going to come off of his

7    person.  It is going to come out of the bag.  I personally

8    didn't do it, but it's going to come off him.  I would like

9    to make sure that the other party involved is secure before

10   we take it off of him.

11       **Q.**   Is that something you are trained on?

12       **A.**   Yes, considering officer safety, scene safey,

13   scene security, I would say, yes.

14       **Q.**   So specifically, you are worried about if you open

15   the bag like you did --

16              MR. WASSERMAN:  Objection.  Asked and answered.

17              THE COURT:  Finish the question and I will answer

18   the objection.

19              MR. OHM:  You open the bag.  You peek in to see

20   whether there is a firearm in there or not.  Your decision

21   is not to do that, not to do that peeking because of why?

22   What are you worried about?

23              THE COURT:  The objection is overruled.  You can

24   answer the question.

25              THE WITNESS:  Because the other individual that is

389

1    involved was per the -- the individual exchanged originally

2    with the defendant.  So the guy went from him to the

3    defendant so assumingly, the first subject had possession,

4    is aware of what is in the bag.  Now he is watching us peer

5    into this bag.  So now he knows that we know there is a

6    firearm in this bag.  Whether or not we pulled it out, he is

7    watching us look into it.  If he's scared, you can bet he

8    will run, fight, flee.

9    **BY MR. OHM:**

10       **Q.**   Wouldn't those things also apply if he sees an

11   individual handcuffed?

12       **A.**   I think it is more likely that that would apply if

13   he sees us looking in the backpack verifying there is a

14   firearm in it versus having someone stopped and handcuffed.

15       **Q.**   So when you decide to put somebody in handcuffs,

16   you are not thinking about how it might trigger another

17   individual.  It is only when you are peeking into the bag?

18       **A.**   It's not my -- can you ask that again?

19       **Q.**   That's all right.  When you say, Am I okay to

20   search, who are you asking?

21       **A.**   The rest of the units that have eyes on the

22   location that I don't.  Anyone else with the other subject.

23       **Q.**   Is that when you said, you asked, Is the other

24   individual apprehended?

25       **A.**   I said -- I'm sorry?

1     Q.   Do you ask on your radio if the other individuals

2     are apprehended.  If the other individual was apprehended.

3     A.   Are you asking if I asked that?

4     Q.   Yeah.

5     A.   No, I don't.

6     Q.   Okay.  That is what you are waiting for according

7     to your testimony?

8     A.   What I said is, Is he good for a search?  I want

9     to know if they say yes, they are saying the scene is

10    secure, go ahead and search it.

11    Q.   So your assumption is if you say he is good for a

12    search, they understand that that means that the scene is

13    secure and the other person is under arrest?

14    A.   No.  I didn't say anything about being under

15    arrest.

16    Q.   Or Stopped.  I'm sorry.

17    A.   Secured.

18    Q.   Okay.  Is that like a predetermined code word?

19    A.   No.  But we all interact with each other

20    regularly.  We know how to understand each other on the

21    scene.

22    Q.   Like, for example, when you said 1-800 means gun;

23    that's a code word?

24    A.   Yes.

25    Q.   So you all sat around and decided that that is

1    what 1-800 --

2              THE COURT:  Mr. Ohm, let's not get close to the

3    line of badgering the witness.

4    **BY MR. OHM:**

5         **Q.**   All right.  So in any other of your

6    communications, either by radio or with the other officers

7    not by radio, you never asked anybody, Hey, can you make

8    sure you let me know when the other guy is apprehended.

9    Right?

10        **A.**   I don't think I said that.

11        **Q.**   And you never told any of the other officers you

12   felt the gun.  Right?

13        **A.**   Not that I recall.

14        **Q.**   You didn't tell your partner that you felt the gun

15   either.  Right?

16        **A.**   No.  I don't think I verbalized that, no.

17        **Q.**   Did you tell in any other way, in a non-verbal

18   way?

19        **A.**   I think she was watching me feel the bag. I can't

20   speak to what she was thinking at that moment.  I didn't

21   give her an answer or anything.

22        **Q.**   Just to be clear, after the jacket is taken off,

23   you never do the experimental frisk again.  Right?

24        **A.**   No, I don't think so.

25              MR. OHM:  I think that is all I have, Your Honor.

1          (Sidebar discussion off the record.)

2          MR. WASSERMAN:  Briefly, Your Honor.

3                    **REDIRECT EXAMINATION**

4     **BY MR. WASSERMAN:**

5          **Q.**    Officer Poupart, good afternoon.

6          **A.**    Good afternoon.

7          **Q.**    You testified in reference to your initial stop

8     with Officer Taylor of the Defendant Mr. Douglas.  Is it

9     fair to say you didn't know what was in the bag at the time

10    that you approached him?

11         **A.**    Correct.

12         **Q.**    All right.  And you testified previously that

13    there was about a minute and a half from the time you heard

14    the lookout until the time that you arrived on the scene.

15    Do you recall saying that?

16         **A.**    Yes.

17         **Q.**    And at the time that you arrived on the scene,

18    were you aware that there was also a second subject that was

19    involved in this exchange?

20         **A.**    Yes.

21         **Q.**    Okay.  Were you able to see what, if anything Mr.

22    Douglas had done with the book bag from the time that he

23    received it from Mr. Williams to the time that you first

24    laid eyes on him over by the parking lot?

25         **A.**    No.

393

1    **Q.**   So do you know whether or not he had reached into

2    the book bag and pulled anything out in that period of time?

3    **A.**   I don't know.

4    **Q.**   All right.  Were you aware of whether he could

5    have had a weapon anywhere else on his person at the time

6    that you approached him?

7    **A.**   I did not, no.

8    **Q.**   About how long do you think it takes for somebody

9    to draw a gun or weapon and use it?

10   **A.**   Half a second to a second.

11   **Q.**   All right.  When you arrived on the scene, you

12   testified it was you and Officer Taylor who were first on

13   the scene.  Do you recall that?

14   **A.**   Yes.

15   **Q.**   And Mr. Ohm showed you some of the video from your

16   body worn camera that showed within about 50 seconds or so

17   other officers arrived on the scene.  Do you recall seeing

18   that part of defense Exhibit No. 3?

19        MR. OHM:  Objection to the characterization, Your

20   Honor.  The record will speak for itself.  The Government's

21   estimate of timing.

22        THE COURT:  I'll allow the question.

23   **BY MR. WASSERMAN:**

24   **Q.**   Certainly within a minute or less other officers

25   were there; is that your recollection of that video?

1          **A.**   Yeah.

2          **Q.**   And do you know whether they were actually looking

3   for the other subject that was part of that lookout, those

4   officers?

5          **A.**   Yes, they were looking for the other subject.

6          **Q.**   Who was handling Mr. Douglas?

7          **A.**   Myself and my partner.

8          **Q.**   And just to be sure, with respect to -- I showed

9   you Government's Exhibit No. 4, I think it was, your body

10  worn camera.  When you approached, do you recall seeing Mr.

11  Douglas in the blue jacket, Mr. Williams and another third

12  individual?

13         **A.**   Yes.

14         **Q.**   Were you aware at that time whether or not either

15  one of those two individuals may have been the second

16  subject that had been part of Officer Jackson's lookout?

17         **A.**   I was not aware.

18         **Q.**   Were you concerned they might be?

19         **A.**   Yes, it is possible.

20         **Q.**   Did that factor into part of your calculation in

21  placing Mr. Douglas in handcuffs?

22              MR. OHM:  Objection.

23              THE COURT:  Overruled.

24              MR. WASSERMAN:  Did the fact that those two

25  individuals were there and may or may not have been part of

1    this transaction, factor into your decision to handcuff Mr.

2    Douglas?

3              MR. OHM:  Objection.  Leading.

4              THE COURT:  Overruled.  You can answer.

5              THE WITNESS:  Yeah.

6    **BY MR. WASSERMAN:**

7        **Q.**   Mr. Ohm asked you a little bit about the pat down,

8    that you frisked or whatever you want to call it, that you

9    conducted.  When you did the pat down or the frisk, did you

10   -- were you able to, you know, detect that there was more

11   than one item in there when you did the frisk?

12       **A.**   Yes.

13       **Q.**   And given that there was more than one item that

14   you could feel in there, was there a point at which you --

15             MR. OHM:  Objection.  Leading.

16             THE COURT:  Mr. Ohm, I will let him finish the

17   question.

18   **BY MR. WASSERMAN:**

19       **Q.**   Was there a point in which you were able to

20   distinguish between the two items during the frisk?  In

21   other words, based on what you were feeling?

22       **A.**   Yes.

23       **Q.**   One distinct item and another distinct item?

24       **A.**   Yes.

25       **Q.**   All right.  And within that period of time on

1    the -- on your body worn camera footage, while you were

2    patting down or frisking the exterior of the jacket, were

3    you able to determine that one of those items was a gun?

4         **A.**   Yes.

5              MR. WASSERNMAN:  The Court's indulgence.

6    **BY MR. WASSERMAN:**

7         **Q.**   One other question.  Mr. Ohm asked you a question

8    about situations where you would not place somebody in

9    handcuffs.

10             If you conducted a stop of somebody for

11   jaywalking, would you put them in handcuffs?

12        **A.**   For jaywalking, probably not.

13        **Q.**   What about a routine traffic stop for a blinker or

14   speeding?

15        **A.**   Probably not.

16        **Q.**   Okay.  Without any other facts or situational

17   facts that might cause you to be concerned for your safety;

18   is that a fair statement?

19        **A.**   Yes.

20             MR. WASSERMAN:  That's all I have.

21             THE COURT:  Thank you, Officer.  Thank you for

22   your time.  You are excused.  Thank you for your testimony

23   today.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  The Government has no additional

1      evidence at this point.

2                  THE COURT:  Mr. Ohm?

3                  MR. OHM:  Your Honor, Mr. Douglas would like to

4      call Officer Taylor.

5                  THE COURT:  Officer Taylor, can you hold on one

6      second.  In case you want to wipe down the witness stand.

7      We will wipe it down for you.

8                  THE WITNESS:  Thank you.

9                  CLERK:  Please raise your right hand.  Do you

10     solemnly swear to tell the truth, the whole truth and

11     nothing but the truth so help you God?

12                 THE COURT:  Officer Taylor, thank you for wearing

13     a mask.  I think it is fair to say we found wearing a mask

14     is more effective than wearing a face shield.  If you would

15     prefer to wear a face shield while you testify, that is a

16     possibility as well.  During our hearing today we concluded

17     that so long as you speak into the microphone and are not

18     too fast, we can understand you just fine with the face mask

19     on, if that's okay with you.

20                 THE WITNESS:  Sounds good.

21                 THE COURT:  Thank you.

22                          **DIRECT EXAMINATION**

23     BY MR. OHM:

24          Q.   Good afternoon, Officer.

25          A.   Good afternoon.

 1        Q.   Could you please state your name and spell it for

 2   the court reporter?

 3        A.   Brianna Taylor.  B-r-i-a-n-n-a, T-a-y-l-o-r.

 4        Q.   How are you employed?

 5        A.   The Metropolitan Police Department as an officer.

 6        Q.   How long have you been with the MPD?

 7        A.   Eight years in February.

 8        Q.   And do you have a partner?

 9        A.   Some days.  It just depends.

10        Q.   And on April 2nd, 2020, did you have a partner?

11        A.   Yes.

12        Q.   Who was that?

13        A.   Officer Poupart.

14        Q.   Have you worked together before?

15        A.   Yes.

16        Q.   Are you on the same team?

17        A.   Yes.  Were, yes.

18        Q.   So even when you didn't work as partners, you also

19   often worked together; is that fair?

20        A.   That's fair.

21        Q.   Okay.  I want to show you what I am marking as

22   defense 4.

23             THE COURT:  Defendant Douglas' 4.

24             MR. OHM:  Defendant Douglas' 4.  Thank you, Your

25   Honor.

1          (Defendant Douglas' Exhibit No. 4 was marked for

2    identification.)

3    **BY MR. OHM:**

4        **Q.**   Does this scene look familiar to you?

5        **A.**   Yes, it does.

6        **Q.**   Do you see the writing in the top-right corner of

7    the exhibit?

8        **A.**   Yes.

9        **Q.**   What is this?

10       **A.**   The body cam information.

11       **Q.**   If I play it right now, it is at 1:33, the first

12   minute of the body worn camera footage, what is that

13   usually?

14       **A.**   Whatever you are doing prior to after putting on

15   your body worn camera.

16       **Q.**   This is activated footage.  Is that fair?

17       **A.**   Yes.

18            (Played video.)

19       **Q.**   Do you recognize this?

20       **A.**   Can you play a little more?

21       **Q.**   Sure.  Whose body worn camera footage is this?

22       **A.**   It appears to be mine.

23       **Q.**   Who is the officer on the left?

24       **A.**   Officer Poupart.

25            MR. OHM:  Your Honor, I would move in Defendant

```
 1    Douglas' 4.

 2              MR. WASSERMAN:  No objection.

 3              THE COURT:  So admitted.

 4              (Defendant Douglas' Exhibit No. 4 was admitted.)

 5    BY MR. OHM:

 6        Q.    Okay.  Did you hear that?  I'm sorry.  How do you

 7    pronounce his name?

 8        A.    Poupart.

 9        Q.    Did you hear Officer Poupart there?

10        A.    Yes.

11        Q.    What did he say?

12        A.    I believe he asked him, do you mind if he checked

13    the bag.

14        Q.    What do you think Officer Poupart means when he

15    says that?

16              MR. WASSERMAN:  Objection.

17              THE COURT:  Sustained.

18    BY MR. OHM:

19        Q.    Have you worked with Officer Poupart on street

20    encounters before?

21        A.    Yes.

22        Q.    Have you worked with Officer Poupart when he

23    searched an individual before?

24        A.    Yes.

25        Q.    Okay.  Does Officer Poupart routinely ask if he
```

1    has permission to search?

2         **A.**   I believe.

3         **Q.**   It isn't routine?

4         **A.**   I don't think anything is routine in terms of --

5         **Q.**   Has Officer Poupart ever expressed to you that he

6    likes to give people an opportunity?

7         **A.**   We never discussed it before.

8         **Q.**   Okay.  And in terms of you being partnered up,

9    would you say that that's happened more than -- how many

10   times do you think that that's happened?

11        **A.**   Um, I am not sure.  We have been partners for six

12   months detailed --

13        **Q.**   So multiple times a week?

14        **A.**   Twice.

15        **Q.**   For the last six months?

16        **A.**   Yes.

17             (Playing video.)

18        **Q.**   Did you hear Mr. Douglas say, You can't check it.

19   It's just glasses?

20        **A.**   Can you play it back, please?

21        **Q.**   Sure.  You heard him say, No, you can't check it.

22   Right?

23        **A.**   Yes.

24        **Q.**   Now, at this point Officer Poupart hasn't opened

25   it up yet.  Why is that?

1          A.   I am not sure.  I am not sure why he did not open

2     the backpack.

3          Q.   Okay.  Did he express to you what he was waiting

4     for?

5          A.   No, he did not.

6          Q.   And just so -- we are at 19:04:24.  Do you see

7     four fellow officers in the background there?

8          A.   Yes.

9          Q.   How many people were on the arrest team that day?

10         A.   I am not sure.

11         Q.   More than 10?

12         A.   I am not sure.

13         Q.   At least five and the two of you though.  Right?

14         A.   That's what I see.  That would be fair.

15         Q.   Just so we can see, there are five on the right

16    side of the exhibit.  We are at 19:04:30.  And two towards

17    the middle of the exhibit, as well as the two of you.

18    Right?

19         A.   Yeah.

20         Q.   Would it be fair to say that these officers are

21    all sort of facing the three of you and not really doing

22    anything else other than sort of supporting you guys?

23         A.   Which officers?

24         Q.   The officers in the background.

25              MR. WASSERMAN:  Your Honor, I am just going to

 1    object to leading the witness.

 2           THE COURT:  Overruled.  You can answer the

 3    question.

 4    **BY MR. OHM:**

 5       **Q.**   Starting at 19:04:35.  I will play for a few

 6    seconds.  If you could keep an eye on the other officers.  I

 7    am stopping at 19:04:41.  Is it fair to say that those

 8    officers are in support of you and Officer Poupart?

 9       **A.**   That would be fair to say.

10           (Playing video.)

11       **Q.**   At that point did you hear Officer Poupart say,

12    Are we good for a search?

13       **A.**   I didn't hear that.

14       **Q.**   Let's go back.  Did you hear that?

15       **A.**   I heard the word search.

16       **Q.**   You heard Officer Poupart.  Right?

17       **A.**   Yes.

18       **Q.**   Do you know what that meant?

19       **A.**   Search.  To do a search.

20       **Q.**   I will show you Officer Poupart --

21           MR. OHM:  This is marked as defense 3, Your

22    Honor.

23           (Playing video.)

24           I'm sorry.  Did you hear it there?

25           (Playing video.)

                           404

1          THE COURT:  Mr. Ohm, I think you are confusing the

2   time on the file with the time of the actual time.  You need

3   to go back.

4          MR. OHM:  Okay.  Thank you, Your Honor.

5   **BY MR. OHM:**

6      **Q.**   Okay.  Defense Exhibit 3 at 19:04:58, did you hear

7   Officer Poupart?

8      **A.**   Yes.

9      **Q.**   Did you hear him say, are we good for a search?

10     **A.**   Yes.

11     **Q.**   Have you worked with Officer Poupart before?  What

12  did you think of that to mean?

13     **A.**   What did I think in terms of?

14     **Q.**   What did you take it to mean in terms of his

15  question, Are we good for a search?  What does that mean?

16          MR. WASSERMAN:  I am going to object to the

17  relevance of that question.

18          THE COURT:  Overruled.

19          THE WITNESS:  To my knowledge, is the individual

20  good to be searched.

21  **BY MR. OHM:**

22     **Q.**   Okay.  He was asking if the individual was good to

23  be searched?

24     **A.**   Yes.

25     **Q.**   Okay.  Was there any other meaning behind that

 1    question that you know of?

 2         A.    Not to my knowledge.

 3         Q.    Okay.  Just very briefly.  Would you say at the

 4    time that you apprehended Mr. Douglas, was he entirely

 5    cooperative?

 6         A.    The entire account or?

 7         Q.    As you approached him and as you encountered him,

 8    did he ever try to flee, argue or threaten?

 9         A.    When we stopped him?  No, he did not.

10         Q.    Did you see any other individuals there?

11         A.    No.

12         Q.    When you stopped Mr. Douglas, initially were there

13    other individuals there acting in a threatening manner

14    towards you?

