ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 21-3032

———————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

THEODORE DOUGLAS,                    Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
SUZANNE GREALY CURT
STEVEN B. WASSERMAN
* ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
(202) 252-6829

Cr. No. 20-121 (CJN)

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for appellant.

## Rulings Under Review

Appellant Theodore Douglas appeals the judgment of the Honorable Carl J. Nichols, entered May 4, 2021, following his conditional guilty plea for unlawful possession of a firearm and ammunition by a convicted felon (18 U.S.C. § 922(g)(1)). Douglas seeks review of the district court's order and published opinion denying his motion to suppress, which was issued on December 10, 2020 (A158-86). *See United States v. Williams*, 507 F. Supp. 3d 181 (D.D.C. 2020).

## Related Cases

Appellee is unaware of any other related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the brief for appellant.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ............................................ 1

    Motions Hearing ................................................................ 2

    District Court's Ruling ...................................................... 9

SUMMARY OF ARGUMENT .................................................... 13

ARGUMENT .......................................................................... 14

  I.  The Police Had Reasonable Suspicion to Stop Douglas ............ 14

    A.  Applicable Legal Principles and Standard of Review ........ 14

    B.  Officer Jackson's Observations Established Reasonable Suspicion ......................................................... 16

      1.  High-Crime Area ........................................................ 16

      2.  Hand-to-Hand Transaction ........................................ 19

      3.  Douglas's Efforts at Concealment ............................... 27

  II.  The Police Permissibly Found the Gun as Part of a Reasonable *Terry* Stop and Frisk ........................................... 32

    A.  The Police Found the Gun During a *Terry* Stop and Frisk, Not an Evidentiary Search Attendant to Arrest ..... 33

    B.  The Police Used Reasonable Force in Stopping Douglas ................................................................................ 38

  III.  The District Court Committed No Clear Error in Upholding the Frisk's Limited Scope ........................................ 45

    A.  Even on Douglas's View of the Facts, the Protective Search was Legal ............................................................. 45

B.    Douglas Shows No Inherent Incredibility or Clear
Error ........................................................................... 48

CONCLUSION ........................................................................... 55

# TABLE OF AUTHORITIES*

**Cases**

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) ................ 15, 16, 25

*Dunaway v. New York*, 442 U.S. 200 (1979) .................................... 34, 35

*Florida v. Royer*, 460 U.S. 491 (1983) ........................................ 30, 34, 35

*Graham v. Connor*, 490 U.S. 386 (1989) .................................... 38, 39, 45

*Hall v. District of Columbia*, 867 F.3d 138 (D.C. Cir. 2017) ................. 33

*Hudson v. Michigan*, 547 U.S. 586 (2006) .............................................. 38

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ............................. 14, 15, 16, 33

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982) ................... 48

*Kansas v. Glover*, 140 S. Ct. 1183 (2020) .................................... 20, 27, 32

*Maryland v. Buie*, 494 U.S. 325 (1990) .................................................. 42

*Michigan v. Summers*, 452 U.S. 692 (1981) ............................................ 35

*Minnesota v. Dickerson*, 508 U.S. 366 (1993) ...................... 44, 45, 46, 54

 * *Muehler v. Mena*, 544 U.S. 93 (2005) ...................................................... 40

*Nix v. Williams*, 467 U.S. 431 (1984) ...................................................... 38

*Ornelas v. United States*, 517 U.S. 690 (1996) ........................... 15, 19, 48

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Pennsylvania v. Dunlap*, 555 U.S. 964 (2008) .........................................32

*Terry v. Ohio*, 392 U.S. 1 (1968)............................ 9, 14, 33, 38, 43, 45, 54

*Torres v. Madrid*, 141 S. Ct. 989 (2021)...................................................43

*United States v. Booker*, 436 F.3d 238 (D.C. Cir. 2006) ........................36

*United States v. Boyd*, 435 F.3d 316 (D.C. Cir. 2006) ............................22

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ...........................30

*United States v. Brockenborrugh*, 575 F.3d 726 (D.C. Cir. 2009) ..........48

*United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003)........................17

*United States v. Bullock*, 510 F.3d 342 (D.C. Cir. 2007) .................17, 36

*United States v. Clipper*, 973 F.2d 944 (D.C. Cir. 1992)........................34

*United States v. Davis*, 458 F.2d 819 (D.C. Cir. 1972) ...........................28

*United States v. Devaugh*, 422 F. Supp. 3d 104 (D.D.C. 2019) ........10, 12

*United States v. Drayton*, 536 U.S. 194 (2002) ......................................52

\* *United States v. Dykes*, 406 F.3d 717 (D.C. Cir. 2005) .....................39, 41

*United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001) ...........10, 17, 19

*United States v. Edwards*, 424 F.3d 1106 (D.C. Cir. 2005)....................17

*United States v. Espinoza*, 996 F.2d 1228 (9th Cir. 1993)......................23

*United States v. Faught*, No. 21-6123, 2022 WL 2813240
  (6th Cir. July 19, 2022)......................................................................23

*United States v. Garrett*, 959 F.2d 1005 (D.C. Cir. 1992)................23, 30

* *United States v. Green*, 670 F.2d 1148
   (D.C. Cir. 1981) ...................................................... 19, 21, 23, 25, 28, 30

*United States v. Harley*, 990 F.2d 1340 (D.C. Cir. 1993).................. 21, 31

*United States v. Hishaw*, 235 F.3d 565 (10th Cir. 2000) ........................ 23

* *United States v. Holmes*, 385 F.3d 786 (D.C. Cir. 2004) ...... 44, 46, 47, 54

*United States v. Howard*, 729 F.3d 655 (7th Cir. 2013) ........................ 38

*United States v. Hughes*, 898 F.2d 63 (6th Cir. 1990) ........................... 21

*United States v. Hurd*, 785 F.3d 311 (8th Cir. 2015)............................. 23

*United States v. Johnson (Abdul)*, 519 F.3d 478 (D.C. Cir. 2008).......... 17

*United States v. Johnson (Larry)*, 599 F.3d 339 (4th Cir. 2010) ...... 23, 29

*United States v. Johnson (Robert)* 212 F.3d 1313
   (D.C. Cir. 2000) ................................................................ 10, 17, 18, 29

*United States v. Jones (James)*, 673 F.3d 497 (6th Cir. 2012),
   *overruled on other grounds by Cartwright v. United States*,
   12 F.4th 572 (6th Cir. 2021) ................................................................ 23

*United States v. Jones (Thomas)*, 973 F.2d 928 (D.C. Cir. 1992),
   *modified in part on other grounds on reh'g*, 997 F.2d 1475
   (D.C. Cir. 1993) (en banc) ............................................................ 40, 43

*United States v. Laing*, 889 F.2d 281 (D.C. Cir. 1989) .................... 39, 42

*United States v. Lea*, 839 F. App'x 551 (D.C. Cir. 2020) ....................... 49

*United States v. Lopez-Garcia*, 565 F.3d 1306 (11th Cir. 2009)............. 23

*United States v. Lucas*, 778 F.2d 885 (D.C. Cir. 1985) ........................... 21

*United States v. Moore*, 394 F.3d 925 (D.C. Cir. 2005) ........................... 17

*United States v. Robinson*, 615 F.3d 804 (7th Cir. 2010) ....................... 44

*United States v. Sharpe*, 470 U.S. 675 (1985) ...................... 33, 34, 37, 45

*United States v. Smart*, 98 F.3d 1379 (D.C. Cir. 1996) ......................... 36

*United States v. Smith*, 373 F. Supp. 3d 223 (D.D.C. 2019) ................... 12

*United States v. Sokolow*, 490 U.S. 1 (1989) .......................................... 30

*United States v. Streater*, 70 F.3d 1314 (D.C. Cir. 1995) ....................... 48

\* *United States v. Taylor*, 997 F.2d 1551 (D.C. Cir. 1993) ................. 20, 31

*United States v. Tucker*, 12 F.4th 804 (D.C. Cir. 2021) .......................... 22

*United States v. Washington*, 559 F.3d 573 (D.C. Cir. 2009) ........... 17, 36

*United States v. White*, 648 F.2d 29 (D.C. Cir. 1981), *overruled on other grounds by Florida v. J.L.*, 529 U.S. 266 (2000) ................... 34

*United States v. Whitfield*, 634 F.3d 741 (3d Cir. 2010) ......................... 23

*United States v. Williams*, 507 F. Supp. 3d 181 (D.D.C. 2020) ............... 2

*United States v. Zavala*, 541 F.3d 562 (5th Cir. 2008) ........................... 23

*Whren v. United States*, 517 U.S. 806 (1996) ................................... 34, 43

## Other Authorities

18 U.S.C. § 922(g)(1) .................................................................................. 1

4 Wayne R. LaFave, Search & Seizure § 9.5(e) (6th ed. Dec. 2021) ....... 30

4 Wayne R. LaFave, Search & Seizure § 9.6(b) ...................................... 46

## ISSUES PRESENTED

I.    Whether the police had reasonable suspicion to stop Douglas where, in a high-crime area known especially for narcotics sales, an officer saw Douglas engage in a hand-to-hand transaction in which Williams handed Douglas a bookbag, Douglas gave Williams an object that appeared to be money, and Douglas immediately hid the bookbag under his jacket.

