ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 21-3032

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

**v.**

THEODORE B. DOUGLAS,
*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

---

REPLY BRIEF OF APPELLANT

---

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

TONY AXAM, JR.
Asst. Federal Public Defender
625 Indiana Avenue, NW
Washington, DC 20004
(202)208-7500
tony_axam@fd.org

District Court
Cr. No. 20-121 (CJN)-2

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT AND AUTHORITIES ........................................................ 3

I.    The passing of a backpack for a "light-colored object"
      in an area deemed "high-crime" did not create
      reasonable suspicion after Mr. Douglas chose to
      place the backpack on his back under his coat ........................... 3

   A.    Officer Jackson did not testify that he saw money
         or something that "appeared to be money" passed ............... 3

   B.    The exchange of a backpack for a "light-colored
         object" is not analogous to the exchange of money
         for small objects ......................................................... 8

   C.    An effort to conceal something, especially when not
         undertaken in response to police presence, does
         not give rise to reasonable suspicion of a crime .................. 14

II.   Given the totality of circumstances, the amount of force
      police used was unreasonable for a *Terry* stop, and
      thereby signified that Mr. Douglas was under arrest ............. 18

III.  The district court finding that Officer Poupart
      immediately recognized the presence of a gun
      upon frisking Mr. Douglas was clearly erroneous ................... 24

CONCLUSION ................................................................................ 32

CERTIFICATE OF COMPLIANCE ....................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Adams v. Williams,* 407 U.S. 143 (1972) ................................................. 19

*Brown v. Texas*, 443 U.S. 47 (1979) ......................................................... 5

*Chimel v. California,* 395 U.S. 752 (1959) ........................................ 12-13

*Delaware v. Prouse,* 440 U.S. 648 (1979) ............................................ 5-6

*Draper v. United States*, 358 U.S. 307 (1959) ........................................ 15

*Florida v. J.L.*, 529 U.S. 266 (2000) ....................................................... 20

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................. 23

*In Re Sealed Case,* 153 F.3d 759 (D.C. Cir. 1998) ................................. 13

*Michigan v. Long,* 463 U.S. 1032 (1983) .......................................... 27-28

*Minnesota v. Dickerson,* 508 U.S. 366 (1993) .............................. 27-28, 29

*Poldo v. United States,* 55 F.2d 866 (9th Cir. 1932) .............................. 15

*Sibron v. New York,* 392 U.S. 40 (1968) .......................................... 27-28

*Terry v. Ohio*, 392 U.S. 1 (1968) ......................1, 10, 18, 19, 20, 27, 29, 30

*Texas v. Brown,* 460 U.S. 730 (1983) ..................................................... 29

*United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003) ........................ 14

*United States v. Clark*, 24 F.3d 299 (D.C. Cir. 1994) ............................. 21

*United States v. Collins*, 439 F.2d 610 (D.C. Cir. 1971) ......................... 30

*United States v. Davis*, 458 F.2d 819 (D.C. Cir. 1972) ..................... 14-16

*United States v. Drayton*, 536 U.S. 194 (2002) ...................................... 26

*United States v. Dykes*, 406 F.3d 717 (D.C. Cir. 2005) ..................... 22, 23

*United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001) ...................... 14

*United States v. Garrett*, 959 F.2d 1005 (D.C. Cir. 1992)...................... 10

*United States v. Gibson*, 366 F. Supp. 3d 14 (D.D.C. 2018) ............. 30-31

*United States v. Green*, 670 F. 2d 1148 (D.C. Cir. 1981) ...... 8-9, 14-15, 16

*United States v. Harley*, 990 F.2d 1340 (D.C. Cir. 1993).......................... 9

*United States v. Holmes*, 385 F.3d 786 (D.C. Cir. 2004) .................. 28-29

*United States v. Jackson*, 415 F.3d 88 (D.C. Cir. 2005) ........................ 13

*United States v. Jeffers,* 342 U.S. 48 (1951)............................................. 13

*United States v. (Robert) Johnson,*
    212 F.3d 1313 (D.C. Cir. 2000)................................................. 11-12

*United States v. Jones*, 973 F.2d 928 (D.C. Cir. 1992) ........................... 21

*United States v. Laing*, 889 F.2d 281 (D.C. Cir. 1989) ............... 19, 21-22

*United States v. Lucas*, 778 F.2d 885 (D.C. Cir. 1985) ............................ 9

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) ....................... 5-6

*United States v. Sharpe*, 470 U.S. 675 (1985) ....................................... 19

*United States v. Taylor*, 997 F.2d 1551 (D.C. Cir. 1993).......................... 8

*United States v. White*, 648 F.2d 29 (D.C. Cir. 1981) ............................ 20

