UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————————

**No. 21-3032**

—————————————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

v.

THEODORE B. DOUGLAS
*Defendant-Appellant.*

—————————————————

**APPELLANT'S PETITION FOR REHEARING
AND REHEARING EN BANC**

—————————————————

## STATEMENT OF THE ISSUES AND THEIR IMPORTANCE

This case raises issues of exceptional importance because the judgment contravenes well-established Fourth Amendment precedent in two significant respects. First, the judgment disregards objective facts in favor of an officer's subjective characterization of the conduct he has observed as a "hand to hand transaction" indicating a drug crime. Although the phrase "hand to hand transaction" is commonly used to describe exchanges of money for drugs, it is ambiguous on its own and does not signify a crime where the underlying objective facts involve neither money nor an object alleged to be drugs, such

as here. By attaching criminal significance to an officer's subjective characterization of the conduct he observed, the Panel essentially defers to law enforcement instead of obeying the command of the Supreme Court to independently decide whether "particularized and objective" facts justify a seizure. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

Second, the judgment undermines our Circuit's settled Fourth Amendment case law holding that concealment and other furtive gestures are part of the calculus establishing reasonable suspicion *"only* if they were undertaken in response to police presence." *United States v. Castle*, 825 F.3d 625, 629 (D.C. Cir. 2016) (emphasis added) (citations omitted). Otherwise, the gestures are not significant. In this case, each concurrence relied upon the purported concealment of a backpack as part of the basis for reasonable suspicion, despite the uncontroverted evidence that any concealment was not undertaken in response to police presence. This Circuit has never before wavered from the fundamental Fourth Amendment precept that citizens have the right to keep private property from public view and when their efforts to conceal their property are not undertaken in response to police presence, they do not factor into the reasonable suspicion calculus.

2

Appellant Theodore Douglas petitions for Panel rehearing or rehearing en banc pursuant to Federal Rules of Appellate Procedure 40 and 35 in order to ensure consistent application of these bedrock Fourth Amendment principles.

## BACKGROUND

MPD Officer Isaac Jackson testified that at 3:00 p.m. on April 22, 2020, he was working in an undercover capacity as a member of the Narcotics Special Investigation Division. Appx.227.[1] He was inside a parked car on a public street in the 2300 block of 15th Street Northeast and in radio communication with an arrest team of 10-15 uniformed officers. Appx.227; 297. He was looking for "hand to hand transactions" involving drugs, which he said typically are characterized by individuals talking, one person passing "money" to the other, the alleged seller going to a stash and returning, and the alleged seller then passing the retrieved item with a "secretive hand movement." Appx.219, 222. He stated that he had *not* heard of cases where bulk narcotics or firearms were transferred out in the open, but was familiar with transfers of large quantities of drugs "usually in a vehicle" or a firearm "usually in a bag." Appx.225.

---

[1]      References to the record are contained in Appellant's Appendix filed with Appellant's Opening Brief and are cited herein by "Appx." and the page number.

Officer Jackson identified the Fifth District, where Mr. Douglas was arrested, as a "high-crime area" (as compared to other districts except Sixth and Seventh Districts) Appx.227. He stated that he previously had seen drug activity near the walkway where Mr. Douglas was arrested. Appx.237.

Officer Jackson saw Mr. Douglas standing in the walkway between apartment buildings talking to two other individuals. Appx.238, 279. Other people were also nearby, going about their business. Appx.237, 326-27. Another person, who was later identified as Tavonte Williams, walked up to Mr. Douglas and handed him a backpack. Appx.269. Neither Douglas nor Williams opened the backpack, took anything out of it, or put anything into it. Appx.275. Rather, Mr. Douglas took off his coat, strapped the backpack on his back, and "quickly" put his coat back on and then just "stood there for some time." Appx.247, 310.

Officer Jackson initially testified that after Douglas took the backpack, that "it appeared he could have given [Williams] some sort of U.S. currency, some money" with a handshake (Appx.238), but later clarified that at a distance of 15 yards, he "could not say that it was U.S. currency." Appx.275-76, 278. He also later unequivocally stated that what he had termed a "hand to hand exchange" involved "a light colored object" – "not paper" and "not currency" (Appx.298, 314), and admitted that he made an "assumption" that he

4

had seen a drug sale. Appx.313-14. He testified that after the purported exchange, he broadcasted a description of Douglas and Williams and the arrest team arrived to detain and search them. Appx.248.

## REASONS FOR GRANTING THE PETITION

**I.    The Panel's Judgment Affirming the District Court Opinion Conflicts With Settled Law That Reasonable Suspicion Must Be Based on Objective Facts and Not Subjective Police Characterizations.**

A fractured per curiam judgment affirmed the District Court's decision denying the motion to suppress. In its published opinion, the District Court ruled that "three facts" established the "minimum level of objective justification" necessary for a *Terry* stop in this case. *See United States v. Williams*, 507 F. Supp. 3d 181, 197 (D.D.C. 2020) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)), *aff'd sub nom. United States v. Douglas*, 72 F.4th 332 (D.C. Cir. 2023).

The District Court identified as central to reasonable suspicion Officer Jackson's testimony "that based on his experience as a police officer, he was familiar with how individuals engaged in hand-to-hand narcotics transactions, and that in his experience bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack." *Williams*, 507 F.

Supp. 3d at 197. (citing Tr. at 17–18).[2] The second important fact was "[Mr. Douglas's] attempt to conceal the backpack under his jacket," and the third fact was that "[the location] where Officer Jackson witnessed the exchange was a high crime area." *Id.*[3]

The District Court erroneously relied upon the officer's subjective characterization that what he had observed was a "hand to hand transaction," and from there concluded that there was reasonable suspicion of a crime because a "hand to hand transaction" necessarily signifies a drug crime. The Panel's judgment affirmed this faulty conclusion and in so doing subordinated independent analysis of objective facts to the subjective judgment of the police.

In *Terry v. Ohio*, the Supreme Court held that "the scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point

---

[2]    The District Court and the Panel reference the October 20, 2020, motions hearing transcript, which is cited herein by "Tr." followed by the page number of the original transcript.

[3]    Other courts will inevitably interpret the judgment to mean that conduct that an officer characterizes as a "hand to hand transaction" signifies a drug sale, regardless of the objective facts underlying that characterization. As a result, additional facts in a case – such as the high crime nature of the area and a furtive movement – will be superfluous to the determination of reasonable suspicion because a crime will have already been established. The panel's judgment therefore effectively carves out a "hand to hand" exception to the Fourth Amendment.

the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." 392 U.S. at 21 (1968) (citations omitted). Moreover, in making an assessment of reasonableness, "it is imperative that the facts be judged against an objective standard." *Id.* This Court has likewise held that "[r]easonable suspicion requires that, based on the totality of the circumstances, an officer have 'a particularized and *objective* basis for suspecting the particular person stopped of criminal activity.'" *United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007) (emphasis added) (citing *Cortez*, 449 U.S. at 417).

Neither the District Court nor the Panel heeded *Terry*'s command to independently determine whether the objective facts underlying the officer's subjective characterization of the evidence actually established reasonable articulable suspicion of a crime. By the officer's own admission, they did not.

Officer Jackson testified that his own experience had taught him that a hand to hand transaction involves two people talking, an exchange of money, retrieval of an item from a stash, and "secretive hand movement" to pass the retrieved item. Appx.219, 222. The objective facts of this case did not involve

money or a stash, or any component of the sequence of events that the officer said would signify the sale of drugs.

Indeed, Officer Jackson ultimately testified that he did not actually see money passed. Officer Jackson was asked, "[I]n this situation it sounds like what you are saying is, the transaction that you observed, you are assuming it was a sale. Right?" and he answered, "It appeared." Counsel then asked, "It's an assumption. Right?" and Jackson answered, "Right." Appx.313. Jackson then answered the explicit question, "You don't know if there was money," by stating, "That's correct." *Id.*

The presence of money is important because it would represent a critical objective fact making up at least one part of the equation signifying that a particular "hand to hand transaction" was criminal. *See Pennsylvania v. Dunlap,* 555 U.S. 964 (2008) (Roberts, C.J., dissenting from denial of certiorari) (explaining that "the 'classic' drug transaction is a hand-to-hand exchange, on the street, of cash for small objects"). A second objective fact in the equation would be that after receiving money, there is the passing of "small objects," or even an unknown object retrieved from a stash location – neither of which occurred here.

It bears emphasis that Officer Jackson's direct testimony was "that it *appeared* that [Mr. Douglas] *could have* given some sort of U.S. currency."

8

Appx.238 (emphasis added). Subjective testimony about how something "appeared" or what "could have" occurred is not what *actually occurred* and can never be a basis for reasonable suspicion. Such evidence is essentially a good faith belief of the police officer – that is, it is evidence of what the officer honestly thought he "could have" seen, and is not an objective fact capable of independent review. The Supreme Court has admonished that "simple 'good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police.'" *Terry*, 392 U.S. at 22 (citing *Beck v. Ohio*, 379 U.S. 89, 97 (1964)).

Demonstrating the suggestive force of the mantra, "hand to hand transaction," the concurrences respectively ruled that Officer Jackson witnessed an exchange of "paper money" and "apparent money" for a backpack despite the objective absence of money in the record.[4]

---

[4] Judge Randolph posited a scenario where "paper money changes hands – or, from that distance, Officer Jackson thinks he sees U.S. currency changing hands, although he is not 100% sure." *Douglas*, 72 F.4th at 334 (Randolph, J., concurring). Judge Rogers ruled that "Douglas hurriedly concealed the object [the backpack] he had received from his associate, and in return handed over what appeared to be 'U.S. currency'. . ." *Douglas*, 72 F.4th at 339 (Rogers, J. , concurring (citing Tr. at 30)). But the record unequivocally shows that Jackson could not say there was money.

As the dissent points out, "the District Court did not credit that Officer Jackson witnessed an exchange of currency." *Douglas*, 72 F.4th at 341 (Wilkins, J., dissenting). The District Court ruled only that the officer was "familiar with hand-to-hand narcotics transactions" and that "in his experience bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack." *See Williams*, 507 F. Supp. 3d at 197 (citing Tr. 17-18). Distilled to its essence, the District Court relied upon the officer's subjective belief – his hunch – based on vague unparticularized instances in which he had seen a gun in a bag, to conclude that the bag Mr. Douglas received contained a gun.

Officer Jackson essentially said that when he previously had seen bulk transfers of drugs, it was "usually" in a car or building, and when he previously had seen the transfer of a firearm, it was "usually" in a bag. But

---

Officer Jackson was asked, "You just know it was a white piece of paper?" and he answered, "I didn't say white piece of paper. I just said white colored object." Appx.297. He was subsequently asked, "You said 'object' today. I just want to be clear. You are not saying you could tell it was paper," and he answered, "That's correct." Appx.314.

Later, Jackson was asked, "Well I don't want to say – the two choices are 100% or 0%. It sounds like you are saying that really don't know what it was," and he responded, "That's correct. I just can't say." Appx.299. The follow-up question was, "Okay. So you are not 80% sure [it was money]?" and he answered, "I can't say." *Id*. He was then asked, "You just can't say one way or the other," and he answered, "I can't say; that's correct." *Id*.

he did not provide an objective fact that would make it reasonable to conclude that that when he saw a car or a building, it likely contained bulk drugs, or when saw a bag, it likely contained a gun. Moreover, the District Court did not draw from the officer's experience a single inference about bags containing guns (or drugs) or a "sequence of events" or modus operandus that could give rise to a reasonable inference that the receipt of a backpack here – or in any other case – would indicate the presence of a gun (or drugs). In the absence of such evidence, there was simply no "particularized and objective" factual basis for finding reasonable suspicion to believe that the backpack in this case contained a gun. *Cortez,* 449 U.S. at 417. As a result, the Panel judgment ratifies subjective conclusions and "inchoate and unparticularized" suspicions that this Court and the Supreme Court have eschewed. *Sokolow,* 490 U.S. at 7; *Terry*, 392 U.S. at 27; *Goddard*, 491 F.3d at 462.

Judge Randolph's concurrence advances an additional problematic basis for justifying reasonable suspicion that the other members of the panel explicitly disavow. Judge Randolph rules that in addition to the reasons provided by the District Court, Mr. Douglas's age along with his presence in the Fifth District at "a specific location – the walkway in the 2300 block of

15th Street – known for criminal transactions,"[5] made the passing of a "book bag" more suspicious than if carried out by an elementary school girl or if it had occurred "in the Library of Congress." *Douglas*, 72 F.4th at 336 (Randolph, J., concurring in judgment) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).[6] According to Judge Randolph, it was particularly significant that Mr. Douglas "appear[ed] to be the age of those who commit the most street crimes, especially drug and firearms crimes." *Id.* (citing James

---

[5]    Officer Jackson testified that he had previously stopped someone at the walkway in the 2300 block of 15th Street.

   According to MPD statistics, in all of 2020, there were 11,390 people stopped in the Fifth District. *See* opendata.dc.gov – Police Stop Data. Of those, 32 people were stopped in 2300 block of 15th Street, NE, of whom only seven were arrested – two of whom were Mr. Douglas and Mr. Williams in this very case, which was the only arrest involving a firearm on that block in 2020. *Id.;* MPD Adult Arrests (2013-2021), Metropolitan Police DC, https://mpdc.dc.gov/publication/mpd-adult-arrests-2013-2021 (using the Arrests by Year 2020 data set, filtering "Arrest Charge" to be only "Weapons Violations," filtering "Offense Location PSA" to be only "505," and then using State Plane Coordinate System (earthpoint.us) and entering the "Offense GeoX" and "Offense GeoY" under the Maryland State Plane system to calculate a more precise Longitude and Latitude, then using those coordinates in Google Maps to determine the approximate Block Location; determining the "Arrest Charge" by looking at the "Charge Description" column*). This data suggests that police stop many more people than they arrest on the 2300 block of 15th Street, NE.

[6]    Again, as between two locations, it may be that one is more or less crime-ridden in relation to the other based on historical data. But their *relative* historical consistency with crime, does not make objectively innocent conduct at either location suspicious.

Q. Wilson & Richard J. Herrnstein, *Crime & Human Nature* 126, 129 (1985);

Jeffery T. Ulmer & Darrell Steffensmeier, *The Age and Crime Relationship:*

*Social Variation, Social Explanations*, *in The Nurture Versus Biosocial*

*Debate in Criminology: On the Origins of Criminal Behavior and Criminality*

377, 378 (Kevin M. Beaver, J.C. Barnes, & Brian B. Boutwell eds., 2014).[7] But

age is not a factor that courts have recognized as a relevant basis for

reasonable suspicion absent some particularized basis. *See, e.g., United States*

*v. Robert L.*, 874 F.2d 701, 705 (9th Cir. 1989) ("Age, like race, is an immutable

trait possessed by a large number of persons that are completely innocent of

any wrongdoing… without more it falls far short of creating the articulable

suspicion necessary for an investigatory detention").[8]

_____

[7]    Judge Randolph estimated Mr. Douglas to be "about 30 years old." *Douglas*, 72 F.4th at 334 (Randolph, J., concurring in judgment). The fact of Mr. Douglas's age was not a finding that the district court made or was even asked to make and should not have informed the judgment affirming the District Court opinion. *See In re Sealed Case*, 552 F.3d 841, 845 (D.C. Cir. 2009) ("[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and ... the Court of Appeals should not ... resolve[ ] in the first instance [a] factual dispute which had not been considered by the District Court." (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 291-92 (1982)))..

[8]    Judge Randolph's assertion that 30-year-olds "commit the most street crimes" is refuted by a source he cites for this claim. In one of the passages upon which Judge Randolph relies, the authors state that "a significant portion of U.S. national crime rate trends over time can be explained by

13

In any event, the Fourth Amendment does not ask what categories or groups of people fit a profile more consistent with people who historically have been arrested for crimes. Instead, Fourth Amendment inquiry is strictly focused on whether police have a "particularized and objective basis for suspecting the particular person" of criminal activity based on the conduct the police observe. *Cortez,* 449 U.S. at 17; *see also Ornelas v. United States,* 517 U.S. 690, 696 (1996) ("The principal components of a determination of reasonable suspicion or probable cause will be the *events which occurred* leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." (emphasis added)). The Panel's judgment deviates from this standard, especially since the mundane act of passing a backpack for an unknown object is not objectively criminal conduct, even in a high crime area by a 30-year-old and even when the backpack is thereafter concealed. Reconsideration is necessary to correct the factual and legal errors flowing from the Panel's flawed analysis and to ensure consistency with governing Supreme Court and Circuit precedent.

