UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

No. 21-3032

———————————

UNITED STATES OF AMERICA,                                                     Appellee,

v.

THEODORE DOUGLAS,                                                            Appellant.

## OPPOSITION TO APPELLANT'S PETITION FOR REHEARING AND REHEARING EN BANC

A panel of this Court affirmed the district court's finding of Fourth Amendment reasonable suspicion after an experienced narcotics officer watched appellant Theodore Douglas apparently buy a bookbag, in a manner consistent with the sale of a firearm or bulk narcotics, in a spot known for drug activity, then immediately hide the bookbag under his jacket. *See United States v. Douglas*, 72 F.4th 332 (D.C. Cir. 2023) (per curiam). Douglas now seeks rehearing of that decision, asserting that the panel erroneously used a subjective standard to assess the facts and wrongly considered Douglas's concealment of his bookbag. Neither of these fact-specific arguments warrants rehearing or rehearing en banc:

Douglas has identified no point of law or fact that the panel overlooked or misapprehended, and his claims neither implicate the "uniformity of the court's decisions" nor involve questions of "exceptional importance." Fed. R. App. P. 35(b)(1)(A)-(B), 40(a)(2). The arguments also lack merit.

## Background

### *Suppression Hearing*

The facts underlying the suppression litigation and the defendant's conviction are detailed in the government's brief (see Brief for Appellee (Gov't Br.) 1-12). In short, Officer Isaac Jackson was working undercover on the afternoon of April 22, 2020, in the 2300 block of 15th Street, Northeast (Appendix (A) 225-26). Officer Jackson had decades of experience as an undercover officer (A216-20, A292). And he knew the block well, patrolling or being involved in investigations there close to 200 times (A228). The block in particular was a high-crime area, known especially for narcotic sales (A26 n.3, A226-27, A231, A237, A324-26, A337). Officer Jackson was focusing on a walkway where he had observed prior drug sales (A230, A236-37).

Shortly before 3:00 p.m., two or three people appeared and stood in the walkway, including a man later identified as Douglas (A237-39,

2

A254-56, A264). Douglas paced along the walkway for a minute or two (A246, A305). Then another man (later identified as Tavonte Williams) approached, holding a bookbag (A237-38, A240, A254-56, A264, A266-69). Williams handed Douglas the bookbag, and Douglas immediately handed Williams an item that appeared to be U.S. currency (A237-38, A266-70, A323-24). Officer Jackson could not be "100% sure" that the item was money, but he believed it was based on the item's "light" color, its nature, its small size, the hand gesture in which it was exchanged, and the way Williams held it in his hand (A238-39, A275-76, A298-99, A332).

Douglas then "quickly" took off his coat, put the bookbag on over his shoulders, and put on the coat over the bookbag, appearing to be "hurrying" throughout (A238, A273-74, A310-11, A323). The conduct struck Officer Jackson as "unusual," as "[i]t appeared that [Douglas] was . . . trying to hide the book bag on his person by covering it up with his jacket" (A238, A247). Douglas and Williams shook hands, then walked out of Officer Jackson's sight (A238, A247-48, A322). The whole interaction lasted less than a minute (A245, A247, A288). Officer Jackson was sitting about 15 yards away from the exchange, with no obstructions

3

or distractions interfering with his observations (A245, A271, A278, A332-33).

Based on what he had seen, Officer Jackson believed Douglas and Williams had just engaged in an "illegal transaction," which "could have been either a large quantity of narcotics or possibly a firearm" (A246-47). Officer Jackson explained that, when working undercover narcotics investigations, he would "look for hand-to-hand interactions" that often mark drug transactions (A219, A295, A312). In his experience, participants in a drug transaction are typically "trying to be secretive" and "discreet" (A222-23, A312). And for transfers of larger quantities of narcotics or firearms, participants usually do not exchange the goods openly, instead using a vehicle or a bag for cover (A225-26).

Officer Jackson broadcast descriptions of Douglas and Williams, and the police teams moved in to stop them for identification (A221, A248-52). After officers stopped Douglas, a protective frisk revealed a gun in the bookbag that Douglas had just gotten from Williams (see Gov't Br. 5-9). He was charged with unlawful possession of a firearm and ammunition by a convicted felon (18 U.S.C. § 922(g)(1)).

Douglas moved to suppress the gun (see Gov't Br. 1-2). The Honorable Carl J. Nichols denied Douglas's motion to suppress in a published opinion (A158-86). *See United States v. Williams*, 507 F. Supp. 3d 181 (D.D.C. 2020). The district court concluded that Officer Jackson's observations provided reasonable, articulable, objective suspicion that criminal activity was afoot, justifying a brief, investigatory stop of Douglas under *Terry v. Ohio*, 392 U.S. 1 (1968). *See Williams*, 507 F. Supp. 3d at 196-98.