15         A.    Honestly, I can't recall.  There were residents I

16    am assuming coming out, but nobody was in an aggressive

17    manner.  There were quite a few officers on the scene.

18         Q.    So you didn't have anyone threaten you or pull a

19    gun on you or anything like that?

20         A.    No.

21         Q.    Okay.  I mean, if you saw somebody you suspected

22    had a gun, officers actually apprehend them.  Right?

23         A.    Yes.

24               MR. OHM:  No further questions, Your Honor.

25               THE COURT:  Mr. Wasserman.

1              MR. WASSERMAN:  Briefly, Your Honor.

2                        **CROSS EXAMINATION**

3    **BY MR. WASSERMAN:**

4         **Q.**   Good afternoon, Officer Taylor.

5         **A.**   Good afternoon.

6         **Q.**   Do you remember when you first started working at

7    NSID?

8         **A.**   I believe it was February, 2020.

9         **Q.**   February.  Was it sort of a detail?

10        **A.**   Yes.

11        **Q.**   And when did you -- where were you assigned

12   before?

13        **A.**   The sixth district.

14        **Q.**   How long have you been with MPD?

15        **A.**   It will be eight years in February.

16        **Q.**   Have you been at 6D the whole time?

17        **A.**   Aside from other details, yes.

18        **Q.**   Okay.  And what is your position in patrol?

19   Crimes?  Correction?

20        **A.**   I am patrol.

21        **Q.**   Okay.  And when did you -- you started in NSID in

22   February of 2020.  When did you finish up with that detail?

23        **A.**   I believe it was August, mid-August.

24        **Q.**   Mid-August of this year?

25        **A.**   Yes.  I'm sorry.  2020.

                              407

1     Q.   So prior to your assignment with NSID, had you

2     worked with Officer Poupart before?

3     A.   No.

4     Q.   And was he your partner the whole time you were in

5     NSID or did you guys switch around?

6     A.   We kind of switched around.

7     Q.   All right.  So as far as actually -- when you say

8     "partner", does that mean you ride in the same car together

9     essentially?

10    A.   Essentially.

11    Q.   And responding to calls together?

12    A.   Yes.

13    Q.   Okay.  So during that six-month period, is it

14    correct to say that, you know, sometimes you worked with him

15    as your partner.  Sometimes you might have worked with him,

16    but he wasn't right there with you as your partner?

17    A.   Yes.

18    Q.   Okay.  Do you happen to recall -- let me,

19    actually, ask if we can play Government's Exhibit No. 4

20    starting at the 6-minute mark.

21         Before we do that, do you recall getting a lookout

22    over the radio to respond to the 2300 block of 15th Street

23    that day?

24    A.   Yes.  Yes.

25    Q.   All right.

```
 1                    MR. WASSERMAN:  Government's Exhibit 3 at the
 2      6-minute mark.
 3                    (Played audio.)
 4      BY MR. WASSERMAN:
 5           Q.    Do you recall, was that the lookout that you and
 6      Officer Poupart responded to that day?
 7           A.    Yes.
 8           Q.    In that lookout, it was for two individuals; is
 9      that correct?
10           A.    Yes, yes.
11           Q.    All right.  And have you worked narcotics and
12      firearm cases before in terms of investigations?  Come
13      across people who have been selling drugs?
14           A.    Yes.
15           Q.    All right.  In your eight-year career; is that
16      correct?
17           A.    Yes.
18           Q.    Okay.  And in your training and experience, is it
19      common for people engaged in drug trafficking to carry
20      firearms or other weapons?
21           A.    Yes.
22           Q.    Is that a concern of yours as an eight-year police
23      officer when you approach somebody in the type of situation
24      where you approached Mr. Douglas?
25           A.    Yes.
```

1    Q.   And on the day of April 22nd, the day you and

2    Officer Poupart approached Mr. Douglas, is it correct that

3    you were aware that there was another individual that was

4    suspected of being involved in this exchange?

5    A.   Yes.

6    Q.   Did you know where that individual was at the time

7    that you approached Mr. Douglas?

8    A.   No.

9    Q.   And when you and Officer Poupart arrived on the

10   scene and approached Mr. Douglas, were you the first

11   officers on the scene?

12   A.   Yes.

13   Q.   Did you know where the other officers were when

14   you first made contact with Mr. Douglas?

15   A.   No.

16   Q.   Do you know how long it was going to take them to

17   arrive in that area?

18   A.   No.

19   Q.   If I could ask -- all right.  I am showing you

20   Government's Exhibit 4-A.  Officer Taylor, do you recall

21   that particular still shot?  Is that from Officer Poupart's

22   body worn camera footage?

23   A.   I am not sure.

24   Q.   You are are not sure.  Do you recognize the

25   individual in the blue coat?

1      **A.**   Yes.

2      **Q.**   Who is that?

3      **A.**   That is the individual that we did the search

4  with.

5      **Q.**   Okay.  Do you see anybody else in that photograph?

6      **A.**   Yes.

7      **Q.**   At the time that you stopped Mr. Douglas, do you

8  know who those other individuals were?

9      **A.**   No.

10          MR. WASSERMAN:  That's all I have, Your Honor.

11  Thank you.

12              THE COURT:  Thank you.

13              Mr. Ohm, any redirect?

14              MR. OHM:  No, Your Honor.

15              THE COURT:  Thank you, Officer.  You are excused.

16              THE WITNESS:  Thank you.

17              THE COURT:  So counsel, here is where I am.  I

18  don't want to hear argument on the motions.  We have the

19  evidence now.  I think it is closed.  Correct me if that's

20  not the case.

21              MR. OHM:  I don't remember if I moved in my

22  exhibits.  I know they are duplicate of the Government

23  exhibits.

24              CLERK:  You did not do 1 through 3.

25              THE COURT:  It looks like maybe not.  Why don't

1   you move in -- it looks like you need to move in Defendant

2   Douglas' Exhibits 1, 2 and 3.  I don't believe there were

3   objections, since they were Government exhibits so we will

4   admit them.

5           (Defendant Douglas' Exhibit Nos. 1-3 were

6   admitted.)

7           MR. WASSERMAN:  No, Your Honor.

8           THE COURT:  So we have the evidence.  I don't want

9   to hear argument today on the motions.

10          Here is what I think is the most efficient course.

11  We've heard something like five hours of testimony today.  I

12  think the best course is for parties to take the evidence

13  that we heard today and file supplemental briefs on the

14  motions.

15          So I am open to whatever proposal you have.  I am

16  thinking of something relatively concise.  They need not be

17  an exchange of briefs.  I want to keep this case moving.  I

18  am thinking about each party getting a supplemental brief of

19  X-number of pages to tell me the most relevant evidence that

20  we heard today as it relates to the arguments that have been

21  presented already.

22          The reason I think it is complicated because, of

23  course, the Government has a position on two of the motions

24  we heard evidence on today.  There are the defendants who

25  are on different positions.  I think the fair way to do it

1    is on the motions to suppress the identification testimony,

2    each party gets to file a 10-page supplemental brief,

3    basically, arguing whatever you want to argue on the

4    evidence today with citations to the record.

5            And then as to the motion to suppress, the

6    tangible evidence, on that one, Defendant Douglas and the

7    Government get 10-page briefs presenting whatever arguments

8    you want to make based on the evidence we heard today.  The

9    briefs will be filed simultaneously.  I don't think we need

10   to have -- I have already read the legal arguments.  I just

11   want to understand the synthesis of the evidence as it

12   relates to various positions.  I will have the Government go

13   first or vice versa.  That's how I want to proceed.  The

14   question for you is, When is an appropriate time for you to

15   file these briefs?

16           Obviously, you heard the evidence today, and

17   obviously you will need the transcript to cite it.  So

18   there's that question.  And I don't know what your schedules

19   are like.  With the goal in mind of resolving this quickly,

20   I want to give you the opportunity to put your best foot

21   forward.

22           That's how I would like to proceed.  The only

23   question being, When would you like to file these

24   supplemental briefs?  Obviously, the Government has two to

25   file.  Mr. Marston one.  So the question is probably to Mr.

1    Ohm and Mr. Wasserman, what do you want to file?

2    Mr. Marston, you can object if you don't like their

3    proposal.  Feel free to approach.

4              MR. WASSERMAN:  Your Honor, I guess the only issue

5    is when we would get the transcript.  We can order it daily

6    I suppose.  I don't know how long.  I have permission to do

7    that.  I don't think it is a problem.  Assuming I can get

8    the transcript.

9              May I confer with the court reporter?

10             THE COURT:  You may.

11             MR. WASSERMAN:  I know it is a pretty lengthy

12   transcript.  How long do you think you might be able to get

13   it completed?

14             COURT REPORTER:  Um, two days.

15             MR. WASSERMAN:  I just want to look at my

16   schedule, Your Honor.  Is two weeks --

17             THE COURT:  That's acceptable from my perspective.

18   I think something can be done before you get the transcript

19   just to make whatever argument, whatever the lawyers will

20   testify to.

21             MR. WASSERMAN:  November 5th or 6th?

22             THE COURT:  Let me hear from Mr. Ohm, whose client

23   is in the most time sensitive position.  Mr. Ohm?

24             MR. OHM:  Your Honor, I am leaning towards only

25   filing the Fourth Amendment one.

1    THE COURT:  I understand.

2    MR. OHM:  So I am -- a week -- a week from the two

3    days is fine with me.  I know everyone is busy.

4    THE COURT:  Why don't we do October 30th.  It's

5    not quite two weeks.  I know Mr. Wasserman, it's more than a

6    full week after the transcripts are available, and we have

7    the rest of this week to at least --

8    MR. WASSERMAN:  Your Honor, I apologize.  I've got

9    compassionate release motion I have to respond to by the

10    28th.  I've got to go to Grand Jury on another case on the

11    27th.  I just have a few balls in the air here that I am

12    trying to balance.

13    The more time I could get, I think, the more

14    realistic it would be for me.

15    THE COURT:  Let's do November 3rd.  Two weeks from

16    today and that's not quite two weeks from the transcript but

17    that's how we are going to proceed.

18    Mr. Ohm, feel free to respond if you like.  I

19    understand you may only file the Fourth Amendment.  Again,

20    each party can file.  The Government can file two briefs,

21    supplemental briefs, each of no more than 10 pages on the

22    two motions to suppress.  Mr. Ohm, Mr. Douglas, can file one

23    or two supplemental briefs on those motions, and Mr.

24    Williams can file one supplemental brief on the motion, the

25    motion to suppress that he has filed.  And those briefs are

1    due two weeks from today, which is November 3rd.  I will not

2    impose a time deadline.

3              Anything else we should discuss today, Counsel?

4              MR. WASSERMAN:  Is the Court going to decide the

5    -- [inaudible] -- will be on papers --

6              THE COURT:  Yes.  Well, I guess I should say, I

7    don't know yet.  What I want to do is I want to see -- to be

8    clear, I want to see the parties' respective positions on

9    these motions, especially the motion to suppress the

10   tangible motions.  I may decide to hear arguments on them

11   and possibly on the other motions.  I tend to think that

12   those can be resolved in the papers, but I really want to

13   see how you synthesize the questions here today, and it may

14   be that depending on how the suppression motions come out.

15             I think the better course is to decide after you

16   file those things whether I want to have argument at all if

17   -- and if so, on what issues?  And, of course, if we

18   schedule argument, I will make everybody aware of what I

19   intend.  Thank you for the question.

20             MR. WASSERMAN:  Very well, Your Honor.

21             MR. MARTSON:  Nothing from Mr. Williams.

22             THE COURT:  Thank you, Counsel.

23             CLERK:  All rise.

24             (Proceedings concluded at 4:37 p.m.)

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                    C E R T I F I C A T E

25

1           I, Lorraine T. Herman, Official Court

2    Reporter, certify that the foregoing is a true and correct

3    transcript of the record of proceedings in the

4    above-entitled matter.

5

6           Please Note:  This hearing occurred during

7    the COVID-19 pandemic and is therefore subject to the

8    limitations of court reporting mask wearers.

9

10

11

12

13

14    __October 21, 2020___      ____/s/_____
                DATE                   Lorraine T. Herman

15

16

17

18

19

20

21

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,
                                        CR Action
4              Plaintiff,              No. 1:20-121

5        vs.                          Washington, DC
                                      March 9, 2021
6   TAVONTE WILLIAMS AND
    THEODORE B. DOUGLAS                3:10 p.m.
7              Defendants.
    _____/
8

9      TRANSCRIPT OF TELEPHONE STATUS CONFERENCE/GUILTY PLEA
               BEFORE THE HONORABLE CARL J. NICHOLS
10                UNITED STATES DISTRICT JUDGE

11

12
    APPEARANCES:
13
    For the Plaintiff:      STEVEN B. WASSERMAN
14                          U.S. ATTORNEY'S OFFICE FOR D.C.
                            555 Fourth Street, NW
15                          Washington, DC 20530
                            (202) 252-7719
16
    For T. Williams:        JOHN PETER MARSTON
17                          FOLEY HOAG, LLP
                            1717 K Street, NW
18                          Washington, DC 20006

19  For T. Douglas:         EUGENE OHM
                            FEDERAL PUBLIC DEFENDER FOR D.C.
20                          625 Indiana Avenue, NW, Suite 550
                            Washington, DC 20004
21                          (202) 208-7500

22
    Reported By:     LORRAINE T. HERMAN, RPR, CRC
23                   Official Court Reporter
                     U.S. District & Bankruptcy Courts
24                   333 Constitution Avenue, NW
                     Room 6720
25                   Washington, DC 20001

**P R O C E E D I N G S**

1

2          THE COURT:  Good afternoon, everyone.  Assuming

3    everyone can hear me, Ms. Lesley, could you please call this

4    matter?

5          COURTROOM DEPUTY:  Yes, Your Honor.  This is

6    criminal case year 2020-121, Tavonte Williams Defendant

7    number 1 and Theodore Douglas Defendant number 2, both who

8    are present by video.

9          MR. WASSERMAN:  Good afternoon, Your Honor.

10   Steven Wasserman on behalf of the United States.

11         THE COURT:  Mr. Wasserman, good afternoon.

12         MR. MARSTON:  John Marston for Tavonte Williams.

13         THE COURT:  Mr. Marston.

14         MR. OHM:   Gene Ohm on behalf of Theodore Douglas.

15         THE COURT:  Good afternoon.  I note Mr. Williams

16   and Mr. Douglas are on the video.

17         We obviously have a number of topics to cover.  My

18   plan, but please tell me, Mr. Marston, if you have a problem

19   with this, is to do the plea hearing first.  And then after

20   we've done that, we can talk about how that impacts the

21   schedule of the case and the like.  But if you would like to

22   take it in a different order, let me know.

23         MR. MARSTON:  This is Mr. Marston.  That sounds

24   good, Your Honor.  Thank you.

25         THE COURT:  Okay.  Thank you.

1          So I understand that Mr. Douglas would like to

2    enter a plea of guilty to the 922(g)(1) charge; is that

3    correct, Mr. Ohm?

4          MR. OHM:  Yes, Your Honor.

5          THE COURT:  So before we proceed to take the plea

6    today, I need to address a preliminary matter, which is to

7    acknowledge the unique nature of today's hearing in light of

8    the pandemic.  Ordinarily, of course, we would conduct this

9    plea in person, but during the pandemic, Congress has

10   authorized federal judges to take felony guilty pleas by

11   video or teleconference so long as after consulting with

12   counsel the Defendant consents and the judge finds the plea

13   in the case cannot be further delayed without serious harm

14   to the interest of justice.

15         Mr. Douglas, after consulting with Mr. Ohm, have

16   you decided that further delay is inappropriate and that you

17   would like to resolve this matter as promptly as possible

18   and without the risks that attend being physically present

19   in the courtroom during the COVID-19 pandemic?

20         THE DEFENDANT:  Yes, sir, Your Honor.

21         THE COURT:  And, Mr. Ohm, do you agree the

22   interests of justice would be seriously harmed by further

23   delay and that we should therefore proceed with this plea

24   hearing by video?

25         MR. OHM:  Yes, Your Honor.

1          THE COURT:  I find that because Mr. Douglas, after

2    consulting with counsel, consents to proceed by

3    videoconference and with the interest of justice being

4    seriously harmed by further delay, that it is appropriate to

5    proceed by video.

6          Incidentally, Mr. Wasserman, I assume you agree

7    that we should proceed by video today?

8          MR. WASSERMAN:  Yes, Your Honor.

9          THE COURT:  Ms. Lesley, could you please

10   administer the oath to Mr. Douglas?

11         COURTROOM DEPUTY:  Mr. Douglas, please raise your

12   right hand.  Do you solemnly swear that you will well and

13   truly answer all questions propounded to you, so help you

14   God?

15         THE DEFENDANT:  Yes, I do.

16         COURTROOM DEPUTY:  Thank you.

17         THE COURT:  Mr. Douglas, the purpose of this

18   hearing is to allow you to enter into a plea of guilty to

19   the charge against you.  Because this is an important

20   decision, it is vital you understand what rights you will

21   give up by entering a guilty plea.  I will ask you a series

22   of questions to make sure that the guilty plea is knowing

23   and voluntary and with the advice of your attorney.  If you

24   don't understand any of the questions, please tell me.  I'll

25   try to explain things more clearly or I will let you consult

1   with Mr. Ohm.  If you don't ask for clarification, I will

2   assume you understand the questions and discussions.  You

3   are under oath now and you are obligated to answer all

4   questions truthfully.  If you are not truthful, and the plea

5   should fall apart, the Government may be able to use some of

6   your statements against you in a later proceeding or

7   separate prosecution for perjury or making a false

8   statement.

9   **BY THE COURT:**

10      **Q.**   Mr. Douglas, what is your full name?

11      **A.**   Theodore Bernard Douglas, III.

12      **Q.**   How old are you, Mr. Douglas?

13      **A.**   Thirty years old.

14      **Q.**   Were you born in the United States?

15      **A.**   Yes.

16      **Q.**   Are you sick or impaired in any way that could

17   prevent you from understanding what is happening here today?

18      **A.**   No.

19          THE COURT:  Mr. Ohm, do you have any reason to

20   believe your client will be unable to understand what we are

21   discussing here today?

22          MR. OHM:  No, Your Honor.

23   **BY THE COURT:**

24      **Q.**   Mr. Douglas, have you had enough time to discuss

25   things with your attorney?