II.    Whether the district court correctly concluded that Douglas was stopped rather than arrested, where he was being held for a show-up identification and the police told him he was "just being stopped as part of an investigation," and whether the force that the police used in making that stop was reasonable.

III.    Whether the district court clearly erred in crediting the officer's testimony that he felt a firearm during a protective frisk, and whether the protective search was valid even on Douglas's view of the events.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

No. 21-3032

———————————

UNITED STATES OF AMERICA,                                          Appellee,

v.

THEODORE DOUGLAS,                                          Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

BRIEF FOR APPELLEE

———————————

## COUNTERSTATEMENT OF THE CASE

On July 21, 2020, appellant Theodore Douglas and co-defendant

Tavonte Williams were indicted for unlawful possession of a firearm and

ammunition by a convicted felon (18 U.S.C. § 922(g)(1)) (A13-15).[1] After

———————————

[1] "A" refers to the appendix for appellant. "Br." refers to appellant's corrected brief. "Ex." refers to the digital exhibits from the suppression hearing, which are included on a disc in the appendix between pages A155 and A156. The cited exhibit times refer to the "Z" timestamps in the top right corner of the video (see Br. 6 n.2).

an evidentiary hearing on October 20, 2020 (see A209-418), the Honorable Carl J. Nichols denied Douglas's motion to suppress in a published opinion issued on December 10, 2020 (A158-86). *See United States v. Williams*, 507 F. Supp. 3d 181 (D.D.C. 2020). On March 17, 2021, Douglas pleaded guilty to the lone charge against him, reserving his right to appeal the suppression ruling (A187-96, A419-56; see also A479-80). The court sentenced Douglas to 15 months of incarceration and 3 years of supervised release on May 4, 2021 (A200-07, A512-16). Douglas filed a timely notice of appeal on May 14, and a corrected notice of appeal (fixing the attorney name) on May 24 (A9, A208). The government voluntarily dismissed the case against co-defendant Williams (Br. ii).

## Motions Hearing

On the afternoon of April 22, 2020, Officer Isaac Jackson was working undercover in the 2300 block of 15th Street, Northeast, in Washington, D.C. (A225-26). He had decades of experience, particularly focused on narcotics, and he had worked as an undercover officer on more than 500 occasions (A216-20, A292). When working undercover narcotics investigations, Officer Jackson would "look for hand-to-hand interactions" that often mark drug transactions (A219, A295, A312). In

his experience, participants in a drug transaction are typically "trying to be secretive" and "discreet," including by "looking around" and positioning themselves "so that somebody cannot see right away" (A222-23, A312). For transfers of larger quantities of narcotics or firearms, participants usually do not exchange the goods openly, instead using a vehicle or a bag for cover (A225-26). In Officer Jackson's training and experience, it is "very common" for people engaged in drug trafficking to possess firearms (A224).

That day, Officer Jackson was sitting in the driver's seat of an unmarked sedan on 15th Street (A130-31, A227, A231-35). In that part of the block, there was a set of row houses on one side, and a recreation center and playground on the other (A228-30; see A131-32). Officer Jackson knew the block well, patrolling or being involved in investigations there close to 200 times (A228). The location was in the fifth police district, an area of the city with higher drug and violent crimes than the first four districts (though with less than the sixth and seventh districts) (A226-27, A324-26). *See also* A26 n.3 (statistics on fifth district violent crime in prior year, including 27 homicides, 131 robberies with a gun, and 129 assaults with a dangerous weapon). And this block

3

in particular was known as a high-crime area, known some for violent crime and especially for narcotic sales (A231, A237, A337). Officer Jackson himself had seen drug transactions in a walkway that went between the row houses, which led to a back parking lot (A230, A237).

Officer Jackson was especially watching two particular areas: near the recreation center where a group of people gathered (A235-36), and the walkway between two row houses where Officer Jackson had seen prior drug sales (A230, A236). Shortly before 3:00 p.m., two or three people appeared and stood in the walkway, including a man with a blueish coat, later identified as Douglas (A237-39, A254-56, A264). Douglas walked back and forth along the walkway for a minute or two (A246, A305). Then a man (later identified as Williams) approached in a grayish jacket and an orange hood, holding a bookbag in his hand (A237-38, A240, A254-56, A264, A266-69).

Williams handed Douglas the bookbag (A237-38, A266-70). In the next instant, Douglas handed Williams an item that appeared to be U.S. currency (A238, A323-24). Officer Jackson could not be "100% sure" that the item Douglas gave Williams was money, but he believed it was based on the item's "light" color, its nature, its small size, the hand gesture in

which it was exchanged, and the way Williams cuffed it in his hand (A238-39, A275-76, A298-99, A332).

Douglas then "quickly" and "immediately" took off his coat, put the bookbag on over his shoulders, and put on the coat over the bookbag, appearing to be "hurrying" throughout (A238, A273-74, A310-11, A323). That conduct struck Officer Jackson as "unusual," as "[i]t appeared that [Douglas] was trying to conceal whatever was in the book bag, trying to hide the book bag on his person by covering it up with his jacket" (A238, A247). Douglas and Williams shook hands, then walked away toward the parking lot, out of Officer Jackson's sight (A238, A247-48, A322). The whole interaction lasted less than a minute (A245, A247, A288). Officer Jackson was sitting about 15 yards away from the exchange, with no obstructions or distractions interfering with his observations (A245, A271, A278, A332-33).

Based on what he had seen, Officer Jackson believed Douglas and Williams had just engaged in an "illegal transaction," which "could have been either a large quantity of narcotics or possibly a firearm" (A246-47). Officer Jackson broadcast descriptions of Douglas and Williams, and the police arrest teams moved in to stop them for identification (A221,

A248-52). The arrest team was assigned jointly to Officer Jackson and a few other undercover officers, who were scattered some blocks away throughout the neighborhood (A336-37, A369).

Officer Maxwell Poupart and his partner, Officer Brianna Taylor, were the first members of the arrest team to arrive on scene (A343-46). Based on Officer Jackson's description, they approached Douglas, who was standing with two other men (one of whom turned out to be Williams) (A346-48). Officer Poupart approached the group, saying in a friendly tone, "How's it going, gentlemen? How're you doing today?" (Gov't Ex. 4 at 19:02:25-:30). He then led Douglas away from the others, telling him "Do me a favor, come over here for a minute," and explaining that Douglas was "just being stopped as part of an investigation" (*id.* at 19:02:30-:40, A348, A364).

Officer Poupart also placed Douglas in handcuffs (Gov't Ex. 4 at 19:02:40-:50, A349). He explained that it is "common" for "individuals engaged in narcotics trafficking to possess firearms," and "[i]n narcotics investigations, it is common for one or many subjects in the area to be armed" (A349-50, A409). So with just two officers on scene "and three other individuals standing there and it [being] a housing complex with

the possibility of more people coming outside," Officer Poupart was concerned about the potential threat to officer safety from stopping Douglas (A348-50, A373). Further, Officer Poupart did not know what had been in the bookbag, or whether Douglas had accessed it while out of police sight (A394). And while other officers were coming to the scene, they were looking for the other individual (Williams), and it was not clear how long it would take them to arrive (A394-95, A410).

Officer Poupart frisked Douglas, starting with the bulge from the backpack (bookbag) under Douglas's coat (A350). *See generally* Gov't Ex. 4 at 19:03:00-:18. Based on his training and experience, Officer Poupart soon felt a "hard object" through the jacket that he believed he recognized as a firearm, based on "the shape, [the] weight of the object, the length and the grip, or some people call it the handle," as well as "the slide and barrel" (A342-43, A350-52, A357-58, A375-79). Officer Poupart did not announce that he had felt a gun, as the police "don't like to use the word gun on the scene unless it is an emergency situation," since "[i]t's going to make that person much more likely to flee, fight, endanger the scene" (A359-60). Officer Poupart also felt a separate object in the backpack in

front of the gun, which Douglas said was his glasses case (A352-53, A357-58, A377, A380).