## Constitutional Provision

Fourth Amendment...................................... 2, 5, 12, 13, 29, 31

## SUMMARY OF ARGUMENT

The government mischaracterizes the record to argue that police had reasonable suspicion to stop Mr. Douglas based on him passing "apparent money" after receiving a backpack that he placed on his back under his coat. The record evidence does not reflect the exchange of "apparent money" and, even if it did, the facts here would not provide a basis to treat the objectively innocent conduct at issue as criminal, and the government does not cite analogous authority indicating otherwise. Furthermore, the government ignores that the act of shielding private property from public view does not support finding criminal suspicion, and certainly not when such shielding is not in response to police presence. In the absence of objective evidence that Mr. Douglas was engaged in a crime, police lacked reasonable suspicion to stop him and the gun seized from him should have been suppressed.

Contrary to the government's arguments attempting to justify the second frisk of Mr. Douglas as part of a *Terry* stop, whether the stop had become an arrest is not determined solely by the duration of detention or whether the use of handcuffs was justified. Rather, because the amount of force police used was unreasonable given the totality of circumstances,

such force constituted an arrest. Moreover, because police lacked probable cause for that arrest, the seized gun should have been suppressed.

Finally, the government is incorrect that there is no variance between Officer Poupart's behavior during his stop and frisk of Mr. Douglas and the explanations he provided to the district court concerning that behavior. Video evidence and common sense and knowledge showed that Officer Poupart did not discover the gun in this case until after he searched inside the bag on Mr. Douglas's back. Under the doctrine of inherent incredibility, this Court can decide that Officer Poupart did not discover the gun during his first few seconds of frisking Mr. Douglas as he claimed and, therefore, that the government did not carry its burden to justify the Fourth Amendment intrusion at issue.

## ARGUMENT AND AUTHORITIES

**I. The passing of a backpack for a "light-colored object" in an area deemed "high-crime" did not create reasonable suspicion after Mr. Douglas chose to place the backpack on his back under his coat.**

### A. Officer Jackson did not testify that he saw money or something that "appeared to be money" passed.

The government does not directly address Mr. Douglas's argument that there was no reasonable articulable suspicion of a crime based on the facts in his case. Instead, the government relies upon a factual premise that is unsupported by the record and cases that differ critically from what actually took place here.

Although the government offers many speculative assertions unsupported by record evidence, its most consequential misrepresentation is its repeated claim that Officer Jackson, whose observation of the interaction between Mr. Douglas and Mr. Williams was the sole basis for the district court's reasonable suspicion finding, saw an exchange of an item that "appeared to be U.S. currency." Gov't Br. at 4 (citing App238, App323-24). According to the government, "Officer Jackson could not be '100% sure' that the item Douglas gave Williams was money, but he believed it was based on the item's 'light'

color, its nature, its small size, the hand gesture in which it was exchanged, and the way Williams cuffed it in his hand." Gov't Br. at 4-5 (citing App238-39, App275-76, App298-99, App332). This is not an accurate reflection of Officer Jackson's testimony. He did not catalog reasons he "believed" he saw an exchange of money, but instead clarified that he did not see something that he could say "appeared" to be money. *See* App275, App298.

Thus, the district court did not discuss the exchange of something that "appeared to be money" in its analysis in denying the motion to suppress. In its written decision, the district court recited "three facts" that formed the basis for reasonable suspicion: (1) "the area where Officer Jackson witnessed the exchange was a high-crime area"; (2) the "hand-to-hand transaction that Officer Jackson witnessed," which included a belief that "bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack"; and (3) "Officer Jackson's observation of Douglas's attempt to conceal the backpack under his jacket." App175-76. To the extent the district court implied that it appeared that money was passed through its reference to a "hand-to-

hand exchange," it erred as such a finding clearly is contrary to Officer Jackson's testimony.

Officer Jackson initially testified that "it appeared [Douglas] could have given [Williams] some sort of U.S. currency, some money," (App238), but that equivocation was not an assertion of what actually happened, but what *could have* happened. Thus, even the most favorable interpretation of his testimony for the government indicated only a hunch or assumption that money was passed. Indeed, in the course of his testimony, Officer Jackson admitted that he had made an "assumption" that there had been a sale and did not know if there had been money. App313. An assumption is something taken as true without proof. As such, Officer Jackson's assumption could not substitute for an objective fact required to justify a seizure under the Fourth Amendment. *Brown v. Texas*, 443 U.S. 47, 51 (1979) ("[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." (citing

*Delaware v. Prouse,* 440 U.S. 648, 663 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 558–62 (1976))).