––––––––––––

fluctuations in the proportion of the population in the crime-prone age group of 15– to 24-year-olds." *See* Ulmer & Steffensmeier, *supra* at 378.

**II.    The Panel's Judgement Is In Direct Conflict With the Long Line of Cases In This Circuit Holding that Furtive Conduct Is Relevant In a Reasonable Suspicion Analysis Only If that Conduct Is Undertaken In Response To the Police – Otherwise The Conduct Is Simply An Assertion of Privacy To Which Every Citizen Is Entitled.**

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351–52 (1967) (citing *Lewis v. United States*, 385 U.S. 206, 210 (1967); *United States v. Lee*, 274 U.S. 559, 563 (1927)). "But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* (citing *Rios v. United States*, 364 U.S. 253 (1960); *Ex parte Jackson*, 96 U.S. 727, 733, (1877)). Indeed, "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822–23 (1982) (citing *Robbins v. California*, 453 U.S. 420, 427 (1981), *overruled on other grounds by United States v. Ross*, 456 U.S. 798 (1982)).

There was no dispute that Mr. Douglas did not remove his coat or conceal his backpack under it in response to the police. These lawful actions did not and could not contribute to reasonable suspicion of a crime. Indeed, the Fourth Amendment allows every citizen – regardless of whether they are present in a high or low crime area – to keep their personal property from

15

public view. *See Castle*, 825 F.3d at 630 (holding that "fact that [furtive gestures] took place in a residential neighborhood plagued by drug use did not allow the police officers to ignore the dictates of the Fourth Amendment" (citing *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997)); *see also United States v. Gibson*, 19 F.3d 1449, 1452 (D.C. Cir. 1994) ("The Fourth Amendment stands in the way of the police arresting people simply because they appear suspicious and may be hiding something.").

As the dissent recognizes, in this Circuit there is an "unbroken line of authority holding that 'furtive gestures [connoting concealment] 'are significant only if they were undertaken in response to police presence.'" *Douglas*, 72 F.4th at 342 (Wilkins, J., dissenting) (quoting *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003) (quoting *United States v. Edmonds*, 240 F.3d 55, 61-62 (D.C. Cir. 2001) (quoting *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000) (cleaned up)). The Panel's affirmance of the District Court finding that Mr. Douglas's "concealment" of his bag under his coat was a "furtive" gesture adding to the calculus establishing reasonable suspicion in this case rends asunder this "unbroken line of authority."

Judge Randolph rules without qualification that "efforts at concealment" contribute to reasonable suspicion. *Douglas*, 72 F.4th at 337

(Randolph, J., concurring in judgment). Judge Rogers similarly holds without qualification that "hurriedly conceal[ing]" an object is part of the "whole picture" that establishes reasonable suspicion. *Id.* at 339 (Rogers, J., concurring in judgment). These rulings are in direct conflict with the law of this Circuit because no part of Mr. Douglas's "concealment" was "in response to police presence." *Castle*, 825 F.3d at 629. The government did not so much as allege that Mr. Douglas had awareness of the police in the area. In fact, Officer Jackson's observations in plain clothes from his undercover location depended on citizens *not* realizing his presence. Appx.220.

Judge Randolph's suggestion that Mr. Douglas's attempt to conceal his bag was evidence in itself that he had knowledge of a "high police presence" in the area is also contrary to the law in this Circuit. In *Castle*, this Court ruled, "When putative police evasion or an alleged furtive gesture is what provokes police suspicion, our precedent requires that the Government proffer evidence, *apart from that behavior or gesture*, from which an officer could reasonably have inferred that the individual in question was aware of the recognizable police presence and was responding to it." *Castle*, 825 F.3d at 638 (emphasis in original) (citing *Brown*, 334 F.3d at 1168; *Johnson*, 212 F.3d at 1316–17).

17

This Court further held that a suspect's knowledge of police presence is "critical" in order for a court to consider furtive conduct as even one part of the totality of the circumstances supporting reasonable suspicion. *Id.* at 636-37. Where the government fails to prove such knowledge, any purportedly furtive conduct has no bearing in the reasonable suspicion analysis. *Id.* at 637. *See als*o *Brown*, 334 F.3d at 1168 ("It is true that 'furtive gestures 'are significant only if they were undertaken in response to police presence,' [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer.'" (citing *Edmonds,* 240 F.3d at 61 (quoting *Johnson,* 212 F.3d at 1316)).

Where a person is not concealing something in response to police, he is simply exercising his right to privacy and "the police cannot conclude that merely because an object or a transaction is not openly displayed, it is necessarily illegal." *United States v. Green*, 670 F.2d 1148, 1152 (D.C. Cir. 1981). The Fourth Amendment guarantees the right to conceal one's property and does not allow law enforcement to attach any significance to a person placing his own property out of sight, whether it is by shoving it into his pants as in *Johnson,* bending to drop it under a U-Haul truck as in *Castle*, or placing it under his coat as appellant did here. Because the District Court's opinion depended on an act of concealment undertaken with no awareness of the

presence of police, and the Panel's judgment explicitly relied upon this factor as part of the totality of circumstances finding reasonable suspicion, rehearing or rehearing en banc is necessary for Circuit consistency on this critical aspect of Fourth Amendment jurisprudence.

## CONCLUSION

For the foregoing reasons, and those stated in appellant's briefs, this Court should grant rehearing or en banc rehearing, reverse the Panel's decision, and conclude that Mr. Douglas was seized without reasonable suspicion.

Respectfully submitted,

A.J. Kramer
Federal Public Defender

_____ /s/ _____
Tony Axam, Jr.
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500
tony_axam@fd.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Petition for Rehearing and Rehearing En Banc was prepared in Century Schoolhouse 14-point font pursuant to Fed. R. App. P. 35(b)(2)(A) and contains 3,579 words.

_____/s/_____

Tony Axam, Jr.
Assistant Federal Public Defender

# ADDENDUM

1.    **Certificate as to Parties, Ruling and Related Cases**

2.    ***United States v. Williams***, **507 F. Supp. 3d 181 (D.D.C. 2020),** ***aff'd sub nom. United States v. Douglas***, **72 F.4th 332 (D.C. Cir.  2023)**

3.    ***United States v. Douglas***, **72 F.4th 332 (D.C. Cir. 2023)**

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), defendant-appellant Theodore Douglas hereby states as follows:

### A.        <u>Parties and Amici:</u>

This appeal arises from a criminal conviction of defendant-appellant Theodore Douglas by plaintiff-appellee, the United States of America. There are no intervenors or *amici.*

### B.        <u>Rulings Under Review:</u>

This is an appeal from the judgment of the District Court (Honorable Carl J. Nichols) entered May 4, 2021, imposing sentence after conviction for one count of possession of a firearm by a person previously convicted of a crime punishable by greater than one year in prison in violation of 18 U.S.C. § 922(g). In this appeal, Mr. Douglas seeks review of the District Court's December 10, 2020 Order and Memorandum Opinion denying Mr. Douglas's motion to suppress evidence under the Fourth Amendment. The District Court's opinion is reported at *United States v. Williams*, 507 F. Supp.3d 181 (D.D.C. 2020).

**C.    <u>Related Cases</u>:**

There currently are no related cases. On May 7, 2021, the District Court granted the government's motion to dismiss without prejudice the case of co-defendant Tavonte Williams.

The Panel opinion is reported at *United States v. Douglas*, 72 F.4th 332 (D.C. Cir. 2023).

United States v. Williams, 507 F.Supp.3d 181 (2020)
114 Fed. R. Evid. Serv. 261

USCA Case #21-3032     Document #2013488        Filed: 08/21/2023     Page 24 of 53

507 F.Supp.3d 181
United States District Court, District of Columbia.

UNITED STATES of America,
v.
Tavonte WILLIAMS, et al., Defendants.

Criminal Action No. 1:20-cr-00121 (CJN)
|
Signed 12/10/2020

**Synopsis**
**Background:** In prosecution for unlawful possession of a firearm and ammunition, government moved to admit other crimes and impeachment evidence, defendants' moved to suppress evidence, and one defendant moved to sever his trial from the other defendant's trial.

**Holdings:** The District Court, Carl J. Nichols, J., held that:

[1] exclusion of other crimes and bad-acts evidence was not warranted for irrelevance, due to defendant being willing to stipulate to the fact that he had been previously convicted;

[2] prior firearm conviction, evidence recovered from defendant's phone and online account, text message conversations, and an image sent between defendants were admissible under rule governing prior crimes and bad-acts evidence;

[3] evidence of two prior convictions were admissible to impeach defendant's testimony;

[4] defendant failed to establish a reasonable probability that proffered exculpatory evidence would be forthcoming, as required to establish prima facie case for severance;

[5] police officer's suspicion that criminal activity was afoot was reasonable, as required to justify an investigatory stop;

[6] frisk of defendant was reasonable under 🔖 *Terry*, and thus suppression of firearm found and seized during the search was not warranted; and

[7] suppression of a police officer's identification of defendant was not warranted under the Due Process Clause.

Government's motion granted in part and denied in part.

Defendants' motions denied.

**Procedural Posture(s):** Pre-Trial Hearing Motion.

West Headnotes (57)

**[1]**     **Criminal Law** 🔑 Relevancy in General
          **Criminal Law** 🔑 Showing bad character or criminal propensity in general
          Convictions are supposed to rest on evidence relevant to the crime charged, not on evidence of other, unrelated bad acts suggesting nothing more than a tendency or propensity to engage in criminality.

          1 Case that cites this headnote

**[2]**     **Criminal Law** 🔑 Purposes for Admitting Evidence of Other Misconduct
          **Criminal Law** 🔑 Showing bad character or criminal propensity in general
          Evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's character; however, that evidence is admissible for any non-propensity purpose, including to establish motive, intent, plan, knowledge, or absence of mistake. Fed. R. Evid. 404(b).

          1 Case that cites this headnote

**[3]**     **Criminal Law** 🔑 Other Misconduct as Evidence of Offense Charged in General
          Rule against introducing character evidence is not based on the idea that a defendant's character is irrelevant; rather, it is based on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds. Fed. R. Evid. 404(b).

**[4]**     **Criminal Law** 🔑 Showing bad character or criminal propensity in general

Rule governing evidence of other crimes, wrongs, or acts only prohibits the admission of other crimes evidence in one circumstance-- when the evidence is being introduced to demonstrate that the that the defendant's acts conformed with his character. Fed. R. Evid. 404(b).

[5]    **Criminal Law** 👈 Showing bad character or criminal propensity in general

**Criminal Law** 👈 Prejudicial effect and probative value

A two-prong test determines whether evidence of prior crimes is admissible: first, the evidence must be probative of a material issue other than character; second, the evidence is subject to a balancing test, in which the evidence's probative value must not be substantially outweighed by its prejudicial effect. Fed. R. Evid. 404(b).

[6]    **Criminal Law** 👈 Necessity that intent be in issue

**Criminal Law** 👈 Other Misconduct Showing Knowledge

**Criminal Law** 👈 Order of Proof

The government is allowed to introduce evidence of other crimes or bad-acts evidence in the government's case-in-chief in anticipation that a defendant will deny intent or knowledge. Fed. R. Evid. 404(b).

[7]    **Criminal Law** 👈 Necessity for evidence

Exclusion of other crimes and bad-acts evidence was not warranted for irrelevance, due to defendant being willing to stipulate to the fact that he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, in prosecution for unlawful possession of a firearm and ammunition, where the evidence was being offered to demonstrate that the defendant knowingly possessed a firearm, rather than solely to prove that defendant had a prior conviction. Fed. R. Evid. 404(b).

[8]    **Criminal Law** 👈 Weapons and explosives

**Criminal Law** 👈 Weapons and explosives

Prior firearm conviction was admissible under rule governing other crimes or bad-acts evidence, in prosecution for unlawful possession of a firearm and ammunition, where the prior gun possession conviction was relevant to demonstrate that defendant was familiar with guns, and that his possession of a gun at the time of his arrest was not an inadvertent mistake. Fed. R. Evid. 404(b).

[9]    **Criminal Law** 👈 Remoteness

Probative value of ten-year-old conviction for possession of a firearm was substantially outweighed by potential prejudicial effect, in prosecution for unlawful possession of a firearm and ammunition; conviction was stale. Fed. R. Evid. 404(b).

[10]    **Criminal Law** 👈 Weapons and explosives

**Criminal Law** 👈 Weapons and explosives

Images, videos, and text messages recovered from defendant's phone and online account were admissible to show knowledge and absence of mistake, under rule governing evidence of prior crimes or bad-acts, in prosecution for unlawful possession of a firearm and ammunition, where a picture showed defendant holding a gun and a video showed the defendant shooting a gun. Fed. R. Evid. 404(b).

[11]    **Criminal Law** 👈 Photographs arousing passion or prejudice; gruesomeness

Probative value of picture recovered from defendant's phone was substantially outweighed by potential unfair prejudice, in prosecution for unlawful possession of a firearm and ammunition, where the picture had been taken approximately 14 years prior, did not demonstrate that defendant was currently familiar with firearms, and did little to show knowledge or absence of mistake in regards to

United States v. Williams, 507 F.Supp.3d 181 (2020)
114 Fed. R. Evid. Serv. 261

USCA Case #21-3032    Document #2013488        Filed: 08/21/2023    Page 26 of 53

a firearm recovered from defendant's backpack when he was arrested. Fed. R. Evid. 404(b).

**[12]**  **Criminal Law**  🔑  Weapons and explosives
**Criminal Law**  🔑  Weapons and explosives
**Criminal Law**  🔑  Telephone records

Text message conversations recovered from defendant's phone were admissible to show knowledge or absence of mistake, under rule governing other crimes or bad-acts evidence, in prosecution for unlawful possession of a firearm and ammunition, where in each conversation, a contact sent the defendant a photograph or photographs of firearms for sale, and the defendant responded by either inquiring about the cost or offering a price for the weapon, showing that within two months of his arrest the defendant had been seeking to purchase a firearm. Fed. R. Evid. 404(b).

**[13]**  **Criminal Law**  🔑  Weapons offenses

Image sent between two defendants was sufficiently similar to charged offense for admissibility under rule governing evidence of prior crimes or bad-acts, in prosecution for unlawful possession of a firearm and ammunition, where the image purportedly showed a defendant on a video call with a masked individual holding a handgun with several accessories, the message containing the image was sent only two months before defendants allegedly participated in a firearm sale, and message showed that the defendants had conversations about firearms. Fed. R. Evid. 404(b).

**[14]**  **Criminal Law**  🔑  Similarity to Crime Charged

A primary requirement when seeking to establish knowledge or intent with prior bad acts is that the evidence must meet a threshold level of similarity to be admissible. Fed. R. Evid. 404(b).

1 Case that cites this headnote

**[15]**  **Witnesses**  🔑  Controlled substances
**Witnesses**  🔑  Time of prior conviction; remoteness

Evidence of two prior convictions was admissible to impeach defendant's testimony, in prosecution for unlawful possession of a firearm and ammunition, where the two drug related convictions were within ten years of defendant's arrest. Fed. R. Evid. 609.

**[16]**  **Indictments and Charging Instruments**  🔑  Construction of rules; presumptions
**Indictments and Charging Instruments**  🔑  Construction of rules; presumptions

Rule permitting joinder of both offenses and defendants is construed broadly in favor of joinder. Fed. R. Crim. P. 8(b).

2 Cases that cite this headnote

**[17]**  **Criminal Law**  🔑  Preferences or presumptions
**Criminal Law**  🔑  Discretion in general

The decision to sever is within the discretion of the trial court, though the balance is struck in favor of joint trials. Fed. R. Crim. P. 14(a).

1 Case that cites this headnote

**[18]**  **Criminal Law**  🔑  Preferences or presumptions

Presumption in favor of joint trials is especially strong where the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, inter alia, with participating in the same illegal acts. Fed. R. Crim. P. 14(a).

1 Case that cites this headnote

**[19]**  **Criminal Law**  🔑  Prejudice; fair trial

Severance should be granted only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Fed. R. Crim. P. 14(a).