The court agreed with the government that three circumstances, considered together, justified a *Terry* stop here. First, the exchange between Douglas and Williams took place in a block that was "'home to the precise type of infraction[ ]' that Officer Jackson suspected Douglas was committing"—narcotics sales—observed by an officer who had extensive experience in the block. *Williams*, 507 F. Supp. 3d at 197 (quoting *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001)). Second, the "hand-to-hand transaction" was consistent with a bulk-narcotics or firearm sale. *Id.* (citing A225-26). While there "could be many innocent explanations" for "receiving an object from another person," it nonetheless "would certainly contribute to a reasonable officer's

5

suspicion." *Id.* (quoting *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000)). Third, Douglas "acted 'quickly' to 'conceal whatever was in that book bag,'" consistent with typical behavior in a narcotics transaction. *Id.* at 198 (quoting A222-23, A238, A310-11).

The district court also concluded that the discovery of the gun satisfied the Constitution. The seizure had been a *Terry* stop (not an arrest), and the brief frisk had been permissible. *See Williams*, 507 F. Supp. 3d at 198-201.

Douglas pleaded guilty while reserving his right to appeal the suppression ruling (A187-96, A419-56; see also A479-80). The court sentenced Douglas to 15 months of incarceration and 3 years of supervised release (A200-07, A512-16).

### *The Panel's Decision*

This Court affirmed in a short per curiam, explaining that "two members of the Court hold that the District Court properly found that the officers had reasonable suspicion to stop Theodore Douglas and that they did not act unreasonably during the protective search." *Douglas*, 72 F.4th at 333 (per curiam). Judges Randolph and Rogers issued separate opinions concurring in the judgment. Judge Wilkins dissented.

6

Judge Randolph's analysis began with "a significant fact": "the location of the stop was not only in a general high crime area, but in a specific location—the walkway in the 2300 block of 15th Street—known for criminal transactions. That is why Officer Jackson was watching it." *Douglas*, 72 F.4th at 335 (Randolph, J.) (citation omitted). But "the criminal nature of this place" was of course "not in itself conclusive." *Id.* at 336. On top of that, "Officer Jackson's skill and experience" had taught him to look for certain "indications of illegal transactions of guns or drugs or both": "[h]and-to-hand transactions, efforts at concealment, exchanges of closed containers like bags, money changing hands, on the streets in high crime areas." *Id.* at 336-37. "[E]ach of these factors converged in the transaction he witnessed between Douglas and Williams on the walkway." *Id.* at 337. The lone alternative explanation proffered by the dissent—"that that Douglas might have hidden the book bag under his coat to prevent local thieves from stealing it"—was not preserved and did not defeat reasonable suspicion. *Id.*

Judge Rogers agreed that "the totality of the circumstances observed by Officer Isaac Jackson" established reasonable suspicion for a *Terry* stop, "adopt[ing] a narrower approach than my colleague." *Douglas*,

7

72 F.4th at 339 (Rogers, J.). Judge Rogers "part[ed] ways with my colleague's emphases on 'crime hot spots,' and the 'demographic characteristics' of Douglas and his associate":

> Here there was a lot more. From an observation post facing a walkway long known to law enforcement as a site of illegal drug transactions, Officer Jackson observed a seemingly prearranged "hand-to-hand exchange" typical of "bulk" transfers of drugs. Douglas hurriedly concealed the object he had received from his associate, and in return handed over what appeared to be "U.S. currency" based on its "light" color and "small" size, Douglas's hand movement, and the manner in which the associate cuffed it in his hands upon receipt. Considering "the whole picture," and Officer Jackson's drug interdiction training and experience at that particular location, . . . the district court could permissibly conclude that these specific observations supported the individualized suspicion required to effect a brief, investigatory stop of Douglas under the Fourth Amendment.

*Id.* at 339 (citations omitted).

Judge Wilkins "conced[ed] that this is a close case" but contended that Officer Jackson's observations did not establish reasonable suspicion. *Douglas*, 72 F.4th at 340 (Wilkins, J.). The dissent discounted the hand-to-hand exchange because the district court did not specifically find that the "light-colored object" exchanged was currency. *Id.* at 341. And it contended that "precedent forecloses assigning *significant* weight of suspicion on Mr. Douglas's placing of the backpack under his jacket,"

8

given that the "concealment" was "not performed in response to knowledge of a police presence." *Id.* at 341-42 (emphasis added). The dissent saw the concealment as equally consistent with avoiding becoming a target for robbery, and thus "a wash." *Id.* at 342-43.