1      **A.**    Yes.

2      **Q.**    Have you received a copy of the indictment against

3    you, which is the written charge made against you in this

4    case?

5      **A.**    Yes.

6      **Q.**    Have you had the opportunity to discuss with Mr.

7    Ohm the charge against you and whether you should enter a

8    plea today?

9      **A.**    Yes.

10      **Q.**    Are you satisfied with the services of Mr. Ohm in

11    this matter?

12      **A.**    Yes.

13            THE COURT:  Mr. Ohm, have you had enough time to

14    review and investigate the law and facts in this case?

15            MR. OHM:  Yes, Your Honor.

16            THE COURT:  I find the Defendant Mr. Douglas is

17    responding appropriately to my questions and appears to

18    understand them fully.  I find he is competent and capable

19    of entering an informed plea.

20    **BY THE COURT:**

21      **Q.**    Mr. Douglas, before I accept your plea, I need to

22    explain the rights you have in this matter and confirm that

23    you understand them.  Please listen closely again, and

24    please let me know if you don't understand anything or need

25    to speak with Mr. Ohm privately, which we could arrange in a

1    separate, private videoconference.  I will now discuss your

2    right to a jury trial and an appeal.

3              Do you understand, Mr. Douglas, that you have the

4    right to plead not guilty to any offense charged against

5    you?

6        **A.**    Yes.

7        **Q.**    Do you understand you have a right to challenge

8    the Government's case against you in a jury trial where 12

9    citizens of the District of Columbia would sit as a jury and

10   determine whether you were guilty based on evidence

11   presented in the courtroom?

12       **A.**    Yes.

13       **Q.**    Do you understand that if you were to go to trial,

14   you would have the right to be represented by your lawyer at

15   that trial and at every stage of the proceeding?

16       **A.**    Yes.

17       **Q.**    Do you understand that if you were to exercise

18   your right to a trial, you would have the right to confront

19   and cross examine any of the Government's witnesses who

20   testify against you?

21       **A.**    Yes.

22       **Q.**    Do you understand that if you were to exercise

23   your right to a trial, you would have the right to present

24   your own witnesses and the right to subpoena them and

25   require them to testify in your defense?

1        **A.**    Yes.

2        **Q.**    Do you understand that at a trial you would have

3    the right to testify and present evidence on your behalf,

4    but only if you wanted to.  If you did not want to testify

5    or present evidence, you would not have to do so?

6        **A.**    Yes.

7        **Q.**    Do you understand that unless and until I accept

8    your guilty plea, you are presumed innocent under the law

9    unless if you were to choose to go to trial, the Government

10    would have the burden of proving you were guilty beyond a

11    reasonable doubt?

12        **A.**    Yes.

13        **Q.**    Do you understand that if you choose to go to

14    trial and are convicted, you would have the right to appeal

15    your conviction and to have a lawyer prepare your appeal,

16    but that by pleading guilty, you are giving up many of your

17    rights to appeal your conviction and sentence with some

18    limited exceptions?  Do you understand that?

19        **A.**    Yes.

20        **Q.**    Do you understand that you are waiving the right

21    to appeal your conviction; that you could not later try to

22    appeal your conviction and argue, for example, that the

23    statute to which you are pleading guilty is unconstitutional

24    or that the conduct you engaged in did not fit within the

25    scope of the statute?  Do you understand all of that?

1        **A.**   Yes.

2        **Q.**   Do you understand you are generally waiving the

3    right to appeal your sentence, which means you can't appeal

4    your prison term, the fine, forfeiture, award of

5    restitution, term or condition of supervised release, my

6    authority to set the condition of release or how I

7    determined your sentence with some limited exceptions that I

8    will get to?  Do you understand all of that?

9        **A.**   Yes.

10        **Q.**   So as I mentioned, there are some limited

11    exceptions to the waiver of your appeal rights.  You can

12    appeal the sentence, if I sentence you above the statutory

13    maximum or the advisory guidelines range, and you could also

14    appeal the conviction and sentence on the basis that your

15    lawyer was ineffective.  Do you understand that you will

16    retain those appeal rights?

17        **A.**   Yes.

18        **Q.**   So, Mr. Douglas, do you understand that you are

19    largely giving up your rights if you plead guilty today?

20        **A.**   Yes.

21        **Q.**   Do you still wish to plead guilty and give up all

22    of the rights that we have discussed?

23        **A.**   Yes.

24             MR. WASSERMAN:  Your Honor, this is Steven

25    Wasserman.  I just wanted to make sure it was clear on the

427

1    record that Mr. Douglas is preserving his right to appeal

2    the denial of his Motion to Suppress, which is included in

3    the terms of the plea agreement.

4           THE COURT:  Okay.  Thank you, Mr. Wasserman.  Mr.

5    Ohm, do you agree that Mr. Douglas is, in fact, preserving

6    his right to appeal the denial of his Motion to Suppress?

7           MR. OHM:  Yes, Your Honor, it is set forth on Page

8    4 of the plea agreement.

9           THE COURT:  Thank you, Mr. Wasserman.

10          MR. WASSERMAN:  Yes, Your Honor.

11   **BY THE COURT:**

12      **Q.**   Mr. Douglas, do you understand you are giving up

13   your right to appeal my decision with respect to your Motion

14   to Suppress?

15      **A.**   Yes.

16          THE COURT:  Thank you, Mr. Wasserman, for that

17   clarification.

18   **BY THE COURT:**

19      **Q.**   I will hold up what appears to be a signed waiver

20   of a trial by jury form.  Does this document contain your

21   signature?

22      **A.**   Yes, Your Honor.

23          THE COURT:  Mr. Ohm, is there any reason Mr.

24   Douglas should not waive jury trial -- [inaudible]

25          MR. OHM:  I'm sorry, Your Honor.  I didn't really

428

1    hear the last part.

2           THE COURT:  That's okay.  There is some background

3    noise somewhere.  Let me say it again.

4           Mr. Ohm, is there any reason Mr. Douglas should

5    not waive his right to a jury trial and his right against

6    self-incrimination to a charge to which a guilty plea will

7    be made?

8           MR. OHM:  No, Your Honor.

9           THE COURT:  I find that the waiver of a trial by

10   jury is knowingly and voluntarily made and it is accepted.

11   The signed waiver will be filed.

12          Mr. Douglas, before I can accept your guilty plea,

13   I must first determine that there was a factual basis for

14   the plea.  The Government has provided a document called the

15   Statement of Offense that describes what the Government

16   would be prepared to prove at trial.  Mr. Wasserman, could

17   you summarize the Statement of the Offense and the elements

18   of charges, please?

19          MR. WASSERMAN:  With respect to the elements of

20   the offense of unlawful possession of a firearm by a person

21   convicted of a crime punishable by imprisonment for a term

22   exceeding one year in violation of 18 US Code, Section

23   922(g)(1), the first element is that the Defendant knowingly

24   possessed a firearm and/or ammunition; secondly, at the time

25   of the charged act, the Defendant had previously been

1   convicted in a court of a crime punishable by imprisonment

2   for a term exceeding one year; three, at the time of the

3   charged act, the Defendant knew that he had previously been

4   convicted in a court of a crime punishablable by a term

5   exceeding one year, and finally, that the firearm or

6   ammunition had been transported in interstate commerce.

7           If this case had proceeded to trial, the

8   Government's evidence would have established that on April

9   22nd of 2020 officers of the Metropolitan Police Department

10  were conducting an observation post in the 2300 block of

11  15th Street, Northeast, Washington, D.C.  An undercover

12  officer observed the Defendant, Mr. Douglas, standing in a

13  walkway in that block, at which time the undercover officer

14  would testify that an individual, later identified as

15  Tavonte Williams, approached Mr. Douglas and handed Mr.

16  Douglas a black backpack with shoulder straps.  Mr. Douglas

17  ultimately put this bag onto his back and put his jacket on

18  over the bag.

19          The undercover observed Mr. Douglas hand Mr.

20  Williams an unidentified object.  The undercover officer

21  then alerted officers from the arrest team to move in and

22  stop both Mr. Douglas and Mr. Williams.  Both defendants

23  were ultimately stopped separately and positively identified

24  by the undercover officer as the individuals previously

25  observed exchanging the backpack and an unidentified object.

1          Mr. Douglas was found to be wearing the backpack

2     under his jacket as observed by the undercover.  The officer

3     who stopped Mr. Douglas conducted an external frisk of the

4     backpack worn by Mr. Douglas, and a later search of the

5     backpack revealed the presence of a firearm inside of the

6     backpack.  Mr. Douglas was placed under arrest.  The firearm

7     was recovered from the backpack and determined to be a Sig

8     Sauer model P320, .40 caliber, semi-automatic, obliterated

9     serial number.  When the firearm was recovered, it was also

10    loaded with 13 rounds in the magazine.  And these events,

11    with respect to the stop and search of Mr. Douglas, were

12    captured on body worn camera by the police.

13         Mr. Douglas would acknowledge and admit that at

14    the time that he possessed the loaded .40 caliber,

15    semi-automatic pistol, he had been previously convicted of

16    an offense for which the penalty was greater than one year

17    of imprisonment.  Specifically, carrying a handgun in the

18    Circuit Court of Prince George's County, Maryland, case

19    number CT090351X, an unlawful possession of firearm in D.C.

20    Superior Court, case number 2013-CF1-6028.

21         Mr. Douglas also agrees and acknowledges at the

22    time he possessed this firearm, he was aware that he had a

23    previous conviction for an offense, which the penalty was

24    greater than one year imprisonment.  And the Government's

25    evidence at trial would establish that the firearm and

431

 1   ammunition had been shipped or transported from one state to

 2   another; and that the firearm was capable of expelling a

 3   projectile by means of an explosive.

 4        THE COURT:  Thank you, Mr. Wasserman.

 5   **BY THE COURT:**

 6        **Q.**   Mr. Douglas, I am holding up for the video camera

 7   a document entitled Statement of the Offense.  There is what

 8   appears to be your signature on the last page.  Mr. Douglas,

 9   have you read this document entitled Statement of the

10   Offense and discussed it fully with Mr. Ohm?

11        **A.**   Yes.

12        **Q.**   Is that your signature on the last page

13   acknowledging that have you read the description of the

14   criminal conduct and fully understand it?

15        **A.**   Yes.

16        **Q.**   And does the Statement of the Offense truly and

17   accurately describe what you did in this case?

18        **A.**   Yes.

19        **Q.**   Are there any corrections or changes you would

20   make to the Statement of the Offense?

21        **A.**   Well, no.  No, Your Honor, I can't say right now,

22   no.

23        **Q.**   Do you wish to confer with your counsel?

24        **A.**   Yes, if I can do that real quick.

25        THE COURT:  I'd rather not have you speak publicly

1   if you wish to confer with Mr. Ohm.  Ms. Lesley, can you put

2   Mr. Ohm and Mr. Douglas on a sidebar or whatever we call it,

3   in a separate room on the videoconference so that they can

4   confer in a non-public setting?

5                    (Discussion off the record.)

6                    MR. OHM:  Thank you, Your Honor.  I appreciate it.

7   I'm embarrassed to say that I didn't catch this.

8                    Mr. Douglas points out that within the plea

9   agreement on Page 7, under Paragraph 10, that the serial

10  numbers listed for the firearm, but in the estimated

11  guideline range that he is acknowledging -- he is being

12  asked to acknowledge an obliterated serial number.  He did

13  want to ask of that.  I spent a couple minutes trying to

14  look at the photos that we have been provided in discovery.

15  The photographs we have are of the other side, so I couldn't

16  tell one way or the other.  So that's the issue we are

17  trying to resolve.

18                    MR. WASSERMAN:  Your Honor, it's my understanding

19  that the Department of Forensic Services was able to raise

20  the serial number.  Although I don't have photos of the

21  seized gun that have the serial number exposed or where the

22  obliteration of the serial number is exposed; that was my

23  understanding, since the police reports indicated that the

24  serial number was obliterated and ultimately DFS, when they

25  did their report, provided a serial number when they

                                 433

1    processed the firearm.

2             In order for me to, I guess, verify that, I would

3    have to probably go back and talk to somebody at DFS,

4    because -- I don't know that it's entirely clear from the

5    paperwork that I have.

6             THE COURT:  So what do you or Mr. Ohm propose we

7    do today?  Obviously, it seems consistent, in my view, that

8    you could have a pistol or firearm where the serial number

9    was obliterated to the normal, naked eye or at least

10   attempted to be obliterated, but then after significant

11   forensic work the serial number was able to be discerned.

12   So conceptually it sure seems possible to me.  But I think

13   we need to be pretty clear about the facts here.  It seems

14   like the record is going to be really kind of conjectural at

15   the moment.

16            Mr. Ohm or Mr. Wasserman, what do you propose we

17   do on this question?

18            MR. WASSERMAN:  Um, what I would have to do is --

19   because I don't know that I've got -- I'd have to see if I

20   can identify a photograph that I have that, you know,

21   essentially shows the serial number or the obliteration of

22   the serial number and provide it to Mr. Ohm.  I don't know

23   that I have that, because I did look as I was going through

24   generating the plea paperwork and, you know, went under the

25   impression that the serial number had been raised in the DFS

1    processing.

2          I don't think the paperwork, the DFS paperwork,

3    makes it completely clear, from my memory, about the raising

4    of the serial number.  So I am going to need to -- what I

5    would suggest, I guess, is perhaps rescheduling this until

6    Thursday, where we could either pick up the plea hearing

7    from here.  If the serial number was not obliterated, then

8    obviously, we will just scratch that.  It will impact the

9    guideline calculation, and we will just recalculate it to

10   whatever it is.

11         But if it is, in fact, obliterated, you know, I

12   will provide Mr. Ohm any confirmatory information that I can

13   get my hands on, you know, in advance of Thursday.

14         THE COURT:  Mr. Ohm, what do you think?

15         MR. OHM:  I don't think I am in a position to

16   object to that way of doing it.  I can't think of anything

17   better off the top of my head.

18         MR. WASSERMAN:  The only other thing I could do is

19   I could try to make a couple of calls to see if I could get

20   confirmation and perhaps -- I don't know how long -- given

21   that I am not in the office and I would have to sort of call

22   around, I think it would be difficult to get that

23   information that quickly.

24         THE COURT:  Right.  As we know, especially if we

25   pause the hearing, it could be a little bit difficult to

435

1    have Mr. Ohm communicate with Mr. Douglas at the jail.

2         I think probably the most efficient course,

3    probably the best and fairest course -- because I think the

4    goal should be to get this right, whatever the facts end up

5    being.  A day or two more to allow that to happen, I think

6    is the most efficient way and the best way to go forward.

7         Assuming that this is resolved in whatever fashion

8    as to the facts, I don't think we need to go over all of the

9    groundwork we already covered.  So my intent would be to

10    simply pick up where we are, which is essentially, with the

11    Statement of Offense.  So we basically would be continuing

12    the plea hearing.

13         Why don't we continue the plea hearing until

14    Thursday or Friday, either of those days is fine with me.

15         MR. WASSERMAN:  Your Honor, Friday would probably

16    be better because it would give me an extra day to make sure

17    that I can get this information and revise the plea

18    paperwork, if necessary, and also get any information over

19    to Mr. Ohm.

20         THE COURT:  Okay.  Ms. Lesley also is telling me

21    that there are no times available on Thursday for

22    videoconference at the jail.  In any event so we are looking

23    at Friday.  Do the parties have time limitations on Friday?

24    Other than one motions hearing, I am free.  But as

25    Ms. Lesley looks at the time.  If you all have constraints,

1   please let her know.

2           MR. WASSERMAN:  Friday afternoon would be better

3   for me.  I have a meeting at 10:00 a.m. on Friday afternoon.

4   I mean Friday at 10:00 a.m.

5           THE COURT:  Duly noted.

6           MR. OHM:  Your Honor, I can't do after 3:30.

7           THE COURT:  Ms. Lesley, look for between 12 and

8   2:30.  It looks like 1:00 is available.  Does that work for

9   everyone?

10          MR. WASSERMAN:  That's fine for the Government,

11  Your Honor.

12          MR. OHM:  That works for me, Your Honor.

13          THE COURT:  Mr. Marston?

14          MR. MARSTON:  That's good for me, Your Honor.

15          THE COURT:  Mr. Williams, are you able to

16  participate at 1:00 on Friday?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          So that's what we will do.  Thank you, Mr.

20  Douglas, for bringing this to our attention.  Mr. Wasserman

21  will go dig into this.  He will be in touch with Mr. Ohm.

22          If necessary, either information will be provided

23  to you or the parties will make whatever changes might be

24  appropriate to the papers, and my intention as I've already

25  said, is to not redo what we've already done with respect to

        1    today's hearing, but to pick it up with the discussion of

        2    the Statement of Offense.  Frankly, we don't even have to

        3    pick up the whole Statement of Offense, just resolve this

        4    question on the record.  See if you are then in agreement

        5    with the Statement of Offense and go forward.

        6             MR. WASSERMAN:  I apologize for the confusion.  I

        7    had thought this was clarified, but when I am looking at the

        8    DFS paperwork, it's not entirely clear.  And I don't want to

        9    -- I think it is correct to not move forward.  I should

       10    apologize.  I should have picked up on that.

       11             THE COURT:  Not a problem.  We will figure it out,

       12    and we will resume this on Friday.

       13             Mr. Marston, do you want to wait until after we

       14    have a concluded guilty plea, assuming that's where we land,

       15    of course, before we talk about next steps in your matter,

       16    Mr. Williams' matter?

       17             MR. MARSTON:  Yes, Your Honor.

       18             THE COURT:  Okay.  So we will just do that.  This

       19    hearing is continued for all purposes until Friday at 1:00

       20    p.m.  We will be together on video then and we will,

       21    obviously, pick up the plea and then we will discuss

       22    whatever we need to discuss with respect to Mr. Williams.