A minute into the stop, the officers unzipped Douglas's jacket and pulled it down around his arms, exposing the backpack (Gov't Ex. 4 at 19:03:37-:55). As a "courtesy," Officer Poupart asked Douglas if he minded if the police searched his bag, giving Douglas "the opportunity to be honest," but Douglas did not consent to a search, reiterating that it was his glasses (A358, A385-86; *see* Gov't Ex. 4 at 19:03:54-:04:05). The officer responded, "I don't know if that's glasses, man" (Gov't Ex. 4 at 19:04:02-:05). Officer Poupart then asked over the radio, "[T]he guy with the blue jacket, is he good for a search?" (A359; Gov't Ex. 4 at 19:04:57-:05:05). This was a "way of checking with everyone else that the scene is safe and secure"—particularly that the other man involved (Williams) had been stopped and was not "running" (A360, A388-92). Upon opening the backpack, Officer Poupart saw the gun and quietly radioed "1-800"—the code word to signal the discovery of a gun (A360-61; see Gov't Ex. 4 at 19:05:08-:13). A glasses case was also recovered from the backpack (A362). Once Officer Poupart found the gun, Douglas "was placed under arrest" (A362).

Officer Jackson positively identified Douglas and Williams in show-up identifications as the two people involved in the transaction (A260-65). During the encounter, the officers never drew their weapons (A347). Nor did they yell at or threaten Douglas (*id.*).

## District Court's Ruling

As part of a larger ruling on various pretrial issues, the district court denied Douglas's Fourth Amendment motion to suppress (see A173-81).

To begin, the district court concluded (see A174-76), Officer Jackson's observations provided reasonable, articulable suspicion that criminal activity was afoot, allowing Officer Poupart to conduct a brief, investigatory stop of Douglas under *Terry v. Ohio*, 392 U.S. 1 (1968). The court agreed with the government that three circumstances, considered in their totality, justified a *Terry* stop here.

*First*, the exchange between Douglas and Williams took place in a "high crime area." It occurred in "the Fifth Police District, where 'violent crimes, shootings, [and] narcotics transactions' were the most frequent criminal offenses and occurred more frequently than some neighboring police districts" (A175) (quoting A226, A325-26). And more "specifically

with regard to the 2300 block of 15th Street," Officer Jackson had repeatedly worked investigations in the area—"more than 200 times in the last five years"—and "that *block* is a high crime area, known for narcotics sales and violent crime" (*id.*) (quoting A231) (emphasis added). This was not merely testimony "that the area 'suffers from general, undifferentiated "crime," but that it is home to the precise type of infraction[ ]' that Officer Jackson suspected Douglas was committing" (*id.*) (quoting *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001)).

*Second*, Officer Jackson witnessed a "hand-to-hand transaction" consistent with a narcotics transaction, and "in his experience bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack" (A175-76) (citing A225-26). While there "could be many innocent explanations" for "receiving an object from another person," it nonetheless "would certainly contribute to a reasonable officer's suspicion" (A176) (quoting *United States v. (Robert) Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000); *United States v. Devaugh*, 422 F. Supp. 3d 104, 111 (D.D.C. 2019)).

*Third*, after receiving the backpack, Douglas "acted 'quickly' to 'conceal whatever was in that book bag' and 'tried to hide the book bag on

10

his person by covering it up with his jacket'" (A176) (quoting A238, A310-11). Officer Jackson explained that "individuals engaged in hand-to-hand narcotics transactions often attempt to be 'discreet' or 'secretive' and engage in acts of concealment" (*id.*) (quoting A222-23). And "furtive movements" like these provide reasonable suspicion (*id.*).

Having found reasonable suspicion for the stop, the district court next held that the use of handcuffs during the stop was reasonable and did not transform the investigatory stop into an arrest (A177-80). While handcuffs generally mark a formal arrest, "their use does not automatically convert a *Terry* stop into an arrest," and handcuffs may be used "to effectuate a Terry stop when specific circumstances make it reasonable to do so" (A177) (quotation marks omitted). Here, the court concluded, at least four circumstances of the stop "made it reasonable for Officer Poupart to fear for his safety and the safety of others" and justified his use of handcuffs: "(1) two unidentified men were in close proximity to Douglas; (2) the second suspect involved in the backpack transaction remained unaccounted for; (3) the transaction he was responding to involved a bag, capable of concealing a weapon; and (4) the reported transaction sounded like a narcotics transaction and in Officer

Poupart's experience drug traffickers are often armed" (A178) (quoting A348-50, A373, A393-94, A395). The court distinguished the district court cases that Douglas cited (A178-80) (discussing *Devaugh*, 422 F. Supp. 3d 104; *United States v. Smith*, 373 F. Supp. 3d 223 (D.D.C. 2019)).

Finally, the district court concluded that Officer Poupart's "brief and minimally invasive protective frisk" had not exceeded the scope of a permissible *Terry* frisk (A180-81). The officer "reasonably believed that the subject was armed and posed a threat to his safety and the safety of others," justifying a "protective frisk for weapons" (A181). And the testimony and body-worn camera footage "demonstrates beyond serious question that the search was minimally invasive and did not exceed what is permissible in a protective frisk": "The camera footage shows that Officer Poupart lightly touched the back of Douglas's jacket just a few times, with the total sequence of events lasting only a few seconds, before Officer Poupart recognized the presence of a firearm. And Officer Poupart testified that the shape and weight of the object made it immediately apparent that he was touching a firearm." (*id.*) (citation omitted) (citing Gov't Ex. 4 & 4B; A377-79).

## SUMMARY OF ARGUMENT

The district court correctly denied Douglas's motion to suppress. To begin, the police had reasonable suspicion to stop Douglas for investigation. An experienced narcotics officer watched Douglas as he apparently bought a bookbag from Williams, in a manner consistent with the sale of a firearm or bulk narcotics, in a spot known for drug activity, with Douglas immediately trying to conceal the bookbag—going so far as to hide the bookbag under his jacket. Under this Court's case law, those observations surrounding a suspicious transaction easily gave the police reasonable suspicion for an investigative stop.

Next, Officer Poupart permissibly stopped Douglas and performed a protective search for a weapon. The seizure was not an arrest, and the frisk was not an evidentiary search. The uses of force that Douglas objects to would not convert the stop into an arrest, so they are not bases for suppression. In any event, the force used here were reasonable.

Finally, the trial court did not clearly err in crediting Officer Poupart's testimony that he detected the gun during the protective frisk, before he opened the backpack. The outline of the gun is visible in the body-worn camera footage taken during the frisk. And anyway, the

officer's explanations for his actions, far from inherently incredible, fit the record in this case. Further, even under Douglas's view of the facts, the officer was continuously searching for a weapon that he reasonably suspected, so his conduct constituted a permissible protective search.

## ARGUMENT

### I. The Police Had Reasonable Suspicion to Stop Douglas

#### A. Applicable Legal Principles and Standard of Review

The Fourth Amendment permits the police to temporarily seize a person for "a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but it requires the officer to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id.* at 123-24 (quoting *Terry*, 392 U.S. at 27).

On appeal, this Court reviews the ultimate determination of reasonable suspicion de novo. *See Ornelas v. United States*, 517 U.S. 690,

14

697-99 (1996). In the course of that review, however, this Court must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* at 699.

Three key guideposts steer the reasonable-suspicion inquiry. First, the Fourth Amendment requires courts to consider "the whole picture." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). Viewing "each fact in isolation, rather than as a factor in the totality of the circumstances," is a "mistake[ ]." *Id.* (quotation marks omitted). That is because "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.*

Second, and relatedly, circumstances that are "susceptible of innocent explanation" may still reasonably increase police suspicion. *Wesby*, 138 S. Ct. at 588. Indeed, "[e]ven in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." *Wardlow*, 528 U.S. at 125. "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Wesby*, 138 S. Ct. at 588 (citation omitted).

15

Third, one of the rare bright lines in Fourth Amendment jurisprudence comes from *Wardlow*, holding that when police are operating in a high-crime area, unprovoked flight from the police establishes reasonable suspicion for a stop. *See* 528 U.S. at 124-25. Circumstances warranting comparable suspicion thus likewise justify an investigative stop.

## B.  Officer Jackson's Observations Established Reasonable Suspicion

As the district court explained (A174-76), the police had reasonable suspicion to stop Douglas after Officer Jackson saw him (1) in a high-crime area known especially for narcotics sales (2) engage in a hand-to-hand transaction in which Williams handed over a bookbag and Douglas in exchange gave Williams an object that appeared to be money, after which (3) Douglas quickly concealed the bookbag. While we discuss these circumstances one-by-one below, they must be considered together in assessing reasonable suspicion. *See Wesby*, 138 S. Ct. at 588.