More important, however, is that Officer Jackson testified that Mr. Williams handed Mr. Douglas a backpack and Mr. Douglas handed Mr. Williams, not money or something that "appeared" to be money (Gov't Br. at 19, 25), but a "light-colored object." App323-324. Officer Jackson could not tell if it was even paper (App314) and stated that "[he] could not say it was U.S. currency" (App275-76). Officer Jackson conclusively clarified what he observed in the following testimony:

> Q. And your suspicion was based upon a hand-to-hand transaction for what you thought might be money. Right?
>
> A. Correct.
>
> Q. And you testified today that you are really not sure. You just know it was a white piece of paper.
>
> A. I didn't say white piece of paper. I just said white colored object.
>
> Q. So what you saw was a white-colored object. You didn't know what it was.
>
> A. Correct. I cannot testify and tell you, yes, for sure, that was U.S. currency.
>
> Q. You remember it was a white-colored object. Right.

6

A. Say again? Are you saying white or light? I am saying light not white. I'm sorry about that.

Q. Do you remember seeing a light-colored object?

A. Yes.

Q. And sitting here today remembering the light-colored object you could say definitively that you are not sure what that light-colored object was?

A. Correct. I cannot tell you that I am 100% sure it was U.S. currency.

Q. Well, I don't want to say -- the two choices are 100% or 0%. It sounds like you are saying that you really don't know what it was.

A. That's correct. I just can't say.

Q. Okay. So you are not 80% sure?

A. I can't say.

Q. You just can't say one way or the other.

A. I can't say; that's correct.

App298-99. Thus, Officer Jackson testified that he could not say what was passed after Mr. Douglas received the backpack and the most that he could determine was that it was a "light-colored object." App298.

**B. The exchange of a backpack for a "light-colored object" is not analogous to the exchange of money for small objects.**

The government's alternative view of the record leads it to rely on cases that involve the exchange of *money* for *small objects* that, when combined with other factors, established justification for police to stop or arrest individuals in those cases. *See* Gov't Br. at 20-25. Primarily, the government relies upon *United States v. Taylor*, 997 F.2d 1551, 1552-54 (D.C. Cir. 1993), which found probable cause based on officers watching two similar transactions that appeared to involve the sale of drugs before witnessing a third transaction in which the apparent drug dealer retrieved a "small object from the brown paper bag, which he gave to [the defendant] in return for cash." In contrast here, there was not a series of transactions preceding an exchange, there was no passing of money, and there was no passing of small objects.

The government also relies heavily on *United States v. Green*, 670 F. 2d 1148, 1151 (D.C. Cir. 1981), where an officer observed a suspected buyer handing the co-defendant "paper currency," after which, the co-defendant "then walked several feet to [the defendant] and handed him the money," which he took and "stuffed it in his trouser pocket," and then

"appeared to hand a small object from a bag" to the co-defendant. Thus, *Green* too involved the exchange of *money* for *small objects*, and detailed a sequence of events between buyer and seller that is simply not analogous to Mr. Douglas's case.

Ignoring such distinctions, the government nevertheless submits that the stop here was similar to *United States v. Harley*, 990 F.2d 1340 (D.C. Cir. 1993), where again, an officer at a known drug trafficking location, watched a defendant "conduct[ing] three apparent exchanges within a few minutes, on each occasion handing an object over to a different individual in exchange for money." Like the other cases, *Harley* is simply inapposite. As is *United States v. Lucas*, 778 F.2d 885, 888 (D.C. Cir. 1985), where, upon arriving at a specific location where police had received a tip that individuals were "selling narcotics," an officer observed two transactions involving the defendant exchanging objects with occupants of automobiles before a third transaction where the officer saw the defendant give "something green" to the co-defendant who "drew an 'object' from her pocket and 'poured' something into [the defendant's] hand."

9

Finally, the government discusses *United States v. Garrett*, 959 F.2d 1005 (D.C. Cir. 1992), where the Court found that police had reasonable suspicion to stop the defendant after receiving a citizen's complaint of narcotics sales at a specific location inside of a specific car and, upon arrival at that location, officers witnessed "[defendant] pass a small object retrieved from inside his car to [co-defendant] in exchange for money." *Id.* at 1007.[1]

As discussed in Mr. Douglas's opening brief, these cases and cases like them are distinct from the facts of this case, foremost, because they involve the exchange of money for small objects – neither of which was observed here. Even assuming arguendo that there had been money, the government does not identify any case where the exchange of a backpack for money is reason to believe criminal activity is afoot.