1 Case that cites this headnote

**[20]     Criminal Law**     Grounds for Severance or Joinder

Serious risks that a joint trial would compromise a specific trial right or prevent jury from making reliable judgment about guilt or innocence include circumstances where essential exculpatory evidence available to a defendant tried alone is unavailable in a joint trial, where defendants with drastically different degrees of culpability are tried together in a complex case, and where highly prejudicial evidence that is probative of a defendant's guilt is only technically admissible against a codefendant. Fed. R. Crim. P. 14(a).

1 Case that cites this headnote

**[21]     Criminal Law**     Availability of codefendant's testimony at joint trial;  comment on refusal to testify

In deciding whether to sever on the basis of an expected co-defendant's testimony, courts first determine whether the moving co-defendant has established a prima facie case for severance, which requires showing: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed. Fed. R. Crim. P. 14(a).

**[22]     Criminal Law**     Availability of codefendant's testimony at joint trial;  comment on refusal to testify

A failure to demonstrate any one of required elements, to establish a prima facie case for severance based on an expected co-defendant's testimony, is dispositive. Fed. R. Crim. P. 14(a).

**[23]     Criminal Law**     Availability of codefendant's testimony at joint trial;  comment on refusal to testify

**Criminal Law**     Time for proceedings

Once a movant has made showing of prima facie case for severance based on defendant's need for co-defendant's expected testimony, courts must then (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion. Fed. R. Crim. P. 14(a).

**[24]     Criminal Law**     Availability of codefendant's testimony at joint trial;  comment on refusal to testify

When conducting balancing analysis, on a prima facie case for severance based on need for co-defendant's expected testimony, courts consider the extent to which proffered exculpatory testimony could be impeached. Fed. R. Crim. P. 14(a).

**[25]     Criminal Law**     Availability of codefendant's testimony at joint trial;  comment on refusal to testify

Defendant failed to establish a reasonable probability that proffered codefendant's testimony would be forthcoming, as required to establish prima facie case for severance of defendant's trial from codefendant's trial based on defendant's need for codefendant's testimony, in prosecution for unlawful possession of a firearm and ammunition, where the codefendant's promise to testify was conditioned on being tried separately and after the defendant's trial had been completed. Fed. R. Crim. P. 14(a).

**[26]     Criminal Law**     Evidence

To meet burden of establishing prima facie case for severance based on an expected co-defendant's testimony, a defendant must

demonstrate by a reasonable probability that the proffered exculpatory evidence from the expected co-defendant will be forthcoming. Fed. R. Crim. P. 14(a).

1 Case that cites this headnote

**[27]**     **Criminal Law**  🔑  Availability of codefendant's testimony at joint trial;  comment on refusal to testify

Defendant failed to establish that proffered testimony from codefendant would be exculpatory, as required to establish prima facie case for severance in prosecution for unlawful possession of a firearm and ammunition, where the expected co-defendant was expected to testify that an interaction between the defendant and him had nothing to do with a backpack or a firearm recovered from the backpack, but that testimony was likely to be impeached by directly contradictory call logs and the co-defendant's prior conviction. Fed. R. Crim. P. 14(a).

**[28]**     **Criminal Law**  🔑  Disparity in weight of evidence

**Criminal Law**  🔑  Limiting effect of evidence competent only as against one of several defendants

Absent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to be given individual consideration to the defendant. Fed. R. Crim. P. 14(a).

**[29]**     **Criminal Law**  🔑  Evidence admissible only against codefendant;  spillover or compartmentalization

Critical question in determining whether prejudice caused by joinder warrants severance, is whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant. Fed. R. Crim. P. 14.

**[30]**     **Arrest**  🔑  Reasonableness;  reason or founded suspicion, etc

Under 🚩 *Terry*, an officer may, consistent with the Fourth Amendment conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot. U.S. Const. Amend. 4.

**[31]**     **Arrest**  🔑  Reasonableness;  reason or founded suspicion, etc

In determining whether reasonable suspicion exists to conduct a brief investigatory stop under 🚩 *Terry*, courts ask whether a reasonable officer would ascertain that all facts taken together warrant further investigation. U.S. Const. Amend. 4.

**[32]**     **Arrest**  🔑  Reasonableness;  reason or founded suspicion, etc

A reasonable officer can consider a wide range of factors when making determination into whether an investigatory stop was warranted under 🚩 *Terry*. U.S. Const. Amend. 4.

**[33]**     **Arrest**  🔑  Reasonableness;  reason or founded suspicion, etc

For purposes of determining whether an investigatory stop was warranted under 🚩 *Terry*, the reasonable suspicion test is an objective test, and the subjective motivations of a particular officer are irrelevant to the analysis. U.S. Const. Amend. 4.

**[34]**     **Arrest**  🔑  Reasonableness;  reason or founded suspicion, etc

Ultimately, it is the government's burden to provide evidence sufficient to support reasonable suspicion justifying a stop under 🚩 *Terry*. U.S. Const. Amend. 4.

**[35]**   **Arrest** ◆ Particular cases

Police officer's suspicion that criminal activity was afoot was reasonable, as required to justify an investigatory stop under ⚑ *Terry*, where an officer had observed a hand-to-hand transaction involving a backpack, the transaction took place in a high crime area which was known for narcotics sales and violent crime, and an officer observed the person who received the backpack act quickly to conceal whatever was in the bag. U.S. Const. Amend. 4.

**[36]**   **Arrest** ◆ Collective knowledge

**Arrest** ◆ Reasonableness; reason or founded suspicion, etc

An officer making an investigatory stop under ⚑ *Terry* need not have direct personal knowledge of all the facts necessary to give rise to reasonable suspicion; instead, an officer may act on a directive or request from another officer or agency. U.S. Const. Amend. 4.

**[37]**   **Arrest** ◆ Reasonableness; reason or founded suspicion, etc

For purposes of determination of whether an investigatory stop is warranted under ⚑ *Terry*, simply receiving an object from another person is a common occurrence for which there could be many innocent explanations; but even so, the observation of a hand-to-hand exchange would certainly contribute to a reasonable officer's suspicion. U.S. Const. Amend. 4.

**[38]**   **Arrest** ◆ Arrest Distinguished

The point at which an investigative stop becomes an arrest is not marked with a bright line.

**[39]**   **Arrest** ◆ Arrest Distinguished

**Arrest** ◆ Duration of detention and extent or conduct of investigation or frisk

Two general principles govern a ⚑ *Terry* stop and ensure that it does not ripen into an arrest; the stop must last no longer than is necessary to effectuate the purpose of a stop and the officer must employ the least intrusive means reasonably available to verify or dispel the officer's suspicion.

**[40]**   **Arrest** ◆ Arrest Distinguished

**Arrest** ◆ Duration of detention and extent or conduct of investigation or frisk

If a ⚑ *Terry* stop is unduly prolonged or intrusive, it transforms from an investigative stop into an arrest requiring probable cause. U.S. Const. Amend. 4.

**[41]**   **Arrest** ◆ Mode of stop

**Arrest** ◆ Arrest Distinguished

Although handcuffs are generally recognized as a hallmark of a formal arrest, their use does not automatically convert a ⚑ *Terry* stop into an arrest. U.S. Const. Amend. 4.

**[42]**   **Arrest** ◆ Mode of stop

**Arrest** ◆ Arrest Distinguished

Officers can only use handcuffs to effectuate a ⚑ *Terry* stop, without transforming the stop into an arrest, when specific circumstances make it reasonable to do so. U.S. Const. Amend. 4.

**[43]**   **Arrest** ◆ Mode of stop

**Arrest** ◆ Arrest Distinguished

One set of circumstances where handcuffs can be used to effectuate a ⚑ *Terry* stop without the stop being transformed into an arrest is when an officer reasonably fears for his safety and the safety of others; after all, a policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. U.S. Const. Amend. 4.

United States v. Williams, 507 F.Supp.3d 181 (2020)
114 Fed. R. Evid. Serv. 261

USCA Case #21-3032    Document #2013488        Filed: 08/21/2023      Page 30 of 53

**[44]**   **Arrest** 👈 Mode of stop

**Arrest** 👈 Particular cases

Use of handcuffs to restrain detainee did not transform an investigatory stop into an arrest, for purposes of Fourth Amendment analysis, where the arresting officers did not draw their weapons, yell orders, or surround detainee in large numbers, and the officers had reason to suspect that the detainee was armed. U.S. Const. Amend. 4.

**[45]**   **Arrest** 👈 Mode of stop

**Arrest** 👈 Arrest Distinguished

An officer need not be absolutely certain that an individual is armed in order to reasonably fear for his safety and the safety of others, for purposes of determining whether the officer's use of handcuffs transformed a 🚩*Terry* stop into an arrest; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. U.S. Const. Amend. 4.

**[46]**   **Arrest** 👈 Justification for pat-down search

Frisk of defendant was reasonable under 🚩*Terry*, and thus suppression of firearm found and seized during the search was not warranted, in prosecution for unlawful possession of a firearm and ammunition, where the frisking officer reasonably believed the defendant was armed and posed a threat to the safety of the officer and public, and footage showed that the officer lightly touched the back of defendant's jacket just a few times before recognizing the presence of a firearm. U.S. Const. Amend. 4.

**[47]**   **Arrest** 👈 Justification for pat-down search

When an officer conducting a 🚩*Terry* stop reasonably believes the subject is armed and a threat to his safety or the safety of others, the officer is permitted to conduct a limited

protective search to determine whether the person being stopped is in fact carrying a weapon. U.S. Const. Amend. 14.

**[48]**   **Arrest** 👈 Justification for pat-down search

The purpose of a 🚩*Terry* frisk is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. U.S. Const. Amend. 4.

**[49]**   **Arrest** 👈 Duration of detention and extent or conduct of investigation or frisk

Under the plain feel doctrine, a weapon discovered during a 🚩*Terry* frisk may be seized if its contour or mass makes its identity immediately apparent. U.S. Const. Amend. 4.

**[50]**   **Arrest** 👈 Duration of detention and extent or conduct of investigation or frisk

In order to fall within the scope of the plain feel doctrine during a 🚩*Terry* stop, a pat down cannot involve an impermissible manipulation or palpitation of the contours of an object to determine its exact contents. U.S. Const. Amend. 4.

**[51]**   **Arrest** 👈 Duration of detention and extent or conduct of investigation or frisk

**Criminal Law** 👈 Investigatory stop, and search or seizure thereafter

When a protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under 🚩*Terry* and its fruits will be suppressed. U.S. Const. Amend. 4.

**[52]**   **Constitutional Law** 👈 Show-ups

**Criminal Law** 👈 Confrontations at the scene or shortly after offense or arrest

**Criminal Law** 👈 Other particular offenses

Officer's showup identification of defendant was not so unreliable that Due Process Clause required suppression of the showup and any subsequent in-court identifications, in prosecution for possession of a firearm and ammunition, even though the officer's initial description of defendant was generic and became more specific in later descriptions, where the officer's evolving descriptions were not influenced by any other officer, the officer had an opportunity to view the defendant during an alleged illegal firearm sale, the officer did not express any doubts about his identification, the identification occurred from a distance of about twenty yards less than five minutes after officer observed the exchange, and the officer had over twenty years of experience. U.S. Const. Amend. 5.

**[53]**    **Constitutional Law**  👈  Identification
Evidence and Procedures

In determining whether to suppress a witness's identification under the Due Process Clause, a court performs a two-step analysis: first, the court must determine whether the identification procedure was impermissibly suggestive, if the court finds that the procedure was impermissibly suggestive, the court must next decide whether the identification was nonetheless sufficiently reliable to preclude a very substantial likelihood of irreparable misidentification. U.S. Const. Amend. 5.

**[54]**    **Constitutional Law**  👈  Identification
Evidence and Procedures

Determination of whether to suppress a witness's identification under the Due Process Clause involves a balancing test in which courts weigh the degree of suggestiveness against the strength or weakness of factors indicating reliability. U.S. Const. Amend. 5.

**[55]**    **Constitutional Law**  👈  Identification
Evidence and Procedures

In determining whether to suppress a witness's identification under the Due Process Clause, reliability factors include the opportunity of the witness to view the criminal at the time of the crime, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. U.S. Const. Amend. 5.

**[56]**    **Constitutional Law**  👈  Identification
Evidence and Procedures

If a trained law enforcement officer, who is expert in observing criminals, is the individual making the identification, that bolsters the reliability of the identification, in determining whether the Due Process Clause requires suppression of the identification. U.S. Const. Amend. 5.

**[57]**    **Criminal Law**  👈  Illegal arrest, detention, or search

If a show-up identification occurs while the subject is in custody following an illegal stop, the identification must be suppressed as the fruit of the illegal stop.

**Attorneys and Law Firms**

**\*187**  Steven B. Wasserman, U.S. Attorney's Office for the District of Columbia, Washington, DC, for United States of America.

John Peter Marston, Foley Hoag LLP, Washington, DC, for Defendant Tavonte Williams.

Eugene Ohm, Federal Public Defender for the District of Columbia, Washington, DC, for Defendant Theodore B. Douglas.

## <u>MEMORANDUM OPINION</u>

CARL J. NICHOLS, United States District Judge

USCA Case #21-3032      Document #2013488            Filed: 08/21/2023      Page 32 of 53

Defendants Tavonte Williams and Theodore Douglas are each charged with one count of unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Currently before the Court are a series of pretrial motions from both Defendants and the government. The government moves to admit other crimes evidence under Federal Rule of Evidence 404(b) and to impeach Defendants' testimony with their prior convictions under Federal Rule of Evidence 609. *See generally* Government's Motion to Admit Other Crimes Evidence and To Impeach the Defendants' **\*188** with their Prior Convictions ("Gov.'s Mot. to Admit Evid."), ECF 28. Williams moves the court to sever his trial from Douglas's and to suppress an undercover officer's identification of him. *See generally* Williams's Motion to Sever Defendants' Trials ("Williams's Mot. to Sever"), ECF 29; *see also generally* Williams's Motion to Suppress Identification ("William's Mot. to Supp. Id."), ECF 30. Douglas moves to suppress tangible evidence and statements obtained from his arrest and to suppress an undercover officer's identification of him. *See generally* Douglas's Motion to Suppress Tangible Evidence ("Douglas's Mot. to Supp. Evid."), ECF 31; *see also generally* Douglas's Motion to Suppress Identification Testimony ("Douglas's Mot. to Supp. Id."), ECF 33. The Court grants the government's motion in part and denies it in part, and denies Defendants' motions.

### I. Background

On the afternoon of April 22, 2020, the Narcotics and Special Investigations Division ("NSID") of the Metropolitan Police Department ("MPD") conducted an undercover operation in the 2300 block of 15th Street, Northeast, Washington, D.C. *See* Motions Hearing Transcript ("Tr.") at 20. During this operation, an undercover officer, while sitting in an unmarked vehicle, observed an individual (later identified as Defendant Douglas) standing in a walkway between two buildings. Tr. at 30. Officer Jackson testified that he was about fifteen yards from the individual with a clear line of sight. Tr. at 30. Shortly thereafter, another individual (later identified as Defendant Williams) approached Douglas. Tr. at 30. According to Officer Jackson, Williams handed Douglas a black backpack in exchange for what appeared to be money, although Officer Jackson stated that he could not be sure that it was not some other light-colored object. Tr. at 29–30. Officer Jackson observed that Douglas quickly concealed the backpack, placing it on his back and putting his jacket on over it. Tr. at 30. Officer Jackson suspected that he had observed

a transaction involving "either a large quantity of narcotics or possibly a firearm." Tr. at 39. He put a "lookout" over the police radio, describing what he had witnessed and asking for uniformed NSID officers in the area to respond. Govt. Ex. 3.

Responding to Officer Jackson's lookout, two uniformed officers approached Douglas in the same general location where Officer Jackson observed the backpack exchange. Tr. at 139–40. Officer Poupart greeted Douglas and the two other men with whom he was talking, advised Douglas that he was being stopped as part of an investigation, and guided Douglas away from the other two individuals by touching his arm. *See BWC of Ofc. Poupart*, ECF 34-1, at 2:11–2:36. Officer Poupart then placed Douglas in handcuffs and frisked him to determine if he had any weapons on his person. *Id.* Officer Poupart felt what he says he immediately knew to be a firearm in the backpack underneath Douglas's jacket. Tr. at 169–71. Officer Poupart then removed Douglas's jacket and searched the backpack, recovering a Sig Sauer, model P320, .40 caliber semiautomatic handgun with an obliterated serial number, loaded with a single round in the chamber and twelve rounds in a thirteen-round capacity magazine. Shortly after Douglas was stopped, officers stopped Williams and, after receiving word that Douglas's bag contained a firearm, arrested him. *See BWC of Ofc. Gabster*, ECF 35-3.