Judges Randolph and Rogers also upheld the stop and the frisk that led to recover of the gun. *See Douglas*, 72 F.4th at 337-39 (Randolph, J.); *id.* at 340 (Rogers, J.). Douglas does not seek rehearing as to that aspect of the decision.

## Argument

### I. The Panel Properly Analyzed Reasonable Suspicion Based on the Established Objective Standard, Not the Officer's Subjective Beliefs.

Contrary to Douglas's main charge, the per curiam judgment[1] in no way sanctions grounding reasonable suspicion on an officer's subjective

---

[1] Is unclear whether the judgment here sets any binding precedent for other cases. *See generally* Appellee's Supplemental Brief for the United States 7-13, *United States v. Robertson*, No. 22-3062 (D.C. Cir. argued May 11, 2023) (discussing application of *United States v. Marks*, 430 U.S. 188 (1977), to fractured lower-court decisions). As explained in the *Robertson* briefing, this Court has never applied *Marks* to its own panel decisions. If *Marks* did apply, Judge Rogers's "narrower" concurrence would likely be regarded as controlling. *See King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc).

9

characterizations instead of his objective observations (cf. Pet. 5-14). Indeed, the argument itself—not made by the dissent, and never suggested in prior briefing—is hard to follow. "Reasonable" suspicion is obviously "an objective standard," requiring something "more substantial than inarticulate hunches" or "simple 'good faith on the part of the arresting officer.'" *Terry*, 392 U.S. at 21-22. Every opinion here rightly recognized that the stop required that sort of *Terry* reasonable suspicion. *Douglas*, 72 F.4th at 335 (Randolph, J.); *id.* at 339 (Rogers, J.); *id.* at 340 (Wilkins, J.). And the district court likewise based its finding of reasonable suspicion on the facts and circumstances, not Officer Jackson's subjective hunches.[2]

Still, according to Douglas, "[o]ther courts will inevitably interpret the judgment to mean that conduct that an officer characterizes as a 'hand to hand transaction' signifies a drug sale, regardless of the objective facts underlying that characterization," rendering facts like "the high

---

[2] *Se Williams*, 507 F. Supp. 3d at 198 ("Based on these factors, Officer Jackson suspected that he had observed either the transfer of a large quantity of narcotics or a weapon. *The Court concludes that, looking at the facts and circumstances in their totality, Officer Jackson's suspicion that criminal activity was afoot was reasonable.*") (emphasis added) (citation omitted).

10

crime nature of the area and a furtive movement" "superfluous" (Pet. 6 n.3). We do not see how. Neither concurrence suggested that Officer Jackson's subjective belief that he had witnessed a drug transaction resolved the case. Rather, both opinions emphasized how Officer Jackson's objective observations supported the *inference* that this particular hand-to-hand exchange was a drug transaction, all while acknowledging uncertainty about exactly what occurred.[3] The district court's ruling followed the same path.[4]

---

[3] *See Douglas*, 72 F.4th at 334 (Randolph, J.) ("Williams holds a small, black, opaque book bag. He hands the bag over the fence to Douglas. Simultaneously, paper money changes hands—or, from that distance, Officer Jackson thinks he sees U.S. currency changing hands, although he is not 100% sure. Douglas now rapidly drops his coat, slings the book bag over his back without looking inside and puts his coat back on, thereby hiding the bag."); *id.* at 337 (agreeing that transaction could have "innocent" explanation); *id.* at 339 (Rogers, J.) ("Douglas hurriedly concealed the object he had received from his associate, and in return handed over what appeared to be 'U.S. currency' based on its 'light' color and 'small' size, Douglas's hand movement, and the manner in which the associate cuffed it in his hands upon receipt.") (citations omitted).

[4] *See Williams*, 507 F. Supp. 3d at 188 ("According to Officer Jackson, Williams handed Douglas a black backpack in exchange for what appeared to be money, although Officer Jackson stated that he could not be sure that it was not some other light-colored object. Officer Jackson observed that Douglas quickly concealed the backpack, placing it on his back and putting his jacket on over it.") (citation omitted); *id.* at 198 (finding Officer Jackson's suspicion "reasonable" based on "the facts and circumstances in their totality").