       23    Thank you, Counsel.

       24             MR. WASSERMAN:  Thank you, Your Honor.

       25             MR. OHM:  Very good.  Thank you.

                                    438

1                    MR. MARSTON:   Thank you.

2                    (Proceedings concluded at 3:44 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8              **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14   ___July 15, 2021____          ___/s/_____
              **DATE**                      **Lorraine T. Herman**
15

16

17

18

19

20

21

22

23

24

25

440

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3

4    UNITED STATES OF AMERICA,
                                        CR Action
              Plaintiff,               No. 1:20-121
5
          vs.                          Washington, DC
6                                      March 17, 2021
     TAVONTE WILLIAMS AND
7    THEODORE B. DOUGLAS               1:00 p.m.
              Defendants.
8    _____/

9

        TRANSCRIPT OF TELEPHONE STATUS CONFERENCE/GUILTY PLEA
10            BEFORE THE HONORABLE CARL J. NICHOLS
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:       STEVEN B. WASSERMAN
13                            U.S. ATTORNEY'S OFFICE FOR D.C.
                              555 Fourth Street, NW
14                            Washington, DC 20530
                              (202) 252-7719
15
     For T. Williams:         JOHN PETER MARSTON
16                            FOLEY HOAG, LLP
                              1717 K Street, NW
17                            Washington, DC 20006
                              (202) 785-6687
18
     For T. Douglas:          EUGENE OHM
19                            FEDERAL PUBLIC DEFENDER FOR D.C.
                              625 Indiana Avenue, NW, Suite 550
20                            Washington, DC 20004
                              (202) 208-7500
21

22

23   Reported By:       LORRAINE T. HERMAN, RPR, CRC
                        Official Court Reporter
24                      U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
25                      Room 6720
                        Washington, DC 20001

1                    **P R O C E E D I N G S**

2              COURTROOM DEPUTY:  This is criminal case year

3     2021-121, United States of America versus Tavonte Williams,

4     Defendant number 1 and Theodore B. Douglas, Defendant number

5     2.  Pre-trial officer is John Copes.

6              Counsel, please introduce yourselves beginning

7     with the Government.

8              MR. WASSERMAN:  Good afternoon, Your Honor.  Steve

9     Wasserman for the United States.

10             THE COURT:  Mr. Wasserman, good afternoon.

11             MR. MARSTON:  Good afternoon, John Marston for

12    Mr. Williams.

13             THE COURT:  Mr. Marston, good afternoon.

14             MR. OHM:  Eugene Ohm on behalf of Mr. Douglas.  I

15    apologize for holding everybody up, Your Honor.

16             THE COURT:  No.  I totally understand, Mr. Ohm.

17    Thank you.

18             I note that Mr. Douglas is on by video, as is Mr.

19    Williams.  We are obviously here on the continued plea

20    hearing that we were conducting last time.  And I know that

21    we have some new papers that we will get to.

22             I do think it is probably appropriate just to

23    ensure, first, Mr. Ohm, that Mr. Douglas consents to proceed

24    again today by videoconference in light of the pandemic and

25    for the reasons discussed at our last hearing.

|     |     |
| --- | --- |
| 1 | MR. OHM:  Mr. Douglas does consent, Your Honor. |
| 2 | THE COURT:  Thank you. |
| 3 | Ms. Lesley, could you then administer the oath to |
| 4 | Mr. Douglas, so he is under oath again today? |
| 5 | COURTROOM DEPUTY:  Yes, Your Honor. |
| 6 | Mr. Douglas, please raise your right hand.  Do you |
| 7 | solemnly swear that you will well and truly answer the |
| 8 | questions propounded to you so help you God? |
| 9 | THE DEFENDANT:  Yes. |
| 10 | THE COURT:  Mr. Douglas, are you sick or impaired |
| 11 | in any way that could prevent you from understanding what is |
| 12 | happening here today? |
| 13 | THE DEFENDANT:  No, Your Honor. |
| 14 | THE COURT:  Mr. Ohm, do you have any reason to |
| 15 | believe that Mr. Douglas will be unable to understand what |
| 16 | we discuss today? |
| 17 | MR. OHM:  No, Your Honor. |
| 18 | THE COURT:  It appears to me that Mr. Douglas is |
| 19 | responding appropriately to questions and appears to |
| 20 | understand them fully, and he continues to be competent and |
| 21 | capable of entering an informed plea. |
| 22 | Obviously, last time we covered some but not all |
| 23 | of the topics that we would normally cover in the plea |
| 24 | hearing.  Mr. Douglas, do you recall our discussion last |
| 25 | time about your rights to a trial and to appeal and the |

1    related rights that you would be giving up if you plead

2    guilty here today?

3                    THE DEFENDANT:  Yes, I do.

4                    THE COURT:  You recall that.  And you continue to

5    believe that you would like to waive those rights and to

6    proceed to a guilty plea here today?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  And last time I held up and noted for

9    the record that we had the waiver of trial by jury.  I don't

10   think we need to do that again, but I assume you continue to

11   agree that that is your signature on the waiver of the right

12   to trial by jury and that you so waive.  Correct?

13                   THE DEFENDANT:  Yes.

14                   THE COURT:  And one thing I will note is, as I

15   believe Mr. Wasserman noted, I believe, during the last

16   hearing, while you are giving up a number of your rights to

17   appeal, the plea agreement expressly authorizes you to

18   appeal, should you wish, my decision on the motions that

19   were pending before me last fall.  Do you understand that,

20   Mr. Douglas?

21                   THE DEFENDANT:  Yes, sir.

22                   MR. WASSERMAN:  Your Honor, this is Steve

23   Wasserman.

24           Just to be clear, it specifically refers to

25   preservation of his right to appeal the Motion to Suppress

1    with a decision to deny the Motion to Suppress tangible

2    evidence.

3                THE COURT:  Thank you.  Yes.  Exactly.  Thank you

4    for the precision there.  That is exactly what I meant.

5                So with that, we are essentially where we left off

6    last time.  Here is what I would like to do.  I would like,

7    because there was a discussion on the record about the

8    Statement of the Offense and a discussion about what the

9    Government could put in that statement and what was in the

10   plea, I think it would probably be best if, Mr. Wasserman,

11   you and Mr. Ohm could state the resolution of that issue,

12   and then we will go ahead and have you, I think, just reread

13   or resummarize the Statement of the Offense so that we can

14   have the record clear that that is what Mr. Douglas is

15   agreeing to.

16               MR. WASSERMAN:  Yes, Your Honor.

17               So the change to the plea removed the enhancement

18   for an obliterated serial number, which was a four-level

19   enhancement to the guideline range.

20               I had viewed that with the officers and determined

21   that it was not appropriate to seek application of that

22   enhancement, so it was removed; that also resulted in

23   recalculation in Paragraph 4 of the plea agreement of the

24   guideline range, which is now 12 months to 18 months of

25   incarceration.

1          The only change that was made to the Statement of

2     Offense, and that is otherwise in all respects the same as

3     what I read last week, is I removed the sentence that

4     referred to the fact that the gun had an obliterated serial

5     number on it.  In all respects the Statement of Offense is

6     identical to what I had read at the last hearing.  So that's

7     the changes that were made to the plea and the Statement of

8     Offense.

9          THE COURT:  Thank you, Mr. Wasserman.  Mr. Ohm, do

10    you agree with all of that?

11         MR. OHM:  I do, Your Honor.

12         THE COURT:  Thank you.

13         I think rather than have you, Mr. Wasserman,

14    resummarize the Statement of Offense, the record reflects

15    that you removed the sentence about the obliteration of the

16    serial numbers.  I reviewed the Statement of Offense.  That

17    sentence is no longer in there.  And the revised Statement

18    of the Offense, which I am now holding up for the video

19    camera and including, I think the paragraph with the removed

20    sentence.  I am now holding up for the record the final

21    page, which I believe bears both Mr. Ohm's signature and

22    Mr. Douglas' signature.

23         Mr. Douglas, have you reviewed the revised

24    Statement of Offense and discussed it with Mr. Ohm?

25         THE DEFENDANT:  Yes, Your Honor.

446

1              THE COURT:  Is that your signature on the last

2      page acknowledging that you read the description of the

3      criminal conduct and fully understand it?

4              THE DEFENDANT:  Yes.

5              THE COURT:  And does the Statement of Offense now

6      truly and accurately describe what you did in this matter?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Are there any corrections or changes

9      that you would make to the revised Statement of Offense?

10             THE DEFENDANT:  No.

11             THE COURT:  Did you, in fact, do what the

12     Government has said that it can prove at trial?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Thank you.

15             Now, as to the plea agreement which Mr. Wasserman

16     has described the changes to, let me just do a little bit

17     more colloquy here.

18             Mr. Wasserman, is this the most lenient plea offer

19     made to Mr. Douglas in this matter?

20             MR. WASSERMAN:  Yes, Your Honor.

21             THE COURT:  Mr. Douglas, have you had enough time

22     to review this plea agreement and to discuss it with Mr.

23     Ohm?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  I am now going to hold up what I

1    believe is the revised plea agreement, which contains on the

2    first page date of March 10, and on the back page,

3    signatures of you, Mr. Douglas and Mr. Ohm, both dated March

4    11.  I think I said for the record March 10.  So March 10,

5    2021 on the front page and March 11, 2021 on the signatures.

6    Is this your signature, Mr. Douglas, accepting and agreeing

7    to the terms and conditions of the plea agreement?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Mr. Ohm, there's obviously been some

10   discussion about the plea agreement including what Mr.

11   Wasserman has mentioned.  Can I ask you to briefly summarize

12   the key terms of the plea agreement.  You don't need to do,

13   I think, the basics around the waiver of appellate rights

14   and jury rights, but just to provide for the record a

15   summary of plea agreement from the Defendant's perspective.

16             MR. OHM:  Yes, Your Honor.

17             Mr. Douglas is pleading to Count 1 of the

18   indictment, which is a violation of 18 USC 922(g),

19   possession of a firearm by a prohibited person.  The

20   Government is agreeing to cap at the low end of the

21   guidelines, which we now estimate the range to be at 12 to

22   18 months.  There is a distribution case in Superior Court

23   that has been dismissed during the pendency of this case and

24   the Government agrees not to rebring that case, and those

25   are the terms of the agreement in essence.

448

1          THE COURT:  Thank you, Mr. Ohm.  Mr. Wasserman,

2    anything you think we need to add?

3          MR. OHM:  I should probably include that this is a

4    conditional plea where Mr. Douglas retains the right to

5    appeal the Fourth Amendment decision by the Court.

6          THE COURT:  Thank you.  Yes.  As we discussed

7    before.  Mr. Wasserman, anything you would add?

8          MR. WASSERMAN:  No, Your Honor.

9          THE COURT:  Thank you.

10   **BY THE COURT:**

11       **Q.**   Mr. Douglas, let me just ask you some questions

12   and describe to you what will happen, assuming your plea

13   happens today, we take your plea.  With respect to

14   sentencing, have you and Mr. Ohm discussed sentencing and

15   how the relevant statute and sentencing guidelines may apply

16   here?

17       **A.**   Yes.

18       **Q.**   Let me just briefly summarize some key portions of

19   that.  Obviously we will take some of this up at sentencing.

20   If I accept your guilty plea in this case, the statutory

21   penalties, the statutory penalties you face are as follows:

22   For the charge to which you are pleading, a maximum sentence

23   of 10 years of imprisonment, a maximum fine of $250,000 and

24   supervised release term of not more than 3 years.  You have

25   obligation to pay any applicable interest or penalties on

449

1    fines not timely paid.  Additionally, you face a special

2    assessment of $100, and upon conviction, you shall forfeit

3    the firearm and ammunition that were seized on April 22nd,

4    2020, and which are described in the plea agreement, which

5    includes a Sig Sauer P320 semiautomatic pistol, serial

6    number 58AU72741, the accompanying magazine and 13 rounds of

7    .40 caliber ammunition.

8         Mr. Douglas, do you understand what I just listed,

9    the prison term, supervised release term, fine, forfeiture

10   and special assessment are statutory penalties that apply in

11   your case?

12   **A.**   Yes.

13   **Q.**   Do you understand that the offense to which you

14   are pleading guilty is a felony offense, and that if your

15   plea is accepted and you are found guilty of that offense,

16   such a finding may deprive you of certain civil rights, such

17   as the right to vote, hold public office, right to serve on

18   a jury and the right to possess any kind of firearm?

19   **A.**   Yes.

20   **Q.**   Have you discussed the statutory penalties and

21   these possible consequences with Mr. Ohm?

22   **A.**   Yes.

23   **Q.**   Now, in deciding on a fair and appropriate

24   sentence, when we get to that stage, I will have to consider

25   statutory factors and sentencing guidelines which we have

450

1       discussed a little bit today, which are detailed guidelines

2       for judges to consider when determining a sentence in a

3       criminal case like this.  The guideline sentencing range is

4       for specific offenses.  And although I must consult the

5       guidelines, they are advisory not mandatory.  While you and

6       Mr. Ohm may have an idea based on your criminal history and

7       the nature of the offense here of what your sentencing range

8       may be, nothing will be certain until the Probation Officer

9       submits a pre-sentence report that will come to me and to

10      the attorneys.

11              Mr. Ohm will review it with you, and you will have

12      a chance to make changes in it or object to portions of it.

13      At the time of sentencing I will hear from both attorneys

14      and I will have to determine what your sentencing guidelines

15      range is.  Once I hear from both parties and determine that

16      range, I am still permitted to impose a sentence outside

17      that range, which means I could sentence you above or below

18      the range.  I can't, however, sentence you to more than the

19      maximum statutory period, which I explained earlier is 10

20      years imprisonment.

21              When I determine your sentence, I am required by

22      law to consider a series of factors including the nature and

23      circumstances of the offense and your history and

24      characteristics, the need for the sentence imposed to

25      reflect the seriousness of the offense, to promote respect

451

1    for the law and provide just punishment, to afford adequate

2    deterrence to criminal conduct, both to you and others, to

3    protect the public from further crimes by you, and to

4    provide you with needed educational or vocational training,

5    medical care or other correctional treatment in the most

6    effective manner.

7            I have to consider the kinds of sentences

8    available.  I have to consider the sentencing guidelines and

9    the relevant range, which I have already discussed with you,

10   and I have to consider the need to avoid unnecessary

11   sentence disparities among Defendants who have similar

12   records, who have been found guilty of similar conduct.

13           So, Mr. Douglas, do you understand that I will not

14   be able to finally determine the guidelines range here until

15   I have received a pre-sentence report and until after you

16   and your attorney and the Government have had the

17   opportunity to challenge the facts reported by the Probation

18   Officer?

19       **A.**   Yes, Your Honor.

20       **Q.**   Do you understand that the ranges in the plea

21   agreement, and in particular the estimated range of 12 to 18

22   months imprisonment, that that's just an estimate at this

23   point?

24       **A.**   Yes.

25       **Q.**   And do you understand that after I decide what the

452

1    guidelines range is, I still have the authority in my

2    discretion to impose a sentence that is more severe or less

3    severe than that range?

4        **A.**    Yes.

5        **Q.**    Finally, and just a few more questions.  As I

6    mentioned earlier, in our last hearing, before I can accept

7    your plea, I need to make sure you are pleading guilty

8    voluntarily.  So I will ask a few more questions to make

9    sure you are entering this plea of your own freewill.

10            Do you understand, Mr. Douglas, that the agreement

11    reached in this case resulted from negotiations agreements

12    between Mr. Ohm and the Government?

13        **A.**    Yes.

14        **Q.**    Has anyone forced, threatened or coerced you in

15    any way regarding your plea?

16        **A.**    No.

17        **Q.**    Has anyone made any promises to you as to what

18    sentence I will impose in this case if I do accept your

19    guilty plea?

20        **A.**    No.

21        **Q.**    Has anyone made you any other promises or

22    representations beyond the ones in the plea agreement or the

23    ones discussed during this hearing, both the earlier part of

24    the hearing and today, to induce you to give up your right

25    to a trial?

1          A.    No.

2          Q.    And are you entering this plea of guilty

3    voluntarily and of your own freewill?

4          A.    Yes.

5          Q.    Is there anything about this proceeding you don't

6    understand, either the plea you are about to enter or any of

7    the rights that you are waiving?

8          A.    No.

9          Q.    Is there anything you would like to ask me or Mr.

10   Ohm before you decide whether to plead guilty?

11         A.    No.

12         Q.    Are you ready to decide whether you wish to plead

13   guilty?  Are you ready to proceed?

14         A.    Yes.

15              THE COURT:  Ms. Lesley, could you please take

16   Mr. Douglas' plea?

17              COURTROOM DEPUTY:  Yes, Your Honor.

18              Mr. Theodore B. Douglas, in Criminal Case 20-121,

19   in which you are charged with unlawful transport of

20   firearms, unlawful possession of a firearm and ammunition by

21   a person convicted of a crime, punishable by imprisonment of

22   a term of 1 year in violation of 18 USC 922(g)(1), how do

23   you wish to plea?

24              THE DEFENDANT:  Guilty.

25              THE COURT:  I find in the case of United States

1    versus Douglas, the Defendant, Theodore Douglas, is fully

2    competent and capable of making a decision today, that he

3    understands the nature of the charges and the consequences

4    of his guilty plea; that the plea is knowing and voluntary;

5    that he is acting of his own freewill; and that there is

6    adequate factual basis containing each of the essential

7    elements of the offense for the plea, I therefore accept the

8    plea of guilty and Mr. Douglas is now adjudged guilty of the

9    offense.

10            As I've explained, Mr. Douglas, there will be a

11    presentence investigation, and the Probation Officer will

12    prepare a report to assist me in sentencing.  You will be

13    interviewed by the Probation Officer.  You are required to

14    give truthful information for the report.  Mr. Ohm may be

15    present, if you wish.  You and Mr. Ohm will be permitted to

16    review the presentence report, as I mentioned, before the

17    sentencing hearing and make any objections to any errors

18    that you believe are in the report.  And as I already said

19    at the sentencing hearing, both you and Mr. Ohm will be

20    given the opportunity to speak on your behalf.

21            So that then brings us, I think, to the question

22    of next steps.  Mr. Wasserman, so we have 70 days from

23    today's date for purposes of a sentencing hearing would be

24    around May 26th, 90 days would be around June 15th.  I don't

25    know whether probation is backed up these days.  I don't

1   have a preference as between those two dates.  But,

2   obviously, we have the question of the case as it relates to

3   Mr. Williams.  Do you have a proposal for how we proceed

4   either with respect to Mr. Douglas' sentencing or this case

5   more generally?

6        MR. WASSERMAN:  Your Honor, with respect to the

7   sentencing of Mr. Douglas, I am going to be on leave --

8   extended leave from about May 3rd and back on June 28th.  In

9   terms of sentencing memos, you know, I certainly could get

10  those in prior to the 28th.  I would request the 28th

11  because it is the first day I will be back.

12        THE COURT:  Thank you.

13        Let me hear from Mr. Ohm first, and then I think I

14  would like to then have a conversation about how these dates

15  relate to proceedings, basically, of Mr. Williams.