### 1.  High-Crime Area

To begin, following *Wardlow*, this Court has "consistently" found it "significant" in evaluating reasonable suspicion that the suspect was in

16

a "high-crime area." *United States v. Washington*, 559 F.3d 573, 577 (D.C. Cir. 2009). *see also, e.g.*, *United States v. (Abdul) Johnson*, 519 F.3d 478, 482 (D.C. Cir. 2008); *United States v. Bullock*, 510 F.3d 342, 348 (D.C. Cir. 2007); *United States v. Edwards*, 424 F.3d 1106, 1108 (D.C. Cir. 2005); *United States v. Moore*, 394 F.3d 925, 930 (D.C. Cir. 2005); *United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003); *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001); *United States v. (Robert) Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000). And "[t]he location is particularly probative in this case because the government established not just that the area suffers from general, undifferentiated crime, but that it is home to the precise type of infractions the officer suspected." *Moore*, 394 F.3d at 930 (quoting *Edmonds*, 240 F.3d at 60) (cleaned up). Indeed, Douglas's transaction took place on a sidewalk where Officer Jackson had himself previously observed drug deals (A237).

Douglas's assertion that the high-crime nature of the area "is of limited significance" (Br. 17) thus "simply misstates the law." *Edmonds*, 240 F.3d at 60. While "the fact that a given locale is well known for criminal activity will not *by itself* justify a *Terry* stop," "the probative

value of a neighborhood's reputation as a high-crime area is firmly established." *Id.*

Nor did the district court's finding of a "high-crime area" rest primarily on its location in the fifth police district (cf. Br. 18). While larger crime trends in the city and fifth district provided relevant context, the location that Officer Jackson identified as a high-crime area was "this particular block"—and even more specifically, the portion of the block shown on the maps, especially known for "[n]arcotic sales and . . . some violent crimes" (A145-46, A231, A337). Indeed, he had witnessed drug deals on the very sidewalk where he watched Douglas and Williams transact (A237). Presumably that is why the police chose that specific spot for their resource-intensive undercover operation (see A294-97, A336-37, A369).

Finally, Officer Jackson's testimony cannot be dismissed for failure to catalogue each prior crime he had witnessed there (cf. Br. 19). Rather, his testimony is at least as strong as that accepted in prior high-crime cases. *See, e.g.*, *(Robert) Johnson*, 212 F.3d at 1316 ("Johnson's car was in a high-crime area. Officer Fulton described it as a 'high narcotics area,' adding 'I have been involved in numerous narcotics arrests there.'"); *see*

*also Edmonds*, 240 F.3d at 60 ("the probative value of a neighborhood's *reputation* as a high-crime area is firmly established") (emphasis added). And there is no requirement that criminal activity in a high-crime area displace all "law-abiding activity" (cf. Br. 19)—if everyone on the street were committing crime, it would be an "all-crime area."

### 2.    Hand-to-Hand Transaction

The next key circumstance justifying police suspicions was the hand-to-hand exchange, in which Williams handed Douglas the bookbag, Williams immediately handed back an item that seemed to be money, and the two shook hands (see A237-39, A266-70, A275-76, A298-99, A323-24, A332). As an experienced undercover officer trying to detect narcotics activity, Officer Jackson was watching for just that sort of hand-to-hand transaction (A219, A295, A312). His reasonable inference that he had just witnessed an illegal transaction for "a large quantity of narcotics or possibly a firearm" (A246-47) must be given "due weight." *Ornelas*, 517 U.S. at 699-700. And this Court has likewise long recognized that "a sequence of events which is typical of a common form of narcotics transaction may create a suspicion in a police officer's mind." *United States v. Green*, 670 F.2d 1148, 1151 (D.C. Cir. 1981).

Indeed, even under the "obviously" more demanding standard of probable cause, *see Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020), suspicious transactions may justify a seizure. This Court has found probable cause based solely on repeated suspicious transactions at an intersection known for drug dealing. *United States v. Taylor*, 997 F.2d 1551, 1552-54 (D.C. Cir. 1993). Officers "clearly" had probable cause, *Taylor* held, when they saw four "apparent transactions" in which a person "would approach talk briefly with Hutchinson. Hutchinson then retrieved a small object from the brown paper bag, which he gave to [the person] in return for cash. Hutchinson replaced the brown paper bag, returned to the corner where Bowe was seated, and gave Bowe the money. Bowe counted the money and placed it in his pocket." *Id.*[2]

---

[2] The Chief Justice has opined that an experienced police officer in a high-crime neighborhood who sees a single "quick hand-to-hand exchange of cash for small objects" "*clearly*" has probable cause to arrest the participants. *Pennsylvania v. Dunlap*, 555 U.S. 964 (2008) (Roberts, C.J., dissenting from denial of certiorari) (emphasis added) (quotation marks omitted). The Chief Justice noted a divide among state courts on whether those circumstances establish probable cause. *See id.* But if there is reasonable debate on probable cause in those circumstances, they surely satisfy the lower standard of reasonable suspicion.

This Court has also repeatedly found probable cause based on "observance of a suspicious transaction" in combination with other circumstances. *Green*, 670 F.2d at 1151. In *Green*, for example, this Court found probable cause based on (1) a transaction with "a sequence of events which is typical of a common form of narcotics transaction," (2) the participants' movements "suggesting an attempt to conceal the object of their transaction," (3) "the appearance of flight and evasion by" one man, and (4) observation by an "experienced police officers in an area noted for the regularity of narcotics trafficking." *Id.* at 1151-53; *accord United States v. Hughes*, 898 F.2d 63, 64 (6th Cir. 1990) (agreeing that these four "*Green* factors" establish probable case). In *United States v. Harley*, 990 F.2d 1340 (D.C. Cir. 1993), this Court found probable cause based on "three apparent exchanges . . . handing an object over to a different individual in exchange for money," "in a high drug traffic area[,] coupled with [one defendant's] later evasive action." *Id.* at 1342. And in *United States v. Lucas*, 778 F.2d 885 (D.C. Cir. 1985), this Court found probable cause based in part "on suspicious observed events similar to the many everyday street exchanges involving narcotics and other controlled substances." *Id.* at 888; *see also Green*, 670 F.2d at 1151 n.4 (collecting

21

other cases where "this Circuit has found probable cause for a narcotics arrest based in part upon a suspicious transaction," along with "other evidence suggesting that the transaction was drug-related").[3]

While this Court seems to have less case law on suspicious transactions in the context of a reasonable-suspicion analysis, the existing decisions consistently recognize the inculpatory nature of a hand-to-hand exchange like Douglas's. This Court has explained, for example, that the police "easily" have reasonable suspicion when a citizen complains that a car matching the suspect's is dealing drugs in a high-narcotic area, and the police then observe the suspect "pass a small object retrieved from inside his car to [another man] in exchange for money."

---

[3] Even outside of the Fourth Amendment context, this Court has repeatedly cited apparent hand-to-hand transactions in finding "sufficient" or "overwhelming" evidence of a drug conviction. *See United States v. Tucker*, 12 F.4th 804, 827 (D.C. Cir. 2021) (finding it "notabl[e]," in upholding defendant's drug conviction and role as street-level dealer, that "agents observed Tucker engaged in 'what appeared to be a hand-to-hand narcotics transaction' on the street"); *United States v. Boyd*, 435 F.3d 316, 318-19 (D.C. Cir. 2006) (pointing out, among "overwhelming" evidence in case, that "the evidence showed that the officers had observed Boyd in what appeared to be a hand-to-hand drug transaction"). If hand-to-hand transactions help a jury find a defendant guilty beyond a reasonable doubt at a criminal trial, surely they can likewise reasonably raise suspicions of police officers working on the streets.

*United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992). While Douglas distinguishes *Garrett* based on the citizen complaint (see Br. 22-23), it lacked concealment like Douglas's (see A176), and it did not purport to set the floor on the showing necessary for reasonable suspicion. *See also, e.g.*, *Green*, 670 F.2d at 1151, 1153 (recognizing it is "natural" for experienced drug enforcement officer operating in a high-narcotics area to develop "suspicion" upon seeing "a pecuniary transaction of a type common to narcotics peddling"). Indeed, given *Taylor* and *Green*, the *Garrett* facts at the time of the stop seem to approach probable cause. Other circuits likewise routinely recognize that this sort of hand-to-hand transaction supports a *Terry* stop.[4]

---

[4] *See United States v. (James) Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (police observation of "what appeared to be a hand-to-hand transaction consistent with a drug transaction" is "highly probative" in evaluating reasonable suspicion), *overruled on other grounds by Cartwright v. United States*, 12 F.4th 572 (6th Cir. 2021); *see also, e.g.*, *United States v. Whitfield*, 634 F.3d 741, 743-45 (3d Cir. 2010); *United States v. (Larry) Johnson*, 599 F.3d 339, 341, 345 (4th Cir. 2010); *United States v. Zavala*, 541 F.3d 562, 570, 575 (5th Cir. 2008); *United States v. Faught*, No. 21-6123, 2022 WL 2813240, at *4 (6th Cir. July 19, 2022) (unpublished) (collecting Sixth Circuit cases); *United States v. Hurd*, 785 F.3d 311, 314-15 (8th Cir. 2015); *United States v. Espinoza*, 996 F.2d 1228 (9th Cir. 1993) (unpublished table decision); *United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir. 2000); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1310, 1313-14 (11th Cir. 2009).