---

[1] The government claims that "[o]ther circuits routinely recognize this sort of hand-to-hand transaction supports a *Terry* stop," and provides a string cite of cases with no analysis. Gov't Br. at 23 n.4. To the extent the "sort of hand-to-hand transaction" the government avers exists in these other circuits actually involves the exchange of money for small objects after police witness a series of drug transactions in drug trafficking areas or receive specific complaints of drug sales at a specific location, these cases add nothing more to the analysis of this Court's inapposite cases.

It bears emphasis that in the cases the government cites, money is passed *first,* after which small objects are passed to the alleged buyer thereby denoting a sale, whereas here, Mr. Williams first handed Mr. Douglas a backpack and *afterwards*, Mr. Douglas is alleged to have handed Williams a "light-colored object" that the government speculates was money – a sequence that is not inconsistent with a typical sales transaction.

The cases on which the government relies also involve either a series of transactions creating an inference of drug trafficking or citizen complaints that drug trafficking was occurring at specific locations where the defendants then were observed in pecuniary exchanges. Neither of these factors is present here.

Rather than acknowledging the distinctions between Mr. Douglas's case and the cases it claims justify the stop here, the government turns to *United States v. (Robert) Johnson*, 212 F.3d 1313, 1314-15 (D.C. Cir. 2000), where this Court ruled that "simply receiving an object from another person . . . is a common occurrence for which there could be many innocent explanations" and therefore would not necessarily be a basis for reasonable suspicion to stop individuals in high-crime area. The

government attempts to expand this principle, contending that in *Johnson*, the "Court was saying, a two-way exchange is not such a 'common occurrence for which there could be many innocent explanations.'" Gov't Br. at 24. *Johnson* does not stand for this proposition and the government does not cite any other case that does.

The government's interpretation of *Johnson* betrays a desperation to convert objectively innocent acts into criminal behavior. A person handing a backpack to another and then being handed a light-colored object is hardly a basis for reasonable suspicion, even in a high-crime area. To the contrary, collecting a bag from someone is a common occurrence for which there are many innocent explantions.

The government purports to concede that the passing of the backpack could have been innocent because Mr. Williams "could have been a friend giving a gift or returning a borrowed item." Gov't Br. at 25. Yet, the government simultaneously insists that "Douglas has failed to provide a 'plausible, innocent explanation'" for receiving the bag and placing it on his back. *Id.* This confusing concession and counterpoint exposes the government's profound misunderstanding of Fourth Amendment jurisprudence. Mr. Douglas did not have a burden to provide a "plausible,

12

innocent explanation" of his behavior. "Both in the district court and in this [C]ourt upon *de novo* review, 'the burden is on those seeking the exemption [from the warrant requirement] to show the need for it.'" *United States v. Jackson*, 415 F.3d 88, 92 (D.C. Cir. 2005) (citing *United States v. Jeffers,* 342 U.S. 48, 51 (1951); *Chimel v. California,* 395 U.S. 752, 762 (1959); *In Re Sealed Case,* 153 F.3d 759, 764 (D.C. Cir. 1998)). In this case, it is the government who seeks exemption from the Fourth Amendment's warrant requirement, and it is the government who has the burden to establish a lawful basis for seizing Mr. Douglas. Failing to recognize that burden, the government has failed to carry it.

Furthermore, while the government assails Mr. Douglas for questioning the designation of the area of his arrest as high-crime, it does not actually argue that the nature of the neighborhood was a basis for assuming that the passing of a bag for a light-colored object, or "apparent money," was evidence of a crime in this case. Mr. Douglas maintains that

13

given the circumstances of this case, the designation was not entitled to great weight in the reasonable suspicion calculus.[2]

## C. An effort to conceal something, especially when not undertaken in response to police presence, does not give rise to reasonable suspicion of a crime.

As a final matter regarding reasonable suspicion, the government does not directly address settled law in this circuit that furtive actions only become significant in a reasonable suspicion analysis "'if they were undertaken in response to police presence.'" *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003) (quoting *Edmonds*, 240 F.3d at 61). Instead, the government argues that an attempt to "conceal" and "stealthily" exchanging items constitute "unusual conduct," Gov't Br. at 28, and "are suspicious even when not taken in direct response to the police," *id.* at 30 (citing *Green*, 670 F.2d at 1152; *United States v. Davis*, 458 F.2d 819, 822 (D.C. Cir. 1972)). In relying upon *Davis* and *Green* for

---

[2] The government accuses Mr. Douglas of "simply mistat[ing] the law" as it relates to the significance of an area as "high-crime." Gov't Br. at 17 (citing *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001)). Counsel takes exception to this accusation. Mr. Douglas asserted that "the designation of the area where Mr. Douglas was arrested as 'high-crime' is of limited significance in an assessment of reasonable suspicion in this case." Appellant's Opening Br. at 17. This is not a misstatement of the law as applied to the facts and circumstances in this case.