After being alerted that the suspects had been arrested, Officer Jackson drove to the parking lot where Williams and Douglas were detained. *Id.* at 52–53. From approximately twenty yards away, while **\*189** remaining in his vehicle, Officer Jackson confirmed that Douglas and Williams were the individuals who had been engaged in the backpack exchange. Gov.'s Ex. 3 at 10:28.

In July 2020, a grand jury returned an indictment that charged both Defendants with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g). The Parties filed various motions to admit or suppress evidence, and the Court held an evidentiary hearing on these Motions.

### II. Government's Motion to Admit Other Crimes Evidence and Impeach Defendants with Prior Convictions

USCA Case #21-3032    Document #2013488    Filed: 08/21/2023    Page 33 of 53

## A. Rule 404(b) Evidence

In its Motion to Admit Other Crimes Evidence and Impeach Defendants with Prior Convictions, ECF 28, the government first asks the Court to admit certain Rule 404(b) evidence against both Douglas and Williams. *See generally* Gov.'s Mot. to Admit Evid., ECF 28. Specifically, with regard to Douglas, the government seeks to introduce two prior gun possession convictions; images and videos taken from Douglas's cellphone of him holding and shooting firearms; and two text message conversations, again taken from Douglas's cellphone, in which Douglas inquires about the price of certain firearms. *See id.* The government argues that this evidence is probative of the fact that Douglas knowingly and intentionally possessed the firearm recovered from the backpack he was wearing on the day of his arrest, and that his possession of the firearm was not the result of inadvertence, mistake, or accident. *See id.* at 22. The government also seeks to introduce a screenshot sent from Williams to Douglas, and recovered from Douglas's phone, of a masked man holding a gun while on a video call with Williams. *See id.* at 19. The government argues the screenshot demonstrates that Williams and Douglas had previously discussed and shared images of firearms, which tends to make it more likely that they engaged together in a firearm exchange. *See id.* at 28–29.

**[1]  [2]  [3]**  "Convictions are supposed to rest on evidence relevant to the crime charged, not on evidence of other, unrelated bad acts suggesting nothing more than a tendency or propensity to engage in criminality." *United States v. McGill*, 815 F.3d 846, 878 (D.C. Cir. 2016). Thus, under Rule 404(b), evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character. However, that evidence is admissible for any non-propensity purpose, including to establish motive, intent, plan, knowledge, or absence of mistake. *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000) (citing Fed. R. Evid. 404(b)). The rule against introducing character evidence is not based on the idea that a defendant's character is irrelevant. Rather, it is based "on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985).

**[4]**  Despite Rule 404(b)'s "restrictive[ ]" framing, the D.C. Circuit has noted that it is actually "quite permissive."

*United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*). It only prohibits the admission of other crimes evidence in "one circumstance"—when the evidence is being introduced to demonstrate that the defendant's acts conformed with his character. *Id.*; *see also United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as **\*190** the evidence is not offered *solely* to prove character.").

**[5]  [6]**  A two-prong test determines whether evidence of prior crimes is admissible under Rule 404(b). First, the evidence must be "probative of a material issue other than character." *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir. 1990). Second, the evidence is subject to the Rule 403 balancing test, in which the evidence's probative value must not be "substantially outweigh[ed]" by its prejudicial effect. *Id.* The government is allowed to admit 404(b) evidence in the government's case-in-chief in anticipation that a defendant will deny intent or knowledge. *See United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) (noting that Rule 404(b) other crime evidence "is admissible during the government's case-in-chief if it is apparent that the defendant will dispute the issue").

### 1. Evidence Pertaining to Douglas

**[7]**  Before turning to the specific evidence that the government seeks to introduce against Douglas, the Court addresses Douglas's threshold argument that all of the government's 404(b) evidence against him should be excluded. *See* Douglas's Opp'n to Gov.'s Mot. to Admit Evid., ECF 39, at 4. Douglas insists that the evidence is "irrelevant" because he is willing to stipulate to the fact that he was previously convicted of a crime punishable by imprisonment for a term exceeding one year. *See id.* Douglas relies on *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), in which the Supreme Court held that a district court abused its discretion when it rejected a defendant's offer to stipulate to the element of a prior felony conviction and instead admitted the full record of the prior judgment, despite the fact that the full record raised the "risk of a verdict tainted by improper considerations." *Id.* at 174, 117 S.Ct. 644.

Douglas's reliance on *Old Chief* is inapposite and his argument lacks merit. In *Old Chief*, the government

sought to introduce the facts of a prior conviction "solely to prove the element of prior conviction." *Id.* at 174, 117 S.Ct. 644. Here, in contrast the government seeks to introduce 404(b) evidence not to demonstrate the existence of a prior conviction, but to demonstrate that Douglas knowingly possessed the firearm, another necessary element in a felon-in-possession case involving constructive possession of a firearm, *see United States v. Cassell*, 292 F.3d 788, 792–94 (2002)—and an element to which Douglas has *not* offered to stipulate. The D.C. Circuit has held that prior convictions and evidence of other wrongs are admissible as probative of this knowledge element, even if they would not be admissible simply to prove the element of a prior conviction. *See United States v. McCarson*, 527 F.3d 170, 173 (2008). The 404(b) evidence that the government seeks to introduce is probative of the fact that Douglas knowingly and intentionally possessed the gun.

**[8]  [9]**  Turning to the specific evidence that the government seeks to introduce against Douglas, the government first asks the Court to admit evidence related to two prior convictions. *See* Gov.'s Mot. to Admit Evid., ECF 28, at 5. In one, Douglas pleaded guilty and admitted to possessing a loaded .22 caliber revolver in April 2013; the gun was recovered from his jacket as he fled police near the same location he was arrested in the instant case. *See United States v. Douglas*, No. 2013-CF2-006028, Dkt. May 23, 2013 (D.C. Super. Ct. 2013). In the other, Douglas pleaded guilty on April 7, 2010, and admitted to possessing a .357 caliber firearm recovered from his person on February 17, 2009. *See Maryland v. Douglas*, No. CT090351X, Dkt. **\*191** April 7, 2010 (Md. Prince George's Cir. Ct. 2009). The government states that it will present evidence of these two prior convictions through the judgment and conviction orders in each case and the transcripts of Douglas's plea hearings. *See id.* at 6.

The D.C. Circuit has consistently allowed the admission of other crimes evidence relating to possession of drugs and firearms under Rule 404(b) to demonstrate knowing possession and absence of mistake. *See, e.g.,* *McCarson*, 527 F.3d at 174 (holding two prior possession with intent to distribute convictions and two firearm convictions "were not only relevant; they were also highly probative of ... his constructive possession of the gun and the drugs"); *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (holding that evidence of a prior conviction for distribution of cocaine from a defendant's car "made it substantially

more likely that [the defendant] knew that there was (and intended that there be) crack in the console [of his car]"); *see also United States v. Moore*, 75 F. Supp. 3d 444, 451–52 (D.D.C. 2014) (finding prior unlawful possession of a firearm evidence admissible under Rule 404(b) to show intent or lack of mistake). A prior gun possession conviction is certainly relevant to demonstrate that Douglas was familiar with guns, and that his possession of a gun at the time of his arrest was not an inadvertent mistake.

But Douglas's 2010 conviction lacks the requisite probative value because the ten-year-old conviction is stale under *United States v. Sheffield*, 832 F.3d 296 (D.C. Cir. 2016). Admitting this conviction would therefore unfairly prejudice Douglas. With respect to his 2013 conviction, however, Douglas has failed to show "compelling or unique" evidence of prejudice that would warrant exclusion. *See United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995). And any potential residual risk of prejudice to Douglas can be minimized through the issuance of a limiting instruction to the jury. *See United States v. Douglas*, 482 F.3d 591, 601 (D.C. Cir. 2007) (emphasizing the significance of the district court's instructions to the jury on the permissible and impermissible uses of evidence). Douglas's most recent gun possession conviction is therefore admissible, while the conviction stemming from his 2009 arrest is inadmissible.

**[10]**  The government also seeks to introduce images, videos, and text messages recovered from Douglas's phone and Apple iCloud account. *See* Gov.'s Mot. to Admit Evid., ECF 28, at 4–5. The first is a picture, dated November 19, 2019, of Douglas holding a firearm. *See id.* at 7. The second is a video that Douglas sent in a text message on May 8, 2019, with the caption "My New toy like dat," and which depicts Douglas shooting a firearm. *Id.* at 8. The third is an image that Douglas received in a text message on August 4, 2019, which depicts Douglas with a firearm in one hand and holding up his middle finger to the camera with the other. *Id.* Douglas responded to that message by writing, "Man this like 06," *id.* at 10, which both parties construe to mean that the picture was taken in 2006. *Id.* at 28.

The government argues that these images demonstrate Douglas's familiarity with guns, thereby making it more likely that Douglas knowingly possessed the firearm found in the backpack. Gov.'s Mot. to Admit Evid., ECF 28, at 24. To be sure, the video of Douglas shooting a gun and the picture of him holding a gun from 2019 are probative of

knowledge and absence of mistake. *See* 🚩*McCarson*, 527 F.3d at 174. Both tend to make it more likely that Douglas knew of the firearm in his backpack. And because Douglas has not demonstrated that the probative value of the image is "substantially outweigh[ed]" by **\*192** the prejudicial effect, these images are admissible. *Miller*, 895 F.2d at 1435.

**[11]** In contrast, the image from 2006 lacks the same probative value. Much like his 2010 conviction, this image is stale under 🚩*Sheffield*. A picture from 14 years ago does little to demonstrate that Douglas is *currently* familiar with firearms and thus does little to show knowledge or the absence of mistake, especially when the more recent videos and images demonstrate the same thing. *See* 🚩*Sheffield*, 832 F.3d at 308.

**[12]** Finally, the February 2020 text message conversations are admissible. *See* Gov.'s Mot. to Admit Evid., ECF 28, at 12–18. In each conversation, a contact sent Douglas a photograph or photographs of firearms for sale. *Id.* at 15–16. Douglas responded by either inquiring about the cost or offering a price for the weapon. *Id.* at 13, 15. The Court agrees with the government that these messages are probative of knowledge or absence of mistake because they establish that within two months of his arrest, Douglas was seeking to purchase a firearm—the very act that Officer Jackson believes he witnessed. *See id.* at 25. And because Douglas has not shown that he will suffer unfair prejudice from their admission, the Court finds that the text message exchanges are admissible under Rule 404(b).

**2. Evidence Pertaining to Douglas and Williams**

**[13]** The final piece of 404(b) evidence that the government seeks to introduce pertains to both Williams and Douglas. *See* Gov.'s Mot. to Admit Evid., ECF 28, at 28. On February 26, 2020, at Douglas's request, Williams sent a screenshot of himself on a video call (much like a Facetime). *See id.* Williams's face appears in a small box on the left-hand corner of the image, and he appears to be speaking to a masked individual holding a handgun with several accessories. *See id.* The government argues that this exchange demonstrates a relationship between Williams and Douglas that includes communicating about firearms and therefore makes it more likely that they would be involved in an intentional exchange of a firearm. *See id.* at 6.

**[14]** For their part, Defendants argue that the texted screenshot is insufficiently similar to the charged offense. *See* Williams's Opp'n to Gov't Mot. to Admit Evid., ECF 38, at 6. A primary requirement when seeking to establish knowledge or intent with prior bad acts is that the evidence must meet a threshold level of similarity to be admissible.

*See* 🚩⚠️*United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003); *see also* 🚩*Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 494 (7th Cir. 1998) ("The other act must be similar enough and close enough in time to be relevant to the matter at issue."). "Otherwise, the evidence would lack probative value of intent, and instead would be more in nature of propensity." *Mazloum v. D.C. Metro. Police Dep't*, 517 F. Supp. 2d 74, 81 (D.D.C. 2007) (finding that defendant's violent verbal threats against his wife two days prior to the alleged assault and battery on another person were not admissible because they were offered as propensity evidence, and verbal threats are "fundamentally different" than actual physical force). Defendants argue that the image is too dissimilar from the alleged criminal activity because it is not the same gun (or type of gun) and neither Williams nor Douglas is even depicted holding the gun. *See* Williams's Opp'n to Gov't Mot. to Admit Evid., ECF 38, at 6.

The Court concludes that this texted screenshot survives the similarity requirement of Rule 404(b). The message is close enough in time to the alleged crime to be **\*193** relevant; after all, it was sent just two months before the alleged exchange. *See* Gov.'s Mot. to Admit Evid., ECF 28, at 28. And, most significantly, the texted screenshot demonstrates that the same people, Williams and Douglas, have had prior conversations about firearms—the subject of the alleged exchange. The probative value of the image is also not "substantially outweigh[ed]" by the prejudicial effect. *Miller*, 895 F.2d at 1435. Although Defendants argue that a photo depicting a masked figure with a menacing gun is "highly inflammatory," the image is important to the government's case. Williams's Opp'n to Gov't Mot. to Admit Evid., ECF 38, at 6. It establishes that Defendants had previously discussed firearms and makes it more likely that both Defendants intentionally possessed the firearm that was allegedly exchanged. The best way of ensuring that any risk of prejudicial effect is minimized is not by exclusion, but by issuing a limiting instruction to the jury. *See* 🚩*Douglas*, 482 F.3d at 601.

**B. Rule 609 Evidence**

Rule 609 of the Federal Rules of Evidence permits the admission of a defendant's prior convictions for purposes of impeachment, as long as the "crime ... was punishable by death or by imprisonment for more than one year" and "the probative value of the evidence outweighs its prejudicial effect." Fed. R. Evid. 609(a)(1). The Rule sets a higher bar for felonies where "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later." Fed. R. Evid. 609(b). In those instances, admission is appropriate only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1).

**[15]** With respect to Williams, the government seeks to impeach his testimony with two prior convictions, both from 2017—one for distribution of a controlled substance and another for unlawful possession of liquid PCP. *See* Gov.'s Mot. Admit Evid., ECF 28, at 31. Williams does not oppose the government's use of these prior convictions. Both convictions fall within the ten-year period of William's arrest, and the probative value of the convictions outweighs any prejudicial effect from their admission. The government may therefore use these two convictions for the purpose of impeaching Williams's testimony.

With respect to Douglas, the government seeks to impeach his testimony with the same convictions that it seeks to introduce under Rule 404(b). *See* Gov.'s Mot. to Admit Evid., ECF 28, at 31. The Court has already decided that the jury may hear about the 2013 conviction under Rule 404(b), but not the 2010 conviction, and thus need not reconsider that analysis in connection with Rule 609. *See* *United States v. Moore*, 75 F. Supp. 3d 444, 456 (D.D.C. 2014) (collecting cases in which courts declined to find prejudice based on the Government's additional use of a prior conviction for Rule 609 purposes when the court had already permitted the prior conviction for use in the Government's case-in-chief under Rule 404(b)). The government may therefore use Douglas's 2013 conviction, but not his 2010 conviction, to impeach his testimony under Rule 609.

**III. William's Motion to Sever**

Williams moves the Court to sever his trial from Douglas's. *See generally* Williams's Mot. to Sever, ECF 29. Williams first argues that the trials should be severed because Douglas has agreed to provide exculpatory testimony for Williams if the trials are conducted separately and Williams's trial happens second. *See* Williams's Mot. to Sever, ECF 29, at 1. Williams also contends that because the evidence against Douglas is so "damning **\*194** and vivid," a jury would be unable to appropriately compartmentalize the evidence introduced against Douglas, and its introduction would unfairly prejudice Williams. *See id.*

**[16]** Federal Rule of Criminal Procedure 8(b) permits joinder of both offenses and defendants. *United States v. Perry*, 731 F.2d 985, 989 (D.C. Cir. 1984). The Rule directs that "[t]wo or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). The D.C. Circuit construes Rule 8(b) broadly in favor of joinder. *United States v. Nicely*, 922 F.2d 850, 853 (D.C. Cir. 1991). And it has cautioned that it is "difficult to prevail on a claim that there has been misjoinder under Rule 8(b)." *Id.*

**[17]** **[18]** But even if joinder of defendants and offenses is proper under Rule 8(b), Federal Rule of Criminal Procedure 14(a) allows a court to sever defendants or counts, if the joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). The decision to sever is within the discretion of the trial court, though the balance is "struck in favor of joint trials." *United States v. Bruner*, 657 F.2d 1278, 1289–90 (D.C. 1981) (quoting *United States v. Hines*, 455 F.2d 1317, 1334 (D.C. Cir. 1972)). This presumption is especially strong where "the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, *inter alia*, with participating in the same illegal acts." *United States v. Sutton*, 801 F.2d 1346, 1363 (D.C. Cir. 1986).