11

In moving for rehearing, Douglas ignores the government's briefing on how observing a hand-to-hand transaction or other "sequence of events which is typical of a common form of narcotics transaction" is a classic circumstance supporting a finding of probable cause or reasonable suspicion. *See* Gov't Br. 19-27 (citing *United States v. Taylor*, 997 F.2d 1551, 1552-54 (D.C. Cir. 1993); *United States v. Harley*, 990 F.2d 1340, 1342 (D.C. Cir. 1993); *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992); *United States v. Lucas*, 778 F.2d 885, 888 (D.C. Cir. 1985); *United States v. Green*, 670 F.2d 1148, 1151 & n.4 (D.C. Cir. 1981); and other cases). Judge Rogers likewise invoked those decisions. *See Douglas*, 72 F.4th at 339-40 (Rogers, J.). The per curiam judgment here is of a piece with those precedents, not a new, subjective "'hand to hand' exception to the Fourth Amendment" (Pet. 6 n.3).

Perhaps Douglas's complaint is with considering Officer Jackson's training and experience. But that too is standard Fourth Amendment analysis, amply supported by precedent. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996); *United States v. Cortez*, 449 U.S. 411, 418-19 (1981); *accord Douglas*, 72 F.4th at 343 (Wilkins, J.).

Beyond the objective/subjective complaint, Douglas also offers two factual objections to the analysis here. But these objections were already covered in the merits briefing. First, the transaction was not inconsistent with typical firearms or bulk-drug sales described by Officer Jackson (cf. Pet. 7-8, 11-12). He explained that guns or large quantities of drugs are typically obscured during a transaction, such as in a bag (Gov't Br. 26-27, 30-32). Second, Officer Jackson did not retreat from his view that the object exchanged for the bookbag was likely money, or base that view on mere hunch (cf. Pet. 8-11). Rather, as Judge Rogers summarized well, the object "appeared to be 'U.S. currency' based on its 'light' color and 'small' size, Douglas's hand movement, and the manner in which the associate cuffed it in his hands upon receipt." *Douglas*, 72 F.4th at 339 (Rogers, J.); *see also* Gov't Br. 4-5, 25 n.5. In any event, these record-specific factual objections would not warrant en banc intervention.

Finally, Douglas's objections to aspects of Judge Randolph's concurrence (Pet. 11-14) do not warrant en banc review. As Douglas acknowledges, "the other members of the panel explicitly disavow[ed]" that reasoning (Pet. 11), making clear that it did not command a majority. Nor was the reasoning raised in the briefing or district court.

13

## II. Douglas's Concealment Permissibly Enhanced Suspicion.

The per curiam judgment also properly considered Douglas's efforts to avoid detection and conceal the bookbag by hurriedly taking off his coat, putting the bookbag on, and then putting on the coat over the bookbag (cf. Pet. 15-19). As the government's brief explained (Gov't Br. 27-32), "common sense" establishes that wearing a bookbag *underneath* a jacket on a sunny day is odd behavior indeed, *see Glover*, 140 S. Ct. at 1190, supporting Officer Jackson's assessment that Douglas seemed to be "trying to hide the book bag on his person by covering it up with his jacket," consistent with the "secretive" efforts typical of a contraband sale (A222-23, A238, A247, A312).

True, "the *sole* fact that individuals may seek to conceal the subject of their business from potentially prying eyes, even on a public sidewalk, does not grant the police the power to arrest them." *Green*, 670 F.2d at 1152 (emphasis added). But as the government explained in its briefing (Gov't Br. 27-32)—again ignored by Douglas's petition—this Court has nonetheless used deliberate concealment as a key factor in meeting the more demanding standard for probable cause. After all, "persons engaged in illegal transactions will desire to conceal those transactions." *Green*,

14

670 F.2d at 1152. In *Green*, for example, this Court relied on the fact that "the parties to the transaction attempted to conceal the exchanged object" by cupping their hands around it then stuffing it into a jacket. *Id.* at 1153. And in *United States v. Davis*, this Court emphasized that one man "stealthily 'slid' money to the second man in exchange for a small brown package." 458 F.2d 819, 822 (D.C. Cir. 1972).

The "furtive gestures" cases cited by the dissent and by the petition address a different situation. *See Douglas*, 72 F.4th at 342 (Wilkins, J.) (citing line of cases beginning with *Johnson*, 212 F.3d at 1316). Those cases address certain actions—which *Johnson* and subsequent decisions call "furtive gestures"—that are suspicious *because* they appear to be taken in response to the police. This includes the "shoving down" upon the approach of the police in *Johnson*, and the unprovoked flight from the police in *Illinois v. Wardlow*, 528 U.S. 119 (2000). But *Terry* considers any "unusual conduct which leads [a police officer] reasonably to conclude in light of his experience that criminal activity may be afoot"—not just reactions to the police. 392 U.S. at 30. Indeed, "[b]y far the most common" ground for a *Terry* stop is suspicious behavior that police spot on routine patrol, like a person "repeatedly looking into parked cars" or "carrying

15

property under circumstances suggesting that the property might have been obtained unlawfully." 4 Wayne R. LaFave, *Search & Seizure* § 9.5(e) (6th ed. Dec. 2021).