16        MR. OHM:  All right, Your Honor.  It would be our

17  request to do it in May.  I would note that Mr. Douglas --

18  right now the estimated guideline range is 12 to 18 months.

19  The Government's allocution for the plea is 12 months, and

20  he was arrested in May.  If he was sentenced to a year and a

21  day, then he would have served all of his time by the time

22  May 23rd comes around.  I would ask for that date.

23        The other situation with Mr. Douglas is because he

24  is on supervised release, there is sort of an experience in

25  dead time being past.  If he gets sentenced to a year and a

456

1    day here, which is essentially time served, there is still

2    going to be a period of dead time where he is not getting

3    any credit until the parole warrant issues because the

4    parole warrant hasn't executed yet, and then he is going to

5    have to be transported to a different jurisdiction to do his

6    parole hearing.  So from his perspective, obviously, getting

7    that ball moving is something we are really interested in.

8    We would like to come in for sentencing as soon as possible.

9          THE COURT:  So, Mr. Wasserman, I think certainly

10   the notion that May would mark the 12th month anniversary of

11   when Mr. Douglas was detained here seems relevant to me.

12   Assuming that a pre-sentence report could be done in time to

13   do a hearing by April 30th, because that's the day -- the

14   last day before you become unavailable, Mr. Wasserman.

15   Would that be possible?

16          Alternatively, is there someone perhaps, Mr.

17   Wasserman, who could take your place in effect for that

18   sentencing hearing, if we can't do it in May?

19          MR. WASSERMAN:  The answer to both questions is,

20   yes.  I can do the 30th, although I have a hearing at 11:30

21   before Judge Bates on that day.  Then should it be necessary

22   to move the hearing to May, you know, I'm sure it could be

23   covered by somebody if need be.

24          THE COURT:  Mr. Copes, I know this is probably

25   faster than you would like, but is there -- would it be

457

1      possible, you think, to do a pre-sentence report in time to

2      do a sentencing on April 30th in light of, I think most

3      importantly, the fact that the Government's allocution as to

4      the appropriate sentence here will have run right around,

5      you know, sometime in May.  And in light of Mr. Wasserman's

6      leave, April 30th is the last date he is available before

7      the 12-month period would run.

8           I apologize.  Mr. Copes, you are pre-trial.  You

9      wouldn't know.

10          MR. WASSERMAN:  Your Honor, I misspoke.  I am free

11     on the 30th.  I have that hearing on the 29th.  So I am

12     flexible on time on the 30th, should that date be chosen.

13          THE COURT:  Thank you.  We are a little bit more

14     flexible on the 30th.  And, Mr. Copes, I apologize.  I posed

15     the question to the wrong person there.  Let's do this,

16     let's set the sentencing hearing in this matter for April

17     30th.  We will do it by videoconference.  And assuming there

18     are no serious time constraints, let's do it at 2:00 p.m. on

19     April 30th.  What I think that means is ideally you would

20     get sentencing memoranda April 23rd.  So we are going to set

21     all of those dates.  So sentencing memoranda due April 23rd,

22     videoconference sentencing April 30th.

23          Mr. Ohm, is it Mr. Douglas' position or what is

24     Mr. Douglas' view or your view on having the sentencing by

25     video?

1              MR. OHM:  Given the accommodations of the Court, I

2    think that that's fine.

3              THE COURT:  Okay.  It may be that we may be in a

4    somewhat more resumed state by then, but I think it is

5    probably prudent to assume we are not and therefore we would

6    be proceeding by video.  So I think that that covers the

7    sentencing hearing.

8              I am assuming that probation will be able to get

9    the pre-sentence report done in time for all of this to

10   happen.  If for some reason that becomes a significant

11   problem, I will probably have Ms. Lesley circle back with

12   the parties to see if there is another time that would

13   accommodate their schedule.  If that happens, Mr. Wasserman,

14   it may be the case that I calendar the sentencing hearing

15   for sometime in May, and then we just have to have somebody

16   from the US Attorney's Office cover for you.

17             MR. WASSERMAN:  I understand, Your Honor.

18             THE COURT:  Thank you.

19             So that covers Mr. Douglas' sentencing hearing.

20             Mr. Marston, I think that turns the floor over to

21   you.  Right now we are -- and I suppose Mr. Ohm as well --

22   although, if we do the hearing on April 30th, perhaps your

23   Fifth Amendment issue may not arise with respect to possible

24   testimony of Mr. Douglas.  We are currently holding still a

25   May 3rd trial date.  Mr. Marston, do you have thoughts about

 1    that in light of that?

 2            MR. MARSTON:  Thank you, Your Honor.

 3            Thinking through the timing and having discussed

 4    it with Mr. Williams, the only person who can decide whether

 5    Mr. Douglas will testify is Mr. Douglas.  I will not be able

 6    to fully evaluate that prospect and -- not having had a

 7    chance to talk to Mr. Douglas -- which is of course,

 8    understandable.  I think it would take some time to evaluate

 9    the potential testimony on Mr. Douglas' part, and given the

10    parole hearing Mr. Ohm mentioned, it is possible that it

11    would take some additional time to do so.

12            I don't think we could go forward as quickly as

13    early May.  I mean, Mr. Wasserman has mentioned not being

14    the person to try this case.  I guess I would ask to allow

15    us to put our case together and to allow us to evaluate

16    Mr. Douglas' testimony and Mr. Douglas to evaluate whether

17    he is truly prepared to testify, I would ask for a trial

18    date in early June, if possible.  Perhaps the week of the

19    7th or the 14th.

20            THE COURT:  Thank you.

21            So what I am doing now is I am looking at this

22    calendar that we have just to see if there are dates around

23    then that we should at least attempt to hold for present

24    purposes.  Just give me a second while I pull this up.  I

25    know there is availability in mid-June.  I just don't know

460

 1        the specifics.  Okay.  Here we are.

 2              So it appears to me that trial beginning on June

 3        8th or June 9th -- and not June 7th because there is already

 4        one scheduled for that day -- could work.  Again, I think

 5        now, since we would be talking about a single-Defendant

 6        trial, what would likely happen is we would do voir dire in

 7        the ceremonial courtroom, under the procedures that I think

 8        have now been posted online.  We would do the voir dire in

 9        the ceremonial courtroom.  I don't know if we would have to,

10        depending on the schedule for the rest of the court, but we

11        would be available to move to my courtroom for the trial.

12              So we could start on the 8th.  I believe we could

13        also start on the 9th or the 10th.  And then the following

14        week it appears to me -- but Ms. Lesley, correct me if you

15        think I am reading this wrong -- that we could also start on

16        the 15th or 16th of the following week, under the same

17        general idea of doing, first, voir dire in the ceremonial

18        courtroom, and then moving to my courtroom for the actual

19        trial itself.

20              Mr. Marston, would you like to pick -- obviously,

21        Mr. Wasserman, you'll be on leave then.  I think your plan

22        was to have someone stand in your place for trial.  Should

23        we pick a date now, at least a notional trial date, or do

24        you need to confer, Mr. Wasserman or even Mr. Marston, with

25        your client on these questions, at least on the date

 1    question?

 2              MR. WASSERMAN:  Your Honor, I don't know at this

 3    point who would handle the matter.  So I think we can set

 4    one of those dates.  If that's what Mr. Marston wants, you

 5    know, I will defer to him, whether he needs to confer with

 6    his client on dates but those are fine at this point.

 7              THE COURT:  Thank you.  Mr. Marston?

 8              MR. WASSERMAN:  The only thing I would add, I

 9    would note that given that Mr. Douglas just entered a

10    conditional plea, I don't believe that his Fifth Amendment

11    privilege will be extinguished by the time a trial date

12    rolls around in this matter for Mr. Williams.

13              MR. MARSTON:  This is Mr. Marston.

14              I understand and agree with what Mr. Wasserman is

15    saying.  My understanding is that Mr. Douglas' odds of

16    testifying will increase after his sentencing.  And while we

17    can all guess whether he will testify or not, the only

18    person who can decide that, of course, is Mr. Douglas.  He

19    can do so whether he has Fifth Amendment -- [inaudible] -- I

20    can certainly understand from his perspective why, after

21    sentencing, you know, his potential testimony, which I, of

22    course, don't know what the would be in full having not

23    talked to him, but I can certainly understand why his

24    chances of testifying might increase after sentencing, even

25    though he may maintain some Fifth Amendment rights.

                              462

 1              All of that said, I have talked with Mr. Williams.

 2    I would ask for June 15th as our trial date.  We discussed

 3    middle of June and he's prepared to agree to a trial around

 4    that time.

 5              THE COURT:  Thank you, Mr. Marston.

 6              Ms. Lesley, am I reading the materials correctly

 7    when I say that June 15th is likely a date on which we could

 8    begin this trial?

 9              COURTROOM DEPUTY:  Yes.  I am looking at it.  It

10    does seem as though -- the fact that it doesn't show on the

11    one where it says highlight with voir dire 6/8 and 6/9, it

12    doesn't show that for the following date, but there aren't

13    any dates other than the 6/14 date.  So by looking at what

14    you are looking at, it looks like it is available.

15              Let me look at the jury calendar that we have to

16    actually enter as the courtroom deputies.  Give me one

17    moment.

18              THE COURT:  I apologize to the parties but we are,

19    at least the notional plan that we haven't really started

20    but is out there is to have -- and I think we discussed some

21    of this before -- is to have only one voir dire occur at a

22    time in the ceremonial courtroom.  Only three trials going

23    on at once in the courthouse as a whole.  We have this

24    schedule that Ms. Lesley and I are both looking at that

25    seems to have availability on the 15th and 16th, but it's

                                463

1    not as clear as the earlier week.  And it's obviously very

2    dependent on what is going on with the other trials that are

3    on that week.  There is only one other trial that both of us

4    can see, but there may be something about it that we are not

5    understanding.

6         Ms. Lesley, if you don't see anything to the

7    contrary, I think we should just go ahead and calendar this

8    trial to start June 15th.

9         COURTROOM DEPUTY:  Okay.  I can do that.  I am

10   looking at the --

11        MR. OHM:  Your Honor, that is my trial.  I could

12   shed some light if the Court has any questions.

13        THE COURT:  In front of Judge Kollar-Kotelly?  Is

14   that a single-Defendant trial?

15        MR. OHM:  It is and we are set to do voir dire on

16   June 14th.  I don't know if the Court is budgeting for one

17   or two days.

18        THE COURT:  I think everyone is trying to budget

19   one day for voir dire.  Have you discussed with Judge

20   Kollar-Kotelly whether you would move to her courtroom for

21   the trial?  That's really the question, I think.

22        MR. OHM:  I believe that that conversation has

23   happened.  I am trying to remember if she said -- I think

24   she did say she had one of the courtrooms that she could do

25   that in -- oh, no.  You know what?  I think she said it

1    depends on the weather.  If there is air conditioning, the

2    courtroom is good.  But if there's not, then it might not be

3    because of the air flow.  There was something not clear.

4    But it is a single-Defendant case.

5              THE COURT:  It's a single-Defendant case.  So are

6    there any witnesses --

7              MR. OHM:  You know what, Your Honor, Judge

8    Kollar-Kotelly said it would be in her courtroom or a

9    different non-ceremonial courtroom courtroom, that there was

10   the possibility she would be borrowing somebody's courtroom.

11             THE COURT:  All right.  That's the alternative

12   here.  So it sounds to me that nobody on this call has

13   reason to believe that we cannot start this trial on June

14   15th.  What we will do is we will set it here for a trial on

15   June 15th.  I will let the calendar committee know of that,

16   that this is not happening on May 3rd, which will obviously

17   free some other time up May 3rd for something possibly

18   happening, and we will do this matter on June 15th.

19             Mr. Marston, are you anticipating filing any other

20   other pre-trial motions, in addition to the ones I've

21   already resolved, obviously.

22             MR. MARSTON:  Not at this time.

23             THE COURT:  Okay.  So, Mr. Wasserman, are you

24   aware of any pre-trial motions, other than the ones I've

25   obviously resolved?

465

1          MR. WASSERMAN:  Not at this time, Your Honor.

2          THE COURT:  So that's helpful.

3          We will calendar this for the 15th, as I said.  I

4    will enter a scheduling order that lays out various dates on

5    the assumption that we are starting the 15th.  I will

6    include time for the filing of pre-trial motions but think

7    it's fair that we can assume those will not be happening or

8    at least if we do it will be unexpected ones.

9          The question you are asking, Ms. Lesley, I think

10   we do voir dire on the 15th.  Obviously, if we could start

11   trial that afternoon, I think we would try.  But I think the

12   safest bet is we would be doing the voir dire in the

13   ceremonial courtroom on June 15th and then start trial the

14   next day in either the ceremonial courtroom or my courtroom

15   or some other courtroom if the court decides it is more

16   appropriate to do somewhere else.  I am not up to speed, I

17   must admit, on what courtrooms have the best air flow and

18   whether my courtroom is determined to be a good one or a bad

19   one.  I think the easiest is to do voir dire on day one, the

20   15th, start the trial the next day because that might just

21   have to be in another courtroom wherever it is.

22          COURTROOM DEPUTY:  Okay.  Thank you, Your Honor.

23          THE COURT:  So having done all of that, is there

24   anything else we should discuss today?  Obviously, we will

25   have -- as to Mr. Williams' portion of this matter, we will

1    have some dates that will be relevant as we approach trial.

2    We will do another conference as we get close to trial, but

3    for present purposes, is there anything else we should

4    discuss today?

5              MR. WASSERMAN:  Your Honor, there is the matter of

6    Mr. Williams' noncompliance with heightened supervision.  I

7    believe pre-trial filed multiple status reports indicating

8    that he has violated the terms of his release.

9              THE COURT:  Mr. Copes.

10             MR. OHM:  Your Honor, not to interrupt, I have

11   another hearing scheduled for 2.  May I be excused?

12             THE COURT:  Yes, Mr. Ohm, you may be excused.

13             MR. OHM:  And Mr. Douglas as well.

14             THE COURT:  Yes, and Mr. Douglas as well.

15             MR. OHM:  Thank you, Your Honor.

16             THE COURT:  Mr. Copes, could you describe to me

17   the nature of the non-compliances from pre-trial's

18   perspective?

19             PROBATION:  Yes, John Copes, pre-trial services.

20   The Defendant has been warned on several occasions to ask

21   for permission or approval prior to leaving his residence.

22   The Defendant is currently on home detention, location

23   restriction program, and is to comply as directed.  He is

24   restricted to his residence due to being on home detention,

25   except for employment, education, religious services,

467

 1   medical, substance abuse, mental health treatment, attorney

 2   visits, court appearances, court obligations or other

 3   activities approved in advance of pre-trial.

 4          According to his records, the Defendant has left

 5   his house often, many times to go to the store, and on

 6   several occasions to go and spend significant time near the

 7   Brentwood Recreational Center on the 2300 block of 15th

 8   Street Northeast.  The Defendant has not been approved to go

 9   to that location, and when the Defendant leaves -- he has on

10   occasion asked for permission to leave, but he does not on a

11   daily basis ask for permission to leave.  Typically, we

12   wouldn't approve, when the Defendant is on home detention,

13   this is not part of his employment or education or one of

14   the things listed while participating in home detention.  We

15   wouldn't approve to leave every day to go to the store, but

16   maybe on a weekly basis go to the store to pick up items

17   that he can cook, and potentially set up time frames when he

18   could go to the store, per se.

19          This is why PSA is requesting the Defendant's

20   removal from -- [inaudible] -- program due to that

21   non-compliance.  The Defendant mainly needs permission to

22   leave his residence before he leaves the residence, whenever

23   he wants to or needs to leave for any purpose.

24          THE COURT:  Thank you.

25          Mr. Copes, do you have a proposal or a

468

1    recommendation as to anything I should do other than warn

2    Mr. Williams that if he continues to fail to comply with the

3    conditions of his release and home detention that he may end

4    up detained pre-trial?

5            PROBATION:  Mr. Williams does communicate with me.

6    And Mr. Williams -- I don't have movement from Mr. Williams

7    over nighttime.  It is mainly the communication that he

8    lacks during the day when he is leaving.  So I think the

9    Court's admonishment at the time would suffice, but the

10   Defendant needs to fully understand that he needs to

11   communicate with pre-trial before he leaves his residence.

12           Also, I would like to -- I don't know the activity

13   that he has had at the Brentwood Recreation Center.  I would

14   like that added as a stay-away.  It looks like he has some

15   interests in that location.

16           THE COURT:  Thank you, Mr. Copes.

17           Mr. Wasserman, do you have a view?

18           MR. WASSERMAN:  Your Honor, I would note that,

19   first of all, the Brentwood Recreation Center is in the same

20   block where the charged offense occurred.  It is my

21   understanding that the Defendant does not live in that area,

22   and I am not aware of any legitimate reason why he needs to

23   be over there, and certainly not while he is on electronic

24   monitoring.

25           I would also note that this is now the second

469

1    violation where he has failed to comply with home detention

2    and traveled outside of his home without permission and, I

3    believe the last time he had issues with charging his

4    electronic bracelet.  So I am concerned that he is just

5    blowing off his conditions.

6              I would note that the pre-trial services'

7    recommendation is program removal, although I don't know

8    that Mr. Copes -- and it appears that Mr. Copes is not

9    necessarily asking for that now.  But if the Defendant is

10   just going to continue to fail to abide by his conditions

11   then, I am going to be moving to, you know, that he be

12   revoked and detained pending trial.

13             THE COURT:  Thank you, Mr. Wasserman.

14             Mr. Marston, what say you?

15             MR. MARSTON:  Thank you, Your Honor.

16             I will just note that Mr. Wasserman's reference to

17   a prior violation was before Your Honor had this case, I

18   believe preindictment.  In any event, many, many months ago.

19   If there were issues with his charging his ankle monitor, it

20   was because there was an issue with the ankle monitor.  He

21   submitted to pre-trial services and went and got a new

22   monitor, if I recall correctly.

23             Overall, he's been subjected to this high level of

24   supervision for nearly one year, and he's been highly

25   compliant.  There have been, as one might expect, a few

1    hiccups along the way, including recently, which I discussed

2    with Mr. Williams.  He understands the seriousness of it.

3    As the weather gets better, he is at home, and wants to get

4    some exercise or whatever down at the rec, which is a

5    common, typical, positive thing to do.  It might occur to

6    him to be a positive place to go and positive activities

7    occur there.  So I don't know on those particular days what

8    was happening there.  Other than he didn't do anything

9    wrong.  He simply went out, if he went out.  With his

10   monitor charged still.  It's not like he has been trying to

11   hide anything.