Dicta in *Johnson,* upon which Douglas relies (Br. 21-22), further supports a finding of reasonable suspicion here. In that case, the police saw "a young woman leaning into the passenger's window [where Johnson was seated] and handing Johnson an object, which they could not identify," and they then saw Johnson make "a 'shoving down' motion." *(Robert) Johnson*, 212 F.3d at 1314-15. The Court opined that "[i]f the seizure had taken place at that point, we doubt very much whether it would have been valid," though it ultimately did "not focus on those questions" because the seizure took place later. *Id.* at 1316. As to the woman handing Johnson an object, the Court explained: "[S]imply *receiving* an object from another person—*[Officer] Fulton did not see Johnson give the woman anything in exchange*—is a common occurrence for which there could be many innocent explanations." *Id.* (emphasis added). By emphasizing that the police had not seen Johnson give anything "in exchange," the Court was carving off a case like ours, where one object is exchanged for another. Implicitly, the Court was saying, a two-way exchange is not such "a common occurrence for which there could be many innocent explanations."

24

In this case, for example, when Williams handed Douglas the bookbag, it could have been a friend giving a gift or returning a borrowed item. *But see Wesby*, 138 S. Ct. at 588 (cannot dismiss circumstance simply because it is "susceptible of innocent explanation"). But when Douglas "in the next instant" gave Williams a light-colored item that appeared to by money,[5] then immediately hid the bookbag, *see infra* Part I.B.3, those alternative explanations no longer made sense. Nor did the transaction take place at a garage sale or other obvious spot to sell a used backpack. Indeed, despite his protests that there was "nothing remotely criminal" in the transaction (Br. 20-21), Douglas has failed to provide a "plausible, innocent explanations for this sequence of behavior," *Green*, 670 F.2d at 1153—let alone an explanation so compelling that it prevents the police from making a short, investigative stop.

---

[5] While Officer Jackson could not be certain that the item he saw Douglas give Williams was U.S. currency (see Br. 20), he reasonably believed that it was given the item's color, its size, the way it was exchanged, and the way Williams cuffed it in his hand (A238-39, A275-76, A298-99, A332). That conclusion was eminently reasonable where the item was given in exchange for the bookbag, and money is the most common medium of exchange used to buy goods.

Last, Douglas fights the record in suggesting that selling a closed

backpack on the sidewalk is somehow inconsistent with typical firearm

and bulk drug sales (cf. Br. 23-24). Rather, Officer Jackson explained that

this is one common way to conduct a transaction:

> Q. In your experience, have you had cases as an OP or heard of cases where transactions or transfers of bulk quantities of narcotics or of a firearm occur in the type of hand-to-hand transaction that you earlier described?
>
> A. Yes, I've had instances like that.
>
> . . . .
>
> Q. No. How, in your experience, are those types of transactions or exchanges conducted?
>
> A. Usually in a vehicle *if large quantities or firearms usually in a bag* or I have been a part of instances where those transactions took place in the vehicle, the building, like, sometimes in a free area outside in a particular area; that's pretty much it.
>
> Q. All right. Would you expect then somebody to out in the open, in the street, hand somebody a kilo of coke or a handgun out in the open?
>
> A. No.

(A225-26) (emphasis added). The "bag" conceals the contents, and thus

hides the nature of the transaction. As the district court recognized

(A176), when Officer Jackson said that he did not expect such

transactions to occur "out in the open," he was saying he would expect the item to be "concealed in a bag, such as a backpack" (A176).

### 3.    Douglas's Efforts at Concealment

The final key piece giving Officer Jackson reasonable suspicion here came from Douglas's efforts to avoid detection and conceal his conduct. As soon as he got the backpack, Douglas hurriedly took off his coat, put the backpack on, and then put on the coat over the backpack (see A238, A273-74, A310-11, A323). Watching from nearby, Officer Jackson thought it looked like Douglas was "trying to conceal whatever was in the book bag, trying to hide the book bag on his person by covering it up with his jacket" (A238, A247).

Common sense supports Officer Jackson's assessment—wearing a backpack *underneath* a jacket on a sunny day is odd behavior indeed. *See Glover*, 140 S. Ct. at 1190 (evaluation of reasonable suspicion should be guided by "common sense, i.e., information that is accessible to people generally").

And the record and case law verify that these sorts of attempts at concealment support a finding of reasonable suspicion. Based on his long experience in narcotics investigations, Officer Jackson testified that

27

"most times" people participating in drug deals are "trying to be secretive" and "discreet," holding themselves in a way "that somebody cannot see right away" what they are doing (A222-23, A312). This Court has likewise recognized that "persons engaged in illegal transactions will desire to conceal those transactions." *Green*, 670 F.2d at 1152. Thus, for example, the "[s]urreptitious passing of a package has been recognized as a possible element in establishing the probable cause mix." *United States v. Davis*, 458 F.2d 819, 822 (D.C. Cir. 1972).

True, "the sole fact that individuals may seek to conceal the subject of their business from potentially prying eyes, even on a public sidewalk, does not grant the police the power to arrest them." *Green*, 670 F.2d at 1152. But this Court has nonetheless used deliberate concealment as a key factor in meeting the more demanding standard for probable cause. In *Green*, for example, this Court relied on the fact that "the parties to the transaction attempted to conceal the exchanged object." *Id.* at 1153. And in *Davis*, this Court pointed to the fact that one man "stealthily 'slid' money to the second man in exchange for a small brown package." 458 F.2d at 822. *See also United States v. (Larry) Johnson*, 599 F.3d 339, 345

(4th Cir. 2010) ("hasty" nature of encounters "was much in keeping with an illicit handoff").'

Douglas principally counters (Br. 28-29) that his concealment does not qualify as a relevant "furtive movement" under this Court's case law, because his actions were not responding to police presence. *See (Robert) Johnson*, 212 F.3d at 1316 ("[W]hile Johnson's furtive gestures prior to Fulton's command may be more suspicious, they are significant only if they were undertaken in response to police presence."). But this argument again misunderstands *Johnson*. True, certain actions—which *Johnson* and subsequent decisions call "furtive gestures"—are suspicious *because* they appear to be taken in response to the police. This includes the "shoving down" upon the approach of the police in *Johnson*, and the unprovoked flight from the police in *Wardlow*. But *Terry* considers any "unusual conduct which leads [a police officer] reasonably to conclude in light of his experience that criminal activity may be afoot"—not just reactions to the police. 392 U.S. at 30. Indeed, "[b]y far the most common type of situation resulting in a stopping on the street for investigation is that in which officers on patrol observe conduct they conclude is suspicious in nature," such as "a person on the street carrying property

under circumstances suggesting that the property might have been obtained unlawfully," or "the act of repeatedly looking into parked cars." 4 Wayne R. LaFave, Search & Seizure § 9.5(e) (6th ed. Dec. 2021) [hereinafter LaFave].

Concealment and other efforts to avoid detection are suspicious even when not taken in direct response to the police. *See Green*, 670 F.2d at 1152-53; *Davis*, 458 F.2d at 822; A222-23, A312 (drug transaction is usually "secretive" and "discreet," so "somebody cannot see"); *see also, e.g.*, *Florida v. Royer*, 460 U.S. 491, 502 (1983) ("travelling under an assumed name" can help establish reasonable suspicion); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (same for "persons trying to hide"). Those breaking the law may reasonably want to hide their actions from everyone—cop and civilian. *See, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 4 (1989) (airline ticket agent told police of suspicious purchase under alias); *Garrett*, 959 F.2d at 1007 (police responding to civilian complaint indicating Garrett was dealing drugs). Concealment here reasonably added to police suspicion.