14

this argument, the government again ignores that those cases, crucially, involved the exchange of money for small objects in locations known for narcotics trafficking and that concealment was not critical to determining that a crime had likely occurred.

In *Davis*, the Court found probable cause after the defendant "nervously approach[ed] an equally nervous well dressed man" in the midst of several "shabbily dressed" men (presumed to be drug addicts), and "stealthily 'slid' money to the second man in exchange for a small brown package." Upholding the search did not turn on the "stealthi[ness]" of the exchange. And although *Davis* cited *Draper v. United States*, 358 U.S. 307, 323 (1959) (Douglas, J., dissenting), to note that "'[s]urreptitious passing of a package has been recognized as a possible element in establishing the probable cause mix,'" *Davis*, 458 F.2d at 822, Justice Douglas further cautioned that an officer "must act on some evidence known to him" and "'[m]ere suspicion is not enough; there must be circumstances represented to the officers through the testimony of their senses.'" *Draper*, 358 U.S. at 324 (Douglas, J., dissenting) (citing *Poldo v. United States*, 55 F.2d 866, 869 (9th Cir. 1932)). Leaving aside that there was nothing "stealthy" about Mr. Williams handing Mr.

15

Douglas the backpack, the ballast of the circumstances in *Davis* was the exchange of money for small objects in a drug area, not necessarily that the exchange was stealthy.

The same was true in *Green,* where police saw "paper currency" exchanged for "small objects" which each defendant "concealed" in their hand. *Id.* at 1150. The "conceal[ment]" during the exchange was not the touchstone for deciding that a crime had occurred. Indeed, the Court ruled that "[w]hile it is true that persons engaged in illegal transactions will desire to conceal those transactions, the desire for privacy in one's affairs is common among law-abiding persons as well. Thus, the police cannot conclude that merely because an object or a transaction is not openly displayed, it is necessarily illegal." *Green*, 670 F.2d at 1152. Eschewing this admonition, the government suggests that an act of concealment is a "key factor" for concluding that a crime has occurred. Gov't Br. at 28. Neither *Green* nor *Davis* support this view and, even if they did, they concern the concealment of suspected narcotics during the passing of those narcotics from one person to another, which is entirely different from openly passing an ordinary backpack and the act of placing the backpack on one's back under a coat.

Even if Mr. Douglas's action of placing the backpack under his coat seemed unusual in some way, the government has not presented reasons for why it was *criminal*. It relies solely upon an unfounded theory that the bag contained contraband while ignoring that Officer Jackson testified that "when [he] gave the call to move in, [he] did not know what was inside of the bag," and "didn't know if it was contraband" or "if it wasn't contraband." App90. And Officer Jackson's unremarkable statement that in his experience he had seen "instances" of "bulk transfers of narcotics or firearms" exchanged "usually in a vehicle if large quantities or firearms usually in a bag," App225, did not correlate contraband to a particular type of bag or identify any objective indicia that could be used to conclude that a particular bag contained contraband. The government does not otherwise identify a fact that would help establish something about the bag in this case that indicated a crime – for example, its shape, weight, style, brand, or material. Without an explanation for how to distinguish between a criminal bag and an innocent one, and more specifically why the bag in this case suggested a crime, there was simply no basis for concluding that there was reasonable suspicion to stop Mr. Douglas.

17

Rather than acknowledging the absence of evidence supporting a basis for Mr. Douglas's seizure, the government posits an elaborate hypothesis that Mr. Douglas arrived minutes before Mr. Williams based on a prearranged sales discussion involving negotiation for contraband, and once the two were at the location, they methodically went about executing their preplanned transaction in a manner that was not typical of illicit transactions Officer Jackson was used to seeing – precisely because it was preplanned in secret. Gov't Br. at 31-32. The government cites no record evidence for these suppositions. This Court should reject this final effort to manifest facts in this case and hold that police lacked reasonable suspicion to seize Mr. Douglas.

## II. Given the totality of circumstances, the amount of force police used was unreasonable for a *Terry* stop, and thereby signified that Mr. Douglas was under arrest.

The government argues that because officers had reasonable suspicion to stop Mr. Douglas for a drug or firearm offense, the amount of force used could not convert the stop into an unlawful arrest requiring suppression of evidence. Gov't Br. 37 ("But even if [officers' uses of force] were unreasonable, that would not lead to suppression."). The government reasons that "once it is clear that the police stopped Douglas

18

instead of arresting him, and that a gun was discovered during a permissible frisk attending that stop, his complaints about the force used during the stop become legally irrelevant." *Id.* Yet, the government ignores the crucial question of whether, even if police initially had a basis to stop Mr. Douglas, the amount of force employed during that stop effectively converted it into an arrest. In circumstances where police exceed the bounds of a *Terry* stop such that the defendant is effectively under arrest, when they do not have probable cause for an arrest, the fruits of their unlawful seizure must be suppressed.