**[19]** **[20]** As a result, Rule 14 severance should be granted only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534,

USCA Case #21-3032      Document #2013488          Filed: 08/21/2023      Page 37 of 53

540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Serious risks identified by the Supreme Court include circumstances where essential exculpatory evidence available to a defendant tried alone is unavailable in a joint trial, where defendants with drastically different degrees of culpability are tried together in a complex case, and where highly prejudicial evidence that is probative of a defendant's guilt is only technically admissible against a codefendant. 🚩 *Id.*

**[21]  [22]  [23]  [24]** As to Williams's first argument, in deciding whether to sever on the basis of an expected co-defendant's testimony, courts in this circuit first determine whether the moving co-defendant has established a *prima facie* case for severance, which requires showing: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed." *United States v. Kayode*, 254 F.3d 204, 210 (D.C. Cir. 2001) (quoting 🚩 *United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989)). "A failure to demonstrate any one of these elements is dispositive." 🚩 *United States v. Washington*, 12 F.3d 1128, 1133 (D.C. Cir. 1994). And once a movant has made this showing, courts must then "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion." *Kayode*, 254 F.3d at 210–11 (quoting 🚩 *Ford*, 870 F.2d at 731). When conducting this balancing analysis, **\*195** courts also consider "the extent to which proffered exculpatory testimony could be impeached." 🚩 *Ford*, 870 F.2d at 732–33.

**[25]  [26]** Williams has failed to demonstrate the fourth prong of the *prima facie* inquiry. To meet his burden Williams must demonstrate by "a reasonable probability" that the proffered exculpatory evidence from Douglas will be forthcoming. 🚩 *Id.* Williams claims that he has met this burden because Douglas assured Williams's counsel that Douglas "will unequivocally testify if Mr. Williams is tried separately, and after Mr. Douglas' case is completed." Williams's Mot. to Sever, ECF 29, at 8.

But courts, including the D.C. Circuit, have consistently held that a movant fails to meet this burden if the offer is conditioned on a specific order in which the defendants will

be tried. *See, e.g.,* 🚩 *Ford*, 870 F.2d at 731; 🚩 *United States v. Blanco*, 844 F.2d 344, 353 (6th Cir. 1988). In 🚩 *Ford*, the movant's co-defendant stated through counsel that he would testify in favor of the movant, but, as here, the offer was conditioned on the co-defendant being tried first. The D.C. Circuit found severance inappropriate, reasoning that Rule 14 should not be read "as a mechanism for alleged co-conspirators to control the order in which they are tried." 🚩 *Ford*, 870 F.2d at 731 (quoting 🚩 *Blanco*, 844 F.2d at 353).

Douglas's offer to testify is similarly conditioned on Douglas's trial occurring first. Williams admits that "while Mr. Douglas will not testify at a joint trial (or it seems any other trial prior to resolution of his case), Mr. Douglas has agreed to testify at a separate trial for Mr. Williams." Williams's Mot. to Sever, ECF 29, at 4. The conditional nature of this promise fails to establish a reasonable probability that Douglas will actually testify. 🚩 *Ford*, 870 F.2d at 732.

**[27]** Even if Douglas had made an unconditional promise to testify, Williams cannot meet his burden to establish the third prong of the *prima facie* inquiry—that the testimony would be exculpatory. This third requirement "demands more than conclusory statements by counsel; rather the showing must be sufficiently definite in nature to allow the court reasonably to conclude that the testimony would in fact be 'substantially exculpatory.' " 🚩 *Ford*, 870 F.2d at 732 (quoting 🔺 *United States v. DeLuna*, 763 F.2d 897, 920 (8th Cir. 1985)). Williams asserts that Douglas will testify that, despite knowing Williams and talking with him on occasion, the two had not talked or texted on the day of their arrest, nor had Douglas planned to see Williams on that day. *See* Williams's Motion to Sever, ECF 29, at 7. Instead, they came across one another by happenstance, and Williams walked up to Douglas and asked to borrow his phone. *See id.* Douglas would therefore apparently testify that he simply allowed Williams to borrow his phone after unexpectedly bumping into him and that their interaction had nothing to do with the backpack or its contents. *See id.*

On its face, this proposed testimony seems sufficiently exculpatory. After all, Douglas will attest that Williams had nothing to do with the backpack. But Williams ignores the extent to which Douglas could be impeached, which the D.C. Circuit has found to be an important consideration when

evaluating this factor. *See* 🟡 *Ford*, 870 F.2d at 732. The government has proffered Douglas's prior conviction, which will likely harm his credibility as a witness. Most importantly, the government is prepared to show that Douglas's testimony would be directly contradicted by the call logs on Douglas's cellphone, which reveal that a short time before their arrest Douglas and Williams exchanged two FaceTime calls. *See* Gov.'s Opp'n to Mot. to Sever, ECF 36, **\*196** at 10. The Court therefore concludes that Williams's testimony will not be sufficiently exculpatory to warrant severance.

Williams also argues that a joint trial in which "damning and vivid evidence against Mr. Douglas" is presented will improperly prejudice a jury against Williams. *See* Williams's Mot. to Sever, ECF 29, at 1. Williams notes that Douglas was caught, on police body camera, wearing a backpack containing a gun and ammunition, and that Douglas made statements indicating that he had some idea about the contents of the backpack. *See id.* Williams, in contrast, was not in possession of the backpack, nor was he found with the cash that Officer Jackson believed he saw Douglas give to Williams. Additionally, Williams argues that the government's Rule 404(b) evidence against Douglas is far stronger and more "vivid" than the Rule 404(b) evidence against Williams. *See id.* at 10.

 **[28]**    **[29]** But even with these disparities in evidence, Williams has failed to meet his "heavy burden" under Rule 14.

🟡 *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013). The D.C. Circuit has consistently cautioned that severance is only appropriate when the moving party shows that the evidence against his co-defendant is "far more damaging than the evidence against [the movant]." 🟡 *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1988). "Absent a dramatic disparity of evidence, any prejudice caused by joinder is best dealt with by instructions to the jury to be given individual consideration to the defendant." 🔶 *Bruner*, 657 F.2d at 1290. The critical question is "whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." 🟡 *United States v. Halliman*, 923 F.2d 873, 884 (D.C. Cir. 1991). Here, the risk of jury confusion is minimal. And Williams has not presented any compelling reason why a jury instruction would be insufficient to ensure that the jury compartmentalizes the evidence against Douglas from the evidence against Williams.

## IV. Douglas's Motion to Suppress Tangible Evidence

Douglas seeks to suppress all tangible objects seized and statements made as a result of his arrest on April 22, 2020. *See generally* Douglas's Mot. to Supp. Evid., ECF No. 31. Douglas argues that those objects and statements were the fruits of a warrantless search for which no exception to the Fourth Amendment's warrant requirement applies. *See id.* at 2.

### A. Whether Reasonable Suspicion Existed to Conduct an Investigatory Stop

 **[30]**    **[31]**    **[32]**    **[33]**    **[34]** The Parties first disagree whether Officer Poupart had reasonable, articulable suspicion that a crime had been committed when he stopped Douglas. *See* Douglas's Mot. to Supp. Evid., ECF 31, at 3. Under 🟡 *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an "officer may, consistent with the Fourth Amendment conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot." 🟡 *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In determining whether reasonable suspicion exists, courts ask whether a reasonable officer would ascertain that all facts "taken together [warrant] further investigation." 🟡 *Terry*, 392 U.S. at 22, 88 S.Ct. 1868. A reasonable officer can consider a wide range of factors when making that determination. *See* 🟡 *id.*; *see also* 🟡 *United States v. Laing*, 889 F.2d 281, 286 (D.C. Cir. 1989) (holding that the time, the "high crime" nature of the area, and the defendant's furtive movements were relevant to the reasonable suspicion inquiry). The reasonable suspicion test is an objective test, and the subjective motivations of a particular **\*197** officer are irrelevant to the analysis. 🟡 *Wren v. United States*, 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Ultimately, "it is the government's burden to provide evidence sufficient to support reasonable suspicion justifying a stop." 🟡 *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016).

 **[35]**    **[36]** Especially relevant here, an officer making an investigatory stop need not have "direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion."

USCA Case #21-3032      Document #2013488      Filed: 08/21/2023      Page 39 of 53

*United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007). Instead, an officer "may act on 'a directive or request from another officer or agency.' " *United States v. Gorham*, 317 F. Supp. 3d 459, 470 (D.D.C. 2018) (quoting WAYNE R. LAFAVE, 2 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 3.5(c) (Oct. 2017 update)). Therefore, even though Officer Poupart did not observe the backpack exchange himself, if Officer Jackson "reasonably suggest[ed] that fellow officers investigate" the individuals engaged in the backpack exchange, Officer Poupart is said to have reasonable suspicion to conduct a stop through the collective knowledge rule. *United States v. Devaugh*, 422 F. Supp. 3d 104, 133 (D.D.C. 2019). The reasonable suspicion inquiry in this case therefore turns on whether the exchange that Officer Jackson observed and the surrounding circumstances gave rise to reasonable suspicion, justifying Officer Jackson's order to other officers to stop the participants in the backpack exchange.

The government has identified three facts that it argues, when considered in their totality, establish the "minimum level of objective justification" necessary to justify a *Terry* stop. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). First, the government submits that the area where Officer Jackson witnessed the exchange was a high crime area. *See* *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (noting that "the fact that the stop occurred in a 'high crime area' among the relevant contextual consideration in a *Terry* analysis."). Officer Jackson testified that he had "quite frequently" worked in the Fifth Police District, where "violent crimes, shootings, [and] narcotics transactions" were the most frequent criminal offenses and occurred more frequently than some neighboring police districts. Tr. 18; 117–18. And, specifically with regard to the 2300 block of 15th Street, Officer Jackson stated that he had worked investigations in the area more than 200 times in the last five years and that that block is a high crime area, known for narcotics sales and violent crime. Tr. at 23. Officer Jackson did not merely testify that the area "suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infraction[ ]" that Officer Jackson suspected Douglas was committing. *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001).

[37]  Second, the government points to the hand-to-hand transaction that Officer Jackson witnessed. *See* Gov.'s Opp'n

to Douglas's Mot. to Supp. Evid., ECF 34, at 7. Officer Jackson testified that based on his experience as a police officer, he was familiar with how individuals engaged in hand-to-hand narcotics transactions, and that in his experience bulk transfers of narcotics or firearms frequently involve contraband concealed in a bag, such as a backpack. Tr. at 17–18. Of course, "simply receiving an object from another person ... is a common occurrence for which there could be many innocent explanations." *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000). "But even so, the observation [of a hand-to-hand exchange] would certainly contribute to a reasonable officer's suspicion." *Devaugh*, 422 F. Supp. 3d at 111.

**\*198**  Finally, the government relies upon Officer Jackson's observation of Douglas's attempt to conceal the backpack under his jacket. *See* Gov.'n to Douglas's Mot. to Supp. Evid., ECF 34, at 7. Officer Jackson testified that the person who received the backpack (later identified as Douglas) acted "quickly" to "conceal whatever was in that book bag" and "tried to hide the book bag on his person by covering it up with his jacket." Tr. at 30; 102–03. In Officer Jackson's experience, individuals engaged in hand-to-hand narcotics transactions often attempt to be "discreet" or "secretive" and engage in acts of concealment. Tr. 14–15. "Furtive movements ... have been consistently recognized as grounds for reasonable suspicion, justifying a stop and frisk." *See United States v. Lovelace*, 357 F. Supp. 2d 39, 43 (D.D.C. 2004) (citing *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673).

Based on these factors, Officer Jackson suspected that he had observed either the transfer of a large quantity of narcotics or a weapon. Tr. at 38–39, 129. The Court concludes that, looking at the facts and circumstances in their totality, Officer Jackson's suspicion that criminal activity was afoot was reasonable. *See* *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673 (holding that reasonable suspicion only requires a "minimal level of objective justification for the stop").

### B. Whether the Investigatory Stop was Transformed into an Arrest

Second, Douglas argues that, even if Officer Poupart had reasonable suspicion to conduct an investigatory stop, his immediate use of handcuffs converted the stop into an arrest before the police developed probable cause. *See* Douglas's

Reply Mot. to Supp. Evid., ECF 42, at 1. The government concedes that Officer Poupart did not have probable cause to arrest Douglas when he placed him in handcuffs, and thus the question is whether Officer Poupart's immediate use of handcuffs converted the stop into an arrest. *See ⚠️Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**[38]   [39]   [40]**   "The point at which an investigative stop becomes an arrest is not marked with a bright line." 🚩*Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). But two general principles govern a 🚩*Terry* stop and ensure that it does not ripen into an arrest. The stop must "last no longer than is necessary to effectuate the purpose of a stop" and the officer "must employ the least intrusive means reasonably available to verify or dispel the officer's suspicion." 🚩*Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). If a stop is "unduly prolonged or intrusive," it "transforms from an investigative stop into an arrest requiring probable cause." 🚩*Hall*, 867 F.3d at 153.

**[41]   [42]   [43]**   Although handcuffs are "generally recognized as a hallmark of a formal arrest," 🚩*United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (collecting cases), their use does not automatically convert a 🚩*Terry* stop into an arrest. 🚩*United States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019); *see also* 🚩*Laing*, 889 F.2d at 285 (holding that "amount of force used to carry out the stop and search must be reasonable, but may include use of handcuffs"). However, officers can only use handcuffs to effectuate a 🚩*Terry* stop "when specific circumstances make it reasonable to do so." 🚩*Devaugh*, 422 F. Supp. 3d at 114. One such set of circumstances is when an officer "reasonably fear[s] for [his] safety and the safety of others." 🚩*Smith*, 373 F. Supp. 3d at 238; *see also* 🚩*United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (holding that, where it was "reasonable for officers to fear that [the suspect] had a weapon in his waistband," the use of handcuffs **\*199** did not convert a 🚩*Terry* stop into an arrest). After all, "a policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." 🚩*Id.*

**[44]   [45]**   Here, the government contends, and Officer Poupart testified, that he placed Douglas in handcuffs because he feared for his safety and the safety of others. *See* Gov.'s Opp'n to Douglas's Mot. to Supp. Evid., ECF 34, at 8–10. Officer Poupart identified in his testimony a number of reasons for his safety concerns, including that: (1) two unidentified men were in close proximity to Douglas; (2) the second suspect involved in the backpack transaction remained unaccounted for; (3) the transaction he was responding to involved a bag, capable of concealing a weapon; and (4) the reported transaction sounded like a narcotics transaction and in Officer Poupart's experience drug traffickers are often armed. Tr. at 140–42, 165, 185–86, 187. These factors made it reasonable for Officer Poupart to fear for his safety and the safety of others. An "officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Gorham*, 317 F. Supp. 3d at 467 (quoting 🚩*Terry*, 392 U.S. at 27, 88 S.Ct. 1868).

Douglas argues that two recent decisions from courts in this circuit—🚩*United States v. Devaugh*, 422 F. Supp. 3d 104 (D.D.C. 2019), and 🚩*United States v. Smith*, 373 F. Supp. 3d 223 (D.D.C. 2019)—both of which found that the use of handcuffs was a factor transforming a 🚩*Terry* stop into an arrest, compel the conclusion that Douglas was arrested here. *See* Douglas's Reply Mot. to Supp. Evid., ECF 42, at 4. But these cases are distinguishable.