Concealment and other efforts to avoid detection can be suspicious even when not taken in direct response to the police, as *Green* and *Davis* establish. *See also, e.g.*, *Florida v. Royer*, 460 U.S. 491, 502 (1983) ("travelling under an assumed name" can help establish reasonable suspicion); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (same for "persons trying to hide"). Lawbreakers often reasonably want to hide their actions from cop and civilian alike. *See, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 4 (1989) (airline ticket agent told police of suspicious purchase under alias); *Garrett*, 959 F.2d at 1007 (police responding to civilian complaint indicating Garrett was dealing drugs).[5]

---

[5] The dissent mistakenly suggested that the government argued that using a bookbag was an act of concealment justifying suspicion. *See* 72 F.4th at 342 (Wilkins, J.) (quoting Gov't Br. 26-27). Not so. The quoted sentence is in the section discussing why the hand-to-hand transaction was suspicions (see Gov't Br. 19-27), explaining that use of a bookbag was *not inconsistent* with the typical bulk-narcotics transactions described by Officer Jackson. The next section, explaining how "Douglas's efforts at concealment" added to suspicion (Gov't Br. 27-32), focused exclusively on his hiding the bookbag underneath his jacket.

16

Douglas fails to explain why the fact that concealment indicates a *subjective expectation of privacy* (Pet. 15, 18-19) would bar the police from considering concealment in assessing reasonable suspicion (*id.*). *Green* is directly to the contrary. *See* 670 F.2d at 1152. And his theory proves far too much, as the "furtive gestures" cases Douglas embraces (Pet. 16-18) recognize that concealment in response to police—which equally reflects an expectation of privacy—adds to reasonable suspicion. *See District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018) ("the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts").

Finally, the dissent's lone alternative explanation for the concealment—that Douglas could have hidden his bookbag to protect against robbery in a high-crime area—does not defeat reasonable suspicion. *See Douglas*, 72 F.4th at 342-43 (Wilkins, J.). This alternative was never suggested in the district court or appellate briefing. *See id.* at 337 (Randolph, J.). So Officer Jackson—the one witness who knew the neighborhood—never had a chance to address whether this robbery-prevention alternative was plausible, let alone so overwhelmingly likely that it negates the suspiciousness of hiding a just-acquired bookbag

17

under a jacket. *Cf. id.* at 342-43 (Wilkins, J.) (citing only a 1999 newspaper article about wallets and two "crime prevention" bulletins about purses to support the reasonability of this alternative explanation). Nor would this alternative possibility meaningfully undercut suspicion.[6] In any event, discounting the peculiar concealment because it was "susceptible of innocent explanation" in isolation would walk into the errors highlighted by *Wesby*, 583 U.S. at 61. And anyway, the case-specific objection does not justify panel or en banc review.

---

[6] As Judge Randolph explained, "even if Douglas had intended to protect the book bag from local thieves, this is entirely consistent with—indeed it reinforces—Officer Jackson's judgment that the book bag contained a pistol or narcotics, rather than some innocuous item like a book from the local library, which would hardly be of interest to a potential thief." *Douglas*, 72 F.4th at 337 (Randolph, J.); *see also, e.g.*, *Reed v. Wainwright*, No. 3:21-cv-799, 2023 WL 4744288, *4 (N.D. Ohio July 25, 2023) (noting that informant told police that defendant concealed his drugs in different locations, including inside a can in a gutter, after being robbed for narcotics).

## Conclusion

WHEREFORE, the government respectfully submits that the petition for rehearing and rehearing en banc should be denied.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> United States Attorney
>
> CHRISELLEN R. KOLB
> NICHOLAS P. COLEMAN
> STEVEN B. WASSERMAN
> Assistant United States Attorney
>
> _____/s/_____
> ERIC HANSFORD
> D.C. Bar #1017785
> Assistant United States Attorney
> 601 D Street, NW
> Washington, D.C. 20530
> Eric.Hansford@usdoj.gov
> (202) 252-6829

# CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this motion contains 3,728 words, and therefore complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A). This opposition has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
ERIC HANSFORD
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing opposition to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Tony Axam, Jr., Esq., on this 8th day of September, 2023.

/s/
ERIC HANSFORD
Assistant United States Attorney