12        He has been highly compliant for nearly one year

13   in this program.  It is my understanding from Mr. Copes by

14   program removal he simply meant that the Court should just

15   allow Mr. Williams to be on PR, with perhaps in-person or

16   telephone check-in, not revocation.

17        I think Mr. Copes is correct that Mr. Williams has

18   been in communication with Mr. Copes, basically, constantly

19   for a year, and has done incredibly well with staying at

20   home.  He's not on full home confinement.  I will also note.

21   Mr. Wasserman mentioned that he is on, essentially, full

22   home detention.

23        There are two levels of home confinement in the

24   pre-trial program, in the Court's standard order for

25   pre-trial release.  One is you can't leave home at all.

471

1    It's total home confinement and that's where Mr. Williams

2    started.  Because he did so well there, the Magistrate Judge

3    lowered Mr. Williams' conditions to allow him to leave, as

4    it says on the pre-trial services report, with advance

5    approval, which Mr. Williams has obtained numerous times

6    from Mr. Copes.  I think there was a recent breakdown in

7    communication or Mr. Williams' request for permission to

8    leave, but the overall totality of Mr. Williams' compliance

9    during the last 11 months indicates that he has been -- the

10   HISP has worked very well from him.  Frankly, he probably

11   should be removed.  It is a lengthy program.  I think he has

12   done everything he can to show he is willing to comply and

13   deal with this case, appear at his hearings and appear by

14   video.

15          So I had, actually, you know, suggested that he be

16   placed on personal recognizance; that the Court, if it so

17   desires, for him to remain in the HISP program.  I think an

18   admonishment, I guess, to stay away from the rec, I can

19   guess we could accept that.  But I think, actually,

20   continuing to check in with Mr. Copes and seek his approval

21   prior to departing his home is appropriate.

22          THE COURT:  Thank you, Mr. Marston.

23          So I'm not going to change the key terms of his

24   release.  I am not going to remove him from the program so

25   to speak.  I am going to keep him on the current conditions.

1    Mr. Williams, it sounds like maybe some difference of

2    opinions about how much checking in.  It sounds like you

3    haven't actually haven't been letting Mr. Copes know, at

4    least sometimes, when you would like to leave the house.  I

5    do think that that is a violation of the conditions on which

6    you are released.

7              It doesn't seem, at this point, serious enough to

8    detain you.  I think it is incumbent on you to reach out to

9    Mr. Copes and tell him or seek his permission for you to

10   leave your house whenever it is.  So I think that is an

11   appropriate condition at this point.  And I think that, you

12   know, my just reiterating it is very important here is the

13   thing to do.

14             Certainly, if that continues to be a problem, and

15   if there are any other problems, I will hear it.  And if it

16   means that there is a significant enough violation of the

17   conditions, that we need to detain Mr. Williams, I will

18   consider that.  It doesn't seem to me to be the case here.

19             As to the rec center, I am concerned that that is

20   very close to the location where Mr. Williams and

21   Mr. Douglas were arrested.  Mr. Marston, on the other hand,

22   makes a point that, perhaps, what Mr. Williams is doing

23   there is good, outdoor exercise or otherwise or something

24   like that.  I don't have enough information to make that

25   judgment.  It seems to me that that is the kind of

1    conversation, Mr. Copes, you should be having with Mr.

2    Williams when he calls you and asks for permission to go to

3    that location.  You need to determine what the purpose of

4    that is and have judgment around whether it's a good thing

5    for him to be doing that or problematic.

6                If you think it's problematic, then we should have

7    another hearing, and I will consider at that point the

8    stay-away order, with a little bit more information around

9    what you think he's up to there.

10               PROBATION:  Yes, Your Honor.

11               THE COURT:  Mr. Wasserman, I appreciate you

12    bringing that to my attention.  I, obviously, was aware of

13    the reports.  The net of it all is let's keep things where

14    they are.  Mr. Williams, I think it is very, very important

15    for you to be as in touch as possible with Mr. Copes, and

16    certainly as much as is required by the conditions of your

17    release and the HISP program as humanly possible, because it

18    is very important for Mr. Copes to have complete confidence

19    that you are where you are supposed to be.

20               Again, Mr. Copes, as to -- and that includes,

21    Mr. Williams, if you want to go to the Brentwood Rec Center,

22    you need to tell Mr. Copes that that's the plan.  And I

23    think very appropriate for him to ask you what you are up to

24    there and what the plan is.  And then, Mr. Copes, if you are

25    not comfortable with what you hear, come back to me and we

474

1    is can have another hearing next week or whatever.  Okay?

2                    PROBATION:  Yes, Your Honor.

3                    THE COURT:  Any other issues, Mr. Wasserman, for

4    today?

5                    MR. WASSERMAN:  No, Your Honor.

6                    THE COURT:  Thank you.  Mr. Marston?

7                    MR. MARSTON:  No, Your Honor.  Thank you.

8                    THE COURT:  Okay.  Obviously, we will do

9    Mr. Douglas' sentencing.  We will confirm, to the extent

10   that we can, that the trial date we set is on.  And assuming

11   we get all of that clarity, we will then issue an order that

12   sets out various pre-trial dates and the like.

13                    Thank you, Counsel.

14                    MR. WASSERMAN:  Thank you, Your Honor.

15                    MR. MARSTON:  Thank you, Your Honor.

16                    (Hearing concluded at 2:20 p.m.)

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8                    **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14   _____**July 15, 2021**_____        _____**/s/**_____
                **DATE**                       **Lorraine T. Herman**
15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,
                                            CR Action
 4             Plaintiff,                   No. 1:20-121

 5        vs.                               Washington, DC
                                            May 4, 2021
 6

 7   THEODORE B. DOUGLAS                     9:16 a.m.
               Defendant.
 8   _____/

 9                    TRANSCRIPT OF SENTENCING
                BEFORE THE HONORABLE CARL J. NICHOLS
10                 UNITED STATES DISTRICT JUDGE

11

12

     APPEARANCES:
13

     For the Plaintiff:      STEVEN B. WASSERMAN
14                           U.S. ATTORNEY'S OFFICE FOR D.C.
                             555 Fourth Street, NW
15                           Washington, DC 20530
                             (202) 252-7719
16

17   For the Defendant:      EUGENE OHM
                             FEDERAL PUBLIC DEFENDER FOR D.C.
18                           625 Indiana Avenue, NW, Suite 550
                             Washington, DC 20004
19                           (202) 208-7500

20

21

22   Reported By:      LORRAINE T. HERMAN, RPR, CRC
                       Official Court Reporter
23                     U.S. District & Bankruptcy Courts
                       333 Constitution Avenue, NW
24                     Room 6720
                       Washington, DC 20001
25
</pre>

1                        **P R O C E E D I N G S**

2              COURTROOM DEPUTY:  This is criminal case year

3       2020-121, United States of America versus Theodore B.

4       Douglas, Defendant number 2.  Probation Officer is Aidee

5       Gavito.

6              Counsel, please introduce yourselves for the

7       record, beginning with the Government.

8              MR. WASSERMAN:  Good morning, Your Honor.  Steve

9       Wasserman for the United States.

10              THE COURT:  Mr. Wasserman, good morning.

11              MR. OHM:   Eugene Ohm on behalf of Mr. Douglas.

12              THE COURT:  Good morning, Mr. Ohm and  Ms. Gavito.

13       Mr. Douglas, good morning.

14              THE DEFENDANT:  Good morning, Your Honor.

15              THE COURT:  Just a few preliminary matters, first

16       with respect to conducting this hearing by videoconference.

17       Ordinarily we would hold this hearing in person, but during

18       the pandemic Congress has authorized federal judges to

19       conduct sentencings by video or teleconference so long as

20       after consulting with counsel, the Defendant consents and

21       the Judge finds that the sentencing cannot be further

22       delayed without serious harm to the interests of juice.

23              Mr. Douglas, after consulting with Mr. Ohm, have

24       you decided that further delay is inappropriate and that you

25       would like to resolve this matter as promptly as possible

                                478

1   and without the risks that attend being physically present

2   in the courtroom during the COVID-19 pandemic?

3                    THE DEFENDANT:  Yes, sir, Your Honor.

4                    THE COURT:  Thank you.

5                    Mr. Ohm, do you agree that we should proceed this

6   morning by video?

7                    MR. OHM:  I do, Your Honor.

8                    THE COURT:  I assume, Mr. Wasserman, you agree as

9   well?

10                   MR. WASSERMAN:  Yes, Your Honor.

11                   THE COURT:  I find that because Mr. Douglas, after

12  consulting with counsel, consents to proceed by

13  videoconference, and that the interests of justice would be

14  seriously harmed by further delay, that it is appropriate to

15  proceed this morning by video.

16                   Second, before we begin with the sentencing

17  matters, I believe we need to correct a -- what I think is

18  an administerial error from the plea agreement, which states

19  that Mr. Douglas is pleading guilty, and as we discussed at

20  the plea hearing, to Count 1 of the indictment against him.

21  But as the Probation Office correctly pointed out when

22  completing Mr. Douglas' pre-sentence investigation report,

23  that Count 1 of the indictment does not charge Mr. Douglas

24  with unlawfully possessing a firearm, instead it charges his

25  co-defendant, Mr. Williams, with that offense.  Mr. Douglas

1   is charged only in Count 2 of this indictment.

2           Mr. Wasserman, how do you propose that we correct

3   that error?

4           MR. WASSERMAN:  Your Honor, the parties submitted

5   to the Court yesterday, Page 1 of the plea agreement, which

6   essentially handwritten, crossed out, Count 1 on Page 1 and

7   wrote in Count 2, and all parties initialed and dated the

8   change; so that's how we propose to modify the plea

9   agreement.

10          THE COURT:  And, Mr. Ohm, you agree that that's an

11  appropriate course here, and that we'll docket it as an

12  amended plea agreement, I believe?

13          MR. OHM:  I do, Your Honor.

14          THE COURT:  Mr. Douglas, do you agree with this

15  course; that is to say, essentially substituting Count 2 for

16  Count 1 in the plea agreement to reflect the count that you

17  are charged with?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Okay.  Thank you very much.

20          So now that we have those two preliminary matters

21  out of the way, we are ready to proceed to sentencing.  I

22  have read Probation's pre-sentence investigation report and

23  recommendation, the Government's sentencing memorandum, the

24  Defendant's sentencing memorandum, Mr. Douglas' letter and

25  the letters of support submitted on Mr. Douglas' behalf.

1    Are there any other written submissions I should know about

2    or anything to add to those written submissions?  Of course,

3    I will hear argument and from the Defendant, if he would

4    like, but just as to the written submissions, anything I

5    have not mentioned or that I should be aware of?

6              MR. WASSERMAN:  Not for the Government, Your

7    Honor.

8              MR. OHM:  No, Your Honor.

9              THE COURT:  Thank you.

10             Will there be any family members or guests on the

11   videoconference today?

12             MR. OHM:  Your Honor, there are family members on

13   the public line, Mr. Douglas' parents and Mr. Douglas' -- I

14   believe the mother of Mr. Douglas' son are on the public

15   line.

16             THE COURT:  Thank you, Mr. Ohm.  Welcome to them.

17             So there are four steps for us to accomplish this

18   morning.  First, I will consider any objections to the PSR

19   and make my factual findings; second, I will calculate the

20   appropriate guidelines range, the sentencing guidelines;

21   third, I will hear from Probation, counsel and Mr. Douglas,

22   if he would like to speak; and, finally, I will pronounce

23   the sentence.

24             Before we turn to the objections to the

25   pre-sentence investigation report, I will just ask Mr.

481

1    Douglas a few questions to make sure that he has reviewed

2    and understands the report.

3          Mr. Douglas, have you had a chance to review the

4    pre-sentence report with Mr. Ohm?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Did you have enough time to talk to

7    him about that report and the briefs that have been filed in

8    this case?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Are you completely satisfied with the

11    services of Mr. Ohm?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Thank you.  Thank you, Mr. Douglas.

14          Now let's turn to the objections of the

15    pre-sentence investigation report lodged by the parties.

16    Mr. Ohm, why don't we start with you.  I believe the state

17    of play is as follows, which is that the Defendant and the

18    Government do not believe that there should be a four-level

19    enhancement for alteration or obliteration of the serial

20    number on the weapon at issue here under Section

21    (2)(k)(2.1)(b)(4) of the sentencing guidelines, but

22    obviously Probation, at a minimum, suggests that there is

23    enough evidence in the record, including the statement of

24    facts filed many months ago to support such an enhancement.

25          What is your -- obviously you've objected to that,

482

1    but what is your argument for why there isn't enough

2    evidence in the record to support that enhancement?

3                MR. OHM:  Well, Your Honor, I think it's a factual

4    matter.  There simply isn't an obliterated serial number.

5    It is a serial number that is visible on the firearm.  Is

6    visible, I think, to the plain eye.  I actually inspected

7    the firearm a long time ago in preparation for the motions

8    hearing.  I was able to see in our pictures that it was

9    visible.

10               I think it is plainly a factual matter.  Probation

11   here has, essentially, hearsay information reported to them

12   through police reports, but while it was somewhat visibly

13   affected, I don't think there is any reasonable argument

14   that it was anywhere near obliterated, because the

15   firearm -- the serial number of the firearm could plainly be

16   seen and was actually reported in the initial police report

17   when the firearm was collected.

18               So, purely as a factual matter, Your Honor, the

19   parties that actually had access to the firearm are relying

20   upon the facts that are what they plainly are, which is that

21   the serial number is there and exists.  Probation obviously

22   has to rely on police reports and whatnot and so could not

23   see it is not obliterated.

24               If the Court sort of follows the logic that

25   Probation set forth or is inclined to, I think that this is

1       probably the worst case for the Court to put out this test

2       run.  I think what was clear to the Court through the

3       body-worn camera and the testimony that the Court saw at the

4       suppression hearing, that Mr. Douglas never actually saw the

5       firearm that he possessed.  As a factual matter and, in

6       fact, I don't know if the Court knows this, when the

7       Government pursued its investigation, the Government took

8       DNA samples and had DNA testing done comparing Mr. Williams'

9       DNA with the firearm but not Mr. Douglas' because it was

10      agreed upon that Mr. Douglas had never touched the firearm

11      or it was not the Government's theory or anybody's theory

12      that he had ever touched or actually put his hands on the

13      firearm.

14             So to the extent that the obliterated serial

15      number is sort of this strict liability enhancement that's

16      being advanced here or could be considered that the Court

17      would have to combine this sort of strict liability concept

18      along with the idea that a serial number that is scratched

19      but not obliterated qualifies for the enhancement, is just

20      several bridges too far in the analysis.  So I urge the

21      Court not to apply the firearm enhancement.

22             THE COURT:  Mr. Wasserman, what is the

23      Government's view?

24             MR. WASSERMAN:  Your Honor, the Government

25      similarly objects to the application of the enhancement,

484

1    although for slightly different reasons.  I don't believe

2    there's sufficient evidence in the record for the Court to

3    conclude that the enhancement would apply.

4         What Probation is relying on is the statement of

5    facts from the Complaint, which really isn't evidence.  It's

6    certainly not evidence that was presented to the Court

7    during sentencing and subject to cross examination.  So I

8    don't really think that the Court necessarily needs to reach

9    the factual issue of whether or not the defacement of the

10   serial number is sufficient to apply the enhancement,

11   although the information that I have is that the serial

12   number was visible to the naked eye, notwithstanding the

13   attempts to scratch it off.

14        But that evidence isn't in the record, and as I

15   mentioned in my sentencing memorandum, the D.C. Circuit has

16   not addressed this specific issue about the extent of the

17   defacement that is necessary in order to apply the

18   enhancement.  There is not evidence in this record, from

19   which I submit the Court can make that determination.  The

20   parties, quite frankly, as part of the plea, agreed that the

21   enhancement should not apply.

22        As I pointed out in my sentencing memorandum, the

23   cases that Probation relied on largely applied the

24   enhancement in situations where there was at least partial

25   obliteration of the serial number, such that it was not

485

1    visible to the naked eye.  I think there may have been one

2    case where the Court applied the enhancement, even though it

3    was visible to the naked eye.  But those cases that were

4    cited by Probation, as I recall from reading them, one or

5    more of the numbers were not readable or ledgible to the

6    naked eye and could not be read without some sort of

7    forensic processing.

8         I don't think those cases would necessarily apply

9    in this case anyway.  Again, given the fact that the D.C.

10   Circuit has not addressed this issue, I don't think that

11   this is the appropriate case, based on this record, for the

12   Court to make that decision and apply the enhancement.

13        THE COURT:  Thank you, Mr. Wasserman.

14        Ms. Gavito, what is Probation's response to these

15   arguments?  I mean, in particular, other than the statement

16   of facts, is there any evidence in the record that would

17   support the argument that the serial number was obliterated

18   or altered here?

19        PROBATION:  No, Your Honor.  There is no other

20   evidence.  I relied on the documents that were filed with

21   the Court initially.  And there is nothing else to add, Your

22   Honor.

23        THE COURT:  Thank you very much.

24        So as to the pre-sentence report, under Rule 32

25   (1)(3)(a) I accept the factual findings regarding the

486

1      circumstances of the offense contained in the undisputed

2      portions of the presentence investigation report.  I adopt

3      those facts for the purpose of imposing the sentence.

4            As to the portions of the pre-sentence

5      investigation report, to which the Government and Mr.

6      Douglas have objected and we just discussed, the record

7      before me does not contain insufficient evidence to find

8      that the serial number on the firearm was altered or

9      obliterated within the meaning of Section (2)(k)(2.1)(b)(4)

10     of the sentencing guidelines; I therefore find on the record

11     before me that the four-level enhancement for an; altered or

12     obliterated serial number does not apply.  I don't believe I

13     need to reach the question of how much alteration or

14     obliteration is sufficient, nor do I need to reach the

15     Defendant's argument about the strict liability nature of

16     the enhancement, because I simply think the evidence in the

17     record does not support the enhancement.

18            So as to the guidelines questions then, obviously

19     the sentencing guidelines apply here.  They are not

20     mandatory.  They are advisory but I, nevertheless, must

21     calculate and consider them.  According to the PSR, the

22     relevant guideline is Section (2)(k)(2.1) because Mr.

23     Douglas pleaded guilty to a violation of 18 US Code, Section

24     922(g)(1).  Because Mr. Douglas was a prohibited person at

25     the time of the offense, committed the offense with

487

1       knowledge, intent or reason to believe the offense would

2       result to the transfer of a firearm or ammunition to a

3       prohibited person, the base offense level is 14.