Douglas also suggests that the transfer of the backpack was inconsistent with how Officer Jackson described a typical drug

30

transaction (see Br. 25-27). In part, this argument ignores the record evidence: Douglas claims that Officer Jackson never said Douglas was "trying to be secretive" and avoid detection (Br. 25), but Officer Jackson testified that Douglas was "hurrying" and seemed to be "trying to hide the book bag on his person by covering it up with his jacket" (A238, A311). Similarly, Officer Douglas believed that the exchange was for money (cf. Br. 26), even if he was not "100% sure." *See supra* note 5.

Other supposed discrepancies—like the lack of stash location, the failure to inspect the product, and the failure to immediately separate (Br. 26)—reflect features of a different type of deal: users buying drugs from a street-level dealer selling to all comers. *See, e.g.*, *Taylor*, 997 F.2d at 1552-53 (multiple similar transactions with apparent drug users); *Harley*, 990 F.2d at 1342 (same). All signs in this case, by contrast, pointed to a prearranged transaction for a firearm or a large quantity of narcotics (see A224-25, A246-47). After all, Douglas had arrived a minute or two before the transaction and paced along the sidewalk, seeming to wait for Williams. Then as soon as Williams arrived, he handed over the bookbag, and Douglas immediately handed back what appeared to be cash. Then they shook hands. The reasonable inference from this

sequence was that Douglas and Williams had already discussed this transaction and reached a deal on the sale of the contents of the backpack. The sidewalk exchange that Officer Jackson witnessed simply executed that deal. And for this sort of prearranged sale between people who know each other, there was no reason to expect a stash, immediate inspection of the product, or quick separation. The absence of those features here thus is not "exculpatory information—let alone sufficient information to rebut the reasonable inference" of an illegal transaction. *Glover*, 140 S. Ct. at 1191.

In sum, the combination of the location and surreptitious behavior surrounding the transaction led Officer Jackson to the completely reasonable—perhaps *most* reasonable—conclusion that he had just witnessed a sale of contraband. *See Pennsylvania v. Dunlap*, 555 U.S. 964 (2008) (Roberts, C.J., dissenting from denial of certiorari).

## II.   The Police Permissibly Found the Gun as Part of a Reasonable *Terry* Stop and Frisk

Next, Douglas contends that the gun should be suppressed because, even if Officer Jackson's observations supported an investigative stop and protective frisk, Officer Poupart pursued a full-blown arrest and search for evidence (Br. 29-39). Under the governing test from this

32

Court's case law, however, Officer Poupart conducted a reasonable stop and protective frisk, defeating Douglas's theory for suppression. And the trial court correctly concluded that the force used during the encounter was reasonable (see A177-80).

### A. The Police Found the Gun During a *Terry* Stop and Frisk, Not an Evidentiary Search Attendant to Arrest

Douglas was not under arrest at the time that the police discovered the gun. A *Terry* stop normally entails "a brief, investigatory stop," *Wardlow*, 528 U.S. at 123, whereas an arrest traditionally "eventuate[s] in a trip to the station house and prosecution for crime,"- *Terry*, 392 U.S. at 16. While "[t]he point at which an investigative stop becomes an arrest is not marked with a bright line," "a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

That does not mean, however, that any "unduly intrusive" use of force during an investigative stop instantly converts the seizure into an arrest. Rather, in deciding whether a seizure is a stop or arrest, this Court applies a multifactor test, considering circumstances like "the

33

impression conveyed to the citizen as to whether he was in custody or only briefly detained for questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made." *United States v. Clipper*, 973 F.2d 944, 951 (D.C. Cir. 1992) (quoting *United States v. White*, 648 F.2d 29, 34 (D.C. Cir. 1981)), *overruled on other grounds by Florida v. J.L.*, 529 U.S. 266 (2000).[6] That holistic test is consistent with the examples from *Sharpe* of supposed stops that were actually arrests, like a murder suspect being involuntarily taken to the police station and interrogated for an hour, or a drug-trafficking suspect being confined in a small airport room for questioning. *See* 470 U.S. at 683-85 & n.4 (citing *Dunaway v. New York*, 442 U.S. 200 (1979); *Royer*, 460 U.S. 491).

All of the *White* factors here consistently point to a stop, not an arrest. Officer Poupart told Douglas to come with him "for a minute" and that he was "just being stopped as part of an investigation" (Gov't Ex. 4 at 19:02:30-:40, A348, A364). The disputed frisk finished within a minute of the seizure (Gov't Ex. 4 at 19:02:30-:03:18). No questions about the case

---

[6] *Clipper* and *White* also cited "the officer's intent in stopping the citizen," but that factor no longer appears relevant after *Whren v. United States*, 517 U.S. 806 (1996).

were asked of Douglas, so there was no suggestion of custodial interrogation. *Cf. Dunaway*, 442 U.S. 200; *Royer*, 460 U.S. 491. And the initial frisk that detected the gun was limited to the outside of Douglas's clothing. On top of that, Douglas was being detained for a show-up identification with Officer Jackson—a classic rationale for a *Terry* stop. *See Michigan v. Summers*, 452 U.S. 692, 701 n.12 (1981). In the first seconds of the encounter, when the police discovered the gun, Douglas was stopped, not arrested.

Moreover, the police had solid grounds for frisking Douglas once they stopped him. Below, Douglas did not dispute that *if* the police had grounds to stop him based on suspicion of a firearms or bulk narcotics transaction, they also had reasonable suspicion to frisk him for a weapon. He appears to take the same approach on appeal, contending that there is no basis for a frisk "aside from the crime underlying the dubious basis for the stop itself" (Br. 32), without developing any standalone argument against a frisk if the stop was valid. There is good reason he does not fight this point. If this was a firearms transaction, Douglas would have one or more guns in the backpack. And if this was a transaction for a large quantity of narcotics, police would reasonably expect Douglas to be armed

35

as well. As all three experienced officers explained, it is "very common" for individuals engaged in narcotics trafficking to possess firearms (A224, A349-50, A409). This Court has recognized the same, explaining that where an officer "had just observed what he believed to be a suspect engaged in a drug transaction, it was reasonable for the officers to suspect that appellant had a gun to protect himself and his drugs" and to therefore perform a protective search. *United States v. Smart*, 98 F.3d 1379, 1385 (D.C. Cir. 1996).[7] Further, as we explain below, the protective search that detected the gun in this case stayed within the bounds of a permissible *Terry* frisk. *See infra* Part III.

Douglas proposes to approach this issue backwards, *starting* with the uses of force, arguing that the force would be unreasonable in a stop and therefore marked an arrest, and concluding that the frisk detecting the gun thus must be seen as an impermissible "search for evidence"

---

[7] *See, e.g.*, *Bullock*, 510 F.3d at 347 ("some crimes"—including "drug crimes"—"by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime"); *United States v. Booker*, 436 F.3d 238, 242 (D.C. Cir. 2006) (this Court "'has frequently recognized that guns and drugs go together in drug trafficking'"); *see also Washington*, 559 F.3d at 577 (high-crime area further supports weapons frisk).

subject to suppression (Br. 32, 39). Below he focused on the use of handcuffs (see A93-97, A140-43). He now complains more generally about the full police conduct during his stop: "officers ordered Mr. Douglas to come over to them, physically grabbed him, led him away, handcuffed him, and frisked him repeatedly" (Br. 29).

That approach does not fit the case law. As we explain below, the uses of force here were reasonable. *See infra* Part II.B. But even if they were unreasonable, that would not lead to suppression. Instead, once it is clear that the police stopped Douglas instead of arresting him, and that the gun was discovered during a permissible frisk attending that stop, his complaints about the force used during the stop become legally irrelevant. There is no need to assess the reasonableness of police conduct during a stop when that conduct "bears no causal relation to [the] discovery" of the evidence at issue in the case. *Sharpe*, 470 U.S. at 683. As the Seventh Circuit has explained in analogous circumstances, "even if the use of handcuffs might have been unconstitutional, that would not require suppression of the evidence. The application of handcuffs increased the severity of the seizure but did not prolong it or permit the discovery of evidence that would not have been discovered otherwise."

*United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013).[8] Indeed, excluding evidence in such circumstances would impermissibly "put the police in a worse position than they would have been in absent any error or violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984). Because the gun was discovered through a permissible stop and frisk, not because of the uses of force he complains about, his suppression claims fail.

## B.    The Police Used Reasonable Force in Stopping Douglas

In any event, this Court's case law makes clear that the police used reasonable force in this case. The right to make an investigative stop based on reasonable suspicion "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Most obviously, an officer may perform a "protective search for weapons" if he has reason to believe that he person he is stopping is armed. *Terry*, 392 U.S. at 26-27.

---

[8] *See also Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("In this case, of course, the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred *or not*, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.").