Whether a seizure is a stop requiring only reasonable suspicion or has become an arrest requiring probable cause is a question of law determined by an examination of whether "the duration of the stop or the amount of force used is 'unreasonable' under the circumstances." *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) (citing *United States v. Sharpe*, 470 U.S. 675, 682-88 (1985)).

Mr. Douglas submits that after he was physically moved, handcuffed, restrained by two officers, and frisked by Officer Taylor, the second frisk by Officer Poupart signaled that Mr. Douglas would remain detained until police found what they were looking for. Moreover, in detaining Mr.

19

Douglas, Officer Poupart did not ask generally what Mr. Douglas was doing in the area, but asked more intrusive questions about what Mr. Douglas was carrying in his bag and whether police could search inside of it. When Mr. Douglas asked officers why he was being seized, his questions went unanswered. By the time Officer Poupart initiated the second frisk, the "limited search of the outer clothing" of Mr. Douglas for weapons had become an investigatory search requiring probable cause. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The officers' unreasonable exertion of force given the circumstances of the case effectuated Mr. Douglas's arrest.

Without acknowledging the substance of Mr. Douglas's argument, the government argues that under *United States v. White*, 648 F.2d 29, 34 (D.C. Cir. 1981), *overruled on other grounds by Florida v. J.L.*, 529 U.S. 266 (2000), Mr. Douglas was not under arrest because police told him to come with them "'for a minute' and that he was 'just being stopped as part of an investigation'" and "the disputed frisk finished within a minute of the seizure." Gov't Br. at 34 (citing Gov't Ex. 4 at 19:02:30-40, App348, App364). Because the government focuses on the duration of detention to the complete exclusion of the degree of force police used, it ignores that

20

when Poupart initiated a second frisk of Mr. Douglas, the amount of force was out of proportion with the circumstances, especially considering the presence of at least nine officers in broad daylight in an open area where Mr. Douglas was not evasive, did not appear to be armed or dangerous, and at all times remained calm, compliant, and respectful. *See United States v. Clark*, 24 F.3d 299, 302 (D.C. Cir. 1994) ("In examining the reasonableness of the force used in making a stop, courts have considered such factors as the time of day, the 'high crime' nature of the area, a tip that the suspect may be armed, furtive hand movements, flight or attempted flight, a pressing need for immediate action, and the involvement of drugs." (citing *United States v. Laing*, 889 F.2d 281, 286 (D.C. Cir. 1989); *Adams v. Williams,* 407 U.S. 143, 147–48 (1972)).

The government misunderstands Mr. Douglas to argue that the use of handcuffs converted his initial stop into an arrest. Notwithstanding this misunderstanding, in cases where this Court has held that handcuffs were a reasonable use of force, it has done so only where the defendant fled or refused an order to stop, as in *United States v. Jones*, 973 F.2d 928 (D.C. Cir. 1992), and where the defendant's hand movements and flight made officers' fear for their safety reasonable, as in *Laing*, 889 F.2d at

21

286. Mr. Douglas's hands were at his side, he did not move them in a threatening way, he complied with officers' commands, and he did not flee. Moreover, whatever police believed he possessed was inside of a closed bag on his back under his zipped coat and not accessible. Thus, his case does not present facts that would provide a basis for officers to reasonably fear for their safety necessitating handcuffs for a brief investigatory stop.

The government argues that *United States v. Dykes*, 406 F.3d 717 (D.C. Cir 2005), and *Laing* justify the use of force here because: "[1] handcuffing took place at the start of the encounter. . . when Douglas could have been armed," which allowed police to "[2] freeze the situation while they could frisk for weapons," given that "[3] police in this case were outnumbered" and "[4] the situation police faced at the moment of detaining Douglas remained in flux." Gov't Br. at 41-42. These are not separate reasons justifying a seizure, but just different iterations of Officer Poupart's claim that he feared for his safety. Under *Dykes*, an officer's claimed fear for his safety does not automatically make the degree of force reasonable. Rather, a court must still evaluate the totality of circumstances. The circumstances of Mr. Douglas's case did not

22

necessitate the use of handcuffs, but even if they did, the additional uses of force against Mr. Douglas – and specifically, Officer Poupart's second frisk – were unreasonable and indicated that Mr. Douglas was under arrest and not merely stopped.