In 🚩*Devaugh*, an undercover officer observed a suspect engage in a hand-to-hand transaction, involving the exchange of money for a small object. 🚩*Devaugh*, 422 F. Supp. 3d at 108. After the suspect was alerted to police presence in the area, he quickly walked to a vehicle while appearing to adjust his waistband. 🚩*Id.* An arrest team arrived in unmarked police cruisers with activated emergency lights. 🚩*Id.* at 108–09. Officers approached the vehicle that the suspect was now sitting in and one officer drew his weapon, touching it to the window of the suspect's vehicle. 🚩*Id.* at 109. After the suspect, in compliance with police orders, exited the vehicle, he was immediately handcuffed. 🚩*Id.* A subsequent search of the vehicle resulted in the recovery of a firearm. 🚩*Id.*

In a decision suppressing evidence of the recovered gun, Judge Contreras held that a number of factors increased the intrusiveness of the stop beyond what was reasonable. In addition to the use of handcuffs, Judge Contreras noted that the overwhelming number of officers (six) responding to stop the suspect and the fact that one officer brandished his weapon transformed the 🔖 *Terry* stop into an arrest. 🔖 *Id.* at 114–15. Furthermore, one of the arresting officers testified that "he and the arrest team did not believe Mr. Devaugh was armed." 🔖 *Id.* at 115.

Here, in contrast, the responding officers did not draw their weapons, did not yell orders at Douglas, and did not surround Douglas in large numbers. Officer Poupart and his partner were the only officers interacting with Douglas, and they maintained a calm and conversational demeanor throughout the interaction. *See* Gov. Ex. 4 and 4B. Officer Poupart also testified about a number of factors that led him to conclude that Douglas was armed. Tr. at 140–42, 165, 185–86, 187.

**\*200** In 🔖 *Smith*, Judge Moss found that handcuffing a suspect standing by the open driver's side door of a parked car, where the officers could smell PCP but were unable to determine whether the suspect was under the influence, converted a 🔖 *Terry* stop into an arrest. 🔖 *Smith*, 373 F. Supp. 3d at 239. Judge Moss noted that it would have been reasonable for officers to handcuff a person whom they reasonably believed to be under the influence of PCP to ensure officer safety, but there was an insufficient basis for such a belief in that case. *See* 🔖 *id.* Here, in contrast, Officer Poupart testified why he believed that Douglas was armed, together with the other reasons he was concerned for his safety and the safety of others. Tr. at 140–42, 165, 185–86, 187.

### C. Whether Officer Poupart Exceeded the Scope of a 🔖 *Terry* Frisk

**[46]** Finally, Douglas argues that even if Officer Poupart had reasonable suspicion to conduct a 🔖 *Terry* stop, and even if his use of handcuffs did not transform the stop into an arrest, evidence of the firearm should be suppressed because the manner in which Officer Poupart felt the exterior of Douglas's jacket exceeded the scope of a lawful frisk under 🔖 *Terry*.

*See* Douglas's Reply in Support of Mot. to Supp. Evid., ECF 42, at 1.

**[47]** **[48]** **[49]** **[50]** **[51]** When an officer conducting a 🔖 *Terry* stop reasonably believes the subject is armed and a threat to his safety or the safety of others, the officer is permitted to conduct a limited protective search "to determine whether the person [being stopped] is in fact carrying a weapon." 🔖 *Terry*, 392 U.S. at 24, 88 S.Ct. 1868. The purpose of a 🔖 *Terry* frisk "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." 🔖 *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). "Under the 'plain feel doctrine,' a weapon discovered during a frisk may be seized if its 'contour or mass makes its identity immediately apparent.' " *United States v. Spriggs*, 2010 WL 917709, \*2 (D. Md. March 10, 2010) (quoting 🔖 *Minnesota v. Dickerson*, 508 U.S. 366, 373–75, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). In order to fall within the scope of the "plain feel" doctrine, a pat down cannot involve an impermissible manipulation or palpitation of the contours of an object to determine its exact contents. *See* 🔖 *Dickerson*, 508 U.S. at 375, 113 S.Ct. 2130. But when a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under 🔖 *Terry* and its fruits will be suppressed." 🔖 *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

As discussed above, Officer Poupart reasonably believed that the subject was armed and posed a threat to his safety and the safety of others. Conducting a protective frisk for weapons was therefore reasonable under 🔖 *Terry*. The only remaining question is whether Officer Poupart's frisk went beyond what was necessary to determine whether Douglas was armed. The footage from Officer Poupart's body worn camera and Officer Poupart's testimony demonstrates beyond serious question that the search was minimally invasive and did not exceed what is permissible in a protective frisk. *See* Gov. Ex. 4 and 4B; Tr. at 169–71. The camera footage shows that Officer Poupart lightly touched the back of Douglas's jacket just a few times, with the total sequence of events lasting only a few seconds, before Officer Poupart recognized the presence of a firearm. Tr. at 169–171. And Officer Poupart testified that the shape and weight of the object made it immediately apparent that he was touching a firearm. Tr. at 169–71. This brief and

USCA Case #21-3032    Document #2013488    Filed: 08/21/2023    Page 42 of 53

minimally invasive protective frisk did not **\*201** exceed the bounds established in 🚩*Terry* and 🚩*Dickerson*.


## V. Defendants' Motion to Suppress Identification

**[52]** Williams and Douglas move the Court to suppress Officer Jackson's identification of them after they were stopped and any subsequent in-court identification. *See generally* Williams's Mot. to Supp. Id., ECF 30; *see also* Douglas's Mot. to Supp. Id., ECF 33.

**[53]** **[54]** **[55]** **[56]** Beginning with their due process argument, both Defendants argue that Officer Jackson's show-up identification—the identification procedure where a single suspect is presented for the witness to identify as the perpetrator—was unduly suggestive and unreliable. *See* Williams's Mot. to Supp. Id., ECF 30, at 5; *see also* Douglas's Mot. to Supp. Id., ECF 33, at 2. In determining whether to suppress a witness's identification under the Due Process Clause, the Court performs a two-step analysis. *See United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007). First, the Court must determine "whether the identification procedure 'was impermissibly suggestive.' " *Id.* (quoting 🚩*United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)). If the Court finds that the procedure was impermissibly suggestive, the Court must next decide whether the identification was nonetheless "sufficiently reliable to preclude 'a very substantial likelihood of irreparable misidentification.' " *Id.* (quoting 🚩*Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). This determination involves a balancing test in which courts weigh the degree of suggestiveness against the strength or weakness of factors indicating reliability. 🚩*Manson*, 432 U.S. at 114, 97 S.Ct. 2243. The reliability factors include the "opportunity of the witness to view the criminal at the time of the crime, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 🚩*Neil v. Biggers*, 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Additionally, courts have noted that if a trained law enforcement officer, who is "expert" in observing criminals, is the individuals making the identification, that bolsters the reliability of the identification. 🚩*United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991);

🚩*United States v. Singleton*, 702 F.2d 1159, 1165–66 (D.C. Cir. 1983).

The government admits, as it must, that courts have held that show-up identifications, such as those used here, are inherently suggestive. *See* Gov.'s Opp'n Mot. to Supp. Id., ECF 35, at 8. *See, e.g.,* 🚩*Singleton*, 702 F.2d at 1165–67; 🚩*Russell v. United States*, 408 F.2d 1280, 1284 (D.C. Cir. 1969). But despite their inherent suggestiveness, "immediate on-the-scene showup identifications ... have long been upheld" as reliable by the D.C. Circuit. 🚩*Singleton*, 702 F.2d at 1165–66.

Here the indicia of reliability all point in favor of admitting Officer Jackson's identification. First, Officer Jackson had an opportunity to view the suspects at the time of their actions. Officer Jackson testified that he was in a parked car fifteen yards away from the alleged exchange with a clear line of sight, and that he witnessed the entire exchange of the backpack and had ample time to observe both suspects. Tr. at 26–30. Second, Officer Jackson's descriptions of the suspects, captured on the Radio Run, accurately described the suspects that were eventually stopped. Gov. Exhibit 3. Third, Officer Jackson did not express any doubts about his identification. Finally, the identification occurred from a distance of about twenty yards, less than five minutes after Officer Jackson observed the backpack exchange. Tr. at 53, 73.

**\*202** Furthermore, Officer Jackson is a trained law enforcement officer, who is expert in observing criminals. Officer Jackson has over twenty years of experience working as a police officer and ten of those years were spent working for the NSID—the division responsible for the undercover operation here. Tr. at 8. Officer Jackson further testified that during the course of his career he has worked as an observation post officer "more than 500" times. Tr. at 12. Officer Jackson's experience strengthens the reliability of the identification. *See* 🚩*Dring*, 930 F.2d at 693; *see also* 🚩*Singleton*, 702 F.2d at 1165–66.

Defendant's principal attack against the identifications is that Officer Jackson's description of the events was inaccurate or incomplete. Defendants argue that Officer Jackson's initial description of the person who handed over the backpack (later identified as Williams) was generic and only became more specific after another officer, sensing the insufficiency of the description, filled in the blanks. *See* Williams's Mot. to Supp.

Id., ECF 30, at 5. Defendants allege that this second officer "suggested [to Officer Jackson the] additional identifying factor of [the] 'orange hood' " on Williams's jacket and that "it appears [that Officer Jackson] affirmed and added 'orange hood' to his own now-evolving description." *See id.* at 3.

Defendants are correct that Officer Jackson's descriptions evolved and became more detailed with each lookout. The initial broadcast lookout stated that the person who turned over the backpack was a "black male with a gray coat," *see* Radio Run, April 22, 2020 ("Radio"), ECF 35-1, at 6:00–6:29; the next description was "a black male with a gray coat with puffy hair" that was "real messy," *id.* at 6:53–7:08; and the third was that the black male with the gray coat had an "orange hood." *Id.* at 7:24–7:39.

But Defendants are wrong to argue that Officer Jackson's descriptions were influenced by any other officer. Instead, body worn camera footage conclusively shows that Officer Jackson provided his descriptions of Williams's orange hood before Williams was handcuffed and the second officer mentioned the orange hood. *See BWC of Ofc. Gabster*, ECF 35-3, at 19:04:26–19:04:35. Officer Jackson also testified that nobody told him Williams was wearing an orange hood, and that his lookout descriptions were the product of his own observations. Tr. at 44.

Defendants make much of the fact that Officer Jackson stated in his initial lookout that the backpack was exchanged for money, but no money was found on Williams when he was arrested. *See* Radio, ECF 35-1, at 6:00–6:29; *see also* William's Mot. to Supp. Id., ECF 30, at 3. Defendants insist that makes Officer Jackson's observation inaccurate and thus unreliable. *Id.* But as the government points out, Williams was out of sight of Officer Jackson immediately after the exchange and had ample time to dispose of any cash. *See* Gov.'s Opp'n to Williams's Mot. to Sever, ECF 36, at 3. In any event, even if Officer Jackson misidentified the object being exchanged for the backpack, this inaccuracy is insufficient to render Officer Jackson's identification testimony unreliable.

**[57]** Finally, if a show-up identification occurs while the subject is in custody following an illegal stop, the identification must be suppressed as the fruit of the illegal stop. *See* ⚑ *United States v. Crews*, 445 U.S. 463, 472–73, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). A stop is illegal if the

officers did not have a "reasonable, articulable suspicion that 'criminal activity may be afoot.' " ⚑ *Edmonds*, 240 F.3d at 59 (quoting ⚑ *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). An officer "must be able to point to specific and articulable facts which, taken together **\*203** with rational inferences from those fact, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity." ⚑ *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016). The government bears the "burden to provide evidence sufficient to support reasonable suspicion." ⚑ *Id.* at 634.

Here, Williams argues, much like Douglas in his Motion to Suppress Tangible Evidence, that the government has not demonstrated that the police had reasonable suspicion. He argues that Officer Jackson's observation of a hand-to-hand transaction did not create "reasonable, articulable suspicion that 'criminal activity may be afoot.' " ⚑ *Edmonds*, 240 F.3d at 59 (quoting ⚑ *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). As discussed above, however, an examination of the totality of the circumstances demonstrates that the government has indeed met its burden. Officer Jackson witnessed a hand-to-hand exchange in a high crime neighborhood, known for drug and firearm activity. During the exchange, Douglas acted strangely, quickly placing the backpack under his jacket, as if to hide it. Tr. at 29–30. These factors provided Officer Jackson with reasonable suspicion that a crime was occurring. Furthermore, Officer Jackson gave an accurate description of Williams, including supplementing his original description without prompting from other officers. The police therefore had reasonable suspicion to conduct an investigatory stop of Williams.

## VI. Conclusion

For the reasons discussed above, the Court grants in part and denies in part the government's motion, and the Court denies the Defendants' motions. An Order will be issued contemporaneously with this Memorandum Opinion.

**All Citations**

507 F.Supp.3d 181, 114 Fed. R. Evid. Serv. 261

---

**End of Document**                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

72 F.4th 332
United States Court of Appeals,
District of Columbia Circuit.

UNITED STATES of America, Appellee

v.

Theodore B. DOUGLAS, Appellant

No. 21-3032
|
Argued December 9, 2022
|
Decided July 7, 2023

Appeal from the United States District Court for the District of Columbia (No. 1:20-cr-00121-2)

**Attorneys and Law Firms**

Tony Axam Jr., Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was A. J. Kramer, Federal Public Defender.

Eric Hansford, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Chrisellen R. Kolb and Suzanne Grealy Curt, Assistant U.S. Attorneys.

Before: Wilkins, Circuit Judge, and Randolph and Rogers, Senior Circuit Judges.

**Opinion**

Opinion concurring in the judgment filed by Senior Circuit Judge Randolph.

Opinion concurring in the judgment filed by Senior Circuit Judge Rogers.

Dissenting opinion filed by Circuit Judge Wilkins.

Per Curiam:

 **\*333**  The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. Two members of the Court hold that the District Court properly found that the officers had reasonable suspicion to stop Theodore Douglas and that they did not act unreasonably during the protective search. One member of the Court dissents.

Accordingly, the District Court's order denying Mr. Douglas's motion to suppress evidence is affirmed.

*So Ordered.*

Randolph, Senior Circuit Judge, concurring in the judgment:

"Crime is not evenly distributed across cities; rather, it is concentrated in very small places, known as crime hot spots, that persistently generate a disproportionate share of serious crime."[1]

Many large cities contain "crime hot spots." The city of Washington, D.C., is no exception. The events in this case occurred in one of Washington's seven Police Districts. In 2020 in the Fifth Police District, in the city's northeast section, there were 22 homicides, 317 armed robberies, and 321 assaults with a deadly weapon. Metropolitan Police Department, *Annual Report* 20–21 (2021). (The Metropolitan Police Department's annual reports do not provide statistics about drug offenses by Police District.)

It was in the Fifth District that the police stopped Theodore B. Douglas, handcuffed him, patted him down, discovered a loaded .40 caliber Sig Sauer pistol and ammunition, and arrested him.[2]

Douglas pled guilty to possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). In his plea deal, which the district court accepted, Douglas reserved the right to bring this appeal of the district court's denial of his suppression motion. He raises issues about whether the police violated the Fourth Amendment to the Constitution.

I.

In analyzing this case it is helpful to contrast two scenes. The first is hypothetical. The second depicts the actual events. Both the first scene and the actual second scene occur in the same location at about the same time, which I now describe.

A paved walkway lies between two large apartment buildings in the 2300 block of 15th Street Northeast, a mostly residential  **\*334**  neighborhood. On both sides of this walkway is a waist-high, black chain link fence. On one end of the walkway is 15th Street. On any given day, cars are parallel parked, bumper to bumper, on both sides of the two-way street. Across

15th Street from the walkway is a recreation center and a children's playground. On the other end of the walkway is a parking lot, entered from a street behind the buildings.

It is 3 p.m. on April 22, 2020, a Wednesday. Officer Isaac Jackson of the Metropolitan Police Department is working undercover, watching as much as he can of the walkway, a spot noted for criminal activity. Officer Jackson has been in this neighborhood many times and has observed illegal drug transactions there. He is in plain clothes, sitting in an unmarked car parked among the other cars on the street, 15 yards from the street end of the walkway.

*First scene (hypothetical)*. While sipping his afternoon cup of coffee Officer Jackson notices a little girl in the walkway entrance. School has let out. A playground is across the street and an elementary school is nearby.

Another young girl arrives carrying a small black, opaque book bag, with a shoulder strap. The arriving girl hands the book bag to the first girl. The girl receiving the book bag opens it, looks inside and smiles, closes the bag, puts her arm through the strap and swings the bag onto her back. The girls exchange greetings, smile, embrace and calmly go their separate ways.