4              As I've already determined, the four-level

5       enhancement for the alteration or obliteration of the serial

6       number does not apply here because the record does not

7       contain sufficient evidence for the Court to find that the

8       serial number was altered or obliterated.

9              An offense level reduction, however, does apply

10      because Mr. Douglas accepted responsibility for his offense.

11      The offense level is decreased by 2; that results in a total

12      offense level of 12.

13             Putting aside the questions we've already

14      discussed -- and again, assuming that the four-level

15      enhancement, as I've already found, does not apply, does

16      anyone object to the total offense level calculation?

17             Mr. Wasserman?

18             MR. WASSERMAN:  No, Your Honor.

19             MR. OHM:  Not on behalf of Mr. Douglas, Your

20      Honor.

21             THE COURT:  Ms. Gavito, I assume Probation agrees

22      with that calculation assuming the four-level enhancement

23      isn't applicable; is that correct?

24             PROBATION:  That's correct, Your Honor.

25             THE COURT:  Thank you.

1    As to the criminal history category, Mr. Douglas

2  received five total points for his 2013 conviction for an

3  unlawful possession of a firearm.  Mr. Douglas received

4  three points for the offense itself, and a two-point

5  enhancement, committing the offense charged in this case

6  while under a criminal justice sentence before that 2013

7  offense, that results in a total criminal history category

8  score of five, which translates to criminal history --

9  sorry.  I am not sure if I said that correctly.  This

10  results in a total criminal history score of five, which

11  translates to criminal history category three.  That's

12  obviously in the pre-sentence report.  There weren't any

13  objections to that, but does anyone object to that

14  calculation of Mr. Douglas' criminal history category?  Mr.

15  Wasserman?

16    MR. WASSERMAN:  No, Your Honor.

17    THE COURT:  Mr. Ohm?

18    MR. OHM:  No, Your Honor.

19    THE COURT:  Ms. Gavito, it's in your report but

20  you agree?

21    PROBATION:  Yes, Your Honor, I agree.

22    THE COURT:  So that offense level of 12 and

23  criminal history category of 3 results in a sentencing

24  guidelines range of 15 to 21 months imprisonment.  I'll ask

25  again, I guess, I think I know the answer, but assuming

489

1    offense level of 12 and criminal history category 3, the

2    parties agree that the appropriate guidelines range is 15 to

3    21 months?  Mr. Wasserman?

4              MR. WASSERMAN:  Yes, Your Honor.

5              MR. OHM:  Yes, Your Honor.

6              THE COURT:  And Ms. Gavito?

7              PROBATION:  Yes, Your Honor.

8              THE COURT:  As to a fine, I can impose a fine up

9    to $250,000 under the statute.  The guidelines range is 5500

10   to $55,000.  Mr. Wasserman, do you agree aside from the $100

11   mandatory special assessment, Mr. Douglas does not have the

12   means to pay a fine?

13             MR. WASSERMAN:  I accept the Probation's findings

14   on that matter, Your Honor.  I usually defer to the Court on

15   the fine.  I am not specifically recommending one.

16             THE COURT:  Fair enough.  Thank you.

17             As to supervised release, the statue also permits

18   me to impose supervised release of three years and the

19   guidelines range is one to three years.

20             Mr. Ohm, does Mr. Douglas object to any of the

21   conditions of supervised release that Probation has

22   recommended?

23             MR. OHM:  No, Your Honor.

24             THE COURT:  And, Mr. Wasserman, does the

25   Government recommend any additional conditions beyond what

490

```
 1    Probation has recommended?

 2              MR. WASSERMAN:  No, Your Honor.

 3              THE COURT:  Thank you.

 4              Counsel, any objections to my guidelines

 5    calculations?  Mr. Wasserman?

 6              MR. WASSERMAN:  No, Your Honor.

 7              THE COURT:  Mr. Ohm?

 8              MR. OHM:  No, Your Honor.

 9              THE COURT:  So that's the relevant guidelines

10    calculations, and I will now hear from the parties.  By

11    that, I intend to first hear from the Government about what

12    the Government believes an appropriate sentence is, and then

13    from you, Mr. Ohm, then from you Ms. Gavito, if you have

14    anything you would like to add.  And then I will give Mr.

15    Douglas an opportunity to speak to me if he would like.

16              Mr. Wasserman, the Government has argued for a low

17    end of the guidelines range sentence here.  Why do you think

18    that is an appropriate sentence?

19              MR. WASSERMAN:  Your Honor, what I would suggest,

20    to highlight my sentencing memorandum, obviously the

21    Defendant has been incarcerated at this point for over a

22    year.  Certainly under probably more trying circumstances

23    than is typical given the COVID pandemic.

24              THE COURT:  Mr. Wasserman, does the Government

25    have a view about whether, essentially, time presently
```

491

1    served at the D.C. Jail under COVID conditions and

2    restrictions should, essentially, get more than a one-day

3    for one-day credit when thinking about an appropriate

4    sentence here?

5            MR. WASSERMAN:  I don't adopt that view, Your

6    Honor.  I certainly acknowledge that the circumstances of

7    the last year have made serving present time more unpleasant

8    than it otherwise already is.  I don't think that there's a

9    basis to somehow create a formula by which to reduce a

10   sentence based upon perceived hardships from the COVID

11   pandemic.

12           I don't know what each individual inmate, what

13   circumstances they served their sentence under; how it has

14   impacted them.  I understand Mr. Ohm's representations.  I

15   don't know, you know, the specifics of what Mr. Douglas has

16   undergone.  I just think that's kind of a bridge too far.  I

17   do think it's fine for the Court to consider those

18   circumstances, perhaps, in this situation in determining

19   where within the guideline range to fall, but not as a basis

20   of a variance.  I don't know if that answers the Court's

21   question.

22           THE COURT:  It does.  It does.  Thank you.

23           MR. WASSERMAN:  So in light of, you know, what

24   really the parties negotiated as part of the plea, I would

25   suggest to the Court that a sentence at the low end of the

1    guideline range is a pretty generous recommendation for this

2    particular Defendant, given his repeated possession of

3    firearms illegally.

4            I do take issue with the notion that somehow he's

5    possessed these guns solely for self-defense.  I think the

6    search of his iCloud and cell phone significantly undermine

7    that notion, particularly where he apparently sought to

8    purchase an assault rifle with an extended magazine, has

9    pictures of himself posing with weapons and a video of

10   himself firing a weapon.  And I would add on the fact that

11   the Defendant was awaiting trial in a narcotics trafficking

12   case in Superior Court at the time that he committed this

13   offense.  Those are facts that I would suggest undermine the

14   notion that this is just strictly for self-defense.

15           Notwithstanding that, whether or not that's true,

16   it's obviously illegal.  I mean, I know the homicide rate in

17   the District of Columbia has been on the increase over the

18   last several years.  The Defendant claims that he's had

19   close friends who have been the victim of gun violence.  So

20   if anybody should know what the impact of carrying illegal

21   firearms is and the consequence of that, it's the Defendant.

22           Quite frankly, and sadly, the overwhelming

23   majority of the victims of gun violence, particularly in the

24   District of Columbia but even nationwide and certainly in

25   major metro area, are African Americans and people of color.

493

1    So the notion that somehow enforcement of or antigun

2    enforcement that is focused in areas where gun violence is

3    at its worst, that that is somehow unfair or discriminatory,

4    quite frankly, is ridiculous in my opinion.

5         So I think the Defendant's prior record is

6    troubling.  It's troubling for the notion that he does not

7    continue to present a risk to reoffend given, obviously, his

8    past behavior; the fact that he's been on probation

9    previously and been revoked.  He was obviously on supervised

10   release in this case.  The fact that he lacks sufficient

11   education or vocational training to have, you know, real

12   opportunities for employability, notwithstanding again, that

13   he's had opportunities at least to try to take advantage of

14   prior periods of probation to get on track.

15        I would suggest that a sentence at the low end of

16   the guidelines is a generous one, but ultimately sufficient,

17   I would hope, to convey to the Defendant that he needs to

18   change his behavior.  Otherwise, he will wind up right where

19   he is or worse, and be the victim of gun violence himself.

20        I know he does face a potential parole hit.  I

21   think that also can factor into a sentence at the low end of

22   the guideline range, since he may face additional time, even

23   if it's just waiting to have his parole matter addressed.

24   Again, I disagree with defense counsel that it's the basis

25   -- it should be the basis of a variance, particularly in

1   light of Mr. Douglas' record.

2          So unless the Court has additional questions,

3   that's my recommendation.  I also would recommend a

4   three-year period of supervised release.

5          THE COURT:  Thank you, Mr. Wasserman.  Mr. Ohm?

6          MR. OHM:  Thank you, Your Honor.

7          As the Court knows, we are asking for a sentence

8   of a year and a day, with a term of one year supervised

9   release added on to that.

10          I want to start with where the Court asked the

11   Government about why the low end of the guideline range is

12   the appropriate place that Mr. Douglas should fall into.  I

13   think it starts with his criminal record.  I know that he

14   does have these offenses.  Obviously, he has to have prior

15   felony offenses or we wouldn't be here in front of Your

16   Honor.  That guideline range encapsulates all sorts of

17   people with criminal history.  Mr. Douglas' criminal record

18   has presumptary offenses.  There is no violent conduct,

19   which distinguishes him from many other individuals that

20   come before Your Honor in this case with 922(g) cases.  I

21   think it is very important in assessing an individual's

22   dangerousness.

23          I take to heart what Mr. Wasserman said.  Number

24   one, I would point out that the drug offense was dismissed

25   even prior to the plea agreement in this case.  So I'm not

495

 1      sure about the evidence that actually supports that charge.

 2              In addition to that, Mr. Douglas has lived long

 3      enough, when an individual doesn't have any sort of record,

 4      and frankly, stayed away from the police and had no contact

 5      with the police for a substantial period of time, I think

 6      that tells the Court about -- I don't think the Court can

 7      infer any sort of malicious intent or behavior with the part

 8      of gun possession, which both the law now and society

 9      acknowledges now is something that is a part of life.

10              I do want to --

11      THE COURT:  Mr. Ohm, Mr. Wasserman points out,

12      however, that there is evidence in the record that from the

13      iCloud and cell phone about your client's interest in guns.

14      I think it is fair to say that doing more than merely

15      possessing a gun for self-defense purposes, as you suggest

16      in your brief, is really the main reason --

17      MR. OHM:  Your Honor, I don't think they are

18      mutually exclusive facts.  There are a lot of individuals in

19      the country who have firearms for self-defense who are

20      interested in the different types of firearms that exist.  I

21      think there are individuals who have firearms for

22      self-defense that actually go and shoot those firearms so

23      that the first time they use a firearm is not in

24      self-defense -- it's not the first time that they use a

25      firearm.  I don't think that those facts are at all mutually

1    exclusive.  I know plenty of individuals who are gun owners

2    and fire their firearms all of the time and have extremely

3    significant interest in the different brands and models of

4    firearms that are out there.  It doesn't mean they are using

5    them for any other purpose other than self-defense or their

6    interest in firearms.  One can't infer and one would not

7    think that there is any criminal purpose for that

8    possession.

9         What I think is more important is that the

10    Government went through Mr. Douglas' phone.  The

11    investigation here for a 922(g) case was significant and

12    far-reaching compared to other 922(g) cases I've seen.  It

13    is the first one I had a full extraction.  They couldn't

14    find any evidence of other criminal activity, any violent

15    activity or dangerous activity because there is none in Mr.

16    Douglas' history or nature.  So I think it is an important

17    fact for the Court to consider.

18         Beyond that, this plea agreement came about at a

19    time when -- this doesn't really apply to Mr. Douglas,

20    himself per se, but I haven't appeared before Your Honor in

21    a sentencing hearing before.  I think that it is important

22    to point out that a Defendant, Defendants generally, both

23    have a right and it is helpful to the criminal justice

24    system to have a sense that is somewhat predictable that a

25    Government's allocution, which obviously isn't a

497

1    be-all-end-all, and obviously the sentence is ultimately

2    left to the judge.  That the criminal justice system

3    benefits when there is some sort of a predictability of a

4    sentence when an individual considers whether to accept a

5    plea offer.  Especially in a time when, I think, both US

6    Attorney's Office and defense bar is substantially stressed

7    and under a lot of pressure because of an influx of,

8    frankly, work that has come into our courthouse in the past

9    several months that individuals who are provided with a plea

10   agreement and given the incentive to dispose of the case

11   before trial, that it is important for Defendants who are at

12   the D.C. Jail who -- I'm sure Mr. Douglas will have

13   conversations when he returns to his cell block -- that it

14   is important for the system, for the Defendants in the

15   system, the other shareholders to know that when a plea

16   agreement is offered, that the presumption is that that will

17   strongly be considered; that those allocutions and those

18   limits on allocution are strongly considered by the Court,

19   just as a general matter.  So I think that is something that

20   the Court should also consider.

21            In terms of --

22            THE COURT:  Mr. Ohm, and that means what here?  I

23   understand the argument but in your view that means?

24            MR. OHM:  Your Honor, that means that if the Court

25   is on the fence, I think the Court should accept the

1    allocution of the Government and recognize that during the

2    time when, frankly, individuals are setting trials that may

3    be within a reasonable amount of time or time under the

4    Speedy Trial Act or made for a more practical purpose.  I

5    know that is not the case for Mr. Douglas, and he could have

6    had the trial earlier.  But if everybody -- I will say this

7    in a more plain manner.  If Your Honor becomes the judge

8    that in defense bar experience and in the D.C. Jail resident

9    experience becomes the judge who does not follow the

10   Government's recommendation for allocution, that does have

11   an impact on how cases get -- or how both defense lawyers

12   and defendants perceive plea agreements and the necessity of

13   or the wisdom of taking a plea agreement in front of one

14   particular forum or another.

15         THE COURT:  I understand that point but are you

16   talking about the Government's agreement to allocute to the

17   low end of the guidelines --

18         MR. OHM:  Yes.

19         THE COURT:  -- or are you talking about the

20   parties mistakenly thought the guidelines were going to look

21   like when they either executed the plea agreement or when we

22   did the plea before.  Because, I mean, I think Mr. Douglas

23   rightly pointed out there was a question about whether the

24   serial number had actually been obliterated, and a question

25   about what his criminal history category was going to be.

1          The Government seems to me is allocuting to the

2     low end of the guidelines.  The guidelines are agreed upon

3     to be 15 to 21 months.  Is it your argument that's the

4     number that I should not be quick to dispose of, or is there

5     some other number that you are suggesting I should take

6     because it was what incented the plea agreement in the first

7     place?

8          MR. OHM:  Your Honor, what I am suggesting is that

9     the defense's understanding is that the Government's

10     allocution cap is at 15 months at this point.  And for the

11     Court to exceed that, that that would simply be perceived as

12     the Court not following the Government's allocution.  I

13     don't mean to suggest much more than that, and the

14     importance of that predictability in decisions that

15     individuals like Mr. Douglas need to make.

16          THE COURT:  Fair enough.  As to the argument about

17     the time Mr. Douglas has spent in D.C. Jail post-COVID

18     restrictions, it seems to me -- though I will probably ask

19     you, Ms. Gavito for your view of this -- it seems to me that

20     there is an agreement, certainly between the parties that

21     time spent in D.C. Jail over the last year has been harder,

22     maybe even considerably harder than it would have been

23     pre-COVID -- I think that's actually pretty obvious -- and I

24     think probably also harder than it would have been at a BOP

25     facility pre-COVID, and maybe even harder than it would have

1    been at a BOP facility post-COVID.  So one question is

2    whether that's the case, if you know?

3            In other words, if Mr. Douglas had his sentencing

4    a year ago and went to one of the BOP facilities in the

5    post-COVID world, would the restrictions in a BOP -- the

6    most likely BOP facilities still have been less restrictive

7    than at the D.C. jail?  I'm interested in your view on that

8    specific situation.

9            Again, since there seems to be agreement that

10   these last 12 months have been harder than they would have

11   been -- I don't think there is any doubt about that --

12   harder at the D.C. Jail, how much I should credit that?

13           PROBATION:  Was that for me, Your Honor?

14           THE COURT:  It was for Mr. Ohm in the first

15   instance, and I have a few questions for you, Ms. Gavito.

16   So why don't we go to Mr. Ohm?

17           PROBATION:  Yes, Judge.

18           MR. OHM:  In short, yes, I think that is correct.

19   The information that came out recently is that the D.C. Jail

20   is the only correctional facility I think in the country,

21   that has imposed 23-and-1 restrictions throughout the

22   pandemic.  It would have been more harsher time at the D.C.

23   Jail than at the BOP, either post- or pre-COVID.

24           I think in modern history, it's just not clear to

25   me how long it's been since we've actually had prisons

1    impose this kind of -- I am not imputing any motive on the

2    part of the Department of Corrections -- mass solitary

3    confinement, as the Court knows is the main form of

4    punishment that the correctional facilities have been using

5    for a while, and there are recommendations that say it

6    should never be more than three days at a time, and

7    obviously everybody over there has been doing it for over a

8    year now.  And Mr. Douglas did it for his entire time there.

9         I don't think that that could be understated.

10    People talk to themselves.  People -- I've gotten over the

11    course of the year I've gotten phone calls at 1 or 2 in the

12    morning.  I will wake up and see missed calls, six or seven

13    missed calls because that's the only time an individual has

14    recreational time and they don't have anybody to talk to.

15         Sort of the confluence of all of these factors is

16    something, I think -- I mean, jail is difficult enough as it

17    is, and obviously it is supposed to be, but the combination

18    of those factors and restrictions that the DOC put in place

19    to keep Mr. Douglas safe.  Obviously, he didn't get COVID;

20    so that's an important thing.  We are not questioning the

21    decisions.  This isn't the forum for that, but it is

22    indisputable that the time he did was unusually and

23    incredibly harsh.

24         I think it makes sense, Your Honor, especially

25    when combining that with our argument about the Parole

1    Commission time sort of the dead time he will lose in the

2    next three months is another place where it comes into play

3    because he has more time that he's going to have to do under

4    these circumstances, which I read an email today that said

5    June 1st they are going to try some things but the next

6    month he will continue to live under these circumstances;

7    that's time that's not going to be credited at all, because

8    if the Court does follow the Government's recommendation,

9    then he will essentially be eligible for release.  It will

10   take two weeks for the BOP to determine that time.  And then

11   once it's credited, and it's determined that he would have

12   been done with his time now, the time between the end of his

13   sentence is calculated, which will be two weeks from now at

14   the earliest, to the time the parole warrant is issued.