Beyond weapons searches, an officer may use "reasonable force" during the stop, judged under an "objective" standard, "without regard to [the officer's] underlying intent or motivation," and assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97. That reasonableness assessment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. This Court's case law permits "reasonable" uses of escalated force during a *Terry* stop "where law officers reasonably believe they are necessary for their protection," "includ[ing] *using handcuffs*[,] forcing the detainee to lie down to prevent flight, or drawing guns." *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) (citation omitted) (emphasis added).

Citing out-of-circuit cases, Douglas suggests that handcuffs during a *Terry* stop are gravely disfavored (Br. 31). But this Court's case law reflects no such skepticism. In *United States v. Dykes*, 406 F.3d 717 (D.C. Cir. 2005), for example, this Court upheld handcuffing a suspect who fled

39

and refused orders to move his hands from near his waistband, holding that "it was reasonable for the officers to fear that Dykes had a weapon in his waistband, and to take the necessary steps to ensure that he could not use it." *Id.* at 721. In *United States v. (Thomas) Jones*, 973 F.2d 928 (D.C. Cir. 1992), this Court upheld handcuffing of a suspect because he had fled and refused an order to stop. *See id.* at 931, *modified in part on other grounds on reh'g*, 997 F.2d 1475 (D.C. Cir. 1993) (en banc). And in *Laing*, this Court allowed handcuffs when the suspect's hand movements and flight "ma[d]e it clear that the officers' actions were motivated by a genuine and well-founded fear that Laing was armed and were reasonable under the circumstances." 889 F.2d at 286. We are not aware of case law from this Court finding the use of handcuffs during a *Terry* frisk unreasonable.

Moreover, in the analogous circumstance of a detention during a search warrant, the Supreme Court has deemed handcuffing for the duration of the search only a "marginal intrusion." *Muehler v. Mena*, 544 U.S. 93, 98-100 (2005). Applying the *Graham* reasonableness framework, *Muehler* held that the "safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs." *Id.* at 100. And

keeping the handcuffs on for the entire "2- to 3-hour detention" was likewise reasonable in light of "the government's continuing safety interests": "[T]his case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons." *Id.*

The district court correctly found that handcuffing Douglas was reasonable (A177-78).[9] The grounds for briefly handcuffing Douglas are similar to those endorsed by other cases and at least as compelling. As in *Dykes* and *Laing*, the handcuffing took place at the start of the encounter, when the police reasonably feared that the Douglas could have been armed, enabling them to freeze the situation while they could conduct a frisk for weapons and "take the necessary steps to ensure that [Douglas] could not use" the suspected weapon. *Dykes*, 406 F.3d at 721. Further,

---

[9] Douglas suggests that the district court somehow misunderstood the legal standard for using force and failed to determine whether the amount of force used during the stop here was reasonable (see Br. 32-34). But the district court quoted the same language from *Laing* and *Dykes* that Douglas does, requiring that the force used during a stop be "reasonable"—particularly in the context of handcuffs (A177-78). And then it explained that (a) the officer "placed Douglas in handcuffs because he feared for his safety and the safety of others," (b) "the officer identified in his testimony a number of reasons for his safety concerns," and (c) "[t]hese factors made it reasonable for Officer Poupart to fear for his safety and the safety of others" (A178). In context, the district court is concluding that the use of handcuffs was reasonable.

like in *Muehler*, the police in this case were outnumbered, with two men next to Douglas when he first was detained, other friends possibly inside the nearby housing complex, and the second suspect unaccounted for. *See also Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990) (recognizing that in high-crime areas, "the possibility that any given individual is armed is significant").

On top of that—far more than in the other cases—the situation the police faced at the moment of detaining Douglas remained in flux. As *Graham* explained, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 396-97. Here, the other man involved in the transaction must have been nearby, but he had not yet been spotted by the police. And Officer Poupart was reasonably concerned that the detention of Douglas could alert the other person, potentially leading to a chase or a fight that would draw other officers away and create chaos

on scene (A359-61). The "split-second judgment[ ]" to use handcuffs in this "tense, uncertain, and rapidly evolving" setting was reasonable.[10]

The other uses of force Douglas cites are obviously permissible. Ordering Douglas to move a few feet and then physically leading him are standard characteristics of a *Terry* stop. *See (Thomas) Jones*, 973 F.2d at 931 ("The stop may also include forced relocation of the suspect."); *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) ("the 'seizure' of a 'person' . . . can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person") (quoting *Terry*, 392 U.S. at 19 n.16). There is nothing unusual in an officer's partner being by his side when he stops a suspect (cf. Br. 31). And we see no "repeated[ ]" frisks in this case—there is a single protective search for a weapon after the stop, first feeling over Douglas's jacket, then unzipping the jacket to get access to

---

[10] Douglas cites (Br. 35) Officer Poupart's inconsistent testimony on the frequency with which he uses handcuffs. He initially said it "depends" and is "situational" for when someone is handcuffed, then said that he "[p]retty much" used handcuffs "almost all of the time" when detaining people in drug operations, then again said "sometimes they are handcuffed" (A365-66), and then later reiterated that it was situational (A397). It is hard to tell Officer Poupart's practice on this record. But fortunately, that is not the relevant question: the question is whether the use of force was *reasonable*—an objective evaluation that does not turn on the officer's subjective intent. *See Whren*, 517 U.S. 806.

43

the backpack after the police felt a gun there, and then opening the backpack to reveal the gun (see Gov't Ex. 4 at 19:03:00-:05:10). *See, e.g.*, *United States v. Holmes*, 385 F.3d 786, 789-91 (D.C. Cir. 2004) (treating this sort of multi-step protective search as a single frisk). But even if viewed as multiple frisks, the police stayed within the bounds of a permissible protective search, because they were only searching as far as "necessary to determine if the suspect is armed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *see, e.g.*, *United States v. Robinson*, 615 F.3d 804, 808 (7th Cir. 2010) ("Pulver was not satisfied with his initial effort to pat down Robinson, and so he was entitled to return to finish the job within the bounds outlined in *Terry*.").

Finally, as Officer Poupart explained (A368-69, A394-95), the fact that other officers were presumably "relatively close" and "hope[fully]" on the way did not address the reasonable fears about officer safety before they arrived (cf. Br. 37-38). It takes "[h]alf a second to a second" for "somebody to draw a gun or weapon and use it" (A394). And anyway, the other officers were coming to search for the other man, not help with Douglas's detention (A395). Douglas's suggestion that this Court should overturn those police decisions "in a swiftly developing situation" is

exactly the sort of "unrealistic second-guessing" that the Supreme Court has cautioned against. *Sharpe*, 470 U.S. at 686-87; *see also Graham*, 490 U.S. at 396-97.

## III. The District Court Committed No Clear Error in Upholding the Frisk's Limited Scope

Last, Officer Poupart's protective search for weapons stayed within the bounds authorized by *Terry*. Douglas's challenge to the district court's findings regarding the protective search (see Br. 39-46) fails both as a matter of law and fact.

### A. Even on Douglas's View of the Facts, the Protective Search was Legal

An officer who reasonably suspects the person he is stopping is armed may "take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24; *Dickerson*, 508 U.S. at 373 ("protective search" is "what is necessary to determine if the suspect is armed"). The factual points that Douglas dissects on appeal—when precisely Officer Poupart realized Douglas had a gun, and whether he learned this in part by squeezing the object (see Br. 39-46)—thus miss the point. Officer Poupart had reasonable suspicion that Douglas was armed, allowing a

45

protective search, and he never "negate[d] the possibility" that Douglas was armed. LaFave § 9.6(b) (citation omitted). Indeed, Douglas *was* armed, carrying a handgun in the exact spot where Officer Poupart focused his frisk. So even if Douglas is correct that (contrary to the district court's finding) Officer Poupart did not immediately recognize that the object he was feeling in the bookbag was a firearm, that did not terminate his ability to continue the protective search.[11]

Rather, as then-Judge Roberts explained in *Holmes*, an officer performing a protective *Terry* frisk who feels an object that "might" be a weapon may remove it in order to "ensure" that it is not something threatening. 385 F.3d at 789-91. In *Holmes*, the officer felt a "hard,

---

[11] In upholding the search, the district court cited (A180-81) the "plain feel doctrine," which allows officers to seize other contraband they discover during a *Terry* frisk, as long as the incriminating character of the object is immediately apparent. *See Dickerson*, 508 U.S. at 377-79. But that doctrine applies to contraband *other than* weapons: "*Dickerson* permits such an officer to probe the contour or mass of an unseen but felt object until he or she negates the possibility that the suspect possesses a gun, knife, club, or some other such obvious weapon that the suspect could use to harm the officer. Thus, if the officer has not yet negated the possibility that the object he or she has located within a suspect's clothing is an obvious weapon, then the officer may continue to palpate the object up to, but no further than the point at which he or she negates the possibility that the object in question is a typical or obvious weapon." LaFave § 9.6(b) (citation omitted).

square object" in a suspect's pocket, which the suspect (accurately) said was a scale: "[T]he Fourth Amendment does not require the officer to gamble his safety and that of those around him on the accuracy of such assumptions. . . . We cannot fault the officer for taking the simple step of checking to ensure that the hard object was not something more threatening before continuing." *Id.* at 790-91.