Even if there were some weak basis for concluding that an item of contraband had been passed, no other facts in this case arguably suggested that Mr. Douglas or anyone else "pose[d] an immediate threat to the safety of the officers or others" or "actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Dykes*, 406 F.3d at 721 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Contrary to the government's assertion, police were not outnumbered and the situation was not in flux. There were at least nine officer present on a clear day in the afternoon and the scene was under officers' complete control. At least seven uniformed armed officers had arrived simultaneously with Poupart and Taylor. There was no claim that anyone presented as a threat or attempted to flee. Because the amount of force used was greater than reasonable given the totality of circumstances, Mr. Douglas was under arrest before Officer Poupart claimed to have discovered the gun.

Because there was no probable cause for such an arrest and search, the gun should have been suppressed.

III.     **The district court finding that Officer Poupart immediately recognized the presence of a gun upon frisking Mr. Douglas was clearly erroneous.**

The government argues that Officer Poupart's testimony that he felt a gun seconds into frisking Mr. Douglas is supported by "body-worn camera footage [that] seems to show the outline of the gun moving as Officer Poupart first probes it through the jacket." Gov't Br. at 49 (citing Gov't Ex. 4 at 19:03:06-:13; App150; App153). The video evidence does not show the "outline of a gun," the district court did not make such a finding, and in any event, the record evidence speaks for itself.

Mr. Douglas takes no issue with the government's observation that the factfinder is in the best position to decide witness credibility. Gov't Br. at 48. But here, the witness was essentially narrating the sequence of events displayed on video evidence of his interaction with Mr. Douglas. There is no impediment to this Court deciding under the doctrine of inherent incredibility that Officer Poupart's narration is not accurate.

Casting aside common experience and knowledge, the government implicitly asks this Court to accept Officer Poupart's claim that seconds

24

after he began his frisk, he immediately knew he was touching a gun. Gov't Br. at 49. Rather than alert fellow officers to the presence of a gun, Officer Poupart continued to frisk Mr. Douglas; unzipped his coat, asked if he could search his bag, and when Mr. Douglas denied him permission, radioed to an officer with more apparent authority and asked if he could search Mr. Douglas. Gov't Ex. 4 at 19:04:00-19:05:01. Only after he received a response, did he unzip Mr. Douglas's backpack, at which point, he immediately notified his fellow officers that he had found a gun. Gov't Ex. 4 at 19:05:00-31.

Officer Poupart's explanations for why he did not seize the gun when he claims to have first discovered it at the inception of the frisk do not jibe with common experience and are patently implausible. Although the government claims Officer Poupart took unusual actions because the "the scene was in a state of flux," this was not the explanation that Officer Poupart provided.[3] Officer Poupart stated only that he did not want to

---

[3] Government Exhibit 4 does not depict a chaotic scene, but shows a scene heavily controlled by an overwhelming number of officers. Mr. Douglas and Mr. Williams (and others) are calmly standing still as

indicate to Mr. Douglas that he discovered a gun because he did not want him to "flee, fight, or endanger the scene." App359. Leaving aside that Officer Poupart undermined this effort when he subsequently forecast his intent to conduct a full search of Mr. Douglas by radioing for permission to do so, more pertinent is that at the moment Poupart actually discovered the gun, he so indicated by use of a code-word to surreptitiously alert other officers nearby of the discovery. Officer Poupart did not use that code-word during the frisk – a fact that fatally undercuts his in-court testimony that the government asks this Court to ratify.

Separately, the government insists that Officer Poupart asked for consent to search Mr. Douglas's bag only as a "courtesy" because "[p]olice officers act in full accord with the law when they ask citizens for consent." Gov't Br. at 52 (citing *United States v. Drayton*, 536 U.S. 194, 207 (2002)). The problem with this explanation is that after Mr. Douglas denied

_____

officers investigate and search. Moreover, the claim that the "second man still [was] not stopped," Gov't Br. at 51, is factually incorrect. Though Poupart was not focused on Mr. Williams, he was in Poupart's field of vision and was surrounded by other officers within seconds of Mr. Douglas being seized. Gov't Ex. 4 at 19:02:27-19:03:08.

Officer Poupart consent, Poupart did not then act with the authority the law bestows upon an officer to seize a gun, but instead looked elsewhere for authority to search.

The government also asks this Court to accept Officer Poupart's explanation that when he called to another officer to ask if Mr. Douglas was "good for a search," he was secretively asking whether the scene was secure and was not actually asking for permission to search Mr. Douglas. Gov't Br. at 52-53. The problem here is that there was no reason for another officer to interpret his question as secretively seeking different information – as evidenced by Officer Taylor testimony that she interpreted the question at face value.