After watching this exchange, Officer Jackson turns his attention elsewhere.

*Second scene (this case)*. Now the scene changes. An adult male who seems to be about 30 years old appears in the walkway between the two buildings. He is pacing. His location and his movements attract Officer Jackson's interest.

The adult male is the defendant Douglas. A few minutes later, another adult male (Tavonte Williams [3]) approaches from outside the walkway fence. Both men appear to be of the age of those who commit the most street crimes, especially drug and firearms crimes. [4]

Williams holds a small, black, opaque book bag. He hands the bag over the fence to Douglas. Simultaneously, paper money changes hands – or, from that distance, Officer Jackson thinks he sees U.S. currency changing hands, although he is not 100% sure. Douglas now rapidly drops his coat, slings the book bag over his back without looking inside and puts his coat back on, thereby hiding the bag.

Officer Jackson broadcasts an alert, in police parlance "a lookout." Within a few seconds two uniformed officers arrive at the walkway. By then, Douglas has walked from the 15th Street opening of the walkway almost to the parking lot at the other end. In the next few minutes, more than a dozen uniformed officers and police cars **\*335** arrive in the parking lot. These officers also have been alerted by Officer Jackson's broadcast as part of an operation of the Narcotics Special Investigation Division.

Moments before other officers arrive, one of the first two officers on the scene calmly approaches Douglas who is then standing near the parking lot not far from two other men of the same apparent age. The officer says to the three of them, "How you doing gentlemen?" Holding Douglas's arm, the officer directs him "over here for just a minute." He tells Douglas that he is "being stopped for an investigation." The officer, Maxwell Poupart, handcuffs Douglas and begins a pat down. Douglas does not resist. Pressing the back of Douglas's coat, Officer Poupart touches a hard, heavy object that feels to him like a pistol. Douglas says it is his glasses case. Then, Poupart pulls down Douglas's coat and pats the outside of the book bag. The officer now confirms that he may well be feeling a firearm. He opens the book bag and radios "1-800," the police code for firearm. Douglas is then arrested.

## II.

Analysis of these events begins with 🚩*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a decision that, by last count, has been cited in nearly 48,000 federal and state court opinions.

🚩*Terry* holds that in stopping a person on the street to investigate, law enforcement officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 🚩*Id.* at 21, 88 S.Ct. 1868. "Reasonable suspicion," [5] the Supreme Court has reminded us, is a standard that is " 'not readily, or even usefully, reduced to a neat set of legal rules.' " 🚩*Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (quoting 🚩*Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Justice Scalia made the same point in 🚩*Ornelas* when he wrote of "the futility of attempting

to craft useful precedent from the fact-intensive review demanded by determinations of ... reasonable suspicion."

*Id.* at 703, 116 S.Ct. 1657 (Scalia, J., dissenting).

Under 🚩*Terry*, a "fact" in this case, a significant fact, is that the location of the stop was not only in a general high crime area, but in a specific location – the walkway in the 2300 block of 15th Street – known for criminal transactions.

*See* 🚩*Wardlow*, 528 U.S. at 124, 120 S.Ct. 673. That is why Officer Jackson was watching it. Officer Jackson knew the spot well and so did the defendant. Before the events in this case, Douglas was arrested for possession of a gun near that same walkway (and eventually pleaded guilty to illegally possessing a firearm). [6] For his part, Officer Jackson had been involved in nearly 200 investigations in the vicinity of the 2300 block of 15th Street Northeast. And in staking out this particular walkway in the **\*336** past he observed many illegal drug transactions.

Among the nearly 48,000 judicial decisions dealing with 🚩*Terry*, there are occasional opinions stating that "just because" an individual was in a high crime area does not mean, or "does not in itself show," that the individual should be suspected of engaging in criminal activity. Statements like these are best understood as throwaway lines. No rational police officer, indeed no rational person, would suppose that just because a person is in a high crime zone that person should be treated as a suspect. Consider the little girls in my hypothetical. They were in a high crime zone. [7]

It does not follow that the criminal nature of this place, noted for drug dealing and other crimes – the very reason Officer Jackson was there undercover on that April afternoon – that this fact should be tossed aside because it is not in itself conclusive. The Supreme Court in 🚩*District of Columbia v. Wesby* reversed a panel opinion of our court that engaged in such mistaken reasoning. [8] *See* 🚩138 S.Ct. at 588. The factors giving rise to reasonable suspicion are not like coin flips in which the probability of heads on one flip is independent of the probability of heads on the next flip. Instead, the facts here are interdependent: the existence of one makes the existence of another more (or less) probable. *See United States v. Prandy-Binett*, 995 F.2d 1069, 1070–71 (D.C. Cir. 1993); *see also Prandy-Binett,* 5 F.3d at 558–60; *Al-Adahi v. Obama*, 613 F.3d 1102, 1105–07 (D.C. Cir. 2010). If an individual hands a book bag to another person in the Library

of Congress, that is one thing. If the hand-off takes place in a high crime area in an outdoor walkway noted for criminal activity, that is quite another.

Another point about high crime spots is that innocent persons in the vicinity will exercise caution – the common expression is that they will be "looking over their shoulder" – to avoid being mugged or murdered. Those engaged in criminal activity will also be on the alert, but for a different reason. High crime areas attract, or should attract, high police presence, as was certainly true in this case. Individuals meeting on the street in such a location to conduct a criminal transaction will naturally take extra measures to avoid detection.

Another consideration, critical in my evaluation, relates to Officer Jackson's skill and experience. By the time of these events, Officer Jackson had been a police officer for more than 20 years and had conducted 500 undercover observation posts. When asked on cross-examination in the suppression hearing how many arrests resulted from his 500 operations he answered "I would say close to 500."

**\*337** It is proper, indeed it is unavoidable, for "a police officer [to] draw inferences based on his own experience in deciding whether" reasonable suspicion warrants an investigatory stop. 🚩*Ornelas*, 517 U.S. at 700, 116 S.Ct. 1657. At the suppression hearing, in compliance with 🚩*Terry*, Officer Jackson "articulated" the factors underlying his judgment, based on his experience. Hand-to-hand transactions, efforts at concealment, exchanges of closed containers like bags, money changing hands, on the streets in high crime areas – these factors together were, in Officer Jackson's experience, indications of illegal transactions of guns or drugs or both. And, as Officer Jackson testified, each of these factors converged in the transaction he witnessed between Douglas and Williams on the walkway.

Unlike my hypothetical exchange of the book bag between the young girls on the same walkway, what actually occurred on the walkway was very different. [9] First of all, as Officer Jackson testified, when Douglas took the bag from Williams Douglas did not look in and inspect its contents. If nothing else, this strongly suggested that Douglas already knew what was in the bag he so rapidly hid after Williams handed it to him.

What else might explain Douglas's actions? The dissent suggests that Douglas might have hidden the book bag under his coat to prevent local thieves from stealing it. After all, this was a high crime spot. There are four answers to this.

*One*, in neither Douglas's opening brief nor his reply brief did he raise this argument.

*Two*, even if Douglas had intended to protect the book bag from local thieves, this is entirely consistent with – indeed it reinforces – Officer Jackson's judgment that the book bag contained a pistol or narcotics, rather than some innocuous item like a book from the local library, which would hardly be of interest to a potential thief.

*Three*, in any event, a determination of reasonable suspicion "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588.

*Four*, it would be absurd – under the Fourth Amendment or otherwise – to require undercover officers observing suspicious activity, before moving in, to read the mind of the suspect and somehow determine whether he had an innocent reason for quickly concealing the object (here the book bag) being transferred in the exchange.

I therefore agree with the district court that the police, in stopping Douglas, did not commit an "unreasonable" "seizure" in violation of the Fourth Amendment to the Constitution.

### III.

What I have written thus far decides only one of the issues on appeal. Douglas also claims that even if the police were justified in stopping him, they committed an "unreasonable" "search" in violation of the Fourth Amendment when they handcuffed him, patted him down, and found the gun and bullets in his book bag.

Here again *Terry v. Ohio* must be the starting point. Here is the guiding principle. When legally stopping a person on the street for suspected criminal activity the police are entitled to protect themselves. They may do this by restraining the suspect and patting him down to make sure he does not possess a dangerous weapon. Given the rationale, the pat down must be **\*338** for the officer's protection, not a search

for evidence of criminal activity. *See Terry*, 392 U.S. at 23–26, 88 S.Ct. 1868.

Officer Poupart's pat down of Douglas's clothing lasted less than a minute. The police had good reason to check Douglas for weapons. He was stopped at a spot known for drug trafficking. "We have recognized many times that 'drugs and guns go together.' " *United States v. Johnson*, 592 F. 3d 164, 169 (D.C. Cir. 2010) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991)). Officer Jackson, in his testimony at the hearing, confirmed that it is "very common" for individuals engaged in drug trafficking to possess firearms. Officer Poupart agreed.

That the stop and pat down of Douglas entailed the use of handcuffs did not transform this legal *Terry* stop into an illegal search and seizure lacking probable cause. The "amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs." [10] *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (quoting *United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989)); *see also Muehler v. Mena*, 544 U.S. 93, 98–100, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005). Here, the police had good reason to suspect that a drug or firearm transaction had just occurred, and Williams – the other party in the transaction – remained at large, so the police used handcuffs to restrain Douglas while he was being frisked. [11]

There is nothing to Douglas's argument that the district court erred in crediting Officer Poupart's testimony that he felt a gun-like object through Douglas's coat at the beginning of the pat down. The body camera footage belies Douglas's claim and the district court, having heard the testimony and examined the exhibits, properly – indeed correctly – concluded that Officer Poupart was telling the truth. In any event, "[t]he scope of a Terry frisk is not limited to weapons, but rather to concealed objects which might be used as instruments of assault." *United States v. Holmes*, 385 F.3d 786, 791 (D.C. Cir. 2004). The body camera footage establishes that Officer Poupart felt a hard object underneath Douglas's coat – just the type of "concealed object" to which *Holmes* refers.

One further point deserves mention. After Officer Poupart patted down the book bag he asked Douglas for permission

to "check out" the bag's contents. Douglas refused. Douglas now argues that the officer's request shows that he did not believe he had possibly detected a pistol. Here too Douglas's argument goes nowhere. Requests for consent are common even when the police have ample suspicion to justify an involuntary search. *See* 4 Wayne R. LaFave, *Search & Seizure* § 8.1 (6th ed. Dec. 2021). In all sorts of personal interactions in America, it is also common practice for one person to ask another for permission to intrude even when the intruder can do so without permission. "May I ask you a personal question?", for instance. **\*339** Erving Goffman, *Relations in Public: Microstudies of the Public Order* 114–15 (1971).

Rogers, Senior Circuit Judge, concurring in the judgment:
I agree that the district court's ruling denying Theodore Douglas's motion to suppress should be affirmed based on the totality of the circumstances observed by Officer Isaac Jackson and their contribution to reasonable suspicion of criminal wrongdoing under the Supreme Court's Terry stop precedents, as followed by this court. 🚩 Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see 🚩 United States v. Arvizu, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); United States v. Moore, 394 F.3d 925, 930 (D.C. Cir. 2005); 🚩 United States v. Garrett, 959 F.2d 1005, 1007 (D.C. Cir. 1992); cf. 🚩 United States v. Green, 670 F.2d 1148, 1151, 1153 (D.C. Cir. 1981); 🚩 United States v. Taylor, 997 F.2d 1551, 1553–54 (D.C. Cir. 1993); United States v. Prandy-Binett, 995 F.2d 1069, 1070–71 (D.C. Cir. 1993). But in affirming I adopt a narrower approach than my colleague.

It is well established that the Fourth Amendment does not tolerate an officer's unreasonable seizures "based on nothing more than [the] demographic profile" of an individual, 🚩 Kansas v. Glover, ––– U.S. ––––, 140 S. Ct. 1183, 1191 n.1, 206 L.Ed.2d 412 (2020) (internal quotation marks omitted); 🚩 United States v. Brignoni-Ponce, 422 U.S. 873, 876, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), or his "presence in an area of expected criminal activity," 🚩 Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); 🚩 Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Concurring only in the court's judgment, I part ways with my colleague's emphases on "crime hot spots," Op. at 332–33, 335–36, and the "demographic characteristics" of Douglas and his associate, id. at 334 &

n.4, along with reliance on the biological-determinants-of-crime postulate, id. at 334 n.4 (citing JAMES Q. WILSON & RICHARD J. HERRNSTEIN, CRIME AND HUMAN NATURE 126 (1985)), implying that the mere presence of a young minority male in a higher-crime area in the District of Columbia could establish reasonable suspicion to effect a lawful Terry stop. Concern over these undue and unnecessary emphases may underlie the dissenting opinion. See Dis. Op. at 334–36.

Here there was a lot more. From an observation post facing a walkway long known to law enforcement as a site of illegal drug transactions, Tr. Mot. Hr'g at 23 (Oct. 20, 2020), Officer Jackson observed a seemingly prearranged "hand-to-hand exchange" typical of "bulk" transfers of drugs, id. at 17. Douglas hurriedly concealed the object he had received from his associate, see id. at 30, and in return handed over what appeared to be "U.S. currency" based on its "light" color and "small" size, Douglas's hand movement, and the manner in which the associate cuffed it in his hands upon receipt, id. at 30–31, 67–68, 90, 124. Considering "the whole picture," 🚩 District of Columbia v. Wesby, ––– U.S. ––––, 138 S. Ct. 577, 588, 199 L.Ed.2d 453 (2018) (quoting 🚩 United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)), and Officer Jackson's drug interdiction training and experience at that particular location, 🚩 Cortez, 449 U.S. at 418, 101 S.Ct. 690, a fact slighted by the dissent, Dis. Op. at 340–41, 343–44, the district court could permissibly conclude that these specific observations supported the individualized suspicion required to effect a brief, investigatory stop of Douglas under the Fourth Amendment. The authorities cited by the dissent cannot bear the weight it seeks to place on them. Dis. Op. at 341–42. For example, in 🚩 **\*340** United States v. Johnson, 212 F.3d 1313 (D.C. Cir. 2000), this court stated in dictum that "[i]f the seizure had taken place at that point" — that is, earlier in the investigation than when the Terry stop in fact had occurred — it "doubt[ed] very much whether it would have been valid," 🚩 id. at 1316. But "at that point" the suspected seller of drugs had not given the would-be buyer "anything in exchange," 🚩 id., making it unreasonable for the officer to infer that a drug transaction had occurred. Here there is no dispute that Officer Jackson witnessed a hand-to-hand exchange. See 🚩 Green, 670 F.2d at 1151.

Further, because courts have "frequently recognized that guns and drugs go together in drug trafficking" and the attendant

risks to officer safety, 🔖 United States v. McLendon, 378 F.3d 1109, 1113 (D.C. Cir. 2004); see, e.g., 🔖 United States v. Bullock, 510 F.3d 342, 347 (D.C. Cir. 2007); 🔖 United States v. Garcia, 459 F.3d 1059, 1064 (10th Cir. 2006), the police did not act unreasonably in handcuffing Douglas and patting him down for weapons upon observing a "bulk" drug transaction while his associate and the area were unsecured. See, e.g., 🔖 United States v. Laing, 889 F.2d 281, 285 (D.C. Cir. 1989).

Wilkins, Circuit Judge, dissenting:
I concede that this is a close case, but on these facts, I would find that the police stopped and seized Theodore Douglas without the reasonable, articulable suspicion required by 🔖 Terry v. Ohio and its progeny. 🔖 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For that reason, I respectfully dissent.

## I.

On April 22, 2020, at approximately 3:00 PM, Officer Isaac Jackson was conducting surveillance as part of an undercover narcotics unit of the District of Columbia Metropolitan Police Department. *See United States v. Williams*, 507 F. Supp. 3d 181, 188 (D.D.C. 2020). Officer Jackson was sitting inside an unmarked car parked in the 2300 block of 15th Street Northeast, *see id.*, when he observed a man standing in a public walkway between two sets of rowhouses with "one to two other individuals," J.A. 228, 237.

Officer Jackson, who was about fifteen yards away and observing without the assistance of binoculars or any other visual aids, saw a second man approach the first. *Williams*, 507 F. Supp. 3d at 188; *see also* J.A. 232. There was no testimony that Officer Jackson knew either of these men or that he had any prior information or reports about them.[1] Officer Jackson did testify that he had conducted "close to 200" investigations in this area in the preceding five years, J.A. 228, and that the area was known as a high crime area, with a prevalence of drug activity and violent crimes, including robberies, *Williams*, 507 F. Supp. 3d at 197; *see also* J.A. 226.