15   Then he has to be brought before the Parole Commission for a

16   probable cause hearing and then there has to be a final

17   determination.

18          All of those things, Your Honor, it's time that he

19   is going to have to spend.  If the Court sentences him to

20   the 15 months, rather than the year and a day that we've

21   asked for, then that time will not be credited to anything;

22   so that's why we came up with a year and a day.

23          I think I agree with Mr. Wasserman.  I don't think

24   that there is a broad formula that you can apply to

25   everybody under every circumstance.  It's not what we are

1    advocating for.  In this situation where the difference

2    between 15 months and a year and a day would only really

3    cover time that he would not actually be credited for, given

4    the fact that he -- we are still in the pandemic.  Given the

5    fact that the D.C. Jail restrictions are still in place and

6    the harm is obvious to anybody.  I think given all of those

7    things, the Court can consider and should consider when

8    fashioning its sentence, the hardships that Mr. Douglas is

9    going to face, both for his violation of the law in this

10   case and for the supervised release violation that is

11   coming.

12           I think it's also important to note that Mr.

13   Douglas, we see him at this point as facts in a case.  Mr.

14   Douglas is a young man.  He has a beautiful son, a dutiful

15   father.  He has suffered and been punished in the most human

16   way that he hasn't and wasn't able to be there for the birth

17   of his child.  He has not been able to interact with his

18   daughter and, frankly, Mr. Douglas for all -- despite the

19   circumstances from which he comes before the Court, Mr.

20   Douglas is a proud and responsible father, who has always

21   taken care of his family; and that that has always been a

22   priority in his life.

23           The fact that he has not been able to help his --

24   the mother of his baby through the most difficult times of

25   the infant's life is something that he takes to heart and he

504

1    recognizes is something that he has to stop.

2            His responsibility -- not necessarily the

3    punishment but the responsibility that he's had time to

4    consider to think about over the past year while he's been

5    sitting in his cell for 23 hours a day, that is what has

6    motivated him and will continue to motivate him to be a

7    different person, to be somebody who will be productive, and

8    to avoid this sort of situation so that he can be there for

9    his children and also continue to be there for his parents,

10   who are getting a little bit older now.

11           So, Your Honor, all of those reasons are why I ask

12   the Court and recommend a sentence of one year and one day.

13   And then on top of that I ask the Court for -- oh, one other

14   thing I didn't mention is the Parole Commission warrant also

15   effects his ability to go to the halfway house at the end of

16   the sentence.  So I think that that is something that the

17   Court can consider.  It also prolongs the incarceration

18   aspect of the sentence under the D.C. Code Parole Commission

19   regulations.

20           For all of those reasons, Your Honor, under the

21   Booker factors I ask the Court to sentence Mr. Douglas to

22   one year and one day.

23           THE COURT:  Thank you, Mr. Ohm.

24           Mr. Douglas, I will give you an opportunity to

25   speak in one minute, if you would like, but I want to turn

1    to Ms. Gavito, to just -- any comment she might have on my

2    questions around the post-COVID restrictions at the D.C.

3    Jail, vis-a-vis, either current BOP restrictions or

4    otherwise.

5            PROBATION:  No, Your Honor.  With regards to the

6    restrictions, I know that the facilities have taken more

7    precautions because it has been, even for Probation

8    Officers, it has been a bit more taxing to schedule

9    interviews and that's for the safety of everybody at the

10   facilities, including Mr. Douglas and everybody that

11   interacts with him.  I couldn't give any more information or

12   comment anymore about the restrictions.  I would need to be

13   better informed to advise the Court any further.

14           I do want to clarify that Mr. Douglas has been in

15   custody for approximately 12 months and 12 days.  Just in

16   case Your Honor is inclined to Mr. Ohm's sentence

17   recommendation of 12 months and a day.  In that case the

18   Court would probably need to vary upwards, to credit the 12

19   months and 12 days that Mr. Douglas has been in custody.

20           Finally, Your Honor, the only other thing that I

21   would seek for clarification, is Your Honor going to request

22   or order that the pre-sentence report be amended or modified

23   to include the deletion of the minus four for the specific

24   offense characteristics?

25           THE COURT:  That doesn't seem to be necessary.

1    I've made findings on the record about that.  Certainly the

2    pre-sentence report is Probation's view of things, and I

3    have a different view based on the record, as is exists.  I

4    think it is crystal clear unless you, I suppose, Mr. Ohm or

5    Mr. Wasserman, you think there should be an amendment to the

6    pre-sentence report.  But I think the record is very clear

7    right now.

8            PROBATION:  Thank you, Judge.

9            MR. OHM:  Your Honor --

10           MR. WASSERMAN:  Go ahead, Mr. Ohm.

11           MR. OHM:  I think I would request an amendment

12   just because I know these PSRs follow individuals throughout

13   their lives, and I think it would be helpful to have --

14   nothing long or lengthy but something reflecting the Court's

15   decision.

16           THE COURT:  That's fair.  Ms. Gavito, could you do

17   a short addendum or amendment that reflects my determination

18   that that enhancement is not appropriate here?

19           PROBATION:  Yes, Your Honor, we can prepare

20   something.

21           THE COURT:  Thank you, Ms. Gavito.

22           Mr. Douglas, I am happy to hear from you, if you

23   would like.  You are not required to speak, but if you would

24   like to address the Court about any and all topics that we

25   discussed today or any others that you would like me to hear

1    about, please feel free to do so.

2         THE DEFENDANT:  Your Honor, I just want to say

3    that this has really been a rough situation and rough

4    experience being in lockdown for 23 hours and sometimes more

5    and in jail.

6         At the same time, I can really say I honestly

7    appreciate the whole situation because it's given me time to

8    rethink a lot of stuff and rethink a lot of things that I've

9    done in my life and my thought process.  It's given me,

10   like, a new sense of looking at my life and doing it for my

11   children and really wanting to be there and not putting

12   myself or my children or my family through this experience

13   again.  I can honestly say I appreciate it, even though it

14   was really rough and still is really rough, I can say I

15   appreciate the whole situation.

16        THE COURT:  Thank you, Mr. Douglas.

17        Mr. Ohm, anyone else since I think family members

18   are on the public line?  Anyone that will be addressing the

19   Court as far as sentencing?

20        MR. OHM:  That's correct, Your Honor.

21        THE COURT:  Thank you, Counsel, Ms. Gavito and Mr.

22   Douglas.  Having heard from counsel and Mr. Douglas, I will

23   now indicate the sentence to be imposed.  Counsel will have

24   an opportunity to make any file legal objections before we

25   conclude today.

1          Obviously under Section 3553(a) I have to consider

2     a series of individual factors.  As to the nature and

3     seriousness of the offense, Mr. Douglas is charged with

4     unlawfully possessing a firearm and ammunition.  He is 30

5     years old and this is his third felony firearms conviction.

6          At the time of the offense, Mr. Douglas was

7     non-compliant with his supervised release conditions from

8     his 2013 firearms conviction, and he was also a fugitive

9     from justice after failing to appear in Superior Court for a

10    then pending felony drug trafficking offense.

11         As to the history and characteristics of Mr.

12    Douglas, he is, as I mentioned, a 30-year-old.  He is a D.C.

13    resident and has been all his life.  According to the PSR he

14    had a structured childhood, was raised by two working

15    parents who encouraged education, but he strayed from the

16    straight and narrow path.  Before he was a teenager, he

17    experimented with drugs and alcohol and quickly ran into

18    legal trouble.  As a juvenile he was charged with two

19    criminal offenses, one which involved the destruction of

20    property, and then dropped out of high school.

21         Unfortunately, at the age of 18 he was convicted

22    of his first firearms offense, and four years later he was

23    found in unlawful possession of a firearm.  As Mr. Ohm

24    noted, and as I have certainly taken note of, Mr. Douglas is

25    the father of two children, a three-year-old son and a very

509

1    young daughter.

2              As to the third factor, protecting the public,

3    respect for the law and deterrence.  When looking to

4    deterrence as it relates to the Mr. Douglas and other

5    criminal defendants, the Court has a strong interest in

6    deterring felons from illegally possessing firearms.  It

7    does not appear that the sentence is administered as a

8    result of his previous firearms convictions, adequately

9    deterred Mr. Douglas from illegally possessing a firearm,

10   and his previous failures to appear at court hearings and to

11   comply with court-imposed conditions of supervised release,

12   demonstrate serious lack of disrespect for the law.

13             As to the need for educational or job training or

14   treatment, the PSR notes that Mr. Douglas would benefit from

15   educational and vocational training.

16             Mr. Douglas completed the eleventh grade and was

17   on track to graduate from Spingarn High School, but based on

18   what he described as a feeling of lack of security and

19   mental anguish, he discontinued his education.  Shortly

20   after dropping out, he attempted to obtain his GED through

21   the Pittsburgh Job Corps Center in Pittsburgh, Pennsylvania,

22   but failed to complete the program.  As to employment, he

23   has been sporadically employed as a landscaper and laborer

24   for a local moving and hauling service, but other than these

25   occasional odd jobs, he has not maintained steady

1    employment.

2              According to his mother, Mr. Douglas is interested

3    in continuing his education and receiving vocational

4    training as an electrician, which is encouraging.  Mr.

5    Douglas' parents indicated to the Probation Officer that

6    Mrs. Douglas and Mr. Douglas' father would be willing to pay

7    for the vocational training.

8              As to substance abuse, the PSR also indicates that

9    Mr. Douglas would benefit from substance abuse testing and

10   treatment.  He began using drugs and alcohol when he was 12.

11   He said that he would drink alcohol on the weekends and

12   occasionally drink to the point of losing consciousness, but

13   he reported to Probation that he has not consumed alcohol

14   since 2012, which is great.  Mr. Douglas began smoking

15   marijuana at 12 and continued to use the substance regularly

16   until the day of his arrest.  Mr. Douglas also said he

17   became addicted to prescription pain killers in 2014.  He

18   admitted he continued to use the prescription pain killers

19   at least recreationally until 2019.

20             As for his mental health, although Mr. Douglas

21   reported no family history of mental health issues, and has

22   never sought mental health treatment, he did tell Probation

23   that his upbringing was filled with tragic events, including

24   gun violence that has led to trauma.  Obviously, witnessing

25   your friends or other people you know be killed by gun

1    violence is obviously traumatic.  Mr. Douglas now believes

2    he may now benefit from counseling.

3            So based on my consideration of the sentencing

4    guidelines, which we have already discussed, and the 3553(a)

5    factors, as well as the discussion here today, I have the

6    following views, which is, first, I believe a term of

7    incarceration of approximately 18 months would have been --

8    in other words, a mid-guideline range sentence would have

9    been appropriate given Mr. Douglas' criminal history,

10   background, the nature of the offense, and the like here.

11   But for two reasons, principally because of the nature of

12   the time he has served to date in D.C. Jail, the 23-hour

13   lockdown, the lack of vocational and other opportunities

14   and, frankly, the fact that as everyone seems to agree, the

15   12-plus months that Mr. Douglas has spent in the D.C. Jail

16   have been harder than they would have been before COVID-19

17   and probably harder than they would have been even during

18   COVID-19 at a BOP facility, that I think it is appropriate

19   to recognize that fact; and I therefore believe that a low

20   end of the guidelines term of incarceration is appropriate.

21   And it is my judgment, therefore, that a sentence of 15

22   months term of imprisonment is appropriate here, which is

23   obviously the lowest end of the guidelines.

24           It is therefore my judgment that you, Mr. Douglas,

25   are committed to the custody of the Bureau of Prisons for a

512

```
 1    term of imprisonment of 15 months.

 2            As to supervised release, I believe a term of

 3    three years of supervised release is important, both because

 4    of the opportunities that can be provided to you as part of

 5    supervised release and, frankly, because historically you

 6    have not done a very good job of complying with terms of

 7    supervised release, and I think it is important to ensure

 8    that there is some contact between you and the system so

 9    that we can try to not have you commit another offense.

10            In my view, the sentence of 15 months of

11    incarceration, plus 3 years of supervised release, is

12    sufficient but not greater than necessary to reflect the

13    seriousness of the offense, promote respect for the law, to

14    provide justice punishment, to protect the public from

15    future crimes by Mr. Douglas.

16            As to supervised release, I'm basically going to

17    adopt all of the recommendations from Probation but will go

18    through them quickly at least for the record.  You are

19    required to abide by several mandatory conditions.  You must

20    not commit another federal, state or local crime.  You must

21    not unlawfully possess a controlled substance, refrain from

22    unlawful use of controlled substance.  You must submit to

23    one drug test within 15 days of placement on supervision,

24    and at least two periodic drug tests thereafter as

25    determined by the Court, and you must cooperate in the
```

1   collection of DNA as directed by the Probation Officer, if

2   necessary, but I think that that has already happened in the

3   past.

4          As I noted, I am also following the

5   recommendations from Probation as to the following special

6   conditions:  Substance abuse, you must participate in an

7   inpatient and/or outpatient substance abuse program.  You

8   must submit to substance abuse testing to determine if you

9   have used a prohibitive substance.  Mental health treatment,

10  you must participate in a mental health treatment and follow

11  the rules and regulations of that program.

12         Vocational services, I think this is very

13  important.  I note your parents' commitment to helping you

14  find a career, and I'm very hopeful that their efforts

15  together, perhaps with a vocational services program, will

16  be effective.  You must participate in such a program,  a

17  vocational services program and follow the rules and

18  regulations of it.

19         Finally, educational services program, it seems to

20  me that you are quite close to getting your high school

21  degree, and I think that would be a good thing to try to

22  achieve; and so therefore, I am ordering you to participate

23  in an educational services program, which could include a

24  high school equivalency and other classes designed to

25  improve your proficiency in skills that people develop in

1   high school.

2        As to the fine, I find you are unable to pay a

3   fine and waive the imposition of one.  As to forfeiture,

4   pursuant to Rule 32.2(a) of the Federal Rules of Criminal

5   Procedure, Mr. Douglas is ordered to forefit the Sig Sauer

6   P320 semiautomatic pistol, magazine and 13 rounds of .40

7   caliber ammunition.

8        A few other general notices.  You must pay a

9   special assessment of $100, in accordance with 18 US Code

10  Section 3013, that amount is payable to the Clerk of Court.

11  If you change address, you must notify the Clerk of the

12  change, until such time as that $100 is paid in full.

13       As to the pre-sentence investigation report, I

14  think we have already discussed an amendment to it to

15  reflect my determination that the four-level enhancement is

16  not warranted here.  That will happen and then Probation is

17  permitted to release that report to other appropriate

18  agencies in order to execute the sentence.

19       I believe we discussed this during the plea

20  hearing, but there are some appellate rights I believe have

21  been preserved.  If you do choose to appeal, Mr. Douglas,

22  you must file any appeal within 14 days after entry of the

23  judgment.  If you are unable to afford the cost of the

24  appeal, you may request permission from the Court to file an

25  appeal without cost to you.

```
 1              Also, as defined in Federal Statute 28 US Code

 2     section 2255, you also have the right to challenge the

 3     conviction entered or sentence imposed if new and currently

 4     unavailable information becomes available to you or on a

 5     claim that you received ineffective assistance of counsel in

 6     entering a plea of guilty to the offense or conviction in

 7     connection with sentencing.

 8              So with all of that, are there any questions about

 9     the sentence I've imposed or any objections to state for the

10     record?  Mr. Ohm, why don't we start with you.

11              MR. OHM:  Just to clarify, Your Honor.  So the

12     Court has essentially taken the language from the Probation

13     Officer's recommendation.  Everything would be essentially

14     at the discretion of the Probation Officer.  Right?

15              THE COURT:  Yes.

16              MR. OHM:  Okay.  Thank you.

17              Your Honor, other than what we've argued both here

18     and in our sentencing memorandum, we don't have any

19     additional objections.

20              THE COURT:  Thank you.  Mr. Wasserman?

21              MR. WASSERMAN:  No objections from the Government,

22     Your Honor.

23              THE COURT:  Ms. Gavito, anything you would like to

24     add?

25              PROBATION:  Nothing further, Your Honor.  Thank
```

516

1      you.

2              THE COURT:  Mr. Ohm, are there any recommendations

3      you would like me to make to the Bureau of Prisons?

4              MR. OHM:  Your Honor, my calculation, based on the

5      Court's sentence, is that, no, that won't be necessary.

6              THE COURT:  Thank you.  Anything else we should

7      discuss today, Counsel?

8              MR. WASSERMAN:  Nothing from the Government, Your

9      Honor.

10             MR. OHM:  Nothing on matter of law, Your Honor,

11     but I would ask if Ms. Lesley could indulge us with the

12     breakout room, I would very much appreciate it.

13             THE COURT:  Yes.  Ms. Lesley, before we close the

14     hearing, could you put Mr. Ohm and Mr. Douglas in a breakout

15     room we will wait for them to return.

16             COURTROOM DEPUTY:  Yes, Your Honor.

17             MR. WASSERMAN:  Are we excused, Your Honor?

18             THE COURT:  Oh, I apologize.  I thought you wanted

19     to consult with him before we close the hearing.  You'd like

20     to talk to him after the hearing is over.

21             MR. OHM:  Correct.  Sorry about that.

22             THE COURT:  So we are concluded for today.  Thank

23     you, Mr. Wasserman.  And Ms. Lesley, if you could put Mr.

24     Ohm and Mr. Douglas in a breakout room after this hearing is

25     over, I would appreciate it.  Thank you all.

```
 1                    MR. WASSERMAN:  Thank you, Judge.  Have a good
 2       day.
 3                    PROBATION:  Thank you, Your Honor.
 4                    MR. OHM:  Thank you, Ms. Lesley.
 5                    COURTROOM DEPUTY:  You're welcome.
 6                    (Proceedings concluded at 10:22 a.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        **C E R T I F I C A T E**

2

3         I, **Lorraine T. Herman, Official Court**

4 **Reporter,** certify that the foregoing is a true and correct

5 transcript of the record of proceedings in the

6 above-entitled matter.

7

8         **Please Note:** This hearing occurred during

9 the COVID-19 pandemic and is therefore subject to the

10 technological limitations of court reporting remotely.

11

12

13

14    **July 15, 2021**        **/s/**
      **DATE**              **Lorraine T. Herman**

15

16

17

18

19

20

21

22

23

24

25

519