Likewise here, even assuming Officer Poupart was not sure that the object that he was "intentionally trying to squeeze over several seconds" was a gun (as Douglas asserts (Br. 41)), it was at least *potentially* one. So Officer Poupart could continue the protective search to determine if the object was a weapon or something that otherwise could harm the officers, including by opening the backpack. Indeed, under the *Holmes* reasoning, the police here could have opened the bookbag simply to examine the hard object that Douglas said was a glasses case. *See* 385 F.3d at 791 ("[T]he scope of a Terry frisk is not limited to weapons, but rather to 'concealed objects which *might* be used as instruments of assault.' A hard, square object would seem to fit that description well.") (citation omitted); *id.* at 790 ("The fact that [the officer] failed to testify that he thought the object was a weapon, or the fact that he apparently believed the [suspect's

statement that the] item was a scale, does not determine our inquiry."). Even on Douglas's view of the facts, opening the backpack was a permissible protective search.

## B.    Douglas Shows No Inherent Incredibility or Clear Error

Douglas's challenge to the court's findings also fail factually. This Court reviews a district court's factual findings on a suppression motion for clear error, giving "due weight to inferences drawn from those facts" and to "a trial court's finding that the officer was credible." *Ornelas*, 517 U.S. at 699-700. "When applying the clear error standard of review, [this Court is] mindful that the trial judge has a unique opportunity 'to evaluate the credibility of witnesses and to weigh the evidence.'" *United States v. Brockenborrugh*, 575 F.3d 726, 737-38 (D.C. Cir. 2009) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)). Notably, while Douglas primarily argues "inherent incredibility" on appeal, he fails to identify any recent decisions in which this Court has reversed a suppression ruling on that theory. *See, e.g.*, *United States v. Streater*, 70 F.3d 1314, 1318 (D.C. Cir. 1995) ("The district court could properly resolve inferences in the government's favor and reject Streater's assertion that the officers' testimony was inherently incredible.").

48

Douglas "does not come close to identifying inherently incredible testimony." *United States v. Lea*, 839 F. App'x 551, 556 (D.C. Cir. 2020) (unpublished) (testimony inherently incredible if it has "inconsistencies so glaring that the police officers' testimony must be a fabrication" or is "highly questionable in light of common experience and knowledge") (citation omitted). Douglas primarily objects to the district court's decision to credit Officer Poupart's testimony that he felt the gun during the frisk (see A181). Douglas contends that Officer Poupart only learned the object was a gun when he opened the bookbag (see Br. 39-45). But the body-worn camera footage seems to show the outline of the gun moving as Officer Poupart first probes it through the jacket, long before the jacket was removed and the bookbag was opened. *See* Gov't Ex. 4 at 19:03:06-:13; A150 (still photo); A153 (in backpack). That clip thus seems to prove the accuracy of Officer Poupart's testimony. And even if ambiguous, the footage forecloses any claim that Officer Poupart's testimony was inherently incredible.

Moreover, even aside from that clip, the district court was in the best position to evaluate credibility. The court watched the officer testify, saw the physical evidence, and witnessed the officer's moment-by-

49

moment analysis of his body-worn camera during cross-examination (see A375-88). And each theory Douglas floats for why Officer Poupart must have been lying fails under scrutiny. Officer Poupart's testimony instead made perfect sense.

Douglas first suggests that the officer would not have been able to feel a gun through a puffy coat and a bookbag that "appears" "thick and stiff" (Br. 41-42). But the district court did not have to guess on these points based on how they "appear[ed]" in the video—the bookbag and gun were both introduced into evidence, and Officer Poupart demonstrated the gun's positioning in court (see A151-55, A354-63). Moreover, a standard-sized handgun is not exactly a subtle object (see A154). There is no reason to think it would be impossible (or even difficult) for a trained police officer to suspect an object was a gun when feeling it through a coat and backpack—particularly when the video makes clear that Officer Poupart could recognize other objects, like the glasses case. Indeed, the video does clearly show Officer Poupart grabbing a hard object—seemingly in the shape of a firearm—through the backpack (see Gov't Ex. 4 at 19:03:06-:13, A150, A153).

Next, Douglas thinks Officer Poupart would not have been squeezing the object if he thought it was a gun (Br. 41). But he testified that he could tell how the gun was positioned (see A351), and he was not squeezing the trigger (see A150, A154). And anyway, even if squeezing the object was unwise, that would not make the testimony untruthful.

Douglas further argues that a police officer who found a gun would have given some sort of signal, reacting with more urgency and seizing it immediately (Br. 42-44). Officer Poupart explained, however, exactly why he did not announce the presence of a gun or immediately seize it: the scene was in a state of flux, with the second man still not stopped, so he did not want to do anything that would increase the odds of a confrontation or flight by Douglas or Williams (see A359-60, A388-92). Confirming those concerns, footage from the scene shows that Williams actually watched as Douglas was stopped and frisked, and even asked the police what was "going on," but the police did not recognize him as the second man or stop him for a couple more minutes (see Gov't Ex. 5 at 19:03:00-:05, 19:05:00-:20). Further supporting Officer Poupart's account of his actions, even when opened the backpack and saw the gun, he continued his low-key behavior. He quietly radioed the "1-800" code word,

51

but then continued to act calmly, leaving the gun in the backpack for a couple more minutes until its recovery could be properly documented (see Gov't Ex. 4 at 19:05:08-:07:20).

Douglas also suggests that Officer Poupart would not have asked for consent if he actually thought he had felt a firearm (Br. 43-44). Requests for consent are common, however, even when the police have adequate suspicion for an involuntary search. *See* LaFave § 8.1. And while Douglas thinks it incredible that Officer Poupart would offer the opportunity to consent as a "courtesy" (A358, A385-86), the Supreme Court has endorsed consent searches on a similar rationale: "Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding." *United States v. Drayton*, 536 U.S. 194, 207 (2002).

Last, there is no reason to second-guess (cf. Br. 44-45) Officer Poupart's explanation that when he asked if Douglas was "good for a search," he was "checking with everyone else that the scene is safe and secure" and that Williams was not "running" (A360, A388-92). The presence of other officers on scene do not undermine that explanation,

because the fear was that those other officers would be called away for a chase of Williams. And the delay in recovering the gun even after Officer Poupart saw it (see Gov't Ex. 4 at 19:05:08-:07:20) reinforces that the gun did not have to be recovered the instant it was detected. Nor did his partner's tautological testimony—that she understood "good for a search" to mean "good to be searched" (A405-06)—contradict Officer Poupart's explanation. There is no reason, in other words, to override the district court's credibility findings on this score.

Douglas's alternative argument (see Br. 45-46) likewise falls short. The district court did not clearly err in finding that "Officer Poupart lightly touched the back of Douglas's jacket just a few times, with the total sequence of events lasting only a few seconds, before Officer Poupart recognized the presence of a firearm" (A181). The video and testimony show Officer Poupart starting to touch Douglas's back at 19:03:00, the officer "first believe[ing]" he was feeling a gun at 19:03:05, then "continuing to frisk the bag" while "suspect[ing] it's a gun," and finally "feeling it pretty well" at 19:03:10 (see Gov't Ex. 4; A378-79). We count three or four times Officer Poupart touches Douglas's jacket by 19:03:10—consistent with the court's finding of "a few" touches. And

whether clocked to 19:03:05 or 19:03:10, this span of time from 19:03:00 can fairly be described as "a few seconds." In any event, even if Douglas were right that it took 14 seconds and six squeezes to confirm the gun's presence, that fits within the court's findings and easily stays within the bounds of a permissible *Terry* frisk. *See Dickerson*, 508 U.S. at 373; *Terry*, 392 U.S. at 24; *Holmes*, 385 F.3d at 789-91.

## Conclusion

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
SUZANNE GREALY CURT
STEVEN B. WASSERMAN
Assistant United States Attorneys

<u>          /s/          </u>
ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
(202) 252-6829

55

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 11,504 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

_____/s/_____
ERIC HANSFORD
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Tony Axam, Jr., Esq., on this 26th day of July, 2022.

_____/s/_____
ERIC HANSFORD
Assistant United States Attorney