As a final fallback, the government argues that even if Poupart did not know he was a touching a gun, he was entitled to continue to manipulate what he was touching – up through opening the backpack – so that he could "negate the possibility" that it was a weapon. Gov't Br. at 46-48. That is not the law. In *Minnesota v. Dickerson,* 508 U.S. 366, 378 (1993), the Supreme Court explained that searches that exceed what is necessary to determine whether an individual is armed "amount[ ] to the sort of evidentiary search that *Terry* expressly refused to authorize"

27

and that were "condemned" in *Sibron v. New York,* 392 U.S. 40 (1968), and *Michigan v. Long,* 463 U.S. 1032 (1983).

Contrary to the government's implications otherwise, *United States v. Holmes*, 385 F.3d 786 (D.C. Cir. 2004), does not hold otherwise. In *Holmes*, the defendant challenged an officer's seizure of a scale from his coat pocket during a traffic stop. The Court ruled the seizure was not unreasonable because, when the officer initiated the stop, the defendant hesitated before pulling over, had "repeatedly reach under the driver's seat, as if to retrieve a weapon," had been drinking, and once he was out of the car, "reached for his pocket – despite repeatedly being directed not to do so." *Id.* at 790. These circumstances suggested that the defendant had ready access to a weapon and was attempting to use it – facts that do not exist here. Moreover, the Court recognized that traffic stops are "one of the more perilous duties imposed on law enforcement officers" to rule that under the circumstances of that case, it was not unreasonable for the officer to reach into the defendant's pocket to seize a hard object (the scale) that he did not believe to be a gun since it "could have been another type of weapon." *Id.* at 791. *Holmes* did not hold that in the context of a frisk, police may search an individual until they "negate the

28

possibility" of a weapon, and certainly did not expand a frisk to encompass the opening of bags and containers.

More importantly, a standard that would allow police to frisk someone to "negate the possibility" that the person is armed would greatly expand the limited exception for a frisk under *Terry* and render the plain-feel doctrine meaningless. *See Dickerson*, 508 U.S. at 378 ("Where, as here, 'an officer who is executing a valid search for one item seizes a different item,' this Court rightly 'has been sensitive to the danger ... that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.'" (citing *Texas v. Brown,* 460 U.S. 730, 748 (1983) (Stevens, J., concurring in judgment))). *Terry* permits an officer to seize an object he believes to be a weapon, but where the officer does not feel an item that appears to be a weapon, the Fourth Amendment does not permit an officer to expand the limited pat-down into a more intrusive search. *Dickerson*, 508 U.S. at 373.

It is also important here that Officer Poupart was manipulating an object inside of a bag that, by his own admission, Mr. Douglas could not reach. And even if Mr. Douglas could have reached it, Officer Poupart did

not need to determine its contents, but could have instead removed it from Mr. Douglas's back without searching it. *Cf. United States v. Collins*, 439 F.2d 610, 618 (D.C. Cir. 1971) (reversing denial of suppression motion for lack of probable cause while noting that even defendant's frisk exceeded *Terry* limitations because "the officer, if he feared that something in the [defendant's] purse might have been used against him, could simply have put it out of reach until his investigation was completed" rather than searching it).

Lastly, the government argues that even if the district court clearly erred in finding that the presence of a gun inside the backpack under Mr. Douglas's coat was immediately apparent to Officer Poupart, the seizure of the gun was nevertheless lawful. This argument ignores that an officer's questionable or inherently inconsistent testimony about recognizing the presence of a gun would have been grounds for the district court to find that the government to sustain its burden to prove the stop lawful. *See, e.g.*, *United States v. Gibson*, 366 F. Supp. 3d 14, 24 (D.D.C. 2018) ("In light of the significant memory gaps in Officer Hiller's testimony, the lack of evidence in the record regarding the words Officer Wright said to Mr. Gibson, and the video footage corroborating Mr.

Gibson's testimony, the Court concludes that the government has not met its burden to prove there was no show of authority."). This Court should not countenance inherently incredible testimony impacting an individual's Fourth Amendment rights by finding such testimony harmless.

## CONCLUSION

For the foregoing reasons, Mr. Douglas respectfully requests that this Court reverse the district court's order denying his motion to suppress evidence, vacate his conviction, and remand his case.

Respectfully submitted,

A.J. Kramer
Federal Public Defender


_____/s/_____
Tony Axam, Jr.
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500
tony_axam@fd.org


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Reply Brief was prepared in Century Schoolhouse 14-point font pursuant to Fed. R. App. P. 27(d)(2) and contains 6,311 words.


_____/s/_____
Tony Axam, Jr.
Assistant Federal Public Defender