Officer Jackson observed the second man hand the first man a "little" backpack; after which the first man quickly removed his jacket, donned the backpack, and put back on his jacket. J.A. 267; *see also Williams*, 507 F. Supp. 3d at 188. Officer Jackson then saw the two men shake hands. J.A. 238. During the handshake, Officer Jackson "believed" the first man handed the second a "light-colored object." *Williams*, 507 F. Supp. 3d at 188, 196. He could not identify for sure what it was, but Officer Jackson thought it could have been currency. *Id.* at 188.

**\*341** Believing that he may have just witnessed a transaction of money for a bulk quantity of drugs or a firearm, Officer Jackson called a lookout with a description of the two men, asking that they be stopped and frisked. *Williams*, 507 F. Supp. 3d at 188, 197. Within about 90 seconds, uniformed police officers seized the first man, later identified as Mr. Douglas. J.A. 346–47, 349. After physically separating Mr. Douglas from the group of individuals he was standing with, one of the officers immediately handcuffed Mr. Douglas's hands behind his back before beginning to pat him down. *Williams*, 507 F. Supp. 3d at 188. The officer felt a handgun when "frisk[ing]" the backpack that Mr. Douglas was wearing. *Id.* at 188. Shortly thereafter, the officers seized the second man, identified as Tavonte Williams, *id.*, but when the officers searched Mr. Williams, they found neither contraband nor currency, *id.* at 202.

## II.

The central question in this appeal is whether Officer Jackson had reasonable, articulable suspicion that these two men had committed a crime when he issued his lookout, based on his brief observations, as well as his knowledge and experience. My colleagues rely upon three facts to uphold the seizure: (1) the exchange of an object for the backpack; (2) the prevalence of drug activity in the neighborhood; and (3) the perceived attempt to secrete the backpack under the jacket. I believe that these facts, in their totality, were insufficient. *See* 🔖 *United States v. Castle*, 825 F.3d 625, 635 (D.C. Cir. 2016).

With respect to the first fact, it is quite significant that the District Court did not credit that Officer Jackson witnessed an exchange of currency; instead, the District Court found only that a "hand-to-hand transaction" occurred, and that Jackson "believed" he may have seen currency. *Williams*, 507 F. Supp. 3d at 196, 197. Also significant is that the District Court did not make a finding that Jackson's belief that currency was involved was a reasonable inference. As stated above, Williams was seized in the vicinity of the walkway very shortly after the exchange, and a search of him revealed no

currency whatsoever. Indeed, Officer Jackson conceded that he made an "assumption" that a sale had taken place and that he could not even tell if the object exchanged was paper, let alone currency. J.A. 313–14. Thus, the fairest reading of the record is that Officer Jackson saw a "light-colored object"—that he could not identify—given in exchange for the backpack. *Williams*, 507 F. Supp. 3d at 188.

Skipping to the third fact, our precedent forecloses assigning significant weight of suspicion on Mr. Douglas's placing of the backpack under his jacket. In *United States v. Johnson*, an officer observed a man inside a car in a "high narcotics area" when a woman leaned into the car and handed the man an object. 212 F.3d 1313, 1316 (D.C. Cir. 2000). When a police officer "approached in his unmarked car, the woman walked away, and [the man] made a 'shoving down' motion." *Id.* Based on these facts, we observed that "[i]f the seizure had taken place at that point, we doubt very much whether it would have been valid." *Id.* Critically, we explained that while the "shoving down" gestures "may be ... suspicious, they are significant only if they were undertaken in response to police presence." *Id.* This is so because citizens have a right to keep their private affairs private and thus to conceal their activities and their possessions from others. *See generally United States v. Green*, 670 F.2d 1148, 1152 (D.C. Cir. 1981). If such concealment is not performed in response to knowledge of a police **\*342** presence, it is not indicative of consciousness of guilt, and thus illegal activity.

Indeed, we have an unbroken line of authority holding that "furtive gestures 'are significant only if they were undertaken in response to police presence,' [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer." *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003) (alterations in original) (quoting *United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001)). We have made it quite clear that "[w]hen putative police evasion or an alleged furtive gesture is what provokes police suspicion, our precedent requires that the Government proffer evidence, *apart from that behavior or gesture*, from which an officer could reasonably have inferred that the individual in question was aware of the recognizable police presence and was responding to it." *Castle*, 825 F.3d at 638 (original emphasis).[2] Notwithstanding our precedent, my colleagues in the majority place considerable weight on

the wearing of the backpack under the jacket in their calculus of reasonable suspicion.

It is true that we have found concealment relevant to our analysis where the suspect cupped his hand to prevent onlookers from seeing the small object he handed over in exchange for currency. *See Green*, 670 F.2d at 1151, 1153. But here, there was no attempt to hide that a backpack was being exchanged. Indeed, it was handed over openly while standing in the middle of a public walkway in broad daylight. If anything, this was an attempt by Mr. Douglas to conceal the backpack from anyone who might later see the bag and attempt to take it off his person, and it is nothing like the "deliberately furtive" creeping around on tiptoes credited in *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The government argues that the fact that the backpack was used for the exchange is itself evidence of concealment, because someone selling drugs or guns would use an opaque bag to obscure the contraband contained inside. *See* Gov't Br. 26–27 ("The 'bag' conceals the contents, and thus hides the nature of the transaction."). Crediting that argument means that citizens in high-crime neighborhoods can be deemed suspicious for "concealment" by handing something over to anyone in a bag at all, unless of course the bag is transparent, quite a remarkable position.

Assigning such weight of suspicion to the "concealment" of the backpack not only violates our precedent, it also ignores the fact that this neighborhood was known by Officer Jackson for its prevalence of robberies. *See* J.A. 226. As Mr. Douglas's counsel explained, it is "understandable that in a high-crime area, that Mr. Douglas would wear something that he does[ ] [not] want others to see under his clothes—something that appears valuable to, [or] may appear valuable to, others—out of sight." Oral Arg. Tr. 4. Hiding one's valuables from potential robbers is Crime Prevention 101; indeed, young men in crime-ridden areas of Washington often consider "a wallet nothing more than tidy packaging for robbers." Marcia Slacum Greene, *Going Legit; Thomas Derrick Ross Grew Up Hiding From the Law, Surrounded by Violence. Now He's Trying to Get a Job, a Credit Card, a Life. It's the Hardest Thing* **\*343** *He's Ever Done*, WASH. POST, July 11, 1999, 1999 WLNR 8872622. Thus—coming back to the second fact—it is of course fair to consider the prevalence of drugs in the neighborhood as adding to the calculus of Officer Jackson's suspicion, because it makes it perhaps more likely that the exchange involved drugs. But then it must also be fair to consider the prevalence of robberies as

subtracting from that calculus, because it makes it perhaps more likely that the concealment of the backpack was to avert a robbery. In such a circumstance, the concealment of the backpack is a wash. *Cf.* 🔖*Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (holding that an "agent's belief" that by looking around "the [defendant] and his companion were attempting to conceal the fact that they were traveling together, ... was more an inchoate and unparticularized suspicion or hunch, ... than a fair inference in the light of [the agent's] experience") (internal quotation marks omitted) (quoting 🔖*Terry*, 392 U.S. at 27, 88 S.Ct. 1868).

I grant that an officer is not "require[d] ... to rule out a suspect's innocent explanation for *suspicious* facts." 🔖*District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 588, 199 L.Ed.2d 453 (2018) (emphasis added). However, that does not mean that we are required to rubber stamp an officer's characterization of an action as "suspicious" in the first place, particularly when that action is consistent with how common sense, and the police, counsel citizens in high crime neighborhoods to act to prevent being victimized. *See, e.g.*, Dallas Police Department, *Crime Prevention Tips – Purse and Wallet Theft Prevention*, https://perma.cc/C6BQ-7RP2 ("During cooler months, carry your purse under your coat[.]"); Columbus Ohio Police Department, *Personal Safety*, https://perma.cc/AZT3-JKFY ("[C]arry your purse under your coat or close to your body."). *Cf.* 🔖*United States v. Leon*, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (noting a magistrate must "not serve merely as a rubber stamp for the police" when reviewing a warrant application for probable cause).

My colleagues rightly reference Officer Jackson's significant drug interdiction experience and knowledge that this was a "high crime area," *see* Randolph Op. 335–36, 336–37; Rogers Op. 339–40, but we cannot permit the Government to use an officer's experience and recognition of an area as "high crime" as a one-way ratchet—only ever adding to suspicion, never detracting from it. Here, Officer Jackson testified that he knew this area to suffer from significant drug trafficking activity, but he also explained that numerous "people ... have been victims of ... robberies" in the area. J.A. 226. Rather than looking to the totality of the circumstances, my colleagues' analysis ignores the latter fact, defaulting to "heads I win, tails you lose" in favor of finding that Officer Jackson had reasonable suspicion.

Courts already face confirmation bias when we evaluate reasonable, articulable suspicion in suppression motions. After all, these are searches where the police actually found something inculpatory. Courts almost never decide what constitutes reasonable, articulable suspicion in civil lawsuits where nothing illegal was found. In civil cases, officers are entitled to qualified immunity unless already existing precedent clearly demonstrates that there was no reasonable, articulable suspicion. *See* 🔖*White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017). Even if courts doubt that the officer in fact had reasonable suspicion, we must find qualified immunity if the officer's actions were objectively reasonable. *See* 🔖*Hedgpeth v. Rahim*, 893 F.3d 802, 807 (D.C. Cir. 2018). Thus, if the officers had found nothing in the backpack **\*344** and Mr. Douglas asserted a Fourth Amendment claim pursuant to 🔖42 U.S.C. § 1983, we would almost certainly grant summary judgment for the officers on one of the aforementioned qualified immunity grounds, without deciding whether the officers had reasonable, articulable suspicion. We almost always decide whether a quantum of acts constitutes reasonable suspicion in contexts raising the specter of whether we are giving the guilty too many rights, rather than situations in which we actually confront whether we are shearing away the rights of the innocent. In sum, courts are already at risk of using confirmation bias to validate inchoate hunches as reasonable suspicion in suppression motions given "the familiar shortcomings of hindsight judgment[,]" 🔖*Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), and it makes matters worse when we consider those living in high crime areas as more suspicious than others, regardless of the circumstances of their actions.

Judge Randolph places the icing on the cake with his invocation of Mr. Douglas's criminal record, even though it was not known to Officer Jackson, and his one-sided reliance on generalized social science analysis and crime demographic data. *See* Randolph Op. 333 nn.1–2, 334 & n.4, 335–36 & n.7, 336–37 & n.9. The end result is that—despite lip service otherwise—people living in high crime areas have fewer Fourth Amendment rights than those who do not, because we rubber stamp characterizations of their actions as "suspicious" and justifying search and seizure, even when those persons are taking innocent actions merely to protect themselves.

\* \* \*

After he broadcast the lookout, and before the officers announced that they had found a gun in the backpack, Officer Jackson told the officers, "I want you all to check that book bag for me, copy?" Gov't Ex. 3 at 00:09:12. In doing so, he gave up the game. He had a hunch that something illegal was in that bag, and he ordered the stop so that the officers could "check" that bag to find out. The directive to "check that book bag" was potentially quite problematic, since probable cause would have been required to search the bag, *see* Torres v. Puerto Rico, 442 U.S. 465, 470–71, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); United States v. Most, 876 F.2d 191, 193–94 (D.C. Cir. 1989), and the government does not seriously contend that Officer Jackson had probable cause when he issued the directive. In hindsight, Officer Jackson's hunch was correct and—fortuitously for the government—a pat down of the bag, rather than a full-blown search, allowed the officer to confirm the hunch. But even so, the Fourth Amendment does not allow the police to seize a citizen, handcuff his hands behind his back, and frisk him based upon a hunch—even when the seizure takes place in a "high crime" area.

I respectfully dissent.

**All Citations**

72 F.4th 332 (Mem)

---

## Footnotes

1    Anthony A. Braga & Philip J. Cook, *Policing Gun Violence: Strategic Reforms for Controlling Our Most Pressing Crime Problem* 57 (2023). Anthony Braga is a Professor of Criminology at the University of Pennsylvania. Philip Cook is a Professor of Economics Emeritus at Duke University and the winner of the 2020 Stockholm Prize in Criminology.

2    At the time, Douglas was on supervised release from his latest criminal conviction and was a fugitive from justice, having failed to appear in D.C. Superior Court in his trial for drug trafficking.

3    Williams was originally Douglas's co-defendant in the district court but the government dismissed the charges against him and he is not a party to this appeal. Appellant's Br. at ii.

4    The classic study is James Q. Wilson & Richard J. Herrnstein, *Crime & Human Nature* 126 (1985) ("Criminal behavior depends as much or more on age than any other demographic characteristic ...."); *see also id.* at 129; Jeffery T. Ulmer & Darrell Steffensmeier, *The Age and Crime Relationship: Social Variation, Social Explanations*, *in The Nurture Versus Biosocial Debate in Criminology: On the Origins of Criminal Behavior and Criminality* 377, 378 (Kevin M. Beaver, J.C. Barnes & Brian B. Boutwell eds., 2014) ("It is now a truism that age is one of the strongest factors associated with criminal behavior.").

5    The many decisions of the Supreme Court reiterating *Terry*'s holding use various formulations, all of which amount to the same basic meaning. *See, e.g.,* Kansas v. Glover, —— U.S. ——, 140 S. Ct. 1183, 1187–88, 206 L.Ed.2d 412 (2020); District of Columbia v. Wesby, —— U.S. ——, 138 S.Ct. 577, 588, 199 L.Ed.2d 453 (2018); Navarette v. California, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014); Illinois v. Wardlow 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); Ornelas v. United States, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Cortez, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

6    The dissent objects to my including this detail. *See* Dissent at 340 n.1, 344. But I do not rely on Douglas's prior conviction in my reasonable suspicion analysis. *See infra* at 336–37.

7    My concurring colleague commits two obvious mistakes when she claims that my citation of *Crime & Human Nature* (*supra* note 4) "impl[ies] that the mere presence of a young minority male in a higher-crime area... could establish reasonable suspicion." Rogers Op. at 339. My citation was to the book's chapter on crime and age, not race or minority status, about which my opinion says nothing. The second mistake is just as apparent. As the text above shows, I expressly disagreed with the absurd idea that "mere presence" in a high crime area "could establish reasonable suspicion."

8    I hesitate to put *Wesby* in terms of the "totality of the circumstances," although the Court used the phrase and it appears in opinions dealing with the sort of issues confronting us in this case. Sometimes these opinions treat the "totality" phrase as if it were a "test," which it surely is not. The phrase itself is "non-descriptive." *United States v. Prandy–Binett*, 5 F.3d 558, 559 (D.C. Cir. 1993) (denying rehearing). It tells us nothing about which circumstances are even relevant (surely, not all circumstances matter – whether the sky was overcast or not, for instance), and it reveals nothing about the probative value of any particular circumstance in the totality.

9    Not only because Douglas was of a different age and sex. *See supra* note 4.

10   Other circuits have long agreed. *See, e.g.*, *United States v. Fiseku*, 915 F.3d 863, 870–872 (2d Cir. 2018); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999); *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989); *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989); *United States v. Glenna*, 878 F.2d 967, 971–73 (7th Cir. 1989); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983).

11   In *Terry* stops, restraining the suspect during the pat down is often justified as protecting the officer doing the pat down and others nearby. There is another consideration. It is the danger – to the police and others – when, "if the suspect is not placed under arrest" but is instead released, "he will then have access to any weapons" on his person or nearby. *Michigan v. Long*, 463 U.S. 1032, 1051–52, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

1    Curiously, Judge Randolph discusses prior criminal activity of Mr. Douglas even though it has no relevance to this case since it was unknown to the officers when they seized Mr. Douglas. *See* *United States. v. Castle*, 825 F.3d 625, 635 (D.C. Cir. 2016).

2    Our precedent is consistent with *United States v. Sharpe*, 470 U.S. 675, 682–683, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); and *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 587, 199 L.Ed.2d 453 (2018), all cases where the Supreme Court found that furtive gestures were probative of reasonable suspicion or probable cause because the actions were taken in response to a known police presence.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.